

United States Government

**NATIONAL LABOR RELATIONS BOARD**

**OFFICE OF THE GENERAL COUNSEL**

Washington, D.C.  20570



May 30, 2024

Lyle W. Cayce
Clerk of the Court
U.S. Court of Appeals for the 5th Circuit
600 South Maestri Place
New Orleans, LA  70130

> *Apple, Inc.  v. NLRB*
> 5th Cir. No. 24-60242, Board Case No. 02-CA-295979

Dear Mr. Cayce:

Attached is the National Labor Relations Board's cross-application for enforcement of its Order in this case.

Please serve a copy of the cross-application on the Petitioner, Apple, Inc. whose address appears on the service list.  I have served a copy of the cross-application on each party admitted to participate in the Board proceedings, and their names and addresses also appear on the service list.

I am counsel of record for the Board, and all correspondence should be addressed to me.  The Board attorneys directly responsible for this case are Elizabeth A. Heaney (202) 273-1743, and Joel Heller (202) 273-1042.

Sincerely,

s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Enclosures

SERVICE LIST
*Apple, Inc v. NLRB*
5th Cir. No. 24-60242, Board Case No. 02-CA-295979

A. John Harper III, Esq.                    Petitioner's Counsel
Littler Mendelson, P.C.
1301 McKinney Street, Suite 1900
Houston, TX  77010
Email:  ajharper@littler.com

Arrissa K. Meyer, Esq.                      Petitioner's Counsel
Amanda Ploof, Esq.
Littler Mendelson, P.C.
2001 Ross Avenue, Suite 1500
Dallas, TX  75201-2931
Email:  akmeyer@littler.com
Email:  aploof@littler.com

Jason R. Stanevich, Esq.                    Petitioner's Counsel
Maura A. Mastrony, Esq.
Littler Mendelson, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT  06510
Email:  jstanevich@littler.com
Email:  mmastrony@littler.com

Deirdre O'Brien                             Petitioner
  Senior Vice President Retail + People
Apple, Inc.
One Apple Parkway
Cupertino, CA  95014
Email:  jawenforcement@apple.com

Sumanth Bollepalli, District Counsel        Charging Party's Counsel
80 Pine Street, 37th Floor
New York, NY  10005-1728
Email: sbollepalli@cwa-union.org

Communications Workers of America           Charging Party
80 Pine Street, Floor 37
New York, NY 10005-1728

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

APPLE, INC.                                    )
        Petitioner                     )          No. 24-60242
                          )
        v.                             )          Board Case No.
                          )          02-CA–295979
NATIONAL LABOR RELATIONS BOARD                 )
        Respondent                     )

## CROSS-APPLICATION FOR ENFORCEMENT
## OF AN ORDER OF THE
## NATIONAL LABOR RELATIONS BOARD

The National Labor Relations Board hereby cross-applies to the Court for enforcement of its Order issued against Apple, Inc. on May 6, 2024, in Board Case No. 02-CA-295979, reported at 373 NLRB No. 52. On May 15, 2024, the Petitioner, Apple, Inc. filed a petition with this Court to review the same Board Order. The Board seeks enforcement of its Order in full.

The Court has jurisdiction over this cross-application pursuant to Section 10(e) and (f) of the National Labor Relations Act, as amended (29 U.S.C. § 160(e) and (f)), because the Petitioner is aggrieved by the Board's Order. Venue is proper in this Circuit because the Petitioner transacts business in the geographic jurisdiction of the United States Court of Appeals for the Fifth Circuit.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 30th day of May 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| APPLE, INC. | ) | |
| Petitioner | ) | No. 24-60242 |
| | ) | |
| v. | ) | Board Case No. |
| | ) | 02-CA–295979 |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| Respondent | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2024, I filed the foregoing document with

the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit

by using the CM/ECF system.  I certify that the foregoing document was served on

all parties or their counsel of record through the CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 30th day of May, 2024

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Apple, Inc. *and* Communications Workers of America, AFL–CIO.** Case 02–CA–295979

May 6, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS PROUTY AND WILCOX

On June 20, 2023, Administrative Law Judge Lauren Esposito issued the attached decision. The Respondent filed exceptions and a supporting brief, and the General Counsel and the Charging Party filed answering briefs. The General Counsel filed limited exceptions and a supporting brief, and the Respondent filed an answering brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions,[2] and to adopt the recommended Order as modified.[3]

ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge as modified below and orders that the Respondent, Apple, Inc., New York, New York, its officers, agents, successors, and assigns, shall take the action set forth in the Order as modified.

1. Substitute the following for paragraph 2(a).

"(a) Post at its facility at 185 Greenwich Street, New York, New York, copies of the attached notice marked "Appendix."[4] Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where

---

[1] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[2] The judge concluded, among other things, that the Respondent violated Sec. 8(a)(1) by interrogating an employee regarding his protected concerted activity and union sympathies. On exception, the Respondent argues that the Board should modify its longstanding objective standard for analyzing alleged unlawful interrogations to add a subjective mental-state requirement, consistent with the Supreme Court's recent decision in *Counterman v. Colorado*, 600 U.S. 66 (2023) (holding that, in criminal cases involving "true threats," to avoid chilling speech protected by the First Amendment, the government must prove that the defendant at least acted recklessly, i.e., that the defendant had a subjective understanding of the threatening character of their communications and delivered them anyway). The Respondent's argument is without merit. *Counterman* is inapplicable here, as it involved a criminal prosecution, and the Supreme Court's decision gave no indication that its principles or reasoning extends to cases arising under the National Labor Relations Act. Accordingly, we find it appropriate to apply the Board's longstanding objective standard, endorsed by the Supreme Court in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 616-620 (1969).

We also find the Respondent's reliance on *Bozzuto's Inc. v. NLRB*, 927 F.3d 672 (2d Cir. 2019), denying enf. in relevant part 365 NLRB No. 146 (2017), to be misplaced. *Bozzuto's* involved a brief "chance encounter," during which the respondent's Senior Vice President asked an open union supporter a single question: "what's going on with this Union stuff?" Id. at 687. In this case, by contrast, Senior Manager Stephanie Gladden deliberately approached employee Jordan Vasquez, questioned him regarding a meeting at which he communicated a group concern about wage rates, asked how many employees he had spoken to about wage rates, and then asked what he thought about the unionization efforts. Thus, Gladden's comments involved more extensive probing, and sought more specific information regarding Vasquez' protected concerted activities and union sentiments, than the Senior Vice President's "offhand" remark at issue in *Bozzuto's*. Moreover, unlike the employee

[continued right column]

in *Bozzuto's*, Vasquez was not an open union supporter at the time of the questioning.

With respect to the judge's finding that the Respondent violated Sec. 8(a)(1) by disparately enforcing its solicitation and distribution policy, the General Counsel filed limited exceptions urging the Board to overrule *AT&T Mobility, LLC*, 370 NLRB No. 121 (2021), find that unlawfully applied rules are unlawful to maintain, and expand the Board's remedy for the unlawful application of facially lawful rules. We decline the General Counsel's request at this time. Chairman McFerran dissented in relevant part in *AT&T Mobility* and adheres to the views she stated there. She nevertheless applies *AT&T Mobility* for institutional reasons for the purpose of determining the remedy in this case. Members Prouty and Wilcox were not members of the Board when *AT&T Mobility* issued. While they acknowledge that *AT&T Mobility* is currently governing law for the purpose of determining the remedy in this case and apply it here for institutional reasons, they would be open to reconsidering it in a future appropriate case.

[3] We shall amend the judge's remedy and modify the judge's recommended Order in accordance with our decisions in *Paragon Systems*, 371 NLRB No. 104 (2022), and *Excel Container, Inc.*, 325 NLRB 17 (1997).

[4] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notices must also be posted by such electronic means within 14 days after service by the Region. If the notices to be physically posted were posted electronically more than 60 days after physical posting of the notices, the notices shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since May 9, 2022."

Dated, Washington, D.C.  May 6, 2024

_____
Lauren McFerran,                Chairman

_____
David M. Prouty,                Member

_____
Gwynne A. Wilcox,               Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

*Ruth Weinreb, Esq.* and *Tanya Khan, Esq.,* for the General Counsel.
*Sumanth Bollepalli, Esq.,* for the Charging Party.
*Jason R. Stanevich, Esq.* and *Maura A. Mastrony, Esq. (Littler Mendelson, P.C.),* of New Haven, Connecticut for the Respondent

### DECISION

#### STATEMENT OF THE CASE

LAUREN ESPOSITO, Administrative Law Judge. On September 30, 2022, the Regional Director, Region 2, issued a complaint and notice of hearing against Apple, Inc. (Apple or Respondent), based upon a charge filed on May 18, 2022, by Communications Workers of America, AFL–CIO (CWA or the Union). On October 14, 2022, Apple filed an Answer denying the complaint's material allegations. The complaint alleged that Apple violated Section 8(a)(1) of the Act when it selectively and disparately enforced its Solicitation and Distribution policy at its store located at 185 Greenwich Street, New York, New York, on May 15, 2022, May 27, 2022, June 1, 2022, and on or about May 30 or

June 2, 2022, by prohibiting the placement of union flyers on the store's breakroom table, while permitting solicitation and distribution with respect to nonunion materials. The complaint further alleged that Apple violated Section 8(a)(1) by unlawfully interrogating employees regarding their support for the Union and protected concerted activities in or about early May 2022. Subsequently, on December 16, 2022, the Regional Director, Region 2, issued an Amendment to complaint to include an allegation that Apple violated Section 8(a)(1) by its confiscation of union flyers in a non-working area of the store on the above dates. Apple filed an Answer to the Amendment on December 21, 2022.

This case was tried before me by videoconference on January 9 and 10, 2022. During the hearing, counsel for the General Counsel (General Counsel) amended the complaint on the record to withdraw the allegations regarding incidents which allegedly occurred on May 30 or June 2, 2022.[1] (Tr. 70–71.) On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by General Counsel, Respondent, and Charging Party, I make the following

#### FINDINGS OF FACT

##### I. JURISDICTION

Apple, a California corporation with headquarters located in Cupertino, California, and retail facilities located throughout the United States, including a store located at 185 Greenwich Street, New York, New York, is engaged in the development, manufacture and retail sale of consumer electronics and software. Apple admits, and I find, that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Apple also admits, and I find, that CWA is a labor organization within the meaning of Section 2(5) of the Act.

##### II. ALLEGED UNFAIR LABOR PRACTICES

###### A. Apple's Retail Store and Operations at 185 Greenwich Street

Apple sells and services consumer electronics devices and software at its retail store at 185 Greenwich Street, New York, New York. The store is located on two floors in the Oculus, a transportation hub in lower Manhattan across the street from the World Trade Center. (Tr. 198–199.) The store opened in August 2016, and has operated continuously since that time. (Tr. 194, 263.) For the purposes of this decision, the 185 Greenwich Street store will be referred to as the WTC store.

The managerial hierarchy of the WTC store consists of four levels, and is generally organized along two lines, one for sales and one for customer service or "after-purchase support." Tr. 195. A "Flagship Leader" or general manager is responsible for overall store operations; beginning in early April 2022 Mona Patel held this position. (Tr. 195, 238–239.) Two "Store Leaders" report to the general manager of the WTC store, one responsible for sales and the other for customer service. (Tr. 195–196.) As of April 2022, the Store Leaders were Paul Distasio and Waleed Abdelal. (Tr. 196, 239, 296, 350.) Three senior managers

_____
[1] In addition, in her Posthearing Brief, General Counsel moves to amend the complaint to include an allegation that Apple violated Sec. 8(a)(1) of the Act by maintaining its Solicitation and Distribution policy

in a manner that restricted the Sec. 7 activities of its employees. Posthearing Br. at 3, 32–37.

reported to each of the Store Leaders, and a number of managers reported to each senior manager. (Tr. 196.) As of April 2022, the senior managers for sales at the WTC store were Rachel Goldman and Yanell Brown, and the senior managers for customer service were Jorge Romero, Catherine Marshall, and one other individual.[2] (Tr. 239–240, 264.) The managers reporting to the senior managers as of April 2022 included Aaron Sidrick and Ryan Radechel with respect to sales, and Matt Moya, Tyler Perroni, Dan Auerbach, and Priscilla with respect to customer service. (Tr. 241–243.) Jason Barilia was Apple's market director for New York as of May 2022. (Tr. 258.)

While there are approximately 20 to 25 job titles for non-managerial employees at an Apple store, these titles are generally grouped into four levels, contingent upon employee experience and expertise. (Tr. 196–197.) Entry-level employees, which comprise the majority of the non-managerial employees, are referred to as the "specialist level." (Tr. 197.) Directly above the "specialist" level is an "expert" level of employees. Above the "expert" level is a level referred to as "pro" or "genius," and the highest level of non-managerial employees is referred to as the "lead" level. (Tr. 197.)

Jordan Vasquez and Ian O'Hara, both of whom worked at the WTC store during the spring and summer of 2022, were called to testify by General Counsel. (Tr. 28, 115.) Vasquez testified that he sells products and services for Apple, and O'Hara stated that he worked for Apple as a technician. (Tr. 28, 115.) At the time of the hearing, Vasquez had been employed by Apple at a retail store near Houston, Texas, since September 2022, where he had begun working immediately after leaving the WTC store. (Tr. 27–28.) O'Hara began working as a technician at the WTC store on June 24, 2016, and his employment with Apple ended on November 24, 2022. (Tr. 115.)

Joshua Jennison, Waleed Abdelal, Paul Distasio, Yanell Brown, and Stephanie Gladden were called to testify by Apple. Jennison was the Flagship Leader or general manager of the WTC store from its opening in 2016 through 2020, and from January 2022 until the first week in April 2022. (Tr. 193–194.) As discussed above, Abdelal and Distasio are Store Leaders at the WTC store, and Brown was a senior manager in sales during the spring of 2022. Stephanie Gladden was a senior manager at the WTC store in sales as of May 2022, and is currently a Store Leader in Aventura, Florida. (Tr. 279, 281–282.)

Both floors of the WTC store contain areas open to and visited by customers. (Tr. 198.) On the ground floor, which is dedicated to sales, customers purchase products and training is conducted. (Tr. 198.) The upper level of the store, referred to as the balcony level, is a sales floor as well, but also contains the customer

service area, called the "Genius Bar," where employees respond to customer questions and assist customers with products which are not property functioning. (Tr. 107–109, 110–111, 198.)

Both of the WTC store's two levels contain areas used only by store employees and management. The balcony level includes a repair room where employees perform repair work on devices brought in by customers. (Tr. 199.) Off of the repair room is a smaller inventory area where spare computers and phones are stored for use by the customer service employees in their work, together with a few computers and desks also used by the customer service employees. (Tr. 199.) The ground floor contains three non-customer areas. (Tr. 195.) At the back of the store on the ground floor is a large inventory room where all of the store's inventory is kept, including not only computers, phones, and iPad tablets but cleaning supplies and products. (Tr. 200.) Behind a video wall is a data room containing all of the electronics necessary for the store's day-to-day operations, as well as a storage area for items used on an occasional basis. (Tr. 200.)

The third noncustomer area, on the ground floor, includes the employee breakroom where the events at issue in the instant case took place. (Tr. 199–201.) The layout and uses of the employee breakroom and the rest of the non-customer area on the ground floor were established by video taken of the breakroom during the course of the store's daily operations, photographs, and schematics, explicated by the witnesses.[3] As one walks into the breakroom from the hallway, there is a silver rack immediately to the left where employees place their backpacks and belongings, and additional racks for clothing. (Tr. 44, 211-212; GC Exh. 4.) To the right as one enters the breakroom are shelves containing devices called "Isaacs," used by the employees to accept customer payments for products and services.[4] (Tr. 45, 85-86, 208–211, 216, 248–249; R. Exh. 22.)[5] Next to the racks used for clothing are lockers for the employees' personal belongings. (Tr. 44, 211, 216–217; R. Exh. 22.) At the back of the breakroom are refrigerators, and along the side is a sink, a microwave, and a coffee machine. (Tr. 45, 211–212.) In the middle of the room is a large table with chairs which employees use during non-work time, such as before and after their shifts and during breaks.[6] (Tr. 45, 211–212, 216; GC Exh. 4; R. Exh. 22.) Thus, employees spend time at the breakroom table eating meals, reading, playing games, and conversing with one another during their lunch and break periods. Tr. 64, 128, 217-218. Managers often enter the breakroom during their shifts, and may use the area for these same purposes. Tr. 65-66, 219.

As one exits the breakroom there is a large whiteboard mounted on the wall to the right.[7] (Tr. 98, 107, 109–110, 204,

---

[2] A third senior manager position for sales was open as of April 2022. Tr. 239. Brown left his employment with Apple in November 2022. Tr. 240, 264.

[3] In particular, the parties stipulated that Vasquez accurately described the layout of the breakroom and other non-customer areas on the ground floor of the WTC store. Tr. 111-112; GC Exh. 4.

[4] The Isaac device is also used by the employees to clock in and out for their shifts. Tr. 210–211, 248.

[5] The staircase depicted in R. Exh. 22 does not lead to the breakroom, but connects the customer areas on the ground floor and the balcony. Tr. 247.

[6] Employees at the WTC store receive an unpaid one hour lunch break and two paid 15-minute breaks per shift. Tr. 28-29, 115–116, 217.

[7] Jennison testified that the whiteboard contains postings of material "either approved at Apple or at a higher level." Tr. 204. At the time that the whiteboard was installed in 2017, Distasio and Jennison had an e-mail exchange discussing the manner in which it would be used and appropriate direction to employees, which included a statement that "we should never use [the whiteboard] for solicitation." Tr. 360–362; R. Exh. 20.

4                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

207–208, 216, 246; R. Exh. 21, 22.) If one turns left coming out
of the breakroom, there are additional tables sometimes used by
employees on their breaks, a small bank of lockers, and, down a
hall about ten to fifteen steps, a manager's office, which contains
desks with computers.[8] (Tr. 45–46, 200–203, 246, 254–255; R.
Exh. 23.) If one turns right, a hallway leads out to the sales floor.
(Tr. 46, 203–204, 215–216, 247–248; R. Exh. 22.) If one con-
tinues straight down the hall after emerging from the breakroom,
there is a table with chairs for the employees' use, together with
vending machines and the employee bathrooms. (Tr. 46, 203–
204, 247.)

At all times material to the complaint's allegations, Apple
maintained the following Solicitation and Distribution Policy ap-
plicable to the WTC store:

Solicitation and Distribution

As an Apple employee, you're not permitted to solicit other
employees—including for your own hobbies or business (such
as jewelry, makeup, personal training services), charitable
campaigns or political causes—during work time. Addition-
ally, you may not distribute material during work time or in a
work area. Third parties are not permitted to distribute materi-
als or solicit employees, vendors, or customers on Apple prop-
erty at any time.

Employees may not use Apple's bulletin boards to distribute
materials or solicit employees, vendors, or customers. In addi-
tion, third parties may not use any Apple system (electronic or
physical) to distribute materials or solicit employees, vendors,
or customers.

Employees and third parties may not request or accept money,
goods, or compensable services of any kind or for any cause,
or buy or sell outside commercial products or services, at any
time on Apple property, including during non-work time and
in non-work areas.

Apple facilities are generally for Apple business use only (in-
cluding authorized Apple events, such as Apple's health and
wellness fairs, product fairs, Apple's Employee Giving, or Di-
versity Network Association activities) and may not be used
for other non-Apple business activity without the prior written
approval of Apple's Facilities Department.

If you're approached by a third party wishing to distribute ma-
terials or engage in any kind of solicitation on Apple property,
you may ask them to leave. If you need any assistance, you may
contact Global Security or Loss Prevention. If you're ap-
proached by an employee who is distributing materials or en-
gaging in solicitation during work time, you may ask them to
stop. Alternatively, you may contact your manager or the Busi-
ness Conduct Helpline

(Tr. 9–10; Jt. Exh. 1.) Managers are versed in the Solicitation

[8] Jennison testified that although a sign next to the door says "man-
ager's" or "leadership" office, the office is crowded with employees
coming in to "check their email" or "complete paperwork," and that the

and Distribution Policy through required annual compliance or
business conduct training, and employees receive notice of the
Policy during "core training" after they are hired. (Tr. 224, 256–
257, 265, 298–299, 351–352.) The Policy is also available on
Apple's internal employee website, as well as its "People" or hu-
man resources website. (Tr. 298–299, 351–352.)

General Counsel and Apple's witnesses both testified regard-
ing the company's practices with respect cleaning the break-
room. Jennison testified that Apple engaged an outside contrac-
tor which provided cleaning services in both the customer and
employee-only areas of the store. (Tr. 219–220.) This contractor
is responsible for emptying trash, mopping, cleaning up spills,
wiping down counters, and restocking items like Kleenex and
hand sanitizer. (Tr. 220.) Jennison stated that after the store
closed for the night the manager was responsible for ensuring
with the cleaning crew that the breakroom was clean, so that no
cleaning needed to be performed in the morning before the store
opened. (Tr. 231–232.) Abdelal also testified that the store was
cleaned every night. (Tr. 306–307.) Vasquez and O'Hara both
testified that employees using the breakroom were expected to
throw out their own trash and generally clean up after them-
selves. (Tr. 68, 150–151.)

*B. Organizing Activity at Apple's 185 Greenwich Street Store*

O'Hara and Vasquez testified regarding employee organizing
activities at the WTC store during 2021 and 2022. O'Hara testi-
fied that he initially contacted CWA in January 2021, and over
the next 2 to 3 months created an organizing committee com-
prised of himself and a few other employees. (Tr. 116.) The
organizing committee held virtual meetings via Zoom once or
twice each week to coordinate their activities, and communicated
through the encrypted messenger application Signal, which the
employees installed on their personal phones. (Tr. 117.) O'Hara
testified that he sent messages to the organizing committee over
Signal on a daily basis. (Tr. 118.) Vasquez testified that he
joined the organizing committee in January 2022, and partici-
pated in the weekly Zoom meetings and Signal communications.
(Tr. 29.) Vasquez testified that he communicated with the or-
ganizing committee via Signal multiple times each day. (Tr. 29–
30.) In addition, Vasquez testified that he had in-person conver-
sations with other WTC store employees on a daily basis regard-
ing the need for higher wages. (Tr. 30.) These conversations
took place at the WTC store on the sales floor and in the break-
room, and also outside of work. (Tr. 30.)

In late April 2022, Vasquez spoke to senior manager Rachel
Goldman regarding wage rates on the sales floor at the WTC
store. (Tr. 30–31.) Vasquez testified that he told Goldman that
he believed that the employees' pay was too low, and asked
whether there were ways that the employees could obtain higher
wage rates. (Tr. 31.) Goldman referred Vasquez to Julissa Rod-
riguez of Apple's People Team or human resources. (Tr. 31.)
On May 3, 2022, Vasquez spoke to Rodriguez over WebEx, stat-
ing that the Apple employees needed higher wages and more va-
cation time. (Tr. 32.) Rodriguez responded that she would

office door is left open. Tr. 200-201. Vasquez and O'Hara both de-
scribed this office as an office for management. Tr. 45–46, 54, 58–59,
127, 146.

discuss these issues with her managers.[9]  (Tr. 32.)

On May 15, 2022, the organizing committee "went public" with respect to their campaign for representation by CWA. (Tr. 30, 39.)  On that date, members of the organizing committee placed flyers on the breakroom table at the WTC store for the first time, in the manner discussed below.  (Tr. 40.)  In addition, beginning on May 15, 2022, members of the organizing committee wore red wristbands that stated "CWA" on them during their shifts, and distributed the wristbands to other employees.  (Tr. 40, 82, 160, 179–180.)

In June or July of 2022, Vasquez spoke about his support for the Union during a "download," a brief meeting conducted each morning where employees discuss events at the company and their duties and objectives for the day and the week.  Tr. 75, 76-77, 101.

### C. The Interaction Between Jordan Vasquez and Stephanie Gladden on May 9, 2022

Jordan Vasquez and Stephanie Gladden both testified regarding a conversation between them which occurred on May 9, 2022.  At the time of this conversation, Gladden was a senior manager at the WTC store.  (Tr. 32–33, 281–282.)  Vasquez was familiar with Gladden from his work at the WTC store, and typically spoke to her a few times each day on the sales floor or in the breakroom.  (Tr. 32–33.)  Vasquez testified without contradiction that while the two had discussed non-work-related issues such as bicycling and bars around the city, they did not socialize outside of work and were not friends.  (Tr. 33, 36.)

On May 9, 2022, Gladden approached Vasquez on the balcony level of the WTC store between 11 a.m. and 12 p.m.  Tr. 33, 283.  Vasquez testified that he could recall the time of the conversation because the store was slow before the rush of customers that typically arrived during the mid-day lunch period.  (Tr. 34.)  Gladden also testified that she approached Vasquez, as part of her general practice to initiate contact with all employees on the floor at the inception of her shift, in order to determine whether they needed anything and how their shift was progressing.  (Tr. 283–284, 290–291.)  Vasquez confirmed that it was not unusual for Gladden to approach him during a shift.  (Tr. 72–73.)  No one else was present at the time.  (Tr. 34.)

Vasquez testified that after Gladden approached him, she asked him how he was doing, and then said that she had heard about Vasquez' meeting with Rodriguez and asked about how the meeting went.  (Tr. 34.)  According to Vasquez, he told Gladden that his meeting with Rodriguez went well, and that the two had discussed the need for higher pay for the Apple employees.  (Tr. 34, 73.)  Gladden then asked Vasquez if he had spoken to other employees regarding the wage increase issue, and when Vasquez stated that he had done so, Gladden asked how many people he had spoken to.  (Tr. 34, 73.)  Vasquez stated in response that he was not keeping track of that information.  (Tr. 34, 73.)  According to Vasquez, Gladden then asked him what he thought about the unionization efforts at Apple.  (Tr. 34–35.)

Vasquez responded that he did not have time to pay attention to that issue because he was running for Congress.  (Tr. 35.)  However, Vasquez said he was concerned that his name had been associated with the union organizing campaign at Apple, and he did not want his name associated with something that he was not a part of.[10]  (Tr. 35.)  Gladden said that she believed that Apple would always do the right thing in the end, and Vasquez agreed.  (Tr. 3.)(Tr. 284–285).  Gladden testified that she told Vasquez that unionization was something that he could talk about and engage in, and asked why he was upset given that union activity was permitted.  (Tr. 285.)  According to Gladden, Vasquez responded that he did not have time to engage in union activity because he was running for Congress.  (Tr. 285.)  Gladden testified that she then asked Vasquez how his knee was healing after a recent injury, and whether he was able to stand during his shift, and Vasquez thanked her for inquiring but stated that he was feeling better.  (Tr. 289.)  Gladden stated that Vasquez raised the topic of union activity, and denied asking Vasquez questions regarding who, if any, of his co-workers may have supported the union.  (Tr. 285–286.)  Gladden also testified that Vasquez did not discuss "pay inequities" or "his views towards his compensation" as an Apple employee, and that she did not ask Vasquez any questions regarding "his compensation or [the] compensation of his colleagues."  (Tr. 290.)  Gladden testified that the sales floor was busy at the time of their conversation.  Tr. 289.

Vasquez testified that after his conversation with Gladden, he went to the back area off of the sales floor and spoke with O'Hara, telling O'Hara that Gladden had asked about his thoughts regarding unionization.  (Tr. 36, 118–119.)  O'Hara encouraged Vasquez to specifically identify Gladden in the organizing committee's group chat to inform the committee.  (Tr. 119.)  Vasquez then sent a message to the organizing committee via Signal, stating "They just had a union feeler convo with me I'll explain when I get a chance."[11]  (Tr. 36–38, 80–81, 120; GC Exh. 2.)  About 15 minutes later, O'Hara responded on Signal, stating, "Stephanie [G]ladden was the manager who tried to talk to you about unions, correct?"  (Tr. 37, 120–121, 122; GC Exh. 2.)  Vasquez did not respond to O'Hara's message.  (Tr. 158–159.)

Vasquez testified that as he was leaving work that day he approached Goldman outside the store, and told Goldman that a manager was asking him what he thought about unions.  (Tr. 38–39.)  Vasquez asked Goldman if she knew why he was being questioned.  (Tr. 39.)  Goldman said that she did not know why it was happening but could look into it, and then asked Vasquez who had questioned him.  (Tr. 39.)  Vasquez said that he did not want to disclose who had questioned him, but was only checking to see whether Goldman knew anything about the issue.  (Tr. 29.)  Goldman reiterated that she would look into it.  (Tr. 39.)

### D. The Events of May 15, 2022

As discussed above, May 15, 2022 was the date that the organizing committee "went public" with respect to the union organizing campaign at the WTC store.  That was the first date that

---

[9]  Goldman and Rodriguez did not testify at the hearing.

[10]  Vasquez testified that he did not tell Gladden about his activities with the union organizing committee because "We were trying to keep all that information under wraps [so] as to not alert managers that we were trying to form a Union."  Tr. 35.

[11]  Vasquez is identified in this series of Signal messages as "Clementine Vasquez," his legal name since late December 2021.  Tr. 27, 37, 121–122; GC Exh. 2.

Vasquez and O'Hara distributed union flyers, both outside the store and inside the breakroom. (Tr. 40–41.) In addition to the testimony of Vasquez and O'Hara, General Counsel introduced into evidence as General Counsel's Exhibit 4 a video of the breakroom at the WTC store filmed on May 15, 2022. (Tr. 42, 59.) The video begins at 7 a.m. and runs continuously through 9 p.m., with time stamps beginning at 0 for 7 a.m. (Tr. 43; GC Exh. 4.) In the discussion that follows, references to the video time stamps from General Counsel's Exhibit 4 will be denoted in parentheses.

The flyers Vasquez and O'Hara placed on the breakroom table on May 15, 2022, attached hereto as Appendix B, contained the logo of the Apple Retail Union CWA, and stated "Higher Pay, Better Benefits, More Representation." (Tr. 40–42, 122–124; GC Exh. 3.) Two QR codes appeared on opposite sides of the Apple Retail Union CWA logo. Explanatory text for one of the QR codes stated, "Read our store's Vision Statement here," and explanatory text for the other QR code stated, "Add your name to join the movement." (GC Exh. 3.) WTC store employees could scan these QR codes with their phones, and be directed to a mission statement prepared by the organizing committee and union cards which appeared on the Union's website, respectively. (Tr. 63, 161–163; GC Exh. 3.)

On May 15, 2022, Vasquez first entered the breakroom at approximately 7:37 a.m., prior to the 8 a.m. start of his shift.[12] (Tr. 40-41, 47 (37:42).) Vasquez walked around the breakroom table and placed two flyers next to one another, face up, on the breakroom table. (Tr. 49 (37:53).) Seconds later, O'Hara entered the breakroom, wearing a pink baseball cap. (Tr. 49 (38:02).) O'Hara proceeded to place two union flyers on the breakroom table, face up, on the side of the table opposite to the flyers Vasquez had placed. (Tr. 50 (38:28).) Store Leader Waleed Abdelal was in the breakroom next to Vasquez during this time. (Tr. 50.) Approximately 10 minutes later, Abdelal entered the breakroom again for a few seconds, then manager Matt Moya entered, took a photograph of the union flyers on the table, and left.[13] (Tr. 51, 124-125 (49:55, 50:02, 50:53-51:17).) About an hour later, Abdelal entered the breakroom, removed all of the union flyers from the table, and exited the breakroom, turning left. (Tr. 53-55 (1:51:08-1:51:24).)

During their lunch break from 3 p.m. to 4 p.m., Vasquez and O'Hara replaced the union flyers that Abdelal had taken from the breakroom table earlier. (Tr. 55 (5:05:39-5:06:08).) A minute later, Moya entered and exited after viewing the breakroom table. (Tr. 55–56, 126 (5:07:45-5:07:58).) A few minutes later, Vasquez and O'Hara left the breakroom to eat lunch at the tables and chairs located in the hallway. (Tr. 56-58 (5:11:05-5:11:08).) Seconds later, Moya returned, removed the union flyers Vasquez and O'Hara had place on the breakroom table, and exited the

breakroom. (Tr. 58, 127 (5:11:15-5:11:33).) From their table in the hallway, Vasquez and O'Hara saw Moya turn down the hallway in the direction of the management office.[14] (Tr. 58–59, 127–128.)

About an hour later, O'Hara entered the breakroom and placed union flyers on the table again. (Tr. 83–84, 171 (6:01:27-6:02:05). ) The video shows O'Hara briefly conversing with someone immediately after placing the union flyers on the table (6:02:05-6:02:17, 6:02:31-6:02:54). Vasquez then entered the room and spoke to O'Hara (6:03:02-6:03:10). O'Hara then picked up the flyers and, after exchanging a few words with the same individual,[15] placed them in his bag. (Tr. 84-85, 171 (6:03:15-6:03:48).) O'Hara testified that he could not recall why he removed the union flyers from the table at that time. (Tr. 172, 173.)

Abdelal addressed the removal of union flyers from the breakroom table on May 15, 2022, during his testimony. Abdelal testified that on May 15, 2022, "a number of" managers had told him that there were union flyers on the breakroom table. (Tr. 309–310.) Abdelal told the managers that if the union flyers were left behind, the managers should just remove them, but the managers "were very nervous" and "uncomfortable," "[b]ecause of the type of material," "union literature," which they had never encountered before. (Tr. 310, 311, 331.) According to Abdelal, "throughout the entire day this was an ongoing conversation with multiple leaders about their concern about removing the literature." (Tr. 331–334.) Abdelal stated that the managers "really struggled," so he "just went in and took them and threw them out" himself. (Tr. 310, 311.) Abdelal testified that he told the other managers that if union flyers were discovered in the future, "we would clean it up like anything else," to the extent that they were "abandoned." (Tr. 312.)

During the afternoon of May 15, 2022, Vasquez approached Abdelal outside of the store, having heard that Abdelal had removed the union flyers from the breakroom table earlier. (Tr. 59–60.) Vasquez asked Abdelal why he had removed the union flyers that day, and Abdelal stated that Apple has a no-solicitation policy that prohibited Vasquez from distributing the union flyers. (Tr. 60, 312.) Abdelal testified that he also discussed Apple's cleanliness standards with Vasquez. (Tr. 312.) Vasquez stated in response that he and O'Hara were employees, and that they were placing the union flyers on the breakroom table during non-work time, but Abdelal stated that Vasquez was nevertheless prohibited from doing so. (Tr. 60.) Abdelal testified that Vasquez also contended that Abdelal was implementing the policy selectively because Apple had previously distributed Shake Shack coupons to the employees, and Abdelal stated that Apple had issued specific vouchers for the employees to use at Shake Shack. (Tr. 312–313.) According to Abdelal, Vasquez also

---

[12] Vasquez identified himself as the individual who appears on General Counsel's Exhibit 4 wearing a red beanie hat. Tr. 47. The parties stipulated that Vasquez accurately identified O'Hara and the various managers depicted in the video. Tr. 111–112; GC Exh. 4.

[13] Vasquez testified that prior to May 15, 2022, he had never seen any manager take a photograph of anything on the breakroom table. Tr. 52. Abdelal testified that one of the managers "took photos as part of just letting us know something was in the break room." Tr. 326. Abdelal testified that it was not unusual for "our leaders, or team" to take

photographs of the breakroom "to celebrate, you know, someone did a really great job" as well as "calling out when standards have been unacceptable and we would share a photo of it." Tr. 341.

[14] Abdelal testified that he "may have" told Moya to shred the union flyer on May 15, 2022. Tr. 326, 327–329. Moya did not testify at the hearing.

[15] Both Vasquez and O'Hara testified that they were unable to identify this person on the video. Tr. 85, 173.

mentioned that employee Andrew Goebel had distributed flyers for his going-away party, and Abdelal told Vasquez that he had discussed the policy with Goebel in that context. (Tr. 313.) Abdelal also told Vasquez that he could send Vasquez the policy if he wanted to review it, and Vasquez asked Abdelal to do so. (Tr. 60–61.) Abdelal sent Vasquez the policy by text later that day. (Tr. 61; Jt. Exh. 1.)

After reviewing the no-solicitation policy, Vasquez asked to discuss it with Abdelal the next day on the sales floor. (Tr. 61.) Vasquez told Abdelal that he had reviewed the policy and did not believe that he and O'Hara had violated it, because they distributed the union flyers during non-work time and in a non-work area. (Tr. 61–62.) Abdelal stated that Vasquez needed to respect the policy, which prohibited distribution of union flyers as he and O'Hara had done. (Tr. 62.) Abdelal also suggested that Vasquez speak to Rodriguez again regarding the issue. (Tr. 62, 312.)

A few days later, Vasquez spoke with Rodriguez by phone. (Tr. 62.) Vasquez described the situation to Rodriguez, and said that after reviewing the no-solicitation policy he did not believe that he had violated it. (Tr. 62.) Rodriguez said that the employees were not permitted to distribute third-party material such as Girl Scout cookies. (Tr. 62–63.) Vasquez stated that he and O'Hara were not third parties, but Apple employees. (Tr. 63.)

Vasquez testified that after May 15, 2022, he did not leave any other union flyers in the breakroom, because multiple Apple managers had informed him that it constituted a violation of company policy. (Tr. 63–64.)

### E.  The Events of May 27, 2022

O'Hara testified that on May 27, 2022, he distributed union flyers by placing them in the center of the breakroom table before his shift began at 11:30 a.m. and during his lunch break after 4 p.m. (Tr. 130–131, 132–133.) O'Hara stated that he placed between four and six flyers on the table before his shift, and three flyers during his lunch break. (Tr. 131, 132–133.) Other employees were present in the breakroom when O'Hara placed the flyers on the table at these times. (Tr. 132–133.) In addition to the union flyers placed on the breakroom table previously, O'Hara placed a new union flyer on the table on May 27, 2022, which stated as follows:

**WHAT OUR UNION
IS FIGHTING FOR:**

**INCLUSION & EQUITY:**  Establish a concrete and actional program committed to diversifying store leadership through inclusion and promotion of BIPOC, LGBTQ, and colleagues with disabilities.  Reward multilingual employees monetarily for their leveraged contributions that are taken for granted. We're all valuable and want fair representation.

**CAREER DEVELOPMENT:**  Protected, regularly scheduled training and coaching time for current roles.  Make internal promotion the primary method for filling open positions. Establish clear and achievable career advancement paths.  Employee oversight when hiring for senior-level store positions.

*…And much more.*

(Tr. 134–135; GC Exh. 6.)  The flyer also contained the Apple Retail Union CWA insignia, and a QR code with explanatory text stating, "Read the full Vision Statement here!"

After placing the union flyers on the breakroom table during his lunch break, O'Hara remained in the breakroom speaking with a colleague. (Tr. 132–133.)  A few minutes later, while O'Hara remained in the breakroom, senior manager Yanell Brown entered the breakroom and removed the flyers, without speaking to anyone. (Tr. 133–134.)  Using his phone, O'Hara took a video of Brown removing the union flyers. (Tr. 135–136, 137–138; GC Exh. 7.)

Brown testified that he did not realize what the union flyers were at the time that he removed them. (Tr. 271.) Brown stated that, "I just kind of saw them laying on the table and was kind of throwing out things as I would normally do and saw they were on the table," in that "it falls into the same no solicitation policy as everything else." (Tr. 271.)  Brown testified that before picking up the union flyer he asked the employee sitting closest to the flyer whether it belonged to them, and the employee shrugged, so Brown picked up the flyer to throw it out. (Tr. 271–272.)  Brown testified that after picking up the union flyer he threw it out in the manager's office. (Tr. 275–276.)

### F.  The events of June 1, 2022

O'Hara distributed union flyers in the breakroom again on June 1, 2022, before his shift began at 11:30 a.m. and during his lunch break. (Tr. 138.) General Counsel introduced a videotape of the breakroom on June 1, 2022, as General Counsel's Exhibit 8; references to the videotape time stamp will be indicated in parenthesis. (Tr. 146–147.)  Before beginning his shift, O'Hara and another Apple employee and organizing committee member placed four union flyers on the breakroom table.  (Tr. 139–140 (3:05:39–3:06:28).) About 5 minutes later, senior manager Ryan Radechal entered and left the breakroom, only to return a few minutes later.  (Tr. 140–141 (3:10:12–3:10:56, 3:11:23–3:13:13).)  Immediately thereafter, senior manager Jorge Romero entered the breakroom and removed the union flyers O'Hara and his co-worker had placed on the table. (Tr. 141–142 (3:13:31-3:13:49).)

Later that day, at about 4:45 p.m. during his lunch break, O'Hara and a coworker placed additional union flyers on the breakroom table. (Tr. 142–143 (7:25:05-7:25:39).)  O'Hara then left the breakroom and went to the tables near the vending machines to eat his lunch. (Tr. 143–144.)  About 15 minutes later, Romero entered the breakroom, removed the union flyers from the table, and exited after briefly speaking with an employee seated at the breakroom table. (Tr. 144–145 (7:40:19-7:41:05).) After leaving the breakroom with the flyers, Romero walked by the tables where O'Hara was eating lunch, and O'Hara saw him walk into the manager's office. (Tr. 145–146.)

About an hour later, Romero walked by the area where O'Hara was taking his lunch break. (Tr. 147.)  O'Hara got Romero's attention, and asked him to stop removing the union flyers. (Tr. 147.)  Romero said that he could not stop removing the flyers, because they were promotional materials. (Tr. 147.) O'Hara stated that the union flyers were not promotional, and

8                                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

that employees were permitted to have them in the breakroom.
(Tr. 147–148.) When Romero contended again that the flyers
were promotional and not permitted, O'Hara pulled up the em-
ployee rights page of the National Labor Relations Board's pub-
lic website, and showed Romero a statement that employees
were allowed to have union materials in nonwork areas. (Tr.
148.) Romero continued to insist that the union flyers were pro-
motional materials, and stated that he would keep removing
them. (Tr. 148.) O'Hara then asked Romero what he did with
the union flyers after removing them, and Romero responded
that he shredded them. (Tr. 148–149.) O'Hara then asked
whether the employees could have a bulletin board or a cork
board to post union flyers and materials; Romero responded that
they could look into it and see whether something could be de-
signed.[16] (Tr. 148–149.)

O'Hara testified that after June 1, 2022 he did not distribute
union flyers again, because managers kept removing them. (Tr.
149.)

### Decision and Analysis

#### A.  Credibility Resolutions

Evaluating certain issues of fact in this case requires an as-
sessment of witness credibility. Credibility determinations in-
volve consideration of the witness' testimony in context, includ-
ing factors such as witness demeanor, "the weight of the respec-
tive evidence, established or admitted facts, inherent probabili-
ties, and reasonable inferences drawn from the record as a
whole." *Double D Construction Group*, 339 NLRB 303, 305
(2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001), enf'd. 56
Fed.Appx. 516 (D.C. Cir. 2003); see also *Hill & Dales General
Hospital*, 360 NLRB 611, 615 (2014). Corroboration and the
relative reliability of conflicting testimony are also significant.
See, e.g., *Precoat Metals*, 341 NLRB 1137, 1150 (2004) (lack of
specific recollection, general denials, and comparative vague-
ness insufficient to rebut more detailed positive testimony). It is
not uncommon in making credibility resolutions to find that
some but not all of a particular witness' testimony is reliable.
See, e.g., *Farm Fresh Co., Target One, LLC*, 361 NLRB 848,
860 (2014).

In addition, the Board has developed general evidentiary prin-
ciples for evaluating witness testimony and documentary evi-
dence. For example, the Board has determined that the testi-
mony of an employer Respondent's current employee which is
contrary to the Respondent's contentions may be considered par-
ticularly reliable, in that it is potentially adverse to the em-
ployee's own pecuniary interests. *Covanta Bristol, Inc.*, 356
NRLB 246, 253 (2010); *Flexsteel Industries*, 316 NLRB 745
(1995), aff'd, 83 F.3d 419 (5th Cir. 1996). It is also well-settled
that an administrative law judge may draw an adverse inference
from a party's failure to call a witness who would reasonably be
assumed to corroborate that party's version of events, particu-
larly where the witness is the party's agent. *Chipotle Services,
LLC*, 363 NLRB 336, 336 fn. 1, 349 (2015), enf'd. 849 F.3d 1161
(8th Cir. 2017); *Roosevelt Memorial Medical Center*, 348 NLRB
1016, 1022 (2006). Adverse inferences may also be drawn based
upon a party's failure to introduce into evidence documents

---

[16] Romero did not testify at the hearing.

containing information directly bearing on a material issue. See
*Metro-West Ambulance Service, Inc.*, 360 NLRB 1029, 1030 fn.
13 (2014).

In making credibility resolutions here, I have considered the
demeanor of the witnesses, the context of their testimony, cor-
roboration via other testimony or documentary evidence or lack
thereof, the internal consistency of their accounts, and the wit-
nesses' apparent interests, if any. As a general matter, any cred-
ibility resolutions I have made are discussed and incorporated
into my analysis herein.

I generally credit the testimony of Jordan Vasquez and Ian
O'Hara. Both Vasquez and O'Hara provided specific, detailed
testimony, and did not speculate regarding circumstances not
within their own personal knowledge. See, e.g., (Tr. 101–102).
I note that Vasquez in particular made a discernable effort to
thoroughly explicate the topics he discussed, even during his
cross-examination. See (Tr. 77–79). Vasquez and O'Hara's tes-
timony regarding the physical layout and uses of the non-em-
ployee areas of the WTC store was consistent with photographs,
videos, and schematics introduced into evidence by both General
Counsel and Apple. Their testimony regarding the removal of
union flyers from the breakroom table on the dates in question
was also confirmed by video created by Apple in the normal
course of the WTC store's operations and, in the case of O'Hara,
by video he created himself using his iPhone.

In addition, Vasquez' testimony directly contradicted the tes-
timony of Apple's witnesses regarding his conversation with
Stephanie Gladden—which forms the basis for the allegation
that Apple unlawfully interrogated employees in violation of
Section 8(a)(1)—and with respect to the parameters and enforce-
ment of Apple's Solicitation and Distribution Policy and house-
keeping procedures. Thus, as a current employee of Apple,
Vasquez' testimony, may be considered particularly reliable in
that it is potentially adverse to his own pecuniary interests. *Co-
vanta Bristol, Inc.*, 356 NRLB at 253; *Flexsteel Industries*, 316
NLRB at 745.

The testimony of Apple's witnesses regarding the store layout
and operations was similarly credible. However, I find that their
explications of Apple's housekeeping and cleanliness standards,
and their accounts of the application of those standards and of
Apple's Solicitation and Distribution Policy, to be of varying re-
liability. I further find that their explanations for their conduct
in connection with the removal of union flyers from the break-
room table to be implausible or contradicted by other, more pro-
bative evidence, in the manner discussed below.

#### B.  The Alleged Interrogation

The complaint alleges that in or about early May 2021, Apple
unlawfully interrogated employees regarding their Union sym-
pathies and protected concerted activities, in violation of Section
8(a)(1) of the Act. General Counsel contends in support of this
allegation that Stephanie Gladden, who was then a senior man-
ager at the WTC store, interrogated Vasquez regarding his sup-
port for the Union and protected concerted activities on the bal-
cony level sales floor on May 9, 2022. Apple contends that Glad-
den did not interrogate Vasquez during their conversation, and

that her remarks were not coercive. For all of the following reasons, the evidence establishes that Gladden coercively interrogated Vasquez during their conversation on May 9, 2022.

For many years, the Board has determined whether an employer has coercively interrogated an employee by evaluating if "under all the circumstances, the interrogation reasonably tends to restrain, coerce, or interfere with the rights granted under the Act." *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, at p. 10 (2022), quoting *Rossmore House*, 269 NLRB 1176, 1177–1178, aff'd. 760 F. 2d 1006 (1985). In order to determine whether a particular interrogation is coercive in nature, the Board considers the background to the specific interaction, the nature of the information sought, the identity of the questioner, the place and method of questioning, and the truthfulness of the employee's response. *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, at p. 10; see also *Relco Locomotives*, 359 NLRB 1145, fn. 1, 1156 (2013), aff'd. 361 NLRB 911 (2014); *Westwood Health Care Center*, 330 NLRB 935, 939 (2000). It is well-settled that such factors "are not to be mechanically applied," but serve as a framework for assessing "the totality of the circumstances" for analyzing the statements' potentially coercive impact. *Westwood Health Care Center*, 330 NLRB at 939, quoting *Rossmore House*, 269 NLRB at 1178, fn. 20, and *Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 835 (D.C. Cir. 1998).

As an initial matter, I credit Vasquez' account of the May 9, 2022, conversation as opposed to Gladden's. As discussed above, Vasquez provided a specific, detailed account of the events that he addressed during his testimony, and evinced a good-faith effort to create an accurate record. Furthermore, as a current employee of Apple who testified in a manner adverse to his own pecuniary interest by contradicting Apple's own witnesses, Vasquez' testimony is considered particularly reliable pursuant to the Board caselaw discussed above.

Thus, I credit Vasquez' testimony that after Gladden greeted him she told him that she had heard about his meeting with human resources representative Julissa Rodriguez, and asked how it went. Although Gladden denied asking Vasquez "questions related to his compensation or compensation of his colleagues," during her testimony, she was not asked and did not testify regarding whether she and/or Vasquez addressed Vasquez' meeting with Rodriguez, which had taken place on May 3, 2022, only days earlier. (Tr. 289–290.) As a result, Vasquez' testimony that Gladden questioned him regarding his meeting with Rodriguez is effectively unrebutted. I further credit Vasquez' testimony that after he described his meeting with Rodriguez, Gladden asked him whether he had spoken to other employees regarding a wage increase, and asked how many employees he had spoken to. According to Vasquez' uncontradicted testimony, his discussions with both senior manager Rachel Goldman and Rodriguez were not directed toward obtaining a wage for himself alone. Instead, Vasquez was contending that the pay for the WTC store Apple employees was too low, and requesting information regarding how the employees as a group could obtain an increase in their wage rates. I thus credit Vasquez' testimony that after asking Vasquez how the meeting with Rodriguez went, Gladden asked Vasquez for information regarding the parameters of the group of employees dissatisfied with their wage rates, whose

concerns Vasquez had just presented to Rodriguez. The Board has found that employer questioning regarding employee discussions of wages may constitute an unlawful interrogation. See *Spectrum Juvenile Justice Services*, 368 NLRB No. 102 at p. 1, fn. 1, and at p. 8–10 (2019) (questioning regarding petition submitted by employees contending that pay rates were inadequate, and addressing other terms and conditions of employment, unlawful); *Chipotle Services*, 363 NLRB 336, 338, 339–340, 346 (2015) (service manager's questions regarding which employees were discussing wages and how employees had learned of one anothers' specific wage rates constituted an unlawful interrogation).

I further credit Vasquez' testimony that after Gladden questioned him regarding his meeting with Rodriguez and interactions with other employees, she asked Vasquez what he thought about the unionization efforts at Apple. In addition to the general credibility considerations addressed above, Vasquez' depiction of the manner in which the May 9, 2022, conversation unfolded was the more inherently plausible. Specifically, Vasquez and Gladden both testified that Vasquez stated during their conversation that he was concerned that his name had been associated with the union organizing campaign, because he was not involved. (Tr. 35, 284–285.) However, I find it unlikely that, as Gladden claimed, Vasquez immediately responded to her initial, innocuous question regarding how his day was going by making such an assertion. (Tr. 284–285.) At the time of their conversation, Vasquez had been a member of the union organizing committee for approximately 4 months, and had spoken to Goldman and Rodriguez regarding how the employees could obtain higher wages and more vacation time. However, the union organizing committee had yet to "go public" with respect to its activities, which did not occur until May 15. Given this context, a scenario where *Vasquez* spontaneously raised the issue with Gladden to convey his disquiet with being associated with the Union only makes sense if one presumes that Vasquez was attempting to "gaslight" Gladden in some way by preemptively denying involvement in the Union campaign. Thus, crediting Gladden's account requires accepting a contorted set of circumstances and motivation on Vasquez' part. Vasquez' contention that Gladden's initial questioning regarding his meeting with Rodriguez and the wage issue segued into her question regarding what Vasquez thought of the union campaign is substantially more plausible. Vasquez' subsequent response that he was concerned that he was being associated with the Union when he was not in fact a part of the organizing efforts is also more believable in that context. Thus, Vasquez provided a more reliable account of their conversation, and I therefore conclude that Gladden asked Vasquez what he thought about the union organizing efforts at Apple. It is well-settled that supervisory questioning regarding employees' thoughts or sentiments involving a union may constitute an unlawful interrogation. See, e.g., *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (2020) (supervisor unlawfully interrogated employee by asking him "how he felt about the Union"); *Relco Locomotives*, 359 NLRB at 1156 (supervisor unlawfully interrogated employee by asking him what he thought about the union).

In addition, Vasquez' account of his conversation with Gladden is corroborated by his statement to O'Hara that Gladden had

asked about his thoughts regarding the Union, as well as by Vasquez' Signal message to the organizing committee stating, "They just had a union feeler convo with me I'll explain when I get a chance." (Tr. 36–38, 118–120; GC Exh. 2.) At the hearing, Vasquez was cross-examined regarding the conversation with Gladden and his subsequent message to the organizing committee, as well as the extent of his public identification as a Union supporter, one of the factors considered as part of the totality of the circumstances analysis. (Tr. 72–74, 74–80, 80–81.) As a result, Vasquez' statements to O'Hara and the committee constitute prior consistent statements admissible pursuant to Federal Rule of Evidence 801(d)(1)(B),[17] and support Vasquez' account of his conversation with Gladden. See *Pagerly Detective Agency*, 273 NLRB 494, fn. 1 (1984) (ALJ erred by excluding employee's testimony regarding his immediate recounting of president's request that he provide a list of employees supporting the union).

Finally, during her direct examination, Gladden testified that she did question Vasquez about union activity, asking him, "if you're allowed to do these things, why does it upset you?" to be associated with the Union, given that "This is something that you can talk about and you can engage in." (Tr. 285.) Vasquez' account of their conversation did not include these statements. Nonetheless, this question is simply a variation on supervisory queries regarding employee "thoughts" and "feelings" about a union or union representation which the Board has found to be impermissible. *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5; *Relco Locomotives*, 359 NLRB at 1156; see also *Dayton Hudson Corp.*, 316 NLRB 477, 483 (1995) (manager's questioning of employee as to "why he wanted the Union, and what significance it had" unlawful interrogation); *Research Management Corp.*, 302 NLRB 627, 648 (1991) (manager unlawfully interrogated employee by asking him "why he supported the Union and what good did he feel the Union would do"); *Nice-Pak Products, Inc.*, 248 NLRB 1278, 1286–1287 (1980) (supervisor's questioning of employees as to "why [they] thought the employees needed a union" and "why [they] really wanted a union" unlawful interrogation).

Apple argues that Gladden's remarks are comparable to the "offhand and somewhat innocuous" comments at issue in *Bozzuto's Inc. v. NLRB*, which the Second Circuit, contrary to the Board, found did not constitute a coercive interrogation. 927 F.3d 672, 685, 686–687 (2019), denying enforcement of *Bozzuto's, Inc.*, 365 NLRB No. 146 (2017). However, the circumstances of that case are inapposite in this respect. In *Bozzuto's Inc.*, a fleeting, chance encounter between an employee and a Senior Vice President resulted in a two-sentence interaction, where the Senior Vice President asked, "what's going on with this Union stuff?" and the employee responded, "I'm not going to talk about it with you." 927 F.3d at 676. In the instant case, by contrast, Gladden deliberately approached Vasquez,

questioned Vasquez regarding his meeting with Rodriguez and the number of employees he had spoken to regarding wage rates, and then asked Vasquez what he thought about the unionization efforts at Apple. Thus, Gladden's comments involved more extensive probing, and sought more specific information regarding Vasquez' protected concerted activities and Union sentiments, than the Senior Vice President's "offhand" remark at issue in *Bozzuto's Inc.*

Other factors comprising the totality of the circumstances analysis further support the conclusion that Gladden's interrogation of Vasquez was coercive. As a senior manager, Gladden reported directly to Store Leaders Abdelal and Distasio, and was Vasquez' direct supervisor on the sales floor during that portion of his shift. See *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (interrogation coercive where questioner was employee's "direct supervisor"); *Spectrum Juvenile Justice Systems*, 368 NLRB No. 102 at p. 11 (questioning by employee's shift supervisor coercive). I do credit Gladden's testimony, which was confirmed by Vasquez, that she approached Vasquez in connection with her general practice of briefly speaking with each employee on the sales floor at the beginning of her shift.[18] (Tr. 72–73, 284.) However, Vasquez' testimony that despite their casual exchanges he and Gladden did not have a friendship or personal relationship was not contradicted. See, e.g., *Bozzuto's, Inc.*, 365 NLRB No. 146 at p. 2, fn. 6, quoting *Management Consulting, Inc.*, 349 NLRB 249, 250 fn. 6 (2007) (supervisory remarks potentially coercive regardless of supervisor's "friendship" with employee and "regardless of whether the remark was well intended"). Furthermore, Gladden's regular interactions with sales floor employees to identify herself and initiate contact at the beginning of her shift do not obviate the coercive nature of questioning regarding Union and protected concerted activity. There was no collective bargaining relationship or certification of a union as collective bargaining representative in effect for the employees at the WTC store at the time. Indeed, as of May 9, 2022, the Union organizing committee had yet to make its campaign public, and while Vasquez had spoken to Goldman and Rodriguez regarding the employees' desire for higher wages and more vacation time, at the time of his conversation with Gladden he was not an open union supporter. See *Bozzuto's, Inc.*, 365 NLRB No. 146 at p. 2–3 (employee's "leading role in the organizing campaign" irrelevant where evidence demonstrated that employee was endeavoring to "keep a low profile when engaged in union activity" "*at the time of the interrogation*") (emphasis in original).

Finally, the evidence establishes that Vasquez equivocated in response to Gladden's questions, by stating that he had not kept track of the number of employees with whom he had discussed the wage rate issue, and by denying any association or involvement with the Union. Vasquez testified that he did so in order to prevent the WTC store managers from learning that the

---

[17] Rule 801(d)(1)(B) provides that statements consistent with a witness' testimony which are offered "to rebut an express or implied charge that the declarant recently fabricated [them] or acted from a recent improper influence or motive in so testifying," or "to rehabilitate the declarant's credibility as a witness when attacked on another ground," do not constitute inadmissible hearsay.

[18] I note as well that the conversation between Gladden and Vasquez took place on the sales floor, and Vasquez was not called into a management office or otherwise subjected to circumstances creating "an atmosphere of unnatural formality." *Westwood Health Care Center*, 330 NLRB at 939, quoting *Bourne v. NLRB*, 332 F.2d 47, 48 (2nd Cir. 1964). This factor therefore militates against a finding that Gladden's questioning was coercive.

employees were attempting to form a Union. It is well-settled that an employee's evasive or untruthful response to supervisory questioning supports a determination that the questioning was coercive in nature. See *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (employee's "reluctance to answer" supervisor's questions evinces their coercive nature); *Chipotle Services*, 363 NLRB at 346; *Relco Locomotives*, 359 NLRB at 1156 (employee's untruthful answer to supervisor's query regarding his union sentiments "because he feared for his job" indicative of coercion). In this respect, I note that while there is no historical backdrop of "employer hostility or discrimination" at issue here, a factor which would militate against a conclusion that Gladden's questioning was coercive, there was no labor union recognized or certified as collective bargaining representative. Furthermore, Vasquez and the rest of the organizing committee were sufficiently concerned with the ramifications if management became aware of the Union organizing campaign that Vasquez responded to Gladden's questioning untruthfully. *Westwood Health Care Center*, 330 NLRB at 939. Such evidence contradicts Apple's argument that Gladden's reassurance to Vasquez that "Apple would always do the right thing at the end," ameliorated the coercive effect of her questioning, as does Vasquez' immediate reporting of the incident to O'Hara and to the organizing committee as a "union feeler convo." (Tr. 35, 36–38; GC Exh. 2; see Posthearing Br. at 26–27.)

For all of the foregoing reasons, the evidence establishes that Gladden coercively interrogated Vasquez on May 9, 2022, in violation of Section 8(a)(1) of the Act.

### C. Alleged Violations Based Upon the Removal of Union flyers from the Breakroom Table

#### 1. The complaint's allegations and General Counsel's Posthearing Motion to Amend

The complaint alleges two distinct violations of Section 8(a)(1) of the Act based upon Apple's removal of union flyers from the table in its employee breakroom on May 15, 2022, May 27, 2022, and June 1, 2022. First, the complaint alleges that Apple's removal of the union flyers constituted a disparate enforcement of its Solicitation and Distribution Policy, in that Apple permitted solicitation and distribution in the breakroom with respect to non-Union materials. The Complaint further alleges that Apple unlawfully confiscated union flyers in a nonworking area of the WTC store.

In her posthearing brief, General Counsel moves to amend the complaint to include an allegation that at all material times Apple maintained its Solicitation and Distribution Policy in a manner which restricted its employees' Section 7 activities, in violation of Section 8(a)(1) of the Act. (GC Posthearing Br. at 3, 35–37.) Section 102.17 of the Board's Rules and Regulations provides that amendments to a complaint may be made "upon such terms as may be deemed just" via a motion to an Administrative Law

Judge at the hearing and until the case is transferred to the Board. In order to determine whether an ALJ has properly exercised their discretion with respect to a motion to amend the complaint, the Board considers "(1) whether there was surprise or lack of notice, (2) whether there was a valid excuse for the delay in moving to amend, and (3) whether the matter was fully litigated." See, e.g., *Rogan Bros. Sanitation, Inc.*, 362 NLRB 547, 549 fn. 8 (2015), enf'd. 651 Fed. Appx. 34 (2nd Cir. 2016), citing *Stagehands Referral Service, LLC*, 347 NLRB 1167, 1171-1172 (2006); see also *CAB Associates*, 340 NLRB 1391, 1397-1398 (2003). Because Apple was provided with no notice regarding the amendment now advanced by General Counsel, and General Counsel has provided no explanation for the delay in moving to amend, General Counsel's motion is denied.

Apple was not provided with any notice that General Counsel would be alleging as a discrete violation of Section 8(a)(1) that it maintained its Solicitation and Distribution Policy in a manner which restricted the Section 7 rights of its employees prior to the submission of the parties' posthearing briefs. As discussed above, as the issuance of the December 16, 2022 Amendment to the complaint, Apple was apprised that General Counsel was contending that its conduct with respect to the distribution of union flyers at the WTC store violated Section 8(a)(1) in two distinct ways: (i) that it selectively and disparately enforced its Solicitation and Distribution Policy by prohibiting the placement of union flyers on the store's breakroom table, while permitting solicitation and distribution with respect to nonunion materials; and (ii) that it unlawfully confiscated union flyers in a non-work area. These were the extant allegations with respect to Apple's conduct involving the union flyers throughout the entirety of the hearing, during the presentation of both the General Counsel's case and Apple's. General Counsel amended the complaint in this matter twice—once on December 16, 2022 and again on the record at the hearing. But although the Solicitation and Distribution Policy has been at issue since the unfair labor practice charge in this case was filed on May 18, 2022,[19] General Counsel never, prior to submitting a posthearing brief, sought to include in the complaint an allegation that the Policy was maintained in a manner that restricted employees' Section 7 rights. See *Oncor Electric Delivery Co.*, 364 NLRB 677, 684-685 (2016), remanded in part on other grounds 887 F.3d 488 (D.C. Cir. 2018) (motion to amend made on the final day of hearing denied where General Counsel was aware of the facts underlying the allegation "prior to the beginning of the trial").

The timing of General Counsel's motion to amend is even more mystifying given the parties' opening statements in the case. During her opening statement on the 1st day of the hearing, General Counsel explicitly argued that the Board's decision in *AT&T Mobility, LLC*—which eliminated the remedy of revision or rescission of an otherwise lawful policy that was unlawfully "applied to restrict" employee Section 7 activity—should be overruled in that respect.[20] 370 NLRB No. 121 at p. 7 (2021).

---

[19] The unfair labor practice charge filed by the Union on May 18, 2022, alleged that Apple "has and continues to maintain an overly broad no-solicitation policy intended to discourage employees from engaging in union activity." GC Exh. 1(a).

[20] "In addition, General Counsel will be requesting the administrative law judge here to overturn AT&T Mobility. . . And order a remedy that would include Respondent rescinding its solicitation and distribution policy, and upon restoration of this policy, disclaim that Respondent will

As the Board discusses at length in *AT&T Mobility, LLC*, the revision or rescission remedy was premised upon the theory that the application of a lawful rule to restrict Section 7 activity engenders a conclusion that the rule itself was unlawful to maintain – a theory that the Board in *AT&T Mobility, LLC* rejected. 370 NLRB No. 121 at p. 1–2, 5–7. Yet at no time during the hearing did General Counsel move to amend the complaint to include an allegation that Apple maintained its Solicitation and Distribution Policy in a manner which restricted its employees' Section 7 activity. Apple specifically addressed the rescission and revision remedy and the import of *AT&T Mobility, LLC* in its posthearing brief, presumably based upon General Counsel's remarks in her opening statement. (R. Posthearing Br. at 45–47.) However, Apple was never on notice that an allegation that it had maintained its Solicitation and Distribution Policy in a manner which restricted employees' Section 7 rights was at issue.

With regard to the second component of the analysis, General Counsel has provided no "valid excuse" for the delay in moving to amend the complaint to include an allegation that Apple unlawfully maintained its Solicitation and Distribution Policy in a manner which restricted employee Section 7 activity. General Counsel provides no explanation whatsoever in her posthearing brief for why such a motion to amend the complaint was not made before the record closed, particularly when one motion to amend was made prior to the hearing's opening and another was made on the record. While General Counsel claims that the proposed amendment is based upon the testimony of Apple's witnesses regarding the enforcement of Solicitation and Distribution Policy, she points to no new information revealed by such testimony which would excuse the failure to move to amend the complaint before the hearing concluded. General Counsel's failure to provide any explanation or mitigating circumstances militates against granting a motion to amend raised in a posthearing brief. See *Graphic Communications Conference/Teamsters Local 137(C)*, 359 NLRB 265, 266 (2012) (motion to amend raised in posthearing brief denied where General Counsel "offers no explanation as to why he did not raise the motion before the record closed"); *Oncor Electric Delivery Co.*, 364 NLRB at 685 (motion to amend made on the final day of trial denied where "General Counsel offered no reason for why the motion to amend was not made earlier").

General Counsel argues that the motion to amend should be granted because it merely articulates a "new theory" for a violation of Section 8(a)(1) based upon the record evidence adduced at trial, citing *Hawaiian Dredging Construction Co.* and *Parexel International, LLC*. (GC Posthearing Br. at 35–36); *Hawaiian Dredging Construction Co.*, 362 NLRB 81 (2015), remanded on other grounds 857 F.3d 877 (D.C. Cir. 2017), vacated 368 NLRB No. 7 (2019); *Parexel International, LLC*, 356 NLRB 516 (2011). However, both of those cases involved violations of Section 8(a)(3) grounded in basic allegations of retaliation for union and/or protected concerted activity. See *Hawaiian Dredging Construction Co.*, 362 NLRB at 82, fn. 6 (*Wright Line* theory encompassed by allegation that Respondent discharged employees "because [they] were members of the Union" in violation of

Section 8(a)(3)); *Parexel International, LLC*, 356 NLRB at 517 ("preemptive strike theory" sufficiently related to complaint allegations that employee "engaged in concerted activities with other employees. . .by discussing wages" and was subsequently discharged by Respondent "to discourage employees from engaging in these or other concerted activities"). Here, by contrast, the violation raised by the motion to amend—the bof a Solicitation and Distribution Policy in a manner which restricted employee Section 7 activity—is distinct from the alleged confiscation of union flyers and disparate enforcement of the Policy described in the amended complaint. Thus, the violation raised by the proposed amendment is not a theory amenable to being encompassed by or subsumed in the Amended–'s extant allegations. Furthermore, the standard applied by the Board in cases such as *Parexel International, LLC* to find and remedy a violation not explicitly alleged in a complaint is different from the analysis articulated in *Stagehands Referral Service, LLC* and similar cases for determining whether an ALJ abused their discretion in granting a motion to amend. See *CAB Associates*, 340 NLRB at 1398 (Board may find and remedy a violation not specifically alleged "if the issue is closely connected to the subject matter of the complaint and has been fully litigated"); *Parexel International, LLC*, 356 NLRB at 517 (same).

For all of the foregoing reasons, Apple was not provided with notice of the proposed amendment prior to the submission of posthearing briefs, and General Counsel has not articulated any explanation for the failure to move to amend the complaint at an earlier time. As a result, General Counsel's motion to amend the complaint to include an allegation that Apple maintained its Solicitation and Distribution Policy in a manner that restricted employee Section 7 activity is denied.

### 2. The Legal Framework

It is well-established that employees are permitted to engage in solicitation and to distribute union literature during non-working time and in nonworking areas, absent a showing of "special circumstances" necessary for the employer to "maintain production or discipline." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797, 801, 805 (1945); *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 2, 23 (2018). The Board has stated that, "Interference with employee circulation of protected material in nonworking areas during off-duty periods is presumptively a violation of the Act unless the employer can affirmatively demonstrate the restriction is necessary to protect its proper interest." *Waste Management of Arizona, Inc.*, 345 NLRB 1339 fn. 2, 1346 (2005), quoting *Champion International Corp.*, 303 NLRB 102, 105 (1991). In order to overcome the presumption that a rule restricting such employee activities is unlawful, an employer "must show a compelling and legitimate business reason necessitating" the restrictions it has imposed. *Waste Management of Arizona, Inc.*, 345 NLRB at 1346, citing *Midland Transportation*, 304 NLRB 4, 5 (1991); see also *Mercedes-Benz U.S. International, Inc. (MBUSI)*, 361 NLRB 1018, 1028 (2014) (employer bears the burden of establishing "special circumstances warranting an exception to the rule that employees not on working time have

modify the policy against employees for engaging in activities protected by Section 7 of the Act." Tr. 15.

the right to distribute union literature to other such employees in a mixed use area").[21]

Consonant with the foregoing, the confiscation of union literature from non-work areas generally constitutes a violation of Section 8(a)(1) of the Act absent such a showing of special circumstances. See, *Valley Health System, LLC d/b/a Desert Springs Hospital Medical Center*, 369 NLRB No. 16 at p. 2, 16 (2020); *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 2, 23 (2018), enf'd. 775 Fed.Appx. 752 (D.C. Cir. 2019). Indeed, the Board has held that it is unlawful for an employer to confiscate union literature even if the employer could under the circumstances legally prohibit its distribution. *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 23, citing *Manorcare Health Services-Easton*, 356 NLRB 202, 204–205 (2010).

Finally, it is well-settled that the disparate or discriminatory enforcement of a facially permissible no-solicitation or no-distribution policy, in order to prohibit the dissemination of union literature while the distribution of other materials is permitted, also violates Section 8(a)(1) of the Act. See, e.g., *Novelis Corp.*, 364 NLRB 1452, 1453, fn. 10, 1489; *Intertape Polymer Corp.*, 360 NLRB 957, 958 (2014); *Ozburn-Hessey Logistics, LLC*, 357 NLRB 1632, fn. 5, 1638 (2011).

3. The Removal of union flyers from the Breakroom Table

The evidence establishes that Apple managers repeatedly removed Union literature from the table in the employee breakroom on the ground floor of the WTC store. Specifically, witness testimony and Apple's continuous video of the breakroom establishes that Store Leader Waleed Abdelal and manager Matt Moya removed union flyers on May 15, 2022. Tr. 53–55, 58, 127; GC Exh. 4 at 1:50:27-1:50:35, 1:51:08-1:51:24, 5:11:15-5:11:33.) Such evidence further demonstrates that Union literature was removed from the breakroom table on June 1, 2022, by senior manager Jorge Romero. (Tr. 144–145; GC Exh. 8 at 7:40:19-7:41:05.) Finally, the evidence establishes that on May 27, 2022, Senior Manager Yanell Brown removed flyers from the breakroom table, as depicted in a video recording made by O'Hara. (Tr. 135–138; GC Exh. 7.) There is no general contention that the employee breakroom is a work area, that Vasquez and O'Hara were on work time when they placed union flyers on the breakroom table, or that any other employees in the breakroom were on work time.

As a result, Apple is required to establish special circumstances that justify its removal or confiscation of union flyers

from the breakroom table. Apple advances two general rationales to support its removal of union literature from the breakroom table—its Solicitation and Distribution Policy and its housekeeping or cleanliness standards. For the following reasons, I find that the evidence does not substantiate either of these contentions.

Apple begins by arguing that its breakroom table is analogous to a bulletin board, so that its uses could lawfully be restricted to prohibit all nonbusiness-related matters, including the posting of union materials. (R. Posthearing Brief at 32–33.) This contention is not persuasive. While a bulletin board is generally established and maintained by an employer for the express purpose of communication with employees, a breakroom table is not. Thus, caselaw cited by Apple which permits an employer to restrict the use of a bulletin board is irrelevant. See, e.g., *Honeywell, Inc.*, 262 NLRB 1402 (1982), enf'd, 722 F.2d 405 (8th Cir. 1983). In support of this argument Apple discusses *Shamrock Foods Co.*, where the ALJ, affirmed by the Board, found that the respondent employer could lawfully remove union literature from an information counter the employer maintained in its employee breakroom. 366 NLRB No. 117 at p. 1, fn. 3, 23–24. However, in analogizing the information counter in that case to a bulletin board, the ALJ found that the information counter was "used by the Company for displaying or distributing health and fitness information." *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 23–24. The breakroom table at issue here, by contrast, was not used by Apple to provide company-generated information to employees; indeed, immediately outside the breakroom was a bulletin board maintained by Apple specifically for that purpose. There is no dispute that the breakroom table was used by the employees for non-business activities, such as eating meals, playing games, and casual conversation, during employees' non-work time such as lunch and breaks. Thus, Apple's argument that the breakroom table constituted some sort of "Apple system (electronic or physical)" which could not be used "to distribute materials or solicit employees" pursuant to its Solicitation and Distribution Policy is not compelling. (Jt. Exh. 1; R. Posthearing Brief at 32–33.)

Apple next argues that its housekeeping and cleanliness standards applicable at the WTC store permitted the removal of union flyers from the breakroom table, pursuant to *Page Avjet* and *North American Refractories Co.*[22] *Page Avjet*, 278 NLRB 444, 450 (1986) and *North American Refractories Co.*, 331 NLRB 1640, fn. 1, 1641, 1642–1643 (2000); see also *Mitchellace, Inc.*,

---

[21] "Mixed-use areas" are areas inside a facility used for both work and non-work related purposes. See, e.g., *Novelis Corp.*, 364 NLRB 1452, 1453, fn. 10 (2016); *DHL Express, Inc.*, 357 NLRB 1742 fn. 1 (2011).

[22] The Board noted in *North American Refractories Co.* that no exceptions were filed to the ALJ's recommended dismissal of the allegation in that case that the respondent employer enforced its housekeeping and distribution rules in a disparate or discriminatory manner. 331 NLRB at 1640, fn. 1. As a result, that issue was never considered by the Board, and based solely upon the Board's decision in that case the ALJ's findings on the issue would lack precedential value. However, in *Ozburn-Hessey Logistics, LLC*, the Board in its decision specifically referred to *North American Refractories Co.* as "holding that an employer may lawfully maintain and enforce housekeeping rules that result in the confiscation from nonworking areas of prounion literature left behind following break periods." 366 NLRB No. 177 at p. 11 (2018), enf. granted and

denied in part on other grounds 803 Fed.Appx.876 (6th Cir. 2000). As a result, *North American Refractories Co.* will be addressed herein.

In *Enloe Medical Center*, 345 NLRB 874, 881 (2005), also cited by Apple, the ALJ, citing *Page Avjet, Inc.* and *North American Refractories Co.*, stated that "Employers may prohibit the leaving of materials in nonwork areas." However, the Board in *Enloe Medical Center* stated that it was "unnecessary to pass on the judge's finding that employers may prohibit the leaving of materials, including union literature, in nonwork areas" given its conclusion that the employer violated Sec. 8(a)(1) by explicitly prohibiting employees from placing union literature in the breakroom. 345 NLRB at 877-878, fn. 15. Thus, *Enloe Medical Center* is not precedential authority for the proposition that, as the Board described the ALJ's finding, "employers may prohibit the leaving of materials in nonwork areas." 345 NLRB at 877.

321 NLRB 191, 198–199 (1996).[23]  However, I find that these cases are inapposite given the record evidence here.  First of all, the evidence does not establish that prior to May 15, 2022, Apple maintained a coherent housekeeping or cleanliness policy with respect to the employee breakroom table at the WTC store.  No such written policy was introduced into evidence by Apple.  See *North American Refractories Co.*, 331 NLRB at 1641 ("Company policy concerning housekeeping. . . contained in the employee handbook" and "addressed frequently by management officials at employee meetings").  Furthermore, the general contentions made by Apple's managers regarding its purported housekeeping and cleanliness policy were belied by video of the breakroom introduced into evidence.

General Counsel and Apple both introduced into evidence continuous video created by Apple of the employee breakroom at the WTC store during the store's operating hours.  General Counsel introduced video taken on May 15, 2022 (GC Exh. 4), and on June 1, 2022 (GC Exh. 8), while Apple introduced video taken on May 29, 2022 (R. Exh. 24), May 30, 2022 (R. Exh. 29), and June 2, 2022 (R. Exh. 30).  (See Tr. 344–346, 375–376.)  As an evidentiary matter, the May 15, 2022 video is substantially more probative with respect to the application of Apple's Solicitation and Distribution Policy, and its housekeeping and cleanliness standards, at the time its managers removed the Union literature from the employee breakroom table.  As discussed above, May 15, 2022 was the day that the Union "went public" with respect to the organizing campaign, and the 1st day that the employees placed flyers on the breakroom table.  Furthermore, the initial unfair labor practice charge in the instant case, alleging that Apple maintained an overly broad no-solicitation policy, was filed on May 18, 2022.  (GC Exh. 1(a-b).)  Therefore, the May 29 and 30, 2022, and June 1 and 2, 2022 videos were all recorded after at least two incidents where Vasquez and O'Hara placed union literature on the breakroom table which was removed by Apple managers, and after the initial charge in this case was filed.[24]

Given these considerations, it is important to note that the May 15, 2022 breakroom video in evidence as General Counsel's Exhibit 4 corroborates the testimony of Vasquez and O'Hara, and not Apple's witnesses, with respect to Apple's purported housekeeping and cleanliness policy or standards.  Specifically, the May 15, 2022 video shows at its very inception approximately three bottles and several other items on the breakroom table.  GC Exh. 4 (0:00:00-0:00:10).  While several managers, including Abdelal and Radechal, enter and exit the breakroom almost immediately after the recording begins, none of them remove these items from the breakroom table.[25]  See Tr. 51; GC Exh. 4 (0:0:10-0:0:15, 0:49:55-0:50:00 (Abdelal), 0:01:40-0:04:10, 0:49:33-0:49:42 (Radechal)).  Some of the items are removed by a member of the cleaning contractor staff about 45 minutes after the video begins at 7 a.m., but others are not removed by the cleaning staff until over six hours later.[26]  (GC Exh. 4 (0:47:58-0:49:05, 7:15:04-7:15-54).)  Furthermore, about two hours after the video begins a basket of fruit is placed on the breakroom table, and is not removed until seven hours later, well after it is completely empty.  (See GC Exh. 4 (1:43:54, 8:48:31-8:48:42).)  The May 15, 2022 video does not show *any* of the several managers who enter and exit the breakroom cleaning, tidying, or organizing the breakroom in any way.  (See, e.g., GC Exh. 4 (38:28, 5:07:45-5:07:58).)

Thus, the most probative video evidence conclusively contradicts the testimony of Apple's witnesses regarding the purportedly critical nature of cleanliness and organization in the employee breakroom, and regarding the managers' role in maintaining Apple's vaunted standards of housekeeping.  For example, Jennison testified that Apple managers were "popping and out" of the breakroom "throughout the day" "whenever you have a spare minute" to check on its "condition," and ensure that it was "really organized and clean."  (Tr. 229, 231.)  Abdelal testified that the managers' cleaning and organization of the breakroom was "part of our values our DNA," and "like breathing.  We just literally do it all the time…you would just go there and you would clean up as you saw things."  (Tr. 302, 307.)  Abdelal further stated, "I intentionally make sure that the team always sees me picking up trash" in "the back of the house."  (Tr. 302–303.)  Brown claimed during his testimony that Apple managers "want to make sure like we're cleaning up really proactively."  (Tr. 272.)  Jennison also testified that at the end of the day managers "reset the break room back to clean," so that the "next morning the place looks like it did when it opened for the very first time."  (Tr. 231–232.)  Abdelal echoed this testimony, stating that it "would be incredibly unlikely in our space to find anything left behind, especially overnight" given the housekeeping and cleanliness standards in effect at the WTC store.  (Tr. 306–307.)  The

---

[23] The ALJ in *Mitchellace, Inc.* cited to *Steelcase, Inc.* for the proposition that "The mere fact of a supervisor removing union literature from a break area does not constitute a violation of the Act – or rather, does not where the supervisor routinely helps keep the break area clean."  *Mitchellace, Inc.*, 321 NLRB at 198, citing *Steelcase, Inc.*, 316 NLRB 1140, 1143–1144 (1995).  However, the Board in *Steelcase, Inc.* stated that it had affirmed the ALJ's holding in that case that a supervisor's removal of union newsletters from tables in the employee breakroom was not unlawful "In the absence of exceptions."  316 NLRB at 1140, fn. 2.  As a result, *Steelcase, Inc.* lacks precedential import in this respect.

[24] General Counsel introduced into evidence photographs taken by Vasquez of items on the breakroom table in the Apple store in Texas where he is currently employed.  Tr. 66–68; GC Exh. 5.  I do not find that these photographs are probative with respect to the application of Apple's Solicitation and Distribution Policy and housekeeping and cleanliness standards at the WTC store.  Apple also elicited testimony regarding the application of its Solicitation and Distribution Policy and

housekeeping and cleanliness standards at other stores, which I also find irrelevant to the events at the WTC store.  Tr. 299–304, 352–353.  Finally, Apple adduced testimony regarding the application of its Solicitation and Distribution Policy in areas of the WTC store open to customers, and with respect to customers waiting on the sidewalk to be admitted to the store.  Tr. 255–228, 304–306, 352–357.  I find that such evidence is not relevant with respect to the enforcement of the Policy in areas of the store accessible only to employees.

[25] Abdelal and Radechal have been identified in these portions of GC Exh. 4 based upon identifications made by Vasquez while viewing this Exhibit during his testimony.  Tr. 51, 53–54; GC Exh. 4 (0:49:43-0:49:55, 1:47:16, 1:51:08-1:51:24).  The parties stipulated that Vasquez accurately identified the various managers depicted in GC Exh. 4.  Tr. 111–112.

[26] As a result, some of these items are still on the breakroom table when Abdelal first removes the union flyers.  See GC Exh. 4 (1:51:07-1:51:23).

video evidence from May 15, 2022 flatly belies all of this testimony. Instead, the video corroborates Vasquez and O'Hara's testimony regarding items left on the breakroom table throughout one of their shifts, and from 1 day to the next.

Even the videos taken after the Union began to openly campaign and the instant charge was filed contradict Apple's witnesses with respect to the application of its purported housekeeping and cleanliness policy. In the four videos taken after the charge in the instant case was filed, three of which Apple introduced into evidence, over approximately 38 hours of video Apple points to only a single instance where a manager removes items from the breakroom table.[27] (R. Exh. 24 (5:49:25); Tr. 174-177); see generally (GC Exh. 8; R. Exh. 24, 29, 30). As in the May 15, 2022 video, video from June 1, 2022, does not show any of the Apple managers who enter the breakroom cleaning or organizing.  ()See GC Exh. 8 (3:10:12-3:10:56, 3:11:23-3:13:13). Thus, the video evidence contradicts the testimony of Apple's managers to the effect that managers cleaned and organized the breakroom and the breakroom table on any sort of a consistent basis pursuant to a housekeeping or cleanliness standard then in effect. Furthermore, the videos conclusively demonstrate that when Apple managers removed union flyers from the breakroom table, they did not do so as part of some overall effort to clean or organize the breakroom. Instead, they entered the breakroom, removed the union flyers from the table, and left without performing any other cleaning, organization, or overall "sweep."[28]

Other specific circumstances at issue in the cases discussed above involving the legitimate removal of union literature pursuant to an employer's housekeeping policy or standard of cleanliness also render them inapposite. For example, in *North American Refractories Co.* and *Page Avjet, Inc.*, the record established that leaflets were left not only on breakroom tables after break times concluded, but "remained on the counters, microwaves, refrigerator and floor" engendering "employee Complaints due to the disarray." *North American Refractories Co.*, 331 NLRB at 1641, 1643; *Page Avjet, Inc.*, 278 NLRB at 450 (union literature "scattered on the floor" of the breakroom as well as "left on the tables"). Here, by contrast, the video evidence confirms Vasquez and O'Hara's testimony that they placed four Union flyers neatly on the breakroom table only. Nor is there any evidence that other Apple employees complained about the Union flyers, or about some state of disorganization that the flyers created. Furthermore, there is no evidence here that Apple

specifically informed employees that they were permitted to distribute union flyers in nonwork areas during breaks, or that the employees did so. See *North American Refractories Co.*, 331 NLRB at 1641, 1642–1643; see also *Page Avjet, Inc.*, 278 NLRB at 450. In addition, in *Page Avjet, Inc.* the alleged violation was based upon a supervisor's admission that "on the one occasion he did pick up the union literature and place it on a table outside the break area." 278 NLRB at 450. Here, by contrast, Apple managers repeatedly returned to the breakroom throughout the day and specifically removed union flyers on multiple occasions, discarding and/or shredding them. Nor did Apple managers permit the union flyers to remain on the table for an entire shift, but removed them as soon as they were discovered. See *Mitchellace, Inc.*, 321 NLRB at 199 (supervisor left union notices on break area tables "for more than 10 hours, including through two break periods and the lunch period"). As discussed herein, after removing Union flyers, Apple managers did not place them in another area where employees could possibly encounter them, but threw them away or shredded them. Thus, the evidence establishes that the managers at the WTC store "specifically targeted union literature for removal" in an unlawful manner. *Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 177 at p. 11.

For all of the foregoing reasons, the evidence establishes that Apple's Solicitation and Distribution Policy did not permit Apple to lawfully remove union flyers from the employee breakroom table, nor did its housekeeping and cleanliness standards. Thus, the evidence does not substantiate any "special circumstances" justifying Apple's removal of union flyers from the employee breakroom table. As a result, I find that the confiscation of union flyers from the employee breakroom on May 15, 2022, May 27, 2022, and June 1, 2022, violated Section 8(a)(1) of the Act.

The evidence further establishes that Apple enforced its Solicitation and Distribution Policy and its housekeeping and cleanliness standards in a discriminatory manner to prohibit the distribution of the union flyers. I credit Vasquez and O'Hara's testimony that they had seen coupons for Shake Shack and Burger King, as well as newspapers,[29] in the breakroom, and that such materials had remained on the breakroom table for an entire shift and were sometimes present at the beginning of their shift the following day. (Tr. 64–65, 92–93, 94–96, 149–150, 165–166, 166–167.) Apple argues in its posthearing brief that Vasquez and O'Hara only described approximately nine incidents where coupons or newspapers were left on the breakroom

---

[27] The other evidence referred to by Apple in its Posthearing Brief consists of employees cleaning up after themselves after using the breakroom table, which is consistent with Vasquez and O'Hara's testimony, or periods where the breakroom table is clean. R. Posthearing Brief at 43–44; Tr. 68, 150–151.

[28] Such a finding is consistent with Abdelal's testimony regarding his own removal of the Union flyers on May 15, 2022. Although Abdelal testified that he told the other managers that they should "clean [Union flyers] up like anything else" if they were "abandoned," he stated that on May 15, 2022, he specifically "went in and took them and threw them out," as opposed to removing the union flyers as part of an overall effort to clean and organize the breakroom. Tr. 310–312.

[29] Apple's contention that leaving newspapers on the breakroom table while removing union flyers does not constitute disparate enforcement

of its Solicitation and Distribution Policy pursuant to *St. Luke's Memorial Hospital*, 342 NLRB 1040 (2004), is not persuasive. R. Posthearing Brief at 39–40. In *St. Luke's Memorial Hospital*, the Board found that local newspapers provided by the respondent employer in a cafeteria which was "open to the general public" "for the convenience of the cafeteria patrons" did not constitute "sufficient evidence of discrimination" with respect to respondent's enforcement of its No-Solicitation/No-Distribution Policy to prohibit the distribution of union literature and deny access to union representatives. 342 NLRB at 1041–1042, 1045. Here, the employee breakroom was not open to the public, and there is no evidence that the newspapers in question were provided by Apple for the convenience of employees.

table at the WTC store. (R. Posthearing Brief at 37–38.) However, when arguing that its Solicitation and Distribution Policy was consistently applied and enforced, Apple's witnesses only identified four to five specific incidents where coupons and menus from restaurants were removed from the breakroom table at the WTC store. (R. Posthearing Brief at 42–43.) Jennison and Abdelal testified without contradiction regarding two specific incidents where they informed employees that they were not permitted to leave flyers in the breakroom advertising their own performance and a going-away party.[30] (Tr. 234–235, 307–308.) However, I am cognizant that these witnesses were not credible when recounting their activities in connection with Apple's purported housekeeping and cleanliness policy. Thus, on balance, the evidence establishes that the Solicitation and Distribution Policy was not consistently applied with respect to the employee breakroom at the WTC store.

The unprecedented manner in which Apple's managers effectuated the Solicitation and Distribution Policy in removing the Union flyers also indicates that this did not constitute an even-handed, non-discriminatory application of the Policy. Abdelal testified that after the other WTC store managers informed him about the Union flyers on May 15, 2022, he removed them pursuant to the Solicitation and Distribution Policy and housekeeping standards, instructing the managers that "abandoned" Union flyers should be cleaned up "like anything else." (Tr. 310–312.) However, nothing in the May 15, 2022 breakroom video, or any of the other record evidence, indicates that Abdelal took any measures to determine whether the union flyers were "abandoned." Abdelal simply entered the breakroom, took the flyers, and left. (GC Exh. 4 (1:51:07-1:51:23).) Nor does any evidence indicate that Moya, Brown, or Romero made any attempt to determine whether the Union flyers they removed from the breakroom table on May 15, 2022, May 27, 2022, or June 1, 2022, were "abandoned."[31] Instead, managers entered a breakroom containing multiple employees engaged in non-work activities and removed union flyers from around those employees. In addition, the breakroom videos establish that, as Jennison testified, the breakroom was constantly busy with employees on non-work time eating, conversing, reading, and playing games. As Jennison testified, "the break room it's busy all hours, 6:30 in the morning, 10:30 at night and so, you know, it's just kind of this ongoing, just kind of never ends." (Tr. 231.) Thus, while the store was open there was no set conclusion to break periods, such that an empty breakroom would permit managers to determine whether or not materials which remained there were "abandoned." As a result, the managers' removal of union flyers before the day ended inevitably prevented other employees from

viewing them. *Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 177 at p. 3, 10–11.

In addition, the breakroom videos establish that Moya photographed the union flyers on May 15, 2022, an action that Vasquez testified he had never witnessed previously. Abdelal's testimony that photographing the breakroom was not unusual "to celebrate. . .someone did a really great job," "let us know something was in the breakroom," or draw attention to "when standards had been unacceptable" is not corroborated and simply incredible. (Tr. 326, 341.) Given the lack of evidence to establish that photographing items on the breakroom table constituted a routine practice, I find Moya's photographing of the union flyers constitutes a distinct change in the manner in which Apple's Solicitation and Distribution Policy was applied or enforced, specific to materials involving the Union. The evidence further establishes that the unprecedented shredding of union flyers removed from the breakroom table constitutes an additional departure from Apple's typical practices with respect to the Solicitation and Distribution Policy, as per Jennison's testimony. (Tr. 148–149, 252.) In this respect, I discredit as implausible Abdelal's claim, after testifying that he "may have" told Moya to shred the union flyers Moya removed from the breakroom table on May 15, 2022,[32] that other materials which violated the Policy were sometimes shredded as opposed to simply discarded. (Tr. 326–329.) In fact, Abdelal provided no coherent explanation for how he determined which materials should be shredded as opposed to thrown out, stating that materials which were "federal per legal anything that we need to get rid of" were shredded, and that the managers did "Whatever we felt needed to be done" with respect to shredding as opposed to discarding items. (Tr. 328.) Thus, the evidence establishes that the shredding of the union flyers, as directed by Store Leader Abdelal, constituted a departure from the typical application of Apple's Solicitation and Distribution Policy.

For all of the foregoing reasons, the evidence establishes that Apple enforced its Solicitation and Distribution Policy in a disparate or discriminatory manner by removing union flyers from the table in its employee breakroom at the WTC store on May 15, 2022, May 27, 2022, and June 1, 2022, in violation of Section 8(a)(1) of the Act.

CONCLUSIONS OF LAW

1. Respondent Apple, Inc. is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Communications Workers of America, AFL–CIO ("the Union") is a labor organization within the meaning of Section 2(5) of the Act.

---

[30] Distasio's testimony in this regard, discussed by Apple in its Posthearing Brief, involved discussions on the sales floor as opposed to a non-customer area, at stores other than the WTC Store. Tr. 352–353.

[31] Brown claimed during his testimony that he did not realize on May 27, 2022, that the items he removed from the breakroom table were union flyers, testimony that I do not credit given the fact that the Union's campaign had "gone public" 12 days earlier and Abdelal's testimony regarding the degree of consternation that the union flyers had caused among the WTC store's managers. Tr. 271; see Tr. 310, 311, 331–334. Brown further contended that he spoke to an employee seated at the breakroom table to determine whether the union flyer was the employee's before

removing it. Tr. 271–272. Given Brown's unreliable claim that he did not realize that he was removing Union flyers from the breakroom table, I credit O'Hara's testimony that Brown did not in fact speak to the employee seated at the breakroom table before removing the flyer, conduct also not evinced by O'Hara's video of the incident. Tr. 133–134, 271–272; GC Exh. 7. I note that in O'Hara's video, the seated employee is wearing earbuds and is not interacting with Brown.

[32] I further credit in this respect that O'Hara's unrebutted testimony that Romero stated that he had shredded the union flyers he removed from the breakroom table on June 1, 2022.

3. On May 9, 2022, Apple coercively interrogated employees regarding their protected concerted activity and their union sympathies, in violation of Section 8(a)(1) of the Act.

4. On May 15, 2022, May 27, 2022, and June 1, 2022, Apple confiscated union flyers in its employee breakroom, a non-working area, in violation of Section 8(a)(1) of the Act.

5. By prohibiting the placement of union flyers on the employee breakroom table on May 15, 2022, May 27, 2022, and June 1, 2022, while permitting solicitation and distribution with respect to nonunion materials, Apple selectively and disparately enforced its Solicitation and Distribution Policy, in violation of Section 8(a)(1) of the Act.

6. The unfair labor practices described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

### The Remedy

Having found that Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the Act's policies.

Respondent shall post an appropriate information notice, as described in the attached Appendix. This notice shall be posted in the Respondent's facility at 185 Greenwich Street, New York, New York, wherever notices to employees are regularly posted, for 60 days, without anything covering the notice or defacing its contents. In addition to the physical posting of paper notices, notices shall be distributed electronically, posted on an intranet or an internet site, and/or other electronic means, to the extent Respondent customarily communicates with its employees in such a manner. In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed its 185 Greenwich Street facility, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since May 1, 2022.

General Counsel requests as part of the remedy that I order Respondent to rescind or revise its Solicitation and Distribution Policy, which was applied in a manner that restricted its employees in the exercise of their Section 7 rights. As discussed in detail above, such a remedy was eliminated by the Board in *AT&T Mobility, LLC*, 370 NLRB No. 121 (2021). As an Administrative Law Judge, I am required to apply existing Board precedent that has not been overruled by the Board itself or by the Supreme Court. See *Pathmark Stores, Inc.*, 342 NLRB 378, 378 fn. 1 (2004); *Waco, Inc.*, 273 NLRB 746, 749 fn. 14 (1984). Thus, General Counsel's request for an order requiring that Respondent revise or rescind its Solicitation and Distribution Policy is denied.

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended[33]

### ORDER

Apple, Inc., its officers, agents, successors and assigns shall

1. Cease and desist from

(a) Coercively interrogating employees regarding their protected concerted activities and union sympathies.

(b) Confiscating union flyers from its employee breakroom, a non-working area.

(c) Selectively and disparately enforcing its Solicitation and Distribution Policy by prohibiting the placement of union flyers on the employee breakroom table, while permitting solicitation and distribution with respect to nonunion materials.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days after service by the Region, post at its facility at 185 Greenwich Street, New York, New York, copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If Respondent has gone out of business or closed the 185 Greenwich Street facility, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since May 1, 2022.

(b) Within 21 days after service by the Region, file with the Regional Director for Region 2 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that Respondent has taken to comply.

Dated, Washington, D.C. June 20, 2023

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT coercively interrogate you regarding your protected concerted activities and your sympathies or sentiments with respect to Communications Workers of America, AFL–CIO (the Union)

WE WILL NOT confiscate union flyers in our employee

---

[33] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

18                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

breakroom, a nonworking area.

WE WILL NOT selectively and disparately enforce our Solicitation and Distribution Policy by prohibiting the placement of union flyers on the employee breakroom table, while permitting solicitation and distribution with respect to nonunion materials.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed to you by Section 7 of the Act.

APPLE, INC.

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case_02-CA-295979 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

