# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

---

In the Matter of:                                    Case No.: 02-CA-295979

APPLE, INC.

      Respondent,

and

COMMUNICATIONS WORKERS
OF AMERICA

      Charging Party

---

Place:   New York, New York (via Zoom)
Dates:   January 9, 2023
Pages: 1 through 182
Volume: 1

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC
**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

```
1                        BEFORE THE

2              NATIONAL LABOR RELATIONS BOARD

3    ---------------------------------: Case No.:

4    In the Matter of:              : 2-CA-295979

5    APPLE, INC.,                   :

6              Respondent,          :

7    And                           :

8    COMMUNICATIONS WORKERS OF AMERICA,

9    AFL-CIO                        :

10             Charging Party.      :

11   ---------------------------------:

12

13        The above-entitled matter came on for hearing pursuant to

14   notice before, JUDGE LAUREN ESPOSITO, Administrative Law Judge,

15   at the National Labor Relations Board, Region 2, Jacob K.

16   Javits Federal Building, 26 Federal Plaza, New York, New York

17   10278-3699, on Monday, January 9th, 2023, at 9:30 a.m.

18

19

20

21

22

23

24

25

26
```

```
 1                    A P P E A R A N C E S
 2   On Behalf of the General Counsel:
 3        RUTH WEINREB, ESQUIRE
 4        TANYA KHAN, ESQUIRE
 5        National Labor Relations Board
 6        REGION 2
 7        Jacob K. Javits Federal Building
 8        26 Federal Plaza Room 36-130
 9        New York, New York 10278-3699
10        Ruth.Weinreb@nlrb.gov
11        Tanya.Khan@nlrb.gov
12
13   On Behalf of the Respondent:
14        JASON R. STANEVICH, ESQUIRE
15        MAURA A. MASTRONY, ESQUIRE
16        Littler Mendelson, P.C.
17        One Century Tower
18        265 Church Street, Suite 300
19        New Haven, Connecticut 06510
20        jstanevich@littler.com
21        mmastrony@littler.com
22
23
24
25
```

```
 1   APPEARANCES (Continued):

 2   On Behalf of the Charging Party:

 3         SUMANTH BOLLEPALLI, ESQUIRE

 4         Communications Workers of America, AFL-CIO

 5         80 Pine Street, 37th Floor

 6         New York, New York 10005-1728

 7         sbollepalli@cwa-union.org

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1
2                        I N D E X
3   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE
4   Jordan Vasquez         27      71       103       106        25
5   Ian O'Hara            114     157       178        --        113
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
1                   E X H I B I T S

2    EXHIBITS              IDENTIFIED          RECEIVED

3    General Counsel's

4    GC-1                      9                   9

5    GC-2                     37                  38

6    GC-3                     41                  42

7    GC-4                     42                  59

8    GC-5                     67                  68

9    GC-6                    135                 135

10   GC-7                    138                 138

11   GC-8                    147                 147

12

13   Respondent's

14   R-17                    101                  --

15

16   Joint Exhibit

17   J-1                      10                   10

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                                    (Time Noted:  09:30 a.m.)
 3         JUDGE ESPOSITO:   Okay, Barry.  Let's go on the record.
 4         COURT REPORTER:   We are.
 5         JUDGE ESPOSITO:   This is a formal hearing before the
 6    National Labor Relations Board in the matter of Apple Inc.,
 7    Case Number 2-CA-295979.  Charging party is Communications
 8    Workers of America, AFL-CIO, and the complaint was issued by
 9    the Regional Office in New York, New York.  My name is Lauren
10    Esposito and I'm the Administrative Law Judge who will be
11    presiding over the hearing and issuing a decision on the case.
12         Because of the circumstances created by COVID-19 pandemic,
13    the hearing is being conducted remotely using the Zoom for
14    government video conference platform.  The procedures and
15    protocols for the Zoom hearing were previously discussed with
16    the parties during a pre-hearing conference, and detailed
17    written instructions and protocols were also issued.  I expect
18    everyone to comply with them, and to handle yourselves with the
19    same professionalism that you would during an in-person trial
20    or hearing.
21         Working with us for this hearing is Courtroom Deputy,
22    Gabrielle Davison, who will assist us with technical issues.
23    For anyone who has joined us only to observe the hearing, I
24    remind you to keep all of your audio and your video app turned
25    on at all times.  Any violation of this instruction or other
```

1  disruption will result in your immediate removal and possible

2  withdrawal to both Zoom and federal authorities or other

3  sanctions.

4      I also remind everyone, both participants and observers,

5  that no videotaping or audio recording is permitted.  Only the

6  Court Reporter may record the hearing in order to prepare the

7  official record of the proceedings.  Again, any violations may

8  result in removal or other sanctions.  Will Counsel please

9  state their appearances for the record, for the General

10 Counsel?

11     MS. WEINREB:   Ruth Weinreb, Counsel for the General

12 Counsel, NLRB Region 2, 26 Federal Plaza, Room 36-130, New

13 York, New York 10278.

14     MS. KHAN:   For the General Counsel, Tanya Khan, Counsel

15 for the General Counsel, NLRB Region 2, 26 Federal Plaza, Room

16 36-130, New York, New York 10278.

17     JUDGE ESPOSITO:   And for the Respondent.

18     MR. STANEVICH:   Jason Stanevich, Counsel for Respondent,

19 Littler Mendelson, 265 Church Street, New Haven, Connecticut

20 06510.

21     MS. MASTRONY:   Maura Mastrony also for Respondent, also

22 from Littler, same address Jason just mentioned, 265 Church

23 Street in New Haven, Connecticut 06510.

24     JUDGE ESPOSITO:   And for the Charging Party.

25     MR. BOLLEPALLI:   Sumanth Bollepalli, Counsel for the

1  Communication Workers of America.  Our office address is 80

2  Pine Street, 37th Floor, New York, New York 10005.

3      JUDGE ESPOSITO:   During an off-the-record conversation,

4  the parties indicated that all issues involving on the

5  production of materials pursuant to various subpoenas that were

6  served by parties on other parties and on third parties have

7  been resolved.  Is that the case, Ms. Weinreb?

8      MS. WEINREB:   Yes, Your Honor.

9      JUDGE ESPOSITO:   Mr. Stanevich?

10     MR. STANEVICH:   Yes, Your Honor.

11     JUDGE ESPOSITO:   And Mr. Bollepalli.

12     MR. BOLLEPALLI:   Yes.

13     JUDGE ESPOSITO:   All right.  Ms. Weinreb, could you

14  please introduce the formal papers at this time?

15     MS. WEINREB:   Yes.  At this time, Your Honor, I'd like to

16  have the formal papers marked as General Counsel 1A-K, K being

17  the index.  The parties have had an opportunity to review them

18  and I'd like to introduce them into evidence.

19     JUDGE ESPOSITO:   Okay.  Mr. Stanevich, Mr. Bollepalli,

20  any objection to the admission of the formal papers as General

21  Counsel Exhibit 1?

22     MR. STANEVICH:   There's no objection, Your Honor.

23     MR. BOLLEPALLI:   No objection.

24     JUDGE ESPOSITO:   All right.  General Counsel Exhibit 1 is

25  admitted.

1      (General Counsel's Exhibit GC-1 identified and received.)

2      JUDGE ESPOSITO:    During an off-the-record conversation,

3  the parties -- somebody's not muted.  Mute yourself.

4  Somebody's not muted.  Mute yourself.  During an off-the-record

5  conversation, the parties also indicated that they had entered

6  into an agreement with respect to a joint exhibit that they

7  wish to have admitted into evidence.  Would the parties like to

8  address the joint exhibit?

9      MS. WEINREB:    Your Honor, the parties have agreed to

10  introduce the Apple's solicitation policy as Joint Exhibit

11  number 1.  And I'd like to introduce that joint exhibit into

12  evidence.  Your Honor, at the same time that we'd like to

13  introduce this into evidence, I believe I had an outstanding

14  question to Mr. Stanevich.  Just to clarify, there are two

15  documents in Joint Exhibit 1.  One is dated from 2016, and one

16  is dated 2022.  And unless I'm wrong, Mr. Stanevich, that it's

17  the same policy that has been implemented at the Apple Store at

18  the World Trade Center and with Apple from 2016 until the

19  present.

20      MR. STANEVICH:    That is correct, Ms. Weinreb.  There are

21  no differences between the policy.  The policy has been the

22  same since at least 2016 when the World Trade Center store

23  opened and we would agree with the joint exhibit.

24      JUDGE ESPOSITO:    Okay.  So Mr. Bollepalli, is there any

25  objection to Joint Exhibit 1, the admission of Joint of Exhibit

1  1?

2       MR. BOLLEPALLI:   I have no objection, Your Honor.

3       JUDGE ESPOSITO:   Okay.  Joint Exhibit 1 is admitted.

4            (Joint Exhibit 1 identified and received.)

5       JUDGE ESPOSITO:   Okay.  Is there anything else that the

6  parties would like to address before opening statements?

7       MS. WEINREB:   No, Your Honor.

8       MR. STANEVICH:   No, Your Honor.

9       JUDGE ESPOSITO:   Mr. Bollepalli?

10      MR. BOLLEPALLI:   No, Your Honor.

11      JUDGE ESPOSITO:   Okay.  Let's just go off the record for

12  one moment.

13  (Off the record.)

14      JUDGE ESPOSITO:   On the record.

15      COURT REPORTER:   We are.

16      JUDGE ESPOSITO:   Thanks, Barry.  Okay, I'll hear opening

17  statements, Ms. Weinreb.

18      MS. WEINREB:   Thank you.  Counsel for the General Counsel

19  contends that the evidence will prove that Respondent, Apple

20  Inc., violated Section 8(a)(1) of the National Labor Relations

21  Act by interrogating employees about the protected concerted

22  activities and their support for the Union, the Communication

23  Workers of America.

24      Counsel for the General Counsel further contends that the

25  evidence will show that Respondent violated 8(a)(1) of the Act

1  by selectively and disparately implementing its solicitation

2  and distribution policy, by discriminating against employees

3  who support the Union, by removing Union flyers from the

4  employee break room while allowing other materials to remain on

5  the table, and independently by confiscating Union flyers from

6  the employee break room table, a non-working area.

7       During the hearing, you will hear testimony about

8  employees conducting a brief organizing campaign that occurred

9  at Respondent's World Trade Center store located at 185

10  Greenwich Street in New York City.  Counsel for the General

11  Counsel contends that the evidence will show that during this

12  organizing campaign, Respondent's Senior Manager, Stephanie

13  Gladden, approached Jordan Vasquez, an employee, and questioned

14  him about his protected concerted activities, as well as his

15  support for the Union.

16       Although Respondent may argue that it was Vasquez and not

17  Gladden who brought up the subject of the Union, Counsel for

18  the General Counsel claims that the evidence will clearly show

19  that it was Gladden and who approached Vasquez while he was

20  working, and specifically questioned him about his views of the

21  Union, and about his meeting with management, where he

22  discussed employee wages, in violation of Section 8(a)(1) of

23  the Act.

24       Respondent may also claim that the conversation between

25  Gladden and Vasquez was not coercive or unlawful since Vasquez

1  openly discussed the Union with Gladden and other managers.

2  General Counsel contends that the evidence will not support

3  Respondent's anticipated defenses.

4      You will also hear testimony about employees engaging in

5  well established protected activity by distributing Union

6  leaflets and by placing these leaflets on the table in the

7  employee break room, a non-working area.  The board has

8  repeatedly affirmed the right of employees to communicate by

9  distributing Union flyers during non-working hours in non-

10  working areas.  However, here, at Respondent's World Trade

11  Center store, several of Respondent's managers, including Matt

12  Moya, Yanell Brown, Jorge Romero, and Waleed Abdelal quickly

13  removed the flyers that were lawfully placed on the employee

14  break room table.

15      The removal of these flyers cannot be in dispute, but

16  Respondent may argue that it had the right to remove the flyers

17  since its solicitation and distribution policy prohibits all

18  third party promotional material, including Union flyers, and

19  that it implemented this policy in a consistent, non-

20  discriminatory way when it removed the flyers from the break

21  room table.

22      In addition, Respondent may claim that it has the right to

23  maintain and enforce certain housekeeping rules that result in

24  the removal of all third party non-Apple material, including

25  Union flyers, from the break room table in order to maintain a

1  clean work environment.  Therefore, Respondent may argue that

2  its policy and practices do not discriminate against Union

3  flyers since these policies prohibit all similar activities by

4  employees.

5      While Respondent solicitation and distribution policy may

6  not be unlawful on its face, it is the way in which Respondent

7  implemented this policy as well as any other housekeeping

8  policy against Union literature that is unlawful and in

9  violation of Section 8(a)(1) of the Act.

10      Under current board law, an employer, like Respondent, is

11  not free to restrict employees' ability to engage in Union

12  solicitation in the workplace during non-working time or Union

13  distribution in non-working areas during non-working time in

14  the absence of special circumstances.  In addition, an

15  employer, such as Respondent, is not free to prohibit protected

16  activity simply because it prohibits all similar activities by

17  employees, including activities that are not statutorily

18  protected.

19      The evidence in this case will show that Respondent does

20  not have any special circumstances to warrant the interference

21  with employees' right to place Union flyers on the employee

22  break room table.  Even if Respondent has certain housekeeping

23  rules, the board has held that employer cannot remove or

24  destroy pro-Union literature from non-working locations on

25  employees' time.

1       Contrary to Respondent's anticipated arguments, the
2  evidence will show that Respondent targeted the Union flyers
3  and confiscated them from the break room table while employees
4  were on their breaks in the employee break room, a non-working
5  area.  The evidence will also show that Respondent specifically
6  removed these leaflets while allowing other non-Apple material
7  to remain on the table.
8       Such a removal in this manner is a clear violation of
9  Section 8(a)(1) of the Act.  And even without a solicitation
10  and distribution policy, the confiscation in and of itself is
11  unlawful.  Moreover, Respondent may argue that the removal of
12  the flyers was not unlawful since it was de minimis in nature.
13  The flyers were removed in a few days.  No one was disciplined.
14  So what's the harm?
15       Well, the harm is significant.  The evidence will show
16  that Respondent not only unlawfully removed the flyers on
17  several occasions, but it also unlawfully interrogated an
18  employee.  As a result, the organizing campaign came to an end.
19  Counsel for the General Counsel contends that this evidence is
20  not simply de minimis in nature, since it causes significant
21  chill to protected activity.
22       As a make-whole remedy, General Counsel is seeking a
23  traditional cease and desist order, an order requiring
24  Respondent to cease interrogating employees about the protected
25  concerted activities and their support for the Union, an order

that Respondent cease selectively and disparately implementing

its solicitation and distribution policy against employees who

support the Union, and an order that Respondent cease and

desist from confiscating Union flyers from non-working areas.

In addition, General Counsel will be requesting the

administrative law judge here to overturn AT&T mobility at 370

NLRB number 121 split back at 7, 2021.  And order a remedy that

would include Respondent rescinding its solicitation and

distribution policy, and upon restoration of this policy,

disclaim that Respondent will modify the policy against

employees for engaging in activities protected by Section 7 of

the Act.

General Counsel also seeks an appropriate noticed posting

and training for management on employee rights under the Act.

Thank you.

JUDGE ESPOSITO:   Thank you, Ms. Weinreb.  Hello Mr.

Bollepalli, would you like to make an opening statement on

behalf of Charging Party?

MR. BOLLEPALLI:   Yes.  Thank you.  So in the Union's

view, this case presents a clear instance where Apple has

interfered with employees' right to engage in Section 7

activities.  And as Counsel for General Counsel pointed out,

Apple is doing this under the guise of its solicitation policy.

Today, you're going to hear two employees testify about

their efforts to organize a Union at an Apple retail store

1  located at 185 Greenwich Street.  Counsel for General Counsel

2  has provided a very detailed opening statement as to the

3  activities that the employees engaged in, specifically their

4  protected activities.

5      But briefly, just to point out the instances that are at

6  issued here.  So these employees were discussing unionizing one

7  Apple retail store during non-work time in a non-work area,

8  that's the break area.  Along with that, they left Union flyers

9  on the table.  And now this is a break room table where

10 employees read, they chat.  They have their meals.  They take

11 breaks.  They leave their personal items on the table.  They

12 leave newspapers, books, coupons.

13     And also, what you'll see is that Apple never had any

14 issue with any of this until the Union flyers were left.  Apple

15 has a on-call cleaning crew that cleans throughout the day.

16 One of the things that they're charged with is wiping down the

17 table.  Apple managers, however, are the ones who come in the

18 break room and they confiscate the Union flyers.  And as the

19 videos will show, they run out of the break room with them.

20     The employees will testify that they've been formed that

21 these flyers are shredded, rather than disposing of them in the

22 trash located in the -- the trash receptacles located in the

23 break room.  Now, while Apple permits coupons, books,

24 newspapers and other items, throughout the day when it came to

25 Union flyers, Apple managers acted very swiftly.  They targeted

1  the flyers.  It's as if Apple was watching the employees

2  engaged in protected activities while they were distributing in

3  the break room.

4      This didn't happen on one occasion, as Counsel for General

5  Counsel also pointed out.  It was not a de minimis violation as

6  Apple is claiming.  Instead, it was continuous and ongoing.

7  Similar to the interference in the employees' distribution of

8  Union flyers, Apple also interrogated an employee shortly after

9  he had discussed with Apple the need for employees to have

10  higher pay.

11      In this case, there's very little dispute as to what

12  happened Apple's break room as well as its sales score as a

13  surveillance video that captured what occurred.  What's not

14  clear is why is Apple treating Union flyers different than any

15  other third party literature, such as books, magazines,

16  newspapers.

17      As I said before, the video footage that we have

18  corroborates what the employees are saying and for the most

19  part, Apple's not denying any of it.  Evidence will show that

20  Apple did not treat other materials similar to the Union flyers

21  in the same manner.  And that's what this case is about.  Thank

22  you, Your Honor.

23      JUDGE ESPOSITO:    Thank you, Mr. Bollepalli.  Mr.

24  Stanevich, would you like to make an opening statement on

25  behalf of Respondent now or at the inception of Respondent's

1  case?

2      MR. STANEVICH:   I would like to make an opening statement

3  now if that is okay, Your Honor.

4      JUDGE ESPOSITO:   Go ahead.

5      MR. STANEVICH:   Okay.  Good morning, Judge Esposito and

6  Counsel.  The complaint in this case is quite limited as to

7  most of the allegations and the underlying unfair labor

8  practice had been withdrawn by the Union.  Paragraph 7 of the

9  complaint alleges that Stephanie Gladden, a senior manager at

10  Apple's flagship World Trade Center store, interrogated an

11  employee in May 22 regarding their support for the CWA and

12  higher wages.

13      Apple denies the allegations and leaves Counsel for

14  General Counsel to approve what you will hear directly from Ms.

15  Gladden about her conversations with the employee in question.

16  Paragraph 8 of the complaint involves Apple's solicitation

17  policy.  Notably, the complaint does not allege the policies

18  over broad or otherwise unlawful as drafted.  While that was

19  the initial allegation when the charge was filed, that's not

20  the issue at trial as the policy to the investigation phase was

21  deemed lawful by Region 2 of the National Labor Relations

22  Board.

23      Rather, the complaint alleges that Apple selectively

24  applied the solicitation policy to remove Union related

25  literature from the break room at the World Trade Center store

1  while not removing other written material from the same area.

2  There are several important points that we would like to make.

3     First, Apple allows Union solicitation in the workplace on

4  non-work time and in non-work areas consistent with well

5  established board law.  Employees have shared Union related

6  literature with each other in the break room while on non-work

7  time, without any issue or interference by Apple.  Indeed, we

8  will hear Apple fosters an open and inclusive work environment

9  whereby employees are not just permitted, but encouraged to

10  share their feelings and thoughts on a range of issues from

11  social justice topics for pay equity to anything else that they

12  feel is an important cause to promote in the work place.  And

13  employees were encouraged to even talk about Union activity

14  with each other during Daily Download sessions.

15     Second, Apple respects employee rights when it comes to

16  Union organizing and protected concerted activity.  For

17  example, Apple did not interfere when team members wore CWA

18  wristbands in the workplace in May 2022, the relevant time

19  period at issue here.

20     Three, that being said, though Apple was rightfully

21  enforcing its property rights and solicitation policy in

22  removing solicitation flyers from the break room table,

23  notably, the solicitation policy specifically prohibits use of

24  Apple's bulletin boards to among other things, to solicit

25  employees and distribute materials.

1    Employees cannot skirt the spirit and the meaning of this

2    policy by using the break room table, which is company

3    property, as a bulletin board and leaving solicitation flyers

4    there and thus turning the break room table into a de facto

5    bulletin board or a whiteboard.  The law is clear that

6    employers can restrict what is posted on bulletin boards.  And

7    Apple has done exactly that here and it's in policy and its

8    application of policy.

9        Fourth, in addition to enforcing its solicitation policy,

10   Apple simply adhered to its consistently enforced housekeeping

11   policy.  Indeed, employees have no right to clutter the break

12   room with any outside material Union related or otherwise.

13   It's not a violation of Section 8(a)(1) of the Act for Apple to

14   remove abandoned literature in the break room.

15       The law is clear, "Employees do not have a right to

16   clutter break areas with Union literature".  And the case is

17   Page Avjet 278 NLRB 444 from 1986.  Rather, employers may apply

18   their housekeeping policies and practices to clean the break

19   room and dispose of Union literature along with other related

20   materials.

21       Apple's practice is in line with well established legal

22   precedents set forth in numerous board decisions.  In North

23   American Refactories 331 NLRB 1640 from 2000, a board held that

24   an employer maintained and enforce housekeeping policies that

25   resulted in the removal of pro-Union literature from non-

1  working areas.

2      Notably, the ALJ in that case even noted that the evidence

3  would show that there were occasions where there was lunch

4  trash on the table, a magazine or two or even a newspaper that

5  material was not immediately removed, is not indicative of a

6  discriminatory purpose by the employer picking up the leaflets.

7      Indeed, Apple has engaged in consistent housekeeping

8  practices of managers and oftentimes employees, which is

9  demonstrated in video that we've provided Counsel to the

10  General Counsel regularly remove all material, including

11  solicitation materials from the break room, and the work areas

12  of the World Trade Center store when they see it.

13      The importance of a clean and organized break area will be

14  explained by several Apple witnesses who have applied this

15  practice of cleaning the break room consistently throughout the

16  years and across all stores in which they have worked,

17  regardless of any pending Union activity.

18      Likewise, Apple has not allowed employees to post non-work

19  material on the store's whiteboards which are located mere feet

20  from the break room table.  We will share multiple examples of

21  application of the solicitation policy, and manager-led

22  housekeeping practices at the World Trade Center store

23  location.

24      But there's one example that is quite notable,

25  particularly as it occurred right before any Union literature

1  appeared in the break room for the first time on May 15th.  A

2  now former Apple employee started to place flyers in non-work

3  areas and around the store in early May of 2022.  There's a

4  picture of him on the flyer and the flyer invited his Apple

5  colleagues to a going away party as he was leaving the company.

6      One manager noticed the flyers, removed them and then

7  proceeded to talk to the employee about the company's policies.

8  And a few days later, in the employee's exit interview, which

9  was on May 10th, 2022, a store leader again reminded the

10  employee about the company's policies and asked him to refrain

11  from leaving handouts in the store and in the break room.

12      As noted before, this happened several days before the

13  company applied the same exact practice to Union flyers in the

14  company break room.  Respondent's events will show a constant

15  and consistent application of the solicitation policy and

16  housekeeping policy, which is intertwined for purposes of this

17  case, on August 2016, when the store opened its doors to the

18  present.  This covers several years before the February's

19  campaign, several months in 2022, when the CWA was actively

20  organizing employees in the store, and the last several months

21  up through the start of this trial.

22      We did hear a reference to newspapers being left on the

23  table.  And I just want to point the Judge's attention to St.

24  Luke's Memorial Hospital, 342 1040 from 2004.  And in that

25  case, the board said, "In disagreeing with the ALJ's findings,

1  the NLRB held that Respondent's practice of permitting a stack

2  of regional newspapers to be placed in its cafeteria was not

3  sufficiently analogous to the Union's action of distributing

4  various materials in the cafeteria to warn a finding of

5  disparate treatments."

6      The judge goes on to say that newspapers should not be

7  compared with Union literature in terms of application of a

8  solicitation policy.  We respectfully request that the

9  complaint be dismissed in its entirety.  Thank you, Your Honor.

10     JUDGE ESPOSITO:   Mr. Stanevich, can you just give me

11  those case cites with respect to the housekeeping policy that

12  you discussed.  I just didn't catch them.

13     MR. STANEVICH:   Sure.  So the first case was Page Avjet,

14  A-v-j-e-t, Inc. 278, NLRB 444, and the year is 1986.  The

15  second case that I cited was North American Refactories 331

16  NLRB 1640 is the page number and the case is from 2000.  And

17  the last case about newspapers not being analogous with Union

18  flyers is St. Luke's Memorial Hospital 342 NLRB on page 1040.

19  And the year is 2004.  Thank you.

20     JUDGE ESPOSITO:   Thank you.  Thank you, everyone.  Is

21  there anything the parties would like to address before General

22  Counsel calls their first witness?

23     MS. WEINREB:   No, Your Honor.

24     JUDGE ESPOSITO:   No?

25     MR. BOLLEPALLI:   CWA does not have any issues.

1    JUDGE ESPOSITO:   All right.  General Counsel, you can go
2  ahead and call in your first witness.
3    MS. WEINREB:   I'd like to call Jordan Vasquez to the
4  stand, please.
5    JUDGE ESPOSITO:   Okay.  Ms. Weinreb, if Mr. Vasquez
6  is not in the --
7    MS. WEINREB:   He should be here.  There he is.
8    JUDGE ESPOSITO:   All right.
9    MS. WEINREB:   Jordan, can you give your name for the
10  record, please?  Are you going to swear him in?
11    JUDGE ESPOSITO:   Right.  Yeah, sorry.  Good morning, Mr.
12  Vasquez.  I'm Laura Esposito, I'm the Administrative Law Judge
13  who will be hearing and deciding this case.
14  Whereupon,
15                          JORDAN VASQUEZ
16  was called as a witness by and on behalf of the General Counsel
17  and, having been first duly sworn, was examined and testified
18  on his oath, as follows:
19    JUDGE ESPOSITO:   Can you please raise your right hand so
20  that we can all see it, sir?  Do you swear or affirm that your
21  testimony in this matter will be the truth, the whole truth,
22  and nothing but the truth under penalty of perjury?
23    THE WITNESS:   I do.
24    JUDGE ESPOSITO:   Thank you.  Can you please state and
25  spell your name for the record?

1    THE WITNESS:   Yes.  It's Jordan Vasquez J-o-r-d-a-n and

2  Vasquez is V-a-s-q-u-e-z.

3    JUDGE ESPOSITO:   Okay.  Does any party have voir dire for

4  Mr. Vasquez regarding his location and surroundings?  No?  Ms.

5  Mastrony?

6    MS. MASTRONY:   I'll ask him a couple of questions.

7    JUDGE ESPOSITO:   Okay, go ahead.

8    MS. MASTRONY:   Now, I can't.

9    JUDGE ESPOSITO:   Do you need to go off the record for a

10  moment?

11    MS. MASTRONY:   Sorry.

12    JUDGE ESPOSITO:   Let's go off the record for just a

13  minute.

14  (Off the record.)

15    JUDGE ESPOSITO:   Barry, let's go back on the record.

16    COURT REPORTER:   We are.

17    JUDGE ESPOSITO:   Okay, go ahead, Ms. Mastrony.

18    MS. MASTRONY:   Thank you.

19                          VOIR DIRE

20  BY MS. MASTRONY:

21  Q.   Just a couple quick questions.  Where are you located this

22  morning?

23  A.   I'm in my bedroom.

24  Q.   Okay.  Is there anyone else in the room with you?  Is that

25  a no?

1    A.    Correct.

2    Q.    All right.  I don't have any other questions.  Thank you.

3          JUDGE ESPOSITO:    Just you need to answer verbally, Mr.

4    Vasquez.

5          THE WITNESS:    Okay.

6          JUDGE ESPOSITO:    Yeah.  Just one moment.  All right.

7    There are just a few things that I'd like to review with you,

8    Mr. Vasquez, before the attorneys begin asking you questions.

9    First, it's important that you listen carefully to each

10   question before answering.  Do not start speaking or answering

11   until you're sure the question is finished.

12         The court reporter is recording what you're saying, and

13   cannot have more than one person talking at the same time to

14   make sure that everyone's statements are accurately transcribed

15   on the recording.

16         Second, if somebody objects during an attorney's question,

17   don't answer the question.  Stop and wait for me to rule on the

18   objection, again, to make sure that there isn't more than one

19   person talking at the same time.

20         Let us know immediately if you're having trouble with your

21   audio or video.  If you're having trouble with your audio or

22   video, feel free to interrupt whatever else is going on.  Tell

23   us you're having problems or wave your hand in front of the

24   camera so that we can all see it.

25         In the event that you lose your audio or video completely,

1    check your power and internet connections and reconnect or

2    reboot your device if necessary.  Then try to join the hearing

3    again, using the same link that was provided to you or attempt

4    to contact us with a backup device if you have one.  And we

5    will assist you.  Okay?

6          THE WITNESS:   Okay.

7          JUDGE ESPOSITO:   All right, Ms. Weinreb.  Go ahead.

8          MS. WEINREB:   Thank you.

9                          DIRECT EXAMINATION

10   BY MS. WEINREB:

11   Q.   Jordan, do you go by any other name?

12   A.   Yes.  I go by Clementine or Clem.

13   Q.   And when did you start using that name?

14   A.   Late December of 2021.

15   Q.   Is this a legal name?

16   A.   Yes.

17   Q.   How do you use this name?

18   A.   I use it in Apple systems at work.  I registered my phone

19   under that name, as well as social media and emails.

20   Q.   And why do you only use it on your phone, emails, and the

21   Apple system?

22   A.   I haven't received a new Social Security card yet with

23   that name on it.  So I'm unable to change it on my ID at the

24   moment.

25   Q.   Are you currently employed?

1   A.   Yes.

2   Q.   By whom?

3   A.   Apple.

4   Q.   And how long have you worked for Apple?

5   A.   Little bit over five years.

6   Q.   Where do you currently work?

7   A.   I work at the Baybrook Mall location outside of Houston,

8   Texas.

9   Q.   And how long have you been at that store?

10   A.   About four months now.

11   Q.   Did you work in another location?

12   A.   Yes.

13   Q.   Where?

14   A.   The World Trade Center location.

15   Q.   And when did you work there?

16   A.   From September 2019 until September 2022.

17   Q.   What do you do for Apple?

18   A.   I sell products and services.

19   Q.   When you worked at the Apple Store at the World Trade

20   Center, what did you do there?

21   A.   I did the same task.

22   Q.   Do you know the address for the World Trade Center stores?

23   A.   I know it's on Greenwich Avenue.  I'm blanking on the

24   address, the numbers right now.

25   Q.   Did you work a particular shift at the World Trade Center

1  store?

2  A.    No.

3  Q.    Did you get any breaks while employed at the World Trade

4  Center store?

5  A.    Yes.

6  Q.    What kind of breaks?

7  A.    Two 15s a day and one lunch break.

8  Q.    Were any of the breaks paid?

9  A.    The two 15 minutes were.

10  Q.    Are you familiar with the Communication Workers of

11  America?

12  A.    Yes.

13  Q.    How?

14  A.    I joined an organizing committee with them.

15  Q.    When did you join this organizing committee?

16  A.    January of 2022.

17  Q.    And who was on this committee?

18  A.    It was myself and other employees of the World Trade

19  Center store.

20  Q.    And what did you do on the committee?

21  A.    We met weekly and discussed how to better talk to our

22  peers about unionization.

23  Q.    And how did you meet weekly?

24  A.    We met over Zoom twice a week, and also spoke over the

25  Signal app.

```
 1   Q.    Okay.  And what's the Signal app?
 2   A.    It's a messaging application.
 3   Q.    How do you use it?
 4   A.    I use it on my phone.
 5   Q.    And how often would you communicate to the organizing
 6   committee over Signal?
 7   A.    Multiple times a day.
 8   Q.    In addition to meeting on Zoom and communicating with the
 9   committee by Signal, did you do anything else as part of this
10   organizing committee?
11   A.    Yes.  On May 15th, we did go public with our Union.
12   Q.    Okay.  Before May 15th, did you do anything as part of the
13   organizing committee?
14   A.    As part of the organizing committee, we -- mostly I spoke
15   to -- myself personally spoke to employees about the need for
16   higher wages.
17   Q.    And when did you do that?
18   A.    That was almost every day.
19   Q.    From what period of time?
20   A.    This would have been from January 2022 until late May.
21   Q.    And where would you have those conversations?
22   A.    Mostly on the sales floor, the break room, and I also
23   spoke with employees outside of work too.
24   Q.    Did there come a time when you discussed wages with a
25   manager?
```

1    A.    Yes.

2    Q.    When?

3    A.    This would have been late April.

4    Q.    Of 2022?  Yes?

5    A.    Oh, yes.

6    Q.    And with whom did you have that discussion?

7    A.    This was with the Senior Manager, Rachel Goldman.

8    Q.    And what store does she work at?

9    A.    The World Trade Center store.

10   Q.    And where did you have that conversation?

11   A.    This was on the sales floor.

12   Q.    Who initiated it?

13   A.    I did.

14   Q.    Was anyone else present?

15   A.    No.

16   Q.    Do you recall what you said to Rachel?

17   A.    I told her that I didn't believe the pay at Apple was high

18   enough for employees and wanted to know if there are ways that

19   we could go about raising that.

20   Q.    Did she respond?

21   A.    Yes.  She made me aware that there was someone named

22   Julissa who was part of a People Team at Apple and that I could

23   speak to them.

24   Q.    What is the People Team?

25   A.    They're essentially HR for Apple.

```
1   Q.   Okay.  Do you know Julissa's last name?

2   A.   I do not know.

3   Q.   Did you eventually speak to Julissa?

4   A.   I did.

5   Q.   When?

6   A.   This would have been on May 3rd.

7   Q.   And where did you speak to her?

8   A.   I spoke with her over WebEx.

9   Q.   Was anyone else on the video conference?

10  A.   No.

11  Q.   Do you recall what you said to Julissa?

12  A.   I spoke with her about the need for higher wages at Apple

13  as well as more vacation time.

14  Q.   Did she respond?

15  A.   Yes.  She said that these were things that she could

16  discuss with her managers and that she would bubble that

17  information up to them.

18  Q.   What do you mean by bubble up?

19  A.   Just to send that information up to them.

20  Q.   Was anything else said during this conversation?

21  A.   No.

22  Q.   Do you know a person named Stephanie Gladden?

23  A.   Yes.

24  Q.   Who is she?

25  A.   She was a senior manager at the World Trade Center store.
```

```
 1   Q.   Did you ever work with Gladden?
 2   A.   Yes.
 3   Q.   At the World Trade Center store?
 4   A.   Yes.
 5   Q.   Did you ever speak to Gladden while you worked at the
 6   World Trade Center store?
 7   A.   Yes.
 8   Q.   How often?
 9   A.   I would say a few times a day.
10   Q.   And where would those conversations take place?
11   A.   Usually on the sales floor or in the break room.
12   Q.   And what were those conversations about?
13   A.   We mostly talked about work, and like personal things such
14   as cycling and bars around the city, things like that.
15   Q.   Do you recall having a conversation with Gladden in early
16   May 2022 that was not only about work or personal stuff?
17   A.   I do.
18   Q.   And when in May?
19   A.   This was May 9th.
20   Q.   And who initiated this conversation?
21   A.   Stephanie did.
22   Q.   And where did it occur?
23   A.   On the second floor balcony.
24   Q.   At what store?
25   A.   The World Trade Center store.
```

1  Q.  Was anyone else present during this conversation?

2  A.  No.

3  Q.  What time of day was this?

4  A.  This would have been around 11 to 12:00.

5  Q.  And how do you know it was around that time?

6  A.  I remember it being kind of slow in the store, which is

7  usually before the after lunch rush.

8  Q.  Do you recall what Gladden said to you?

9  A.  She approached me and asked how I was doing and said she

10  heard about the meeting I had with Julissa.

11  Q.  Did you know what meeting -- oh, she said Julissa?  And

12  did you respond?

13  A.  Yes.  I said that my meeting with Julissa went well.  And

14  we discussed the need for higher pay for employees at Apple.

15  Q.  Did Gladden say anything?

16  A.  Yes.  She asked if I spoke with other employees about this

17  topic.

18  Q.  Did you respond?

19  A.  I said I have.

20  Q.  Did she respond?

21  A.  She wanted to know how many people that I spoke to.

22  Q.  Did you answer?

23  A.  I did.  I said I wasn't keeping track of that information.

24  Q.  Do you recall if Gladden said something else?

25  A.  She asked if what I thought about the unionization efforts

1    at Apple.

2    Q.    Did you respond?

3    A.    I did.  I said I was running for Congress at the time.

4    And I didn't have time to pay attention to that information.

5    But that my name had been associated with the unionization at

6    Apple, and I didn't want my name associated with anything that

7    I wasn't a part of.

8    Q.    Did Gladden respond to your comment?

9    A.    Yes.  She said that she believes that Apple would always

10   do the right thing at the end.  And I said I had agreed.

11   Q.    Do you recall if you said anything else during the

12   conversation?

13   A.    No.

14   Q.    Do you recall saying anything about an injury?

15   A.    I don't remember, no.

16   Q.    Did you say anything about your participation on the

17   organizing committee?

18   A.    No.

19   Q.    And why not?

20   A.    We were trying to keep all that information under wraps as

21   to not alert managers that we were trying to form a Union.

22   Q.    Do you recall if Gladden said anything else during that

23   conversation?

24   A.    I do not.

25   Q.    Did she say anything about your motivation at work?

```
 1    A.    No.

 2    Q.    Are you friends with Gladden?

 3    A.    We're colleagues at work.

 4    Q.    Do you socialize with her outside of work?

 5    A.    No.

 6    Q.    Did you do anything immediately after the conversation

 7    with Gladden?

 8    A.    After that, I went to the back area off the sales floor

 9    and spoke with Ian O'Hara.

10    Q.    Who is he?

11    A.    He's another member of our organizing committee.

12    Q.    Was anyone else present during that conversation?

13    A.    No.

14    Q.    Do you recall what you said to Ian?

15    A.    I told him that Stephanie was asking me about my thoughts

16    on unionization.  And he told me we would talk about it more

17    after his session with the customer ended.

18    Q.    Did you do anything else after speaking to Ian?

19    A.    After that, I sent a message to our organizing committee

20    chat and let them know that a manager had asked me about

21    Unions.

22    Q.    And how did you send that message?

23    A.    Over text through Signal.

24    Q.    And did you use a particular device to do that?

25    A.    Oh, yes.  I used my phone.
```

```
 1   Q.   And what did you text?
 2   A.   I told them that I believe it was a manager had like a
 3   Union feeler conversation with me, and I'll explain it later.
 4   Q.   Did anyone respond to that text message?
 5   A.   I remember Ian responded.
 6   Q.   Do you recall what he wrote?
 7   A.   Ian was just confirming that it was Stephanie.
 8   Q.   Do you have a copy of that text?
 9   A.   No.
10   Q.   Why not?
11   A.   I've had several new phones since then.  And the messages
12   get deleted with each new phone.
13   Q.   After Ian responded, did anyone else respond after Ian?
14   A.   I don't remember.
15        MS. WEINREB:   I'd like to show the witness what we've
16   marked as General Counsel 2, but I'd like to have it marked as
17   General Counsel 2 for identification.
18        JUDGE ESPOSITO:   Okay.  Go ahead.
19        MS. WEINREB:   I don't see it.  Okay.
20   (General Counsel's Exhibit 2 identified.)
21   BY MS. WEINREB:
22   Q.   Okay.  Mr. Vasquez, can you see what's been marked as
23   General Counsel 2 for identification?  What's on the shared
24   screen?
25   A.   Yes.
```

1  Q.   Okay.  Have you ever seen this before?

2  A.   Yes.

3  Q.   What is it?

4  A.   That's the message I sent to our group chat.

5       MS. WEINREB:   I'd like to introduce it into evidence.

6       MS. MASTRONY:   No objection.

7       JUDGE ESPOSITO:   I'm sorry, Ms. Mastrony.

8       MS. MASTRONY:   No objection.

9       JUDGE ESPOSITO:   Okay.  General Counsel Exhibit 2 is

10 admitted.

11 (General Counsel Exhibit 2 received.)

12 BY MS. WEINREB:

13 Q.   Aside from speaking to Ian and texting the organizing

14 committee, did you speak to anyone else about your conversation

15 with Gladden?

16 A.   Yes, as I was leaving work.

17 Q.   Who did you speak to?

18 A.   I spoke to Rachel Goldman.

19 Q.   And who initiated that conversation?

20 A.   I did.

21 Q.   And where did the conversation take place?

22 A.   This happened outside the store.

23 Q.   Was anyone else present?

24 A.   No.

25 Q.   Do you recall what you said to Rachel?

1   A.    I told her that a manager was asking me what I thought

2   about Unions, and if she knew why that was happening.

3   Q.    Did she respond?

4   A.    She said that she didn't know why that was happening and

5   said she could look into it and wanted to know who it was.

6   Q.    Did you respond?

7   A.    I told her I didn't really want to disclose who it was,

8   but was just checking to see if she knew anything.

9   Q.    Did Rachel respond?

10  A.    She just said that she would look into it.  And that was

11  about it.

12  Q.    Why did you speak to Rachel about this matter?

13  A.    Rachel's the manager that I trusted the most in the store.

14  And I believe that if I told her I wasn't a part of the Union,

15  more managers -- the store would be more inclined to believe I

16  wasn't a part of that.

17  Q.    Have you ever socialized with Rachel outside of work?

18  A.    No.

19  Q.    You testified earlier on about May 15th.  What happened on

20  May 15th?

21  A.    May 15th was the day that we decided to go public with our

22  Union.

23  Q.    And what do you mean we?

24  A.    We, as in myself and other members of the organizing

25  committee at the World Trade Center store.

1  Q.   And what do you mean by going public?

2  A.   That was the day that we put flyers down and alerted

3  management that we were just forming a Union.

4  Q.   Okay.  What do you mean alerted management?

5  A.    We were wearing like red wristbands that said CWA on it.

6  We had flyers out on the table with QR codes to Union cards, so

7  they were aware that this was now happening.

8  Q.   Okay.  What time of day was it that you engaged in that

9  activity?

10 A.   This was early in the morning before my shift.

11 Q.   And when did your shift start that day?

12 A.   8:00 a.m.

13 Q.   And what did you do before your shift?

14 A.   Before my shift, I handed out Union flyers with the QR

15 codes to the Union cards, as well as put Union flyers out on

16 the break room table.

17 Q.   Where did you distribute Union flyers?

18 A.   I did this outside the store and inside the break room.

19 Q.   When you went into the break room that morning, what time

20 of day was that?

21 A.   This was still before my shift.

22 Q.   And was anyone in the break room when you went there?

23 A.   Yes.  There were other employees there.

24 Q.   Did you speak to anyone?

25 A.   Yes.  I spoke to a couple of people.

1  Q.   Okay.  And how did you place the flyers on the table?

2  A.   I put two flyers on one side of the table and then Ian

3  O'Hara put two on the other side.

4  Q.   And how many flyers did you place on the table?

5  A.   There were four total.

6  Q.   Do you recall what the flyer said?

7  A.   They had just the QR codes, one for mission statement, one

8  for the Union cards, and just said what we were looking to

9  improve with the Union.

10      MS. WEINREB:   I'd like to show the witness what we've

11  marked on SharePoint as General Counsel 3 and have it marked as

12  General Counsel 3 for identification, please.

13  (General Counsel's Exhibit 3 identified.)

14  BY MS. WEINREB:

15  Q.   Mr. Vasquez, can you see the screen?

16  A.   Yes.

17  Q.   Have you ever seen this before?

18  A.   Yes.

19  Q.   What is it?

20  A.   Those are the Union flyers that we had placed on a table.

21  Q.   On what day?

22  A.   May 15th.

23  Q.   Do you know who made the flyer?

24  A.   I believe it was Ian O'Hara.

25  Q.   Do you know how you got the flyer?

1  A.    Yes.   Ian had printed those out.

2        MS. WEINREB:    I'd like to introduce it into evidence.

3        JUDGE ESPOSITO:    Any objection to the admission of

4  General Counsel Exhibit 3?

5        MS. MASTRONY:    No objection.

6        JUDGE ESPOSITO:    General Counsel Exhibit 3 is admitted.

7  (General Counsel's Exhibit 3 received.)

8        JUDGE ESPOSITO:    Mr. Bollepalli, I'm assuming you don't

9  have objections to any of these documents.   If you do, please

10  let me know.   Thank you.

11        MR. BOLLEPALLI:    I will.   Thank you.

12        MS. WEINREB:    Your Honor, at this time, I'm going to go

13  to the video as they say.   And I'd like to bring up what we've

14  had marked as General Counsel Exhibit 4.   This video was

15  produced by Respondent pursuant to our subpoena.   It's a

16  videotape of May 15th of the employee break room.   I'd like to

17  bring it up and I'd like to start it at the very beginning if

18  we can.

19        (General Counsel's GC-4 identified)

20        JUDGE ESPOSITO:    Okay.   Let me just ask you Ms. Weinreb.

21  Are you going to be simply moving for the admission of the

22  video?   Or are you going to be asking -- I'm sorry, Jordan

23  Vasquez.   What pronouns would you like me to use?   What form of

24  address?

25        THE WITNESS:    He, him pronouns are fine.

1    JUDGE ESPOSITO:    Him pronouns, okay.  All right.  Thank

2   you.  Are you going to be questioning Mr. Vasquez regarding the

3   contents of the video?

4    MS. WEINREB:    Yes, I will.  I'm sure nothing's in

5   dispute, but I think some narration is important and relevant.

6   And so I will be asking Mr. Vasquez certain questions about

7   what you will see.  I do have certain locations.  We're not

8   going to watch the entire 10-hour video.  But I do have -- I'm

9   able to -- I hope I'm able to quickly move it into the spots

10   where I think are relevant for the hearing.

11    JUDGE ESPOSITO:    Okay.

12    MS. WEINREB:    Okay.  So we have GC-4, which right now

13   you're looking at the Respondent employee break room from the

14   World Trade Center store on May 15th.  And Respondent Counsel

15   has represented to me that the tapes you'll be seeing today,

16   including the tape up on the screen now GC-4, starts at about

17   7:00 a.m. and goes through 9:00 p.m.  Because the tape does not

18   have the actual time on it, it just has hours and minutes as

19   it's rolling.  So I can't see the screen.  Let me just -- I'm

20   sorry, I can't see --

21    JUDGE ESPOSITO:    Would you like to go off the record for

22   a minute?

23    MS. WEINREB:    No.  I've got it now.  I just couldn't see

24   -- it's important for me to see the actual minutes.  So if we

25   can just look at what's on the screen now.

1  BY MS. WEINREB:

2  Q.    Mr. Vasquez, can you describe what we're looking at?

3  A.    Yes.  This is the employee break room at the World Trade

4  Center store.

5  Q.    Okay.  And if you can identify what's in this room, so

6  everyone could understand.  Like, I have the cursor here when

7  you walk into the door immediately to the left.  What is over

8  here, this rack?

9  A.    The silver rack to the left, that's going to be where

10  people put backpacks at.

11  Q.    And to the right of that, there's more racks.

12  A.    Yes.  That's going to be for shirts and coats and things

13  like that.

14  Q.    And to the right of the coats rack, what's there?

15  A.    Those are the lockers.

16  Q.    And then if you come across to the right side, what are we

17  looking at against the immediate right, the far right?

18  A.    Those are more lockers.

19  Q.    Right here?  Now, there's two cursors going on.  Tanya,

20  are you -- I can do it from here.  There were two cursors,

21  sorry.

22  A.    Okay.

23  Q.    The one right here where my cursor is to the far right,

24  what is that?

25  A.    So I actually can't see your cursor.  Okay, now, I see it.

1  Q.   Okay.

2  A.   I'm assuming you're pointing at the bottom right, I think?

3  Q.   The top right.  Or it's my top right.  Kind of middle.

4  Are these refrigerators back here?

5  A.   There are refrigerators in the room.  Yes.  By the fire

6  extinguisher against the wall?

7  Q.   Yes.  Yes, exactly.  Here's the flyers.  Yes.  And then

8  what's to the right -- oh, to the immediate right, is that a

9  trash can?

10  A.   That would be a trash can, yes.

11  Q.   And the sink is over here?

12  A.   Yes.

13  Q.   Okay.  And then what's at the bottom right?  It looks like

14  shelving or something.  What's the bottom right?

15  A.   Those -- that's where the iPads are kept.

16  Q.   Okay.  And over here on the left, the bottom left, that

17  goes towards the door, what's kept here?

18  A.   Those are our payment devices.

19  Q.   Okay.  And this is the table, I guess, and chairs, the

20  break room table.  This is the hallway.  There's an entrance

21  here to the break room, right?

22  A.   Yes.

23  Q.   If you go -- can you tell me what's outside that entrance?

24  What directions can people go and what's immediately outside

25  that area?

1  A.   So from our point of view, if you walk out that hallway,

2  when you take a left, there are more white tables and then the

3  manager -- a door to the manager's office.  If you take a right

4  instead of going left, that leads you straight out to the sales

5  floor.  And if you go straight ahead, from our point of view,

6  there is a table in the very back, that's where some people eat

7  lunch.  There's also vending machines back there and the

8  bathrooms.

9  Q.   Okay.

10  A.   Also, Ruth, I don't know if you're using your cursor, but

11  I can't see anything on my screen.

12  Q.   Oh, you can't see my cursor.  Okay.

13       MS. WEINREB:   Okay, so maybe does someone else have their

14  cursor ability with the share?  I don't know.  Ms. Davison,

15  does someone else have the ability to have a cursor?

16       MS. DAVIDSON:   I believe since Ms. Kahn is screen sharing

17  that that would be her cursor.

18       MS. WEINREB:   Okay.  All right.  Let's go back.  Wait,

19  wait, what happened here?  Also, I can't even do the moving of

20  the screen then.  Okay, Tanya, I'm going to need assistance

21  then.  Okay.  Tanya?

22       JUDGE ESPOSITO:   Ms. Khan?

23       MS. KHAN:   Sorry, I was having a problem with turning my

24  mic back on.  Yeah, what I can do Ruth is I can just stop

25  sharing and then you can just post the video on your computer

1 and share from your screen.

2      MS. WEINREB:   Why don't you just do it?  I'll just give

3 me where to stop.  Okay.

4      MS. KHAN:   Okay, that's fine.  I'll do that.

5      MS. WEINREB:   If we can do it that way.

6      MS. KHAN:   Yeah, that's fine.  I'll do that.

7      MS. WEINREB:   We can go to 37 minutes and 50 seconds on

8 the tape.

9      MS. KHAN:   One second.  Can you give me that timing

10 again?

11      MS. WEINREB:   37 minutes and 50 seconds.  Okay, 37:41 is

12 fine, too.  We're not going to get it exactly right.

13      MS. KHAN:   Okay.  I have at 37:41 right now.

14      MS. WEINREB:   Okay.

15      MS. KHAN:   Let me know when to press play.

16      MS. WEINREB:   Play.  Please stop.  Can you just stop it

17 for a minute?

18      MS. KHAN:   It's stopped, yeah.

19      MS. WEINREB:   Okay.

20 BY MS. WEINREB:

21 Q.   Jordan, can you take a look at this, what's at 37:45.

22 What happened?  Oh, it changed.  Do you see yourself in this

23 room?

24 A.   Yes.  I'm on the bottom right corner with the red beanie

25 on.

1      MS. WEINREB:   Okay.  Let's go ahead.

2      MS. KHAN:   Play?

3      MS. WEINREB:   Yeah.  I think I'm going to have to have

4  control, because I know I think -- okay.

5      MS. KHAN:   Let me give you control.

6      MS. WEINREB:   I think it's just better if I have control.

7      JUDGE ESPOSITO:   Let me know if you want to go off the

8  record in order to deal with this.

9      MS. WEINREB:   Do I have to go to SharePoint, Tanya?

10     MS. KHAN:   No, I gave you -- it says it's waiting for you

11 to control the screen, so you should have a option to gain

12 control on Zoom.  Otherwise, you can just pull it up on your

13 SharePoint and then share your screen, if that's easier for

14 you.

15     MS. WEINREB:   Where does it -- I don't have something on

16 Zoom that says I can do this.  Where am I looking on Zoom?

17     JUDGE ESPOSITO:   Go off the record.

18 (Off the record.)

19     COURT REPORTER:   We are.

20     MS. WEINREB:   Right now, what we're looking at is that

21 same videotape from May 15th at the employee break room from

22 the World Trade Center.  And I have it at 36 minutes and 56

23 seconds.  So if we can just watch the video.

24 BY MS. WEINREB:

25 Q.   And Mr. Vasquez, as the video goes, if you could tell me

1  whether you walked into that, whether you're in the shot or
2  whether you walk in or whether any manager walks in.  Just tell
3  me right away and I'll stop the video for you to identify the
4  person.  Oh, wait a second, where is it going?  It just went
5  backwards a little bit.  Just a second.
6  A.   So I'm walking in right now.
7  Q.   And which one are you?
8  A.   The pink and blue backpack with the red beanie.
9  Q.   Okay.  Right here?
10  A.   Correct.  Yes.
11  Q.   So at 37:41, you walked in.  And let me know if any
12  manager comes in.  What are you doing there?
13  A.   Placing the Union flyers on the table.
14  Q.   On the picture in the top right, correct?
15  A.   Yes.
16  Q.   Let me know if any manager comes in.  Do you recognize
17  this person with the pink hat and the blue shirt?
18  A.   Yes.  That's Ian O'Hara.
19  Q.   Right up here in the center?
20  A.   Yes.
21  Q.   With the pink baseball cap?
22  A.   Yes.  So a manager is walking in right now.
23  Q.   Right.  This person?
24  A.   Yes.
25  Q.   And what's his name?

1  A.   Ryan.

2  Q.   He's right at the entrance, the door?

3  A.   He is.  And another manager right there but she's leaving.

4  Q.   The person in the door.

5  A.   Yes.

6  Q.   What's her name?

7  A.   That's Rachel.

8  Q.   Rachel Goldman?

9  A.   Yes.

10 Q.   What's Ian doing up here on the top of the screen at the

11 table?

12 A.   Ian is also placing flyers down.

13 Q.   Let me know if any managers walked in.

14 A.   Yes, right now.  Right --

15 Q.   This person, right next to you?

16 A.   Oh, yes.

17 Q.   And who is that?

18 A.   That's Waleed.

19 Q.   Okay.  Clean shaven head?

20 A.   Yes.

21 Q.   I'm going to now move the tape to 49:12.  First of all,

22 let me just -- before it goes, this is at now I've moved the

23 same tape to 49 minutes and 12 seconds.  Can you tell us what's

24 on the break room table?

25 A.   Yes.  The Union flyers are on the table at the top.

1   Q.   Are there any managers in the screen right now?

2   A.   That looks like Waleed next to the table.

3   Q.   Okay.  Tell me if you see any managers.

4   A.   No, I don't think that's it.  Sorry.  All right, that's a

5   manager entering now.

6   Q.   And who is that walking in?

7   A.   That's Ryan.  And there's another manager at the bottom,

8   Tyler.

9   Q.   Which one?

10  A.   Right next to him.

11  Q.   Right here?

12  A.   Yes.

13  Q.   Next to Ryan?

14  A.   Yes.

15  Q.   At the bottom of the screen, and that's at 49 minutes and

16  43 seconds?

17  A.   Yes.  And Waleed's entering right now.

18  Q.   Let me just -- 49:55, this is Waleed right by the orange

19  device on the floor?

20  A.   Yes.

21  Q.   Who's this person to the right on the middle of the --

22  next to the sink?

23  A.   That's Tyler.

24  Q.   But not the cleaning person who's at the sink, but the one

25  in front of the sink.

1    A.    Right.

2    Q.    He's Tyler?  He's a manager?

3    A.    Yes.

4    Q.    Who just walked in?

5    A.    That's Matt Moya.

6    Q.    And who is he?

7    A.    He's also a manager.

8    Q.    So right at the entrance of the door at 50 minutes and 53

9    seconds, you've identified Matt Moya walking into the break

10   room on May 15th.

11   A.    Yes.

12   Q.    Let me just back up a little bit.  I'm sorry.  If we can

13   just get right to Matt Moya in a second.  So that's Matt Moya

14   walking in as you identified.

15   A.    Yes.

16   Q.    Know what he did right there?

17   A.    It appears he took a photo.

18   Q.    I can't stop my camera.  There it goes.  Okay.  Have you

19   ever seen Moya take a photograph of something from the table?

20   A.    No.

21   Q.    Have you ever seen any manager take a photograph of

22   something from the table?

23   A.    No.

24   Q.    Okay.  I'd like to move the tape.  We're at 1 minute, 46

25   seconds and 17 -- one hour into the day, 1 hour 46 minutes and

1   17 seconds.  Did you enter -- are you in this picture?

2   A.   Yes, the bottom with the iPad and the red beanie.

3   Q.   Right here, with the beanie on the bottom right?

4   A.   Yes.

5   Q.   Are there any managers in the room at this time?

6   A.   No.

7   Q.   And where are you now at 1 hour 46 minutes and 27 seconds?

8   A.   I'm exiting.

9   Q.   Let me know if a manager comes in.

10  A.   Right now.

11  Q.   Okay.  Who's entering at the door?

12  A.   It's Ryan right there where the cursor is at.

13  Q.   Okay.  That's at 1 hour 47 minutes and 16 second, Ryan is

14  at the entrance of the door.

15  A.   And Ryan's entering.

16  Q.   That's Ryan at 1 hour 49 and 10 seconds at the door.

17  A.   Right.  And --

18  Q.   Who's that?  My screen's -- oh, God.  Who just walked in,

19  this person with the clean shaved head that walked in at about

20  1 hour 50 minutes and 26 seconds but we're now at 29 seconds?

21  Who is this person?

22  A.   That's Waleed.

23  Q.   That's Waleed.  And who is Waleed?

24  A.   He's the store leader.

25  Q.   Where's Waleed going now?

1  A.    Exiting the store, or exiting the break room, I'm sorry.
2  And that's me entering.
3  Q.    At 1 hour, 15 minutes, and 54 seconds?
4  A.    Yes.
5  Q.    That's you entering with the mask?
6  A.    Yes.
7  Q.    Are you exiting now?
8  A.    Yes.
9  Q.    At 1 hour, 51 minutes, and 4 seconds.
10 A.    Yes.  And Waleed just entered.
11 Q.    Excuse me?
12 A.    Waleed just entered.
13 Q.    At 1 hour 51 seconds and -- 51 minutes and 9 seconds,
14 that's Waleed just entering the break room?
15 A.    Yes.
16 Q.    What's he doing right now at 1 hour, 51 seconds, and 14 --
17 51 minutes and 14 seconds?
18 A.    He's removing the flyers we placed from the break room
19 table.
20 Q.    He's turning left outside of the break room entrance.
21 What's down that area?
22 A.    That's the manager's office.
23 Q.    And anything else?
24 A.    And the lunch tables, that's it.
25 Q.    So at 1 hour, 51 minutes, and 23 seconds, it shows Waleed

1  walking left out the entrance of the break room.  I'm going to

2  move it to five hours.  We're at 5 hours and 4 minutes and 24

3  seconds from the beginning of the tape.  Are there flyers on

4  the table at this point?

5  A.   No.

6  Q.   And let me know if you walk in or if any managers walk in

7  at this point.

8  A.   Oh, right there.

9  Q.   Who was entering at 5 hours and 5 minutes and 40 seconds?

10  A.   That's myself in the red beanie and Ian O'Hara in the pink

11  hat.

12  Q.   Okay.  Let me just ask you, when you entered this time,

13  what time of day was it?  What were you doing?

14  A.   This would have been around 3:00 to 4:00 p.m.  This would

15  have been my lunch break.

16  Q.   What is Ian doing?

17  A.   Placing the Union flyers down on the table.

18  Q.   And we're at 5 hours and 5 minutes, and 54 seconds on the

19  tape.  Let me know if any managers walk in.

20  A.   Right now.

21  Q.   And who is that entering the door at 5 hours, 07 minutes,

22  and 45 seconds?

23  A.   That's Matt Moya.

24  Q.   He's wearing a jacket?

25  A.   Yes.

1  Q.   What's he doing now?  Excuse me.

2  A.   Exiting.

3  Q.   What's Moya doing now?

4  A.   He's exiting the room.

5  Q.   At 5 hours and 7 minutes and 58 seconds.  To just fasten

6  things up, I'm going to move it a little bit.  It's at 5 hours,

7  9 minutes, and 36 seconds.  Are you still in this video?

8  A.   Yes.

9  Q.   And where were you at?

10  A.   The bottom with the red beanie.

11  Q.   Is Ian O'Hara still in it?

12  A.   Yes, to the right of me.  And Matt Moya is in the room as

13  well.

14  Q.   Where's Matt Moya?

15  A.   Oh wait, no.  I'm sorry.  I don't think that's him.

16  Q.   And you're leaving.

17  A.   Yes.

18  Q.   Where are you going?

19  A.   I believe to sit down in the back.  I don't know.  There's

20  Matt Moya.  Sorry, he is in the room.

21  Q.   Next to you right now that was Matt Moya in the room?

22  A.   Yes.

23  Q.   And he's leaving now.

24  A.   Yes.

25  Q.   That's Matt Moya at the exit at 5 hours, 10 minutes, and

1    11 seconds.

2    A.    Yes.

3    Q.    And you and Ian are leaving?

4    A.    Yes.

5    Q.    At 5 hours, 10 minutes, and 14 seconds.  You just came

6    back.  Where is Ian?  Do you see him down here?  Where is he?

7    A.    Ian's going to where we sit down eat lunch at.

8    Q.    Are there chairs there?

9    A.    Yes.

10   Q.    So at 5 hours, 10 minutes, and 20 seconds, the video does

11   show Ian O'Hara in the back on the top upper left hand of the

12   screen with his blue shirt.

13        JUDGE ESPOSITO:    I'm sorry.  Is that your testimony, Mr.

14   Vasquez?  Is that Mr. O'Hara going down the corridor?

15        THE WITNESS:    Yes, that is my testimony.

16        JUDGE ESPOSITO:    Okay.

17   BY MS. WEINREB:

18   Q.    Who just walked in?

19   A.    Ian walked in again.

20   Q.    And he's wearing the blue shirt with the pink hat?

21   A.    Yes.

22   Q.    Where were you and Ian now?

23   A.    We're heading to the back to sit down, it looks like.

24   Q.    How far is that area from the entrance to the break room?

25   A.    It's like 10, 15 feet.

1    Q.   And what's in that area?

2    A.   The area where we were sitting down at.

3    Q.   I know, but what's there physically?  What's in that area?

4    A.   Oh, yeah.  That's vending machines and the bathrooms, and

5    a table with two chairs.

6    Q.   And why were you going there?

7    A.   That's where we go to eat.

8    Q.   Who's entering now?

9    A.   That's Matt Moya.

10   Q.   Okay, so at 5 hours and 11 minutes and 15 seconds, Matt

11   Moya is entering, correct?

12   A.   Yes.

13   Q.   What's he doing now?

14   A.   He's removing the Union flyers.

15   Q.   So at 5 hours, 11 minutes, and 19 seconds, Moya is

16   removing the flyers.  And where is Moya now?

17   A.   Exiting.

18   Q.   Okay, at 5:11:33, he's exiting.  Where are you and Ian?

19   A.   Still at the end of the hallway.

20   Q.   And what did you see from that hallway?

21   A.   From there, I can see the entrance, anyone coming in from

22   the sales floor, anyone leaving the manager's office, anyone

23   leaving the break room.

24   Q.   Could you see Moya at this time?

25   A.   What's that?  I'm sorry.

1  Q.   Did you see Moya at this time?

2  A.   Yes.

3  Q.   He turned left.  Do you know where Moya went?

4  A.   Left is to the manager's office.

5  Q.   Did you see him go in the office?

6  A.   No.

7  Q.   Okay.

8       MS. WEINREB:   Your Honor, at this time, I'd like to

9  introduce General Counsel 4, the videotape of May 15th into

10 evidence.

11      JUDGE ESPOSITO:   Is there any objection to the admission

12 of General Counsel Exhibit 4?

13      MS. MASTRONY:   No objections.

14      JUDGE ESPOSITO:   All right.  General Counsel Exhibit 4 is

15 admitted.

16 (General Counsel's Exhibit 4 received.)

17 BY MS. WEINREB:

18 Q.   Mr. Vasquez, did there come a time when you spoke to a

19 manager about the Union flyers?

20 A.   Yes.

21 Q.   When?

22 A.   This was on May 15th.

23 Q.   And what time of day was that?

24 A.   The time of day would have been the afternoon.

25 Q.   And to whom did you speak?

1   A.   I spoke to Waleed.

2   Q.   And who initiated this conversation?

3   A.   I did.

4   Q.   Was anyone else present?

5   A.   No.

6   Q.   Where did the conversation occur?

7   A.   Outside of the store.

8   Q.   Do you recall what you said to Waleed?

9   A.   Yes.  I asked Waleed why he had taken down the Union

10  flyers.

11  Q.   Had you seen Waleed take down the flyers that day?

12  A.   No.

13  Q.   So why did you ask him the question?

14  A.   Somebody told me that it was him.

15  Q.   Did Waleed respond?

16  A.   Waleed said that Apple has a no solicitation policy, and

17  that I wasn't allowed to distribute that material.

18  Q.   Did you respond?

19  A.   Yes.  I said that we're employees, and that it was during,

20  like, a non-work time.  And he still said that I wasn't able to

21  do that.

22  Q.   And did he say anything else?

23  A.   Waleed said he could also send me the policy if I'd like

24  to read it.

25  Q.   Did you respond to that?

1  A.    Yes.  I said I would like to see it.

2  Q.    Did you receive the policy?

3  A.    Yes.  He texted it to me later that day.

4       MS. WEINREB:   I'd like to show the witness the Joint

5  Exhibit 1 that's been introduced into evidence.

6       MS. KHAN:   I'll put it on.  But Ruth, you just have to

7  stop sharing your screen.

8       MS. WEINREB:   Okay.

9  BY MS. WEINREB:

10 Q.    Mr. Vasquez, if you could look at what's been introduced

11 into evidence as Joint Exhibit 1.  Have you ever seen this

12 before?

13 A.    Yes.

14 Q.    And what is it?

15 A.    This is the policy that Waleed had sent me.

16 Q.    Did you review the policy?

17 A.    Yes.

18 Q.    After reviewing it, did you do anything?

19 A.    Yes.  I asked to speak with him again the next day.

20 Q.    And did you speak to him?

21 A.    Yes.

22 Q.    Where?

23 A.    On the sales floor.

24 Q.    And was anyone else present?

25 A.    No.

1   Q.   And do you recall what you said?

2   A.   Yes.  I told him that I looked at the policy and that I

3   didn't believe that we violated it.  We distributed during non-

4   work times in a non-work area.

5   Q.   Did Waleed respond?

6   A.   Yes.  Waleed just kept repeating that that was the policy

7   and I needed to respect it.

8   Q.   Did he say anything else?

9   A.   Yes.  He said that I could also speak with Julissa again

10  if I wanted to.

11  Q.   And did you speak to Julissa?

12  A.   Yes.  I spoke with her a few days later.

13  Q.   And who initiated that conversation?

14  A.   I did.

15  Q.   Where did the conversation take place?

16  A.   Over the phone.

17  Q.   Was anyone else on the call?

18  A.   No.

19  Q.   Do you recall what you said to Julissa?

20  A.   Yes.  I made Julissa aware of the situation and that we

21  were distributing Union flyers.  And I told her I reviewed the

22  policy and didn't believe it was a violation.

23  Q.   Did she respond?

24  A.   Yes.  She says that Apple isn't -- or that we aren't

25  allowed to, I guess, distribute third party material on Apple

1  and gave examples of things such as like Girl Scout cookies,

2  stuff like that and -- but I just repeated that we're not third

3  party.  We're Apple employees.  And that was about it.

4       MS. WEINREB:    I'm just going to show you -- if we can

5  show GC-3 again please to the witness.

6       MS. KHAN:    I will do that right now.

7  BY MS. WEINREB:

8  Q.    Mr. Vasquez, you testified that this was the flyer you

9  distributed on the morning of May 15th.  What are the little

10 black squares on the document on the left side and the right

11 side?

12 A.    Those are QR codes.

13 Q.    And what does that connect you to?

14 A.    It'll send you to a website that one of them will have the

15 mission statement that we wrote up, and the other one is a link

16 to the Union cards.

17 Q.    Okay.  You testified that you left this flyer down in the

18 morning of May 15th.  What flyer was left in the break room

19 table the second time the afternoon that you went there?

20 A.    They were the same amount of flyers.

21 Q.    Okay.  Did you leave any other flyers in the break room

22 after May 15th?

23 A.    No.

24 Q.    Why not?

25 A.    I had multiple managers telling me it was a policy

1  violation.  So I thought it'd be best just to speak with people

2  in person.

3  Q.   Okay.  Thank you for showing the exhibit.

4       JUDGE ESPOSITO:   Is General Counsel 3 in evidence, Ms.

5  Weinreb?

6       MS. WEINREB:   I believe it is.

7       JUDGE ESPOSITO:   Okay.

8       MS. WEINREB:   If it isn't, I'll move to have it

9  introduced.  I thought it was.

10      JUDGE ESPOSITO:   Barry, is General Counsel Exhibit 3 in

11 evidence?

12      COURT REPORTER:   Oh, yeah.

13      JUDGE ESPOSITO:   Okay, thank you.

14 BY MS. WEINREB:

15 Q.   We saw a lengthy video and it had a table of a break room

16 table.  How is that table used?

17 A.   That table is used for eating lunch, playing games.

18 People will sit there and read.  There's also newspapers that

19 are usually there in the morning.  And I have seen coupons

20 there before as well.

21 Q.   What type of coupons on the table?

22 A.   There were Shake Shack coupons when they had opened up.

23 And they were left on the break room table.

24 Q.   Do you know how long they were on the break room table?

25 A.   I saw them there from when my shift began to when I left

1   to go home.

2   Q.    And what about newspapers on the table, do you know how

3   long they are on the table?

4   A.    Newspapers, I've seen newspapers there from one shift

5   until my next shift the next day.

6   Q.    And how do you know it's the same newspaper?

7   A.    It had the same cover on it.

8   Q.    Have you ever seen anyone clean the break room?

9   A.    Yes.

10  Q.    Who?

11  A.    Our cleaning crew.

12  Q.    Have you ever seen anyone clean the break room table?

13  A.    Yes.

14  Q.    Who?

15  A.    The cleaning crew and employees after they're done eating.

16  Q.    Did you ever see managers clean the break room?

17  A.    I have not.

18  Q.    Have you ever seen managers clean the break room table?

19  A.    I have not.

20  Q.    Did you ever see managers clean coupons or newspapers off

21  the table.

22  A.    I have not.

23  Q.    When we went through the video you described various

24  managers entering the break room during the day on May 15th.

25  Aside from that time that you saw them on May 15th entering the

1  break room, have you ever seen managers go into the break room

2  on other days?

3  A.   I have.

4  Q.   How often?

5  A.   I'd say a couple times a day.

6  Q.   And what have you seen them do while in the break room?

7  A.   Sometimes they'll be in there to get their lunch from the

8  fridge.  Sometimes there'll be in there to eat at the table or

9  use the microwaves.

10 A.   Does your current Apple store in Texas have an employee

11 break room?

12 A.   It does.

13 Q.   And what's in the break room in that store?

14 A.   A lot of the same items.  You've got a fridge, trash cans,

15 sink, coat hangers, lockers, things like that, as well as a big

16 table in the middle.

17 Q.   And what have you seen on the break room table at your

18 current location?

19 A.   At this location, there are usually snacks on the table.

20 Q.   Wait, what?

21 A.   Snacks on the table.

22 Q.   Oh, snacks.

23 A.   And there are also coupons that have been there for

24 several days, as well as I've seen a container from another

25 company promoting their services as well on the container

1  that's been there for several days.

2      MS. WEINREB:    Okay.  I'd like to show the witness on what

3  we've marked as General Counsel 5, and I'd like to have it

4  identified as General Counsel 5.

5  (General Counsel's Exhibit 5 identified.)

6  BY MS. WEINREB:

7  Q.   If you could take a look at this what's been marked as

8  General Counsel 5 for identification.  If you could scroll

9  down, there's three pages to it.  Have you seen these images

10  before?

11  A.   Yes.

12  Q.   When?

13  A.   I took those images.

14  Q.   How did you take it?

15  A.   With my cell phone.

16  Q.   And when did you take it?

17  A.   I believe this was a month or so ago.

18  Q.   And what are these photos of?

19  A.   Those are coupons that had been left for several days on

20  the break room table at my current store.

21      MS. WEINREB:    I'd like to put General Counsel 5 into

22  evidence.

23      JUDGE ESPOSITO:    Any objection to the admission of

24  General Counsel Exhibit 5?

25      MS. MASTRONY:    No objection.

1    JUDGE ESPOSITO:   General Counsel Exhibit 5 is admitted.

2    (General Counsel's Exhibit 5 received.)

3    BY MS. WEINREB:

4    Q.   Mr. Vasquez, have you ever received any instructions from

5    Apple to clean up the break room and break room table?

6    A.   Just like to throw away trash when we're done eating,

7    stuff like that.

8    Q.   Did managers ever give you instructions to clean up the

9    break room and break room table?

10   A.   Outside of just cleaning up after yourself, no.

11   Q.   Before May 15th, 2022, did any manager ever tell you that

12   you were not allowed to place any third party material on the

13   break room table?

14   A.   After what date, I'm sorry?

15   Q.   Before May 15th.

16   A.   Before, no.

17   Q.   Before May 15th, did any manager ever tell you that you

18   couldn't place any non-Apple material on the break room table?

19   A.   No.

20       MS. WEINREB:   No further questions.

21       JUDGE ESPOSITO:   All right.  Mr. Bollepalli, do you have

22   any questions for Mr. Vasquez?

23       MR. BOLLEPALLI:   I do not have any questions.

24       JUDGE ESPOSITO:   No?

25       MR. BOLLEPALLI:   No.

1      JUDGE ESPOSITO:   Okay.  Ms. Mastrony?

2      MS. MASTRONY:   I will have some questions.  But first

3  we'd like to review the Jencks material.

4      JUDGE ESPOSITO:   Okay.

5      MS. WEINREB:   Yes.  I will email that to you now.

6      THE WITNESS:   I have one question, Your Honor.

7      JUDGE ESPOSITO:   Okay.  Do you want to go into a breakout

8  room with Ms. Weinreb?  I'm not sure what kind of question this

9  is.

10     THE WITNESS:   No, I was just seeing if I could take a

11  five-minute break.

12     JUDGE ESPOSITO:   Sure.  As a matter of fact, after --

13  we'll take a break for Ms. Mastrony to review the materials

14  that Ms. Weinreb is sending her now.  So just wait a minute and

15  let's say --

16     MS. WEINREB:   Did you get it?  I sent it.

17     MS. MASTRONY:   Not yet.  Yeah, just gotten it.

18     MS. WEINREB:   Okay.

19     JUDGE ESPOSITO:   Okay.  So Ms. Mastrony, how long would

20  you like to review the Jencks materials and prepare for cross

21  examination?

22     MS. MASTRONY:   Can we come back at like 12:10?

23     JUDGE ESPOSITO:   That sounds fine.  So let's go off the

24  record.  We'll be back at 10 after 12.

25     MS. MASTRONY:   Thank you.

1    JUDGE ESPOSITO:   Off the record.

2   (Off the record.)

3    JUDGE ESPOSITO:   Mr. Vasquez, as cross examination

4   General Counsel have indicated that there was a preliminary

5   matter that she had neglected to address and she would want to

6   do so now.  So go ahead, Ms. Weinreb.

7    MS. WEINREB:   So at this time, the General Counsel would

8   like to withdraw certain allegations from the amendment to the

9   complaint.  We'd like to withdraw the revised paragraph

10   8(b)(II) as it pertains to Matt Moya on or about May 30th or

11   June 2nd.  This is in the amendment to the complaint.  We'd

12   like to withdraw that.

13    And we'd like to withdraw the part of the paragraph in

14   8(b)(IV), the Yanell Brown on or about May 30th or June 2nd,

15   2022 as well.  So it's not the entire allegation related to

16   those two individuals but it's just part, the May 30th and June

17   2nd timeframe.

18    JUDGE ESPOSITO:   Okay, so just to be clear.  So you're

19   withdrawing paragraph 8(b)(II) in terms of the May 30th or June

20   2nd incident involving Mr. Moya.

21    MS. WEINREB:   Judge, I'm sorry.  I'm having some trouble

22   hearing you.  It's almost like you're farther from your

23   microphone.

24    JUDGE ESPOSITO:   I'm sorry.  Okay.

25    MS. WEINREB:   It's much better.

1    JUDGE ESPOSITO:   Is it better?

2    MS. WEINREB:   It is.

3    JUDGE ESPOSITO:   I'm moving too far back then.

4    MS. WEINREB:   Thank you.  Sorry about that.

5    JUDGE ESPOSITO:   No, no, no, I'm glad.  Thank you for

6  letting me know.  So Ms. Weinreb, you were withdrawing a part

7  of the amended complaint on paragraph 8(b)(II) regarding the

8  May 30th or June 2nd incident involving Mr. Moore.

9    MS. WEINREB:   Moya, correct.

10    JUDGE ESPOSITO:   Moya, and then you're withdrawing

11  8(b)(IV) involving the May 30th or June 6th incident with Mr.

12  Brown.

13    MS. WEINREB:   Correct.

14    JUDGE ESPOSITO:   Okay.  I'm sorry.  Do you have a

15  question about that, Ms. Mastrony, that you'd like to address

16  on the record?

17    MS. MASTRONY:   No.  That was clear.  Thank you.

18    JUDGE ESPOSITO:   Anything else before we begin the cross

19  examination of Mr. Vasquez?

20    MS. WEINREB:   No.

21    JUDGE ESPOSITO:   Okay.  All right.  Ms. Mastrony, go

22  ahead.

23    MS. MASTRONY:   Thank you.

24                          CROSS EXAMINATION

25  BY MS. MASTRONY:

1  Q.   All right.  Good afternoon, Mr. Vasquez.  I questioned you

2  briefly before, but just to reintroduce myself.  My name is

3  Maura Mastrony.  I'm representing the Respondent in this

4  matter.  I do have some questions for you based on the

5  testimony you just gave in your direct examination.  So first

6  question for you is, do you have any materials in front of you

7  that you're looking at or that are just in front of you?

8  A.   Just my hair band.

9  Q.   All right.  Did you have any in front of you while you

10 were doing your direct exam?  I'm sorry, I didn't hear you.

11 A.   Oh, no.

12 Q.   Okay, thank you.  All right, so let's first start with the

13 testimony you gave regarding your conversation with Ms.

14 Gladden.  Do you remember testifying about that previously?

15 A.   Yes.

16 Q.   All right.  Did you record that interaction with Ms.

17 Gladden?

18 A.   No.

19 Q.   I'm sorry?

20 A.   No.

21 Q.   Okay.  All right.  I think you testified that Ms. Gladden

22 approached you for that conversation, right?

23 A.   Yes.

24 Q.   All right.  And was that unusual for her to approach you

25 during your shift?

1  A.    No.

2  Q.    All right.  So it was actually pretty frequent that she

3  would -- or not frequent.  It was not unusual that she would

4  approach you to ask how you were doing at the start of your

5  shift or the first time she saw you for your shift.

6  A.    Correct.  Yes.

7  Q.    Okay.  And you said that you discussed a couple of things

8  with her.  She asked about your meeting with Julissa, right?

9  A.    Yes.

10  Q.    Okay.  And then she then asked you about your thoughts on

11  the Union activity going on at Apple, right?

12  A.    Yes.

13  Q.    Okay.  And after that, she kind of ended the conversation,

14  right?

15  A.    Before that, there was more than just those two incidents.

16  Q.    Okay, what else did she discuss with you?

17  A.    When she  asked about my meeting with Julissa, she also

18  asked what it was about.  I told her what it was about.  And

19  then she asked if I had spoken to any other employees about

20  what it was about, which was the pay increase at Apple.

21  Q.    Okay.  And do you recall approximately how long this

22  conversation was?

23  A.    I'd say maybe five to 10 minutes or so.

24  Q.    All right.  Would it surprise you to know that it was more

25  like 20 minutes?

 1  A.   Kind of, yeah.

 2  Q.   Okay.  All right.  And you had told her that you were

 3  concerned about being viewed as a Union supporter, right?

 4  A.   Yes.

 5  Q.   Right.  But you were pretty vocal about your support for

 6  the Union, weren't you?

 7  A.   No.

 8  Q.   You weren't?

 9  A.   Not to management, no.

10  Q.   Okay.  Did you ever discuss your support for the Union

11  during a download?

12  A.   After May 15th, yes.

13  Q.   Okay.  And did you do that on more than one occasion?

14       MS. WEINREB:   Objection, relevancy.  The witness

15  testified about May 15th.  Now we're talking about something

16  beyond May 15th.

17       MS. MASTRONY:   Well, he testified that he didn't want to

18  be known as a Union supporter and showing that he was vocal

19  about his support for the Union.

20       MS. WEINREB:   But the conversation with Gladden happened

21  way before May 15th.  And now you're focusing on something that

22  happened after May 15th.

23       MS. MASTRONY:   I understand that.

24       MS. WEINREB:   I don't think it's the relevancy.

25       JUDGE ESPOSITO:   Okay.  I'll allow you to ask about this

1  -- well, you need to explain what the download is, Ms.

2  Mastrony.

3      MS. MASTRONY:    Sure.

4      JUDGE ESPOSITO:    Go ahead.

5  BY MS. MASTRONY:

6  Q.    Mr. Vasquez, can you just for the Judge's own edification,

7  can you explain what a download is?

8  A.    Yes.  So a download is a, like, work meeting that we have

9  every morning about, like 15 minutes or so.  And that's where

10  we discuss things like what's going on at Apple, what our

11  focuses are for the day, the week, things of that nature.

12  Q.    Okay.  I am going to show you a document we have marked as

13  Respondent's Exhibit 17.  I'm just going to share my screen

14  here.  All right, let me know when you can see it.

15  A.    I can see it.

16  Q.    All right.  And do you recognize what this document is?

17  A.    I am trying to remember.  I mean, I obviously participated

18  in this.

19  Q.    Is that your name at the top there?

20  A.    It is.

21  Q.    Okay.  And do you remember writing this text message?

22  A.    Yes, I think so.

23  Q.    All right.  So your text messages would have been in the

24  gray on the left-hand side, correct?

25  A.    Yes.

1   Q.   All right.  And do you remember with whom this exchange

2   was?

3   A.   I don't know.

4   Q.   Okay.  Do you remember writing your essentially review via

5   text message?

6   A.   Review, as in?

7   Q.   Well, the first text message says, "My brain is way too

8   foggy to write my review.  I tried this morning.  Do I have to

9   write it before tomorrow?"

10  A.   Let's see.  Okay.  Oh, so this was like a yearly review.

11  Okay, I think I know who this is for.

12  Q.   Okay, who was it for?

13  A.   I believe this is Aaron.

14       MS. MASTRONY:   Okay.  I'd like to enter this as a full

15  exhibit.

16       MS. WEINREB:   Objection, Your Honor.  We don't even know

17  who that -- a proper foundation hasn't been made.  We don't

18  even know who this text message is with, when it was written,

19  the relevancy of it.  So I object to introduction into

20  evidence.

21       JUDGE ESPOSITO:   Okay.  Ms. Mastrony, what's the

22  relevance of the --

23       MS. MASTRONY:   Again, just goes to the fact that he was

24  not hiding his support for the Union.  You can see right in his

25  review that he wrote via text message that he displayed

1  excellent leadership skills by helping bring the store together

2  to form an organization effort.

3      THE WITNESS:   This was done in June or July.

4      MS. WEINREB:   There's no witness.  There's no question.

5      JUDGE ESPOSITO:   Hold on, Mr. Vasquez.  Yeah, but when --

6  okay, when did this -- I don't understand the context for this

7  and when it occurred.

8      MS. MASTRONY:   Well, I'd have to ask the witness when it

9  occurred.

10     JUDGE ESPOSITO:   I mean, is the argument that this is

11 relevant to whether or not he was what's conceived as an open

12 Union supporter at the time of the alleged interrogation?

13     MS. MASTRONY:   No, just that he was a known Union

14 supporter.

15     JUDGE ESPOSITO:   Okay.  But I do think the time is

16 irrelevant to the extent that at least you move to establish

17 when this occurred in order for me to determine the extent of

18 its probative value.

19 BY MS. MASTRONY:

20 Q.   Okay.  Mr. Vasquez, can you tell us approximately when

21 this text message exchange occurred?

22 A.   This would have had to have done with my yearly review and

23 those happen -- this year, it happened -- I've forgotten either

24 June or July, one of those two months.

25     JUDGE ESPOSITO:   Which year are you talking about, Mr.

1  Vasquez?

2       THE WITNESS:   2022.

3       JUDGE ESPOSITO:    2022, okay.

4       MS. WEINREB:    Your Honor, I still object to foundation.

5  We haven't had a definitive answer as to who is the text

6  exchange between.  Mr. Vasquez said it has his name on top, but

7  we don't even know who the actual person is.

8       MS. MASTRONY:    I'm not sure that's relevance, because he

9  has admitted that he wrote this text message and that it is his

10 yearly review.  So I'm not sure the --

11      MS. WEINREB:    There's no identification that it's a

12 supervisor.  And he also just testified that it would have

13 happened in June or July of 2022, which is way beyond the scope

14 of the complaint.

15      JUDGE ESPOSITO:    Okay.  I understand, Ms. Weinreb.  The

16 witness identified the material in the gray areas as material

17 that he wrote.  Do you recall, Mr. Vasquez, who sent you the

18 material in the blue area?

19      THE WITNESS:    So this seems like it would have been from

20 a connection manager, which would have been Aaron.  But like I

21 said, I -- so I can't confirm that as like certain.

22      JUDGE ESPOSITO:    Okay.  Ms. Mastrony, are you prepared to

23 put on evidence through another witness or other documents that

24 will establish the identity of the individual who placed the

25 material in the blue?

1    MS. MASTRONY:   We could.  I also think it's relevant

2   because he told Ms. Gladden that he wasn't a Union supporter.

3   And this goes to his credibility.  He's writing in his annual

4   review that he had excellent leadership skills by helping to

5   bring together an organization effort.

6        THE WITNESS:   I also testified that --

7        MS. WEINREB:   Okay.  There's no question for you, Mr.

8   Vasquez.

9        JUDGE ESPOSITO:   Mr. Vasquez, these evidentiary arguments

10   are something that the lawyers do with me.  So unless you're

11   being asked the question, you don't have to worry about

12   answering it.  If there's something that the lawyers feel that

13   they need to ask you, they'll do that.  Okay?

14        THE WITNESS:   Okay.  Sorry.

15        JUDGE ESPOSITO:   No, that's fine.  I just want you to

16   understand the process.  Okay.  So I'm sorry, what was that

17   last remark you made, Ms. Mastrony, regarding the relevance of

18   the material?  It had to deal with the credibility because to

19   Ms. Gladden, he stated that he was not involved in the Union in

20   the conversation that he discussed during his direct testimony.

21   I don't really want to get too much into the law in this area.

22   I'm not going to admit this until there's some kind of

23   definitive evidence for the fact that it went to management,

24   okay, or that the individual who put the material in the blue

25   area was a manager at the store.  So far, Mr. Vasquez's

1  uncertainty with respect to exactly who this text exchange took

2  place with.

3       MS. MASTRONY:   All right, that's fine.  We'll leave it

4  for ID for now.

5  BY MS. MASTRONY:

6  Q.  All right, so let me stop the share.  All right, so Mr.

7  Vasquez, you testified that after speaking with Stephanie --

8  I'm sorry, Ms. Gladden, that you then spoke with Ian, correct?

9  A.  Yes.

10 Q.  All right.  And then you sent a text message, correct?

11 A.  I sent a message over Signal.

12 Q.  I'm sorry.  Pardon my lack of technology.  All right.  So

13 I'm going to put this back up for you.  I am just going to

14 share my screen.  This is GC's Exhibit 2.  Just let me know

15 when you can see it.

16 A.  I see it.

17 Q.  All right.  And this was your text message to a group?

18 I'm sorry, your Signal message on some sort of group chat,

19 right?

20 A.  Yes.

21 Q.  All right, that's that OC chat up there?  I'm sorry.  You

22 have to speak up.

23 A.  Yes.

24 Q.  All right.  And what's OC?

25 A.  Organizing committee.

```
1   Q.   Okay.  And so this blue text here is from Ian?

2   A.   Yes.

3   Q.   All right.  And you testified I think that you didn't

4   recall if he responded, correct?

5   A.   Yeah.  I said that he did respond.

6   Q.   You said what?  I'm sorry, if you responded?

7   A.   Yes.

8   Q.   You do not recall if you responded.

9   A.   I don't.

10  Q.   All right.  And did you have the rest of the text chain to

11  verify whether you responded?

12  A.   I do not, no.

13  Q.   Okay, you just somehow had only these two text messages

14  from this chain.

15  A.   What was that, I'm sorry?

16  Q.   You somehow only had these two Signal messages from this

17  chain?

18       MR. BOLLEPALLI:   Objection.  She's misstating his

19  testimony.

20       MS. MASTRONY:   I'm asking.

21       JUDGE ESPOSITO:   Yeah, overruled.  Go ahead.

22       THE WITNESS:   No.  This isn't from me.

23  BY MS. MASTRONY:

24  Q.   Oh, this was not produced from you.

25  A.   Correct.
```

1   Q.   Okay.  All right.  Let me put this down, sorry.  Okay, you
2   also testified that on May 15th, you wore red bracelets with
3   CWA on them, right?
4   A.   Yes.
5   Q.   All right.  No one from Apple management stopped you from
6   doing that, right?
7   A.   No.
8   Q.   All right.  Did you pass those bracelets out to other
9   colleagues of yours at Apple?
10  A.   Yes.
11  Q.   All right.  And no one from Apple management stopped you
12  from doing that, did they?
13  A.   No.
14  Q.   All right.  And then you also testified that on that day,
15  you got there early.  I think you said about 30 minutes early,
16  and you started handing out flyers in the break room, right?
17  A.   I was handing out flyers outside the store and placed
18  flyers on the break room table.
19  Q.   All right.  Did you hand out any flyers to anyone in the
20  break room at that point?
21  A.   No.
22  Q.   All right.  But you placed them on the break room table.
23  A.   Right, for people to scan.
24  Q.   For people to?
25  A.   Scan with the camera.

1  Q.   Oh, scan.  All right.  And during that time period too,

2  about 30 minutes before your shift, you also were speaking with

3  employees in the break room about the Union, right?

4  A.   Yes.

5  Q.   All right.  And did anyone from Apple management stop you

6  from doing that?

7  A.   No management was in the break room at the time.

8  Q.   Okay, so no one stopped you from having those

9  conversations, right?

10 A.   Right.  Nobody was in the room.

11 Q.   Okay.  All right.  We're going to go back to the video of

12 the 15th which is GC's Exhibit 4.  I'm just going to play --

13 let me share this first.  All right.  Tell me when you can see

14 it.

15 A.   I can see it.

16 Q.   All right.  So I'm going to play this now.  And give it a

17 few seconds and just tell me if you see yourself or Ian come

18 into the room.  I'm starting at 6:01.

19 A.   Okay.

20 Q.   All right.  So who just entered the break room?

21 A.   That's Ian O'Hara.

22 Q.   All right.  And that's at 6:01:29?

23 A.   Yes.

24 Q.   I'm sorry.  Let me clarify.  That's 6 hours in, 1 minute,

25 and 29 seconds.  I know it's not the time.  All right.  So

1  let's keep this going.  All right.  So we're now at 6 hours, 1
2  minute, 50 seconds.  What's Ian doing now, if you can tell from
3  the video?
4  A.    Placing flyers on the table.
5  Q.    All right.  Are those the same Union flyers you had placed
6  on the table previously?
7  A.    Yes.
8  Q.    All right.  Let's continue it.  I'm just stopping it here.
9  Were you in the break room at this time?
10 A.    No.
11 Q.    All right.  Let me try and move it a little bit.  All
12 right.  I'm picking back up at 6 hours in, 2 minutes, 59
13 seconds.  All right.  I'm going to stop it right there.  What's
14 Ian doing here?
15 A.    Looks like he's rearranging a flyer.
16 Q.    All right.  Let me keep it playing.  Let me stop it there.
17 Is that you in the break room in the red hat?
18 A.    Oh, yes.  Sorry.
19 Q.    Okay.  I'm going to keep playing it.  All right.  I'm
20 going to stop it here at 6:03:29.  So was he rearranging the
21 flyers or was he removing the flyers?
22 A.    Looks like he's rearranging the flyers.  I see one at the
23 bottom right, it looks like --
24 Q.    What about the -- go ahead.
25 A.    That's all.

```
 1   Q.    Is he holding some flyers in his hand?
 2   A.    He's holding flyers in his hand it seems.
 3   Q.    Okay.  The three that he just picked up, he now has in his
 4   hand?
 5   A.    Yes, looks like he's rearranging them.
 6   Q.    All right.  Let's keep it playing.  And who is he speaking
 7   to over there in the top right.
 8   A.    That I can't tell.
 9   Q.    Okay.  I'll keep it playing.  All right.  So he didn't put
10   those flyers back on the table, did he?
11   A.    It doesn't appear so.
12   Q.    Right, because he's actually putting them into a locker,
13   right?
14   A.    Right.  It looks like it's his bag.
15   Q.    Okay, so I'm sorry, his bag.  So he removed those flyers
16   from the table, didn't he?
17   A.    It looks like it.
18   Q.    Okay.  And at that point that he removed them, was there
19   any manager around him that you could see?
20   A.    Well, I can't see who he's talking to?
21   Q.    Okay, you can't tell if that's a manager?
22   A.    No.  It's too blurry.
23   Q.    Okay.  All right.  Now, with respect to the break room, I
24   know you testified about what occurs in there previously.  But
25   isn't it true that employees who are working and not on any
```

1   kind of break regularly go into the break room to obtain

2   devices they need to work with?

3   A.   Can you repeat the question, sorry?

4   Q.   Sure.  Isn't it true that employees who are working, so

5   not on some sort of break, routinely go into the break room

6   while they're working to obtain devices they need to work?

7   A.   Yes.

8   Q.   And can you tell us what devices are in the break room

9   that employees might need to access for work purposes while

10  they are working?

11  A.   iPads and payment devices.

12  Q.   Okay.  And these devices are actually kept a mere feet

13  from the actual break room table, right?

14  A.   Correct.  Yes.

15  Q.   All right.  Now, at one point, you testified that Mr. Moya

16  who's management took a picture of the flyers that were in the

17  break room table.  Do you remember that testimony?

18  A.   I do.  Yes.

19  Q.   All right.  Were you in the break room at that point?

20  A.   I was not, no.

21  Q.   All right.  Do you know for certain that he took a photo

22  of the flyers?

23  A.   At the time of the testimony, I -- well, in questioning

24  with Ruth in preparation, I remember things differently now

25  than I did when I did that testimony.

1   Q.   What does that mean?

2   A.   Ruth asked me different questions.  And I will remember

3   things a lot more clearly.

4   Q.   With respect to what?

5   A.   Whether he was taking any photos or not.

6   Q.   So are you changing your testimony?

7   A.   No.

8   Q.   I'm not really sure I understand your clarification here.

9   A.   Right.  What I'm saying is that I -- when I gave the

10   testimony, I had believed that it was Moya that took the

11   photos.  But upon, like further questioning and things that

12   happened at the time that I do not remember Moya taking these

13   photos.

14   Q.   Okay.

15   A.   Moya was not in the room.

16   Q.   Okay.  All right.  And while you were testifying

17   previously, Ms. Weinreb asked you to identify every time a

18   manager came in the room.  Do you remember that?

19   A.   Yes.

20   Q.   All right.  And you identified numerous managers just in a

21   few minutes of video that we saw, correct?

22   A.   Yes.

23   Q.   So isn't it true that managers frequently come in and out

24   of the break room?

25   A.   Yes.

1  Q.    And not just to eat lunch, right?

2  A.    Not all the time.

3  Q.    All right.  So there are times that they go into the break

4  room for less than a minute to just pop in without eating

5  lunch, right?

6  A.    Yes.

7  Q.    All right.  And you showed us numerous examples of that

8  during your testimony.

9  A.    Yes.

10  Q.    All right.  All right.  I'm going to put up GC's Exhibit 3

11  here.  All right, just let me know when you can see it.

12  A.    I can see it.

13  Q.    All right.  And so this is one of the flyers that you left

14  on the break room table, correct?

15  A.    Correct.

16  Q.    All right.  And you testified previously that in speaking

17  with Julissa and Waleed, that you didn't understand their

18  reference to third party material because you are an Apple

19  employee putting this flyer out, right?

20  A.    Yes.

21  Q.    All right.  Do you see a reference to CWA on there?

22  A.    Yes.

23  Q.    All right.  That's at the bottom of the flyer?

24  A.    Yes.

25  Q.    All right.  That's not Apple, is it?

1   A.   No.

2   Q.   That's the Union, right?

3   A.   Yes.

4   Q.   All right.  And then you have two QR codes on here as

5   well, right?

6   A.   Yes.

7   Q.   All right.  And under the one -- or above the one on the

8   right, it says, "Add your name to join the movement".  You see

9   that?

10  A.   Yes.

11  Q.   All right.  So you are inviting your colleagues to take a

12  picture of that QR code to see what is under that, right?

13  A.   In our break room, during our breaks, yes, I am.

14  Q.   Okay, to join the movement, right?

15  A.   Yes.

16  Q.   And what was that?  If an employee clicked on that QR

17  code, what would pop up?

18  A.   That one would be Union cards.

19  Q.   All right.  And when you say Union card, you're talking

20  about an authorization card?

21  A.   Yes.

22  Q.   All right.  And then on the left, there's another QR code

23  that says, "Read our store's vision statement here".  And what

24  was that?  If they clicked on that QR code, what would they see

25  there?

1  A.   That would take you to the mission statement that myself

2  and other OC members wrote.

3  Q.   Okay.  Was it about the store?

4  A.   It was about why we want to unionize our store.

5  Q.   Okay.  Was it about the Union?

6  A.   It was about why we want to unionize our store.

7  Q.   All right.  Do you recall telling Ms. Weinreb during the

8  investigation of the charge, that that QR code was to the

9  Union's mission statement?

10      MS. WEINREB:   Objection.  What he told is irrelevant.

11 What he told the investigator and me, if you have evidence that

12 you want to reflect in terms of the affidavit and you want to

13 talk to him, but what he told me is not relevant.  And it could

14 be work product.

15      MS. MASTRONY:   All right.  Well, I'm looking at the

16 affidavit that he submitted where he said that that QR code was

17 for the Union's mission statement.

18      MS. WEINREB:   Okay.  So would you like to direct the

19 witness to the point in the affidavit?

20      MS. MASTRONY:   No.  I'm asking Mr. Vasquez if he recalls

21 representing that that QR code on the left-hand side was for

22 the Union's mission statement.  Do you recall that?

23      MS. WEINREB:   It's not clear.  I don't --

24      MS. MASTRONY:   Ruth, I'm allowed to ask him if he

25 remembers something.  I can refresh his recollection after the

1  point.

2      JUDGE ESPOSITO:   All right.  Hold on.  Mr. Vasquez, do

3  you recall whether that was part of your affidavit?

4      THE WITNESS:   I do not.

5  BY MS. MASTRONY:

6  Q.   Okay.  Then I will put it up for you.  All right.  Are you

7  able to see this?

8  A.   No.

9  Q.   Oh, I see.  All right, tell me if you are able to see it.

10  I'm just scrolling to the top.

11  A.   I can see you scrolling, yeah.

12  Q.   All right.  So you see at the top here, it says

13  confidential witness affidavit, and that is you, correct,

14  Jordan Vasquez?

15  A.   Yes.

16  Q.   All right.  Let's just scroll down to the bottom.  Is that

17  your signature?

18  A.   Yes.

19  Q.   All right.  And if you look at paragraph 20 here, that's

20  the flyer we left on the break room table, it has two QR codes

21  on the flyer.  One code connects to the Union card website, our

22  employees can sign Union, I believe that's supposed to be

23  cards.  And the other code is for the Union's mission

24  statement.  You see that?

25  A.   I see it.

1  Q.   All right.  Does that refresh your recollection as to what

2  that other QR code was?

3  A.   Right.  The Union as in us the employees trying to form

4  the Union, yes.

5  Q.   Okay.  So it was the mission statement that you drafted?

6  A.   Myself and other members of the organizing committee, yes.

7  Q.   Okay.  All right.  You testified earlier that you had seen

8  Shake Shack I think you said coupons left on the break room

9  table at the World Trade Center store, is that correct?

10 A.   Yes.

11 Q.   All right.  And were they coupons?  Did you ever know?

12 A.   They were coupon like advertisement.  Green Cards.

13 Q.   Okay.  And did you ever discuss this issue with Waleed at

14 any point?

15 A.   No.  I wasn't aware of the policy.

16 Q.   That wasn't my question.  Did you discuss the Shake Shack

17 vouchers with Waleed at any point?

18 A.   No.  I wouldn't.

19 Q.   Okay.  Did you know that the Shake Shack vouchers were put

20 there by Apple?

21 A.   The vouchers and coupons are two different things.

22 Q.   Okay.  So are you referring to Shake Shack coupons as

23 opposed to vouchers?

24 A.   I'm referring to coupons not vouchers.

25 Q.   Okay.  So you do see that there were Shake Shack vouchers

1  put there by Apple at some point, correct?

2  A.   I have not seen vouchers put on tables.  Vouchers are

3  handed to us from our team in the back.

4  Q.   Okay.  So the only thing that you saw on the table with

5  respect to Shake Shack was Shake Shack coupons.

6  A.   Yes.

7  Q.   Okay.  All right.  And how many times did you see Shake

8  Shack coupons in the break room table?

9  A.   I've only -- that has only happened once.

10  Q.   Okay.  And how many were there in the table?

11  A.   They were a handful.  I don't remember an exact number.

12  Q.   Okay.  All right.  And you also testified about your break

13  room at your Texas location.  You recall that testimony?

14  A.   Yes.

15  Q.   All right.  I'm going to put up pictures.  All right.  Let

16  me know when you can see them.  This is GC's 5.

17  A.   I see them.

18  Q.   All right.  And you testified that these are some

19  documents that were left on the break room table in Texas,

20  right?

21  A.   Yes.

22  Q.   All right.  Do you have any pictures like that in the

23  break room table at the World Trade Center?

24  A.   I do not.

25  Q.   All right.  So you don't have any pictures of non-Union or

1  non-Apple material being left on the break room table at the

2  World Trade Center, do you?

3  A.   I was not aware of the policy.  So no, I did not take

4  photos at the time before I was aware of the policy.

5  Q.   Okay.  But you became aware of the policy as of May 15th?

6  A.   Yes.  And before then when the coupons were on the table,

7  I was not aware of the policy.  So there was no reason for me

8  to take a photo of those.

9  Q.   All right.  Do you know if those coupons were eventually

10  removed?

11        MS. WEINREB:   Objection, no identification of what

12  coupons you're referring.

13        MS. MASTRONY:   I think he is referring to the Shake Shack

14  coupons that he testified about, but --

15        MS. WEINREB:   He's talking about the Texas one, so I'm

16  not sure --

17        JUDGE ESPOSITO:   Okay.  Ms. Mastrony, are you asking

18  about the Shake Shack coupons now?

19        MS. MASTRONY:   Yes, I am.

20  BY MS. MASTRONY:

21  Q.   Do you know if the Shake Shack coupons you testified about

22  that were present on the break room table at the World Trade

23  Center store were eventually removed by anyone?

24  A.   Eventually, yes.

25  Q.   Okay.  Do you know for how long they were sitting out on

1  the table?

2  A.    I saw them when I left for work.  And that was about it.

3  Q.    And then how do you know if they were removed?

4  A.    I don't remember seeing them again.

5  Q.    Okay.  All right.  And then you also testified that you

6  recall that newspapers were left on the World Trade Center

7  break room table, I believe you said from the end of your one

8  shift to the next day at the start of your next shift.  Is that

9  accurate?

10  A.    Yes.

11  Q.    All right.  Do you recall if you mentioned that detail in

12  your affidavit that we just looked at?

13  A.    I don't recall.

14  Q.    All right.  Let me put it up for you.  All right.  Let me

15  know when you can see it.

16  A.    I can see it.

17  Q.    All right.  In paragraph 19 you say, "Newspapers are left

18  in the break room table".  Do you see that?

19  A.    Yes.

20  Q.    All right.  You didn't note in this affidavit that they

21  were left overnight, did you?

22  A.    I did not because additional questions were asked after

23  the affidavit was taken.

24  Q.    Okay, but you didn't offer that up when you were --

25       MS. WEINREB:   Objection.

1    MS. MASTRONY:   I didn't even finish my question.

2    MS. WEINREB:   Just did not offer up.

3    JUDGE ESPOSITO:   Okay.  Go ahead with the rest of your

4    question, Ms. Mastrony.

5    MS. MASTRONY:   You did not offer that detail up when you

6    were giving that affidavit, did you?

7    MS. WEINREB:   Objection.

8    JUDGE ESPOSITO:   Did you say that during the affidavit,

9    Mr. Vasquez?

10   THE WITNESS:   I was not asked that, so I did not say it.

11   BY MS. MASTRONY:

12   Q.   Okay.  All right.  And the Union flyers that you put down

13   that were eventually removed from the break room table, do you

14   know if anyone was actually reading the flyers while they were

15   removed?

16   MS. WEINREB:   Objection, relevancy.

17   JUDGE ESPOSITO:   Hold on.  Hold on.  Could you repeat

18   that, Ms. Mastrony?

19   MS. MASTRONY:   Sure.  My question was if he's aware of

20   whether anyone was actually reading the flyers when they were

21   removed.

22   JUDGE ESPOSITO:   At the time that they were being

23   removed?

24   MS. MASTRONY:   Exactly.

25   MS. WEINREB:   Objection, relevancy.

```
 1          JUDGE ESPOSITO:   Okay.

 2          MS. MASTRONY:   I think it's very relevant.  If someone's

 3   holding a flyer and reading it or even has it in front of them,

 4   that's very different than a flyer that's just sitting on the

 5   table.

 6          MS. WEINREB:   And we went through the tapes.

 7          JUDGE ESPOSITO:   Okay.  All right.  Ms. Mastrony, your

 8   questions you say, were you aware?  Do you mean, did he

 9   actually see that happen?  Or did he develop an understanding

10   that that happened?  Do you understand what I mean?

11          MS. MASTRONY:   I'll ask him both.

12          JUDGE ESPOSITO:   Yeah.  Well, the scope of your question

13   is unclear.

14          MS. MASTRONY:   Sure.

15   BY MS. MASTRONY:

16   Q.   All right.  Mr. Vasquez, did you actually witness anyone

17   reading the Union flyers at the time that they were removed by

18   managers?

19   A.   I did not witness that.

20   Q.   All right.  Did you ever subsequently become aware that

21   someone was in the middle of reading a Union flyer that had

22   been placed on the table at the time that it was removed by

23   management?

24   A.   I'm not aware of that.

25   Q.   Okay.  I'll go ahead and put up another exhibit for you.
```

1  All right.  I'm putting up Joint Exhibit 1.  We've looked at

2  this previously.  Just let me know when you can see it.

3  A.    I can see it.

4  Q.    Okay.  And this is the solicitation and distribution

5  policy that we have been referred to, right?

6  A.    Yes.

7  Q.    All right.  And you see here that in the second paragraph

8  it says, "Employees may not use Apple's bulletin boards to

9  distribute materials or solicit employees, vendors or

10 customers", right?

11 A.    Yes.

12 Q.    All right.  And Apple does have a bulletin board in the

13 vicinity of the break room, correct?

14 A.    No.

15 Q.    Okay.  Where's the whiteboard at Apple at the World Trade

16 Center store?

17 A.    That's outside of the break room.

18 Q.    Okay.  And how close is it to the break room, though?

19 A.    That's going to be you walk out the break room and take a

20 right, it's going to be to the right.

21 Q.    All right.  So it's immediately outside of the door to the

22 break room, right?

23 A.    Yes.  It's outside the break room.

24 Q.    All right.  And have you seen any materials posted to the

25 whiteboard that are from a third party?

1   A.   Well, there are specific programs we use that are third

2   party and we do post that material on that board.

3   Q.   All right.  Can you give me an example?

4   A.   I am blanking on the name that we use for our volunteer

5   hours.  But it is through a third party company.  And when we

6   have the -- when we have events for those volunteer hours, we

7   do post them on the board.

8   Q.   All right.  And is that an Apple sponsored program?

9   A.   Yes.

10  Q.   Okay.  How about anyone posting selling Girl Scout

11  cookies?  You ever see anything like that up on the board?

12  A.   Not on a bulletin board.

13  Q.   Okay.  Do you see it on another board?

14  A.   No.  I mean, I've seen Girl Scout cookies boxes in the

15  break room, but I've never seen people like soliciting them.

16  Q.   Okay.

17      MS. MASTRONY:   All right, if I could just have -- let me

18  pop this down.  If I could just have a minute to see if I can

19  wrap up.

20      JUDGE ESPOSITO:   Sure.

21      MS. MASTRONY:   Thanks.

22      JUDGE ESPOSITO:   Let's go off the record.

23  (Off the record.)

24      JUDGE ESPOSITO:   Can we just go back on the record?

25      COURT REPORTER:   Yeah, go ahead.  We're on.

1    JUDGE ESPOSITO:   Ms. Mastrony, do you have any more

2    questions for Mr. Vasquez?

3    MS. MASTRONY:   I do not.

4    JUDGE ESPOSITO:   Okay.  Looking at my notes about the

5    Respondent Exhibit 17 that you were questioning Mr. Vasquez, if

6    you would want to ask him more questions just to typically

7    establish the extent of his personal knowledge recording that

8    exchange, I'll allow you to do that on the individual that

9    wrote the material in the blue area, if that's something you

10   want to do.

11   THE WITNESS:   I can do it --

12   MS. WEINREB:   No, no --

13   JUDGE ESPOSITO:   No, Mr. Vasquez, no.  Well, you have to

14   wait to see if Ms. Mastrony wants to ask you that.

15   THE WITNESS:   Oh.

16   JUDGE ESPOSITO:   Do you know what I mean?

17   MS. MASTRONY:   I mean, I can try again for sure.  Let me

18   put it back up.  Hold on one second.  So we're all looking at

19   it.

20   JUDGE ESPOSITO:   Mr. Vasquez, thank you.  I appreciate

21   that you want to be helpful and participate, but it's a

22   question and answer format this process.

23   THE WITNESS:   Sorry, I thought that was directed at

24   me.  Sorry.

25   JUDGE ESPOSITO:   Yeah, no, no.  I understand.  Thank

1  you.

2  BY MS. MASTRONY:

3  Q.   All right.  I put back up Respondent's Exhibit 17 for

4  identification.  Just let me know when you can see it.

5  A.   I can see it.

6  Q.   All right.  And again, you had written the text message --

7  or I'm sorry, the Signal message in the gray.  And you weren't

8  sure who you sent this to, correct?

9  A.   That is a text message, this one.

10  Q.   Oh, I'm sorry.  This is a text.  Sorry, I got confused

11  with the other one.  Okay.  And so do you recall who you sent

12  this text message to?

13  A.   I don't know.

14  Q.   All right.  Do you believe it was a member of management

15  given that you were relaying your annual review?

16      MR. BOLLEPALLI:   Objection.  What the witness believes is

17  not relevant.

18      MS. MASTRONY:   I think it is.

19      MR. BOLLEPALLI:   He already said he doesn't know who he

20  sent it to.

21      JUDGE ESPOSITO:   Yeah.  I mean, if he -- do you know

22  whether you sent it to a member of management, Mr. Vasquez?

23      THE WITNESS:   This seems like it would have been to a

24  member of management.  But like I said, I just can't confirm

25  who this was.

1    JUDGE ESPOSITO:   Do you have a specific recollection of

2  having sent it to a member of management?

3    MS. MASTRONY:   Judge, you're going in and out.  I didn't

4  quite hear the whole --

5    JUDGE ESPOSITO:   Sorry.  Do you have a specific

6  recollection of having sent it to a member of management?  Or

7  are you just sort of extrapolating from reading it, well, yeah,

8  I guess that would have gone to management?

9    THE WITNESS:   I'm kind of just like extrapolating it out

10  based on what I said.

11    JUDGE ESPOSITO:   What's that, Mr. Vasquez?

12    THE WITNESS:   Yeah, I'm assuming that it went to

13  management just based off what I'm saying, but I can't confirm

14  that.

15    JUDGE ESPOSITO:   Okay.

16  BY MS. MASTRONY:

17  Q.   All right.  Would you be able to see if it's still on your

18  phone?

19  A.   It's not because I'm extremely OCD in cleaning my phone

20  out regularly.

21    MS. MASTRONY:   Okay.  We'll put on evidence otherwise if

22  he --

23    JUDGE ESPOSITO:   Anything else, Ms. Mastrony?

24    MS. MASTRONY:   No, nothing else.

25    JUDGE ESPOSITO:   Okay.  Ms. Weinreb, do you have any

1  redirect examination for Mr. Vasquez?

2      MS. WEINREB:   I believe I do, if I can have about five

3  minutes to just review my notes.

4      JUDGE ESPOSITO:   Sure.  Let's come back at 10 after 1:00.

5  Off the record.

6  (Off the record.)

7      COURT REPORTER:   We are.

8      JUDGE ESPOSITO:   Ms. Weinreb, redirect examination?

9      MS. WEINREB:   I do not, Your Honor.

10      JUDGE ESPOSITO:   Okay.  I just have a few --

11      MS. WEINREB:   Well, Your Honor, the Union may have some

12  questions.

13      JUDGE ESPOSITO:   Oh, I'm sorry.  Mr. Bollepalli, do you

14  have redirect examination?

15      MR. BOLLEPALLI:   Yes.  I just have a brief redirect.

16                          REDIRECT EXAMINATION

17  BY MR. BOLLEPALLI:

18  Q.   Good afternoon, Mr. Vasquez.  I'm Sumanth Bollepalli,

19  Union's Counsel.  I'm just going to ask you a few questions.

20  Earlier, you were asked by Apple's Counsel about the

21  whiteboards located outside the break room.  Do you recall?

22  A.   Yes.

23  Q.   Are you familiar with Benevity?  It's spelled B-e-n-e-v-i-

24  t-y.

25  A.   Yes.

```
 1   Q.   What is that?
 2   A.   That's the third party company Apple uses for their
 3   volunteer program.
 4   Q.   So when you say volunteer program, what does that mean?
 5   A.   So employees can do volunteer work, and that money gets
 6   submitted to Benevity?
 7   Q.   And where do they volunteer?
 8   A.   They volunteer on Benevity's website.
 9   Q.   And what kinds of things do they volunteer?  Is it time?
10   A.   It would be time, right.
11   Q.   What about charitable contributions?
12   A.   Those have been a thing.  Yes.
13   Q.   And as an Apple employee, how do you obtain information
14   about this program?
15   A.   It's, you can find it either through their website or on
16   Apple's internal sites.
17   Q.   What, if anything, was posted on the bulletin board about
18   it?
19   A.   You can find it there as well.
20   Q.   Have you personally seen information on the bulletin board
21   about Benevity?
22   A.   Yes, multiple times.
23   Q.   And what does that information provide?
24   A.   There would be like dates to events that are happening,
25   location information, and signup sheets.
```

1  Q.   What about QR codes?

2  A.   QR codes as well, sir.

3  Q.   Have you accessed those QR codes?

4  A.   I haven't.  I usually go to the website.

5  Q.   And what website do you go to?

6  A.   I'll go through Apple's internal sites.

7  Q.   And does Benevity have its own site?

8  A.   It does.

9  Q.   And do you recall the names of any specific organizations

10 you saw listed?

11 A.   I do not.  The last time I saw them was in 2020.  But I do

12 know one that happens yearly is the 9/11 Memorial 5K.

13 Q.   Did you or anyone you know participate in it?

14 A.   People I know did participate in it.

15 Q.   And what, if any, benefit does an Apple employee have to

16 participating in this through Benevity?

17 A.   You just basically use it to donate time, which equals out

18 some money for the organization that the signup is for.

19 Q.   And do you know exactly how it equates to money the time

20 that you contribute?

21 A.   I don't.  I don't have the exact breakdown.  No.

22      MR. BOLLEPALLI:   Okay, no more questions.

23      JUDGE ESPOSITO:   All right.  Ms. Mastrony, do you have

24 any questions?

25      MS. MASTRONY:   I do briefly.  Can you just give me one

1  minute?

2      JUDGE ESPOSITO:   Okay.  Let's go off the record.

3  (Off the record.)

4      JUDGE ESPOSITO:   Let's go back on the record.

5      COURT REPORTER:   We are.

6      MS. MASTRONY:   Thank you, just briefly.

7                        RECROSS EXAMINATION

8  BY MS. MASTRONY:

9  Q.   So, Mr. Vasquez, this Benevity program is basically a

10  benefit that Apple offers its employees, correct?

11  A.   It's a benefit through a third party.  Yes.

12  Q.   Well, it's offered through Apple, correct?

13  A.   The company, like it's through the company.  Like, I

14  wouldn't say it's through Apple.  Like, Apple gives us access

15  to the website.  And, you know, I mean, I could access that on

16  my phone if I wanted to.  But yeah, you could access it through

17  Apple if you wanted.

18      MS. MASTRONY:   Okay, no other questions.

19      JUDGE ESPOSITO:   Okay.  I just have a couple of questions

20  for you, Mr. Vasquez.  Okay.  First of all, I just want to

21  confirm this Signal function for sending messages.  That is not

22  from Apple, correct?

23      THE WITNESS:   Correct.

24      JUDGE ESPOSITO:   That is not something that is through

25  the company or is used by the company for employees to send

1  messages to one another.  That's an independent platform,

2  correct?

3        THE WITNESS:   Yes.

4        JUDGE ESPOSITO:   All right.  You testified in response to

5  Ms. Mastrony's questions that the whiteboard or bulletin board

6  is in an area where after you walk out of the break room, it's

7  on the right.

8        THE WITNESS:   Yes.

9        JUDGE ESPOSITO:   Is it in that corridor when you leave

10 the break room or is it somewhere else?

11       THE WITNESS:   It's -- yes.  So right when you walk out

12 the break room, there's like an archway that leads out of the

13 break room and so a separate room.  It's in that room to the

14 right.

15       JUDGE ESPOSITO:   Okay, but is it in the area of the

16 corridor that you can see leading out of the break room when

17 you look on the videos, or is it in another place?

18       THE WITNESS:   Yeah, you can't see the whiteboard in the

19 video.  But yes, it is in that room that the break room leads

20 out to.

21       JUDGE ESPOSITO:   Okay.  Can you just describe for me the

22 second floor balcony where the conversation that you testified

23 about with Ms. Gladden took place?

24       THE WITNESS:   Yes.  So the second floor balcony, that's

25 our sales floor as well as our Genius Bar area.  And there's a

1  staircase that leads up to it.  And then outside, you can just

2  see like the inside of the Oculus.

3      JUDGE ESPOSITO:  Okay.  Can you tell me what the Genius

4  Bar is?

5      THE WITNESS:  Yes.  That's going to be where people with

6  like Apple devices go to have their products serviced or fixed

7  or repaired.

8      JUDGE ESPOSITO:  Okay.  And when you mentioned the

9  Oculus, is that the Oculus that's inside the Trade Center?

10     THE WITNESS:  Yes, the -- it's like a building next to

11  the One World Trade Center.

12     JUDGE ESPOSITO:  Okay.  The area that you go -- I

13  understand what that is.  Okay.  Is this balcony, it goes

14  around the sides of the building or of the atrium that

15  comprises the store?  Is that what it's on?

16     THE WITNESS:  So it's just called the balcony just

17  because like it's on the second floor and you can walk out of

18  the store and look over and see, like, down to the first levels

19  of, like, the mall and all the other stores.

20     JUDGE ESPOSITO:  Okay.  And what else is on the second

21  floor?  Is it solely the balcony area?

22     THE WITNESS:  So there's I think like, six -- 12 tables,

23  12 tables from Apple in total.  And then on the walls is like

24  accessories you can buy.  And that's really about it.  It's a

25  pretty plain floor.

1    JUDGE ESPOSITO:  Okay.  And the entire floor is just for

2  sales and servicing of devices?

3    THE WITNESS:  Yes.

4    JUDGE ESPOSITO:  Okay.  All right.  Thank you.  Did

5  Counsel have any questions based upon the questions that I just

6  asked Mr. Vasquez?

7    MS. WEINREB:  Yes, Your Honor.  I just would like to ask

8  one follow-up because maybe I'm confused by this whiteboard

9  discussion exactly where it is.

10  BY MS. WEINREB:

11  Q.  Mr. Vasquez, if you can just -- if we're looking out of

12  the break room, can you describe if we're looking at -- we're

13  in the break room entrance looking out of the break room, where

14  is the whiteboard?

15  A.  From the camera's perspective, right?

16  Q.  Yes.  Like, when we saw it this morning we're looking

17  outside the break room and the table in the break room is

18  behind us.  And as if we're walking out of the break room,

19  there's the hallway.  But where is the whiteboard?

20  A.  The whiteboard, it's to the right.

21  Q.  So do you make a right turn?

22  A.  No, because the walls like right there, so you can't

23  really turn into anything.  But you can't see it from the video

24  because the entrance of the break room blocks where the

25  whiteboard's at.  But there's maybe like this much space

1  between the wall and where the whiteboard's at.

2  Q.   So when you make the right after you leave the break room,

3  what is there?  Where does that lead?

4  A.   Straight into a wall.  There's a wall right there.

5  Q.   Oh, there's a wall?

6  A.   Yeah, there's a wall and then further down is the door to

7  lead to the sales floor.

8  Q.   Oh, okay.  I see.  Okay.  How long is that wall that's

9  outside the break room entrance?

10  A.   That's like, maybe like three feet.

11  Q.   Okay.  Okay.

12       MS. WEINREB:   No further questions.

13       JUDGE ESPOSITO:   Mr. Bollepalli?

14       MR. BOLLEPALLI:   No questions.

15       JUDGE ESPOSITO:   Ms. Mastrony?

16       MS. MASTRONY:   Just one quick question.

17  BY MS. MASTRONY:

18  Q.   Mr. Vasquez, on the second floor there you said it was the

19  Genius Bar and sales floor, correct?

20  A.   Yes.

21  Q.   All right.  So are there typically a bunch of customers

22  out there?

23  A.   Not a bunch, I'd say.  It's like our least busy floor.

24  Q.   Okay.  Are there employees up there?

25  A.   There are.

1  Q.   All right.  And you do get customers up there, right?

2  A.   Oh, yes.

3  Q.   I imagine people do visit the Genius Bar, right?

4  A.   Yes.

5      MS. MASTRONY:   All right.  No other questions.

6      JUDGE ESPOSITO:   Okay, thank you.  I'm sorry.  Do you

7  have any redirect based on Ms. Mastrony's questions?

8      MS. WEINREB:   No, I don't.

9      JUDGE ESPOSITO:   Okay.  All right.  Okay, Mr. Vasquez.

10 Thank you very much.  You're excused.

11     THE WITNESS:   Okay.  Then I just hit leave?

12     JUDGE ESPOSITO:   Yes.

13     THE WITNESS:   Okay.  Cool.

14     JUDGE ESPOSITO:   All right, let's go off the record.

15 {Off the record.)

16     JUDGE ESPOSITO:   Okay.  During an off-the-record

17 conversation, Ms. Weinreb indicated that the parties have

18 reached a stipulation regarding the testimony that we heard

19 this morning.  So go ahead, Ms. Weinreb.

20     MS. WEINREB:   So I believe the stipulation that we

21 reached is that Jordan Vasquez accurately identified the

22 people, including Ian O'Hara and the other managers, Respondent

23 managers in the May 15th tape GC-4 when he testified, as well

24 as he accurately described the break room and the layout of the

25 break room including the hallway and the side rooms of the

1    break room.

2        JUDGE ESPOSITO:   All right.  Ms. Mastrony, is that

3    correct?

4        MS. MASTRONY:   Yes.  That is what we discussed.

5        JUDGE ESPOSITO:   All right.

6        MS. WEINREB:   And the Union has no objection to that?

7        MR. BOLLEPALLI:   No, no objection.

8        MS. WEINREB:   Okay.

9        JUDGE ESPOSITO:   All right, so I'll receive that

10   stipulation.  Anything else before General Counsel calls their

11   next witness?  No?  Okay, go ahead, Ms. Weinreb.

12       MS. WEINREB:   I'd like to call Ian O'Hara.

13       MS. DAVIDSON:   It will take just one second for him to

14   come in.

15       JUDGE ESPOSITO:   Okay, thank you, Davison.

16       MS. DAVIDSON:   You need to take your mute button off.

17   Thank you.

18       THE WITNESS:   All done.

19   Whereupon,

20                          IAN O'HARA

21   was called as a witness by and on behalf of the General Counsel

22   and, having been first duly sworn, was examined and testified

23   on his oath, as follows:

24       JUDGE ESPOSITO:   Okay.  Good afternoon, Mr. O'Hara.  I am

25   Judge Esposito.  I am the judge who's been assigned to hear and

1  decide this case.  And can you please raise your right hand so

2  that we can all see it?  Do you solemnly swear or affirm that

3  the testimony you're about to give will be the truth, the whole

4  truth, and nothing but the truth under penalty of perjury?

5       THE WITNESS:   I do.

6       JUDGE ESPOSITO:   Thank you, Mr. O'Hara.  Can you please

7  state and spell your name for the record?

8       THE WITNESS:   My name is Ian O'Hara.  My name is spelled

9  I-a-n.  Last name is O-'-H-a-r-a.

10      JUDGE ESPOSITO:   Okay.  Before I continue, would anyone

11 like to voir dire Mr. O'Hara regarding his location and

12 surroundings?

13      MS. MASTRONY:   I'll ask just a couple of questions,

14 please.

15                          VOIR DIRE

16 BY MS. MASTRONY:

17 Q.   Good afternoon, Mr. O'Hara.  My name is Maura Mastrony.

18 I'm attorney representing Apple in this proceeding.  Just a

19 couple questions for you.  Where are you located today?

20 A.   I'm at my home.

21 Q.   Okay.  And is there anyone else in the room that you're

22 in?

23 A.   No, there's not.

24 Q.   Okay.  Do you have any documents or anything in front of

25 you?

1   A.    I don't.

2        MS. MASTRONY:    Okay.  I don't have any other questions.

3   Thank you.

4        JUDGE ESPOSITO:    All right.  Mr. O'Hara, there's just a

5   few things I'd like to discuss with you before Ms. Weinreb

6   begins asking you questions.  First, it's important that you

7   listen carefully to each question before answering and do not

8   start speaking or answering until you're sure the question is

9   finished.

10       The court reporter is recording and cannot have more than

11  one person speaking at a time or else the transcribers will not

12  be able to accurately determine what everyone said once they go

13  to transcribe these recordings.  Second, if someone objects to

14  an attorney's question, don't answer the question.  Stop and

15  wait for me to rule on the objection.  Again, so there isn't

16  more than one person speaking at the same time.

17       Third, let us know immediately if you're having trouble

18  with your audio or video.  If you are having trouble with your

19  audio or video, you should feel free to interrupt whatever else

20  is going on.  Let us know that you're having problems or wave

21  your hands in front of the cameras so that we can see it.

22       If you lose your audio or video completely, check your

23  power and internet connections, and reconnect or reboot your

24  device if necessary.  Then try to join the hearing again, using

25  the same link that you used before or try to join or contact us

1    with a backup device.  We will assist.  Okay, go ahead, Ms.
2    Weinreb.
3          MS. WEINREB:    Thank you.
4                        DIRECT EXAMINATION
5    BY MS. WEINREB:
6    Q.    Mr. O'Hara, are you currently employed?
7    A.    I am not.
8    Q.    Did you ever work for Apple?
9    A.    I did.
10    Q.    When?
11    A.    My hire date was June 24 of 2016.  And I had my last day,
12    November 24, 2022.
13    Q.    Did you work in a particular location?
14    A.    Yes.
15    Q.    Where?
16    A.    I worked at 185 Greenwich Street, World Trade Center
17    location.
18    Q.    And how long did you work in that particular store?
19    A.    I worked there from the start of my hire date to the last
20    day that I was at the company.
21    Q.    Now, what did you do for Apple?
22    A.    I was a technician.
23    Q.    Did you have a particular shift?
24    A.    No.  They would start at various times throughout the day.
25    Q.    Did you get any breaks at work?

1    A.    Yes.

2    Q.    What kind of breaks?

3    A.    We were given two paid 15-minute breaks and one 60-minutes

4    unpaid lunch.

5    Q.    Are you familiar with the Communication Workers of

6    America?

7    A.    I am.

8    Q.    How?

9    A.    They are an organizing affiliate that's helping Apple

10   employees unionize.

11   Q.    Did someone at the World Trade Center store contact them?

12   A.    Yes.

13   Q.    Who?

14   A.    I did.

15   Q.    And when did you contact them?

16   A.    I contacted CWA January of 2021.

17   Q.    Did you do anything after contacting them?

18   A.    Yes.

19   Q.    What?

20   A.    That following fall, we built an organizing committee.

21   Q.    And who was part of the organizing committee?

22   A.    Myself and a few other employees.

23   Q.    And how long did it take you to establish this organizing

24   committee?

25   A.    I would say two to three months.

1    Q.    Did the organizing committee do anything?

2    A.    Yes.

3    Q.    What?

4    A.    The organizing committee have virtual meetings one or two

5    times a week.  We were coordinating to get employees interested

6    in unionizing the store.

7    Q.    And how would you meet virtually?

8    A.    We met via Zoom.

9    Q.    Aside from meeting on Zoom, did you communicate with the

10   organizing committee in any other way?

11   A.    Yes.

12   Q.    How?

13   A.    We communicated via Signal.

14   Q.    And what's that?

15   A.    Signal is an encrypted messenger app.

16   Q.    And how do you use it?

17   A.    You can message people in a group.  You can message one-

18   on-one.  But it's for communication purposes.

19   Q.    Do you have to use a particular device to do that

20   messaging?

21   A.    People have it installed on their phones.  And so it's

22   typical to use a personal device.

23   Q.    How did you communicate with over Signal?

24   A.    I communicated through my personal iPhone.

25   Q.    And how often would you message the organizing committee

1  over Signal?

2  A.    Daily.

3  Q.    Do you know a person by the name of Stephanie Gladden.

4  A.    I do.

5  Q.    Who is she?

6  A.    Stephanie Gladden was the manager at Apple World Trade

7  Center.

8  Q.    Did you ever have a conversation with someone from the

9  organizing committee about Gladden?

10  A.    I did.

11  Q.    And when was that?

12  A.    That would have been May 9th.

13  Q.    And with whom did you have that conversation?

14  A.    With Jordan Vasquez.

15  Q.    And who is he?

16  A.    Jordan Vasquez is a colleague, a former colleague.  He is

17  on the -- he was on the organizing committee.

18  Q.    And when did you have that conversation?

19  A.    We had that conversation on May 9th.

20  Q.    Do you know around what time?

21  A.    I would say approximately noon, 12:00.

22  Q.    And where was the conversation?  Where'd you have it?

23  A.    We had it in person.  It was on the sales floor.

24  Q.    Was anyone else present?

25  A.    No.

| | |
|---|---|
| 1 | Q.   Who initiated the conversation? |
| 2 | A.   Jordan did. |
| 3 | Q.   Do you recall what he said? |
| 4 | A.   Yes. |
| 5 | Q.   What? |
| 6 | A.   He approached me.  He told me that Stephanie Gladden had |
| 7 | come and had a "feeler" conversation about his Union activity. |
| 8 | Q.   What type of feeler? |
| 9 | A.   A feeler conversation. |
| 10 | Q.   And did you respond? |
| 11 | A.   Yes. |
| 12 | Q.   What did you say? |
| 13 | A.   I was in awe.  I was in shock that she had done that.  I |
| 14 | said that's not right.  It's illegal.  And I encouraged him to |
| 15 | put that specific manager in the chat to let the organizing |
| 16 | committee know that she was the manager who had approached him. |
| 17 | Q.   Was anything else said during that conversation? |
| 18 | A.   No. |
| 19 | Q.   Was Gladden eventually part of the Signal chat? |
| 20 | A.   Yes. |
| 21 | Q.   When? |
| 22 | A.   Not long after we had the in-person conversation. |
| 23 | Q.   On what day? |
| 24 | A.   May 9th. |
| 25 | Q.   And who sent the initial message? |

1  A.    I had sent the message with her containing her name.

2  Q.    Who wrote the initial message?

3  A.    Jordan wrote the initial message.

4  Q.    And did you receive that text from Jordan?

5  A.    I did.

6  Q.    How'd you receive it?

7  A.    I received it through Signal.

8  Q.    And do you know what Jordan messaged?

9  A.    His message said, they just had a feeler conversation with

10 me.  And they was suggestive of management.

11 Q.    Did he say what kind of feeler?

12 A.    About his Union activity.  Yes.

13 Q.    And when did you receive that message?

14 A.    The timestamp was, I believe, at 11:50 or 11:40, somewhere

15 around there.  But I didn't see it until after we had spoken in

16 person.

17 Q.    Did anyone respond to the message Jordan left?

18 A.    Yes.

19 Q.    Who?

20 A.    I did.

21 Q.    And when did you respond?

22 A.    Sometime after 12:00.

23 Q.    And do you recall what your message said?

24 A.    Yes.  My message was specifying to his message Stephanie

25 Gladden was the manager who had this conversation with you.

1   And I ended it with correct, with a question mark.

2   Q.   And what device did you use to write that message?

3   A.   I used my personal iPhone.

4   Q.   Did anyone respond to your message?

5   A.   No.

6        MS. WEINREB:   I'd like to show the witness General

7   Counsel Exhibit 2, please.

8        MS. DAVIDSON:   Just one second, I'll be pulling it up.

9        MS. WEINREB:   Okay.

10  BY MS. WEINREB:

11  Q.   If you can take a look what has been introduced into

12  evidence as General Counsel Exhibit 2.  Have you ever seen this

13  before?

14  A.   I have.

15  Q.   And what is it?

16  A.   This is a screenshot of the two messages that we had in

17  the group chat.

18  Q.   A screenshot of whose phone?

19  A.   This is a screenshot from my phone.

20  Q.   And can you identify who the OC is on the top?

21  A.   That is organizing committee.

22  Q.   And who took this screenshot?

23  A.   I did.

24  Q.   And it says up here in the top bubble, "Clementine

25  Vasquez".  Do you see that?

1  A.    Yes.

2  Q.    And who is that?

3  A.    That's Jordan Vasquez.

4  Q.    Does Jordan Vasquez's message mention Stephanie Gladden?

5  A.    It does not.

6  Q.    So why did you respond in your -- well, let me ask you.

7  Whose below message in the blue, whose message is that?

8  A.    That's mine.

9  Q.    Why did you write Stephanie Gladden in the blue message?

10 A.    I wrote Stephanie Gladden because I wanted to clarify for

11 the organizing committee the details of the conversation that

12 he had shared with me in person.

13 Q.    Okay.  Thanks, you can take GC-2 off.  Thank you.  You

14 testified about meeting virtually with the organizing committee

15 and exchanging Signal messages.  Did the organizing committee

16 do anything else with regard to organizing?

17 A.    Yes.

18 Q.    What?

19 A.    2022 May, we distributed and began to distribute Union

20 flyers?

21 Q.    Okay, and when did you begin to do that?

22 A.    May 15th.

23 Q.    Did you engage in that activity?

24 A.    I did.

25 Q.    And where'd you get the flyer?

1    A.    I printed them in my home.

2    Q.    When?

3    A.    A couple of days before May 15th.

4    Q.    And what'd the flyer say?

5    A.    The flyer that we distributed on May 15th had three items

6    at the top indicating what the Union was vying for and fighting

7    for.  And it had two QR codes, one on the left, one on the

8    right with our Apple retail Union in the middle, or Apple

9    retail Union logo, excuse me, in the middle.

10    Q.    Can we show the witness GC-3, please?  Have you ever seen

11    this?

12    A.    I have.

13    Q.    What is it?

14    A.    This is the flyer that we began distributing on May 15th.

15    Q.    And what do the black squares on either side of the

16    document indicate?

17    A.    Those are QR codes.

18    Q.    Okay, and where do they go to?

19    A.    They redirect to websites.  These particular QR codes

20    redirect to CWA's hosted websites regarding Apple retail Union

21    World Trade Center and our information.

22    Q.    And so when it says here on my right, "Add your name to

23    join the movement", what does that connect you to?

24    A.    That connects you to the actual card that you can use to

25    sign on to joining the Union, so adding your name.

1    Q.    And the one on the left?  What is that?

2    A.    The one on the left is a vision statement.  So this is a

3    document that myself and several other organizing committee

4    members drafted to give other employees an idea of what exactly

5    the Apple retail Union would be fighting for.

6    Q.    Okay.  You could take GC-3 down, please.  So you testified

7    that you started distributing flyers on May 15th.  When on May

8    15th?

9    A.    We began at 9:30 in the morning on May 15th.

10   Q.    And when did your shift start that day?

11   A.    My personal shift started at 9:30 in the morning.

12   Q.    Did you engage in that activity in the morning?

13   A.    Distributing flyers, yes.

14   Q.    Okay.  In addition to distributing -- and where did you

15   distribute flyers?

16   A.    We distributed them in the break room.

17   Q.    Okay.  And how did you distribute them in the break room?

18   A.    Myself and other organizing committee members had them in

19   hand.  We laid them neatly in the center of the main break room

20   table so other employees could see them easily.

21   Q.    And how many flyers did you place there?

22   A.    I believe that day it was between four and six flyers.

23   Q.    I'm just going to get the May 15th video here.  I'm going

24   to share it.  Okay.  So let me just stop it there.  So Mr.

25   O'Hara, I'm going to show you a tape that's already in

1  evidence, May 15th.  It's a tape of May 15th of the employee

2  break room.  And I'm starting at 50 minutes into the morning.

3  As we already identified, the tape started at 7:00 a.m. and

4  ended at 9.  So this is 50 minutes and 12 seconds into the

5  tape.  And I'd like you to tell me, I'd like you to look at the

6  tape and tell me if you see any managers, okay?

7  A.    Okay.  That's manager Matt Moya that just walked in.

8  Q.    My thing isn't stopping.  Okay, so this gentleman, it's 50

9  minutes and 56, the man in the center walking to the left, our

10  left of the table is who?

11  A.    That's Matt Moya.

12  Q.    Okay.  I'm stopping it there at 51:04.  Do you know what

13  he's doing?  Can you see -- can you identify what he's doing?

14  A.    He looks as though he's taking a photo of our four flyers.

15  Q.    Okay.  And then at 51:15, he's walking out.  I also would

16  like to show you -- before I show you anything on the tape, I'm

17  going to ask you.  You said you distributed the flyers in the

18  morning on the table.  Did there come another time when you

19  distributed flyers in the break room that day?

20  A.    Yes.  We distributed flyers on our unpaid lunch break in

21  the afternoon.

22  Q.    And how did you distribute them then?

23  A.    We distributed them in the same manner as the morning.  We

24  set them out neatly in the table.

25  Q.    And when you say we, who are you referring to?

1    A.    Myself and Jordan.

2    Q.    All right, I'm going to leave it there.  I'm sorry.  It's

3    very touchy.  When you move it, it's very difficult to get

4    exactly.  It's the technology.  So I'm going to stop it right

5    there at 5:10:34.  Are you in the picture?

6    A.    I am.

7    Q.    And where are you?

8    A.    I'm in the center top left of the frame.  That's me in the

9    pink hat.

10   Q.    And who's this down here?

11   A.    That's Jordan.  He is wearing a red hat.

12   Q.    Okay, on the bottom right screen?

13   A.    Yes.

14   Q.    With his hands over his head?

15   A.    Yes.

16   Q.    Okay.  Are there flyers on the table in this shot?

17   A.    There are.

18   Q.    I'm continuing the tape.  Let me know if a manager comes

19   in.

20   A.    That's Matt Moya coming into the break room.

21   Q.    Okay.  And I'd like you to look down the hallway right

22   across from the break room.  Do you recognize where my cursor

23   is?

24   A.    Yes.

25   Q.    And do you know who's there?

1  A.    That's Jordan and myself.

2  Q.    And what's there?

3  A.    That's an additional part of the break room.

4  Q.    Does it have anything?

5  A.    Yes.  It has three vending machines on the right and two

6  bathrooms on the left, and a table where I'm standing at the

7  end of the hall.

8  Q.    And how far would you say you were from the entrance of

9  the break room?

10 A.    I'd say 10 to 20 feet.

11 Q.    Okay.  So at 5:11:16, we see Moya entering the break room.

12 Can you identify who took the flyers?

13 A.    Matt Moya.

14 Q.    So we just saw Moya walk out the door and turn to the

15 left.  Did you see Moya walk out the door?

16 A.    I did, very briefly.

17 Q.    And what did you see?

18 A.    I saw him holding flyers.

19 Q.    He turned left in the video.  Do you know where he went?

20 A.    Turning left would indicate walking towards the manager's

21 office.

22 Q.    Did you see him go into the manager's office?

23 A.    There's a wall right there, so I didn't see him go in.

24 But that is to the manager's office.

25 Q.    Is there anything else down there in that hallway?

1    A.    There's a janitorial closet, 3:08:46.

2    Q.    Anything else?

3    A.    Oh, on the hallway that I'm at is the janitorial closet.

4    But on the hallway where he turned into is a row of tables and

5    on the adjacent wall is a row of lockers.

6    Q.    What occurs in the break room?

7    A.    People taking lunches, taking their breaks, people on

8    their phones playing video games, reading, a myriad --

9    Q.    And how's the -- oh, sorry.  Go ahead.

10    A.    I was going to say a myriad of activities.

11    Q.    Like what?

12    A.    Board games, people playing dominoes on a computer.

13    Q.    And how is the break room table used?

14    A.    It's a multi-use space.  Frequently, it's used for

15    distribution of food for employees, distribution of coupons if

16    there are coupons available to give out.  It's used, like I

17    said, and as can be seen in the tape, for breaks and lunches.

18    Q.    All right.  I'm just going to take this tape down.  Did

19    you distribute Union flyers at work on any other day?

20    A.    Yes.

21    Q.    When?

22    A.    We distributed flyers on May 27th.

23    Q.    Okay.  Did you distribute Union flyers any other time

24    before May 27th did you say?  I didn't hear you.

25          JUDGE ESPOSITO:   Yeah, what was that date, Mr. O'Hara,

```
 1  May?
 2        THE WITNESS:   May 27th.
 3  BY MS. WEINREB:
 4  Q.    Prior to May.
 5  A.    And May 19th.
 6  Q.    So let's focus on May 19th.
 7  A.    Okay.
 8  Q.    What time of day on May 19th did you distribute flyers?
 9  A.    My shift began in the afternoon.  So it would have been
10  before 3:30 p.m.
11  Q.    And where did you distribute flyers?
12  A.    In the break room.
13  Q.    Did anyone distribute them with you?
14  A.    No.  I did it alone.
15  Q.    How many flyers did you leave?
16  A.    Probably a few, maybe two or three.
17  Q.    And how did you place them in the break room?
18  A.    From what I can remember, I placed them very neatly in the
19  center of the table.
20  Q.    Was anyone in the break room when you did this?
21  A.    Yes.
22  Q.    Who?
23  A.    There were other employees.
24  Q.    Was anything else on the table that you recall?
25  A.    There were things on the table.  I can't recall exactly
```

1  what was on the table, though.

2  Q.   Were there any managers present in the break room at that

3  time?

4  A.   No.

5  Q.   Did you see any managers enter the break room?

6  A.   I did not.

7  Q.   How long did you stay in the break room?

8  A.   I was there for a few minutes to get ready for my shift,

9  and then I left.

10  Q.   Okay.  Where did you go?

11  A.   I went to -- it's a daily meeting.  It's called the Daily

12  Download.  And it's at the beginning of each shift.  So I went

13  to that meeting.

14  Q.   Did you ever go back to the break room that day?

15  A.   Several hours later.

16  Q.   Is he frozen?

17  A.   Am I frozen?

18  Q.   Can you hear me?  Oh, now you're not.  Okay.  Did you hear

19  the question?

20  A.   Yes, I did.  And I returned several hours later.

21  Q.   Did you see any flyers on the break room table?

22  A.   I did not, no.

23  Q.   Did you see any managers take any flyers that day?

24  A.   I did not.

25  Q.   You mentioned May 27th as another time you distributed

1    flyers.  Where did you distribute flyers that day?

2    A.    In the break room.

3    Q.    And exactly where in the break room?

4    A.    In the center of the table.

5    Q.    And around what time did you do that?

6    A.    That would have been before my shift and on my unpaid

7    lunch as well.

8    Q.    And when did your shift start that day?

9    A.    That day my shift started at 11:30 and ended at 8:30 p.m.

10   Q.    And so what times did you do it, did you distribute

11   flyers?

12   A.    Before my shift and on my unpaid lunch.

13   Q.    Was anyone with you when you did it before your shift

14   started?

15   A.    No.

16   Q.    And what did you do with the flyers in the morning?

17   A.    I put them on the break room table.

18   Q.    How many flyers did you leave?

19   A.    I believe between four and six flyers.

20   Q.    And how did you placed them on the table?

21   A.    Neatly arranged in the center so that they aligned with

22   the tables.

23   Q.    Was anything else on the table?

24   A.    I believe there was, but I can't recall exactly what.

25   Q.    And was anyone else in the break room when you did this?

1    A.    Yes.

2    Q.    Who?

3    A.    There were other employees in the break room.

4    Q.    Do you know what they were doing?

5    A.    At that time, getting ready for shifts, 15-minute breaks

6    in the morning.

7    Q.    Did you see any managers in the break room then?

8    A.    I did.

9    Q.    You did?  The morning?

10   A.    The morning, no.  The morning, no.  The afternoon, yes.

11   Q.    Okay, we're focusing on the morning right now.  Did you do

12   anything after placing the flyers down on the table in the

13   morning?

14   A.    I went to my morning meeting.

15   Q.    So you testified that you also distributed flyers in the

16   afternoon on May 27th.  Around what time?

17   A.    That would have been after 4 p.m.

18   Q.    And what happens at 4 p.m. on that day?

19   A.    I didn't take my lunch.

20   Q.    And how did you distribute flyers that afternoon?

21   A.    I took them out of the folder that I kept flyers in, and I

22   put them on the break room table.

23   Q.    And how did you place them on the table?

24   A.    I placed them in the center of the table so that each

25   flyer was on the table neatly.

```
1   Q.   And how many flyers did you place down?

2   A.   I think it was three, three flyers.

3   Q.   Was anyone in the break room when you did this?

4   A.   Yes.

5   Q.   Who?

6   A.   Other employees.

7   Q.   Do you know what they were doing?

8   A.   They were also on their lunch.

9   Q.   Were any managers in the break room when you placed the

10  flyers on the table that afternoon?

11  A.   No.

12  Q.   Did you do anything after placing the flyers on the table?

13  A.   Yes.

14  Q.   What?

15  A.   I stayed in the break room.

16  Q.   Did you do anything while you were there?

17  A.   I was talking to a colleague.  And I took a video of a

18  manager removing the flyers.

19  Q.   Okay.  Let's break that down a little bit.  At any point

20  after you placed the flyers on the table, did you see a manager

21  enter the break room?

22  A.   I did.

23  Q.   And who did you see?

24  A.   I saw Yanell Brown.

25  Q.   And how soon after you placed the flyers on the table did
```

1  Mr. Brown come into the break room?

2  A.    Three minutes.

3  Q.    And did you see Yanell Brown do anything?

4  A.    Yes.

5  Q.    What?

6  A.    He walked in through the only entrance and exit of the

7  break room, went to the table, took the flyers off the table

8  and exited the break room.

9  Q.    Did he speak to anyone?

10  A.    He did not.

11  Q.    Did he walk around the break room?

12  A.    He did not.

13  Q.    How long would you say he was in the break room?

14  A.    It could have been no less than five seconds.

15  Q.    Did you speak to him at that time?

16  A.    I did not.

17  Q.    And what flyer did you place down on the table the morning

18  of May 27th?

19  A.    I placed the initial flyer that I had created a couple of

20  weeks prior or a week or so prior and then a new flyer that I

21  had made in coordination with other organizing members.

22  Q.    And what'd the new flyer say?

23  A.    The new flyer was more description about what exactly

24  Apple retail Union was fighting for with another QR code to

25  find out more.

1    Q.    I'd like to show the witness GC-6 for identification.    Can

2    you identify what's been marked as GC-6 for identification?

3    A.    Yes.

4    Q.    What is it?

5    A.    This is the second Union flyer that we created.

6    Q.    And when did you place it down?

7    A.    Wait, in what way?

8    Q.    What was the first time you placed it down?

9    A.    From what I can recall, the 27th was the first time that

10   we would have it on the table.

11   Q.    And what flyers did you place down the afternoon of the

12   27th?

13   A.    This flyer in addition to the previous flyer.

14   Q.    And who made this flyer?

15   A.    I did.

16        MS. WEINREB:    I'd like to introduce GC-6 into evidence.

17        JUDGE ESPOSITO:    Any objection to the admission of

18   General Counsel Exhibit 6?

19        MS. MASTRONY:    No objection.

20        JUDGE ESPOSITO:    General Counsel Exhibit 6 is admitted.

21         (General Counsel Exhibit 6 identified and received.)

22   BY MS. WEINREB:

23   Q.    When you saw Yanell Brown remove the flyers the afternoon

24   on May 27th, did you do anything?

25   A.    Yes.

1   Q.    What?

2   A.    I took a video of the incident.

3   Q.    And how did you take the video?

4   A.    I took a video on my iPhone.

5   Q.    And where were you when you took the video?

6   A.    I was a few feet from incident, at the very end of the

7   break room table.

8         MS. WEINREB:   I'd like to show the witness General

9   Counsel 7 for identification.

10        MS. KHAN:   One second, I'm pulling it up.

11        MS. WEINREB:   We're going to play this video if you could

12  just take a look at it.

13        MS. KHAN:   You want me to play it now?

14        MS. WEINREB:   Yes, please.

15        MS. KHAN:   Okay.

16        MS. WEINREB:   Wait, it's cut off on mine.  I don't know.

17        MS. KHAN:   Let me enlarge it.  Is this better?

18        MS. WEINREB:   No, you have to make it smaller I think.  I

19  can't see the top part.

20        MS. KHAN:   All right, one second.  Does that work or?

21        MS. WEINREB:   I can't see the top, so I don't know.

22        MS. KHAN:   Are you still unable to see the --

23        MS. WEINREB:   Yeah.

24        MS. KHAN:   All right, one second.  Still?

25        MS. WEINREB:   Yeah.  I mean, it's way too long, if that

1  matters.

2      JUDGE ESPOSITO:   You're seeing the top.  There's more on

3  the top?

4      MS. WEINREB:   Yes.  The video that I saw had more on the

5  top.

6      MS. KHAN:   Okay.  One second.  Can we go off the record

7  for just a second, so I can --

8      JUDGE ESPOSITO:   Off the record.

9  (Off the record.)

10     JUDGE ESPOSITO:   All right, let's go back on the record.

11     MS. WEINREB:   Okay.  Can we play what's been marked for

12  identification as General Counsel Number 7 please?

13     JUDGE ESPOSITO:   Yes.

14     MS. WEINREB:   We saw what's been marked as General

15  Counsel 7.  Are you able to stop it, Tanya, when we get a full

16  screen?  Right there.

17  BY MS. WEINREB:

18  Q.   Mr. O'Hara, can you identify the man in the middle?

19  A.   The man in the middle is Yanell Brown.

20  Q.   Okay.  And what did you see him do that afternoon on May

21  27th?

22  A.   I observed him walk into the break room, take the flyers

23  off the table that I had just put down, and then leave the

24  break room.

25  Q.   And the video that you just saw, what is it?

1  A.   The video is of him doing exactly that.

2  Q.   And who took the video?

3  A.   I did.

4       MS. WEINREB:   I'd like to introduce it into evidence.

5       JUDGE ESPOSITO:   Any objection to the admission of

6  General Counsel Exhibit 7?

7       MS. MASTRONY:   No objection.

8       JUDGE ESPOSITO:   The General Counsel Exhibit 7 is

9  admitted.

10      (General Counsel's Exhibit 7 identified and received.)

11      MS. WEINREB:   Khan, you could take it down.  Thank you.

12      MS. KHAN:   Okay.  Thanks.

13 BY MS. WEINREB:

14 Q.   Mr. O'Hara, did you distribute flyers at the World Trade

15 Center store again?

16 A.   I did.

17 Q.   And when was that?

18 A.   June 1st.

19 Q.   And what time of day was that?

20 A.   June 1st, my shift began at 11:30.  So I would be

21 distributing flyers before my shift and on my lunch.

22 Q.   I'm just going to pull up the tape.  Okay.  Can you see

23 this tape?

24 A.   I can.

25 Q.   So this tape is from Respondent pursuant to the General

1    Counsel's subpoena.  It's a tape of the break room area on June

2    1st, 2022.  And again, Respondent has represented that the tape

3    starts at about 7 a.m. and it goes till 9 p.m.  And I just want

4    to take Mr. O'Hara through some of the photographs or the video

5    on that day.  I'm starting the tape at 2 minutes and 22 seconds

6    into the tape.  And Mr. O'Hara, tell me if you walk into the

7    picture, if any managers walk into the picture.  Before I go

8    further, do you see what's being displayed on the screen?  It's

9    now at 2 minutes and 43 seconds.  Do you recognize what's being

10   displayed?

11   A.    In what way?

12   Q.    What is it?  What are we looking at?

13   A.    Oh, we're looking at the break room.

14   Q.    Okay, at what store?

15   A.    Apple World Trade Center.

16   Q.    Okay.  So I'm going to continue the tape after 2 minutes

17   and 43 seconds.  Oh, you know what?  I think I did the wrong

18   time.  I'm sorry.  It's three hours not three minutes I was

19   looking at.  Let me go into three hours.  I apologize.  Okay.

20   I'm looking at 3 hours and 5 minutes and 31 seconds.  Let me

21   know if you're in the room or if you can identify yourself in

22   the room.

23   A.    I'm in the room.

24   Q.    Okay.  Where are you?

25   A.    I have the bright orange long sleeve on.

1    Q.    That's you in the middle by the coat rack?

2    A.    Yes, the very center of the screen.

3    Q.    Wearing the orange shirt as you identified?

4    A.    Correct.

5    Q.    Okay.  So let me know if you see any managers.  What are

6    you doing right now at three -- oh God, it's not stopping.

7    Okay, wait a second, I'm having -- what are you doing now at

8    3:06:06?

9    A.    I'm distributing flyers.  I'm placing them on the break

10   room table.

11   Q.    Is someone helping you?

12   A.    Yes.

13   Q.    Who's that?

14   A.    My colleague and fellow organizing committee member

15   Meredith Callie (ph).

16   Q.    I'm just going to fast forward it.

17   A.    Right there, it's Ryan.

18   Q.    Where?

19   A.    In the center of the screen wearing a plaid shirt, it's a

20   manager.

21   Q.    Oh, that's Ryan?

22   A.    Yes.

23   Q.    Okay.  And we're at 3 hours and 12 minutes and 11 seconds.

24   Are you in this screenshot of this video?

25   A.    I am.

1    Q.    You are?  Where are you?

2    A.    I'm next to Ryan at the coat rack.

3    Q.    Okay.  And is that you leaving at 3:12:58?

4    A.    It is.

5    Q.    Okay.  So 3 hours and 12 minutes and 58 seconds into the

6    tape, you're leaving the break room.  Is Ryan still in the

7    break room?

8    A.    Yes, he's at the sink to the right of the screen.

9    Q.    Right here to the right?

10   A.    Yes.

11   Q.    At the sink, in the plaid shirt?

12   A.    Yes.

13   Q.    Now, continuing the tape.  And who's that leaving, walking

14   out?

15   A.    That's the manager Ryan.

16   Q.    At 3 hours and 13 minutes and 11 seconds, Ryan's exiting.

17   Let me know if any managers come in.

18   A.    That's manager Jorge Romero coming in.

19   Q.    The one in the entrance right here?

20   A.    Yes.

21   Q.    So at 3 hours and 13 minutes and 31 seconds, Jorge Romero

22   walks in?

23   A.    Yes.

24   Q.    Yes?

25   A.    Yes, he's walking in.

1    Q.    And what's he doing now?

2    A.    He's removing the flyers from the break room table.

3    Q.    At 3:13:33 minutes -- 3 hours and 13 minutes and 37

4    seconds, that's where you're observing him remove the flyers.

5    And what is he doing now?

6    A.    He's exiting the break room.

7    Q.    And we're at 3 hours and 13 minutes and 48 seconds.  Okay.

8    Now, I'm going to go to a different.  So did you see Romero

9    leaving that morning of this time when you just saw him?  Did

10   you see -- this was after you placed the flyers on the table.

11   At the beginning of your shift, did you see Romero leave?

12   A.    I personally did not observe him.

13   Q.    Did you place flyers again that day on June 1st?

14   A.    I did.

15   Q.    When?

16   A.    On my lunch break.

17   Q.    Around what time was that?

18   A.    I took my lunch at 4:40 -- I believe 4:45.

19   Q.    I'm going to advance the tape later in the day.  Okay.

20   I'm going to stop it here for a minute.  We're at 7 hours, 25

21   minutes, and 7 seconds.  Do you see yourself in this screen?

22   A.    I do.

23   Q.    Where are you?

24   A.    That's me in the top of the screen in the orange shirt.

25   Q.    And do you know what you're doing?

1  A.    I'm looking around my backpack and I'm retrieving Union

2  flyers.

3  Q.    Are there any managers in the room at this time?

4  A.    Not that I can see.

5  Q.    So again, we're at 7 hours, 25 minutes, and 7 seconds.

6  I'm going to continue with the tape.  What are you doing there?

7  A.    I'm laying flyers on the break room table.

8  Q.    And we're at 7 hours, 25 minutes, and 22 seconds.  I'm

9  going to continue with the tape.  Let me know if there are any

10  managers who come in.  I'm going to advance it a little bit.

11  Okay.  We're at 7 hours and 35 minutes and 38 seconds.  Are you

12  in the room now?

13  A.    I am not.

14  Q.    Okay.  Any managers in the room?

15  A.    Not that I can see.

16  Q.    Okay.  I'm going to continue with the tape.  Let me know

17  if you enter or any managers enter.

18  A.    That's me in the entryway.

19  Q.    With the orange shirt?

20  A.    Yes.

21  Q.    So it's 7 hours and 36 minutes and 46, you enter the room

22  again.  Where are you going now?

23  A.    I'm leaving the break room.

24  Q.    Where are you going?

25  A.    To the left of this hallway where you had seen managers

1  walk.  There's a side area where people take lunches.  There's
2  a table there and I was sat at that table.
3  Q.  Why were you going there?
4  A.  To eat my lunch.
5  Q.  So it's 7 hours and 38 minutes and 7 seconds you're
6  departing the break room.  And at 7, 39 seconds, you're turning
7  left, right?
8  A.  Yes.
9  Q.  That's you.
10  A.  Yes.
11  Q.  Okay.  And I'm advancing the tape to 7 hours, 39 minutes,
12  and 26 seconds.  If you could look at the screenshot at this
13  point in the tape, do you see yourself?
14  A.  No.
15  Q.  Do you see managers?
16  A.  No.
17  Q.  Do you see flyers?
18  A.  I do.
19  Q.  And where are they?
20  A.  They're in the center of the break room table.
21  Q.  Okay.  I'm going to play the tape forward from 7 hours and
22  39 minutes and 26 seconds.  I'm going to move it forward.  Let
23  me know if you see a manager come in or if you come in.
24  A.  That's manager Ryan again.
25  Q.  Who just entered at 7:40:14?

1    A.    Yes.

2    Q.    That's Ryan with the mask on?

3    A.    Yes.  And that's manager Jorge.

4    Q.    At 7 hours and 40 minutes and 20 seconds.  Who's in the

5    doorway entering?

6    A.    Jorge Romero.

7    Q.    I'm going to continue with the tape.  What's Mr. Romero

8    doing at 7 hours and 40 minutes and 27 seconds into the tape on

9    June 1st?

10    A.    He is removing the flyers that I had put there earlier.

11    Q.    And now, Mr. Romero by the end, he turns left at 7 hours,

12    41, and 05 seconds.  Did you see Mr. Romero after he turned

13    left?

14    A.    Yes.

15    Q.    Where were you?

16    A.    I was at the farthest right seat at the table.

17    Q.    And what did you see?

18    A.    I saw him exiting the break room with the flyers in his

19    hand.

20    Q.    In the area that you were sitting at eating lunch, how far

21    were you from the break room?

22    A.    Less than 10 feet.

23    Q.    Could you see inside the break room?

24    A.    Not clearly.  But you can see the front entry hallway.

25    Q.    And when you say you saw Jorge holding the flyers, how do

1 you know he had flyers?

2 A.   Because I know what they look like.  And I could see that

3 there was red ink on the papers that was the same size and

4 dimension as the flyers.  I just knew they were the flyers.

5 Q.   When you saw Romero leave the break room this afternoon on

6 June 1st, did you speak to him?

7 A.   Not as he was exiting.

8 Q.   Did you see where Mr. Romero was going when he exited the

9 break room?

10 A.   Yes.

11 Q.   Where?

12 A.   He walked into the manager's office.

13 Q.   And where were you sitting in relation to the manager

14 office?

15 A.   So he walked behind me to go to the manager's office.  The

16 door of the office is about five to seven feet to my left.

17      MS. WEINREB:   Did I identify this as GC-8?

18 Did I?

19      COURT REPORTER:   No, you didn't.

20      MS. WEINREB:   Okay, I'm sorry.  I'd like to identify this

21 tape of June 1st that was provided by Respondent pursuant to GC

22 subpoena as General Counsel 8 for identification.  I'd like to

23 introduce it into evidence.

24      JUDGE ESPOSITO:   All right.  Any objection to the

25 admission of General Counsel Exhibit 8?

1    MS. MASTRONY:    No objection.

2    JUDGE ESPOSITO:    General Counsel Exhibit 8 is admitted.

3  (General Counsel's Exhibit 8 identified and received.)

4  BY MS. WEINREB:

5  Q.    Mr. O'Hara, did there come another time that day on June

6  1st that you spoke to Romero about the flyer?

7  A.    Yes.

8  Q.    When was that?

9  A.    An hour or so later, he walked -- he came by the same area

10  where I was taking my lunch.

11  Q.    Was anyone else present for this conversation?

12  A.    No.

13  Q.    And who initiated the conversation?

14  A.    I did.

15  Q.    Do you recall what you said to him?

16  A.    I got his attention.  I asked him to stop removing the

17  Union flyers.

18  A.    Did he respond?

19  A.    He did.

20  Q.    What did he say?

21  A.    He said he can't stop removing them because they are

22  promotional materials.

23  Q.    Did you respond?

24  A.    Yes.

25  Q.    What?

1    A.    I replied that they were not promotional and that we as

2    employees are allowed to have them in the break room.

3    Q.    Did he respond?

4    A.    He did.

5    Q.    What?

6    A.    He said we're not, and that they are still promotional

7    materials.

8    Q.    Did you respond?

9    A.    I did.

10    Q.    What?

11    A.    I insisted that they were not promotional.  I then

12    directed him to look at my phone where I had pulled up the

13    employee rights page of the National Labor Relations Board's

14    website.  And I showed him a bullet point on the page that says

15    that employees are allowed to have Union materials in non-work

16    spaces.

17    Q.    Did he respond to the website?

18    A.    He didn't respond to me showing him the website.  He just

19    said they are still promotional materials and that he will keep

20    removing them.

21    Q.    Do you recall if he said anything else during that

22    conversation?

23    A.    Yes.

24    Q.    What?

25    A.    I asked what he does with the flyers.

```
 1   Q.   And did he respond?

 2   A.   Yes.

 3   Q.   What'd he say?

 4   A.   He said that he shreds them.

 5   Q.   And did you respond to that?

 6   A.   Yes.  I said, well, if we can't have them in the break

 7   room, can we have a bulletin board or a cork board for

 8   employees to post Union flyers and Union material?

 9   Q.   Did he respond?

10   A.   He did.

11   Q.   What'd he say?

12   A.   He said, we can look into it and see if we can design

13   something.

14   Q.   Did you distribute any flyers after June 1st?

15   A.   No.

16   Q.   Why not?

17   A.   They kept being removed.

18   Q.   After June 1st, did you see any flyers being distributed?

19   A.   I did not.

20   Q.   You described before the break room table and you

21   mentioned coupons.

22   A.   Yes.

23   Q.   And what have you seen with regard to coupons on the

24   table?

25   A.   In my six years and five months that I was at Apple, I saw
```

1   Shake Shack coupons.  I saw Burger King coupons.  I saw flyers
2   from newspapers that had coupons on them on the break room
3   table.
4   Q.   And do you know how long the coupons lasted on the table?
5   A.   Some of them lasted a full day and some of them one to
6   three days, depending on I would say just how long somebody
7   didn't want to clean them up.  I'm not sure.
8   Q.   And how do you know that?
9   A.   Because I worked frequently, I would come in and they
10  would be there and then they would come in the next day to work
11  and they would still be there, those same coupons or the same
12  newspapers.
13  Q.   So how long have you seen newspapers on the table?
14  A.   Anywhere from a full day to several days.
15  Q.   And how do you know it's the same newspaper another day?
16  A.   It has the same publication date, same front page.
17  Q.   Have you ever seen anyone clean up the employee break
18  room?
19  A.   I have.
20  Q.   Who did the cleaning?
21  A.   The quarters, the cleaning crew and employees.
22  Q.   What have you seen employees do with regard to cleaning
23  up?
24  A.   Employees are responsible for their own area.  So if they
25  take breaks or lunches at the break room table, they're

1  directed to clean up their area.

2  Q.   Have you ever seen supervisors or managers clean up the

3  break room?

4  A.   Not any more than cleaning up their own area.

5  Q.   Did you ever see them clean up the break room table other

6  than their own area?

7  A.   No.

8  Q.   Did you ever see managers remove newspapers from the

9  table?

10  A.   No.

11  Q.   Did you ever see a manager remove coupons from the table?

12  A.   No.

13  Q.   Have you ever seen a manager take a photograph of

14  something on the table?

15  A.   Yes.

16  Q.   When?

17  A.   I saw Matt Moya taking a picture of the flyers from the

18  video camera.

19  Q.   Aside from Matt Moya, have you ever seen any other manager

20  take a photograph of something from the table?

21  A.   No.

22  Q.   Have you ever seen Matt Moya do that before May 15th?

23  A.   No.

24  Q.   You testified over about many days where you saw managers

25  entering the break room.  Aside from what you testified about

1    today, have you ever seen managers go into the break room on

2    other occasions?

3    A.    Yeah.

4    Q.    How often?

5    A.    They take their lunches there.  They talk to employees

6    there.  They put out their stuff.  Put their backpacks in the

7    lockers.  They use it just like every other employee does.

8    Q.    So how often would you see them in a day go in there?

9    A.    Multiple times daily.

10   Q.    While employed at Apple, did any manager ever tell you

11   that you had to clean up the break room table?

12   A.    Not the table specifically, no.

13   Q.    Something else?

14   A.    Cleaning dishes if the dishes were in the sink after you

15   use them, but the table, no.

16   Q.    And how were you notified of cleaning up the dishes?

17   A.    There's a notice posted on the wall right above the sink

18   instructing employees to clean the dishes if they're used.

19   Q.    Before May 15th, 2022, did any manager ever tell you that

20   you were not allowed to place third party material on the break

21   room table?

22   A.    Other than onboarding when we went through our employee

23   handbook, no.

24   Q.    So what's onboarding?

25   A.    Onboarding is the process when you get hired at Apple.

1    You're taken through training.  And they walk you through the

2    employee handbook, paragraph by paragraph.

3    Q.   And so what did they show you that said that you as an

4    employee cannot place third party material on the table?

5    A.   There's a no solicitation policy for basically employees

6    to not promote their businesses or third party non-Apple

7    businesses or organizations at the company.

8    Q.   Excuse me?

9    A.   At the company.

10   Q.   Can we show the witness Joint Exhibit 1, please?  Have you

11   ever seen this document before?

12   A.   I have.

13   Q.   And what is it?

14   A.   It's the solicitation and distribution policy.

15   Q.   When was the first time you saw it?

16   A.   When I first became an employee.

17   Q.   Okay.  You can take the joint exhibit down.  Thanks.

18   After you saw the policy during your onboarding day and when

19   you saw the solicitation policy and before May 15th, did an

20   employee ever tell you that you couldn't place any non-Apple

21   material on the break room table?

22   A.   The employer never said that, no.

23        MS. WEINREB:   No further questions.

24        JUDGE ESPOSITO:   Mr. Bollepalli, do you have any

25   questions for Mr. O'Hara?

1    MR. BOLLEPALLI:   Yeah, just briefly.

2    JUDGE ESPOSITO:   Sure.

3  BY MR. BOLLEPALLI:

4  Q.   Good afternoon, Mr. O'Hara.  It's Sumanth Bollepalli,

5  Union Counsel.  I just have a few questions for you.  Are you

6  familiar with Benevity spelled B-e-n-e-v-i-t-y?

7  A.   I am.

8  Q.   Can you tell us what that is?

9  A.   From what I recall, Benevity is a Canadian company, non-

10  Apple Company that it works in tandem with Apple to work with

11  volunteer organizations for employees to donate their time,

12  donate their resources to causes and community events.

13  Q.   And are you aware of any other organizations that are

14  participating in Benevity?

15  A.   I'm not aware.

16  Q.   And in terms of the Greenwich Street facility, where can

17  employees access information regarding this program?

18  A.   They can access them on the two whiteboards that are in

19  the break room hallway, right outside the main break area.

20  There can typically be found a QR code for employees to scan,

21  be directed to Benevity's website and volunteer their time or

22  donations for different events that are going on in the world

23  or a different community.

24  Q.   So these QR codes that you're referring to, where have you

25  seen them?

1  A.    I've seen them on their whiteboard in the hallway that is

2  used for employee resources.

3  Q.    And have you tried to access these QR codes at any time?

4  A.    I have.

5  Q.    And what happens when you access it?  Does it take you to

6  a website?

7  A.    It does.  It usually directs you to either the

8  organization that is sponsoring the Benevity coordinated event,

9  or it takes you to Benevity's own portal, their own website.

10 Q.    And when you accessed it, do you recall specifically where

11 it took you?

12 A.    Sometimes I know specifically I recall the 9/11 Memorial

13 Run, it will take you to a signup sheet for you to enter your

14 information and then join that.

15 Q.    And besides the 9/11 Memorial Run, are you aware of any

16 other events or organizations that participate in this program?

17 A.    Not that I can recall.  No.

18 Q.    Have you specifically participated in any of the events?

19 A.    I have not, no.

20 Q.    Earlier, you were testifying when Jorge Romero took the

21 flyers.  You were in an area eating your lunch.  That's

22 correct?

23 A.    Correct.

24 Q.    And is that an area where employees take breaks?

25 A.    It is.

1    Q.    Is that an area that customers go into?

2    A.    It's not, no.

3    Q.    And where you were sitting, are the bulletin boards

4    visible?

5    A.    They are.  They're directly to my right.

6         MR. BOLLEPALLI:    All right, no more questions.

7         MS. WEINREB:    If I could just ask maybe one more

8    question.

9         JUDGE ESPOSITO:    All right, go ahead.

10   BY MS. WEINREB:

11   Q.    Mr. O'Hara, are any customers ever in the back area where

12   the break room is?

13   A.    They are not, no.  That is not accessible to customers.

14   Q.    And in the area where the vending machines are, are there

15   any customers there?

16   A.    No.  It's the same break area so it's not accessible.

17        MS. WEINREB:    No further questions.

18        JUDGE ESPOSITO:    All right, Ms. Mastrony?

19        MS. MASTRONY:    Yeah.  I will have cross, but I would like

20   to see a Jencks material first, please.

21        JUDGE ESPOSITO:    Sure.

22        MS. WEINREB:    I just sent it to you.  So just let me know

23   if you received it.  And Your Honor, with regard to Jordan

24   Vasquez's affidavit, I would appreciate if the same

25   instructions that were given at the pre-hearing conference

1  would be given to Respondent concerning the subpoenas.

2       JUDGE ESPOSITO:  Yes.  Ms. Mastrony, can you represent on

3  the record with respect to Mr. Vasquez's affidavit that you've

4  completely deleted -- Counsel have completely deleted Mr.

5  Vasquez's affidavit and any other Jencks materials from your

6  equipment and that you've destroyed any printed out versions of

7  the affidavit you may have made in order to prepare for cross

8  examination?

9       MS. MASTRONY:  Yeah.  We understand our obligations.  I

10 haven't destroyed the copy yet.  But I will.

11      JUDGE ESPOSITO:   Okay.

12      MS. MASTRONY:  Ruth, I still haven't gotten anything from

13 you.

14      MS. WEINREB:  Okay, it's the government slowness I guess.

15 You got it?

16      MS. MASTRONY:  Yep.  All right, can we have some time to

17 review?

18      JUDGE ESPOSITO:  How much time would you like to review

19 the affidavit before your cross examination?

20      MS. MASTRONY:  Like half an hour.

21      JUDGE ESPOSITO:  All right.  Why don't we come back at

22 five to 4.

23 (Off the record.)

24      COURT REPORTER:  We are.

25      JUDGE ESPOSITO:  Ms. Mastrony.

1    MS. MASTRONY:    Yeah.  Let's try again.  Okay.  Sorry,

2  there's going to be a little echo.  All right.  Thank you.

3                        CROSS EXAMINATION

4  BY MS. MASTRONY:

5  Q.    Oh, my God.  I was going to say good morning.  Good

6  afternoon, Mr. O'Hara.  It's in fact almost 4:00, nowhere

7  during the morning.  My name is Maura Mastrony.  I'm an

8  attorney representing the Respondent Apple in this proceeding.

9  I do have some questions for you based upon the testimony that

10  you just gave.  So first, did you speak to Mr. Vasquez at any

11  point after he testified this morning in this proceeding?

12  A.    No.

13  Q.    Okay.  Are you sure?

14  A.    Yes.

15  Q.    Okay.  You just look like you hesitated a little bit

16  there.  All right.  And did you hear any part of his testimony

17  this morning?

18  A.    No.

19  Q.    Okay.  All right.  You were asked some questions about a

20  Signal message that you shared with the group chat that you

21  had.  Let me just put it up for you.  All right.  I'm going to

22  share my screen.  Just let me know when you're able to see it.

23  This is GC's Exhibit 2.

24  A.    I can see it.

25  Q.    All right.  And so this is you in the blue, right?

1  A.    It is.

2  Q.    All right.  And you were responding to a message from Mr.

3  Vasquez?

4  A.    I was.

5  Q.    All right.  And was that all there was in this chain or

6  did Mr. Vasquez respond to this?

7  A.    There was no other response.  No.

8  Q.    Okay.  So let me just clarify that.  Did Mr. Vasquez

9  respond to your message in the blue here?

10  A.    He did not.

11  Q.    All right.  Did anyone else respond to your message in the

12  blue?

13  A.    No.

14  Q.    Okay.  Let me stop sharing there.  All right.  You

15  mentioned that you became aware of the solicitation and

16  distribution policy during your onboarding, is that right?

17  A.    Yes.

18  Q.    All right.  And you were with Apple for over six years.

19  Did you also take the business conduct policy training

20  annually?

21  A.    I did.

22  Q.    All right.  You mentioned that after May 15th or around

23  May 15th that you started wearing the red bracelet, right?

24  A.    I never specified any bracelet.

25  Q.    Okay.  All right.  Do you recall doing an affidavit for

1    the board in connection with the -- trans file?

2    A.    Yes.

3    Q.    All right.  Do you recall discussing the fact that the

4    organizing committee wore and passed out red bracelets or

5    wristbands?

6    A.    Yes.  In my affidavit, I specified.

7    Q.    Okay.  So did you wear red wristbands around the Apple

8    Store during that May 2022 timeframe?

9    A.    I did.

10   Q.    All right.  Did you pass out those bracelets to anyone

11   else?

12   A.    Yes.

13   Q.    All right, some of your colleagues?

14   A.    Yes.

15   Q.    All right.  Did anyone from management say no, you can't

16   wear that bracelet?

17   A.    No, not explicitly.

18   Q.    Did they implicitly say it?

19   A.    It was suggested that they knew what that meant, and that

20   they didn't particularly approve of it.

21   Q.    Okay, how was it suggested?

22   A.    Colleagues of mine had reported to me that they had been

23   given dirty looks from managers that they had been avoided by

24   management when they started wearing wristbands.

25   Q.    All right.  Did anyone from management prohibit anyone

1  from wearing those red wristbands?

2  A.    Not to my knowledge.

3  Q.    Okay.  And did anyone from management tell you that you

4  were not allowed to pass out those red wristbands to others?

5  A.    Not to my knowledge.

6  Q.    And wasn't part of the purpose of wearing the red

7  wristband so that other employees would know who to speak to

8  about the Union if they wanted to?

9  A.    That was the intent.  Yes.

10 Q.    Okay.  All right.  You discussed Stephanie Gladden a

11 little bit in your testimony, you recall that?

12 A.    Yes, I do.

13 Q.    All right.  And Stephanie Gladden never spoke to you about

14 the Union, right?

15 A.    No, I did not engage with Stephanie Gladden during that

16 time.

17 Q.    All right.  She didn't try to ask you about your support

18 for the Union, did she?

19 A.    No.

20 Q.    All right.  Let me show you another exhibit.  All right,

21 let me show my screen here.  Let me know when you can see it.

22 A.    Yes.  Yeah.

23 Q.    All right.  This is General Counsel Exhibit 3.  This was

24 the flyer that you stated that you designed, correct?

25 A.    Correct.

1  Q.   All right.  On the left side, there's a QR code that

2  someone could scan, right?

3  A.   Yes.

4  Q.   All right.  This is the store's mission statement?

5  A.   Yes.

6  Q.   And if someone clicked on that they would see a statement

7  that you and other organizing committee members had drafted?

8  A.   Correct.

9  Q.   All right.  In the middle here, does that say CWA there?

10 A.   It does.

11 Q.   All right.  And that's the Union, right?

12 A.   Yes.

13 Q.   All right.  That's not connected to Apple in any way,

14 right?

15 A.   They're its own affiliate.  Yes.

16 Q.   It's its own affiliate?

17 A.   So we are affiliated with Communication Workers of

18 America.  But they're their own I would say organization.

19 Q.   Okay.  And then on the right, it says, "Add your name to

20 join the movement", right?

21 A.   Correct.

22 Q.   So you were providing an opportunity to allow employees to

23 join this movement, right?

24 A.   Correct.

25 Q.   All right.  And they would do that by scanning that QR

1  code underneath there?

2  A.   Yes.

3  Q.   Because that will lead to an authorization card, right?

4  A.   It would lead to fields in which they could read more

5  about it and then add their name to a card.  Yes.

6  Q.   Okay.  So you said that you disagreed with the

7  representation by Jorge that this was promotional material,

8  right?

9  A.   I do.

10 Q.   Weren't you promoting membership in the CWA with this

11 flyer?

12       MS. WEINREB:   Objection.

13       JUDGE ESPOSITO:   Go ahead, Ms. Weinreb.

14       MS. WEINREB:   What Mr. O'Hara thinks is promotional

15 doesn't matter here.  It's what the employer is deciding what

16 is promotional.  The flyer speaks for itself.  He described the

17 flyer.  He described the intent of the flyer, what the QR codes

18 were doing.  If the company thinks it's promotional and they

19 can ban it, then they can make that argument in the brief.

20 Whether Mr. O'Hara thinks it's promotional or isn't that

21 promotional, I don't think it's relevant at all.

22       MS. MASTRONY:   I do, because he testified that it wasn't

23 promotional.  So I want to understand why he believes that and

24 disagreed with the company.

25       MS. WEINREB:   But he said -- yeah, that's right.  He said

1   he didn't think it was promotional.  He's not the one who's

2   concerned about whether it's promotional or not.  He's saying

3   it's not, you're saying it is.  He's giving you all the facts

4   around the week leading, around putting it on the table.  And

5   if you have a case that says this is promotional, and you don't

6   allow it, then that's your case.  What Mr. O'Hara thinks why it

7   should be promotion or not is no matter here to show whether or

8   not he violated the statute.

9       JUDGE ESPOSITO:   I'll allow Ms. Mastrony to answer the

10  question given Mr. O'Hara's testimony regarding the

11  conversation with, I believe, Mr. Romero.

12      MS. MASTRONY:   Mr. Romero.

13      JUDGE ESPOSITO:   Yeah, regarding whether the material was

14  promotional.  Go ahead.  Do you remember the question, Mr.

15  O'Hara?  Or would you like Ms. Mastrony to ask it again?

16      THE WITNESS:   I remember the question.  Personally, as an

17  employee of Apple don't view this as promotional because in my

18  time of employment, there was no indication that led me to

19  believe that anything regarding employees' rights would be

20  viewed as promotional.  There was no past precedent that I

21  anticipated to be that would indicate that this would be filed

22  under promotional activity or that it was promoting anything.

23  BY MS. MASTRONY:

24  A.   But you would agree that this flyer says, "Add your name

25  to join the movement", right?

1    A.    I do.

2    Q.    Okay.  And the movement is related to a non-Apple entity,

3    a third party, the Union, right?

4    A.    Now, Union is employees at Apple, so it's not third party.

5    Q.    It's not owned by Apple.

6    A.    What do you mean?  Clarify that, please?

7         JUDGE ESPOSITO:   Okay.  Ms. Mastrony --

8         MS. MASTRONY:   I'll let it go.  That's fine.

9    BY MS. MASTRONY:

10   Q.    All right.  Mr. O'Hara, you also testified that you saw

11   coupons on the break room table at the World Trade Center at

12   Apple.  Do you recall that testimony?

13   A.    I do.

14   Q.    All right.  Do you have any pictures of those coupons that

15   you saw on the table?

16   A.    I do not.

17   Q.    All right.  Any recordings that you took to show coupons

18   that's on the table?

19   A.    I do not.

20   Q.    All right.  How many times did you see coupons left on the

21   table?

22   A.    I can recall at least twice.

23   Q.    Twice in your six years and five months you were at Apple?

24   A.    It's more than that.  It's more -- like, it's probably

25   more than that.  But I can recall two specific instances.

1    Q.   All right. Was that the Shake Shack and the Burger King

2    coupons that you referenced?

3    A.   It was.

4    Q.   All right.  Do you recall for how long the Shake Shack

5    coupons were sat out there?

6    A.   They were there for multiple days as there was basically

7    like a free lunch coupon that employees could take advantage

8    of.

9    Q.   So were those vouchers?

10   A.   To my knowledge, they were coupons that were -- employees

11   could take advantage of going to Shake Shack.

12   Q.   Okay.  And do you know who put the coupons or who put the

13   vouchers out?

14   A.   I do not.

15   Q.   All right.  Do you know if Apple had sponsored the free

16   lunch at Shake Shack?

17   A.   I'm not aware.

18   Q.   Okay.  What about the Burger King coupons, how long were

19   those out?

20   A.   Those were out for a day or so.

21   Q.   Okay.  And then were they eventually removed?

22   A.   They were.

23   Q.   Okay.  And you also said you saw newspapers, right?

24   A.   Yes.

25   Q.   Okay.  And how many times have you seen newspapers left

1  out?

2  A.    Several times.

3  Q.    Well, what is several?  Is that two?  Is that three?  Is

4  that 30?

5  A.    I mean, in my six years, more than 10 times.

6  Q.    Okay.  And how long would you say the newspapers were left

7  out?

8  A.    As I testified, anywhere from a day or a couple of days.

9  Q.    Okay.  And then they were eventually removed as well,

10  correct?

11  A.    Correct.

12  Q.    All right.  There's a whiteboard, right?  Like, right

13  outside the break room there?

14  A.    Yes.  In the break space, yes.

15  Q.    In the break space, okay.  And that's used for the company

16  to leave messages for employees, right?

17  A.    It is.

18  Q.    And maybe to highlight some benefits that Apple has for

19  its employees?

20  A.    Yes.

21  Q.    All right.  But you don't see employee material up there,

22  correct?

23  A.    I have.

24  Q.    Okay.  What employee material have you seen up there?

25  A.    I have seen business cards left on the shelf that holds

1 markers.  I've seen promotional business cards there.

2 Q.   All right.  Is that on the whiteboard or is that on the

3 shelf?

4 A.   It's connected to the whiteboard.  So it's part of the

5 whiteboard.  Yes.

6 Q.   So it's where the markers for the whiteboard are kept.

7 A.   Yes.

8 Q.   Okay.  How many times did you see business cards there?

9 A.   I mean, to my most recent recollection, a couple of times,

10 one or two times.

11 Q.   Okay.  One or two times in the six years that you've been

12 at Apple?

13 A.   I mean, again, six years, but in my recent memory, it was

14 a couple of times.

15 Q.   Okay.  Did you take any pictures of those business cards

16 left on the whiteboard shelf?

17 A.   I did not.

18 Q.   Okay.  All right.  And now, you testified that you left

19 flyers I think on six different occasions in the May, June

20 timeframe, correct?

21 A.   Correct.

22 Q.   All right, and that they were removed every time that you

23 put them?

24 A.   They were.  Yes.

25 Q.   Okay.  And how many times did you actually witness the

1  flyers being removed?

2  A.   Out of the six occasions in which I observed that they

3  were no longer there, probably three to four times that I

4  observed it.

5  Q.   Okay.  And so when we you saw the flyers being removed by

6  a member of management, was someone actually reading any of the

7  flyers at the time that they were removed?

8  A.   Can you rephrase that?

9  Q.   I'll give it a go.  So in the three to four times that you

10 saw a member of management remove the flyers, was someone

11 actually reading the flyer at the time that it was removed?

12 A.   I can't speak for what they were doing with the flyers.

13 They were indicated for somebody to scan the QR code and view

14 it on their phone so they wouldn't have to.

15 Q.   Okay.  Did you see anyone trying to scan a QR code while

16 the flyer was being removed?

17 A.   I did not.

18 Q.   Okay.  So you could have just handed those flyers to your

19 colleagues while you were in the break room on break time,

20 right?

21 A.   I mean, I could have.  But I chose to make it available

22 for everybody to read.

23 Q.   Okay.  So there's nothing in the solicitation policy that

24 would have prohibited you from walking up to your colleagues on

25 your 15-minute breaks, on your lunch break and discuss the

1  Union with them while you hand the flyer, right?

2  A.    To talk about the Union?

3  Q.    Yes.

4  A.    I mean, I don't know of any policy in the actual handbook

5  that says you can't talk about unionizing.

6  Q.    Right, so you could have talked to your colleagues about

7  the Union while you were on a break in the break room, right?

8  A.    Yes, when you're on a break, you're on unpaid time.

9  Q.    In fact, you did talk to your colleagues about the Union

10  while you were on break in the break room at times, right?

11  A.    Yes.

12  Q.    Right.  And you could have just handed them the flyer

13  while you were talking to them as well, right?

14  A.    Sure, yes.

15  Q.    All right.  Did you ever put any flyers in anyone's

16  lockers and leave them there?

17  A.    No.

18  Q.    No.  All right.  And when you did discuss the Union with

19  your colleagues, no member of management told you can't have

20  that conversation here, did they?

21  A.    No.

22  Q.    Okay.  All right.  Let's go to the videotape.  Give me a

23  second.  All right.  I'm putting up GC-4, which is the makeup

24  team video.  Bear with me.  All right.  I'm going to start it

25  at 6 hours in, 55 seconds.  Okay.  All right.  Tell me and when

1  you see either yourself or Jordan enter the break room.

2  A.    That's me.

3  Q.    All right.  That's you, right, with the pink hat?

4  A.    Yes.

5  Q.    All right.  Let me keep going.  All right.  I'm stopping

6  at 6 hours in, 1 minute, and 47 seconds.  And what are you

7  doing here?

8  A.    I'm laying out flyers on the break room table.

9  Q.    All right.  Those are the Union flyers that you were

10  laying?

11  A.    They are.

12  Q.    Okay.  Were you speaking to anyone about what you were

13  doing at this point?

14  A.    I don't recall.

15  Q.    Okay.  All right.  Now, I am going to move it forward a

16  little bit.  This thing is really hard to -- all right, I'm

17  starting it at 6 hours and 2 minutes and 59 seconds.  Okay.

18  Who are you speaking to right there?  Can you tell?

19  A.    I can't tell.

20  Q.    Okay.

21  A.    Oh, this is Jordan.  Yes.  I can see his hat.

22  Q.    That's Jordan?  Okay.  What are you doing there?  It looks

23  like you're removing the flyers from the table.

24  A.    I'm recollecting them, yes.

25  Q.    Okay.  Why were you doing that?

1    MS. WEINREB:   Objection.  Why he removed them is

2    irrelevant.

3    MS. MASTRONY:   I don't think it is irrelevant.  He's

4    saying he wanted to leave them out and management was taking

5    them.  Why would he be taking them away?  I think I should --

6    MS. WEINREB:   This isn't a case about the individual

7    taking the flyers away.  It's about the Respondent taking the

8    flyers away.  Whether he took --

9    JUDGE ESPOSITO:   I understand that, but we've had

10   extensive testimony regarding this particular incident.  So

11   I'll allow it.  Go ahead.

12   BY MS. MASTRONY:

13   Q.   So my question was, Mr. O'Hara, why you were removing the

14   flyers?

15   A.   I can't recall.

16   Q.   You can't recall why you picked up the Union flyers that

17   you were so desperately trying to put on the table?

18   MR. BOLLEPALLI:   Objection.

19   JUDGE ESPOSITO:   Yeah.  I mean, don't characterize his

20   motivation like that.

21   MS. MASTRONY:   I'm sorry.  He just has testified at

22   length about how he kept trying to put them down and they were

23   taken away.  So I'm wondering how he can't remember why he

24   pulled them away.

25   MR. BOLLEPALLI:   Objection.

1      JUDGE ESPOSITO:   What was that, Mr. Bollepalli?

2      MR. BOLLEPALLI:   He answered that he doesn't recall.  I

3  don't understand why we keep asking him the same question.

4      JUDGE ESPOSITO:   Okay.  Mr. O'Hara, do you remember at

5  this point why you took the flyers off the table?

6      THE WITNESS:   To the best of my knowledge, I do not know.

7  So you can ask me again but I don't know.

8  BY MS. MASTRONY:

9  Q.   All right.  I'm starting it again from 6:03:26.  Who are

10  you speaking to over there?

11  A.   I'm not sure.

12  Q.   You can't tell who that is?

13  A.   I don't know who that is from this video.

14  Q.   Okay.  Could it be Tyler Mobley (ph)?

15      JUDGE ESPOSITO:   Who?

16      MS. MASTRONY:   Tyler Mobley (ph).

17      THE WITNESS:   I'm not sure.  I don't know who that is in

18  the video.

19  BY MS. MASTRONY:

20  Q.   Okay.  All right.  Let me pull up one more video.  All

21  right.  This has not been entered into evidence yet.  I'm going

22  to put it up on the screen and ask Mr. O'Hara to identify what

23  we're looking at here.  Mr. O'Hara, can you tell us what we're

24  looking at?

25  A.   This is a video of the break room.

1  Q.   Okay.  Of the World Trade Center Apple?

2  A.   Yes.

3       MS. MASTRONY:   All right.  And I can represent to you

4  that it is from May 29th.  This is one of the videos that we

5  pulled pursuant to the subpoena.  I would like to enter this as

6  employer's 24.

7       JUDGE ESPOSITO:   Okay, I'm sorry, Ms. Mastrony.  Are you

8  just marking it now, or do you want it -- are you moving --

9       MS. MASTRONY:   I'd like to move it into evidence.

10      MS. WEINREB:   Your Honor, since the GC's subpoena did not

11 request May 29th, since that was not a date, I don't know

12 whether this is what Respondent is claiming it is.  So I don't

13 know.  This isn't something that I requested.  So I don't know.

14 If you want to send it to me as a document and put it up on

15 SharePoint, I don't know.  I don't even know if it is in

16 SharePoint.

17      MS. MASTRONY:   It is.

18      MS. WEINREB:   It is?

19      MS. MASTRONY:   It is, yes.

20      MS. WEINREB:   Okay, because this wasn't something that I

21 requested.  Without more of a foundation, I can't say that this

22 is seven hours of the break room from May 29th.

23      MR. BOLLEPALLI:   I just want to add, I would also like to

24 know, since the General Counsel withdrew the allegation

25 regarding May 29th, I would like to know the relevance of this

1  video.

2      MS. WEINREB:  Well, we never had May 29th.  We had May

3  30th and June 2nd that I withdrew.

4      JUDGE ESPOSITO:  Okay.  What's the relevance of something

5  that -- there's going to be something that occurred that's

6  depicted in this video on May 29th that's somehow relevant to

7  the complaint's allegations, Ms. Mastrony?

8      MS. MASTRONY:  It's actually relevant to the testimony

9  that Mr. O'Hara just gave.

10     JUDGE ESPOSITO:  Which testimony?  Regarding the events

11  of May 15th, regarding that video?

12     MS. MASTRONY:  No.  He testified that he never saw a

13  manager clear the break room table.  He said he only saw

14  management clear their place, but at the table, but never saw

15  management clear the table otherwise.  And this will --

16     JUDGE ESPOSITO:  And this video depicts a manager

17  clearing the table?

18     MS. MASTRONY:  Correct, in that timeframe that the

19  complaint is about right on May 15th to June 2nd timeframe.

20     JUDGE ESPOSITO:  I understand.  All right, I'll allow it

21  on that basis.  Go ahead.

22     MS. WEINREB:  Are you allowing the introduction into

23  evidence the entire video or are we going to see the portion of

24  the video that is being alleged to be relevant?

25     JUDGE ESPOSITO:  Well, I mean, I'm assuming that -- are

1  you intending to introduce the entire seven hours, Ms.

2  Mastrony, of the video?  Or is there a certain portion of the

3  video that depicts the cleaning of the table that you're

4  interested in?

5      MS. MASTRONY:   Just like we've introduced the entire time

6  for every other day in question that we've introduced here, I

7  want to introduce this whole video as well.  There are some

8  other things that are relevant of the video, in addition to

9  this one issue.

10      JUDGE ESPOSITO:   Okay.

11      MS. WEINREB:   But unlike before, I haven't seen anything

12  that ties it to relevancy.  If you want to make the point that

13  managers clear it, do you want to show us so it like can be

14  authenticate that in fact this video does have that?

15      MS. MASTRONY:   I'm trying.  That's where I'm going.

16      JUDGE ESPOSITO:   All right.

17      MS. WEINREB:   Maybe before you introduce it.

18      JUDGE ESPOSITO:   Okay.  Here's what we're going to do.

19  Ms. Mastrony, you show the portions of the video that relate to

20  this witness's testimony.

21      MS. MASTRONY:   Sure.

22      JUDGE ESPOSITO:   And then Ms. Weinreb will have the

23  opportunity to review the entire video.  Ms. Mastrony, if you

24  want to enter the entire video, Ms. Weinreb will have the

25  opportunity to review the entire video and then take a position

```
 1  with respect to its admission at a later time.  And I'll
 2  reserve ruling on the admission of the entire video until Ms.
 3  Weinreb has had a chance to review the whole thing.
 4      MS. MASTRONY:    Okay.
 5      JUDGE ESPOSITO:    Okay.
 6  BY MS. MASTRONY:
 7  Q.   All right.  So I'm going to press play from 5 hours in, 49
 8  minutes and 15 seconds.  All right.  Can you tell me, Mr.
 9  O'Hara, who that -- can you see my cursor when I do that?
10  A.   I can.
11  Q.   Okay.  Can you tell me who that is?
12  A.   This is Kathryn Marshall.
13  Q.   All right.  Who is Kathryn Marshall?
14  A.   She's a senior manager.
15  Q.   All right.  I'm going to play it from here.  All right
16  then, what's Ms. Marshall doing there if you can tell from the
17  video?
18  A.   She's collecting objects from the table.
19  Q.   All right.  So she was clearing up the break room table,
20  right?
21  A.   It's what it looks like, yes.
22      MS. MASTRONY:    Okay.  Let me stop this.  All right.  If
23  you just give me like two minutes I can see if I can wrap this
24  up.
25      JUDGE ESPOSITO:    Sure.  Let's go off the record.
```

1    (Off the record.)

2         JUDGE ESPOSITO:    Okay.  Let's go back on the record.

3         COURT REPORTER:    We are.

4    BY MS. MASTRONY:

5    Q.    All right, just briefly.  So Mr. O'Hara, you testified

6    previously that you had seen managers go in and out of the

7    break room multiple times a day, right?

8    A.    Yes.

9    Q.    All right.  You just saw Kathryn cleaning things off the

10   break room table at one point when she walked in the break

11   room, right?

12   A.    From the video camera, not in person.

13   Q.    Correct.  Great.  So is it from your testimony that in the

14   first years you were at Apple, you never saw a manager walk

15   into the break room and clear things off the table?

16   A.    Again, I don't watch them so.

17   Q.    Sorry?

18   A.    I don't watch them while I'm at work all the time.  So

19   they could have.  I just never, to my knowledge, saw them do

20   that.

21        MS. MASTRONY:    Okay.  Thank you.  No further questions.

22        JUDGE ESPOSITO:    Okay.  Ms. Weinreb, do you have any

23   redirect examination?

24        MS. WEINREB:    I just have one question.

25                         REDIRECT EXAMINATION

1    BY MS. WEINREB:

2    Q.   Mr. O'Hara, when you testified that you saw managers

3    remove the flyers, we saw the videotape, you identified the

4    people removing the flyers.  On those occasions, did you

5    actually see them remove it from the table?

6    A.   The occasion that I recorded, yes.  The occasions in which

7    I saw them carrying them out of the break room, it's clear that

8    they had removed them from the table otherwise they wouldn't

9    have got it.

10   Q.   But on those occasions, not the one where you videoed, the

11   other occasions, did you see them actually removing?

12   A.    No.

13       MS. WEINREB:   No further questions.

14       JUDGE ESPOSITO:   Mr. Bollepalli, any additional

15   questions?

16       MR. BOLLEPALLI:   Yeah, just briefly, I wanted to clarify.

17   BY MR. BOLLEPALLI:

18   Q.   Mr. O'Hara, you were testifying about the flyers on May

19   15th.  But in regards to the red wristbands, do you recall the

20   first time the red wristbands were handed out to employees?

21       JUDGE ESPOSITO:   I'm sorry.  We didn't get that Mr.

22   O'Hara.

23       THE WITNESS:   May 15th.

24   BY MR. BOLLEPALLI:

25   Q.   And prior to that at any time, were you wearing a red

1   wristband?

2   A.   No.

3   Q.   To your knowledge, was any other Apple employee wearing a

4   red wristband?

5   A.   Not to my knowledge.

6        MR. BOLLEPALLI:   No more questions.

7        JUDGE ESPOSITO:   Ms. Mastrony, do you have any questions

8   based on Ms. Weinreb and Mr. Bollepalli's redirect?

9        MS. MASTRONY:   I do not.  Thank you.

10       JUDGE ESPOSITO:   All right.  Thank you very much, Mr.

11  O'Hara.  You're excused.  Thank you.

12       THE WITNESS:   Okay.

13       JUDGE ESPOSITO:   Let's go off the record.

14  (Off the record.)

15       JUDGE ESPOSITO:   Let's go back on the record.

16       COURT REPORTER:   We are.

17       JUDGE ESPOSITO:   Okay.  All right.  So Ms. Weinreb, do

18  you have any additional witnesses to present?

19       MS. WEINREB:   Not at this time, Your Honor.  We've put

20  our case in, and I just want to reserve time for rebuttal.

21       JUDGE ESPOSITO:   Okay.  So then Ms. Mastrony -- I'm

22  sorry, Mr. Bollepalli, you've indicated off the record that

23  Charging Party does not have any additional witnesses or

24  documentary evidence to introduce.  Is that correct?

25       MR. BOLLEPALLI:   Yes, that's correct.

1      JUDGE ESPOSITO:   Okay.  So then Ms. Mastrony will begin

2  tomorrow at 9:30 with Respondent's case.

3      MS. MASTRONY:   Okay, like I said, we're happy to start

4  earlier if everyone prefers to do that.  We're flexible.

5      JUDGE ESPOSITO:   Okay.  What does everyone think?  9:30

6  is fine with me.  If other people would like to do 10:00, we

7  can do that as well.

8      MR. BOLLEPALLI:   I'm fine either way.

9      JUDGE ESPOSITO:   Ms. Weinreb, are you frozen?  Okay, 9:30

10  it is.  Let's resume tomorrow at 9:30.

11      MR. BOLLEPALLI:   Okay.

12      MS. MASTRONY:   Thank you.

13      JUDGE ESPOSITO:   All right.  Off the record.

14

15  (Whereupon, at 4:45 p.m., the above-entitled matter was

16  recessed to reconvene on Tuesday, January 10, 2022)

17

18

19

20

21

22

23

24

25

```
 1
 2
 3                    C E R T I F I C A T I O N
 4
 5        This is to certify that the attached proceedings before
 6    the National Labor Relations Board (NLRB), Region 2, in the
 7    matter of Apple, Inc., Case Number 02-CA-295979, at New York,
 8    New York, on January 9th, 2023, was held according to the
 9    record, and that this is the original, complete, and true and
10    accurate transcript that has been compared to the recording
11    from the hearing, that the exhibits are complete and no
12    exhibits received in evidence or in the rejected file are
13    missing.
14
                         _Barrington G. NMoxie_
15        _____
16
17            BARRINGTON MOXIE, COURT REPORTER
18
19
20
21
22
23
24
25
```

**{**

**{Off (1)**
111:15

**A**

**Aaron (2)**
76:13;78:20
**abandoned (1)**
20:14
**Abdelal (1)**
12:12
**ability (3)**
13:11;46:14,15
**able (9)**
43:9,9;60:20;91:7,
9;102:17;114:12;
137:15;158:22
**above (2)**
89:7;152:17
**above-entitled (2)**
1:13;181:15
**absence (1)**
13:14
**access (8)**
86:9;106:14,15,16;
154:17,18;155:3,5
**accessed (2)**
105:3;155:10
**accessible (2)**
156:13,16
**accessories (1)**
108:24
**accurate (1)**
95:9
**accurately (4)**
26:14;111:21,24;
114:12
**across (3)**
21:16;44:16;126:22
**Act (8)**
10:21,25;11:23;
13:9;14:9;15:12,14;
20:13
**acted (1)**
16:25
**action (1)**
23:3
**actively (1)**
22:19
**activities (12)**
10:22;11:14;13:3,
16,17;14:25;15:11,
22;16:3,4;17:2;
128:10
**activity (13)**
12:5;13:16;14:21;
19:13,16;21:17;40:9;
73:11;119:7;120:12;
122:23;124:12;
164:22

12:8
**actual (6)**
43:18,24;78:7;
86:13;123:24;170:4
**actually (14)**
44:25;73:2;85:12;
86:12;96:14,20;97:9,
16;168:25;169:6,11;
175:8;179:5,11
**Add (6)**
89:8;123:22;
162:19;163:5;164:24;
174:23
**adding (1)**
123:25
**addition (8)**
12:22;13:14;15:5;
20:9;30:8;124:14;
135:13;176:8
**additional (5)**
95:22;127:3;
179:14;180:18,23
**address (10)**
7:22;8:1;9:8;10:6;
23:21;28:22,24;
42:24;70:5;71:15
**adhered (1)**
20:10
**adjacent (1)**
128:5
**Administrative (4)**
1:14;6:10;15:6;
24:12
**admission (11)**
8:20;9:25;42:3,21;
59:11;67:23;135:17;
138:5;146:25;177:1,2
**admit (1)**
79:22
**admitted (11)**
8:25;9:7;10:3;
38:10;42:6;59:15;
68:1;78:9;135:20;
138:9;147:2
**advance (2)**
142:19;143:10
**advancing (1)**
144:11
**advantage (2)**
166:7,11
**advertisement (1)**
92:12
**affidavit (17)**
90:12,16,19;91:3,
13;95:12,20,23;96:6,
8;156:24;157:3,5,7,
19;159:25;160:6
**affiliate (3)**
116:9;162:15,16
**affiliated (1)**
162:17
**affirm (2)**
24:20;113:2
**affirmed (1)**

12:8
**AFL-CIO (2)**
1:9;6:8
**afternoon (18)**
59:24;63:19;72:1;
103:18;112:24;
113:17;125:21;129:9;
132:10,16,20;133:10;
135:11,23;137:20;
146:5;154:4;158:6
**Again (27)**
7:7;22:9;26:18;
27:3;47:10;57:19;
61:19;62:9;63:5;
76:23;95:4;100:17;
101:6;114:15,24;
138:15;139:2;142:13;
143:5,22;144:24;
158:1;164:15;168:13;
173:7,9;178:16
**against (7)**
11:2;13:2,8;15:2,
10;44:17;45:6
**ago (1)**
67:17
**agree (2)**
9:23;164:24
**agreed (2)**
9:9;35:10
**agreement (1)**
9:6
**ahead (25)**
18:4;24:2;25:7,17;
27:7;37:18;46:5;48:1;
70:6;71:22;75:4;
81:21;84:24;96:3;
97:25;99:25;111:19;
112:11;115:1;128:9;
156:9;163:13;164:14;
172:11;175:21
**alert (1)**
35:21
**alerted (2)**
40:2,4
**aligned (1)**
131:21
**ALJ (1)**
21:2
**ALJ's (1)**
22:25
**allegation (3)**
18:19;70:15;174:24
**allegations (4)**
18:7,13;70:8;175:7
**allege (1)**
18:17
**alleged (2)**
77:12;175:24
**alleges (2)**
18:9,23
**allow (2)**
74:25;100:8;
162:22;164:6,9;

172:11;175:20
**allowed (9)**
21:18;60:17;62:25;
68:12;90:24;148:2,
15;152:20;161:4
**allowing (3)**
11:4;14:6;175:22
**allows (1)**
19:3
**almost (3)**
30:18;70:22;158:6
**alone (1)**
129:14
**Along (2)**
16:8;20:19
**Although (1)**
11:16
**always (1)**
35:9
**amended (1)**
71:7
**amendment (2)**
70:8,11
**AMERICA (7)**
1:8;6:8;8:1;10:23;
29:11;116:6;162:18
**American (2)**
20:23;23:15
**among (1)**
19:24
**amount (1)**
63:20
**analogous (2)**
23:3,17
**annual (2)**
79:3;101:15
**annually (1)**
159:20
**answered (1)**
173:2
**anticipated (3)**
12:3;14:1;164:21
**apologize (1)**
139:19
**app (4)**
6:24;29:25;30:1;
117:15
**appear (1)**
85:11
**appearances (1)**
7:9
**appeared (1)**
22:1
**appears (1)**
52:17
**APPLE (112)**
1:5;6:6;9:17,18;
10:19;15:20,23,25;
16:7,13,14,17,23,25;
17:1,6,8,9,14,20;
18:13,23;19:3,7,8,15,
17,20;20:7,10,13;
21:7,14,18;22:2,4;

27:18,21;28:3,4,17,
19;31:17,22,25;
32:12;34:14;35:1,6,9;
60:16;62:24,25;63:3;
66:10;68:5;73:11,20;
75:10;82:5,9,11;83:5;
88:18,25;92:20;93:1;
98:12,15;99:8;104:2,
13;105:15;106:10,12,
14,14,17,22;108:6,23;
113:18;115:8,21;
116:9;118:6;123:8,8,
20;124:5;134:24;
139:15;149:25;
152:10,25;154:10,10;
158:8;159:18;160:7;
162:13;164:17;165:4,
5,12,23;166:15;
167:18;168:12;174:1;
178:14;180:3
**Apple's (11)**
9:10;17:12,19;
18:10,16;19:24;
20:21;98:8;103:20;
104:16;105:6
**application (5)**
20:8;21:21;22:15;
23:7;30:2
**applied (3)**
18:24;21:14;22:13
**apply (1)**
20:17
**appreciate (2)**
100:20;156:24
**approach (2)**
72:24;73:4
**approached (6)**
11:13,19;34:9;
72:22;119:6,16
**appropriate (1)**
15:13
**approve (2)**
18:14;160:20
**approximately (3)**
73:21;77:20;118:21
**April (1)**
31:3
**archway (1)**
107:12
**area (39)**
11:6;12:7;14:5;
16:7,8;19:1;21:13;
36:8;45:25;54:21;
57:24;58:1,2,3;62:4;
78:18;79:21,25;
100:9;107:6,15,25;
108:12,21;139:1;
144:1;145:20;147:9;
150:24;151:1,4,6;
154:19;155:21,24;
156:1,11,14,16
**areas (9)**
12:10;13:13;15:4;

19:4;20:16;21:1,11;
22:3;78:16
**argue (4)**
11:16;12:16;13:1;
14:11
**argument (2)**
77:10;163:19
**arguments (2)**
14:1;79:9
**around (18)**
22:3;33:14;34:4,5;
55:14;85:19;108:14;
118:20;120:15;131:5;
132:16;134:11;
142:17;143:1;159:22;
160:7;164:4,4
**arranged (1)**
131:21
**Aside (5)**
38:13;65:25;117:9;
151:19,25
**assigned (1)**
112:25
**assist (3)**
6:22;27:5;115:1
**assistance (1)**
46:20
**associated (2)**
35:5,6
**assuming (4)**
42:8;45:2;102:12;
175:25
**AT&T (1)**
15:6
**atrium (1)**
108:14
**attempt (1)**
27:3
**attention (3)**
22:23;35:4;147:16
**attorney (2)**
113:18;158:8
**attorneys (1)**
26:8
**attorney's (2)**
26:16;114:14
**audio (8)**
6:24;7:5;26:21,21,
25;114:18,19,22
**August (1)**
22:17
**authenticate (1)**
176:14
**authorities (1)**
7:2
**authorization (2)**
89:20;163:3
**available (2)**
128:16;169:21
**Avenue (1)**
28:23
**Avjet (2)**
20:17;23:13

**A-v-j-e-t (1)**
23:14
**avoided (1)**
160:23
**aware (17)**
31:21;40:7;62:20;
92:15;94:3,4,5,7;
96:19;97:8,20,24;
154:13,15;155:15;
159:15;166:17
**away (8)**
22:5;49:3;68:6;
172:5,7,8,23,24
**awe (1)**
119:13

**B**

**back (32)**
15:7;25:15;36:8;
45:4;46:6,7,18,24;
52:12;56:19;57:6,11,
23;69:22,24;71:3;
80:13;83:11;84:12;
85:10;93:3;99:24;
100:18;101:3;103:4;
106:4;130:14;137:10;
156:11;157:21;178:2;
180:15
**backpack (2)**
49:8;143:1
**backpacks (2)**
44:10;152:6
**backup (2)**
27:4;115:1
**backwards (1)**
49:5
**bag (2)**
85:14,15
**balcony (6)**
33:23;107:22,24;
108:13,16,21
**ban (1)**
163:19
**band (1)**
72:8
**Bar (4)**
107:25;108:4;
110:19;111:3
**Barry (4)**
6:3;10:16;25:15;
64:10
**bars (1)**
33:14
**baseball (1)**
49:21
**based (7)**
72:4;102:10,13;
109:5;111:7;158:9;
180:8
**basically (4)**
105:17;106:9;
153:5;166:6

**basis (1)**
175:21
**bathrooms (3)**
46:8;58:4;127:6
**Baybrook (1)**
28:7
**beanie (6)**
47:24;49:8;53:2,3;
55:10;56:10
**Bear (1)**
170:24
**became (3)**
94:5;153:16;159:15
**become (1)**
97:20
**bedroom (1)**
25:23
**began (6)**
64:25;122:19;
123:14;124:9;129:9;
138:20
**begin (4)**
26:8;71:18;122:21;
181:1
**beginning (4)**
42:17;55:3;130:12;
142:11
**begins (1)**
114:6
**behalf (4)**
15:18;17:25;24:16;
112:21
**behind (2)**
109:18;146:15
**believes (3)**
35:9;101:16;163:23
**below (1)**
122:7
**benefit (3)**
105:15;106:10,11
**benefits (1)**
167:18
**B-e-n-e-v-i- (1)**
103:23
**Benevity (10)**
103:23;104:6,21;
105:7,16;106:9;
154:6,9,14;155:8
**B-e-n-e-v-i-t-y (1)**
154:6
**Benevity's (3)**
104:8;154:21;155:9
**besides (1)**
155:15
**best (2)**
64:1;173:6
**better (5)**
29:21;48:6;70:25;
71:1;136:17
**beyond (2)**
74:16;78:13
**big (1)**
66:15

**bit (10)**
28:5;49:5;52:12;
56:6;84:11;133:19;
143:10;158:15;
161:11;171:16
**black (2)**
63:10;123:15
**blanking (2)**
28:23;99:4
**blocks (1)**
109:24
**blue (14)**
49:8;17;57:12,20;
78:18,25;79:24;81:1;
100:9;122:7,9;
158:25;159:9,12
**blurry (1)**
85:22
**BOARD (26)**
1:2,15;6:6;12:7;
13:10,23;18:22;19:5;
20:3,5,22,23;22:25;
98:12;99:2,7,11,12,
13;104:17,20;107:5;
128:12;149:7,7;160:1
**boards (4)**
19:24;20:6;98:8;
156:3
**Board's (1)**
148:13
**BOLLEPALLI (49)**
7:25,25;8:11,12,19,
23;9:24;10:2,9,10;
15:17,19;17:23;
23:25;42:8,11;68:21,
23,25;81:18;101:16,
19;103:13,15,17,18;
105:22;110:13,14;
112:7;153:24;154:1,
3,4;156:6;172:18,25;
173:1,2;174:23;
179:14,16,17,24;
180:6,22,25;181:8,11
**Bollepalli's (1)**
180:8
**books (3)**
16:12,23;17:15
**both (3)**
7:2,4;97:11
**bottom (14)**
45:2,13,14,16;
47:24;51:7,15;53:2,3;
56:10;84:23;88:23;
91:16;126:12
**boxes (1)**
99:14
**bracelet (3)**
159:23,24;160:16
**bracelets (4)**
82:2,8;160:4,10
**brain (1)**
76:7
**break (237)**

11:4,6;12:7,14,20,
25;13:22;14:3,4;16:8,
9,18,19,23;17:3,12;
18:25;19:6,22;20:2,4,
11,14,16,18;21:11,13,
15,20;22:1,11,14;
29:7;30:22;33:11;
40:16,18,19,22;42:16;
43:13;44:3,4;45:20,21;
48:21;50:24;52:9;
54:1,14,18,20;55:1,
15;57:24;58:23;
63:18,21;64:15,23,24;
65:8,12,16,18,24;
66:1,1,6,11,13,17;
67:20;68:5,5,9,9,13,
18;69:11,13;82:16,18,
20,22;83:3,7,20;84:9,
17;85:23;86:1,1,5,5,8,
13,17,19;87:24;88:3,
14;89:13;91:20;
93:8,12,19,23;94:1,
22;95:7,18;96:13;
98:13,17,18,19,22,23;
99:15;103:21;107:6,
10,12,13,16,19;
109:12,13,13,17,17,
18,24;110:2,9;111:24,
25;112:1;124:16,17,
19;125:2,19,20;
126:20,22;127:3,9,11;
128:6,13;129:12,17,
20;130:2,5,7,14,21;
131:2,3,17,25;132:3,
7,22;133:3,9,15,19,
21;134:1,7,8,11,13;
136:7;137:22,24;
139:1,13;140:9;
141:6,7;142:2,6,16;
143:7,23;144:6,20;
145:18,21,23;146:5,9;
148:2;149:6,20;
150:2,17,25;151:3,5,
25;152:1,11,20;
153:21;154:19,19;
156:12,16;165:11;
167:13,14,15;169:19,
19,25;170:7,7,8,10,
10;171:1,8;173:25;
174:22;175:13;
177:19;178:7,10,10,
15;179:7
**breakdown (1)**
105:21
**breakout (1)**
69:7
**breaks (15)**
14:4;16:11;29:3,6,
8;89:13;115:25;
116:2,3;128:7,17;
132:5;150:25;155:24;
169:25
**brief (3)**

11:8;103:15;163:19
**briefly (8)**
16:5;72:2;105:25;
106:6;127:16;154:1;
178:5;179:16
**bright (1)**
139:25
**bring (4)**
42:13,17;77:1;79:5
**broad (1)**
18:18
**brought (1)**
11:17
**Brown (8)**
12:12;70:14;71:12;
133:24;134:1,3;
135:23;137:19
**bubble (3)**
32:16,18;121:24
**Building (3)**
1:16;108:10,14
**built (1)**
116:20
**bullet (1)**
148:14
**bulletin (12)**
19:24;20:3,5,6;
98:8,12;99:12;
104:17,20;107:5;
149:7;156:3
**bunch (2)**
110:21,23
**Burger (3)**
150:1;166:1,18
**business (5)**
159:19;167:25;
168:1,8,15
**businesses (2)**
153:6,7
**busy (1)**
110:23
**button (1)**
112:16
**buy (1)**
108:24

## C

**cafeteria (2)**
23:2,4
**call (4)**
24:2,3;62:17;
112:12
**called (4)**
24:16;108:16;
112:21;130:11
**Callie (1)**
140:15
**calls (2)**
23:22;112:10
**came (6)**
1:13;14:18;16:24;
57:5;87:18;147:9

**camera (5)**
26:24;52:18;82:25;
151:18;178:12
**cameras (1)**
114:21
**camera's (1)**
109:15
**campaign (4)**
11:8,12;14:18;
22:19
**can (139)**
20:6;23:10;24:1,9,
19,20,24;26:24;
37:22;41:15;42:18;
43:25;44:2,5,20;45:9,
10,23,24;46:24,24,25;
47:5,7,9,16,21;48:12,
16,23;50:23;52:12;
58:21;63:4;69:22;
75:6,7,14,15;76:24;
77:20;80:15;83:13,
15;84:2;86:3,8;88:11,
12;90:25;91:11,22;
93:16;95:15,16;98:2,
3;99:3,18,24;100:11,
17;101:4,5;103:2;
104:5,15,19;105:25;
107:16,21;108:1,3,17,
24;109:11,12;113:1,2,
6;114:21;117:17,17;
121:11,20;122:13;
123:10,24;125:13,13;
127:12;128:17;
129:18;130:18;135:1,
9;137:6,7,11,18;
138:22,24;139:21;
143:4,15;145:24;
149:7,12,12;153:10,
17;154:8,16,18,20;
155:17;157:2,16;
158:24;161:21;
163:19,19;165:22,25;
169:8;171:18,21;
173:7,23;174:3;
176:13;177:8,9,10,11,
16,23,23;181:7
**Canadian (1)**
154:9
**cans (1)**
66:14
**cap (1)**
49:21
**captured (1)**
17:13
**card (7)**
27:22;89:19,20;
91:21;123:24;163:3,5
**cards (11)**
40:6,15;41:8;63:16;
89:18;91:23;92:12;
167:25;168:1,8,15
**carefully (2)**
26:9;114:7

**carrying (1)**
179:7
**Case (26)**
1:3;6:7,11;8:7;
13:19;15:20;17:11,
21;18:1,6;20:16;21:2;
22:17,25;23:11,13,15,
16,17;24:13;113:1;
164:5,6;172:6;
180:20;181:2
**catch (1)**
23:12
**cause (1)**
19:12
**causes (2)**
14:20;154:12
**cease (4)**
14:23,24;15:1,3
**cell (1)**
67:15
**Center (50)**
9:18,22;11:9;12:11;
18:10,25;21:12,22;
28:14,20,22,25;29:4,
19;31:9;32:25;33:3,6,
25;39:25;43:14;44:4;
48:22;49:19;92:9;
93:23;94:2,23;95:6;
98:16;108:9,11;
115:16;116:11;118:7;
123:21;124:19;125:9;
126:8;129:19;131:4,
21;132:24;138:15;
139:15;140:2,19;
144:20;165:11;174:1
**certain (8)**
12:23;13:22;43:6,7;
70:8;78:21;86:21;
176:2
**chain (4)**
81:10,14,17;159:5
**chairs (3)**
45:19;57:8;58:5
**chance (1)**
177:3
**change (1)**
27:23
**changed (1)**
47:22
**changing (1)**
87:6
**characterize (1)**
172:19
**charge (2)**
18:19;90:8
**charged (1)**
16:16
**Charging (5)**
1:10;6:7;7:24;
15:18;180:23
**charitable (1)**
104:11
**chat (9)**

16:10;36:20;38:4;
80:18,21;119:15,19;
121:17;158:20
**check (2)**
27:1;114:22
**checking (1)**
39:8
**chill (1)**
14:21
**chose (1)**
169:21
**Church (2)**
7:19,22
**circumstances (3)**
6:12;13:14,20
**cited (1)**
23:15
**cites (1)**
23:11
**City (2)**
11:10;33:14
**claim (2)**
11:24;12:22
**claiming (2)**
17:6;174:12
**claims (1)**
11:18
**clarification (1)**
87:8
**clarify (6)**
9:14;83:24;122:10;
159:8;165:6;179:16
**clean (19)**
13:1;20:18;21:13;
50:19;53:19;65:8,12,
16,18,20;68:5,8;
150:7,17;151:1,2,5;
152:11,18
**cleaning (15)**
16:15;21:15;51:24;
65:11,15;68:10;
102:19;150:20,21,22;
151:4;152:14,16;
176:3;178:9
**cleans (1)**
16:15
**clear (14)**
14:8;15:20;17:14;
20:5,15;70:18;71:17;
90:23;175:13,14,15;
176:13;178:15;179:7
**clearing (2)**
175:17;177:19
**clearly (3)**
11:18;87:3;145:24
**Clem (1)**
27:12
**Clementine (2)**
27:12;121:24
**clicked (3)**
89:16,24;162:6
**close (1)**
98:18

**closet (1)**
128:1,3
**clutter (2)**
20:11,16
**coat (3)**
66:15;140:1;141:2
**coats (2)**
44:12,14
**code (16)**
89:12,17,22,24;
90:8,16,21;91:21,23;
92:2;134:24;154:20;
162:1;163:1;169:13,
15
**codes (15)**
40:6,15;41:7;63:12;
89:4;91:20;105:1,2,3;
123:7,17,19;154:24;
155:3;163:17
**coercive (1)**
11:25
**colleague (4)**
118:16,16;133:17;
140:14
**colleagues (11)**
22:5;36:3;82:9;
89:11;160:13,22;
169:19,24;170:6,9,19
**collecting (1)**
177:18
**coming (3)**
58:21;126:20;
141:18
**comment (1)**
35:8
**committee (35)**
29:14,15,17,20;
30:6,9,10,13,14;
35:17;36:11,19;
38:14;39:25;80:25;
92:6;116:20,21,24;
117:1,4,10,25;118:9,
17;119:16;121:21;
122:11,14,15;124:3,
18;140:14;160:4;
162:7
**communicate (4)**
12:8;30:5;117:9,23
**communicated (2)**
117:13,24
**communicating (1)**
30:8
**Communication (6)**
8:1;10:22;29:10;
116:5;117:18;162:17
**COMMUNICATIONS (2)**
1:8;6:7
**community (2)**
154:12,23
**company (19)**
20:2;22:5,13,14;
66:25;99:5;104:2;
106:13,13,25,25;

115:20;153:7,9;
154:9,10;163:18,24;
167:15
**company's (2)**
22:7,10
**compared (1)**
23:7
**complaint (12)**
6:8;18:6,9,16,17,
23;23:9;70:9,11;71:7;
78:14;175:19
**complaint's (1)**
175:7
**completely (4)**
26:25;114:22;
157:4,4
**comply (1)**
6:18
**comprises (1)**
108:15
**computer (2)**
46:25;128:12
**conceived (1)**
77:11
**concerned (2)**
74:3;164:2
**concerning (1)**
157:1
**concerted (4)**
10:21;11:14;14:25;
19:16
**conduct (1)**
159:19
**conducted (1)**
6:13
**conducting (1)**
11:8
**conference (4)**
6:14,16;32:9;
156:25
**confidential (1)**
91:13
**confirm (4)**
78:21;101:24;
102:13;106:21
**confirming (1)**
37:7
**confiscate (1)**
16:18
**confiscated (1)**
14:3
**confiscating (2)**
11:5;15:4
**confiscation (1)**
14:10
**confused (2)**
101:10;109:8
**Congress (1)**
35:3
**connect (2)**
63:13;123:23
**connected (2)**
162:13;168:4

**Connecticut (2)**
7:19,23
**connection (2)**
78:20;160:1
**connections (2)**
27:1;114:23
**connects (2)**
91:21;123:24
**consistent (4)**
12:19;19:4;21:7;
22:15
**consistently (2)**
20:10;21:15
**constant (1)**
22:14
**contact (4)**
27:4;114:25;
116:11,15
**contacted (1)**
116:16
**contacting (1)**
116:17
**container (2)**
66:24,25
**containing (1)**
120:1
**contends (5)**
10:19,24;11:11;
12:2;14:19
**contents (1)**
43:3
**context (1)**
77:6
**continue (7)**
84:8;113:10;
139:16;143:6,9,16;
145:7
**continuing (2)**
126:18;141:13
**continuous (1)**
17:6
**Contrary (1)**
14:1
**contribute (1)**
105:20
**contributions (1)**
104:11
**control (5)**
48:4,5,6,11,12
**conversation (47)**
8:3;9:2,5;11:24;
31:10;32:20;33:15,
20;34:1;35:12,23;
36:6,12;37:3;38:14,
19,21;60:2,6;62:13,
15;72:13,22;73:13,
22;74:20;79:20;
107:22;111:17;118:8,
13,18,19,22;119:1,7,
9,17,22;120:9,25;
122:11;147:11,13;
148:22;164:11;
170:20

**conversations (5)**
18:15;30:21;33:10,
12;83:9
**cookies (3)**
63:1;99:11,14
**Cool (1)**
111:13
**coordinated (1)**
155:8
**coordinating (1)**
117:5
**coordination (1)**
134:21
**copy (2)**
37:8;157:10
**cork (1)**
149:7
**corner (1)**
47:24
**corridor (3)**
57:14;107:9,16
**corroborates (1)**
17:18
**Counsel (86)**
7:8,10,11,12,14,14,
15,18,25;8:16,21,24;
10:18,18,24,24;11:10,
11,17,18;12:2;14:19,
19,22;15:5,13,22,22;
16:1,1;17:4,5;18:6,13,
14;21:9,10;23:22;
24:1,16;37:16,17,23;
38:9,11;41:11,12;
42:4,6,14;43:14;59:9,
12,14;64:4,10;67:3,4,
8,21,24;68:1;70:4,7;
103:19,20;109:5;
112:10,21;121:7,12;
135:18,20,21;136:9;
137:12,15;138:6,8;
146:22,25;147:2;
154:5;157:4;161:23;
174:24
**Counsel's (2)**
37:20;42:19
**Counsel's (9)**
9:1;41:13;42:7;
59:16;67:5;68:2;
138:10;139:1;147:3
**couple (13)**
25:6,21;40:25;66:5;
73:7;106:19;113:13,
19;123:3;134:19;
167:8;168:9,14
**coupon (2)**
92:12;166:7
**coupons (40)**
16:12,23;64:19,21,
22;65:20;66:23;
67:19;92:8,11,21,22,
24;93:5,8;94:6,9,12,
14,18,21;128:15,16;
149:21,23;150:1,1,2,

4,11;151:11;165:11,
14,17,20;166:2,5,10,
12,18
**COURT (15)**
6:4;7:6;10:15;
25:16;26:12;48:19;
64:12;99:25;103:7;
106:5;114:10;146:19;
157:24;178:3;180:16
**Courtroom (1)**
6:21
**cover (1)**
65:7
**covers (1)**
22:18
**COVID-19 (1)**
6:12
**created (3)**
6:12;134:19;135:5
**credibility (2)**
79:3,18
**crew (4)**
16:15;65:11,15;
150:21
**cross (8)**
69:20;70:3;71:18,
24;156:19;157:7,19;
158:3
**current (4)**
13:10;66:10,18;
67:20
**currently (3)**
27:25;28:6;115:6
**cursor (11)**
44:6,23,25;46:10,
12,14,15,17;53:12;
126:22;177:9
**cursors (2)**
44:19,20
**customer (1)**
36:17
**customers (7)**
98:10;110:21;
111:1;156:1,11,13,15
**cut (1)**
136:16
**CWA (10)**
18:11;19:17;22:19;
23:25;40:5;82:3;
88:21;116:16;162:9;
163:10
**CWA's (1)**
123:20
**cycling (1)**
33:14

**D**

**Daily (5)**
19:14;118:2;
130:11,11;152:9
**date (6)**
68:14;115:11,19;

4,11;151:11;165:11,
14,17,20;166:2,5,10,
12,18
**COURT (15)**
128:25;150:16;
174:11
**dated (2)**
9:15,16
**dates (1)**
104:24
**DAVIDSON (4)**
46:16;112:13,16;
121:8
**Davison (3)**
6:22;46:14;112:15
**day (56)**
16:15,24;29:7;30:7,
18;33:9;34:3;39:21;
40:2,8,11,20;41:21;
52:25;55:13;59:23,
24;60:11;61:3,19;
65:5,24;66:5;75:11;
82:14;95:8;115:11,
20,24;119:23;124:10,
22;125:19;128:19;
129:8;130:14,23;
131:1,8,9;132:18;
138:19;139:5;142:13,
19;147:5;150:5,10,14,
15;152:8;153:18;
166:20;167:8;176:6;
178:7
**days (14)**
14:13;22:8,12;
62:12;66:2,24;67:1,
19;123:3;150:6,14;
151:24;166:6;167:8
**de (4)**
14:12,20;17:5;20:4
**deal (2)**
48:8;79:18
**December (1)**
27:14
**decide (1)**
113:1
**decided (1)**
39:21
**deciding (2)**
24:13;163:15
**decision (1)**
6:11
**decisions (1)**
20:22
**deemed (1)**
18:21
**defenses (1)**
12:3
**definitive (2)**
78:5;79:23
**deleted (3)**
37:12;157:4,4
**demonstrated (1)**
21:9
**denies (1)**
18:13
**denying (1)**
17:19

departing (1)
144:6
depending (1)
150:6
depicted (1)
175:6
depicts (2)
175:16;176:3
Deputy (1)
6:21
describe (3)
44:2;107:21;109:12
described (5)
65:23;111:24;
149:20;163:16,17
description (1)
134:23
design (1)
149:12
designed (1)
161:24
desist (2)
14:23;15:4
desperately (1)
172:17
destroy (1)
13:24
destroyed (2)
157:6,10
detail (2)
95:11;96:5
detailed (2)
6:16;16:2
details (1)
122:11
determine (2)
77:17;114:12
develop (1)
97:9
device (9)
27:2,4;36:24;51:19;
114:24;115:1;117:19,
22;121:2
devices (8)
45:18;86:2,6,8,11,
12;108:6;109:2
differences (1)
9:21
different (8)
17:14;87:2;92:21;
97:4;142:8;154:22,
23;168:19
differently (1)
86:24
difficult (1)
126:3
dimension (1)
146:4
dire (4)
25:3,19;113:11,15
DIRECT (6)
27:9;72:5,10;79:20;
90:18;115:4

directed (4)
100:23;148:12;
151:1;154:21
directions (1)
45:24
directly (2)
18:14;156:5
directs (1)
155:7
dirty (1)
160:23
disagreed (2)
163:6,24
disagreeing (1)
22:25
disciplined (1)
14:13
disclaim (1)
15:10
disclose (1)
39:7
discriminate (1)
13:2
discriminating (1)
11:2
discriminatory (2)
12:20;21:6
discuss (9)
32:16;73:16;74:10;
75:10;92:13,16;
114:5;169:25;170:18
discussed (12)
6:15;11:22;12:1;
17:9;23:12;29:21;
30:24;34:14;73:7;
79:20;112:4;161:10
discussing (2)
16:6;160:3
discussion (2)
31:6;109:9
dishes (4)
152:14,14,16,18
dismissed (1)
23:9
disparate (1)
23:5
disparately (2)
11:1;15:1
displayed (3)
76:25;139:8,10
dispose (1)
20:19
disposing (1)
16:21
dispute (3)
12:15;17:11;43:5
disruption (1)
7:1
distribute (19)
19:25;40:17;60:17;
62:25;98:9;122:19;
124:15,17;125:22;
128:19,23;129:8,11,

13;131:1,10;132:20;
138:14;149:14
distributed (13)
62:3;63:9;122:19;
123:5;124:16;125:17,
19,20,23;128:22;
130:25;132:15;
149:18
distributing (11)
12:5,9;17:2;23:3;
62:21;123:14;124:7,
13,14;138:21;140:9
distribution (13)
11:2;12:17;13:5,13;
14:10;15:2,9;17:7;
98:4;128:15,15;
153:14;159:16
document (7)
63:10;75:12,16;
123:16;124:3;153:11;
174:14
documentary (1)
180:24
documents (5)
9:15;42:9;78:23;
93:19;113:24
dominoes (1)
128:12
donate (3)
105:17;154:11,12
donations (1)
154:22
done (7)
20:7;65:15;68:6;
77:3,22;112:18;
119:13
door (15)
44:7;45:17;46:3;
50:2,4;52:8;53:11,14,
16;55:21;98:21;
110:6;127:14,15;
146:16
doors (1)
22:17
doorway (1)
145:5
down (37)
16:16;40:2;50:12;
54:21;55:17;56:19;
57:6,7,14,23;58:2;
60:9,11;63:17;67:9;
82:1;91:16;96:12;
99:18;108:18;110:6;
124:6;126:10,21;
127:25;128:18;
132:12;133:1,19;
134:17;135:6,8,11;
137:23;138:11;
153:17;172:22
Download (6)
19:14;74:11;75:1,7,
8;130:12
drafted (4)

18:18;92:5;124:4;
162:7
duly (2)
24:17;112:22
during (37)
6:16,19;8:3;9:2,4;
11:7,11;12:9;13:12,
13;16:7;19:14;26:16;
32:20;34:1;35:11,22;
36:12;60:19;62:3;
65:24;72:25;74:11;
79:20;83:1;88:8;
89:13;90:7;96:8;
111:16;119:17;
148:21;153:18;158:7;
159:16;160:8;161:15

E

earlier (6)
39:19;92:7;103:20;
145:10;155:20;181:4
early (5)
22:3;33:15;40:10;
82:15,15
easier (1)
48:13
easily (1)
124:20
eat (6)
46:6;57:7;58:7;
66:8;88:1;144:4
eating (6)
64:17;65:15;68:6;
88:4;145:20;155:11
echo (1)
158:2
edification (1)
75:6
effort (2)
77:2;79:5
efforts (2)
15:25;34:25
either (6)
77:23;104:15;
123:15;155:7;171:1;
181:8
else (48)
10:5;19:11;25:24;
26:22;30:9;31:14;
32:9,20;34:1,24;
35:11,22;36:12,18;
37:13;38:14,23;
46:13,15;54:23;60:4,
22;61:24;62:8,17;
71:18;73:16;102:23,
24;107:10;108:20;
112:10;113:21;
114:11,19;118:24;
119:17;122:16;
127:25;128:2;129:24;
131:23,25;147:11;
148:21;152:13;

159:11;160:11
email (1)
69:5
emails (2)
27:19,20
employed (4)
27:25;29:3;115:6;
152:10
employee (40)
11:4,6,13,22;12:7,
13;13:21;14:4,18;
15:14;17:8;18:11,15;
19:15;22:2,7,10;
42:16;43:13;44:3;
48:21;66:10;88:19;
89:16;104:13;105:15;
125:1;148:13;150:17;
152:7,22;153:2,4,16,
20;155:2;164:17;
167:21,24;180:3
employees (82)
10:21;11:2,8;12:4,
8;13:4,17;14:3,24;
15:2,11,24;16:3,6,10,
20;17:1,9,18;19:5,9,
13,25;20:1,11,15;
21:8,18;22:20;29:18;
30:15,23;31:18;
34:14,16;40:23;
60:19;63:3;65:15;
73:19;83:3;85:25;
86:4,9;91:22;92:3;
98:8,9;104:5;106:10,
25;110:24;116:10,22;
117:5;124:4,20;
128:15;129:23;132:3;
133:6;148:2,15;
149:8;150:21,22,24;
152:5,18;153:5;
154:11,17,20;155:24;
161:7;162:22;165:4;
166:7,10;167:16,19;
179:20
employees' (6)
13:11,21,25;15:21;
17:7;164:19
employee's (1)
22:8
employer (7)
13:10,15,23;20:24;
21:6;153:22;163:15
employers (2)
20:6,17
employer's (1)
174:6
employment (1)
164:18
encouraged (3)
19:9,13;119:14
encrypted (1)
117:15
end (7)
14:18;35:10;58:19;

95:7;127:7;136:6;
145:11
**ended (5)**
36:17;73:13;121:1;
125:4;131:9
**enforce (2)**
12:23;20:24
**enforced (1)**
20:10
**enforcing (2)**
19:21;20:9
**engage (5)**
13:11;15:21;
122:23;124:12;
161:15
**engaged (4)**
16:3;17:2;21:7;
40:8
**engaging (2)**
12:4;15:11
**enlarge (1)**
136:17
**enough (1)**
31:18
**enter (11)**
53:1;76:14;130:5;
133:21;143:17,17,21;
155:13;171:1;174:5;
176:24
**entered (7)**
9:5;54:10,12;55:12;
83:20;144:25;173:21
**entering (16)**
51:5,17;53:11,15;
54:2,5,14;55:9,21;
58:8,11;65:24,25;
127:11;145:5;151:25
**entire (10)**
43:8;70:15;109:1;
175:23;176:1,5,23,24,
25;177:2
**entirety (1)**
23:9
**entity (1)**
165:2
**entrance (15)**
45:20,23;50:2;52:8;
53:14;54:20;55:1;
57:24;58:21;109:13,
24;110:9;127:8;
134:6;141:19
**entry (1)**
145:24
**entryway (1)**
143:18
**environment (2)**
13:1;19:8
**equals (1)**
105:17
**equates (1)**
105:19
**equipment (1)**
157:6

**equity (1)**
19:11
**ESPOSITO (214)**
1:14;6:3,5,10;7:17,
24;8:3,9,11,13,19,24;
9:2,24;10:3,5,9,11,14,
16;15:16;17:23;18:4,
5;23:10,20,24;24:1,5,
8,11,12,19,24;25:3,7,
9,12,15,17;26:3,6;
27:7;37:18;38:7,9;
42:3,6,8,20;43:1,11,
21;46:22;48:7,17;
57:13,16;59:11,14;
64:4,7,10,13;67:23;
68:1,21,24;69:1,4,7,
12,19,23;70:1,3,18,
24;71:1,3,5,10,14,18,
21;74:25;75:4;76:21;
77:5,10,15,25;78:3,
15,22;79:9,15;81:21;
91:2;94:17;96:3,8,17,
22;97:1,7,12;99:20,
22,24;100:1,4,13,16,
20,25;101:21;102:1,5,
11,15,23,25;103:4,8,
10,13;105:23;106:2,4,
19,24;107:4,9,15,21;
108:3,8,12,20;109:1,
4;110:13,15;111:6,9,
12,14,16;112:2,5,9,
15,24,25;113:6,10;
114:4;128:25;135:17,
20;137:2,8,10,13;
138:5,8;146:24;
147:2;153:24;154:2;
156:9,18,21;157:2,11,
18,21,25;163:13;
164:9,13;165:7;
172:9,19;173:1,4,15;
174:7;175:4,10,16,20,
25;176:10,16,18,22;
177:5,25;178:2,22;
179:14,21;180:7,10,
13,15,17,21;181:1,5,
9,13
**essentially (2)**
31:25;76:4
**establish (4)**
77:16;78:24;100:7;
116:23
**established (3)**
12:5;19:5;20:21
**Even (12)**
13:22;14:9;19:13;
21:2,4;46:19;76:16,
18;78:7;96:1;97:3;
174:15
**event (2)**
26:25;155:8
**events (8)**
22:14;99:6;104:24;
154:12,22;155:16,18;

175:10
**eventually (8)**
32:3;94:9,23,24;
96:13;119:19;166:21;
167:9
**everybody (1)**
169:22
**everyone (7)**
6:18;7:4;23:20;
44:6;114:12;181:4,5
**everyone's (1)**
26:14
**evidence (38)**
8:18;9:7,12,13;
10:19,25;11:11,18;
12:2;13:19;14:2,5,15,
19;17:19;21:2;38:5;
42:2;59:10;61:5,11;
64:4,11;67:22;76:20;
78:23;79:23;90:11;
102:21;121:12;125:1;
135:16;138:4;146:23;
173:21;174:9;175:23;
180:24
**evidentiary (1)**
79:9
**exact (3)**
22:13;93:11;105:21
**exactly (14)**
20:7;45:7;47:12;
80:1;96:24;105:19;
109:9;124:4;126:4;
129:25;131:3,24;
134:23;138:1
**exam (1)**
72:10
**EXAMINATION (17)**
27:9;69:21;70:3;
71:19,24;72:5;103:1,
8,14,16;106:7;115:4;
157:8,19;158:3;
178:23,25
**examined (2)**
24:17;112:22
**example (3)**
19:17;21:24;99:3
**examples (3)**
21:20;63:1;88:7
**excellent (2)**
77:1;79:4
**exchange (5)**
76:1;77:21;78:6;
80:1;100:8
**exchanging (1)**
122:15
**Excuse (4)**
54:11;56:1;123:9;
153:8
**excused (2)**
111:10;180:11
**Exhibit (57)**
8:21,24;9:1,6,8,10,
11,15,23,25,25;10:3,

4;37:20;38:9,11;
41:13;42:4,6,7,14;
59:12,14,16;61:5,11;
64:3,10;67:5,24;68:1,
2;75:13;76:15;80:14;
83:12;88:10;97:25;
98:1;100:5;101:3;
121:7,12;135:18,20,
21;138:6,8,10;
146:25;147:2,3;
153:10,17;158:23;
161:20,23
**exit (3)**
22:8;56:25;134:6
**exited (2)**
134:8;146:8
**exiting (12)**
53:8;54:1,1,7;56:2,
4;58:17,18;141:16;
142:6;145:18;146:7
**expect (1)**
6:17
**explain (3)**
37:3;75:1,7
**explained (1)**
21:14
**explicitly (1)**
160:17
**extensive (1)**
172:10
**extent (3)**
77:16,17;100:7
**extinguisher (1)**
45:6
**extrapolating (2)**
102:7,9
**extremely (1)**
102:19

# F

**face (1)**
13:6
**facility (1)**
154:16
**fact (7)**
69:12;76:23;79:23;
158:6;160:3;170:9;
176:14
**facto (1)**
20:4
**facts (1)**
164:3
**fall (1)**
116:20
**familiar (4)**
29:10;103:23;
116:5;154:6
**far (7)**
44:17,23;57:24;
71:3;79:25;127:8;
145:20
**farther (1)**

70:22
**farthest (1)**
145:16
**fast (1)**
140:16
**fasten (1)**
56:5
**February's (1)**
22:18
**Federal (5)**
1:16,16;7:2,12,15
**feel (4)**
19:12;26:22;79:12;
114:19
**feeler (6)**
37:3;119:7,8,9;
120:9,11
**feelings (1)**
19:10
**feet (8)**
21:19;57:25;86:12;
110:10;127:10;136:6;
145:22;146:16
**fellow (1)**
140:14
**few (15)**
14:13;22:8;26:7;
33:9;62:12;83:17;
87:21;103:10,19;
114:5;116:22;129:16;
130:8;136:6;154:5
**fields (1)**
163:4
**fighting (3)**
123:6;124:5;134:24
**file (1)**
160:1
**filed (2)**
18:19;164:21
**find (3)**
104:15,19;134:25
**finding (1)**
23:4
**findings (1)**
22:25
**fine (10)**
42:25;47:4,6,12;
69:23;79:15;80:3;
165:8;181:6,8
**finish (1)**
96:1
**finished (2)**
26:11;114:9
**fire (1)**
45:5
**First (26)**
19:3;22:1;23:13,22;
24:2,17;26:9;50:21;
69:2;72:5,12;73:5;
76:7;83:13;106:20;
108:18;112:22;114:6;
135:8,9;153:15,16;
156:20;158:10;

178:14;179:20

**five (9)**
28:5;55:2;73:23;
103:2;134:14;146:16;
149:25;157:22;
165:23

**five-minute (1)**
69:11

**fixed (1)**
108:6

**flagship (1)**
18:10

**flexible (1)**
181:4

**Floor (22)**
8:2;30:22;31:11;
33:11,23;36:8;46:5;
51:19;58:22;61:23;
107:22,24,25;108:17,
21,25;109:1;110:7,18,
19,23;118:23

**flyer (41)**
22:4,4;41:6,23,25;
63:8,17,18;84:15;
88:19,23;91:20,21;
97:3,4,21;122:25;
123:4,5,14;132:25;
134:17,19,20,22,23;
135:5,13,13,14;147:6;
161:24;163:11,16,17,
17;164:24;169:11,16;
170:1,12

**flyers (160)**
11:3,5;12:9,13,15,
16,18,20,25;13:3,21;
14:2,12,13,16;15:4;
16:8,14,18,21,25;
17:1,8,14,20;19:22;
20:3;22:2,6,13;23:18;
40:2,6,14,15,17;41:1,
2,4,20;45:7;49:13;
50:12,25;54:18;55:3,
17;58:14,16;59:19;
60:10,11;62:21;
63:20,21;82:16,17,18,
19;84:4,5,21,21,22;
85:1,2,10,15;86:16,
22;88:13;96:12,14,
20;97:17;122:20;
124:7,13,15,21,22;
125:14,17,19,20;
126:16;127:12,18;
128:19,22,23;129:8,
11,15;130:21,23;
131:1,1,11,16,18,19;
132:12,15,20,21;
133:1,2,10,12,18,20,
25;134:7;135:11,23;
137:22;138:14,21;
140:9;142:2,4,10,13;
143:2,7;144:17;
145:10,18,25;146:1,4,
4;147:17;148:25;

149:8,14,18;150:1;
151:17;155:21;
168:19;169:1,5,7,10,
12,18;170:15;171:8,9,
23;172:7,8,14,16;
173:5;179:3,4,18

**focus (1)**
129:6

**focuses (1)**
75:11

**focusing (2)**
74:21;132:11

**foggy (1)**
76:8

**folder (1)**
132:21

**following (1)**
116:20

**follows (2)**
24:18;112:23

**follow-up (1)**
109:8

**food (1)**
128:15

**footage (1)**
17:17

**forgotten (1)**
77:23

**form (4)**
35:21;42:23;77:2;
92:3

**formal (4)**
6:5;8:14,16,20

**format (1)**
100:22

**formed (1)**
16:20

**former (2)**
22:2;118:16

**forming (1)**
40:3

**forth (1)**
20:22

**forward (4)**
140:16;144:21,22;
171:15

**fosters (1)**
19:8

**found (1)**
154:20

**foundation (3)**
76:17;78:4;174:21

**four (7)**
28:10;41:5;124:22;
125:14;131:19;169:3,
9

**Fourth (1)**
20:9

**frame (1)**
126:8

**free (6)**
13:11,15;26:22;
114:19;166:7,15

**frequent (2)**
73:2,3

**frequently (3)**
87:23;128:14;150:9

**fridge (2)**
66:8,14

**friends (1)**
36:2

**front (10)**
26:23;51:25;72:6,7,
9;97:3;113:24;
114:21;145:24;
150:16

**frozen (3)**
130:16,17;181:9

**full (4)**
76:14;137:15;
150:5,14

**function (1)**
106:21

**further (10)**
10:24;68:20;87:11;
110:6,12;139:8;
153:23;156:17;
178:21;179:13

## G

**Gabrielle (1)**
6:22

**gain (1)**
48:11

**games (3)**
64:17;128:8,12

**gave (7)**
48:10;63:1;72:5,13;
87:9;158:10;175:9

**GC (1)**
146:21

**GC-1 (1)**
9:1

**GC-2 (1)**
122:13

**GC-3 (3)**
63:5;123:10;124:6

**GC-4 (5)**
42:19;43:12,16;
111:23;170:23

**GC-6 (3)**
135:1,2,16

**GC-8 (1)**
146:17

**GC's (6)**
80:14;83:12;88:10;
93:16;158:23;174:10

**General (75)**
7:9,11,14,15;8:16,
20,24;9:1;10:18,24;
11:10,18;12:2;14:19,
22;15:5,13,22;16:1;
17:4;18:14;21:10;
23:21;24:1,16;37:16,
17,20,23;38:9,11;

41:11,12,13;42:4,6,7,
14,19;59:9,12,14,16;
64:4,10;67:3,4,5,8,21,
24;68:1,2;70:4,7;
112:10,21;121:6,12;
135:18,20,21;136:8;
137:12,14;138:6,8,10,
25;146:22,25;147:2,
3;161:23;174:24

**Genius (4)**
107:25;108:3;
110:19;111:3

**gentleman (1)**
125:8

**gets (1)**
104:5

**Girl (3)**
63:1;99:10,14

**given (6)**
101:15;116:3;
156:25;157:1;160:23;
164:10

**gives (1)**
106:14

**giving (2)**
96:6;164:3

**glad (1)**
71:5

**Gladden (39)**
11:13,17,19,25;
12:1;18:9,15;32:22;
33:1,5,15;34:8,15,24;
35:8,22;36:2,7;38:15;
72:14,17,21;74:20;
79:2,19;80:8;107:23;
118:3,6,9;119:6,19;
120:25;122:4,9,10;
161:10,13,15

**God (3)**
53:18;140:6;158:5

**goes (10)**
23:6;43:17;45:17;
48:25;50:22;52:18;
76:23;79:3;108:13;
139:3

**Goldman (3)**
31:7;38:18;50:8

**Good (9)**
18:5;24:11;72:1;
103:18;112:24;
113:17;154:4;158:5,5

**government (2)**
6:14;157:14

**gray (3)**
75:24;78:16;101:7

**Great (1)**
178:13

**Green (1)**
92:12

**Greenwich (5)**
11:10;16:1;28:23;
115:16;154:16

**group (6)**

38:4;80:17,18;
117:17;121:17;
158:20

**guess (4)**
45:19;62:25;102:8;
157:14

**guise (1)**
15:23

## H

**hair (1)**
72:8

**half (1)**
157:20

**hall (1)**
127:7

**hallway (14)**
45:20;46:1;58:19,
20;109:19;111:25;
126:21;127:25;128:3,
4;143:25;145:24;
154:19;155:1

**hand (11)**
24:19;26:23;57:11;
82:19;85:1,2,4;113:1;
124:19;145:19;170:1

**handbook (2)**
152:23;153:2;170:4

**handed (5)**
40:14;93:3;169:18;
170:12;179:20

**handful (1)**
93:11

**handing (2)**
82:16,17

**handle (1)**
6:18

**handouts (1)**
22:11

**hands (2)**
114:21;126:14

**hangers (1)**
66:15

**happen (3)**
17:4;77:23;97:9

**happened (13)**
17:12;22:12;38:22;
39:19;46:19;47:22;
74:20,22;77:23;
78:13;87:12;93:9;
97:10

**happening (4)**
39:2,4;40:7;104:24

**happens (3)**
105:12;132:18;
155:5

**happy (1)**
181:3

**hard (1)**
171:16

**harm (2)**
14:14,15

hat (8)
  49:17;55:11;57:20;
  84:17;126:9,11;
  171:3,21
Haven (2)
  7:19,23
head (3)
  50:19;53:19;126:14
heading (1)
  57:23
hear (14)
  10:16;11:7;12:4;
  15:24;18:14;19:8;
  22:22;72:10;102:4;
  112:25;128:24;
  130:18,18;158:16
heard (2)
  34:10;111:18
hearing (15)
  1:13;6:5,11,13,15,
  20,21,23;7:6;11:7;
  24:13;27:2;43:10;
  70:22;114:24
held (1)
  13:23;20:23;23:1
Hello (1)
  15:16
helpful (1)
  100:21
helping (4)
  77:1;79:4;116:9;
  140:11
Here's (2)
  45:7;176:18
hesitated (1)
  158:15
hiding (1)
  76:24
high (1)
  31:17
higher (5)
  17:10;18:12;30:16;
  32:12;34:14
highlight (1)
  167:18
hire (2)
  115:11,19
hired (1)
  152:25
hit (1)
  111:11
Hold (5)
  77:5;91:2;96:17,17;
  100:18
holding (5)
  85:1,2;97:3;127:18;
  145:25
holds (1)
  167:25
home (3)
  65:1;113:20;123:1
Honor (25)
  8:8,10,15,22;9:9,

12;10:2,7,8,10;17:22;
  18:3;23:9,23;42:12;
  59:8;69:6;76:16;78:4;
  103:9,11;109:7;
  156:23;174:10;
  180:19
hope (1)
  43:9
Hospital (2)
  22:24;23:18
hosted (1)
  123:20
hour (13)
  52:25,25;53:7,13,
  16,20;54:3,9,13,16,
  25;147:9;157:20
hours (47)
  12:9;43:18;55:2,2,
  9,18,21;56:5,6,25;
  57:5,10;58:10,15;
  83:24;84:1,12;99:5,6;
  130:15,20;139:18,19,
  20;140:23;141:5,16,
  21;142:3,7,20;143:5,
  8,11,21;144:5,11,21;
  145:4,8,11;170:25;
  171:6,17;174:22;
  176:1;177:7
housekeeping (10)
  12:23;13:7,22;
  20:10,18,24;21:7,22;
  22:16;23:11
Houston (1)
  28:7
How'd (1)
  120:6
how's (1)
  128:9
HR (1)
  31:25

## I

Ian (33)
  36:9,14,18;37:5,7,
  13,13;38:13;41:4;2,24;
  42:1;49:18;50:10,12;
  55:10,16;56:11;57:3,
  6,11,19,22;58:18;
  80:8;81:1;83:17,21;
  84:2,14;111:22;
  112:12,20;113:8
I-a-n (1)
  113:9
Ian's (1)
  57:7
ID (2)
  27:23;80:4
idea (1)
  124:4
identification (12)
  37:17,23;41:12;
  67:8;78:11;94:11;

101:4;135:1,2;136:9;
  137:12;146:22
identified (18)
  9:1;10:4;37:20;
  41:13;42:19;52:9,14;
  67:4,5;78:16;87:20;
  111:21;125:3;135:21;
  138:10;140:3;147:3;
  179:3
identify (12)
  44:5;49:3;87:17;
  121:20;125:13;
  127:12;135:2;137:18;
  139:21;146:17,20;
  173:22
identity (1)
  78:24
illegal (1)
  119:14
images (2)
  67:9,13
imagine (1)
  111:3
immediate (3)
  7:1;44:17;45:8
immediately (7)
  21:5;26:20;36:6;
  44:7;45:24;98:21;
  114:17
implemented (3)
  9:17;12:19;13:7
implementing (2)
  11:1;15:1
implicitly (1)
  160:18
importance (1)
  21:13
important (6)
  19:2;12;26:9;43:5,
  24;114:6
improve (1)
  41:9
INC (4)
  1:5;6:6;10:20;
  23:14
inception (1)
  17:25
incident (6)
  70:20;71:8,11;
  136:2,6;172:10
incidents (1)
  73:15
inclined (1)
  39:15
include (1)
  15:8
including (8)
  12:11,18,24;13:17;
  21:10;43:16;111:22,
  25
inclusive (1)
  19:8
increase (1)

73:20
Indeed (3)
  19:7;20:11;21:7
independent (1)
  107:1
independently (1)
  11:5
index (1)
  8:17
indicate (3)
  123:16;127:20;
  164:21
indicated (6)
  8:4;9:5;70:4;
  111:17;169:13;
  180:22
indicating (1)
  123:6
indication (1)
  164:18
indicative (1)
  21:5
individual (4)
  78:24;79:24;100:8;
  172:6
individuals (1)
  70:16
information (12)
  32:17,19;34:23;
  35:4,20;104:13,20,23,
  25;123:21;154:17;
  155:14
initial (5)
  18:19;119:25;
  120:2,3;134:19
initiated (7)
  31:12;33:20;38:19;
  60:2;62:13;119:1;
  147:13
injury (1)
  35:14
ink (1)
  146:3
in-person (2)
  6:19;119:22
inside (4)
  40:18;108:2,9;
  145:23
insisted (1)
  148:11
installed (1)
  117:21
instance (1)
  15:20
instances (2)
  16:5;165:25
Instead (2)
  17:6;46:4
instructing (1)
  152:18
instruction (1)
  6:25
instructions (4)

6:17;68:4,8;156:25
intending (1)
  176:1
intent (2)
  161:9;163:17
interaction (1)
  72:16
interested (2)
  117:5;176:4
interfere (1)
  19:17
interfered (1)
  15:21
interference (3)
  13:20;17:7;19:7
internal (2)
  104:16;105:6
internet (1)
  27:1;114:23
interrogated (3)
  14:17;17:8;18:10
interrogating (2)
  10:21;14:24
interrogation (1)
  77:12
interrupt (2)
  26:22;114:19
intertwined (1)
  22:16
interview (1)
  22:8
into (56)
  8:18;9:6,7,11,13;
  20:4;38:5;39:5,10;
  40:19;42:2;43:9;44:7;
  49:1;52:9,25;59:9;
  61:5,11;66:1;67:21;
  69:7;76:19;79:21;
  83:18;85:12;86:1,5;
  88:3;109:23;110:4;
  121:11;125:2,4;
  126:20;127:22;128:4;
  134:1;135:16;137:22;
  138:4;139:6,6,7,19;
  141:5;145:8;146:12,
  23;149:12;152:1;
  156:1;173:21;174:9;
  175:22;178:15
introduce (15)
  8:14;18:9;10,11,13;
  38:5;42:2;59:9;
  135:16;138:4;146:23;
  176:1,7,17;180:24
introduced (6)
  61:5,10;64:9;
  121:11;176:5,6
introduction (2)
  76:19;175:22
investigation (2)
  18:20;90:8
investigator (1)
  90:11
invited (1)

22:4
**inviting (1)**
89:11
**involved (1)**
79:19
**involves (1)**
18:16
**involving (4)**
8:4;70:20;71:8,11
**iPad (1)**
53:2
**iPads (2)**
45:15;86:11
**iPhone (3)**
117:24;121:3;136:4
**irrelevant (4)**
77:16;90:10;172:2,
3
**issue (6)**
16:14;18:20;19:7,
19;92:13;176:9
**issued (3)**
6:8,17;16:6
**issues (4)**
6:22;8:4;19:10;
23:25
**issuing (1)**
6:11
**items (4)**
16:11,24;66:14;
123:5

## J

**jacket (1)**
55:24
**Jacob (1)**
1:15
**janitorial (2)**
128:1,3
**January (5)**
1:17;29:16;30:20;
116:16;181:16
**Jason (2)**
7:18,22
**Javits (1)**
1:16
**Jencks (4)**
69:3,20;156:20;
157:5
**join (11)**
27:2;29:15;89:8,14;
114:24,25;123:23;
155:14;162:20,23;
164:25
**joined (2)**
6:23;29:14
**joining (1)**
123:25
**joint (15)**
9:6,8,10,11,15,23,
25,25;10:3,4;61:4,11;
98:1;153:10,17

**Jordan (26)**
11:13;24:3,9,15;
25:1;27:11;42:22;
47:21;91:14;111:21;
118:14,16;119:2;
120:3,4,8,17;122:3,4;
126:1,11;127:1;
156:23;171:1,21,22
**J-o-r-d-a-n (1)**
25:1
**Jorge (8)**
12:12;141:18,21;
145:3,6,25;155:20;
163:7
**Judge (220)**
1:14,14;6:3,5,10;
7:17,24;8:3,9,11,13,
19,24;9:2,24;10:3,5,9,
11,14,16;15:6,16;
17:23;18:4,5;23:6,10,
20,24;24:1,5,8,11,12,
19,24;25:3,7,9,12,15,
17;26:3,6;27:7;37:18;
38:7,9;42:3,6,8,20;
43:1,11,21;46:22;
48:7,17;57:13,16;
59:11,14;64:4,7,10,
13;67:23;68:1,21,24;
69:1,4,7,12,19,23;
70:1,3,18,21,24;71:1,
3,5,10,14,18,21;
74:25;75:4;76:21;
77:5,10,15,25;78:3,
15,22;79:9,15;81:21;
91:2;94:17;96:3,8,17,
22;97:1,7,12;99:20,
22,24;100:1,4,13,16,
20,25;101:21;102:1,3,
5,11,15,23,25;103:4,
8,10,13;105:23;106:2,
4,19,24;107:4,9,15,
21;108:3,8,12,20;
109:1,4;110:13,15;
111:6,9,12,14,16;
112:2,5,9,15,24,25,
25;113:6,10;114:4;
128:25;135:17,20;
137:2,8,10,13;138:5,
8;146:24;147:2;
153:24;154:2;156:9,
18,21;157:2,11,18,21,
25;163:13;164:9,13;
165:7;172:9,19;
173:1,4,15;174:7;
175:4,10,16,20,25;
176:10,16,18,22;
177:5,25;178:2,22;
179:14,21;180:7,10,
13,15,17,21;181:1,5,
9,13
**Judge's (2)**
22:23;75:6
**Julissa (13)**

31:22;32:3,11;
34:10,11,13;62:9,11,
19,20;73:8,17;88:17
**Julissa's (1)**
32:1
**July (3)**
77:3,24;78:13
**June (23)**
70:11,14,16,19;
71:8,11;77:3,24;
78:13;115:11;138:18,
20;139:1;142:13;
145:9;146:6,21;
147:5;149:14,18;
168:19;175:3,19
**justice (1)**
19:11

## K

**Kahn (1)**
46:16
**Kathryn (3)**
177:12,13;178:9
**keep (10)**
6:24;35:20;84:1,16,
19;85:6,9;148:19;
171:5;173:3
**keeping (1)**
34:23
**kept (8)**
45:15,17;62:6;
86:12;132:21;149:17;
168:6;172:22
**Khan (25)**
7:14,14;46:22,23;
47:4,6,9,13,15,18;
48:2,5,10;61:6;63:6;
136:10,13,15,17,20,
22,24;137:6;138:11,
12
**kind (11)**
29:6;34:6;45:3;
69:8;73:13;74:1;
79:22;86:1;102:9;
116:2;120:11
**kinds (1)**
104:9
**King (3)**
150:1;166:1,18
**knew (4)**
39:2,8;146:4;
160:19
**knowledge (8)**
100:7;161:2,5;
166:10;173:6;178:19;
180:3,5
**known (2)**
74:18;77:13

## L

**LABOR (7)**

1:2,15;6:6;10:20;
18:7,21;148:13
**lack (1)**
80:12
**laid (1)**
124:19
**last (8)**
22:20;23:17;32:1;
79:17;105:11;113:9;
115:11,19
**lasted (2)**
150:4,5
**Late (3)**
27:14;30:20;31:3
**later (9)**
22:8;37:3;61:3;
62:12;130:15,20;
142:19;147:9;177:1
**Laura (1)**
24:12
**LAUREN (2)**
1:14;6:9
**Law (9)**
1:14;6:10;13:10;
15:6;19:5;20:5,15;
24:12;79:21
**lawful (1)**
18:21
**lawfully (1)**
12:13
**lawyers (2)**
79:10,12
**laying (1)**
143:7;171:8,10
**layout (1)**
111:24
**lead (4)**
110:3,7;163:3,4
**leader (2)**
22:9;53:24
**leadership (2)**
77:1;79:4
**leading (2)**
107:16;164:4
**leads (4)**
46:4;107:12,19;
108:1
**leaflets (4)**
12:6,6;14:6;21:6
**least (4)**
9:22;77:16;110:23;
165:22
**leave (16)**
16:11,12;63:21;
80:3;107:9;110:2;
111:11;126:2;129:15;
131:18;137:23;
142:11;146:5;167:16;
170:16;172:4
**leaves (1)**
18:13
**leaving (15)**
20:3;22:5,11;38:16;

50:3;56:16,23;57:3;
58:22,23;141:3,6,13;
142:9;143:23
**led (1)**
164:18
**left (54)**
16:8,14;22:22;44:7,
9;45:16,16;46:2,4;
54:20;55:1;57:11;
59:3,4;63:10,17,18;
64:23,25;67:19;
88:13;89:22;91:20;
92:8;93:19;94:1;95:2,
6,17,21;120:17;
123:7;124:1,2;125:9,
10;126:8;127:6,15,19,
20;130:9;143:25;
144:7;145:11,13;
146:16;162:1;165:20;
166:25;167:6,25;
168:16,18
**left-hand (2)**
75:24;90:21
**legal (2)**
20:21;27:15
**length (1)**
172:22
**lengthy (1)**
64:15
**less (3)**
88:4;134:14;145:22
**letting (1)**
71:6
**levels (1)**
108:18
**Likewise (1)**
21:18
**limited (1)**
18:6
**line (1)**
20:21
**link (3)**
27:3;63:15;114:25
**listed (1)**
105:10
**listen (2)**
26:9;114:7
**literature (11)**
13:8,24;17:15;
18:25;19:6;20:14,16,
19,25;21:25;23:7
**little (13)**
17:11;28:5;49:5;
52:12;56:6;63:9;
84:11;133:19;143:10;
158:2,15;161:11;
171:16
**Littler (2)**
7:19,22
**located (8)**
11:9;16:1,22,22;
21:19;25:21;103:21;
113:19

**location (12)**
21:23;25:4;28:7,11,
14;66:18,19;93:13;
104:25;113:11;
115:13,17
**locations (2)**
13:24;43:7
**locker (1)**
85:12
**lockers (6)**
44:15,18;66:15;
128:5;152:7;170:16
**logo (1)**
123:9
**long (21)**
28:4,9;64:24;65:3;
69:19;73:21;94:25;
110:8;115:18;116:23;
119:22;130:7;134:13;
136:25;139:25;150:4,
6,13;166:4,18;167:6
**longer (1)**
169:3
**look (18)**
39:5,10;43:25;
47:21;61:10;67:7;
91:19;107:17;108:18;
121:11;125:5;126:21;
136:12;144:12;146:2;
148:12;149:12;
158:15
**looked (3)**
62:2;95:12;98:1
**looking (21)**
41:8;43:13;44:2,17;
48:16,20;72:7;90:15;
100:4,18;109:11,12,
13,16;139:12,13,19,
20;143:1;173:23,24
**looks (13)**
45:13;51:2;57:23;
84:15,22,23;85:5,14,
17;125:14;160:23;
171:22;177:21
**lose (2)**
26:25;114:22
**lot (2)**
66:14;87:3
**Luke's (2)**
22:24;23:18
**lunch (27)**
21:3;29:7;34:7;
46:7;54:24;55:15;
57:7;64:17;66:7;88:1,
5;116:4;125:20;
131:7,12;132:19;
133:8;138:21;142:16,
18;144:4;145:20;
147:10;155:21;166:7,
16;169:25
**lunches (5)**
128:7,17;144:1;
150:25;152:5

# M

**machines (4)**
46:7;58:4;127:5;
156:14
**magazine (1)**
21:4
**magazines (1)**
17:15
**main (1)**
124:19;154:19
**maintain (2)**
12:23,25
**maintained (1)**
20:24
**makeup (1)**
170:23
**make-whole (1)**
14:22
**Mall (2)**
28:7;108:19
**man (3)**
125:9;137:18,19
**management (30)**
11:21;15:14;40:3,4;
74:9;79:23;82:5,11;
83:5,7;86:16;97:23;
101:14,22,24;102:2,6,
8,13;120:10;160:15,
24,25;161:3;169:6,
10;170:19;172:4;
175:14,15
**Manager (54)**
11:12;18:9;22:6;
30:25;31:7;32:15;
36:20;37:2;39:1,13;
46:3;49:2,12,16,22;
50:3;51:5,7;52:2,7,
21;53:9;59:19;68:11,
17;78:20;79:25;
85:19,21;87:18;
118:6;119:15,16;
120:25;125:7;126:18;
133:18,20;140:20;
141:15,18;144:23,24;
145:3;146:13;151:11,
13,19;152:10,19;
175:13,16;177:14;
178:14
**manager-led (1)**
21:21
**managers (49)**
12:1,11;16:17,25;
21:8;32:16;35:21;
39:15;50:13;51:1,3;
53:5;55:6,19;63:25;
65:16,18,20,24;66:1;
68:8;87:20,23;97:18;
111:22,23;125:6;
130:2,5,23;132:7;
133:9;139:7;140:5;
141:17;143:3,10,14,

17,25;144:15;151:2,8,
24;152:1;160:23;
176:13;178:6;179:2
**manager's (9)**
46:3;54:22;58:22;
59:4;127:20,22,24;
146:12,15
**manner (3)**
14:8;17:21;125:23
**many (13)**
34:21;41:4;93:7,10;
124:21;129:15;
131:18;133:1;151:24;
165:20;166:25;168:8,
25
**mark (1)**
121:1
**marked (13)**
8:16;37:16,16,22;
41:11,11;42:14;67:3,
7;75:12;135:2;
137:11,14
**markers (2)**
168:1,6
**marking (1)**
174:8
**Marshall (3)**
177:12,13,16
**mask (2)**
54:5;145:2
**Mastrony (149)**
7:21,21;25:5,6,8,11,
17,18,20;38:6,7,8;
42:5;59:13;67:25;
69:1,2,13,17,19,22,
25;71:15,17,21,23,25;
72:3;74:17,23;75:2,3,
5;76:14,21,23;77:8,
13,19;78:8,22;79:1,
17;80:3,5;81:20,23;
90:15,20,24;91:5;
94:13,17,19,20;96:1,
4,5,11,18,19,24;97:2,
7,11,14,15;99:17,21;
100:1,3,14,17;101:2,
18;102:3,16,21,23,24;
105:23,25;106:6,8,18;
110:15,16,17;111:5;
112:2,4;113:13,16,17;
114:2;135:19;138:7;
147:1;156:18,19;
157:2,9,12,16,20,25;
158:1,4,7;163:22;
164:9,12,15,23;165:7,
8,9;172:3,12,21;
173:8,16,19;174:3,7,
9,17,19;175:7,8,12,
18;176:2,5,15,19,21,
23;177:4,6,22;178:4,
21;180:7,9,21;181:1,
3,12
**Mastrony's (2)**
107:5;111:7

**material (32)**
12:18,24;14:6;19:1;
20:12;21:5,10,19;
60:17;62:25;68:12,
18;69:3;78:16,16,18,
25;79:18,24;88:18;
94:1;99:2;100:9;
149:8;152:20;153:4,
21;156:20;163:7;
164:13;167:21,24
**materials (17)**
8:5;11:4;17:20;
19:25;20:20;21:11;
23:4;69:13,20;72:6;
98:9,24;147:22;
148:7,15,19;157:5
**Matt (21)**
12:11;52:5,9,13,13;
55:23;56:12,14,20,21,
25;58:9,10;70:10;
125:7,11;126:20;
127:13;151:17,19,22
**Matter (11)**
1:4,13;6:6;24:21;
39:12;69:12;70:5;
72:4;163:15;164:7;
181:15
**matters (1)**
137:1
**Maura (4)**
7:21;72:3;113:17;
158:7
**may (102)**
7:6,7;11:16,24;
12:16,22;13:1,5;
14:11;18:11;19:18;
20:17;22:1,3,9;30:11,
12,20;32:6;33:16,18,
19;39:19,20,21;
41:22;42:16;43:14;
48:21;52:10;59:9,22;
63:9,18,22;65:24,25;
68:11,15,17;70:10,14,
16,19;71:8,11;74:12,
15,16,21,22;82:2;
94:5;98:8;103:11;
111:23;118:12,19;
119:24;122:19,22;
123:3,5,14;124:7,7,9,
23;125:1,1;128:22,
24;129:1,2,4,5,6,8;
130:25;132:16;
134:18;135:24;
137:20;151:22;
152:19;153:19;157:7;
159:22,23;160:8;
168:19;174:4,11,22,
25;175:2,2,6,11,19;
179:18,23
**maybe (9)**
46:13;73:23;109:8,
25;110:10;129:16;
156:7;167:18;176:17

**meals (1)**
16:10
**mean (24)**
32:18;39:23;40:1,4;
75:17;77:10;87:1;
97:8,10;99:14;
100:16,17;101:21;
104:4;106:15;136:25;
165:6;167:5;168:9,
13;169:21;170:4;
172:19;175:25
**meaning (1)**
20:1
**meant (1)**
160:19
**media (1)**
27:19
**meet (2)**
29:23;117:7
**meeting (13)**
11:21;30:8;34:10,
11,13;73:8,17;75:8;
117:9;122:14;130:11,
13;132:14
**meetings (1)**
117:4
**member (10)**
36:11;101:14,22,
24;102:2,6;140:14;
169:6,10;170:19
**members (8)**
19:17;39:24;90:2;
92:6;124:4,18;
134:21;162:7
**membership (1)**
163:10
**Memorial (5)**
22:24;23:18;
105:12;155:12,15
**memory (1)**
168:13
**Mendelson (1)**
7:19
**mention (1)**
122:4
**mentioned (7)**
7:22;95:11;108:8;
130:25;149:21;
159:15,22
**mere (2)**
21:19;86:12
**Meredith (1)**
140:15
**message (42)**
36:19,22;37:4;38:4;
75:21;76:5,7,18,25;
77:21;78:9;80:10,11,
17,18;101:6,7,9,12;
117:17,17,25;119:25;
120:1,2,3,9,13,17,23,
24,24;121:2,4;122:4,
7,7,9;158:20;159:2,9,
11

**messaged (1)**
120:8
**messages (9)**
37:11;75:23;81:13,
16;106:21;107:1;
121:16;122:15;
167:16
**messaging (2)**
30:2;117:20
**messenger (1)**
117:15
**met (3)**
29:21,24;117:8
**mic (1)**
46:24
**microphone (1)**
70:23
**microwaves (1)**
66:9
**middle (10)**
45:3;51:21;66:16;
97:21;123:8,9;
137:18,19;140:1;
162:9
**might (1)**
86:9
**mine (3)**
122:8;136:16;
160:22
**minimis (3)**
14:12,20;17:5
**minute (12)**
25:13;43:22;47:17;
52:24;69:14;83:24;
84:2;88:4;99:18;
106:1;142:20;171:6
**minutes (67)**
29:9;43:18,24;47:7,
11;48:22;50:23;
51:15;52:8,25;53:7,
13,20;54:3,9,13,17,
25;55:2,9,18,21;56:5,
7,25;57:5,10;58:10,
15;73:23,25;75:9;
82:15;83:2;84:12;
87:21;103:3;125:2,4,
9;130:8;134:2;139:5,
9,16,18,20;140:23;
141:5,16,21;142:3,3,
7,21;143:5,8,11,21;
144:5,11,22;145:4,8;
171:17;177:8,23
**mission (9)**
41:7;63:15;90:1,9,
17,22;91:23;92:5;
162:4
**misstating (1)**
81:18
**mobility (1)**
15:6
**Mobley (2)**
173:14,16
**modify (1)**

15:10
**moment (4)**
10:12;25:10;26:6;
27:24
**Monday (1)**
1:17
**money (3)**
104:5;105:18,19
**month (1)**
67:17
**months (7)**
22:19,20;28:10;
77:24;116:25;149:25;
165:23
**Moore (1)**
71:8
**more (33)**
26:13,18;32:13;
36:16;39:15,15;
44:11,18;46:2;73:15,
24;74:13;87:3;100:1,
6;105:22;114:10,16;
134:23,25;137:2,4;
151:4;156:6,7;163:4;
165:24,24,25;167:5;
173:20;174:21;180:6
**Moreover (1)**
14:11
**morning (32)**
18:5;24:11;25:22;
40:10,19;63:9,18;
64:19;75:9;76:8;
109:16;111:19;124:9,
11,12;125:2,18,23;
131:16;132:6,9,10,10,
11,13,14;134:17;
142:9;158:5,7,11,17
**most (4)**
17:18;18:7;39:13;
168:9
**mostly (3)**
30:14,22;33:13
**motivation (2)**
35:25;172:20
**move (12)**
43:9;50:21;52:24;
55:2;56:6;64:8;77:16;
84:11;126:3;144:22;
171:15;174:9
**moved (1)**
50:22
**movement (7)**
89:8,14;123:23;
162:20,23;164:25;
165:2
**moving (4)**
42:21;46:19;71:3;
174:8
**Moya (38)**
12:12;52:5,9,13,13,
19;55:23;56:3,12,14,
20,21,25;58:9,11,15,
16,24;59:1,3;70:10,

20;71:9,10;86:15;
87:10,12,15;125:7,11;
126:20;127:11,13,14,
15;151:17,19,22
**much (6)**
70:25;79:21;
109:25;111:10;
157:18;180:10
**multiple (7)**
21:20;30:7;63:25;
104:22;152:9;166:6;
178:7
**multi-use (1)**
128:14
**Mute (3)**
9:3,4;112:16
**muted (2)**
9:3,4
**myriad (2)**
128:8,10
**myself (12)**
29:18;30:15;39:24;
55:10;72:2;90:1;92:6;
116:22;124:3,18;
126:1;127:1

## N

**name (32)**
6:9;24:9,25;27:11,
13,15,17,19,23;32:1;
35:5,6;49:25;50:6;
72:2;75:19;78:6;89:8;
99:4;113:7,8,8,9,17;
118:3;120:1;123:22,
25;158:7;162:19;
163:5;164:24
**named (2)**
31:21;32:22
**names (1)**
105:9
**narration (1)**
43:5
**NATIONAL (6)**
1:2,15;6:6;10:20;
18:21;148:13
**nature (3)**
14:12,20;75:11
**neatly (5)**
124:19;125:24;
129:18;131:21;
132:25
**necessary (2)**
27:2;114:24
**need (13)**
17:9;25:9;26:3;
30:15;32:12;34:14;
46:20;75:1;79:13;
86:2,6,9;112:16
**needed (1)**
62:7
**neglected (1)**
70:5

**New (19)**
1:16,16;6:9,9;7:12,
13,16,16,19,23;8:2,2;
11:10;27:22;37:11,
12;134:20,22,23
**newspaper (3)**
21:4;65:6;150:15
**newspapers (21)**
16:12,24;17:16;
22:22;23:2,6,17;
64:18;65:2,4,4,20;
95:6,17;150:2,12,13;
151:8;166:23,25;
167:6
**next (15)**
50:15;51:2,10,13,
22;56:21;61:19;65:5,
5;95:8,8;108:10;
112:11;141:2;150:10
**NLRB (9)**
7:12,15;15:7;20:17,
23;23:1,14,16,18
**Nobody (1)**
83:10
**non- (5)**
12:9,19;20:25;62:3;
154:9
**non-Apple (7)**
12:24;14:6;68:18;
94:1;153:6,20;165:2
**non-Union (1)**
93:25
**non-work (10)**
16:7,7;19:4,4,6;
21:18;22:2;60:20;
62:4;148:15
**non-working (9)**
11:6;12:7,9;13:12,
13,13,24;14:4;15:4
**noon (1)**
118:21
**North (2)**
20:22;23:15
**notable (1)**
21:24
**Notably (3)**
18:17;19:23;21:2
**note (1)**
95:20
**Noted (3)**
6:2;21:2;22:12
**notes (2)**
100:4;103:3
**nothing's (1)**
43:4
**notice (2)**
1:14;152:17
**noticed (2)**
15:13;22:6
**notified (1)**
152:16
**November (1)**
115:12

**nowhere (1)**
158:6
**Number (6)**
6:7;9:11;15:7;
23:16;93:11;137:12
**numbers (1)**
28:24
**numerous (3)**
20:22;87:20;88:7

## O

**oath (2)**
24:18;112:23
**object (2)**
76:19;78:4
**objection (36)**
8:20,22,23;9:25;
10:2;26:18;38:6,8;
42:3,5;59:11;67:23,
25;74:14;76:16;
81:18;90:10;94:11;
95:25;96:7,16,25;
101:16;112:6,7;
114:15;135:17,19;
138:5,7;146:24;
147:1;163:12;172:1,
18,25
**objections (2)**
42:9;59:13
**objects (3)**
26:16;114:13;
177:18
**obligations (1)**
157:9
**observe (2)**
6:23;142:12
**observed (3)**
137:22;169:2,4
**observers (1)**
7:4
**observing (1)**
142:4
**obtain (3)**
86:1,6;104:13
**obviously (1)**
75:17
**OC (4)**
80:21,24;90:2;
121:20
**occasion (3)**
17:4;74:13;179:6
**occasions (9)**
14:17;21:3;152:2;
168:19;169:2;179:4,
6,10,11
**occur (2)**
33:22;60:6
**occurred (8)**
11:8;17:13;21:25;
77:7,9,17,21;175:5
**occurs (2)**
85:24;128:6

**OCD (1)**
102:19
**Oculus (3)**
108:2,9,9
**off (40)**
10:11,13;25:9,12,
14;36:8;43:21;48:7,
17,18;65:20;69:23;
70:1,2;99:22,23;
102:13;103:5,6;
106:2,3;111:14;
112:16;122:13;134:7;
136:16;137:6,8,9,23;
157:23;173:5;177:25;
178:1,9,15;180:13,14,
22;181:13
**offer (4)**
95:24;96:2,5
**offered (1)**
106:12
**offers (1)**
106:10
**Office (14)**
6:9;8:1;46:3;54:22;
58:22;59:4,5;127:21,
22,24;146:12,14,15,
16
**official (1)**
7:7
**off-the-record (4)**
8:3;9:2,4;111:16
**often (6)**
30:5;33:8;66:4;
117:25;152:4,8
**oftentimes (1)**
21:8
**O'Hara (46)**
36:9;41:3,24;49:18;
55:10;56:11;57:11,
14;83:21;111:22;
112:12,20,24;113:6,8,
11,17;114:4;115:6;
124:25;128:25;
137:18;138:14;139:4,
6;147:5;153:25;
154:4;156:11;158:6;
163:14,20;164:6,15;
165:10;172:13;173:4,
22,23;175:9;177:9;
178:5;179:2,18,22;
180:11
**O-'-H-a-r-a (1)**
113:9
**O'Hara's (1)**
164:10
**onboarding (5)**
152:22,24,25;
153:18;159:16
**on-call (1)**
16:15
**once (2)**
93:9;114:12
**one (76)**

9:15,15;10:12;
14:13;16:6,16;17:4;
21:24;22:6;26:6,13,
18;27:4;29:7;41:2,7,
7;44:23;47:9;49:7;
51:9,24;52:25;63:14,
15;65:4;69:6;74:13;
77:24;82:5,11;83:8;
84:22;86:15;88:13;
89:7,7,18;91:21;
94:15;95:7;100:18;
101:9,11;105:12,25;
107:1;108:11;109:8;
110:16;112:13;
114:11,16;116:3;
117:4;121:8;123:7,7;
124:1,2;136:10,20,24;
137:6;141:19;150:5;
156:7;164:1;168:10,
11;173:20;174:4;
176:9;178:10,24;
179:10
**one- (1)**
117:17
**ones (1)**
16:17
**ongoing (1)**
17:6
**only (12)**
6:23;7:5;14:16;
27:20;33:16;81:13,
16;93:4,9,9;134:6;
175:13
**on-one (1)**
117:18
**open (2)**
19:8;77:11
**opened (3)**
9:23;22:17;64:22
**opening (6)**
10:6,16;15:17;16:2;
17:24;18:2
**openly (1)**
12:1
**opportunity (4)**
8:17;162:22;
176:23,25
**opposed (1)**
92:23
**option (1)**
48:11
**orange (5)**
51:18;139:25;
140:3;142:24;143:19
**order (10)**
7:6;12:25;14:23,23,
25;15:3,7;48:8;77:17;
157:7
**organization (5)**
77:2;79:5;105:18;
155:8;162:18
**organizations (5)**
105:9;153:7;

154:11,13;155:16
**organize (1)**
15:25
**organized (1)**
21:13
**organizing (40)**
11:8;12;14:18;
19:16;22:20;29:14,
15;30:5,10,13,14;
35:17;36:11,19;
38:13;39:24;80:25;
92:6;116:9,20,21,23;
117:1,4,10,25;118:9,
17;119:15;121:21;
122:11,14,15,16;
124:3,18;134:21;
140:14;160:4;162:7
**others (1)**
161:4
**otherwise (6)**
18:18;20:12;48:12;
102:21;175:15;179:8
**out (58)**
15:22;16:5,19;17:5;
40:6,14,15;42:1;46:1,
4;55:1;82:8,16,17,19;
87:23;88:19;94:25;
98:19;102:3,9,20;
105:17;107:6,11,12,
16,20;108:17;109:11,
13,18;110:22;125:15,
24;127:14,15;128:16;
132:21;134:25;
141:14;152:6;157:6;
160:4,10;161:4;
166:5,13,19,20;167:1,
7;169:2;171:8;172:4;
178:6;179:7,20
**outside (22)**
20:12;28:7;30:23;
36:4;38:22;39:17;
40:18;45:23,24;
54:20;60:7;68:10;
82:17;98:17,21,23;
103:21;108:1;109:17;
110:9;154:19;167:13
**outstanding (1)**
9:13
**over (21)**
6:11;18:18;28:5;
29:24,24;30:6;32:8;
36:23;44:7;45:11,16;
62:16;80:11;85:7;
108:18;117:23;118:1;
126:14;151:24;
159:18;173:10
**overnight (1)**
95:21
**overruled (1)**
81:21
**overturn (1)**
15:6
**own (10)**

75:6;105:7;150:24;
151:4,6;155:9,9;
162:15,16,18
**owned (1)**
165:5

## P

**Page (7)**
20:17;23:13,16,18;
148:13,14;150:16
**pages (1)**
67:9
**paid (2)**
29:8;116:3
**pandemic (1)**
6:12
**papers (2)**
8:14,16,20;146:3
**Paragraph (11)**
18:8;16;70:9,13,19;
71:7;91:19;95:17;
98:7;153:2,2
**Pardon (1)**
80:12
**part (19)**
17:19;30:9,12,14;
31:22;35:7;39:14,16;
70:13,16;71:6;91:3;
116:21;119:19;127:3;
136:19;158:16;161:6;
168:4
**participants (1)**
7:4
**participate (4)**
100:21;105:13,14;
155:16
**participated (2)**
75:17;155:18
**participating (2)**
105:16;154:14
**participation (1)**
35:16
**particular (8)**
28:25;36:24;
115:13,18,23;117:19;
123:19;172:10
**particularly (2)**
21:25;160:20
**parties (13)**
6:16;8:4,6,6,6,17;
9:3,5,7,9;10:6;23:21;
111:17
**Party (24)**
1:10;6:7;7:24;
12:18,24;15:18;
17:15;22:5;25:3;
62:25;63:3;68:12;
88:18;98:25;99:2,5;
104:2;106:11;152:20;
153:4,6;165:3,4;
180:23
**pass (3)**

82:8;160:10;161:4
**passed (1)**
160:4
**past (1)**
164:20
**pay (6)**
17:10;19:11;31:17;
34:14;35:4;73:20
**payment (2)**
45:18;86:11
**peers (1)**
29:22
**penalty (2)**
24:22;113:4
**pending (1)**
21:17
**People (24)**
31:22,24;34:21;
40:25;44:10;45:24;
46:6;64:1,18;82:23,
24;99:15;105:14;
108:5;111:3,22;
117:17,21;128:7,7,12;
144:1;179:4;181:6
**period (3)**
19:19;30:19;83:1
**perjury (1)**
24:22;113:4
**permits (1)**
16:23
**permitted (2)**
7:5;19:9
**permitting (1)**
23:1
**person (21)**
26:13,19;32:22;
49:4,17,23;50:4,15;
51:21,24;53:19,21;
64:2;78:7;114:11,16;
118:3,23;120:16;
122:12;178:12
**personal (8)**
16:11;33:13,16;
100:7;117:22,24;
121:3;124:11
**personally (4)**
30:15;104:20;
142:12;164:16
**perspective (1)**
109:15
**pertains (1)**
70:10
**ph (3)**
140:15;173:14,16
**phase (1)**
18:20
**phone (14)**
27:18,20;30:4;
36:25;37:12;62:16;
67:15;102:18,19;
106:16;121:18,19;
148:12;169:14
**phones (3)**

37:11;117:21;128:8
**photo (4)**
   52:17;86:21;94:8;
   125:14
**photograph (4)**
   52:19,21;151:13,20
**photographs (1)**
   139:4
**photos (5)**
   67:18;87:5,11,13;
   94:4
**physically (1)**
   58:3
**picked (2)**
   85:3;172:16
**picking (2)**
   21:6;84:12
**picture (9)**
   22:4;49:14;53:1;
   86:16;89:12;126:5;
   139:7,7;151:17
**pictures (5)**
   93:15,22,25;
   165:14;168:15
**Pine (1)**
   8:2
**pink (7)**
   49:8,17,21;55:10;
   57:20;126:9;171:3
**place (25)**
   13:21;19:12;22:2;
   33:10;38:21;41:1,4;
   62:15;68:12,18;80:2;
   107:17,23;124:21;
   129:17;132:23;133:1;
   134:17;135:6,11;
   142:13;152:20;153:4,
   20;175:14
**placed (18)**
   12:13;23:2;41:20;
   54:18;78:24;82:17,
   22;84:5;97:22;
   129:18;131:20;
   132:24;133:9,20,25;
   134:19;135:8;142:10
**placing (8)**
   12:6;49:13;50:12;
   55:17;84:4;132:12;
   133:12;140:9
**plaid (2)**
   140:19;141:11
**plain (1)**
   108:25
**platform (2)**
   6:14;107:1
**play (11)**
   47:15,16;48:2;
   83:12,16;136:11,13;
   137:11;144:21;177:7,
   15
**playing (7)**
   64:17;84:16,19;
   85:6,9;128:8,12

**Plaza (3)**
   1:16;7:12,15
**please (21)**
   7:8;8:14;24:4,10,
   19,24;41:12;42:9;
   47:16;63:5;113:1,6,
   14;121:7;123:10;
   124:6;136:14;137:12;
   153:10;156:20;165:6
**pm (8)**
   43:17;55:14;
   129:10;131:9;132:17,
   18;139:3;181:15
**point (23)**
   16:5;22:23;46:1,5;
   55:4,7;82:20;85:18;
   86:15,19;90:19;91:1;
   92:14,17;93:1;
   133:19;144:13;
   148:14;158:11;
   171:13;173:5;176:12;
   178:10
**pointed (2)**
   15:22;17:5
**pointing (1)**
   45:2
**points (1)**
   19:2
**policies (6)**
   13:3;18:17;20:18,
   24;22:7,10
**policy (55)**
   9:10,17,21,21;11:2;
   12:17,19;13:2,5,7,8;
   14:10;15:2,9,9,10,23;
   18:17,20,24;19:21,23;
   20:2,7,8,9,11;21:21;
   22:15,16;23:8,11;
   60:16,23;61:2,15,16;
   62:2,6,22;63:25;
   92:15;94:3,4,5,7;
   98:5;153:5,14,18,19;
   159:16,19;169:23;
   170:4
**pop (3)**
   88:4;89:17;99:18
**portal (1)**
   155:9
**portion (2)**
   175:23;176:2
**portions (1)**
   176:19
**position (1)**
   176:25
**possible (1)**
   7:1
**post (5)**
   21:18;46:25;99:2,7;
   149:8
**posted (4)**
   20:6;98:24;104:17;
   152:17
**posting (2)**

15:13;99:10
**power (2)**
   27:1;114:23
**practice (5)**
   18:8;20:21;21:15;
   22:13;23:1
**practices (4)**
   13:2;20:18;21:8,22
**precedent (1)**
   164:20
**precedents (1)**
   20:22
**prefers (1)**
   181:4
**pre-hearing (2)**
   6:16;156:25
**preliminary (1)**
   70:4
**preparation (1)**
   86:24
**prepare (3)**
   7:6;69:20;157:7
**prepared (1)**
   78:22
**present (13)**
   9:19;22:18;31:14;
   34:1;36:12;38:23;
   60:4;61:24;94:22;
   118:24;130:2;147:11;
   180:18
**presents (1)**
   15:20
**presiding (1)**
   6:11
**press (2)**
   47:15;177:7
**pretty (3)**
   73:2;74:5;108:25
**previous (1)**
   135:13
**previously (8)**
   6:15;72:14;84:6;
   85:24;87:17;88:16;
   98:2;178:6
**printed (3)**
   42:1;123:1;157:6
**Prior (4)**
   129:4;134:20,20;
   179:25
**Probably (3)**
   129:16;165:24;
   169:3
**probative (1)**
   77:18
**problem (1)**
   46:23
**problems (2)**
   26:23;114:20
**procedures (1)**
   6:14
**proceeded (1)**
   22:7
**proceeding (3)**

113:18;158:8,11
**proceedings (1)**
   7:7
**process (3)**
   79:16;100:22;
   152:25
**produced (2)**
   42:15;81:24
**product (1)**
   90:14
**production (1)**
   8:5
**products (3)**
   28:18;108:6
**professionalism (1)**
   6:19
**program (7)**
   99:8;104:3,4,14;
   106:9;154:17;155:16
**programs (1)**
   99:1
**prohibit (3)**
   13:3,15;160:25
**prohibited (1)**
   169:24
**prohibits (3)**
   12:17;13:16;19:23
**promote (2)**
   19:12;153:6
**promoting (3)**
   66:25;163:10;
   164:22
**promotion (1)**
   164:7
**promotional (21)**
   12:18;147:22;
   148:1,6,11,19;163:7,
   14,16,18,20,21,23;
   164:1,2,5,14,17,20,
   22;168:1
**pronouns (1)**
   42:23,25;43:1
**proper (1)**
   76:17
**property (2)**
   19:21;20:3
**protected (11)**
   10:21;11:14;12:5;
   13:15,18;14:21,24;
   15:11;16:4;17:2;
   19:16
**protocols (2)**
   6:15,17
**pro-Union (2)**
   13:24;20:25
**prove (1)**
   10:19
**provide (1)**
   104:23
**provided (4)**
   16:2;21:9;27:3;
   146:21
**providing (1)**

162:22
**public (3)**
   30:11;39:21;40:1
**publication (1)**
   150:16
**pull (3)**
   48:12;138:22;
   173:20
**pulled (3)**
   148:12;172:24;
   174:5
**pulling (2)**
   121:8;136:10
**purpose (2)**
   21:6;161:6
**purposes (3)**
   22:16;86:9;117:18
**pursuant (4)**
   1:13;8:5;42:15;
   138:25;146:21;174:5
**put (41)**
   40:2,15;41:2,3;
   44:10;61:6;67:21;
   78:23;79:24;80:13;
   82:1;85:9;88:10;91:6;
   92:19;93:1,2,15;
   95:14;96:12;97:25;
   100:18;101:3;102:21;
   119:15;131:17;
   132:22;137:23;
   145:10;152:6,6;
   158:21;166:12,12;
   168:23;170:15;
   172:17,22;173:22;
   174:14;180:19
**putting (5)**
   85:12;88:19;98:1;
   164:4;170:23

---

### Q

**QR (29)**
   40:6,14;41:7;63:12;
   89:4,12,16,22,24;
   90:8,16,21;91:20;
   92:2;105:1,2,3;123:7,
   17,19;134:24;154:20,
   24;155:3;162:1,25;
   163:17;169:13,15
**quarters (1)**
   150:21
**quick (2)**
   25:21;110:16
**quickly (2)**
   12:12;43:9
**quite (3)**
   18:6;21:24;102:4

---

### R

**Rachel (9)**
   31:7,16;38:18,25;
   39:9,12,17;50:7,8

**Rachel's (1)**
39:13
**rack (5)**
44:8,9,14;140:1;
141:2
**racks (1)**
44:11
**raise (2)**
24:19;113:1
**raising (1)**
31:19
**range (1)**
19:10
**rather (3)**
16:21;18:23;20:17
**reached (2)**
111:18,21
**read (6)**
16:10;60:24;64:18;
89:23;163:4;169:22
**reading (9)**
96:14,20;97:3,17,
21;102:7;128:8;
169:6,11
**ready (2)**
130:8;132:5
**really (6)**
39:7;79:21;87:8;
108:24;109:23;
171:16
**rearranging (4)**
84:15,20,22;85:5
**reason (1)**
94:7
**reboot (2)**
27:2;114:23
**rebuttal (1)**
180:20
**recall (53)**
31:16;32:11;33:15;
34:8,24;35:11,14,22;
36:14;37:6;38:25;
41:6;60:8;62:1,19;
73:21;78:17;81:4,8;
90:7,22;91:3;93:13;
95:6,11,13;101:11;
103:21;105:9;119:3;
120:23;129:24,25;
131:24;135:9;147:15;
148:21;154:9;155:10,
12,17;159:25;160:3;
161:11;165:12,22,25;
166:4;171:14;172:15,
16;173:2;179:19
**recalls (1)**
90:20
**receive (5)**
61:2;112:9;120:4,6,
13
**received (13)**
9:1;10:4;27:22;
38:11;42:7;59:16;
68:2,4;120:7;135:21;

138:10;147:3;156:23
**recent (2)**
168:9,13
**receptacles (1)**
16:22
**recessed (1)**
181:16
**recognize (4)**
49:16;75:16;
126:22;139:9
**recollecting (1)**
171:24
**recollection (5)**
90:25;92:1;102:1,6;
168:9
**reconnect (2)**
27:1;114:23
**reconvene (1)**
181:16
**record (47)**
6:3;7:6,7,9;10:11,
13,14;24:10,25;25:9,
12,14,15;43:21;48:8,
17,18;69:24;70:1,2;
71:16;72:16;99:22,
23,24;103:5,6;106:2,
3,4;111:14,15;113:7;
137:6,8,9,10;157:3,
23;177:25;178:1,2;
180:13,14,15,22;
181:13
**recorded (1)**
179:6
**recording (5)**
7:5;26:12,15;100:7;
114:10
**recordings (2)**
114:13;165:17
**RECROSS (1)**
106:7
**red (20)**
40:5;47:24;49:8;
53:2;55:10;56:10;
82:2;84:17;126:11;
146:3;159:23;160:4,
7;161:1,4,6;179:19,
20,25;180:4
**redirect (11)**
103:1,8,14,15,16;
111:7;123:19,20;
178:23,25;180:8
**Refactories (2)**
20:23;23:15
**reference (3)**
22:22;88:18,21
**referenced (1)**
166:2
**referred (1)**
98:5
**referring (6)**
92:22,24;94:12,13;
125:25;154:24
**reflect (1)**

90:12
**refrain (1)**
22:10
**refresh (2)**
90:25;92:1
**refrigerators (2)**
45:4,5
**regard (4)**
122:16;149:23;
150:22;156:23
**regarding (17)**
18:11;25:4;43:2;
71:7;72:13;79:17;
111:18;113:11;
123:20;154:17;
164:10,13,19;172:10;
174:25;175:10,11
**regardless (1)**
21:17
**regards (1)**
179:19
**Region (4)**
1:15;7:12,15;18:21
**Regional (2)**
6:9;23:2
**registered (1)**
27:18
**regularly (3)**
21:10;86:1;102:20
**reintroduce (1)**
72:2
**relate (1)**
176:19
**related (6)**
18:24;19:5;20:12,
19;70:15;165:2
**relation (1)**
146:13
**RELATIONS (6)**
1:2,15;6:6;10:20;
18:21;148:13
**relaying (1)**
101:15
**relevance (5)**
76:22;78:8;79:17;
174:25;175:4
**relevancy (6)**
74:14,24;76:19;
96:16,25;176:12
**relevant (13)**
19:18;43:5,10;
77:11;79:1;90:13;
97:2;101:17;163:21;
175:6,8,24;176:8
**remain (2)**
11:4;14:7
**remark (1)**
79:17
**remedy (2)**
14:22;15:7
**remember (21)**
34:6;35:15;37:5,14;
72:14;75:17,21;76:1,

4;86:17,24;87:2,12,
18;93:11;95:4;
129:18;164:14,16;
172:23;173:4
**remembers (1)**
90:25
**remind (2)**
6:24;7:4
**reminded (1)**
22:9
**remotely (1)**
6:13
**removal (7)**
7:1,8;12:15,24;
14:8,11;20:25
**remove (12)**
12:16;13:23;18:24;
20:14;21:10;135:23;
142:4;151:8,11;
169:10;179:3,5
**removed (29)**
12:13,20;14:6,13,
16;21:5;22:6;85:15,
18;94:10,23;95:3;
96:13,15,21,23;97:17,
22;149:17;166:21;
167:9;168:22;169:1,
5,7,11,16;172:1;179:8
**removing (17)**
11:3;19:1,22;54:18;
58:14,16;84:21;
133:18;142:2;145:10;
147:16,21;148:20;
171:23;172:13;179:4,
11
**repaired (1)**
108:7
**repeat (2)**
86:3;96:17
**repeated (1)**
63:2
**repeatedly (1)**
12:8
**repeating (1)**
62:6
**rephrase (1)**
169:8
**replied (1)**
148:1
**reported (1)**
160:22
**REPORTER (15)**
6:4;7:6;10:15;
25:16;26:12;48:19;
64:12;99:25;103:7;
106:5;114:10;146:19;
157:24;178:3;180:16
**represent (2)**
157:2;174:3
**representation (1)**
163:7
**represented (2)**
43:15;139:2

**representing (4)**
72:3;90:21;113:18;
158:8
**request (2)**
23:8;174:11
**requested (2)**
174:13,21
**requesting (1)**
15:5
**requiring (1)**
14:23
**rescinding (1)**
15:8
**reserve (2)**
177:2;180:20
**resolved (1)**
8:7
**resources (2)**
154:12;155:2
**respect (9)**
9:6;23:11;62:7;
80:1;85:23;87:4;93:5;
157:3;177:1
**respectfully (1)**
23:8
**respects (1)**
19:15
**respond (35)**
31:20;32:14;34:12,
18,20;35:2,8;37:4,13;
39:3,6,9;60:15,18,25;
62:5,23;81:5;119:10;
120:17,21;121:4;
122:6;147:18,23;
148:3,8,17,18;149:1,
5,9;159:6,9,11
**responded (6)**
37:5,13;81:4,6,8,11
**Respondent (40)**
1:6;7:17,18,21;
10:19,25;11:16,24;
12:16,22;13:1,5,6,10,
15,19,22;14:2,5,11,
16,24;15:1,3,8,10;
17:25;42:15;43:13,
14;72:3;100:5;
111:22;138:25;139:2;
146:21;157:1;158:8;
172:7;174:12
**Respondent's (12)**
11:9;12:12,13,10,11;
14:1;17:25;22:14;
23:1;75:13;101:3;
181:2
**responding (1)**
159:2
**response (2)**
107:4;159:7
**responsible (1)**
150:24
**rest (2)**
81:10;96:3
**restoration (1)**

15:9
**restrict (2)**
13:11;20:6
**result (4)**
7:1,8;12:23;14:18
**resulted (1)**
20:25
**resume (1)**
181:10
**retail (7)**
15:25;16:7;123:8,9,
20;124:5;134:24
**retrieving (1)**
143:1
**returned (1)**
130:20
**review (21)**
8:17;26:7;61:16;
69:3,13,20;76:4,6,8,
10,25;77:22;78:10;
79:4;101:15;103:3;
157:17,18;176:23,25;
177:3
**reviewed (1)**
62:21
**reviewing (1)**
61:18
**revised (1)**
70:9
**right (389)**
8:13,24;12:8,16,22;
13:21;15:21;20:11,
15;21:25;24:1,8,11,
19;26:2,6;27:7;28:24;
35:10;43:1,12;44:11,
14,16,17,17,19,23,23;
45:2,3,3,8,8,13,14,21;
46:3,18;47:12,13,24;
48:20;49:3,6,9,14,19,
22,23;50:2,3,14,14,
15;51:1,4,10,11,17,
18,21;52:1,8,13,16;
53:3,3,10,12,17;
54:16;55:8,20;56:12,
21;59:14;63:6,10;
68:21;71:21;72:1,9,
12,16,21,22,24;73:2,
8,11,14,24;74:2,3,5;
75:14,16,23;76:1,24;
80:3,6,6,10,12,17,19,
21,24;81:3,10;82:1,3,
5,6,8,11,14,16,19,22,
23;83:1,3,5,9,10,11,
13,16,20,22,25;84:1,
5,8,11,12,13,13,16,19,
23;85:6,7,9,12,13,14,
23;86:13,15,19,21;
87:9,16,20;88:1,3,5,7,
10,10,11,13,16,19,21,
23,25;89:2,4,5,7,8,11,
12,14,19,22;90:7,15;
91:2,6,9,12,16,19;
92:1,3,7,11;93:7,12,

15,15,18,20,22,25;
94:9;95:5,11,14,14,
17,20;96:12;97:7,16,
20;98:1,5,7,10,12,20,
20,21,22,24;99:3,8,
17;101:3,6,14;
102:17;104:10;
105:23;107:4,7,11,14;
109:4,15,20,21,22;
110:2,4,21;111:1,1,3,
5,9,14;112:2,5,9;
113:1;114:4;119:14;
123:8,22;126:2,4,12,
21;127:5,23;128:18;
132:11;136:20,24;
137:10,16;140:6,17;
141:8,9,9,19;144:7;
145:16;146:24;
152:17;154:19;156:5,
6,9,18;157:16,21;
158:2,16,19,21,25,25;
159:2,5,11,14,16,18,
22,23,25;160:10,13,14,
15,25;161:10,13,14,
17,20,20,23;162:1,2,
4,9,11,11,13,14,19,20,
23,25;163:3,8,25;
164:25;165:3,10,14,
17,20;166:1,4,15,23;
167:12,12,12,16,21;
168:2,18,22;169:20;
170:1,6,7,10,12,13,15,
18,22,23,24,25;171:3,
3,5,5,9,15,16,18;
173:9,20,21;174:3;
175:19,20;176:16;
177:7,8,13,15,15,19,
20,22;178:5,7,9,11;
180:10,17;181:13
**rightfully (1)**
19:20
**rights (5)**
15:14;19:15,21;
148:13;164:19
**rolling (1)**
43:19
**Romero (15)**
12:12;141:18,21;
142:8,11;145:6,7,11,
12;146:5,8;147:6;
155:20;164:11,12
**Room (243)**
7:12,15;11:4,6;
12:7,14,21,25;13:22;
14:3,4;16:9,18,19,23;
17:3,12;18:25;19:6,
22;20:2,4,12,14,19;
21:11,15,20;22:1,11,
14;25:24;30:22;
33:11;40:16,18,19,22;
42:16;43:13;44:3,5;
45:5,20,21;47:23;
48:21;50:24;52:10;

53:5;54:1,14,18,20;
55:1;56:4,12,20,21;
57:24;58:23;63:18,
21;64:15,23,24;65:8,
12,16,18,24;66:1,1,6,
11,13,17;67:20;68:5,
5,9,9,13,18;69:8;
82:16,18,20,22;83:3,
7,10,18,20;84:9,17;
85:23;86:1,5,8,13,17,
19;87:15,18,24;88:4,
14;89:13;91:20;92:8;
93:8,13,19,23;94:1,
22;95:7,18;96:13;
98:13,17,18,19,22,23;
99:15;103:21;107:6,
10,12,13,13,16,19,
19;109:12,13,13,17,
17,18,24;110:2,9;
111:24,25;112:1;
113:21;124:16,17,19;
125:2,19;126:20,22;
127:3,9,11;128:6,13;
129:12,17,20;130:2,5,
7,14,21;131:2,3,17,
25;132:3,7,22;133:3,
9,15,21;134:1,7,8,11,
13;136:7;137:22,24;
139:1,13,21,22,23;
140:10;141:6,7;
142:2,6;143:3,7,12,
14,21,23;144:6,20;
145:18,21,23;146:5,9;
148:2;149:7,20;
150:2,18,25;151:3,5,
25;152:1,11,21;
153:21;154:19;
156:12;165:11;
167:13;169:19;170:7,
10;171:1,8;173:25;
174:22;175:13;
177:19;178:7,10,11,
15;179:7
**rooms (1)**
111:25
**routinely (1)**
86:5
**row (2)**
128:4,5
**rule (2)**
26:17;114:15
**rules (2)**
12:23;13:23
**ruling (1)**
177:2
**run (3)**
16:19;155:13,15
**running (1)**
35:3
**rush (1)**
34:7
**Ruth (8)**
7:11;46:10,24;61:6;

86:24;87:2;90:24;
157:12
**Ryan (13)**
50:1;51:7,13;53:12,
13,16;140:17,21;
141:2,6,15;144:24;
145:2
**Ryan's (2)**
53:15;141:16

## S

**sales (13)**
17:12;30:22;31:11;
33:11;36:8;46:4;
58:22;61:23;107:25;
109:2;110:7,19;
118:23
**same (32)**
6:19;7:22;9:12,17,
22;17:21;19:1;22:13;
26:13,19;27:3;28:21;
48:21;50:23;63:20;
65:6,7;66:14;84:5;
114:16,25;125:23;
146:3;147:9;150:11,
11,15,16,16;156:16,
24;173:3
**sanctions (2)**
7:3,8
**sat (2)**
144:2;166:5
**saw (43)**
64:15,25;65:25;
73:5;87:21;93:4;95:2;
105:10,11;109:16;
127:14,18;133:24;
135:23;137:4,14,25;
142:9;145:18,25;
146:5;149:25;150:1,
1;151:17,24;153:15,
18,19;165:10,15;
166:23;169:5,10;
175:12,13,14;178:9,
14,19;179:2,3,7
**saying (8)**
17:18;26:12;35:14;
87:9;102:13;164:2,3;
172:4
**scan (7)**
82:23,25;83:1;
154:20;162:2;169:13,
15
**scanning (1)**
162:25
**scope (2)**
78:13;97:12
**score (1)**
17:12
**Scout (3)**
63:1;99:10,14
**screen (29)**
37:24;41:15;43:16,

19,25;46:11,16,20;
47:1;48:11,13;50:10;
51:1,15;57:12;61:7;
75:13;80:14;126:12;
137:16;139:8;140:2,
19;141:8;142:21,24;
158:22;161:21;
173:22
**screen's (1)**
53:18
**screenshot (6)**
121:16,18,19,22;
140:24;144:12
**scroll (2)**
67:8;91:16
**scrolling (2)**
91:10,11
**seat (1)**
145:16
**Second (28)**
19:15;23:15;26:16;
33:23;47:9;49:4,5;
52:13;53:13;63:19;
98:7;100:18;107:22,
24;108:17,20;110:18;
112:13;114:13;121:8;
135:5;136:10,20,24;
137:6,7;140:7;170:23
**seconds (61)**
47:7,11;48:23;
50:23;51:16;52:9,25;
53:1,7,16,20,20;54:3,
9,13,13,16,17,25;
55:3,9,18,22;56:5,7;
57:1,5,10;58:10,15;
83:17,25;84:2,13;
125:4;134:14;139:5,
9,17,20;140:23;141:5,
16,21;142:4,7,21;
143:5,8,11;144:5,6,
12,22;145:4,8,12;
170:25;171:6,17;
177:8
**Section (7)**
10:20;11:22;13:9;
14:9;15:11,21;20:13
**Security (1)**
27:22
**seeing (4)**
43:15;69:10;95:4;
137:2
**seeking (1)**
14:22
**seeks (1)**
15:13
**seems (3)**
78:19;85:2;101:23
**selectively (3)**
11:1;15:1;18:23
**sell (1)**
28:18
**selling (1)**
99:10

**send (6)**
32:19;36:22;60:23;
63:14;106:25;174:14
**sending (2)**
69:14;106:21
**Senior (5)**
11:12;18:9;31:7;
32:25;177:14
**sent (16)**
36:19;38:4;61:15;
69:16;78:17;80:10,
11;101:8,11,20,22;
102:2,6;119:25;
120:1;156:22
**separate (1)**
107:13
**September (2)**
28:16,16
**served (1)**
8:6
**serviced (1)**
108:6
**services (2)**
28:18;66:25
**servicing (1)**
109:2
**session (1)**
36:17
**sessions (1)**
19:14
**set (2)**
20:22;125:24
**seven (3)**
146:16;174:22;
176:1
**several (18)**
12:11;14:17;19:2;
21:14;22:12,18,19,20;
37:11;66:24;67:1,19;
124:3;130:15,20;
150:14;167:2,3
**Shack (17)**
64:22;92:8,16,19,
22,25;93:5,5,8;94:13,
18,21;150:1;166:1,4,
11,16
**Shake (17)**
64:22;92:8,16,19,
22,25;93:5,5,7;94:13,
18,21;150:1;166:1,4,
11,16
**share (11)**
19:10;21:20;46:14;
47:1;48:13;75:13;
80:6,14;83:13;
124:24;158:22
**shared (4)**
19:5;37:23;122:12;
158:20
**SharePoint (5)**
41:11;48:9,13;
174:15,16
**sharing (4)**

46:16,25;61:7;
159:14
**shaved (1)**
53:19
**shaven (1)**
50:19
**sheet (1)**
155:13
**sheets (1)**
104:25
**shelf (3)**
167:25;168:3,16
**shelving (1)**
45:14
**shift (29)**
28:25;40:10,11,13,
14,21;64:25;65:4,5;
72:25;73:5,5;83:2;
95:8,8;115:23;
124:10,11;129:9;
130:8,12;131:6,8,9,
12,13;138:20,21;
142:11
**shifts (1)**
132:5
**shirt (8)**
49:17;57:12,20;
140:3,19;141:11;
142:24;143:19
**shirts (1)**
44:12
**shock (1)**
119:13
**shortly (1)**
17:8
**shot (2)**
49:1;126:16
**show (34)**
10:25;11:11,18;
13:19;14:2,5,15;
16:19;17:19;21:3;
22:14;37:15;41:10;
57:11;61:4;63:4,5;
67:2;75:12;121:6;
123:10;124:25;
125:16,16;135:1;
136:8;153:3,10;
161:20,21;164:7;
165:17;176:13,19
**showed (2)**
88:7;148:14
**showing (3)**
64:3;74:18;148:18
**shows (1)**
54:25
**shredded (1)**
16:21
**shreds (1)**
149:4
**side (11)**
41:2,3;44:16;63:10,
11;75:24;90:21;
111:25;123:15;144:1;

162:1
**sides (1)**
108:14
**sign (2)**
91:22;123:25
**Signal (18)**
29:25;30:1,6,9;
36:23;80:11,18;
81:16;101:7;106:21;
117:13,15,23;118:1;
119:19;120:7;122:15;
158:20
**signature (1)**
91:17
**significant (2)**
14:15,20
**signup (2)**
104:25;105:18;
155:13
**silver (1)**
44:9
**similar (4)**
13:3,16;17:7,20
**simply (4)**
13:16;14:20;20:10;
42:21
**sink (9)**
45:11;51:22,24,25;
66:15;141:8,11;
152:14,17
**sit (4)**
56:19;57:7,23;
64:18
**site (1)**
105:7
**sites (2)**
104:16;105:6
**sitting (6)**
58:2;94:25;97:4;
145:20;146:13;156:3
**situation (1)**
62:20
**six (11)**
108:22;124:22;
131:19;149:25;
159:18;165:23;167:5;
168:11,13,19;169:2
**size (1)**
146:3
**skills (2)**
77:1;79:4
**skirt (1)**
20:1
**sleeve (1)**
139:25
**slow (1)**
34:6
**slowness (1)**
157:14
**smaller (1)**
136:18
**snacks (3)**
66:19,21,22

**social (3)**
19:11;27:19,22
**socialize (1)**
36:4
**socialized (1)**
39:17
**solely (1)**
108:21
**solemnly (1)**
113:2
**solicit (2)**
19:24;98:9
**solicitation (28)**
9:10;11:1;12:17;
13:5,12;14:9;15:2,8,
23;18:16,24;19:3,21,
22,23;20:3,9;21:11,
21;22:15;23:8;60:16;
98:4;153:5,14,19;
159:15;169:23
**soliciting (1)**
99:15
**somebody (4)**
26:16;60:14;150:6;
169:13
**somebody's (2)**
9:3,4
**somehow (3)**
81:13,16;175:6
**someone (12)**
31:21;46:13,15;
97:21;114:13;116:11;
118:8;140:11;162:2,
6;169:6,10
**someone's (1)**
97:2
**Sometime (1)**
120:22
**Sometimes (3)**
66:7,8;155:12
**somewhere (2)**
107:10;120:14
**soon (1)**
133:25
**sorry (52)**
24:11;25:11;38:7;
42:22;43:20;44:21;
46:23;51:4;52:12;
54:1;56:15,20;57:13;
58:25;68:14;70:21,
24;71:4,14;72:10,19;
79:14,16;80:8,12,18,
21;81:6,15;82:1;
83:24;84:18;85:15;
86:3;100:23,24;
101:7,10,10;102:5;
103:13;111:6;126:2;
128:9;139:18;146:20;
158:1;172:21;174:7;
178:17;179:21;
180:22
**sort (3)**
80:18;86:5;102:7

**sounds (1)**
69:23
**space (4)**
109:25;128:14;
167:14,15
**spaces (1)**
148:16
**speak (21)**
31:23;32:3,7;33:5;
38:14,17;39:12;
40:24;59:25;61:19,
20;62:9,11;64:1;
80:22;134:9,15;
146:6;158:10;161:7;
169:12
**speaking (13)**
26:10;36:18;38:13;
80:7;83:2;85:6;88:16;
114:8,11,16;171:12,
18;173:10
**speaks (1)**
163:16
**special (2)**
13:14,20
**specific (6)**
99:1;102:1,5;105:9;
119:15;165:25
**specifically (8)**
11:20;14:5;16:3;
19:23;152:12;155:10,
12,18
**specified (2)**
159:24;160:6
**specifying (1)**
120:24
**spell (2)**
24:25;113:7
**spelled (3)**
103:23;113:8;154:6
**spirit (1)**
20:1
**split (1)**
15:7
**spoke (17)**
29:24;30:14,15,23;
32:8,12;34:16,21;
36:9;38:18;40:25;
59:18;60:1;62:12;
80:8;147:6;161:13
**spoken (2)**
73:19;120:15
**sponsored (2)**
99:8;166:15
**sponsoring (1)**
155:8
**spots (1)**
43:9
**squares (2)**
63:10;123:15
**St (2)**
22:23;23:18
**stack (1)**
23:1

**staircase (1)**
108:1
**stand (1)**
24:4
**standing (1)**
127:6
**Stanevich (15)**
7:18,18;8:9,10,19,
22;9:14,16,20;10:8;
17:24;18:2,5;23:10,
13
**start (15)**
22:21;26:10;27:13;
40:11;42:17;72:12;
73:4;95:8;114:8;
115:19,24;124:10;
131:8;170:24;181:3
**started (9)**
22:2;82:16;124:7,
11;125:3;131:9,14;
159:23;160:24
**starting (5)**
83:18;125:2;139:5;
171:17;173:9
**starts (2)**
43:16;139:3
**state (3)**
7:9;24:24;113:7
**stated (2)**
79:19;161:24
**statement (16)**
15:17;16:2;17:24;
18:2;41:7;63:15;
89:23;90:1,9,17,22;
91:24;92:5;124:2;
162:4,6
**statements (3)**
10:6,17;26:14
**statute (1)**
164:8
**statutorily (1)**
13:17
**stay (1)**
130:7
**stayed (1)**
133:15
**Stephanie (17)**
11:12;18:9;32:22;
33:21;36:15;37:7;
80:7;118:3,6;119:6;
120:24;122:4,9,10;
161:10,13,15
**still (14)**
40:21;56:7,11;
58:19;60:20;78:4;
102:17;136:22,24;
141:6;148:6,19;
150:11;157:12
**stipulation (3)**
111:18,20;112:10
**Stop (22)**
26:17;46:24;47:3,
16,16;49:3;52:18;

61:7;80:6;83:5;84:13,
16,20;114:14;124:24;
126:4;137:15;142:20;
147:16,21;159:14;
177:22
**stopped (4)**
47:18;82:5,11;83:8
**stopping (5)**
84:8;125:8,12;
140:6;171:5
**Store (58)**
9:17,22;11:9;12:11;
15:25;16:7;18:10,25;
21:12,22;22:3,9,11,
17,20;28:9,19;29:1,4,
19;31:8,9;32:25;33:3,
6,24,25;34:6;38:22;
39:13,15,25;40:18;
43:14;44:4;53:24;
54:1;60:7;66:10,13;
67:20;77:1;79:25;
82:17;90:3,4,6;92:9;
94:23;98:16;108:15,
18;115:18;116:11;
117:6;138:15;139:14;
160:8
**stores (3)**
21:16;28:22;108:19
**store's (3)**
21:19;89:23;162:4
**straight (3)**
46:4,5;110:4
**Street (7)**
7:19,23;8:2;11:10;
16:1;115:16;154:16
**stuff (4)**
33:16;63:2;68:7;
152:6
**subject (1)**
11:17
**submitted (2)**
90:16;104:6
**subpoena (5)**
42:15;139:1;
146:22;174:5,10
**subpoenas (2)**
8:5;157:1
**subsequently (1)**
97:20
**sufficiently (1)**
23:3
**suggested (2)**
160:19,21
**suggestive (1)**
120:10
**Sumanth (3)**
7:25;103:18;154:4
**supervisor (1)**
78:12
**supervisors (1)**
151:2
**support (12)**
10:22;11:3,15;12:2;

14:25;15:3;18:11;
74:5,10,19;76:24;
161:17
**supporter (5)**
74:3,18;77:12,14;
79:2
**supposed (1)**
91:22
**Sure (29)**
23:13;26:11,14,18;
43:4;69:8,12;75:3;
78:8,10;86:4;87:8;
94:16;96:19;97:14;
99:20;100:17;101:8;
103:4;114:8;150:7;
154:2;156:21;158:13;
170:14;173:11,17;
176:21;177:25
**surprise (1)**
73:24
**surroundings (1)**
25:4;113:12
**surveillance (1)**
17:13
**swear (3)**
24:10,20;113:2
**swiftly (1)**
16:25
**sworn (2)**
24:17;112:22
**system (1)**
27:21
**systems (1)**
27:18

## T

**table (164)**
11:5,6;12:6,14,21,
25;13:22;14:3,7;16:9,
9,11,17;19:22;20:2,4;
21:4,20;22:23;40:6,
16;41:1,2,4,20;45:19,
20;46:6;49:13;50:11,
24,25;51:2;52:19,22;
54:19;55:4,17;58:5;
63:19;64:15,16,16,17,
21,23,24;65:2,3,12,
18,21;66:8,16,17,19,
21;67:20;68:5,9,13,
18;82:18,22;84:4,6;
85:10,16;86:13,17;
88:14;91:20;92:9;
93:4,8,10,19,23;94:1,
6,22;95:1,7,18;96:13;
97:5,22;109:17;
124:20;125:10,18,24;
126:16;127:6;128:13;
129:19,24,25;130:1,
21;131:4,17,20,23;
132:12,22,23,24,25;
133:10,12,20,25;
134:7,7,17;135:10;

136:7;137:23;140:10;
142:2,10;143:7;
144:2,2,20;145:16;
149:20,24;150:3,4,13,
25;151:5,9,11,14,20;
152:11,12,15,21;
153:4,21;164:4;
165:11,15,18,21;
171:8,23;172:17;
173:5;175:13,14,15,
17;176:3;177:18,19;
178:10,15;179:5,8
**tables (7)**
46:2;54:24;93:2;
108:22,23;128:4;
131:22
**talk (9)**
19:13;22:7;29:21;
36:16;90:13;152:5;
170:2,5,9
**talked (2)**
33:13;170:6
**talking (9)**
26:13,19;74:15;
77:25;85:20;89:19;
94:15;133:17;170:13
**tandem (1)**
154:10
**Tanya (6)**
7:14;44:19;46:20,
21;48:9;137:15
**tape (38)**
43:16,17;47:8;
50:21,23;52:24;55:3,
19;111:23;124:25;
125:1,3,5,6,16;
126:18;128:17,18;
138:22,23,25;139:1,2,
5,6,16;141:6,13;
142:19;143:6,9,16;
144:11,13,21;145:7,8;
146:21
**tapes (2)**
43:15;97:6
**targeted (2)**
14:2;16:25
**task (1)**
28:21
**team (5)**
19:17;31:22,24;
93:3;170:24
**technical (1)**
6:22
**technician (1)**
115:22
**technology (2)**
80:12;126:4
**telling (2)**
63:25;90:7
**terms (4)**
23:7;70:19;90:12;
154:16
**testified (40)**

24:17;39:19;63:8,
17;72:21;74:15,17;
78:12;79:6;80:7;81:3;
82:2,14;85:24;86:15;
88:16;92:7;93:12,18;
94:14,21;95:5;107:4,
22;111:23;112:22;
122:14;124:6;132:15;
151:24,25;158:11;
163:22;165:10;167:8;
168:18;172:21;
175:12;178:5;179:2
**testify (2)**
15:24;16:20
**testifying (4)**
72:14;87:16;
155:20;179:18
**testimony (28)**
11:7;12:4;24:21;
57:13,15;72:5,13;
79:20;81:19;86:17,
23,25;87:6,10;88:8;
93:13;111:18;113:3;
158:9,16;161:11;
164:10;165:12;
172:10;175:8,10;
176:20;178:13
**Texas (5)**
28:8;66:10;93:13,
19;94:15
**texted (1)**
61:3
**texting (1)**
38:13
**Thanks (5)**
10:16;99:21;
122:13;138:12;
153:17
**Therefore (1)**
13:1
**there'll (1)**
66:8
**third (19)**
8:6;12:18,24;17:15;
62:25;63:2;68:12;
88:18;98:25;99:1,5;
104:2;106:11;114:17;
152:20;153:4,6;
165:3,4
**though (4)**
19:20;98:18;
125:14;130:1
**thought (5)**
34:25;39:1;64:1,9;
100:23
**thoughts (3)**
19:10;36:15;73:10
**Three (19)**
19:20;67:9;85:3;
110:10;116:25;123:5;
127:5;129:16;133:2,
2;134:2;139:18,18,
19;140:6;150:6;

167:3;169:3,9
**throughout (4)**
16:15,24;21:15;
115:24
**throw (1)**
68:6
**thus (1)**
20:4
**ties (1)**
176:12
**till (1)**
139:3
**timeframe (5)**
70:17;160:8;
168:20;175:18,19
**times (26)**
6:25;30:7;33:9;
62:4;66:5;88:3;93:7;
104:22;115:24;117:5;
131:10;152:9;165:20;
166:25;167:2,5;
168:8,9,10,11,14,25;
169:3,9;170:10;178:7
**timestamp (1)**
120:14
**timing (1)**
47:9
**Today (4)**
15:24;43:15;
113:19;152:1
**together (2)**
77:1;79:5
**told (18)**
31:17;36:15,16;
37:2;39:1,7,14;60:14;
62:2,21;73:18;74:2;
79:2;90:10,11,13;
119:6;170:19
**tomorrow (3)**
76:9;181:2,10
**took (22)**
52:17;67:13;80:1;
86:16,21;87:10;
107:23;121:22;
127:12;132:21;
133:17;134:7;136:2,
4,5;138:2;142:18;
155:11,20;165:17;
172:8;173:5
**top (21)**
45:3,3;49:14;50:10,
25;57:11;75:19;78:6;
85:7;91:10,12;
121:20,24;123:6;
126:8;136:19,21;
137:2,3,5;142:24
**topic (1)**
34:17
**topics (1)**
19:11
**total (2)**
41:5;108:23
**touchy (1)**

126:3
**towards (2)**
45:17;127:20
**track (1)**
34:23
**Trade (39)**
9:18,22;11:9;12:10;
18:10,25;21:12,22;
28:14,19,22,25;29:3,
18;31:9;32:25;33:3,6,
25;39:25;43:14;44:3;
48:22;92:9;93:23;
94:2,22;95:6;98:15;
108:9,11;115:16;
116:11;118:6;123:21;
138:14;139:15;
165:11;174:1
**traditional (1)**
14:23
**training (3)**
15:14;153:1;159:19
**trans (1)**
160:1
**transcribe (1)**
114:13
**transcribed (1)**
26:14
**transcribers (1)**
114:11
**trash (7)**
16:22,22;21:4;45:9,
10;66:14;68:6
**treat (1)**
17:20
**treating (1)**
17:14
**treatments (1)**
23:5
**trial (3)**
6:19;18:20;22:21
**tried (2)**
76:8;155:3
**trouble (5)**
26:20,21;70:21;
114:17,18
**true (3)**
85:25;86:4;87:23
**trusted (1)**
39:13
**truth (6)**
24:21,21,22;113:3,
4,4
**try (7)**
27:2;84:11;100:17;
114:24,25;158:1;
161:17
**trying (8)**
35:20,21;75:17;
92:3;169:15;172:17,
22;176:15
**Tuesday (1)**
181:16
**turn (3)**

109:21,23;127:14
**turned (5)**
6:24;59:3;127:19;
128:4;145:12
**turning (5)**
20:4;46:23;54:20;
127:20;144:6
**turns (1)**
145:11
**twice (3)**
29:24;165:22,23
**two (31)**
9:14;15:24;21:4;
29:7,9;41:2,3;44:19,
20;58:5;70:16;73:15;
77:24;81:13,16;89:4;
91:20;92:21;116:3,
25;117:4;121:16;
123:7;127:5;129:16;
154:18;165:25;167:3;
168:10,11;177:23
**t-y (1)**
103:24
**Tyler (5)**
51:8,23;52:2;
173:14,16
**type (2)**
64:21;119:8
**typical (1)**
117:22
**typically (3)**
100:6;110:21;
154:20

## U

**unable (2)**
27:23;136:22
**uncertainty (1)**
80:1
**unclear (1)**
97:13
**Under (10)**
13:10;15:14,23;
24:22;27:19;35:20;
89:7,12;113:4;164:22
**underlying (1)**
18:7
**underneath (1)**
163:1
**unfair (1)**
18:7
**Union (123)**
10:22;11:3,3,5,15,
17,21;12:1,5,9,18,25;
13:2,8,11,12,21;14:2,
25;15:3,4,25;16:8,14,
18,25;17:8,14,20;
18:8,24;19:3,5,13,16;
20:12,16,19;21:17,25;
22:13;23:7,17;30:11;
35:21;37:3;39:14,22;
40:3,6,14,15,15,17;

41:8,9,20;49:13;
50:25;55:17;58:14;
59:19;60:9;62:21;
63:16;73:11;74:3,6,
10,18,19;76:24;77:12,
13;79:2,19;83:3;84:5;
89:2,18,19;90:5;
91:21,22;92:3,4;
96:12;97:17,21;
103:11;112:6;119:7;
120:12;122:19;123:6,
8,9,20,25;124:5;
128:19,23;134:24;
135:5;143:1;147:17;
148:15;149:8,8;
154:5;161:8,14,18;
162:11;165:3,4;
170:1,2,7,9,18;171:9;
172:16
**unionization (4)**
29:22;34:25;35:5;
36:16
**unionize (3)**
90:4,6;116:10
**unionizing (3)**
16:6;117:6;170:5
**Unions (2)**
36:21;39:2
**Union's (7)**
15:19;23:3;90:9,17,
22;91:23;103:19
**unlawful (6)**
11:25;13:6,8;14:11,
12;18:18
**unlawfully (2)**
14:16,17
**unless (1)**
9:16;79:10
**unlike (1)**
176:11
**unpaid (5)**
116:4;125:20;
131:6,12;170:8
**unusual (2)**
72:24;73:3
**up (66)**
11:17;21:6;22:21;
32:17,18,19;42:13,17;
43:16;48:12;49:19;
50:10;52:12;56:6;
63:15;64:22;68:5,8,
10;80:13,21,22;
84:12;85:3;88:10;
89:17;91:6;93:15;
95:14,24;96:2,5;
97:25;98:1;99:11,19;
100:18;101:3;108:1;
110:24;111:1;121:8,
24;136:10;138:22;
148:12;150:7,17,23;
151:1,2,4,5;152:11,
16;158:21;167:21,24;
169:24;170:23;

172:16;173:20,22;
174:14;177:19,24
**upon (4)**
15:9;87:11;109:5;
158:9
**upper (1)**
57:11
**use (20)**
19:23;27:17,18,20;
30:3,4;36:24;42:23;
66:9;98:8;99:1,4;
105:17;117:16,19,22;
121:2;123:24;152:7,
15
**used (12)**
36:25;64:16,17;
106:25;114:25;121:3;
128:13,14,16;152:18;
155:2;167:15
**uses (1)**
104:2
**using (6)**
6:13;20:2;27:3,13;
46:10;114:24
**Usually (6)**
33:11;34:7;64:19;
66:19;105:4;155:7

## V

**vacation (1)**
32:13
**value (1)**
77:18
**various (4)**
8:5;23:4;65:23;
115:24
**Vasquez (67)**
11:13,16,19,25,25;
24:3,5,12,15;25:1,2,4;
26:4,8;37:22;41:15;
42:23;43:2,6;44:2;
48:25;57:14;59:18;
61:10;63:8;68:4,22;
70:3;71:19;72:1;75:6;
77:5,20;78:1,6,17;
79:8,9;80:7;90:20;
91:2,14;96:9;97:16;
100:2,5,13,20;101:22;
102:11;103:1,18;
106:9,20;109:6,11;
110:18;111:9,21;
118:14,16;121:25;
122:3;158:10;159:3,
6,8
**V-a-s-q-u-e-z (1)**
25:2
**Vasquez's (5)**
79:25;122:4;
156:24;157:3,5
**vending (4)**
46:7;58:4;127:5;
156:14

**vendors (1)**
98:9
**verbally (1)**
26:3
**verify (1)**
81:11
**versions (1)**
157:6
**via (4)**
76:4,25;117:8,13
**vicinity (1)**
98:13
**video (69)**
6:14,24;17:13,17;
21:9;26:21,22,25;
32:9;42:13,14,22;
43:3,8;46:25;48:23,
25;49:3;56:7;57:10;
64:15;65:23;83:11;
84:3;87:21;107:19;
109:23;114:18,19,22;
124:23;127:19;128:8;
133:17;136:2,3,4,5,
11;137:4,25;138:1,2;
139:4;140:24;151:18;
170:24;173:13,18,20,
25;175:1,6,11,16,23,
24;176:2,3,7,8,14,19,
23,24,25;177:2,17;
178:12
**videoed (1)**
179:10
**videos (3)**
16:19;107:17;174:4
**videotape (5)**
42:16;48:21;59:9;
170:22;179:3
**videotaping (1)**
7:5
**view (5)**
15:20;46:1,5;
164:17;169:13
**viewed (2)**
74:3;164:20
**views (1)**
11:20
**violated (4)**
10:20,25;62:3;
164:8
**violation (8)**
6:25;11:22;13:9;
14:8;17:5;20:13;
62:22;64:1
**violations (1)**
7:7
**virtual (1)**
117:4
**virtually (2)**
117:7;122:14
**visible (1)**
156:4
**vision (2)**
89:23;124:2

**visit (1)**
111:3
**vocal (2)**
74:5,18
**voir (4)**
25:3,19;113:11,15
**volunteer (10)**
99:4,6;104:3,4,5,7,
8,9;154:11,21
**vouchers (10)**
92:17,19,21,23,24,
25;93:2,2;166:9,13
**vying (1)**
123:6

# W

**wages (5)**
11:22;18:12;30:16,
24;32:12
**wait (12)**
26:17;46:18,19;
49:4;56:15;66:20;
69:14;100:14;114:15;
135:7;136:16;140:7
**waiting (1)**
48:10
**Waleed (25)**
12:12;50:18;51:2,
18;53:22,23,23,25;
54:10,12,14,25;60:1,
8,9,11,15,16,23;
61:15;62:5,6;88:17;
92:13,17
**Waleed's (1)**
51:17
**walk (19)**
44:7;46:1;49:2;
55:6,6,19;98:19;
107:6,11;108:17;
127:14,15;134:11;
137:22;139:6,7;
144:1;153:1;178:14
**walked (14)**
49:1,11;50:13;52:4;
53:18,19;57:18,19;
125:7;134:6;146:12,
15;147:9;178:10
**walking (13)**
49:6,22;51:6;52:9,
14;55:1;109:18;
125:9,15;127:20;
141:13,25;169:24
**walks (2)**
49:2;141:22
**wall (10)**
45:6;110:1,4,4,5,6,
8;127:23;128:5;
152:17
**walls (2)**
108:23;109:22
**wants (1)**
100:14

**warn (1)**
23:4
**warrant (1)**
13:20
**watch (4)**
43:8;48:23;178:16,
18
**watching (1)**
17:1
**wave (2)**
26:23;114:20
**way (12)**
12:20;13:6;47:5;
74:21;76:7;78:13;
117:10;135:7;136:25;
139:11;162:13;181:8
**ways (1)**
31:18
**wear (2)**
160:7,16
**wearing (4)**
40:5;55:24;57:20;
126:11;140:3,19;
159:23;160:24;161:1,
6;179:25;180:3
**WebEx (1)**
32:8
**website (13)**
63:14;91:21;104:8,
15;105:4,5;106:15;
148:14,17,18;154:21;
155:6,9
**websites (2)**
123:19,20
**week (5)**
29:24;75:11;117:5;
134:20;164:4
**weekly (2)**
29:21,23
**weeks (1)**
134:20
**Weinreb (180)**
7:11,11;8:7,8,13,
15;9:9,20;10:7,17,18;
15:16;23:23;24:3,5,7,
9;27:7,8,10;37:15,19,
21;38:5,12;41:10,14;
42:2,12,20;43:4,12,
23;44:1;46:13,18;
47:2,5,7,11,14,16,19,
20;48:1,3,6,9,15,20,
24;57:17;59:8,17;
61:4,8,9;63:4,7;64:5,
6,8,14;67:2,6,21;68:3,
20;69:5,8,14,16,18;
70:6,7,21,25;71:2,4,6,
9,13,20;74:14,20,24;
76:16;77:4;78:4,11,
15;79:7;87:17;90:7,
10,18,23;94:11,15;
95:25;96:2,7,16,25;
97:6;100:12;102:25;
103:2,8,9,11;109:7,

10;110:12;111:8,17,
19,20;112:6,8,11,12;
114:5;115:2,3,5;
121:6,9,10;129:3;
135:16,22;136:8,11,
14,16,18,21,23,25;
137:4,11,14,17;138:4,
11,13;146:17,20;
147:4;153:23;156:7,
10,17,22;157:14;
163:12,13,14,25;
172:1,6;174:10,18,20;
175:2,22;176:11,17,
22,24;177:3;178:22,
24;179:1,13;180:8,17,
19;181:9
**weren't (4)**
74:6,8;101:7;
163:10
**what'd (4)**
123:4;134:22;
149:3,11
**what's (50)**
14:14;17:13;30:1;
37:22,23;43:25;44:5,
14;45:8,13,14,17,23,
24;47:21;49:25;50:6,
10,23;54:16,21;56:1,
3;58:1,3,3,13,25;
61:10;66:13;67:7;
75:10;76:21;77:11;
80:24;84:2,13;
102:11;117:14;127:2;
135:2;137:11,14;
139:8,9;142:1;145:7;
152:24;175:4;177:16
**whereby (1)**
19:9
**Where'd (2)**
118:22;122:25
**Where's (3)**
53:25;56:14;98:15
**Whereupon (3)**
24:14;112:19;
181:15
**white (1)**
46:2
**whiteboard (16)**
20:5;98:15,25;
107:5,18;109:8,14,19,
20;155:1;167:12;
168:2,4,5,6,16
**whiteboards (3)**
21:19;103:21;
154:18
**whiteboard's (2)**
109:25;110:1
**whole (5)**
24:21;102:4;113:3;
176:7;177:3
**Who's (13)**
51:21,24;53:11,18;
58:8;86:16;112:25;

126:10,25;140:13;
141:13;145:4;164:1
**whose (3)**
121:18;122:7,7
**wiping (1)**
16:16
**wish (1)**
9:7
**withdraw (4)**
70:8,9,12,13
**withdrawal (1)**
7:2
**withdrawing (3)**
70:19;71:6,10
**withdrawn (1)**
18:8
**withdrew (2)**
174:24;175:3
**without (4)**
14:9;19:7;88:4;
174:21
**witness (70)**
23:22;24:2,16,23;
25:1;26:5;27:6;37:15;
41:10;42:25;57:15;
61:4;63:5;67:2;69:6,
10;74:14;77:3,4,8;
78:2,16,19,23;79:6,
14;81:22;90:19;91:4,
13;96:10;97:16,19;
100:11,15,23;101:16,
23;102:9,12;106:23;
107:3,8,11,18,24;
108:5,10,16,22;109:3;
111:11,13;112:11,18,
21;113:5,8;121:6;
123:10;129:2;135:1;
136:8;153:10;164:16;
168:25;173:6,17;
179:23;180:12
**witnesses (3)**
21:14;180:18,23
**witness's (1)**
176:20
**wondering (1)**
172:23
**wore (3)**
19:17;82:2;160:4
**work (57)**
13:1;19:8,12;21:11;
27:18;28:6,7,11,15,
25;30:23;31:8;33:1,
13,16;35:25;36:3,4;
38:16;39:17;62:4;
75:8;86:2,6,9;90:14;
95:2;104:5;115:8,13,
18,25;128:19;136:20;
150:10;154:10;
178:18
**worked (7)**
21:16;28:4,19;33:5;
115:16,19;150:9
**WORKERS (7)**

1:8;6:8;8:1;10:23;
29:10;116:5;162:17
**Working (8)**
6:21;11:20;12:10;
21:1;85:25;86:4,6,10
**workplace (3)**
13:12;19:3,18
**works (1)**
154:10
**World (39)**
9:18,22;11:9;12:10;
18:10,25;21:12,22;
28:14,19,22,25;29:3,
18;31:9;32:25;33:3,6,
25;39:25;43:14;44:3;
48:22;92:9;93:23;
94:2,22;95:6;98:15;
108:11;115:16;
116:11;118:6;123:21;
138:14;139:15;
154:22;165:11;174:1
**worry (1)**
79:11
**wrap (2)**
99:19;177:23
**wraps (1)**
35:20
**wristband (3)**
161:7;180:1,4
**wristbands (9)**
19:18;40:5;160:5,7,
24;161:1,4;179:19,20
**write (4)**
76:8,9;121:2;122:9
**writing (3)**
75:21;76:4;79:3
**written (4)**
6:17;19:1;76:18;
101:6
**wrong (2)**
9:16;139:17
**wrote (10)**
37:6;63:15;76:25;
78:9,17;90:2;100:9;
120:2,3;122:10

## Y

**Yanell (6)**
12:12;70:14;
133:24;134:3;135:23;
137:19
**year (4)**
23:14,19;77:23,25
**yearly (4)**
76:10;77:22;78:10;
105:12
**years (10)**
21:16;22:18;28:5;
149:25;159:18;
165:23;167:5;168:11,
13;178:14
**Yep (1)**

157:16
**York (11)**
1:16,16;6:9,9;7:13,
13,16,16;8:2,2;11:10

## Z

**Zoom (10)**
6:13,15;7:2;29:24;
30:8;48:12,16,16;
117:8,9

## 0

**05 (1)**
145:12
**06510 (2)**
7:20,23
**07 (1)**
55:21
**09:30 (1)**
6:2

## 1

**1 (26)**
8:21,24;9:11,15,25;
10:1,3,4;52:24,25;
53:7,13,16,20;54:3,9,
13,16,25;61:5,11;
83:24;84:1;98:1;
153:10;171:6
**1:00 (1)**
103:4
**10 (12)**
53:16;56:25;57:5,
10,25;69:24;73:23;
103:4;127:10;145:22;
167:5;181:16
**10:00 (1)**
181:6
**10005 (1)**
8:2
**10278 (2)**
7:13,16
**10278-3699 (1)**
1:17
**1040 (2)**
22:24;23:18
**10-hour (1)**
43:8
**10th (1)**
22:9
**11 (6)**
34:4;57:1;58:10,15;
140:23;141:16
**11:30 (2)**
131:9;138:20
**11:40 (1)**
120:14
**11:50 (1)**
120:14
**12 (7)**

50:23;69:24;
108:22,23;125:4;
140:23;141:5
**12:00 (3)**
34:4;118:21;120:22
**12:10 (1)**
69:22
**121 (1)**
15:7
**13 (4)**
141:16,21;142:3,7
**14 (3)**
54:16,17;57:5
**15 (6)**
29:9;54:3;57:25;
58:10;75:9;177:8
**15-minute (3)**
116:3;132:5;169:25
**15s (1)**
29:7
**15th (49)**
22:1;30:11,12;
39:19,20,21;41:22;
42:16;43:14;48:21;
52:10;59:9,22;63:9,
18,22;65:24,25;68:11,
15,17;74:12,15,16,21,
22;82:2;83:12;94:5;
111:23;122:22;123:3,
5,14;124:7,8,9,23;
125:1,1;151:22;
152:19;153:19;
159:22,23;175:11,19;
179:19,23
**16 (1)**
53:13
**1640 (2)**
20:23;23:16
**17 (5)**
52:25;53:1;75:13;
100:5;101:3
**185 (3)**
11:9;16:1;115:16
**19 (2)**
58:15;95:17
**1986 (2)**
20:17;23:14
**19th (3)**
129:5,6,8
**1A-K (1)**
8:16
**1st (10)**
138:18,20;139:2;
142:13;145:9;146:6,
21;147:6;149:14,18

## 2

**2 (19)**
1:15;7:12,15;18:21;
37:16,17,20,23;38:9,
11;80:14;84:12;
121:7,12;139:5,9,16;

158:23;171:17
**20 (5)**
57:10;73:25;91:19;
127:10;145:4
**2000 (2)**
20:23;23:16
**2004 (2)**
22:24;23:19
**2016 (5)**
9:15,18,22;22:17;
115:11
**2019 (1)**
28:16
**2020 (1)**
105:11
**2021 (3)**
15:7;27:14;116:16
**2022 (21)**
9:16;19:18;22:3,9,
19;28:16;29:16;
30:20;31:4;33:16;
68:11;70:15;78:2,3,
13;115:12;122:19;
139:2;152:19;160:8;
181:16
**2023 (1)**
1:17
**22 (3)**
18:11;139:5;143:8
**23 (1)**
54:25
**24 (4)**
55:2;115:11,12;
174:6
**25 (3)**
142:20;143:5,8
**26 (6)**
1:16;7:12,15;53:20;
144:12,22
**265 (2)**
7:19,22
**27 (2)**
53:7;145:8
**278 (2)**
20:17;23:14
**27th (10)**
128:22,24;129:2;
130:25;132:16;
134:18;135:9,12,24;
137:21
**29 (2)**
53:20;83:25
**29th (6)**
174:4,11,22,25;
175:2,6
**2-CA-295979 (2)**
1:4;6:7
**2nd (7)**
70:11,14,17,20;
71:8;175:3,19

## 3

3 (17)
41:11,12,13;42:4,6,
7;64:4,10;88:10;
139:20;140:23;141:5,
16,21;142:3,7;161:23
**3:00 (1)**
55:14
**3:06:06 (1)**
140:8
**3:08:46 (1)**
128:1
**3:12:58 (1)**
141:3
**3:13:33 (1)**
142:3
**3:30 (1)**
129:10
**30 (3)**
82:15;83:2;167:4
**30th (7)**
70:10,14,16,19;
71:8,11;175:3
**31 (2)**
139:20;141:21
**331 (2)**
20:23;23:15
**342 (2)**
22:24;23:18
**35 (1)**
143:11
**36 (3)**
48:22;56:7;143:21
**36-130 (2)**
7:12,16
**37 (3)**
47:7,11;142:3
**37:41 (3)**
47:11,13;49:11
**37:45 (1)**
47:21
**370 (1)**
15:6
**37th (1)**
8:2
**38 (2)**
143:11;144:5
**39 (3)**
144:6,11,22
**3rd (1)**
32:6

## 4

**4 (11)**
42:14;54:9;55:2;
59:9,12,14,16;83:12;
132:17,18;157:22
**4:00 (2)**
55:14;158:6
**4:40 (1)**
142:18
**4:45 (2)**
142:18;181:15

**40 (3)**
　55:9;145:4,8
**41 (1)**
　145:12
**43 (3)**
　51:16;139:9,17
**444 (2)**
　20:17;23:14
**45 (1)**
　55:22
**46 (4)**
　52:24,25;53:7;
　143:21
**47 (2)**
　53:13;171:6
**48 (1)**
　142:7
**49 (4)**
　50:23;51:15;53:16;
　177:7
**49:12 (1)**
　50:21
**49:55 (1)**
　51:18

**5**

**5 (24)**
　55:2,9,9,18,18,21;
　56:5,6,25;57:5,10;
　58:10,15;67:3,4,5,8,
　21,24;68:1,2;93:16;
　139:20;177:7
**5:10:34 (1)**
　126:5
**5:11:16 (1)**
　127:11
**5:11:33 (1)**
　58:18
**50 (8)**
　47:7,11;52:8;53:20;
　84:2;125:2,4,8
**51 (6)**
　54:9,13,13,16,17,25
**51:04 (1)**
　125:12
**51:15 (1)**
　125:15
**53 (1)**
　52:8
**54 (2)**
　54:3;55:18
**55 (1)**
　170:25
**56 (2)**
　48:22;125:9
**58 (2)**
　56:5;141:5
**59 (2)**
　84:12;171:17
**5K (1)**
　105:12

**6**

**6 (9)**
　83:24;84:1,12;
　135:18,20,21;170:25;
　171:6,17
**6:01 (1)**
　83:18
**6:01:29 (1)**
　83:22
**6:03:26 (1)**
　173:9
**6:03:29 (1)**
　84:20
**60-minutes (1)**
　116:3
**6th (1)**
　71:11

**7**

**7 (27)**
　15:7,11,21;18:8;
　56:5;136:9;137:12,
　15;138:6,8,10;139:3;
　142:20,21;143:5,5,8,
　11,21;144:5,5,6,11,
　21;145:4,8,11
**7:00 (2)**
　43:17;125:3
**7:40:14 (1)**
　144:25

**8**

**8 (5)**
　18:16;146:22,25;
　147:2,3
**8:00 (1)**
　40:12
**8:30 (1)**
　131:9
**80 (1)**
　8:1
**8a1 (6)**
　10:20,25;11:22;
　13:9;14:9;20:13
**8bII (3)**
　70:10,19;71:7
**8bIV (2)**
　70:14;71:11

**9**

**9 (4)**
　54:13;56:7;125:4;
　139:3
**9/11 (3)**
　105:12;155:12,15
**9:00 (1)**
　43:17
**9:30 (7)**

1:17;124:9,11;
181:2,5,9,10
**9th (5)**
　1:17;33:19;118:12,
　19;119:24

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____
_____

In the Matter of:                     Case No.: 02-CA-295979

APPLE, INC.

      Respondent,

and

COMMUNICATIONS WORKERS
OF AMERICA

      Charging Party

_____
_____

Place:   New York, New York (via Zoom)
Dates:   January 10, 2023
Pages: 183 through 379
Volume: 2

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC
**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

1                              BEFORE THE

2                  NATIONAL LABOR RELATIONS BOARD

3    --------------------------------: Case No.:

4    In the Matter of:               : 2-CA-295979

5    APPLE, INC.,                    :

6                Respondent,         :

7    And                             :

8    COMMUNICATIONS WORKERS OF AMERICA,

9    AFL-CIO                         :

10               Charging Party.     :

11   --------------------------------:

12

13        The above-entitled matter came on for hearing pursuant to

14   notice, before Administrative Law Judge Lauren Esposito, at the

15   National Labor Relations Board, Region 2, Jacob Javis Federal

16   Building, 26 Federal Plaza, New York, New York, 10278-3699, via

17   ZOOM on January 10th, 2023, at 9:30 a.m.

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S
 2   On Behalf of the General Counsel:
 3        RUTH WEINREB, ESQUIRE
 4        TANYA KHAN, ESQUIRE
 5        National Labor Relations Board
 6        REGION 2
 7        Jacob K. Javits Federal Building
 8        26 Federal Plaza Room 36-130
 9        New York, New York 10278-3699
10        Ruth.Weinreb@nlrb.gov
11        Tanya.Khan@nlrb.gov
12
13   On Behalf of the Respondent:
14        JASON R. STANEVICH, ESQUIRE
15        MAURA A. MASTRONY, ESQUIRE
16        Littler Mendelson, P.C.
17        One Century Tower
18        265 Church Street, Suite 300
19        New Haven, Connecticut 06510
20        jstanevich@littler.com
21        mmastrony@littler.com
22
23
24
25
```

```
 1   APPEARANCES (Continued):

 2   On Behalf of the Charging Party:

 3        SUMANTH BOLLEPALLI, ESQUIRE

 4        Communications Workers of America, AFL-CIO

 5        80 Pine Street, 37th Floor

 6        New York, New York 10005-1728

 7        sbollepalli@cwa-union.org

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Joshua Jennison | 192 | 237 | 256 | 256 | 190 |
| | 215 | -- | -- | -- | 213 |
| Yanell Brown | 262 | 274 | -- | -- | 260 |
| Stephanie Gladden | 279 | -- | -- | -- | 277 |
| Waleed Abdelul | 295 | 315 | 341 | -- | 292 |
| Paul Distasio | 349 | 369 | 373 | -- | 348 |

```
 1              E X H I B I T S

 2    EXHIBITS              IDENTIFIED        RECEIVED

 3    GENERAL COUNSEL

 4    GC-9                    316              --

 5    RESPONDENT

 6    R-18                    359              360

 7    R-19                    357              358

 8    R-20                    361              361

 9    R-21                    208              208

10    R-22                    215              215

11    R-23                    203              203

12    R-24 (index)            376              376

13    R-25                    366              366

14    R-27                    364              365

15    R-29 thru R-31          345              376

16    (Pending admission)

17    CHARGING PARTY

18    CP-1                    337              337

19

20

21

22

23

24

25

26
```

```
 1                         P R O C E E D I N G S

 2                                      (Time Noted:  9:30 a.m.)

 3        JUDGE ESPOSITO:  This is a continuation of a formal

 4   hearing before the National Labor Relations Board in the matter

 5   of Apple, Inc., Case number 2-CA-295979.  My name is Lauren

 6   Esposito and I am the administrative law judge who will be

 7   presiding over the hearing at issue in that decision in the

 8   case.

 9        Working with us today is courtroom deputy Gabrielle

10   Davison to assist with technical issues.  Our court reporter

11   today is Raegan Rogue, spelled R-a-e-g-a-n, R-o-g-u-e.  For

12   anyone who has joined us today only to observe the hearing, I

13   remind you to keep your audio and video turned off at all

14   times.  Any violation of this instruction or other disruption

15   will result in your immediate removal and possible referral to

16   zoom and federal authorities for other sanctions.

17        I also again remind everyone, both participants and

18   observers that no videotaping or recording of the hearing is

19   permitted.  Only the court reporter may record the hearing in

20   order to prepare the official record.  Again, any violations

21   may result in removal and/or sanctions.  Will counsel please

22   state their appearances for the record today.  For the General

23   Counsel?

24        MS. WEINREB:  Ruth Weinreb, counsel for the General

25   Counsel.
```

1      MS. KHAN:  Tanya Khan, counsel for the General Counsel.

2      JUDGE ESPOSITO:  For the Charging Party?

3      MR. BOLLEPALLI:  Sumanth Bollepalli, counsel for the

4  union.

5      JUDGE ESPOSITO:  And for Respondent?

6      MR. STANEVICH:  Jason Stanevich for the Respondent and

7  with me is my colleague Maura Mastrony.

8      JUDGE ESPOSITO:  Okay.  During off the record conversation

9  the parties discussed Jenks material involving the two

10  witnesses who were presented by General Counsel yesterday,

11  Jordan Vasquez and Ian O'Hara, and Mr. Stanevich, could you

12  represent please on the record that Respondent has completely

13  deleted any Jenks materials provided by General Counsel in

14  connection with Mr. Vasquez and Mr. O'Hara's testimony from

15  your devices and destroyed any copies of those materials that

16  may have been printed out in order to assist in preparing for

17  cross examination?

18      MR. STANEVICH:  Your Honor, I can make that

19  representation.  Emails have been deleted and any copies have

20  been shredded.

21      JUDGE ESPOSITO:  Okay.  Thank you.  All right.  So this

22  morning we're going to begin with Respondent's case.  Mr.

23  Stanevich, is there anything before you call Respondent's first

24  witness?

25      MR. STANEVICH:  No, there is not.

1    JUDGE ESPOSITO:  Okay.  Go ahead and call Respondent's

2  first witness?

3    MR. STANEVICH:  Respondent would call Josh Jennison as its

4  first witness in the case.

5    JUDGE ESPOSITO:  All right.  Mr. Jennison?  Good morning,

6  Mr. Jennison.

7    THE WITNESS:  Good morning.

8  Whereupon,

9                    JOSHUA JENNISON

10  was called as a witness by and having been first duly sworn,

11  was examined and testified on his oath, as follows:

12    JUDGE ESPOSITO:  Thank you.  Can you please state and

13  spell your full name for the record?

14    THE WITNESS:  Sure.  My first name is Joshua, j-o-s-h-u-a,

15  and last name is Jennison, j-e-n-n-i-s-o-n.

16    JUDGE ESPOSITO:  Is that one E or two?

17    THE WITNESS:  Just one E.

18    JUDGE ESPOSITO:  Thank you.  All right.  Before we begin,

19  is there any voir dire for Mr. Jennison regarding his location

20  and surroundings?

21    MS. WEINREB:  Yes, Your Honor, I would like to ask a few

22  questions.

23    JUDGE ESPOSITO:  Go ahead.

24                    VOIR DIRE EXAMINATION

25  BY MS. WEINREB:

1  Q.    Thank you.  Hi, Mr. Jennison.  I'm Ruth Weinreb, counsel

2  for the General Counsel, and I would just like to ask you

3  questions about where you are, who is with you.  Right now,

4  where are you seated?

5  A.    Sure.

6  Q.    Where are you seated right now?

7  A.    I am in -- yeah, I'm in a -- I'm in a small office in the

8  Littler Mendelson office on Third Avenue in New York City.

9  Q.    Is anyone with you?

10  A.    Nobody is with me.

11  Q.    And do you have any documents in front of you?

12  A.    No.

13  Q.    No first further questions, Your Honor.

14       JUDGE ESPOSITO:  Okay.  Now, there are just a few things,

15  Mr. Jennison, that I want to review with you before Mr.

16  Stanevich begins asking you questions.  First, it's very

17  important that you listen carefully to each question before

18  answering.  Do not start answering until you're sure the

19  question is finished.

20       The court reporter makes a recording of the hearing and

21  cannot have more than one person speaking at a time, so that we

22  have an accurate transcription of the hearing.  Second, if

23  someone objects during an attorney's question, don't answer the

24  question.  Stop and wait for me to rule on the objection.

25       Third, let us know right away if you're having trouble

| 1 | with your audio or video.  If you're having trouble with your |
|---|---|
| 2 | audio or video, feel free to interrupt whatever else is going |
| 3 | on.  Tell us you're having problems.  Just wave your hand in |
| 4 | front of the camera so that we can see it. |
| 5 | THE WITNESS:  Okay. |
| 6 | JUDGE ESPOSITO:  Finally, if you lose your audio or video |
| 7 | completely, check your power and Internet connection and |
| 8 | reconnect or reboot your device if necessary.  Then try joining |
| 9 | the hearing again using the same link that you were provided |
| 10 | with before, or try to join or contact us with a backup device |
| 11 | and we will assist you.  Okay?  Thank you.  Go ahead, Mr. |
| 12 | Stanevich. |
| 13 | DIRECT EXAMINATION |
| 14 | BY MR. STANEVICH: |
| 15 | Q.  Good morning, Josh.  How are you today? |
| 16 | A.  I'm good.  Thank you. |
| 17 | Q.  Josh, are you currently employed? |
| 18 | A.  I am. |
| 19 | Q.  Can I have the name of your company? |
| 20 | A.  Apple. |
| 21 | Q.  And how long have you been with Apple? |
| 22 | A.  I've been with Apple for a little over 14 years. |
| 23 | MS. WEINREB:  I didn't hear that.  He went out a little |
| 24 | bit.  I don't know. |
| 25 | JUDGE ESPOSITO:  How many years was that, Mr. Jennison? |

1        THE WITNESS:  So a little over 14 years.

2   BY MR. STANEVICH:

3   Q.    And Josh, what is your current position with the company?

4   A.    So my current position, my job title is workforce

5   flexibility leader for Apple retail.

6   Q.    And just give us a high-level overview of what that

7   involves?

8   A.    Yeah.  So I work for the retail HR team and my team leads

9   development programs to support our global retail store teams

10  to move ahead in role, to be more engaged and enriched so

11  again, I have a global team that leads these programs across

12  all of Apple.

13  Q.    And how long have you been in this position as workforce

14  flexibility leader?

15  A.    I'm relatively new.  I started this position in early

16  April of last year, 2022.

17  Q.    Okay.  Prior to your current position, what was your role

18  with the company?

19  A.    I was the flagship leader for the Apple role chain center

20  retail store.  Flagship leader is a term that we use internally

21  at Apple, but it's really a fancy way of saying general

22  manager.

23  Q.    Okay.  And when did the -- when did you start that

24  position as flagship leader with the company's World Trade

25  Center store location?

1   A.   Sure.  So I began -- so the World Trade Center store is a

2   relatively new store and I was the general manager in charge of

3   opening the store, hiring the team and getting the store

4   opened.  That work for me started in December 2015.

5   Q.   All right.  And when did the store actually open to the

6   public?

7   A.   The store opened in the middle of August 2016.

8   Q.   Okay.  And how long did you remain at the World Trade

9   Center store as a flagship leader?

10  A.   So I was officially the flagship leader at the World Trade

11  Center up until early April of this year.  However, there was

12  an interruption in kind of my role in the store as I was pulled

13  into a special project supporting other work at Apple for most

14  of 2021.

15  Q.   Okay.  So is it fair to say that you were in the store for

16  2016, 2017, 2018 and 2019 and 2020?

17  A.   That is correct, yes.

18  Q.   And when did you return to the store after being away in

19  '21?

20  A.   I returned to the store in January 2022.

21  Q.   Okay.  And did there come a time you left the store for

22  your current position?

23  A.   Yes.  So I left my last -- my last day in the store was

24  during the first week of April 2022.

25  Q.   Okay.  And prior to the World Trade Center position, what

1  was your previous position from there?

2  A.    So before I went to World Trade Center I was the flagship

3  leader at Apple Upper West Side.

4  Q.    Okay.  For how long?

5  A.    About two and a half years.

6  Q.    The same type of responsibilities or was there any

7  differences?

8  A.    Exact same role.

9  Q.    Okay.  Mr. Jennison, I'd like to talk about the store

10  organization in terms of titles and leadership at the World

11  Trade Center store.  Can you walk us through the titles that

12  exist perhaps starting with the managerial titles?

13  A.    Yeah.  For sure.  Yeah, so when I think about the team at

14  the World Trade Center there's really kind of two -- there's

15  two kind of types of employees.  I think there's the leadership

16  piece that I think we'll talk about now and then there's kind

17  of the hourly team.

18      When we refer to leadership at the World Trade Center

19  store, there is really four levels of leadership that kind of

20  comprise I guess the leadership team.  So I'm starting at the

21  top.  I was the general manager, so I was kind of the head of

22  the building and responsible for the overall operation.

23      Below me there was a position called store leader and in

24  the World Trade Center store we had two store leaders.  The

25  store was kind of split into two halves.  One part of the store

1  was all about the selling, selling computers to customers and
2  the sales floor.  The other half of the store was I guess what
3  we would call like after purchase support.
4      So things like the Genius Bar and training.  So I had a
5  store leader in charge of the sales and operations component of
6  the store and a second store leader in charge of the after
7  purchase support.  Below each store leader there was a number
8  of senior managers.  You know, each store leader had three
9  senior managers that supported them in their part of the
10  business, and then below each senior manager there were a
11  number of managers who worked in partnership with the senior
12  manager.
13      So those would be the four different I guess levels or
14  types of leadership that we had at the -- or that we still have
15  at the World Trade Center store.
16  Q.  And at the time you left the World Trade Center store in
17  April 2022, can you identify the store leaders for us in terms
18  of the store leader position?
19  A.  Sure.  So the two store leaders were Paul Distasio and
20  Waleed Abdelal.
21  Q.  Okay.  Now, so walk us through the leadership positions.
22  Can you give us an overview of the team member level?
23  A.  For sure.  So inside of an Apple store there is a lot of
24  different sub businesses and areas of focus.  And so there's
25  probably -- if you're looking at job titles, there's probably

1  between 20 and 25 various job titles within an Apple store.
2  But in essence those 25 -- 20 or 25 roles really fall into kind
3  of four different levels or categories that are pretty
4  consistent, or that are fully consistent across different parts
5  of the store.
6      We have an entry-level position or level that we call the
7  specialist level.  It's the bulk of our team and again it's
8  kind of designed to be our entry-level role.  Above that we
9  have a leveling that we call expert and each team at that --
10 each department within the store has a number of expert roles.
11 Above that is a level that we call the pro or genius level.
12     These are folks that are a little bit more technically
13 savvy that kind of take on a larger role, and then at the top
14 of those four is a level called lead.  And these are folks that
15 help inspire, you know, drive -- you know, motivation on the
16 floor, but again, essentially we have a lot of job titles, but
17 they easily fall into those -- those kind of -- those specific
18 categories.
19     JUDGE ESPOSITO:  I'm sorry, Mr. Jennison.  I just have to
20 interrupt you because somebody came into my office
21 unexpectedly.  What was the last, the highest level, the level
22 above pro or genius again?
23     THE WITNESS:  Yeah, it's called the lead level.
24     JUDGE ESPOSITO:  Okay.  Okay.  Thank you.  I'm sorry.
25 That won't happen again.

1        THE WITNESS:  No worries.

2    BY MR. STANEVICH:

3    Q.    Josh, where is the World Trade Center store located?

4    A.    So Apple World Trade Center is located in lower Manhattan.

5    It is in a transit hub called the oculus.  It's a beautiful,

6    newly constructed building right across the street from the new

7    World Trade Center tower and inside the oculus there is a

8    couple of balconies that overlook this -- it's a huge -- it's

9    basically a transit hub and the Apple store takes over an

10   entire quarter of the inside of this oculus and we are located

11   on two floors inside the building.

12   Q.    Okay.  And can you walk is through the set up of the Apple

13   Store at the oculus?

14   A.    Yeah, for sure.  So like I mentioned, the store is located

15   on two floors and the store is really, really wide.  We have

16   beautiful glass fronting across the entire front of the store.

17   Each level has six points of entry, so six double doors for

18   customers to come in.  The ground floor is where we do our

19   sales, so it's where customers can purchase products.

20        It's also where we do our training.  The upper floor,

21   which we call the balcony level is where our Genius Bar is

22   located.  So it's where if you need support with a product

23   that's not working or you have questions you can go up there.

24   The store is -- I mean it's a jewel box.

25        I firmly believe it's the most beautiful Apple store in

1   New York City, if not the world, and its front and center.
2   There is, you know -- anybody can see it morning, noon or night
3   that's coming through the transit center.  So it's a big store,
4   a lot of square footage, but it's gorgeous.
5   Q.   Now, you've given us an overview of, you know, the public
6   areas of the store.  Can you walk us through the nonpublic
7   areas of the store, maybe starting with the balcony level,
8   which is the second level.
9   A.   Yeah, for sure.  But, you know, kind of when you go beyond
10  the customer facing section of the floor, there's a couple of
11  areas that the team uses to complete work.  The first space
12  that's located on the balcony level is what we call our repair
13  room.  It's where are geniuses and other members of the Genius
14  Bar will actually perform the repair work on computers and
15  phones and it's a busy, hectic working area.
16      There's also a smaller inventory area just off of the
17  repair room where we keep, you know, spare computers and phones
18  that the Genius Bar team will use and then off to the side
19  there is an office, a long narrow office that our business team
20  uses.  There's a few computers and desks up there that the team
21  uses and that is -- that's pretty much everything that's kind
22  of like non-customer facing area on the balcony floor.
23      If we go down to the ground floor there is basically kind
24  of three areas that are kind of the noncustomer facing area.
25  The first and main area is just off the sales floor and it's

1    where we have our break room.  It's where we have an office and

2    it's where we have the restrooms.

3        So that area is where essentially anybody -- everybody

4    that's coming in to work during the course of the day kind of

5    starts their day down there.  There is a lot of activity there.

6    The other area in the back of house is a large inventory room

7    which is where we keep all of the inventory for the store.

8        So that includes computers, phones and iPads in addition

9    to cleaning supplies and products and, you know, you name it.

10   It's kind of where everything is kept.  The final area on the

11   first floor is kind of a flex area that is located -- we have a

12   video wall.  It's an area behind the video wall where we have a

13   data room.  It's where we kind of keep all of the -- all of the

14   electronics that kind of keeps the store up and running and it

15   serves as a storage area for things like folding chairs and

16   things that we use occasionally but not often.

17       So those are the three areas that are located within the

18   main -- within the main building.  I'm sorry.

19   Q.   Well, we've heard some testimony about the office

20   yesterday.  Can you give us an overview of, you know, how that

21   office is used and, you know, what is -- what one would see

22   inside of that office?

23   A.   For sure.  So it's a -- if you look at the door, and next

24   to the door there is a little sign that says something like

25   manager's office or leadership office, which is really funny

1  because it's really the only office -- it's the only place on

2  the first floor where there is any computers where people can

3  check email, can complete training can, you know, use the

4  printer and so that office that's located on the first floor is

5  -- it's like Grand Central.

6      There are people streaming in and out.  Is it managers?

7  Yes, but it's also admins and team members are coming in to say

8  good morning, to check their email, to complete paperwork.  The

9  door is -- essentially, we keep it open all of the time so that

10 people can come in and out.  I will say it's both the best part

11 and the worst part of the store in that it's just hectic and

12 crowded and it's sometimes hard to get work done, but it's also

13 really nice because it's a great way to stay connected with the

14 team.

15     I don't know, it serves a really great purpose in making

16 sure that, you know, I think everybody stays well connected and

17 in the tune of kind of what's happening.  So again, it's a

18 hectic, busy place, but we're -- I'm honestly super proud that

19 we -- you know, we don't close the door.  It's not really a

20 manager's office.  It's kind of an office for everybody.

21 Q.   Josh, just so we're clear, I'd like to show you an

22 exhibit.  One second.  I would like to show you a document that

23 if we can mark it and as Respondent's Exhibit 23 for

24 identification.  I'll share my screen.

25     Can you see the two pictures on the screen here?

1    A.    Yes.

2    Q.    Okay.  And are you familiar with these two pictures?

3    A.    Yes.

4    Q.    Okay.  And what is -- what are the -- what are these

5    pictures and how are you familiar with it?

6    A.    So the picture on the left is a picture of the inside of

7    that office that's on the ground floor that I just referenced.

8    The photo on the right is a photo of the area immediately

9    outside of the office, and I'm familiar with these photos in

10   these areas from having worked in the store and having opened

11   the store.

12   Q.    I would move Respondent's Exhibit 23 into evidence.

13         JUDGE ESPOSITO:  Any objections to the admission of

14   Respondent Exhibit 23?

15         MS. WEINREB:  No objection.

16         MR. BOLLEPALLI:  I just have a brief voir dire.

17         JUDGE ESPOSITO:  Go ahead, Mr. Bollepalli.

18         MR. BOLLEPALLI:  Mr. Jennison, do you know when these

19   photos were taken?

20         THE WITNESS:  I have no idea.

21         MR. BOLLEPALLI:  I see these time or Bates stamps on the

22   bottom.  I just don't know what the relevance is.

23         MR. STANEVICH:  The relevance is there was a lot of

24   testimony yesterday about the set up of the break room at the

25   World Trade Center, so I thought it would be helpful just to

1  share a picture so the judge can, you know, fully understand

2  the testimony and what is included in the break room and how it

3  looks.  This is just a demonstrative exhibit and Mr. Jennison

4  was clear.  This is the break room at the World Trade Center

5  store and it was the same set up as when he was the general

6  manager.

7       MR. BOLLEPALLI:  Okay.  No objection.

8       JUDGE ESPOSITO:  All right.  Respondent Exhibit 23 is

9  admitted.

10      (Respondent Exhibit 23 identified and received)

11 BY MR. STANEVICH:

12 Q.   You mentioned there is a break room.  So if someone was

13 walking out of the manager's -- I'm sorry, the office.  I know

14 we don't like to call it the manager or the leader's office,

15 and they made a left or right, which way would the break room

16 be?

17 A.   So if somebody was to be walking out of the office, they

18 would walk ahead a few steps.  If they turned right they would

19 be in the main break room.

20 Q.   And approximately how many feet is the break room from the

21 entrance of the manager's office?

22 A.   It might be 10 or 15 foot steps.  It's close.

23 Q.   Okay.  And between the office door and the break room,

24 what exists in that area?

25 A.   So if you're walking out of the office and heading towards

1  the break room area, to the left would be a hallway that would

2  take you down to the bathrooms and the janitor's closet.

3  Slightly to the left would be the door that takes you back out

4  to the sales floor that, you know, everybody comes in and out

5  of.

6      Straight ahead of you would be a whiteboard or essentially

7  a set of two whiteboards that we have mounted on the wall, and

8  then like I mentioned before, if you turn right you would go

9  into the main break room.

10 Q.   What do you mean by whiteboard?

11 A.   So we have there is actually two white erase boards that

12 are mounted on the wall and, you know, we use that as a

13 leadership team to communicate Apple, you know, initiatives and

14 announcements and, you know, kind of things that are kind of

15 business related.

16 Q.   And is the board ever used for nonwork material?

17 A.   So every -- so those boards are really -- they're really

18 focused and the messaging is really driven by us, the

19 leadership team or Apple, and so, you know, the things that we

20 choose to post up there are the things that are either approved

21 at Apple at a higher level.

22     Initiatives that are happening in New York City with Apple

23 or there also are at times engagement initiatives or programs

24 that we build on a store level to help the team get to know

25 each better, to help build some team camaraderie or maybe

```
 1  celebrate somebody's permission.  So it's really a mix of those
 2  two things, but essentially it's designed to be really work
 3  related.
 4  Q.   And have you ever received, you know, any request from an
 5  employee at the World Trade Center store to post personal items
 6  on that whiteboard?
 7  A.   I personally have never had somebody, you know, come to me
 8  and ask to post on the board, but it is something that because
 9  it's so front and center, and everybody sees it, it's very
10  visible.  Like we take a lot of pride and there's a lot of
11  focus on making sure that that board continues to be engaging
12  and have all the right, you know, kind of what is the message
13  that we want to deliver as the store, you know, for that day.
14  Q.   And have you ever been informed of a request by an
15  employee to post podcast related material on that whiteboard?
16  A.   Yeah.  So like I mentioned, yeah, so like I mentioned
17  before, there are times where we want to do with employee
18  engagement activities to help the team get to know each other
19  better.  So we're a big team.  We have, you know, at times over
20  300 team members, and one of the big challenges is how do we
21  make sure that the team knows each other.
22       That a new hire knows one of the veterans and there is the
23  beginning of a personal connection.  There was a -- there was a
24  six month period where we came with a program called what's in
25  your bag, and it was designed to highlight an employee and we
```

1  would essentially say it's like what's in your backpack.

2      Let's talk about what's in your backpack and it would be

3  something like, hey, here's a book I'm reading or, you know, I

4  have -- there's keys in my bag because I just moved into a new

5  apartment and I'm really excited about that and it was really

6  designed to be, you know, kind of a getting to know you.

7      Whenever that content was being pulled together we ask as

8  a leadership team to have a chance to take a look at it.  We

9  wanted to make sure that it was our message.  We wanted to make

10 sure that it was appropriate and there was an instance where we

11 had an employee who was selected to participate in the

12 engagement program.

13     Her name was Kerri and on top of, you know, all of the

14 kind of normal, mundane things that she was sharing about

15 herself, she also shared -- wanted to share that she had a

16 podcast and she was -- wanted to encourage people to navigate

17 over to her podcast and to listen to it on the Apple podcast

18 app and other apps as well.

19     And so we -- it never got posted on the board.  We

20 reviewed it.  We made some edits, decided to pull that off

21 before we proceeded to present her kind of final what's in your

22 bag in the store on the whiteboard for that day.

23 Q.  So when you say you reviewed it, was this like a document

24 that she wanted to post on the board?

25 A.  So members of our store team worked with her to pull

1  together, you know, the content.  And so she herself didn't

2  like present here's what I would like to have hung out.  We had

3  a format and a template that they filled that together, but

4  before it got posted, one of our -- the team member who was in

5  charge of the kind of organizing the content to go on the

6  boards, as they always did, brought it to myself and the store

7  leaders to say, hey, put some eyes on this.  Is this -- does

8  this work.  I mean that's how we were -- that's how I was made

9  aware of it.

10 Q.   Okay.  And you advised us that her request to post a

11 podcast material was declined.  Why was it declined?

12 A.   Because I felt that it was in violation of our non

13 solicitation policy.

14 Q.   And we'll come back to the policy in a moment.  Mr.

15 Jennison, I would like to show you a document that has been

16 marked for identification purposes as Respondent's Exhibit 21.

17 I'll share my screen.  Mr. Jennison, do you recognize this

18 picture?

19 A.   Yes.

20 Q.   Okay.  And what do we see in this picture here?  Just let

21 us know where this area is located and then how are you

22 familiar with this picture?

23 A.   So this photo was taken in the back of house area on the

24 first floor.  It was taken standing essentially in front of the

25 door that exits out onto the sales floor, and it's the area

1    that on the left you can see the two whiteboards that we use

2    for communications.

3        Straight ahead down that short hallway would be how you

4    get into the main break area, and if you were put to pan to the

5    right 90 degrees, you would see the office that we referred to

6    earlier a few steps away.

7    Q.   I would move Respondent's Exhibit 21 into evidence.

8        MS. WEINREB:  No objection.

9        JUDGE ESPOSITO:  Mr. Bollepalli, any objections?

10       MR. BOLLEPALLI:  No objections.

11       JUDGE ESPOSITO:  Respondent Exhibit 21 is admitted.

12       (Respondent Exhibit 21 identified and admitted)

13   BY MR. STANEVICH:

14   Q.   Now, straight in front of us on the picture here, what do

15   we see?  Do these appear to be shelves?

16   A.   Yes.  Those ourselves that's in the area that we call our

17   tech station.

18   Q.   Okay.  And this is inside the break room?

19   A.   Yes.

20   Q.   And how were these shelves used in reference to tech

21   station?  Can you describe it better for us?

22   A.   Yep.  So basically anybody that's coming to work at the

23   store during the day, whether you are a leader, whether you

24   work on the sales floor, the Genius Bar, everybody needs to

25   have the tools -- the tools necessary to take care of

1   customers, to confirm appointments, to complete sales.

2       That is done in the Apple store on a device that we call

3   the Isaac.  Essentially, it's an iPhone that has a sled on it

4   that can be used to take credit cards.  It's how we check in

5   customers for appointments and a store of our is equipped with

6   --

7       MS. WEINREB:  He's freezing.  I don't know if anyone else

8   --

9       THE WITNESS:  -- probably 85 --

10      JUDGE ESPOSITO:  Mr. Jennison, I'm sorry.  We just really

11  didn't get any of that bit of your testimony.  There is a

12  certain -- there is a certain amount of distortion and freezing

13  going on Mr. Stanevich.  I don't know if we should go off the

14  record so someone can take a look at the set up in the office

15  where Mr. Jennison is located.

16      MR. STANEVICH:  Yes.  We were actually in the process of

17  doing that, of getting him the office Wi-Fi so it will be a

18  stronger connection.  So if we could just go off the record for

19  two or three minutes we will resolve this issue.

20      JUDGE ESPOSITO:  Let's go off the record and we'll come

21  back at 20 past 10.

22      MR. STANEVICH:  Thank you.  Perfect.

23      (Off the record)

24      THE COURT REPORTER:  We are on the record.

25      JUDGE ESPOSITO:  Mr. Stanevich, go ahead.

1  BY MR. STANEVICH:

2  Q.   Okay, Mr. Jennison, before we went off the record to

3  resolve tech issues, I was having you explain some things about

4  Respondent's Exhibit 21 which is in evidence and I would like

5  to share my screen again and then we can pick up where we left

6  off, okay?

7  A.   Sounds good.

8  Q.   Okay.  So Mr. Jennison, can you see the exhibit in front

9  of you?

10  A.   Yes.

11  Q.   Okay.  So we started to talk about this shelf, what's on

12  it and how it's used as part of in the day to day at the World

13  Trade Center store.  You were giving us an example or a

14  description and it cut out there.  So if we can start back and

15  if you can --

16  A.   Sure.

17  Q.   -- walk us through this area?

18  A.   Yeah.  So this area is what we call the tech station.  You

19  know, we have up to 300 team members that are working and

20  regardless of where you're working in the store, whether it be

21  the sales floor or the Genius Bar or a leader, you need certain

22  pieces of technology to allow you to do your job, and so, you

23  know, on these shelves we provide the supplies necessary for

24  everybody to do their job for the day.

25        So on those shelves, what you see immediately on those

1   black units on the three shelves are a number of -- they're

2   basically iPhones with a special sled on it that we call an

3   Isaac.  It's where the team clocks in and out.  It's what we

4   use when we're selling products to customers.

5        It's what we use at the Genius Bar to look up repair

6   information and so, you know, when somebody is starting their

7   day, everybody goes there, you know, grabs an Isaac and a

8   holster.  There is also some drawers that you might see towards

9   the back of those shelves that has things like pens, cleaning

10  cloths, to keep the computers looking good.

11       There is some tools for the Genius Bar.  It's really a

12  place where you go to start your day.  You get the supplies you

13  need and then you can head out to the floor.

14  Q.   And just to be clear, these shelves and equipment that are

15  shown here are actually inside of the break room; is that

16  correct?

17  A.   Yes, that's right.

18  Q.   Okay.  So let me stop sharing my screen.  So Josh, in

19  terms of the break room, can you give us an overview of what's

20  included in the break room?

21  A.   For sure.  So in addition to the tech station that we just

22  spoke about, there are employee lockers.  There's probably

23  anywhere -- I'm just guessing, maybe 100 or 150 lockers that

24  the whole team uses when they come in to put jackets, their

25  lunch, et cetera.

1        There is a coat rack that, you know, people can hang up

2    their jackets or their backpacks during the course of their

3    shift.  There is a small kitchenette that includes two

4    refrigerators, a coffee machine, a microwave and a sink, and

5    then in the middle of the break room there is a table that is

6    kind of a shared communal table where, you know, team members

7    can sit, take their 15 minute break or their lunch, or before

8    they're going to start a shift or end their shift.

9        It's where the full team goes to spend time to get ready

10   for their shift or, you know, to take a break.

11   Q.   I would like to show you a document that has been marked

12   for identification as Respondent's Exhibit 22.  Josh, are you

13   familiar with this particular schematic here?

14   A.   Yes.

15   Q.   Okay.  And just high level, what do we see on the screen

16   and then I'll walk you through some particular points?

17   A.   So this schematic shows a portion of the back of house

18   area on the ground floor.  That would include a portion of the

19   break room, the white -- the two whiteboards and the door that

20   would go out to the main sales floor.

21      (Respondent's R-22 identified)

22   Q.   Okay.  And just to be clear, this is for the World Trade

23   Center store?

24   A.   Yes.

25   Q.   Okay.  I would move this exhibit into evidence.

1        MS. WEINREB:  Well, I would like to voir dire about the

2   document.

3        JUDGE ESPOSITO:  Sure.

4   VOIR DIRE BY MS. WEINREG:

5   Q.   If I may.  So I don't have control of the screen, but Mr.

6   Jennison you mentioned the whiteboard.

7   A.   Yes.

8   Q.   Where in this picture is the whiteboard?

9   A.   So inside the red dashed lines there is a thin rectangular

10  box in the center of that line.  That would represent the

11  placement of the two whiteboards.

12  Q.   Okay.  And to the left of the screen I'm hoping we're

13  looking at the same way.  I hope we're seeing it the same way -

14  -

15  A.   Okay.

16  Q.   -- and it's not reversed somehow, but to the left, the

17  long, white area that those are the tables?

18  A.   Yes, that's correct.

19  Q.   That's in the break room?

20  A.   Yes.

21  Q.   And the two little rectangles right at the top of the

22  screen on the top where the table is, that's where the Isaac,

23  where the iPad Isaacs are stored, there shelves?

24  A.   That's correct.

25       MR. STANEVICH:  I'm going to object.  This is not voir

1  dire.  This is cross-examination.

2      MS. WEINREB:  Well, I don't know what I'm looking for.

3      MR. STANEVICH:  Well, Ms. Weinreb, I was going to ask the

4  witness to explain the document.  Voir dire is to understand

5  the authenticity of the documents.

6      MS. WEINREB:  Okay.

7      MR. STANEVICH:  But what's in the documents and station

8  relationships, that's cross-examination.

9      MS. WEINREB:  Well, then maybe before it's admitted, I

10  don't know what I'm looking at so I would object then to the

11  admission of --

12      MR. STANEVICH:  He has explained what the document is and

13  I would be happy to ask some further questions as to what's

14  included in this document.  We've offered it because we've had

15  a lot of testimony about the spatial relationships and just

16  wanted to be helpful for the record when it's reviewed months

17  from now or weeks from now where everything is located.

18      So I can as Mr. Jennison some additional questions.

19      JUDGE ESPOSITO:  Okay.  Ms. Weinreb, do you have any

20  questions about what the document is or how it came into

21  existence?

22      MS. WEINREB:  No.  No, I don't have to --

23      JUDGE ESPOSITO:  Okay.  So Mr. Bollepalli, do you have any

24  voir dire?

25      MR. BOLLEPALLI:  No objections to it.

1    JUDGE ESPOSITO:  Okay.  So Ms. Weinreb, are you objecting

2    to the admission of the document?

3    MS. WEINREB:  Yes.  At this moment.  If Mr. Stanevich is

4    going to ask further questions so we could get clarity on what

5    we're looking at to make sure we understand what this is and

6    then I probably would let it come into evidence.  I would not

7    object.

8    JUDGE ESPOSITO:  All right.  I'm going to overrule that

9    objection and admit Respondent Exhibit 22, and Ms. Weinreb, if

10   you have any questions regarding what the document -- what the

11   document represents, what's being represented in the document,

12   what's being depicted, you can ask those questions on cross-

13   examination of Mr. Jennison.

14       (Respondent's R-22 received)

15   MS. WEINREB:  Okay.

16   JUDGE ESPOSITO:  Go ahead, Mr. Stanevich.

17   MR. STANEVICH:  Thank you, Josh.  A few questions so we

18   can all understand what we have on the screen here.

19   BY MR. STANEVICH:

20   Q.   Can you see my cursor?

21   A.   Yes.

22   Q.   Okay.  So what is this open area here?

23   A.   So that is the corner of the customer facing the sales

24   floor.  So it is out in front of the house.

25   Q.   And right here we have a line and a couple of dashes.

1    What is that?

2    A.    That's a door that goes from the sales floor into the back

3    of the house area.

4    Q.    Okay.  And then right up here it looks like there's an

5    entrance.  What would we find in this area?

6    A.    So that entrance takes you into the -- it's kind of the

7    little area that's located outside of the manager's office.

8    Q.    Okay.  And within this red box I see a little line that

9    goes across here.  What is this?

10   A.    That would be representing the whiteboard, the

11   whiteboards.

12   Q.    Okay.  And so then moving over to the left side of the

13   document we see two rectangles here.  What are these

14   rectangles?

15   A.    Those are the tech stations where the Isaacs and other

16   technology and tools that the team uses to do their jobs is

17   located.

18   Q.    Okay.  And this is the tech station that you referenced

19   earlier?

20   A.    Yes.

21   Q.    Okay.  And right here in the middle I assume this is

22   either tables and chairs in the break room?

23   A.    Yes.

24   Q.    Okay.  And you mentioned lockers.  Would the lockers be

25   along here kind of off to the right of the break table?

1    A.    Yes.

2    Q.    Okay.  I have no further questions on this document, so

3    let me stop sharing my screen.  Now, Josh I think you touched

4    upon this a little bit before when you were describing the

5    break room, but could you tell us how and when this break area

6    or this area is used?

7    A.    Yes.  So the break room is an action-packed, hectic, busy

8    part of the store.  When the store opens in the morning we have

9    team members that come in as early as -- I'm not sure, you

10   know, when I was there it was like, you know, 6:30, seven

11   o'clock and depending on the day of the week, you know, the

12   break room would be used until 10:30 or 11 o'clock at night.

13        Throughout the course of the day it's much like the

14   office.  It's like Grand Central station.  It's where everybody

15   comes in,  drops off their bags at the beginning of their

16   shift.  They finish maybe the coffee or the donut they bought

17   on the way in.  They get their shirts, you know, their dress

18   code uniforms ready to go and laid out.

19        They stash their backpacks.  They would get the technology

20   and the tools they need to be ready to head out to the floor to

21   begin their shift.  It's also the place where when there are

22   breaks, 15 minute breaks for everybody on the team, it's often

23   where people will come, spend time to kind of unwind and get

24   ready to go back out onto the floor.

25        It's where lunches happen.  So people will run out and

1  grab food or they'll have brought food and they'll warm it up

2  in the microwave so, you know, these lunches and meals are

3  happening as early as 10:30 in the morning and they could go

4  all the way until the end of the night.  And it is -- it's an

5  active, exciting kind of dynamic place.

6      It's really where, you know, it's kind of the -- in some

7  ways it's kind of the heart and soul of the store in terms of

8  kind of who is in and out and again, it's a pretty busy place.

9  Q.   Is any work performed in this area?

10  A.   I mean I think there is.  I think knowing that there is a,

11  you know, the technology station is in that area and so, you

12  know, I would consider, you know, getting your equipment, you

13  know, kind of as potentially, you know, kind of work happening

14  in that area.

15      You know, we really try not to have it, you know, be a

16  place where -- we try to minimize the amount of work that

17  happens in that area.  We really -- our goal is to try to

18  preserve it to be something that's where as possible as much

19  breaks, you know, kind of focus on breaks as we can, but the

20  reality is it's kind of a gray area where, you know, the store

21  is -- I'll be honest, the store is very, very small considering

22  how many employees we have.

23      And so, you know, space is always a challenge for us and,

24  you know, despite our best efforts, you know, it's hard to --

25  it would be hard to say.  It could go either way.

1  Q.   Understood.  And so you outlined how employees use this
2  area.  Does that also include store leaders?  Do they use this
3  area as well or is it just really for the hourly employee so to
4  speak.
5  A.   No, no.  It's absolutely a place where leaders of all
6  levels also spend their time.  And so, you know, the managers
7  and the senior managers, they also get 15 minute breaks.  They
8  also get lunch breaks and, you know, very, very often, you
9  know, they will spend time in the break room to take their
10 breaks.  I often would have lunch or would have a cup of coffee
11 on, you know, when I was taking a few minutes, you know, out of
12 my day.  And so not only did we do that because there was no
13 space anywhere else, as a requirement, it's also something that
14 -- you know, when I opened the store, we really wanted to
15 encourage the leaders to spend time in that area to be with the
16 team, to be engaged and, you know, I consider the leaders to be
17 part of the store team as much as any other role in the store.
18      You know, the way that that was used by the leaders,
19 including Paul, and Waleed, and myself was essentially
20 consistent with how, you know, all the other team members would
21 use it as well.
22 Q.   Okay.  We've heard a little bit about cleaning services
23 that Apple uses at that store outside -- you know, an outside
24 contractor.  Is that accurate?  Is there an outside contractor
25 that provides cleaning services?

1  A.    Yes.

2  Q.    Okay.  And just kind of walk us through that relationship

3  and what the cleaning services are.  The contractors are

4  responsible for?

5  A.    Yeah.  For sure.  So we have -- we contracted with this

6  outside cleaning service and they provided the staff and the

7  leadership for their staff in order to accomplish a few kind of

8  key goals for the store.  The first component of their

9  responsibilities was helping to maintain the customer facing

10  areas on both the first and the balcony levels.

11      So there would always be one or two other porters that

12  would be out front looking for trash, picking up empty coffee

13  cups.  They would be spot cleaning the floors, the walls,

14  cleaning the windows all the time.  And so they were

15  responsible for really making sure that anything that a

16  customer sees is clean and kind of at our brand standards.

17      In addition to their work in the customer facing areas, an

18  equally important part of their role was helping to maintain

19  cleanliness in our employee areas.  So they would be

20  responsible for going into every corner of the store, emptying

21  trashes, spot mopping, clean up spills, restocking things like

22  Kleenex's and sanitizer.

23      They would be in offices, you know, cleaning up and wiping

24  down counters.  They also have responsibility to maintain the

25  bathrooms and they also maintain the break area in terms of

1  things like cleanliness, organization and taking out the trash,
2  et cetera.
3  Q.   Would the cleaning contractor have any responsibilities in
4  terms of enforcement of Apple policies?
5  A.   No.
6  Q.   Okay.  And specifically why would a contractor not have
7  any responsibility related to enforcement of its solicitation
8  policy?
9  A.   Well, I think enforcement of any policy, including the
10  solicitation policy has some level of judgment and requires a
11  level of training and confidence and enforcement of any
12  policies, including the solicitation policy, I would not feel
13  comfortable outsourcing that to a vendor or, you know,
14  especially anybody that doesn't directly work for Apple, or
15  that I have responsibility for.
16  Q.   Josh, let's go to a different topic before we get to the
17  solicitation policy.  You testified before that the doors
18  opened in August 2016 for customers, but you were there for a
19  number of months.  You know, what was your role leading up to
20  the opening of the store and, you know, what would you and your
21  leadership team do on a daily basis?
22  A.   Yeah.  So my responsibilities kind of broke out over a
23  couple of different kind of key areas.  First and foremost, you
24  know, my job was to hire, source and identify the entire team
25  for the store.  So I first was responsible for identifying and

1  hiring my leadership team and having that team get selected so

2  that then we could then begin the process of hiring and

3  onboarding the 300 team members that we were bringing on board

4  to be part of the new store opening.

5       In terms of the leadership team, you know, the leadership

6  team was comprised of a number of existing leaders at Apple

7  that were coming over to be part of the new store opening, as

8  well as sourcing a number of leaders that were new to Apple and

9  this would be their first experience with Apple.  Part of --

10  one of the most important parts of my role as a flagship leader

11  in this process was to build a sense of team of identity of

12  setting goals and making sure that the leadership team that we

13  agreed on, what was important.

14       What were we going to be known for.  How did we want to

15  engage our team and ultimately when the store opened, you know,

16  how did we want Apple World Trade Center to show up for our

17  customers and/or Apple.

18  Q.   In setting those expectations, was the store appearance

19  considered and/or discussed among the leadership team?

20  A.   Yes.  Often.  So we -- so I and the leadership team were I

21  would almost say obsessed with wanting to make sure that this

22  beautiful jewel box of a store, that is in -- first off, one of

23  the most beautiful buildings in New York City, but also is in

24  the shadow of the 911 memorial and the national 911 museum.

25       We wanted this to be the best representation to our

1  customers and we also wanted this to be a special place to be

2  an employee.  And so among the things that we talked about and

3  the expectations that were set was the importance of

4  maintaining the store and I guess we would use the term like a

5  grand opening ready every day, every minute during busy times

6  and during slow times.

7      And so that was an important component of the message that

8  I delivered to the leadership team and it was a part of the

9  commitment that we made together as a leadership team to make

10 sure that we, you know, achieve those standards.

11 Q.   Okay.  And the leadership at that time, did it include

12 Paul Distasio?

13 A.   It did, yes.

14 Q.   Did it include Yanell Brown?

15 A.   Yes.

16 Q.   And what was Yanell's position, if you recall?

17 A.   So Yanell at that time was a manager.

18 Q.   Did it include Matt Moya (phonetic)?

19 A.   Yes.

20 Q.   Okay.  Did it include Jorge Romero?

21 A.   Yes.

22 Q.   Okay.  Did it include Waleed or did he come later on?

23 A.   He came later on.

24 Q.   Okay.  Now, we've referenced the solicitation policy a few

25 times.  Are you familiar with that policy, Josh?

A.   Yes.

Q.   Okay.  And were you familiar with the policy back when you opened the store in 2016?

A.   Yes.

Q.   Okay.  And can you tell us how you are familiar with this Apple solicitation policy?

A.   For sure.  So I have been with Apple for 14 years and I was a, you know, a member of the leadership team within New York City for all of that time and there were a couple of ways that I was made aware of the solicitation policy.  The first is that we as leaders and actually it's all retail employees are required to take an annual compliance training.

As leaders we take additional compliance training above and beyond what our front line hourly employees take, and the solicitation policy included in that annual compliance training.  So, you know, at this point I've taken that training, you know, 14 times and it will be coming up again here in a few months, I'm sure.

We also did -- we also ran in person training and classes for our leadership teams where we talked about things like the solicitation policy, among other policies, and I can specifically remember two in person training that took place in New York where the solicitation policy was presented and it was conversation and back and forth around, you know, how to implement it, what it means, why it's important, et cetera.

1     So I feel comfortable that -- you know, I felt comfortable

2  with the policy.  It's something that was made important to me

3  as a leader throughout my tenure working for Apple in New York

4  City.

5  Q.   And since you opened the store in August 2016, has the

6  solicitation policy itself changed at all, to the best of your

7  knowledge?

8  A.   No.

9  Q.   Meaning that it has not changed, correct?

10  A.   I don't believe so.

11  Q.   Okay.  Now, let's talk a little bit about the application

12  of the policy and other cleanliness related items, at the World

13  Trade Center, in your time when you were there.  So can you

14  give us some examples how you may have applied the policy or

15  the cleanliness standards you've talked about today in customer

16  facing areas of the store.  When I say customer facing

17  accessible to the public?

18  A.   For sure.  Yeah.  I can -- there is a couple back come to

19  mind right away.  The first is in, you know, the summer of

20  2020, you know, there was a lot of, you know, civil justice

21  kind of movement that was happening around the country and New

22  York especially was a place where there was a lot of protests

23  and activism.

24     The store is located within the oculus transit hub and

25  it's a high profile building where there is, you know, in the

1   mornings and afternoons there's a lot of, you know, commuters

2   transiting in and out and when we reopened after we were closed

3   because of the Covid pandemic, that fall there were several

4   instances where, you know, there were protest groups that would

5   come into the oculus and there were instances where they would

6   come into the Apple store to look to engage customers or the

7   team and I was specifically there one of the evenings, you

8   know, when that happened and, you know, I connected with and

9   talked to the folks that were in the store, you know, looking

10  to share a message and it was pretty simple.

11      I shared with them the solicitation policy and asked that

12  they leave the store but shared that they're welcome, you know,

13  they're welcome to stand outside of the store, go into the

14  oculus, and continue their efforts there and, you know, that --

15  that happened -- I can specifically remember that happening at

16  several points during that fall because of what was happening

17  kind of more broadly in society.  The other example is a little

18  smaller but, you know, downtown --

19      MR. BOLLEPALLI:  I'm going to object as to relevance.  I

20  mean the witness is testifying about customer areas.  I don't

21  believe that's at issue in this case.

22      JUDGE ESPOSITO:  Oh, okay.  Mr. Stanevich, is there any

23  issue with respect to the solicitation and customer areas.  My

24  understanding was that this case only had to do with incidents

25  that took place in the break room.

```
 1        MR. STANEVICH:  That is correct, Your Honor, but under
 2   federal rule 406 I'm entitled to provide evidence regarding
 3   habits and routine practices and Mr. Jennison's testimony is
 4   going to outline what his practices were not just in the break
 5   room areas but in all areas of the store, and I think that's
 6   important to our theory of the case in terms of how the store
 7   was kept clean of third-party material.
 8        It was kept clean of clutter.  Whether it's employee
 9   provided material or its third-party provided material.  So the
10   practices regarding cleanliness and solicitation throughout the
11   entire store is relevant to our defense in this matter.  And
12   we're not going to spend that much time on it, I can promise
13   you that.  Just one or two more questions about the customer
14   phase scenarios before we move to the back room.
15        JUDGE ESPOSITO:  All right.  I'll allow it.  Go ahead.
16        THE WITNESS:  So I was just starting to explain another
17   example of solicitation of the customer facing areas.  So lower
18   Manhattan had -- it no longer exists but there was a huge
19   discount department store located a few blocks from the store
20   called Sentry 21.  It was probably one of the top five tourist
21   destinations in New York City, interestingly enough, and at
22   times we would -- I'm not sure who did it but there were --
23   there were folks that would come in from I believe from Sentry
24   21 and they would leave these little red postcards that had it
25   looked like a fake credit card on it that was good for 15
```

1  percent off if you come to visit, and they would leave them

2  sitting on the stools in our training area, on the customer

3  facing tables and, you know, I would or the team would remove

4  them and throw them away because not only because it violated

5  the solicitation policy, but it looked terrible.

6      It looked like a garage sale and it would drive --

7  personally it would drive me crazy because we put -- we took so

8  much care to keep the store looking so good that we didn't want

9  this like random stuff kind of left sitting around the store.

10  So the removal of that was both from kind of a solicitation

11  perspective but also from a just like cleanliness and making

12  sure that the store kind of met it's kind of brand standards

13  that we were aiming for.

14  BY MR. STANEVICH:

15  Q.   Okay.  So I'll move on here.  Let's focus on, you know,

16  the back area, the nonwork areas of the store.  Have you had

17  the occasion to enforce solicitation policy or any cleanliness

18  standards regarding third-party material in the break room, for

19  example?

20  A.   Yes.

21  Q.   Okay.  And can you give us some examples of how you've

22  done so and what you experienced in your time as the flagship

23  leader at the World Trade Center store?

24  A.   Yeah.  For sure.  So I would often, during the course of a

25  day, I would be in every area of the store and that would

1   include the break room, so I would often pop back there to say

2   hello, good morning to folks, check on the condition, make sure

3   that -- frankly make sure that the break room was a place that

4   if somebody came into work and it was there first kind of

5   impression of how the day was going to go, I wanted it to be

6   really organized and clean.

7         A sense of order so that they could focus on the important

8   things.  There were definitely times where I would find

9   materials that were not provided by Apple that were provided by

10  a third party and, you know, there's a lot of businesses in

11  lower Manhattan that would open up and would meet customers or

12  were doing probations and, you know, I can think of instances

13  where a coffee shop, Joe Coffee opened up, you know, just down

14  the hallway from us and, you know, a stack of menus and a 10

15  percent off coupon was left in the center of the break room

16  table and so that would be picked up and thrown away.

17        There is instances where, you know, a Chinese restaurant

18  would be looking for business and there would be honest stack

19  of Chinese menus, you know, sitting in the corner of the table

20  and that was -- that was like an easy decision.  Like that

21  shouldn't be left.  It looks terrible.  Let's kind of throw

22  that away.

23        So those are I think a couple of the ones that first come

24  to mind but, you know, I can think of a, you know, a Popeye's

25  Chicken coupon that was up at one time.  There's just -- it was

1  -- it happened regularly.  We're part of this larger community
2  of businesses downtown and, you know, at times, you know, these
3  businesses and these third parties would somehow get their
4  materials into the back of the -- into the back of the room, or
5  --
6  Q.   And on that point, do, you know, outside retailers and
7  vendors have access to our break room?
8  A.   Well, they don't and in my experience the way those
9  materials end up in our break room is, you know, somebody from
10 that café or that restaurant approaches one of our employees on
11 the floor and says, hey, I'm from a local restaurant.  Hey, do
12 you mind, you know, putting these, you know, kind of in your
13 break room to make it available for your team.
14     You know, and the frontline team wants to do the right
15 thing.  Like they want to help out.  They maybe don't know how
16 to say no or they're probably not, you know, kind of aware of,
17 you know, kind of what this means and so at times the team will
18 walk back, put it on the break room table and then head out to
19 the floor.  But, you know, these third parties, we don't let
20 anybody into the break room so they're able to get it back
21 there somehow.
22 Q.   Now, in terms of, you know, you talked about your practice
23 of clearing the things off the table.  I mean would you check
24 the break room table at, you know, certain designated points of
25 the day or is this more of when you see something you take

1  action, or something in between?

2  A.   Yeah, it's probably something in between.  You know, it

3  wasn't like there was like an alarm at 11 o'clock in the

4  morning and that was like the sweep the break room time.  It

5  was ongoing and it was -- it was, you know, whenever you had a

6  spare minute, whenever you were heading out to the floor

7  getting ready to talk to somebody, you would pop back there,

8  and see what was going on, connect with the team and, you know,

9  like I mentioned, the break room it's busy all hours, 6:30 in

10  the morning, 10:30 at night and so, you know, it's just kind of

11  this ongoing, just kind of never ends.

12       You just kind of have to be popping in and out of there,

13  you know, throughout the day, to make sure that, you know, just

14  make sure things are good, make sure how were people feeling.

15  Like what's the condition.

16  Q.   What does the break room look like at the end of the day

17  when everybody is, you know, left and there's, you know, no

18  more employees in the store.  There's no more customers in the

19  store.  What does the break room look like at that time?

20  A.   Yeah.  So once all the employees have left and we -- you

21  know, the employees, like we reset the break room.  We make

22  sure all of the technology is back.  You know, we make sure

23  that it's set back to the way it should.  Part of the manager

24  closing duties is they go into the break room and they open up

25  every locker to make sure that there's nothing left and so

1    literally every single locker is opened up and cleaned out.

2        The cleaning crew goes into the back with the manager and

3    they reset the break room back to clean.  The goal is nothing

4    on the break room table.  There's nothing on the counter in the

5    kitchenette.  The thinking that we use on that is we want to

6    close to open so that when the first person comes into the

7    store early that next morning the place looks like it did when

8    it opened for the very first time because it's crazy in an

9    Apple store the first thing in the morning and the team doesn't

10   -- we don't have time to spend time cleaning up from the night

11   before in addition to all of the other tasks that need to

12   happen.

13   Q.    Josh, one of the things that we heard yesterday from some

14   of the witnesses for counsel, for General Counsel, is that

15   newspapers or coupons, the same ones would stay on the table

16   day after day after day during the course of a week.  Have you

17   ever experienced such a thing in your tenure as flagship leader

18   at the World Trade Center store?

19   A.    No.  I cannot imagine --

20        MR. BOLLEPALLI:  I'm going to object to that question.

21        JUDGE ESPOSITO:  What's the basis for your objection, Mr.

22   Bollepalli?

23        MR. BOLLEPALLI:  I think it was more of Mr. Stanevich

24   testifying than hearing Mr. Jennison.

25        JUDGE ESPOSITO:  I'm sorry?

1      MR. BOLLEPALLI:  It's a leading question.  Mr. Stanevich

2  is testifying as opposed to us hearing from our witness, Mr.

3  Jennison.

4      JUDGE ESPOSITO:  Okay.

5      MR. STANEVICH:  It's not a leading question at all.  I

6  asked him if he ever experienced that.

7      JUDGE ESPOSITO:  Yeah, have you ever -- have you ever

8  encountered that, Mr. Jennison, things being left on the table

9  in the break room for, you know, days at a time?

10     THE WITNESS:  No.

11  BY MR. STANEVICH:

12  Q.   Josh, let's move on.  We've spent some time talking about

13  third parties, customer facing areas and the break room, but

14  I'd like you to -- I'd like to talk to you a little bit about

15  how employees may have engaged in activity in nonwork areas

16  that either run afoul of our cleanliness standards or our

17  solicitation policy.

18  A.   Right.

19  Q.   Can you think of some examples and just give us your over

20  -- start with giving us your overall philosophy here?

21  A.   Yeah, for sure.  Part of the best part about working for

22  Apple in a place like New York City is we attract an incredibly

23  diverse, talented, creative group of employees and, you know,

24  people come to New York to follow their dreams of being a

25  photographer, a model, and actor, a musician, a standup comic

1    and so our team, they participate in a ton of really

2    interesting, exciting activities outside of work that really is

3    their passion and often, you know, the team spends -- they

4    spend a lot of time with their colleagues at Apple and I think

5    often they want to share their -- you know, their

6    accomplishments and they want to invite their team to, you

7    know, come join and see these performances and so, you know, we

8    would -- and so I personally can think of a couple of examples

9    of where, you know, a team member wanted to share an event with

10   their larger team to, you know, gain support or to have, you

11   know, people kind of be there to cheer them on in the audience.

12        And so, you know, I can think of instances where, you

13   know, somebody was a standup comic and they, you know, had

14   booked their first comedy show at a comedy club in New York

15   City and, you know, they have postcards that were printed up

16   for that event and, you know, they left those on the table,

17   presumably with the hope that if somebody was on a break or at

18   the end of their shift, you know, they would grab a postcard

19   and would choose to join them, you know, in that event.

20        I can also think of a specific example where one of our

21   team members is an opera singer and he had moved to New York

22   City with -- this is funny, like $10 to his name and had found

23   himself -- he got his first big job performing in Brooklyn and

24   he was excited to invite his colleagues to come see his

25   performance.

1      And in that instance, you know, I had a conversation with

2  the employee like first off saying, you know, this is exciting.

3  Congratulations, but it's not okay to leave, you know, flyers

4  sitting around the break room for folks to see and to pick up.

5  And in both of those instances it was -- there was two things.

6      Really, you know, the first piece is it was -- it didn't

7  align with our non solicitation policy and the other piece is,

8  you know, leaving stacks of postcards and brochures et cetera,

9  passively on the break room table.  It's clutter and the break

10  room table is too busy.  There is too many people that need to

11  use it and so we, you know, that was the other kind of -- the

12  kind of spirit behind removing that is it just -- we're didn't

13  have space for it.

14      The break room is too challenging and it looked cluttered.

15  So those were I think in my mind the two reasons why, you know,

16  I would choose to address or I chose to address those two

17  instances.

18  Q.    Josh, you were away for most of 2001 and returned --

19  sorry, January 2021 and you returned in -- strike that.  You

20  were away for most of the year for 2021, correct?

21  A.    Yes.

22  Q.    And you returned to the store in January 2022; is that

23  right?

24  A.    Yes.

25  Q.    And just remind us again when you left the store?

1  A.   My last day in store before I transitioned into my new

2  role was during the first week of April 2022.

3  Q.   Okay.  In that time period when you came back to the store

4  January and left in April, how did the store leadership apply

5  to solicitation and cleanliness standards that we've discussed

6  today as compared to when you were there, 2016 through 2020.

7  Was it different?  Did anything change at all?

8       MS. WEINREB:  Objection.  He wasn't there.

9       MR. STANEVICH:  No, I'm comparing --

10      MS. WEINREB:  You're asking him --

11      MR. STANEVICH:  -- I'm comparing the times that he was

12 there, Ruth, not the time that he was not there.

13      MS. WEINREB:  Yes.

14      MR. STANEVICH:  I'm asking him the 2022 period he was

15 there, how did it compare to when he was there in 2016?

16      MS. WEINREB:  Before?  Okay.  Before he left?

17      JUDGE ESPOSITO:  Go ahead.

18      THE WITNESS:  Perfect.  So when I returned back to the

19 store in January 2022, I didn't notice any difference in terms

20 of cleanliness standards, organization.  There was no

21 difference in terms of how the solicitation policy was being

22 applied.  It appeared the same to me as it had when I had left

23 the store that previous December.

24      JUDGE ESPOSITO:  Thank you, Josh.  I have nothing further.

25      MS. WEINREB:  I'd like some time to prepare for cross.

1    JUDGE ESPOSITO:  Okay.  How much time do you need, Ms.
2   Weinreb?
3    MS. WEINREB:  Fifteen minutes.
4    JUDGE ESPOSITO:  All right.  Let's come back at quarter
5   past 11.
6    MS. WEINREB:  Thank you.
7    MR. BOLLEPALLI:  Thank you.
8    (Off the record)
9    THE COURT REPORTER:  We're back on the record.
10    JUDGE ESPOSITO:  Ms. Weinreb, cross examination?
11    MS. WEINREB:  Yes.  Thank you, Your Honor.
12                      CROSS-EXAMINATION
13   BY MS. WEINREB:
14   Q.   Hi, Mr. Jennison.  As I mentioned earlier I'm Ruth
15   Weinreb, counsel for the General Counsel.  I'm just going to
16   ask you some questions about your testimony.  First of all,
17   where DO you currently work?  You've already given what your
18   title is but where do you currently work?
19   A.   Yeah.  So I work in -- I work in New York City and I work
20   out of a set of Apple offices that are in Midtown Manhattan.
21   Q.   And when you were the flagship leader for the World Trade
22   Center store, did you work at the store itself?
23   A.   Yes, that's right.
24   Q.   Now, you testified about the organizational chart so to
25   speak at the World Trade Center store and I would just like to

1  go through these titles and people who were there at the end of
2  your term in April 2022.  So you mentioned there was two store
3  leaders and you mentioned Paul Distasio, I believe, correct?
4  A.    Yes, that's right.  Distasio.
5  Q.    And Waleed Abdullah?
6  A.    Yes.  That's right.
7  Q.    And when did Paul become a store leader?
8  A.    He was promoted -- that's a great question.  He was
9  promoted to store leader I believe in 2017.  I can't remember
10  the exact date, but I believe it was 2017.
11  Q.    Okay.  And what about Waleed?
12  A.    Waleed was -- he was already a store leader but he was
13  working at Apple Fifth Avenue.  When he came over to join us at
14  Apple World Trade Center he moved over laterally as a store
15  leader.  So he was an existing store leader at the time.
16  Q.    And when was that?
17  A.    That would have been the summer of 2018.
18  Q.    And when you left in April, they were still store leaders?
19  A.    Yes.
20  Q.    When you left in April, did someone become the flagship
21  leader?
22  A.    Yes.
23  Q.    And who was that?
24  A.    Her name was Mona Patel.
25  Q.    And when did she move into that position?

1    A.    She moved into that position during the first week of

2    April.  So she and I overlapped.  Just as I was leaving she was

3    coming on board.  So we had time together.

4    Q.    And so -- okay, so Paul was a store leader at the World

5    Trade Center store since 2017?

6    A.    Yes.

7    Q.    And do you know if he currently is?

8    A.    Yes, he is currently the store leader, one of the store

9    leaders.

10   Q.    And Waleed has been a store manager, a store leader since

11   the summer of 2018 and he currently is?

12   A.    Yes.

13   Q.    Okay.  Now, you mentioned there are three senior managers

14   on the selling side and three senior managers on the purchase

15   side?

16   A.    Yes.

17   Q.    When you left in April, early April 2022, who were the

18   senior managers for the selling side?

19   A.    That would be Rachel Goldman, Yanell Brown and at that

20   time I think we had an open -- we had an opening.  We had an

21   open position that we had not yet hired.  So we had an open

22   senior manager role.

23   Q.    Okay.  And how long had Rachel Goldman, is that her last

24   name, Goldman?

25   A.    Yes.  Goldman.  Yes.

1   Q.   How long had Rachel Goldman been the senior manager, since
2   when?
3   A.   We hired her.  She was new to Apple.  I'm going to guess
4   probably second half of 2018 would be my guess, if I remember
5   correctly.
6   Q.   And Yanell Brown, how long had he been a senior manager
7   before April?
8   A.   Yeah.  So Yanell had been a senior manager probably --
9   again, this is just ballpark, probably early 2019.  Late 2018,
10  early 2019.
11  Q.   And Yanell Brown is still a senior manager, correct?
12  A.   No, he is no longer with Apple.
13  Q.   Oh, he left?
14  A.   Yeah, he left Apple -- yeah, he left Apple within the last
15  6 to 8 weeks or the last couple of months.
16  Q.   But in May 2022 he was still the senior manager?
17  A.   Yes.
18  Q.   Who were the three senior managers on the after purchase
19  side?
20  A.   So there was Jorge Romero, Catherine Marshall and I'm
21  trying to think who the sixth was.  It's totally a space in my
22  mind right now.
23  Q.   Okay.  So there's another person?
24  A.   Yes.
25  Q.   And how long was Jorge senior manager?

1  A.    Jorge was senior manager.  He was promoted to senior

2  manager I think probably around early 2017.

3  Q.    And Catherine?

4  A.    She was -- she was a more recent promotion.  I believe she

5  was promoted probably end of 2019.  And again, these are just -

6  - I don't have the exact dates.  This is just ballpark

7  recollection if I'm -- if I'm putting my best -- my best guess

8  forward.

9  Q.    And is Jorge still the senior manager?

10 A.    He's still a senior manager.  I don't know today if he is

11 still overseeing the Genius Bar or if he has moved, but I do

12 know he is still a senior manager there.

13 Q.    At the World Trade Center store?

14 A.    Yes.

15 Q.    Okay.  And what about the manager on the selling side?

16 Who were -- who were the managers at the time you left in April

17 2022?

18 A.    Let me think.  There was Arianna Meli.  There was Aaron --

19 I'm blanking has last name.

20 Q.    Sidrick?

21 A.    Yes, Aaron Sidrick.  There was Ryan Radachel.  I'm trying

22 to think.  The managers are at times moved between different

23 departments and so I'm trying to remember who was -- who was

24 part of which team back then, you know, when I was leaving.  So

25 those are the ones I know for sure were part of the sales --

1  were part of the sales team.

2  Q.   And what about after purchase supply?  Who were the

3  managers in April 2022?

4  A.   Yeah.  So there was Matt Moya.  There was Tyler Perroni

5  (phonetic).  Let me think here, Dan Auerbach.  There was

6  Priscilla.  I'm trying to remember her last name, but

7  Priscilla.  And there may be one or two others, but at the

8  moment I can't remember exactly who it was.

9  Q.   Okay.  So how long -- and Aaron Sidrick is still at the

10  World Trade Center store?

11  A.   As far as -- as far as you know, yes.

12  Q.   And how long had he been a manager, has he been a manager

13  there?

14  A.   Again, this is just ballpark.  I believe he joined us

15  probably in the late 2018.

16  Q.   As a manager?

17  A.   As a manager, yes.

18  Q.   Okay.  And what about Matt Moya?  How long had he been a

19  manager?

20  A.   Yeah, so he joined us before the store opened.  So he

21  joined Apple in June 2016 and so he's been a manager for the

22  entire time that the store has been open.

23  Q.   And Tyler Perroni?  How long has he been a manager?

24  A.   Tyler was a manager starting in 2021, at some point.

25  Q.   Okay.  And Matt Moya is still there, correct?

1  A.   As far as I know, yes.

2  Q.   And Tyler Perroni?

3  A.   Yes.

4  Q.   And you mentioned that you have taken annual leadership

5  classes?

6  A.   No.  The leadership classes that are kind of hosted either

7  in person or virtually, they're offered annually, but we're not

8  required to attend them annually.  So we -- so I attended that

9  over the course of my time as a flagship leader or store leader

10 in New York, I can remember to specific instances where I

11 attended that training or leadership class as you call it.

12 Q.   Okay.  But these classes aren't required for everyone?

13 A.   They're not required for the front line hourly employees,

14 though we do attempt to have every leader attend the class at

15 some point.

16 Q.   Okay.  So is Waleed required to attend these classes?

17 A.   He would be encouraged to, yes.  He would be encouraged to

18 attend one of these classes.

19 Q.   But you don't know if he has?

20 A.   I don't know.

21 Q.   Yeah.  And you don't know if Tyler did?

22 A.   I don't know.

23 Q.   And you don't know if Matt Moya did?

24 A.   No.

25 Q.   And you don't know if Aaron Sidrick did?

1  A.    No.

2  Q.    And you don't know if Paul Distasio did?

3  A.    I don't remember that.

4  Q.    I hope I have this right now.  Yeah, Distasio, right?

5  A.    That's right.

6  Q.    All right.  So you don't know?  So I would like to see

7  Respondent's 22, please, on the screen.  I don't know whether

8  the court reporter can put that up or I don't know, Jason, if

9  you have it readily available.  I don't know.  I don't have it

10 on my SharePoint.

11       MR. STANEVICH:  I emailed it to you last night, but I'm

12 more than happy to put it up for the sake of convenience.

13       MS. WEINREB:  Okay.

14       MR. STANEVICH:  Did you say 22?

15       MS. WEINREB:  Yes, 22, please.

16       MR. STANEVICH:  Okay.  One second.

17 BY MS. WEINTREB:

18 Q.    So you saw this before, right, Mr. Jennison, what's

19 Respondent's 22 on the screen?

20 A.    Yes.

21 Q.    So I hate to go through it again because, you know, Jason

22 did go through with it and I'm sure it's accurate, but I don't

23 think the transcript has where Jason's mouse was.  There was no

24 -- at least as far as I heard the testimony, it wasn't clear.

25 I don't think the transcript would accurately reflect what you

1  were looking at, so I would like to add more detail to this so
2  we know exactly what we're looking at in Respondent's 22.  Oh,
3  I don't have -- so I would like you to look at the screen and
4  look above where you see the red mark, where the red marks are?
5  A.   Yes.
6  Q.   And inside the red mark there is a very thin rectangle,
7  correct?
8  A.   Yes.
9  Q.   And is that the whiteboard?
10 A.   The video -- I have audio, but the video just cut out.
11 Let me just really quickly see if I can get you back on the
12 screen so I can see.
13      JUDGE ESPOSITO:  You're not able to see any of us, Mr.
14 Jennison?
15      THE WITNESS:  No.  It's like the zoom window for me just
16 closed.
17      JUDGE ESPOSITO:  Mr. Stanevich, do you want to go off the
18 record and take a look at this?
19      MR. STANEVICH:  Yes, if we can go off the record for a few
20 minutes.
21      JUDGE ESPOSITO:  All right.  Let's go off the record.
22      (Off the record)
23      THE COURT REPORTER:  We're back on the record.
24      JUDGE ESPOSITO:  Thank you.  Go ahead, Ms. Weinreb.
25 BY MS. WEINREB:

1    Q.    Mr. Jennison, if you could look inside the -- can you see

2    the document?  You're okay?

3    A.    Yes.

4    Q.    Okay.  So that's Respondent's 22 there -- do you see a

5    broken up rectangle in red marks, correct?

6    A.    Yes.

7    Q.    And inside that there is a gray area and then along there

8    is a thin little rectangle area.  That's the whiteboard?

9    A.    Yes.

10    Q.    Okay.  And across from that, going to the top of the page

11    there's an entrance way?

12    A.    Yes.

13    Q.    And in that entranceway in the top of the page, what area

14    is that?

15    A.    That entranceway leads to the office, so there's -- in

16    that entranceway there's a couple of tables that have chairs

17    and there is a small bank of lockers, and then you have the

18    office.

19    Q.    So if you make a left out of the break room you go towards

20    the area of the manager's office?

21    A.    Yes.

22    Q.    Okay.  And if you look at Respondent's 22, this document,

23    if you walk out of the break room, which you've identified the

24    break room area with all of the tables and chairs, that big

25    space, correct?

1  A.   Yes.

2  Q.   Okay.  So if you walk out of that area where the

3  whiteboard would be on your right as you just described in that

4  rectangle, and if you go straight where do you go?

5  A.   So if you walk out of the break room and go straight you

6  will head into a little alcove where the employee restrooms are

7  located.  There is also a small janitorial closet and there are

8  three or four vending machines across from the bathrooms.

9  Q.   And in front of that rectangle on the other side, not the

10  side where it leads you to the manager's office, but right

11  against that wall, are those stairs?  What's that?

12  A.   So that is an outline of a staircase that is for the

13  customers.  So it's an internal staircase where customers and

14  team can go from the first floor of the store up to the

15  balcony.

16  Q.   Okay.  But those stairs don't lead in -- you don't walk

17  through the whiteboard, right?  You can't get through it?

18  A.   Yes, that is correct.  Those stairs are representing a

19  staircase that's not attached to the break room.  That just

20  connects to the first and second floor.

21  Q.   Okay.  And to the right of that red rectangle, broken up

22  rectangle, as you identified that little semi-circle on the

23  right side of the page?

24  A.   Yes.

25  Q.   And that's in entranceway, correct?

1    A.    Yes.

2    Q.    And so if you go out not towards the manager office but

3    the other way going towards the bottom of the page, where are

4    you heading?

5    A.    You will be -- it will take you out to the customer facing

6    sales floor.

7    Q.    Okay.  So I see there's some beige looking items here on

8    the lower right side.

9    A.    Yes.

10    Q.    What would that be?

11    A.    So that represents one of the tables that we have in the

12    store where we stage and merchandise product for customers to

13    look at and to test and to play with.

14    Q.    All right.  So customers don't walk through the door where

15    the rectangle, that red rectangle is.  Customers don't walk

16    through that door?

17    A.    That is correct.

18    Q.    So the iPhone Isaacs as you called them, the little tech

19    device that your team members use, they clock in and out on

20    that device?

21    A.    Yes.

22    Q.    And they take them out of the customer area and when they

23    take orders for customers with it?

24    A.    Yes.

25    Q.    And they get payment from customers with it?

1   A.    Yes.

2   Q.    And that would be dealing with the customers, correct?

3   A.    Yes.

4        JUDGE ESPOSITO:  Can you just spell that for the record,

5   Mr. Jennison?  Isaac?  Is that like the Old Testament prophet

6   or what --

7        THE WITNESS:  That's exactly.  Yes, it's i-s-a-a-c.

8        JUDGE ESPOSITO:  Okay.

9        THE WITNESS:  Like Isaac Newton.

10  BY MS. WEINREB:

11  Q.    And what are the store hours for the World Trade Center

12  location?

13  A.    I don't know what they are currently, but when I was the

14  flagship leader there we would open at -- during the week we

15  would open at 9:00 a.m. and remain open until 9:00 p.m. and

16  then the hours would be adjusted a little bit on the weekends.

17  We would open an hour later on Saturday and close -- I think we

18  closed at 9:00 and it was similar for Sunday.

19  Q.    And what kind of shift did you have at the time you left

20  in April 2022 --

21  A.    There was a variety -- there was a variety of shifts.  So

22  the team, you know, we have both full-time and part-time

23  positions.  So we would have team members that worked, you

24  know, would be scheduled for and would work a full 40 hours a

25  week and then we had other team members that were part-time

1   that would work anywhere between 18 to 25, 26 hours a week.

2       And so the shifts -- you know, the shift's times would

3   vary based on the day and based on the employee and their

4   availability.  But generally, there would be a team that would

5   come in together the first thing in the morning, like an

6   operations team to help get the store staged and prepared to

7   open.

8       There would be another wave of team members who would come

9   in to be ready for when the doors opened to the customers.

10  There might be a late morning shift so that the folks that came

11  in early in the day would be able to take their breaks and

12  their lunch and there would be enough coverage on the floor to

13  support that.  And then as the day went on there would be a

14  number of additional start times for employees to come in.  So

15  the shift times would never exceed eight hours and they would

16  never be below four hours in terms of the length, but they

17  would vary somewhere between those two.

18  Q.   Okay.  And what about breaks?  How did you work out

19  breaks?  How many breaks were given by the time you left in

20  April 2022?

21  A.   Yeah.  So the breaks are all, you know, dictated by the

22  length of shift and, you know, what the break policy is for New

23  York State and for New York City.  So in the example of

24  somebody who is a full-time employee who would be working a

25  standard eight hour shift, you know, they would typically

1 receive two 15 minute breaks where it would be paid time but

2 they would have time off the floor to go get a cup of coffee

3 or, you know, otherwise relax and then they would also be

4 provided a one hour unpaid lunch break kind of as standard.

5      Depending on the length of additional shifts, employees

6 may have a lunch and a single 15 minute break or they might

7 have just a 15 minute break.  So it all depended on when they

8 were working and how long their shift was.

9 Q.   So whether you were full-time or part-time you were still

10 entitled to breaks and lunch?

11 A.   In the instances where you had a four hour shift you might

12 not be entitled to a lunch.  You might be entitled to just a

13 break or two but in essence, yes, anybody who is working any

14 length of shift would have some combination of break and/or

15 lunch.

16 Q.   So during -- during the day when the store was open from

17 9:00 a.m. to 9:00 p.m., employees could have breaks because you

18 had staggered shifts.  Employees could have breaks and lunch at

19 various times during that entire period?

20 A.   Yes.

21 Q.   Correct?

22 A.   Yes.

23      MS. WEINREB:  No further questions.

24      JUDGE ESPOSITO:  Okay.  Mr. Bollepalli, any cross

25 examination?

1    MR. BOLLEPALLI:  Yes.  Just very briefly.

2    JUDGE ESPOSITO:  Go ahead.

3  EXAMINATION BY MR. BOLLEPALLI:

4  Q.   Mr. Jennison, earlier you were testifying about I believe

5  Popeye's flyers and maybe Sentry 21 flyers.  Do you recall?

6  A.   Yes.

7  Q.   And those items you had personally removed?

8  A.   Yes.

9  Q.   And what did you do after you removed them?

10  A.   I threw them away.

11  Q.   And the break room that we saw in Respondent Exhibit 22,

12  are there garbage cans in that break room, to your knowledge?

13  A.   Yes.

14  Q.   What about recycle bins, like paper recycling?

15  A.   Yes.

16  Q.   So in some of the examples that you gave regarding -- I

17  think one of them was a stack of Chinese restaurant menus, did

18  you also just throw them in the trash?

19  A.   Yes.

20  Q.   Did you shred any of these materials that you stated you

21  found and removed over the years?

22  A.   No.

23  Q.   And also you testified I think one of the Apple employees

24  is an opera singer.  Do you recall?

25  A.   Yes.

1   Q.   And so in that instance I believe it was your testimony

2   that the opera singer had left cards and maybe business cards

3   on the break room table?

4   A.   Yes.

5   Q.   And that would be the first floor break room?

6   A.   Yes.

7   Q.   And so you had actually personally seen the cards there?

8   A.   Yes.

9   Q.   And when you saw them, what did you do?

10  A.   I threw them away.

11  Q.   Okay.  And then did you then go and speak to the employee?

12  A.   I did.

13  Q.   And what did you advise that employee?

14  A.   I first off connected with them.  I said congratulations,

15  this is really exciting, but I asked that we not leave

16  materials inviting team members to an event to sit on the break

17  room table because it violates our solicitation policy and it

18  also created clutter.

19  Q.   So in that instance you approached the employee.  The

20  employee didn't approach you?

21  A.   Right.  And to my recollection, the employee was still in

22  the break room, so it was easy for me to turn to him and have

23  that conversation.

24  Q.   So are you saying that if the employee wasn't in the break

25  room you wouldn't have had that conversation?

1    A.    It depends.  It depends.  If they were available I may --

2    if they were in the store at that moment I may talk to them but

3    it wouldn't be necessarily like a required component of kind of

4    how I would enforce the -- you know, the standard of the

5    policy.  Not leaving items stacked up on the break room table.

6    Q.    And so it was in Respondent Exhibit 22, but you recall the

7    whiteboard, right, and the schematic?

8    A.    Yes.

9    Q.    So if your back is to the whiteboard then looking forward

10   is the hallway to the manager's office?

11   A.    Yes.

12   Q.    And to the right I think there's some tables there and

13   chairs?

14   A.    Yes.

15   Q.    And that's an area where employees also take their breaks?

16   A.    Yes. Employees would at times take their breaks there and

17   that's --

18   Q.    Either a 15 minute break or the lunch break?

19   A.    Sure.  Yes.

20   Q.    And there is also employee lockers located right next to

21   the tables?

22   A.    Yes.

23   Q.    And so I just want to make sure I'm clear.  So you go down

24   that hallway and then you get to the manager's office, correct?

25   A.    Yes.

1    Q.    And there's a sign that says manager's office?

2    A.    I believe it says manager's office.  It might simply say

3    office.

4    Q.    Are employees permitted to go in there?

5    A.    Absolutely.

6    Q.    And do the store leaders have access to the surveillance

7    tapes on any given day?

8    A.    Yes and no.  So store leaders have -- I think have the

9    possibility of having access to the video system.  In terms of

10    do they know how to use it, do they have the skills to do it, I

11    think that depends on the store leader, but if they were to

12    request access they could have access to the camera system.

13          MR. STANEVICH:  There's just one point that I would like

14    to mention.  We've heard characterization of surveillance

15    tapes.  I just want to be clear that these are not surveillance

16    tapes.

17          MR. BOLLEPALLI:  Yeah, I apologize.  The video footage of

18    the break room and the sales force.  I have no more questions.

19          MR. STANEVICH:  I may have two questions, follow-up

20    questions for the witness and I if I could just have until

21    11:50?

22          JUDGE ESPOSITO:  Okay.  Let's go off the record.  We'll

23    come back at 10 until 12.

24          (Off the record)

25          THE COURT REPORTER:  We're back on the record.

1       JUDGE ESPOSITO:  Mr. Stanevich?

2                       REDIRECT EXAMINATION

3  BY MR. STANEVICH:

4  Q.   Josh, just a quick follow-up.  There's been some testimony

5  about business conduct training and manager training, other

6  transactions.  I just want you to focus on the business conduct

7  training.  Is that a required training?

8  A.   Yes.

9  Q.   And how often is it required of store leaders?

10 A.   Every year.

11 Q.   And do employees also have the same requirement to attend?

12 A.   They do have the same requirement to attend.  I'm not sure

13 if it's the exact same training that a manager or a store

14 leader would we receive, but everybody does complete a

15 compliance training annually.

16      MR. STANEVICH:  Thank you.  No further questions, Josh.

17      JUDGE ESPOSITO:  Mr. Weinreb, any additional cross

18 examination?

19      MS. WEINREB:  Yes.  I would just like to ask just a few

20 questions.

21      JUDGE ESPOSITO:  Okay.

22                       RECROSS EXAMINATION

23 BY MS. WEINREB:

24 Q.   With the business conduct training, do you know for a fact

25 whether the store managers you identified earlier, Paul or

1   Waleed took that training every year?

2   A.   Yes.

3   Q.   You know for a fact?

4   A.   Yes.  As part of the business conduct training there is an

5   active tracking of who has gone in and completed the training,

6   and if an employee who reports into me does not complete the

7   training I think within two weeks of the training being

8   assigned, I receive regular email notifications letting me know

9   that the employee needs to complete the training and at some

10  point I believe if it doesn't get addressed then it gets

11  escalated to my boss and above.

12      So again, that's how I as a leader know and again, that

13  people have completed and taken that training.

14  Q.   So you're confident that Waleed took it, yes?

15  A.   Yes.

16  Q.   And Paul?

17  A.   Yes.

18  Q.   And Moya?

19  A.   Yes.

20  Q.   And Jorge?

21  A.   Yes.

22  Q.   And do you know, aside from your attorney, Jason

23  Stanevich, do you know another person by the name of Jason in

24  the store?

25  A.   I mean there is a lot of employees.  I mean --

1   Q.   Well, managers I mean.  Managers?

2   A.   Another manager named Jason?  No.

3   Q.   Or another store leader?

4   A.   No.

5   Q.   Or someone who you reported to, maybe someone in

6   leadership, another Jason?

7   A.   Yes.  So my boss at -- my boss at the time, his name is

8   Jason.

9   Q.   And what's his last name?

10  A.   Barlia.

11  Q.   How do you spell that?

12  A.   B-a-r-l-i-a.

13  Q.   And when you left in -- and what's his title?

14  A.   He would be what is called a market director?

15  Q.   Okay.  And was he there in April when you left?

16  A.   Yes.  He was the market director for the stores in New

17  York at that time.

18  Q.   Do you know if he was the market director of New York in

19  May 2022?

20  A.   Yes.

21       MR. STANEVICH:  Object to relevancy.  This is also outside

22  the scope of our redirect examination.

23       MS. WEINREB:  It was a few questions and it goes to

24  anticipated defenses.

25       JUDGE ESPOSITO:  Okay.  Is it --

1       MS. WEINREB:  And that's it.  I don't have any --

2       JUDGE ESPOSITO:  All right.  That's it?

3       MS. WEINREB:  Yes.

4       JUDGE ESPOSITO:  Okay.  Mr. Bollepalli, do you have any

5  additional cross examination?

6       MR. BOLLEPALLI:  I do not.

7       JUDGE ESPOSITO:  Okay.  Mr. Stanevich do you have any

8  additional redirect examination?

9       MR. STANEVICH:  I do not, Your Honor.

10       JUDGE ESPOSITO:  Okay.  All right.  Thank you very much,

11  Mr. Jennison.  You are excused.

12       THE WITNESS:  Awesome.  Thank you.

13       JUDGE ESPOSITO:  Let's go off the record.

14       (Off the record)

15       THE COURT REPORTER:  We are back on the record.

16       JUDGE ESPOSITO:  Mr. Stanevich, would you like to call

17  Respondent's next witness?

18       JUDGE ESPOSITO:  Yes.  Respondent would call Yanell Brown.

19  Mr. Brown should be in the waiting room.

20       MS. DAVISON:  It will be just be one second.

21       JUDGE ESPOSITO:  Sure.  Thank you.  Hello, Mr. Brown.

22       THE WITNESS:  Hi.  How are you?

23  Whereupon,

24                        YANELL BROWN

25  was called as a witness by and having been first duly sworn,

1  was examined and testified on his oath, as follows:

2       JUDGE ESPOSITO:  Thank you, sir.  You can put your hand

3  down.  Can you please state and spell your full name for the

4  record?

5       THE WITNESS:  Yes.  It's Yanell Brown, y-a-n-e-l-l and

6  last name b-r-o-w-n.

7       JUDGE ESPOSITO:  Does anyone have voir dire for Mr. Brown

8  regarding his location and surroundings?

9       MS. WEINREB:  Yes.  I would just like to confirm where he

10 is.

11      JUDGE ESPOSITO:  Okay.  Go ahead.

12      MS. WEINREB:  Thank you.

13                          VOIR DIRE

14 BY MS. WEINREB:

15 Q.  Hi, Mr. Brown.  I'm Ruth Weinreb.  I'm counsel for the

16 General Counsel and I just want to ask you where you are seated

17 today?  Right now?

18 A.  I am in a conference room at the -- I don't know what the

19 law offices are officially named, but 900 Third Avenue.

20 Q.  And is anyone with you?

21 A.  No, ma'am.

22 Q.  Is the door open or closed?

23 A.  It is closed.

24 Q.  And do you have any papers in front of you?

25 A.  No.  Nothing in front of me.

1    Q.    Okay.  Thank you.

2    A.    No problem.

3        JUDGE ESPOSITO:  All right.  Mr. Brown, there's just a few

4    things I want to review with you before Mr. Stanevich begins to

5    ask you questions.

6        THE WITNESS:  Okay.

7        JUDGE ESPOSITO:  First, it's very important that you

8    listen carefully to each question before answering and do not

9    start speaking or answering until you're sure that the question

10   is finished.  The court reporter is recording the hearing and

11   can't have more than one person speaking at a time or

12   everyone's remarks will not be transcribed correctly.

13       Second, if somebody objects to any attorney questions,

14   don't answer it.  Stop and let me rule on the objection before

15   you answer, again to make sure that there's not more than one

16   person talking at the same time.  Third, let us know

17   immediately if you are having a problem with your audio or

18   video.  If you are having a problem, feel free to interrupt

19   whatever else is going on.

20       Tell us you're having problems or wave your hand in front

21   of the camera where we can see it.  Finally, if you lose audio

22   or video completely, check your power and Internet connection,

23   reboot or reconnect or reboot the device if necessary and then

24   try again to join the hearing using the same link that was

25   provided previously, or try to join or contact us with a backup

1   device and you will be assisted, okay?

2        THE WITNESS:  Okay.

3        JUDGE ESPOSITO:  Thank you, sir.  Go ahead, Mr. Stanevich.

4                        DIRECT EXAMINATION

5   BY MR. STANEVICH:

6   Q.   Good afternoon, Yanell.  How are you today?

7   A.   I'm doing well.  How are you?

8   Q.   Good.  Thank you.  And I know it's around lunch time so

9   I'll do my best to get you out of here as quickly as possible

10  subject to Ms. Weinreb's questions.  Was there a time you

11  worked for Apple?

12  A.   Yes.

13  Q.   Okay.  And approximately when did you start with Apple?

14  A.   I started in August 2013.

15  Q.   Okay.  And did there come a time when you left Apple?

16  A.   I did.

17  Q.   And approximately when was that, sir?

18  A.   That was this past November 2022.

19  Q.   All right.  And so just to be clear, you are no longer

20  employed by Apple; is that right?

21  A.   That is correct.

22  Q.   Okay.  Where did you start when you began your employment

23  with Apple?

24  A.   I started at the Upper West Side location.

25  Q.   Okay.  And what different positions did you hold at the

1   Upper West Side location?

2   A.   I was a part-time specialist.   Transitioned to full-time

3   and then I was in the role of expert and then moved on to

4   becoming a manager all the while at Upper West Side.

5   Q.   Okay.   And approximately how many years were you in a

6   managerial position at the Upper West Side?

7   A.   At the Upper West Side, about a year.

8   Q.   Okay.   And what were your responsibilities as a manager at

9   that particular store location?

10   A.   I was checking with team, team engagement.   I was a

11   product zone, so sales manager, so handled, you know, all

12   customer relations, customer escalations, help promote and

13   drive sales and also supported the Genius Bar as well as a

14   general employee, kind of check and do support.

15   Q.   And did there come a time where you moved from the Upper

16   West Side to a different store location?

17   A.   Yes.   I actually opened the World Trade Center location

18   and I think that was 2016.

19   Q.   And what does it mean to open a location?

20   A.   So I was part of the original crew of managers, so NSO is

21   what we used to call it, but new store openings, I was a part

22   of the team that really built the walls and shelves in the new

23   location.

24   Q.   Okay.   And can you just kind of explain your -- you know,

25   your day to day role and the different types of things that you

1  were involved with as a manager to open the store in August

2  2016?

3  A.    Yeah.  So overall training, hiring, just making sure we

4  kind of put together like practices of like what we wanted the

5  store to look like.  I was one of the team, hey, how do we

6  support the team, how do we support the employees and then

7  obviously just like how do we get product from the store, what

8  should our customer journey look like.

9       So that was a lot of what, you know, how do we engage with

10  the team once they get here.  So a lot of that was what was

11  happening prior to opening.

12  Q.    Okay.  And when you started with the store your position

13  was manager?

14  A.    Yes.  I was a manager for that location as well.

15  Q.    Okay.  And did there come a time where you changed

16  positions?

17  A.    Yes.  I became a senior manager in May of 2020.

18  Q.    Okay.  And were you still at the World Trade Center store

19  at that time?

20  A.    Yes, sir.

21  Q.    Okay.  And did you remain at the World Trade Center store

22  up until the time you left Apple several weeks ago?

23  A.    Yes.

24  Q.    Okay.  Are you familiar with the company solicitation

25  policy?

1  A.   Yes.

2  Q.   And do you know how are you familiar with that policy?

3  A.   Generally it's just a mail solicitation policy that we

4  have Apple.  You know, we did various like conduct training

5  that kind of talk related and that was general practice for all

6  the locations.

7  Q.   Okay.  Let me just unpack that a little bit.  When you say

8  you did conduct training, that's business conduct training,

9  correct?

10 A.   Yes.

11 Q.   And is that a requirement of managers?

12 A.   Yes.  It's a requirement of everybody, specifically

13 managers have to make sure we're up to date.

14 Q.   And how often do you have to go through that training?

15 A.   It would be 12 to 18 months.

16 Q.   Okay.  Now, while you were at the Upper West Side, did you

17 have opportunity to apply the solicitation policy or any

18 cleanliness policy of Apple?

19     MS. WEINREB:  Wait.  Excuse me, Your Honor.  I'm just

20 hearing a lot of feedback.  There's some clicking noise and

21 feedback.  I don't know if anyone else hears that.

22     JUDGE ESPOSITO:  I was hearing something that sounded like

23 whispering.  Is there a non -- is there a non-participant even

24 muted?  Is there an observer or someone who is not muted.

25 Everyone please make sure that you are muted.  Okay.  Let's

1  continue and we'll see if it comes up again.  Go ahead, Mr.

2  Stanevich.

3       MR. STANEVICH:  Thank you.

4  BY MR. STANEVICH:

5  Q.  You know my question to you was when you were at the Upper

6  West Side, did you have occasion to apply Apple's non

7  solicitation policy?

8  A.  Yeah, it definitely came up a couple of times just in

9  passing.  I know like one of the times where we really big like

10 sneaker culture at Apple so we definitely have had employees

11 trying to promote their personal businesses and things for

12 which we wouldn't allow and we would generally talk to them

13 about it aside from like their normal like flyers and things

14 that get, you know, dropped off or posted at the stores.

15 Q.  And when there was outside flyers and things posted at the

16 store, how did you respond at the Upper West Side?

17 A.  Generally we would just throw out whatever it was that

18 would come in and if it was something -- sometimes the person

19 would come in and ask floor managers to speak directly to just

20 kind of see if they could leave these items here.  We would

21 just enforce the policy at that time and let them know that it

22 wasn't something they could do.

23 Q.  Okay.  Now, moving over to the World Trade Center, you

24 were there from 2016 when the store opened until late 2022.

25 Did you have occasions to apply this solicitation policy at the

1  World Trade Center location?

2  A.    Yes.

3  Q.    Okay.  And could you think of specific examples of outside

4  material that you may have observed in the workplace?

5  A.    Yeah.  It was definitely done a bunch of times.  I mean

6  like we've had coupons from KFC.  We've had coffee coupons

7  dropped off.  We've had, you know, a lot of brands in that

8  right, especially because the location was so new.

9       A lot of businesses in the area would generally try to

10 promote through us, so that was stuff that we would usually get

11 rid of and throw away and then we had a couple of employee

12 situations as well which they would try to either promote

13 something or leave stuff on the board and we would, you know,

14 generally have to remove it and have that conversation.

15 Q.    And we'll come back to employee specific examples in a

16 moment, but for the examples you mentioned about restaurant

17 coupons and other handouts, would that material ever find its

18 way to the employee break room?

19 A.    Yeah, definitely.  It would end up on the table somewhere,

20 whether someone might pass it to someone or it just kind of got

21 left there somehow.  We would do a sweep, come around and throw

22 that stuff out.

23 Q.    Okay.  And can you think of any specific coupons or

24 handouts you may have seen on the table related to outside, you

25 know, organizations?

1    A.    Yeah, we used to get a lot of like KFC because they were

2    opening up in our area.  So KFC and a lot of like coffee

3    coupons and things would be left there so we would throw those

4    out.  I think Matteo was a brand that used to do it pretty

5    often.

6    Q.    And what is Matteo?

7    A.    Just an espresso bar coffee place that's in the Wilson

8    Center.

9    Q.    And those are examples of coupons or handouts you've seen

10   personally in the break room?

11   A.    Yes.

12   Q.    And you personally have removed them?

13   A.    Yes.

14   Q.    Okay.  Now, I would like to ask you if you, you know,

15   applied this policy to employees specifically while at the

16   World Trade Center.  Can you, you know, think of any particular

17   examples and then we'll walk through those examples?

18   A.    Yeah.  I would say I probably sent out the most, like

19   there was an employee named Naomi who a couple of years ago who

20   was a singer and a couple of years ago had a show and was

21   trying to, you know, drum up support and she had wanted to like

22   post her flyers and things to have the team members come to so

23   we had to explain to her that wasn't something that could

24   happen and have her like remove it from the floor and then we

25   had another employee.

1        I think this one was actually earlier last year who was

2    like going away and leaving the company which was something we

3    celebrated.  We usually do like a clap out as they leave, but

4    he was trying to do like a going away and put together like a

5    flyer with his face on it and all of this to try to promote,

6    just like hang out essentially for the team after he left which

7    I know I had to also remove and have that conversation with him

8    about it.

9    Q.    Okay.  So let's just quickly go through those two

10   examples.  The first person I believe involved the whiteboard,

11   is that correct?

12   A.    Yes.

13   Q.    Okay.  And do you recall the name of the employee?

14   A.    It was Naomi.

15   Q.    Okay.  And what did Naomi seek to post on the whiteboard?

16   A.    She was trying to invite people to a -- she has like a

17   folk player, so folk music.  She sings and plays guitar.  She

18   was trying to get some of the team to come out to one of her

19   events that she was hosting or being a part of.

20   Q.    Okay.  And you observed this on the whiteboard?

21   A.    Yeah, so I saw it on the whiteboard.  Obviously she had

22   her name on it so I knew who it was.  So I had to remove it and

23   have that conversation with her just around the policy and, you

24   know, different ways that she could potentially talk to the

25   team if she wanted to about it, but like we can't have her, you

1 | know, post things or leave stuff around for it.

2 | Q.    Okay.  And why did you tell her that she couldn't use the

3 | whiteboard to post material but she could talk to her

4 | colleagues?  What was the difference in your mindset at the

5 | time?

6 | A.    Yeah, I mean it's definitely within your right to talk to

7 | the team and have that conversation one-on-one about, you know,

8 | them wanting to support you, but when it comes to like posting,

9 | that's where it does kind of again lean very much into that

10 | solicitation piece of it and we just didn't want to go through

11 | that road, so she was fine.  She understood, but that's

12 | generally the difference with us.

13 | Q.    Okay.  And did you also have -- the other example that

14 | involved -- what was the name of that employee?

15 | A.    It was Andrew Goebel.

16 | Q.    All right.  And walk us through specifically what you

17 | observed involving Mr. Goebel and the actions that you took in

18 | response?

19 | A.    Yeah, so at the time I was one of the operation seniors so

20 | it was like the break space and different like desks in like

21 | the back of the house area and I saw like these flyers with

22 | like his face on it and like a location.  So I picked up a few

23 | and realized there were a couple more.

24 |     So I grabbed them all and just kind of had a conversation

25 | with him about it and just explained like, hey, you know,

1  unfortunately we can't have you post these and, you know, I

2  understand you wanted to have them out and wanted people to

3  come and support but again, the same thing.  You can talk about

4  it and definitely talk to the team about it, but it's not

5  something I can have you kind of post around the store in

6  various areas.

7  Q.   And do you recall when approximately this was, do you

8  know?

9  A.   This was April, May-ish, somewhere in that timeframe.

10 Q.   Of which year?

11 A.   Of 2022.

12 Q.   Okay.  Now, did there come a time where you removed union

13 flyers from the break room table?

14 A.   Yes.

15 Q.   Okay.  And approximately when was that?

16 A.   That was probably -- I know it was warmer outside, so

17 probably May, June-ish, something in that timeframe.

18 Q.   Okay.  And just can you quickly explain to us why you

19 removed the flyers from the break room table?

20 A.   Yeah.  Honestly, it wasn't even something I realized what

21 they were.  Actually I just kind of saw them laying on the

22 table and was kind of throwing out things as I normally would

23 do and saw they were on the table.  Again, it kind of falls

24 into the same no solicitation policy as everything else so it

25 was something that, you know, I picked up and removed.

1    There was someone sitting near it like a seat or so away,

2   so just verify, like hey, is this yours?  You know, he had

3   headphones on, kind of shrugged and didn't know what it was so

4   I picked it up.  I saw what it was but either way, so it had to

5   be thrown out.  So then I went and threw it out.

6   Q.    So you mentioned you threw this out like you normally

7   throw out other things.  Why is it your practice to throw out

8   material that you come across in the workplace?

9   A.    One, it's just the cleanliness thing.  You know, when you

10  have 300 or so people sharing a space, it's a really tight

11  space and we want to make sure like we're cleaning up really

12  proactively and then again, you know, when it comes to flyers

13  and any sort of promotion of things, we would also throw those

14  things out generally anyway.

15  Q.    So you have worked at two different locations, the Upper

16  West Side and the World Trade Center.  Any difference in terms

17  of, you know, how you followed the solicitation policy or

18  cleanliness policies at those two locations?

19  A.    No.  It was the same policy, same expectations, just keep

20  -- you know, keep the space tidy.  Again, you've got a lot of

21  Apple employees under one roof so generally the same protocol

22  in both places.

23  Q.    Okay.  And I apologize if I covered this already, but just

24  going back to that whiteboard example, do you recall roughly

25  when that occurred?

1  A.   The one with Naomi?

2  Q.   Yes.

3  A.   That was I believe 2019 because I know it was pre-

4  pandemic.  I believe it was 2019.

5  Q.   Okay.  And did you ever have an occasion to enforce the

6  policy in relation to an employee by the name of Kerri Ellis

7  Wilson?

8  A.   Yes, actually Kerri also was one that -- again, another

9  artist.  We have a lot of artists at Apple who was trying to

10 promote some photography or music.  I don't remember which one

11 she was doing at that time on the whiteboard as well and had a

12 similar conversation with her just around our policy, what we

13 can and cannot promote.

14      And again, just different ways to go about connecting with

15 your peers around it.

16 Q.   So if I understand you correctly she did physically post

17 something on the whiteboard?

18 A.   Yes.  She posted I think there was like a link or

19 something that brought that team directly to her social media

20 page to like showcase some of her art and things that she was

21 doing which I explained to her was not something that I could,

22 you know, have on the whiteboard.  So I took it down and spoke

23 to her about it.

24 Q.   And do you recall approximately when this occurred?

25 A.   This was -- this is also probably in 2019, maybe even '18

 1 | kind of a thing but it was again all pre-pandemic.  I'm sorry
 2 | it runs together but definitely a ways -- a while ago.
 3 | Q.   We understand pre-pandemic mindset.  So, you know, thank
 4 | you.  I have no further questions.
 5 | A.   Okay.
 6 |      JUDGE ESPOSITO:  Ms. Weinreb, any cross examination?
 7 |      MS. WEINREB:  Yes.  If I could just have 10 minutes?
 8 |      JUDGE ESPOSITO:  All right.  Let's come back at 12:35.
 9 |      Off the record)
10 |      JUDGE ESPOSITO:  Back on the record.
11 |      THE COURT REPORTER:  We're on the record.
12 |      JUDGE ESPOSITO:  Ms. Weinreb, cross examination?
13 |      MS. WEINREB:  Yes.  Thank you.
14 |                      CROSS EXAMINATION
15 | BY MS. WEINREB:
16 | Q.   Mr. Brown, you testified just before about Andrew Goebel.
17 | Is that his name?
18 | A.   Yeah, Andrew Goebel.
19 | Q.   Is that g-o-e-b-e-l?
20 | A.   G-o-e-b-l I believe it was.
21 | Q.   Okay.  And he's a team member, an employee?
22 | A.   Yes, previously.
23 | Q.   And you mentioned that you grabbed some flyers in April or
24 | May 2022?
25 | A.   Yes.

1  Q.   Okay.  And you said that you grabbed all of them and in

2  various areas?

3  A.   Yes.

4  Q.   And what are the various areas where you grabbed them?

5  A.   There were one or two that were on like a workstation in

6  like our operations room and then the rest in the break space.

7  Q.   And how many flyers altogether?

8  A.   I don't recall an exact number.  I know I picked up at

9  least like four or five.  I know there were a few more that he

10 made that he showed me.

11 Q.   And when you say workstation in ops did you say?

12 A.   Yes.

13 Q.   And what's that?

14 A.   We just have like a computer desk a essentially like a

15 stock room.

16 Q.   And what happens there?

17 A.   The team works out of there, so he was one of the

18 operations team members.

19 Q.   And you also testified that you removed union flyers in

20 May or June 2022, correct?

21 A.   Yes.

22 Q.   Was that the first time you ever saw a union flyer on the

23 break room table?

24 A.   I believe it might have been, yeah.

25 Q.   Okay.  And you walked out after taking it?

1    A.    Yeah, I believe so.

2    Q.    And where did you go?

3    A.    I just threw it out of the manager's office.

4    Q.    No further questions.

5          JUDGE ESPOSITO:  Mr. Bollepalli, do you have any questions

6    for Mr. Brown?

7          MR. BOLLEPALLI:  No, Your Honor.

8          JUDGE ESPOSITO:  Okay.  Mr. Stanevich, do you have any

9    redirect examination?

10         MR. STANEVICH:  I do not, Your Honor.

11         JUDGE ESPOSITO:  Okay.  Thank you very much, Mr. Brown.

12   You are excused.

13         THE WITNESS:  Awesome.  Thank you.

14         JUDGE ESPOSITO:  Thank you.  Let's go off the record.

15         (Off the record)

16         THE COURT REPORTER:  We're back on the record.

17         JUDGE ESPOSITO:  Okay.  Mr. Stanevich, your next witness?

18         MR. STANEVICH:  The company would call Stephanie Gladden

19   as its next witness in this case.

20         JUDGE ESPOSITO:  Okay.  Ms. Davison, can you let in a Ms.

21   Gladden if she's not in already.

22         MS. DAVISON:  She should be in right now.

23         JUDGE ESPOSITO:  Okay.

24         THE WITNESS:  Hello.

25   Whereupon,

1                          STEPHANIE GLADDEN

2  was called as a witness by and having been first duly sworn,

3  was examined and testified on his oath, as follows:

4       JUDGE ESPOSITO:  Okay.  Thank you, ma'am.  You can put

5  your hand down.

6       THE WITNESS:  Okay.

7       JUDGE ESPOSITO:  Can you please state and spell your name

8  for the record?

9       THE WITNESS:  Stephanie Gladden, s-t-e-p-h-a-n-i-e, g-l-a-

10  d-d-e-n.

11      JUDGE ESPOSITO:  Okay.  Does anyone have voir dire for Ms.

12  Gladden regarding her location and surroundings?

13      MS. WEINREB:  Yes, Your Honor.

14      JUDGE ESPOSITO:  Go ahead.

15                      VOIR DIRE EXAMINATION

16   BY MS. WEINREB:

17  Q.   Hi, Ms. Gladden.  I'm Ruth Weinreb, counsel for the

18  General Counsel and I just wanted to ask you where you're

19  sitting right now?

20  A.   I'm in my home office.

21  Q.   Is anyone in with you?

22  A.   No, there's no one in the residence but me.

23  Q.   Okay.  Is there any documents in front of you?

24  A.   No.

25  Q.   Okay.  Thank you.

```
 1   A.    You're welcome.

 2        JUDGE ESPOSITO:  All right.  Ms. Gladden, let me just go

 3   review a few things with you before Mr. Stanevich begins asking

 4   you questions.  First of all, it's very important that you

 5   listen carefully to each question before answering and try not

 6   to start speaking or answering until you're sure the question

 7   is finished.

 8        The court reporter is recording the proceedings and cannot

 9   have more than one person speaking at a time.  If someone

10   objects during the question, don't answer the question.  Stop

11   and wait for me rule again to make sure that there's only one

12   person speaking at a time.

13        Let us know right away if you're having trouble with your

14   audio or video.  If you're having trouble with your audio or

15   video it's okay to interrupt anything else that's going on.

16   Just tell us you're having problems or wave your hand in front

17   of the camera so we can see it.

18        Finally, if you lose your audio or video completely, check

19   your power and Internet connection and reconnect or reboot the

20   device if necessary.  Then try again to join the hearing using

21   the same link you used before, or try to join and contact us

22   with a backup device and we will assist you.

23        THE WITNESS:  Okay.

24        JUDGE ESPOSITO:  Thank you, ma'am.  All right.  Go ahead,

25   Mr. Stanevich.
```

1      MR. STANEVICH:  Thank you, Your Honor.

2                       DIRECT EXAMINATION

3  BY MR. STANEVICH:

4  Q.   Good afternoon, Stephanie.  How are you today?

5  A.   I'm well.  Thank you for asking.

6  Q.   Stephanie, are you employed?

7  A.   Yes, I currently am.

8  Q.   Okay.  And the name of your employer?

9  A.   I work for Apple.

10  Q.   And when did you start with Apple?

11  A.   I started with Apple five years ago in November.

12  Q.   So that would be November 2017?

13  A.   Yes, sir, that's correct.

14  Q.   Okay.  And what was your position and location at that

15  time?

16  A.   When I began my career with Apple I was a senior manager

17  in the World Trade Center location in New York City.

18  Q.   Okay.  And when you started at the world trade center

19  location, who did you immediately report to?

20  A.   I reported to a man named Josh Willam (phonetic).

21  Q.   Okay.

22      MS. WEINREB:  I didn't hear the name.

23      THE WITNESS:  Josh Willam.

24  BY MR. STANEVICH:

25  Q.   And what was Josh's title?

1    A.    Store leader.

2    Q.    Okay.  And can you give us an overview of what you were

3    responsible for as a senior manager at the World Trade Center?

4    A.    Yes.  I was responsible for everything that fell within

5    the four walls of operations.  That would include the internal

6    customer journey as well as the external customer journey and

7    anything that might fall in between that.

8    Q.    And what type of personnel related responsibilities did

9    you have if any as a senior manager?

10    A.    Will you clarify?  What do you mean personnel?

11    Q.    What kind of responsibilities did you have, if any, in

12    regard to other team members at the store?

13    A.    Yes.  I spent a large majority of my time leading the

14    sales floor as a leader of the floor, or a coach, so my

15    responsibility would be to go to the floor and check in with

16    each team member.  I spent a lot of time just checking in to

17    make sure that they felt good about their day, that they felt

18    set up for the day, that they understood what like we were

19    focusing on and then I would start to talk about the business

20    side of it.

21        A lot of what I did is interpersonal skills making sure

22    that our team is feeling good about the work that they would do

23    before they would actually begin to assist the customers in

24    their interactions.

25    Q.    And why did you do that, Stephanie?

1  A.   Why did I do what?

2  Q.   Focus on, you know, whether they're feeling good before

3  you focused on any business?

4  A.   Yeah, it's the culture at Apple, but it also is my

5  leadership style.  I think that, you know, when our team feels

6  really good about where they're at personally they can show up

7  in a way that feels really true to them and can meet the

8  customer in interactions which can be kind of busy and hectic

9  in our store, and so I just want to make sure everyone feels

10 good before they start their day.

11 Q.   All right.  And did there come a time that you left the

12 World Trade Center store either on a permanent or an interim

13 basis?

14 A.   Yes, I left on both.

15 Q.   Okay.  So when is the first time that you left the World

16 Trade Center location?

17 A.   Yes, I left in January 2021.  I went to market team '22 as

18 an interim store leader which is right outside of Chicago.

19 Q.   Okay.  And how long were you the interim store leader in

20 Chicago?

21 A.   Just under one year.

22 Q.   Okay.  And when that assignment ended, where did you go

23 next?

24 A.   At the end of January, beginning of February, 2022, I

25 returned to the World Trade Center in my senior manager

```
 1  capacity.
 2  Q.    Okay.  And at that time, did you report to a particular
 3  store leader?
 4  A.    Yes.  I kind of started my report to both Paul Distasio
 5  and Waleed Abdelal.
 6  Q.    Okay.  And when you came back to the store in February
 7  2022, what were your responsibilities as a store manager?
 8  A.    I was a senior manager leading the product zone at that
 9  time.
10  Q.    Okay.  And thank you for correcting me in the title, but
11  we got some testimony already about the product zone, but can
12  you just give us an overview of what that is?
13  A.    Yeah.  So it's my responsibility as a senior manager to
14  support the managers and the greater team and being able to
15  lead a positive internal and external customer experience.
16  Q.    Okay.  And you mentioned there is a time that you left the
17  World Trade Center location again.  When was that?
18  A.    Yes.  In May of 2022 I was promoted to a store leader in
19  Aventura, Florida.
20  Q.    Congratulations on your promotion?
21  A.    Thank you.
22  Q.    And is that your current position?
23  A.    Yes.
24  Q.    Okay.  Now, going back to your time at the World Trade
25  Center and before you left to go to Florida, did you know a
```

1  team member by the name of Jordan Vasquez?

2  A.   Yes, I do.

3  Q.   Okay.  And how did you know Jordan?

4  A.   Jordan was a product zone specialist at World Trade

5  Center.

6  Q.   Okay.  And do you recall how long Jordan had worked in the

7  store?

8  A.   No.  I don't know the length or tenure of his employment.

9  Q.   Okay.  And what was his responsibilities as a product zone

10 specialist?

11 A.   Jordan primary responsibility was to support our customer

12 in providing the Apple steps of service.

13 Q.   Now, do you recall a conversation that you had with Jordan

14 on or about May 9 of 2022?

15 A.   Yes, I do.

16 Q.   Okay.  And where did that conversation take place?

17 A.   It took place on the second floor of the World Trade

18 Center store.

19 Q.   And where on the second floor?

20 A.   I believe at the top of the stairs to the left of the

21 tables.

22 Q.   Now, I'd like you to talk about the purpose of that

23 conversation but actually let me back up.  Who initiated the

24 conversation?

25 A.   I initiated the conversation.

```
1   Q.   Okay.  I'm sorry.  And why did you do so?
2   A.   Yeah, I initiated the conversation because I was taking
3   over the floor as the leader of the floor.
4   Q.   Okay.  And so in that case, Jordan is working.  You're
5   taking over leadership of the floor.  Why would you reach out
6   to Jordan at that time?
7   A.   Well, it's not just Jordan that I would reach out to.  I'm
8   not easy to find sometimes on the floor because of my height
9   and when the store is very busy I always want to make sure that
10  my team is known that I am there.  My primary job is to support
11  them and if they can't find me that can be very difficult and
12  so at the start of each of my either of the floor segments I
13  would go to every single team member and talk to them or
14  approach them and say, hey, I'm your leader of the floor right
15  now.  How is your day going.
16       Do you need anything.  If there is something that you
17  need, I'm the person that you're going to be looking for.  I
18  would also sometimes share with them who the other support was
19  on the floor in the event that I got pulled into something and
20  at that moment I approached Jordan in the same manner that I
21  approach the rest of the team to let him know that I was the
22  leader of the floor.
23  Q.   And what type of reaction or response if any did you get
24  from Jordan?
25  A.   I asked Jordan how his day was going and he didn't seem
```

1  like he was having a great day.

2  Q.   Okay.  And what did he say in response to your question?

3  A.   He shared with me that he had been made aware that his

4  name was connected to some union activity and conversation in

5  the store and that he was very upset.

6  Q.   Okay.  And did you respond to his statements?

7  A.   Yes.  So in these types of situations I always want to

8  ensure that I remain neutral because my ultimate responsibility

9  is to support the team member and so I always say to the team

10  members like you are allowed to have these conversations.  This

11  is an open topic.

12      This is something that you can talk about and you can

13  engage in, and so I asked Jordan after I said that like if

14  you're allowed to do these things, why does it upset you.

15  Q.   And what was Jordan's response?

16  A.   He just was very concerned that his name was being

17  attached to union activity in the store and he shared with me

18  that he was really upset and that he didn't have time to engage

19  in union activity because he was too busy running for Congress.

20  Q.   And did you know whether or not Jordan was in fact running

21  for Congress or another elected office?

22  A.   Honestly I have no idea.  It was outside of my scope to

23  explore.

24  Q.   Now, and in this conversation I just want to be clear.

25  You know, was it Jordan who raised the topic of his support or

1  alleged support for the union or did you raise the topic of

2  union representation?

3       MS. WEINREB:  Objection.  Leading.

4       JUDGE ESPOSITO:  No.  I'll allow that given that she has

5  already described the conversation with some level of detail.

6  So who was it, Ms. Gladden, who raised -- first raised the

7  issue of the union in any way?

8       THE WITNESS:  Jordan raised it to me.

9  BY MR. STANEVICH:

10 Q.   And did you ask Jordan any questions about who may have

11 supported the union?

12 A.   Absolutely not.

13 Q.   Did you ask Jordan any questions about whether his

14 colleagues may have supported the union?

15 A.   No.

16 Q.   Okay.  Now, how would you describe Jordan as an employee?

17 A.   Jordan would be described as high touch.  He lacks focus

18 in his day to day --

19      MR. BOLLEPALLI:  I object.  What's the relevance of this?

20      JUDGE ESPOSITO:  So what is the relevance, Mr. Stanevich

21 of Mr. Vasquez's work performance?

22      MR. STANEVICH:  Well, it goes to his credibility and it

23 also goes to the fact why Ms. Gladden would speak to him about

24 the start of his shift and he also mentioned that he was having

25 a bad day.  So I think, you know, collectively it's fair for

1    Ms. Gladden to weigh in on her use of Jordan as a supervisor.

2        MS. WEINREB:  Your Honor, he may have had a bad day, but

3    that doesn't go to any credibility, and his work performance

4    isn't as you point out as Mr. Bollepalli pointed out isn't part

5    of this case.  We don't have an 883 here.  If you can show

6    through -- if you want to show work performances that show I

7    don't know what because we're not talking about his work

8    performance.  He wasn't disciplined.

9        JUDGE ESPOSITO:  Okay.  I believe -- I don't believe that

10   Ms. Gladden testified that Mr. Vasquez actually said to her he

11   was having a bad day.  I believe she testified that based upon

12   some observation that she made that Mr. Vasquez appeared to her

13   to be having a bad day, which is one of the reasons that she

14   approached him in addition to approaching employees on the

15   floor given her typical practice.

16       So I'll allow questions regarding Ms. Gladden's perception

17   and how she formulated that perception on that specific day,

18   but I don't see how Mr. Vasquez's overall work performance is

19   relevant given that there are no allegations involving his --

20   involving some sort of discipline or discharge or reprimand

21   that Mr. Vasquez is actually subject to.

22       MR. STANEVICH:  Just to be clear, I did not ask the

23   witness about his performance.  I asked her to describe him as

24   an employee and she had stated that he lacks focus which ties

25   directly to our observation that he appeared to have a bad day.

1  So I'm looking to corroborate the witness's testimony on that

2  exact point in her description of Jordan on that day and her

3  experience with Jordan is entirely relevant in terms of why she

4  believed he was having a bad day.

5       JUDGE ESPOSITO:  Okay.  So Ms. Gladden, what was it that

6  led you to believe that Mr. Vasquez was having a bad day on

7  that day that you had this conversation with him that you

8  testified about?

9       THE WITNESS:  His body language.  He seemed tense.  He

10  just clearly was having difficulty with the information that he

11  had gathered at some point.  I don't know when he had received

12  or identified that he was allegedly attached to this unionizing

13  activity.

14       MS. WEINREB:  Your Honor, I object to the line of

15  questioning.

16       MR. STANEVICH:  I'm going to move on, Ms. Weinreb.

17       MS. WEINREB:  Well, first of all, she said -- it's on the

18  record but I object because Ms. Gladden is not an expert.  We

19  don't have a psychiatrist on board.  We don't have someone who

20  is an expert in reading body language.  This is just an

21  employer, a manager who is talking about an employee and it's

22  irrelevant what she, her perception of Mr. Jordan, of Mr.

23  Vasquez.

24       MR. STANEVICH:  If I can respond.  The witness answered a

25  question that the judge asked her and I'm ready to move on with

1  --

2     MS. WEINREB:  And it went way beyond I think the scope of

3  the complaint and what we're -- what we're addressing at this

4  trial and I don't think it's relevant at all.

5     JUDGE ESPOSITO:  Okay.  You can just move on now Mr.

6  Stanevich.

7     MR. STANEVICH:  Thank you.

8  BY MR. STANEVICH:

9  Q.  Now, was there any further conversation about the union at

10  all on this particular day with Jordan?

11  A.  No.  I didn't ask questions.  I just listened to what he

12  wanted to share in that moment so that I could get him

13  refocused to do the job that he was there to do.

14  Q.  Okay.  And why were you trying to get him refocused?

15  A.  Because the floor was busy and I remember that I was

16  trying to keep an eye on what was happening on balcony level

17  and I was also checking in with him.

18  Q.  Okay.  Now, was anything else discussed in this

19  conversation?

20  A.  Yes.  He had had some type of a knee injury and so I asked

21  him how his knee was healing.  I asked him how he was feeling,

22  if he was okay to be standing during his shift and he said that

23  it was healing and he was feeling better and thanked me for

24  checking in on it.

25  Q.  Okay.  And did he in this conversation, did he make any

1  statements to you regarding, you know, pay inequities or his

2  views towards his compensation at Apple?

3  A.    No.

4  Q.    Did you ask him any questions related to his compensation

5  or compensation of his colleagues?

6  A.    Absolutely not.

7  Q.    Okay.  And you seem pretty firm in that answer.  Why so?

8  A.    Because it's completely irrelevant to the situation that I

9  was in and it would not make sense in that scenario.  Also, I

10  was on the sales floor which is public facing and it's just not

11  the time or the appropriate place for those types of

12  conversations in our business.

13  Q.    Now, how did the conversation come to an end?

14  A.    After I checked in with him on his knee he said he was

15  fine and I went and proceeded to check in with the other

16  employees on the floor.

17  Q.    Now, you've testified you checked with him on this

18  particular day you checked with other employees on that day.

19  How does that compare to your normal day to day routine while

20  you were at the World Trade Center?

21  A.    It's very, very consistent.  I pride myself in that.  It's

22  part of my personal leadership style.

23  Q.    And just so we're clear, was this the, you know, the first

24  and only time you've ever checked in with Jordan at the start

25  of your shift?

1  A.    No.

2  Q.    No further questions.  Thank you, Stephanie.

3  A.    Thank you.

4        JUDGE ESPOSITO:  All right.  Ms. Weinreb, cross

5  examination?

6        MS. WEINREB:  If I could just have five minutes.

7        JUDGE ESPOSITO:  Sure.  Why don't we come back at 20 till

8  two.  Off the record.

9        (Off the record)

10       THE COURT REPORTER:  We are on the record.

11       JUDGE ESPOSITO:  Ms. Weinreb, cross examination?

12       MS. WEINREB:  I have no further questions.

13       JUDGE ESPOSITO:  Okay.  Mr. Bollepalli, do you have any

14  questions for Ms. Gladden?

15       MR. BOLLEPALLI:  No questions, Your Honor.

16       JUDGE ESPOSITO:  Okay.  Thank you very much, Ms. Gladden.

17  You are excused.

18       THE WITNESS:  Thank you.

19       MR. STANEVICH:  Thank you, Stephanie.

20       THE WITNESS:  Thank you.

21       JUDGE ESPOSITO:  Mr. Stanevich, do you have another

22  witness ready?

23       MR. STANEVICH:  Yes.  Let me just make sure that he is set

24  up on the Wi-Fi and we'll be ready to begin in one minute?

25       JUDGE ESPOSITO:  All right.  Let's go off the record.

1        (Off the record)

2        THE COURT REPORTER:  We're back on the record.

3    Whereupon,

4                        WALEED ABDELAL

5    was called as a witness by and having been first duly sworn,

6    was examined and testified on his oath, as follows:

7        THE WITNESS:  Yes.

8        JUDGE ESPOSITO:  Thank you, sir.  You can put your hand

9    down.  Can you please state and spell your full name for the

10   record?

11       THE WITNESS:  Yes.  My name is Waleed Abdelal.  My first

12   name is spelled w-a-l-e-e-d.  My last name is spelled a-b-d-e-

13   l-a-l.

14       JUDGE ESPOSITO:  Okay.  Does anyone have voir dire for Mr.

15   Abdelal regarding his location and surroundings?

16       MS. WEINREB:  Yes.

17                     VOIR DIRE EXAMINATION

18   BY MS. WEINREB:

19   Q.   Just to confirm.  Hi, Mr. Abdelal.  I'm Ruth Weinreb with

20   the National Labor Relations Board.  I'm counsel for the

21   General Counsel and I just want to know where are you seated

22   right now?

23   A.   I am seated in an office, a closed office in the back end

24   of the Littler Mendelson offices.

25   Q.   And are you alone?

1   A.    Yes, I am.

2   Q.    And do you have any material in front of you?

3   A.    I have my phone, but my phone is on do not disturb.

4   That's it.

5   Q.    Okay.  But it's illuminated, correct, you're phone?

6   A.    Well, no, it's face down and it's on do not disturb.

7   Would you like me -- and I'm using it just as a -- for the

8   hotspot because the Wi-Fi is an issue so I was using it just

9   for Wi-Fi purposes.

10  Q.    I don't know how that works with the phone in terms of why

11  you need your phone in front of you to get connectivity.  I'm

12  not sure.

13  A.    Yeah.  The phone is being used as a personal hotspot

14  because just in terms of providing Wi-Fi for this event, but

15  it's not being used.

16        MR. STANEVICH:  If this is an issue, I can just give

17  Waleed the passcode to a different non-phone device which we

18  have in that room.

19        JUDGE ESPOSITO:  Do you want to do that Ms. Weinreb.  I

20  mean my understanding is that the phone itself creates an area

21  of connectivity that can be used to, you know, in lieu of what

22  -- to supplement other -- I don't know the types of

23  connectivity to the Wi-Fi but it's up to you.  If you would

24  like Mr. Stanevich -- Mr. Stanevich has offered to, you know,

25  use a different method than that, the phone can be away from

 1   Mr. Abdelal if you prefer to do that.

 2        MS. WEINREB:  No, I'm fine.  But I just want to make sure.

 3   BY MS. WEINREB:

 4   Q.   You're using a computer --

 5   A.   Yeah.

 6   Q.   -- as for the zoom?

 7   A.   That's correct.

 8   Q.   Not your phone?

 9   A.   No, ma'am, I'm not.

10   Q.   Okay.

11        JUDGE ESPOSITO:  My understanding is the computer somehow

12   picks up the hotspot that's created by the phone and uses it.

13   I don't know.  Am I wrong?

14        THE WITNESS:  That's correct, Judge.  It's being used -- I

15   just picked up the phone right now being the source of the Wi-

16   Fi and it's just a faster network to ensure that this zoom call

17   is as clean as it could be.  It tends to be a better source of

18   Wi-Fi then an existing office space.

19        JUDGE ESPOSITO:  Thank you.  You said that a lot better

20   than I could Mr. Abdelal, so let me just review with you a few

21   instructions about your testimony before Mr. Stanevich starts

22   asking you questions.  It's very important that you listen

23   carefully to each question before answering and do not start

24   speaking or answering until you're sure the question is

25   finished.

1      The court reporter makes a recording of this proceeding

2  and can't have more than one person talking at the same time.

3  So that is -- so that it can be transcribed accurately.

4  Second, if someone objects during the attorney's questions,

5  don't answer the question.  Stop and wait for me to rule on the

6  objection so that there's not more than one person talking at

7  the same time.

8      Third, let us know right away if you're having trouble

9  with your audio or video.  You can interrupt whatever else is

10  going on in that event.  Tell us you're having problems or wave

11  your hand in front of the camera so that we can see it.  If you

12  lose your audio or video completely, check your power and

13  Internet connection and reconnect or reboot the device or

14  devices you are using, if necessary.

15      Then try to join the hearing using the same link or number

16  or try to contact us with a backup device and we will assist

17  you.  All right, Mr. Stanevich, go ahead.

18                      DIRECT EXAMINATION

19  BY MR. STANEVICH:

20  Q.   Sorry.  I was on mute.  Good afternoon, Waleed, how are

21  you today?

22  A.   How are you?  Very good.

23  Q.   Good.  Waleed, are you employed?

24  A.   Yes, I am.

25  Q.   All right.  And the name of your employer?

1   A.    Apple.

2   Q.    When did you start with Apple?

3   A.    In 2013.

4   Q.    All right.  And what is your current position with the

5   company?

6   A.    I'm a store leader for the World Trade Center location.

7   Q.    Okay.  And how long have you been at the World Trade

8   Center location?

9   A.    About five years.

10  Q.    So you started in 2017, 2018-ish?

11  A.    About that time.

12  Q.    Okay.  Can you give us a high level overview of your

13  responsibilities as a store leader as it relates to the World

14  Trade Center location?

15  A.    My role as a store leader is first off is to create an

16  environment to support our teams.  We are above all tasked with

17  the care and well-being of our teams.  I personally see myself

18  as someone that's a keeper of culture and someone that helps to

19  bring the values of Apple to life.

20       Values of the environment that we created as well as the

21  values around the brand and making sure that we do everything

22  to elevate the brand, whether it's brand standards, the way the

23  brand is projected to customers and the way in which we bring

24  the overall company to life in our physical stores.

25  Q.    What do you mean by brand standards?

1    A.    So we believe in our Apple store and the Apple product

2    that we make and that we have a responsibility to make sure

3    that that product represents the company and our values in the

4    best way possible.  So everything from, you know, the way we

5    care for the material user in our stores and the way it relates

6    our environmental responsibility, to the way in which we

7    embrace our community and create a space where we all feel

8    welcome.  Those are all aligned with our product values and our

9    brand values.

10   Q.    Thank you.  Prior to coming onto the World Trade Center

11   team, you know, five or so years ago, what was your position

12   with Apple?

13   A.    I was a store leader at the Apple Fifth Avenue location

14   and I was there for five years.

15   Q.    Five years.  And was that your first position with Apple?

16   A.    Yes.  I was hired as an external store leader.  I came to

17   Apple as a store leader.

18   Q.    Okay.  And just quickly before we bring it back to the

19   World Trade Center, give us an overview of the Fifth Avenue

20   store and what your role was there?

21   A.    Yeah.  So my role at the Fifth Avenue location -- so a

22   little bit about Fifth Avenue.  Fifth Avenue was one of the

23   only 24 hour Apple stores.  We had a team of about 800 team

24   members.  I was part of leading a team of about 55 managers.

25   The store -- my specific role in the store, I ran the Genius

1    Bar, which is the service side of the business.

2        My department served just about a half a million customers

3    a year and we are the equivalent of an on-site repair facility,

4    and my job is to oversee that department for the Fifth Avenue

5    location and I did that for five years there.

6    Q.    Okay.  Waleed, are you familiar with the company

7    solicitation policy?

8    A.    Yes.

9    Q.    Okay.  And how are you familiar with that policy?

10   A.    So there are a number of different ways that we are

11   familiar with that policy.  Me personally, it's part of our on

12   boarding at Apple so we do something called core and we do that

13   alongside all team members.  So the leaders as well as the team

14   will go through a core training and we will introduced around

15   the number of things and one of the things that will be

16   introduced on is our non-solicitation policy.

17       Every year we are required to revisit our business conduct

18   training as well as some additional trainings with manager and

19   the law and things of that nature.  So there are internal

20   trainings.  The on boarding at Apple as well as ongoing

21   compliance training that we do, that everyone does and also

22   it's available publicly on our internal site.  I'm sorry, our

23   employee site as well and on our people site.

24   Q.    Okay.  When you say it's available publicly, does that

25   mean the general public or to employees --

1   A.   Any team member can log and see that.

2   Q.   Okay.  Now, you reference compliance training.  Is that

3   also known as business conduct training?

4   A.   Yeah.  Business conduct training.

5   Q.   Is that a required training for managers?

6   A.   Everyone has to take it as managers.

7   Q.   And how often do you have to take it?

8   A.   I think about once a year we will get a prompt that we

9   have to take it.

10  Q.   Okay.  Now I'm wanting to talk a little bit about the

11  application of that policy prior to your knowledge of that

12  policy prior to your movement over to the World Trade Center.

13  Did you have occasions to enforce the solicitation policy at

14  the Fifth Avenue store?

15  A.   Yes.

16  Q.   Okay.  And can you just give us a general overview and

17  then we'll move on?

18  A.   Yeah.  I think it's important to distinguish the way the

19  policy is administered for our internal customer, which is our

20  team members and the way to administer it for our external

21  customers which are our customers.

22  Q.   Let's start with the external and go internal?

23  A.   Yeah.  So our external customers, the most kind of general

24  way we would administer the policy would be, you know, as you

25  can imagine, our launch events are pretty significant events.

1   Well, you have thousands of customers waiting to get our

2   products and services and we have a lot of small businesses

3   that are looking to maximize on those events.

4        So the most general way you would have, you know,

5   individuals show up in the store within a framework worn around

6   their body trying to promote, you know, an iPhone, you know,

7   service, whether it be cases that they would sell or repair

8   facility and you would have to explain to them that you

9   couldn't do that.

10        You would have someone get a local business and

11   potentially open up locally and they would want to like -- you

12   know, when you have 800 team members it's a huge customer base

13   that you can attract, then they would want to do some sort of

14   incentive for just our team members to go there and actually

15   promote them.  We would say we couldn't do that, right?

16        There will be someone that would want to give out, you

17   know, flyers or coupons and we have to explain to them that

18   they can't do that as well.  Hats, stickers, anything you can

19   think of where someone from the outside would be intentionally

20   trying to promote to our team members to drive business, luring

21   of the business, we would have to give them the direction they

22   couldn't do that.

23   Q.   Is there a break room area at Fifth Avenue?

24   A.   Yes.  Of course.

25   Q.   Okay.  And some of the materials that you outlined,

1  coupons and stickers and, you know, other third-party material,

2  would it ever find its way to the break room?

3  A.   Yes, they would.  I mean team members, if innocently

4  someone gave it to them they would, you know, leave it there,

5  we would throw it out and obviously take care of it and throw

6  them out and if we knew who did it we could obviously connect

7  with them and explain to them and reinforce the policy so that

8  they understood why we couldn't do that.

9      And just from a general housekeeping perspective, we're

10 always kind of clearing things throughout the building, whether

11 it's something you see on the floor or back at house.  He would

12 just clean it up.

13 Q.   And why is that the case, what you just outlined in terms

14 of a general housekeeping perspective?

15 A.   Well, first off, we just have an expectation that our

16 building is kept clean, right?  I think that's just general

17 expectation.  You know, we adhere to very high standards at

18 Apple.  I think it's something that if you know our values and

19 you know our culture, you know, we care about everything.  Not

20 just the front of the house.  We care about the back of the

21 house.

22     You know, we have a deep belief that the things that

23 customers don't see are just as important as the things

24 customers do see.  So if you think about our products, for

25 example, if you were to open up an iPhone, open up a watch,

1    open up a computer, it is just as beautiful on the inside as it

2    is on the outside.

3         We take deep pride in the way we represent ourselves and

4    represent our product and represent our spaces.  So we want to

5    make sure they are at our very best and we do it from a place

6    not only for our customers.  We deeply care about our team.  We

7    want our team to be environments that are at the highest level,

8    the highest standards because we expect that from them, but we

9    also want to give them that because they deserve that.  They

10   deserve clean areas.

11        They deserve areas that are -- that give them the space

12   where they can enjoy their time and we really follow through on

13   that expectation.  So again, it's consistent to what we've

14   done.  It's part of our values, our DNA.  So it's just like

15   breathing to us, you know, just to make sure that space looks

16   clean and make sure we maintain it.

17   Q.   So what we were discussing a few months ago, application

18   of our policy, both solicitation and cleanliness to external,

19   right?  And you said also internal is our employees.  So while

20   you were at Fifth Avenue, can you explain how you have applied

21   either a housekeeping policy or a solicitation policy to our

22   internal customers which you characterize as our team members.

23   A.   Yeah.  So I think housekeeping is one where it is just,

24   again, it's just part of the day to day of making sure that,

25   you know, we lead by example.  So I will intentionally make

1  sure that the team always sees me picking up trash, whether in
2  the front of the house or the back of the house because I think
3  it's important for people to understand that, you know, you
4  have to take ownership of your space and we want to make sure
5  that people take pride in it.
6      We need to share that example to our team by leading by
7  example.  The other piece of it is from the very technical side
8  of it, as long as team members are on non-work time, they're
9  able to talk about things that they're doing, whether it's like
10 they're going to do a show, they're promoting things that
11 they're interested in.
12     We have incredibly talented people at Apple.  You know,
13 everyone from every walk of life comes to New York City and
14 they are the -- there are artists, there are musicians.  There
15 are actors.  They're on Broadway.  Like they do all of these
16 incredible things and team members want to promote them and I
17 think we want to create an opportunity where people can
18 definitely share their talents.
19     We make sure that they are adhering to our policies so as
20 -- the team member wants to post something on like our bulletin
21 board or we call it like a whiteboard, we would have to explain
22 to them that they couldn't do that.  If a team member wanted to
23 pass out a flyer to a show that they were going to be in, we
24 would explain to them that, you know, they would need to make
25 sure that they do those things on nonwork time.

1  Q.   Okay.  And just to be clear, while we were talking about

2  the Fifth Avenue store right now, correct?

3  A.   Yes.

4  Q.   Okay.

5  A.   Yes.  So when I was at Fifth that would be a regular

6  occurrence.  No, I wouldn't say a regular occurrence.  It's

7  just not the right -- on the regular would be most likely that

8  the topic, someone is in a show, someone is on Broadway and

9  they wanted to invite their peers and they would ask to, you

10 know, promote it and we would say like they couldn't do that

11 and we would explain to them what the framework was and where

12 they could.

13 Q.   All right.  Let's fast-forward to your time at the World

14 Trade Center and you testified before you been there five years

15 or thereabouts.  Have you had the opportunity to apply the same

16 type of -- the same solicitation policy and cleanliness

17 standards at the World Trade Center store as you did at Fifth

18 Avenue?

19 A.   Yes.

20 Q.   Okay.  And can you kind of walk us through the external

21 side of it at the World Trade Center?

22 A.   Yes.  Very similar.  The only I think probably the

23 complexity at the world trade is our square footage of our

24 store.  Also covers the front of the building, right, so

25 because our customers will cue out there for events, for

1   launches or whenever we are really busy and we have stand-sions

2   set up.

3       If someone is engaged with our customers, while they deem

4   them to be outside but within a certain square footage from the

5   store, we would then have to also encourage them not to solicit

6   our customers, but it's kind of like the same thing, right,

7   like we would have customers come in.  You know, especially in

8   a mall.

9       New businesses are opening up constantly.  They want to

10  promote to our team members.  They want to promote the

11  customers coming into our stores which is usually the busiest

12  location in the mall and we would have to explain to them that

13  they couldn't do that while they were on our property.

14  Q.   Waleed, can you give us some specific examples of, you

15  know, external material or a solicitation that you personally

16  dealt with at the World Trade Center store?

17  A.   Yeah, I mean honestly the most recent cases, there was a

18  customer, it was last Sunday I believe where they came into the

19  store and I had noticed when I was on the floor checking on the

20  team that there was a trail of pastries with a bumper sticker

21  spread out and a customer engaged with one of our team members.

22      I reached out to the leader on the floor, Ryan Tannen

23  (phonetic) and asked, hey, do you know what's going on over

24  there.  I see a bunch of stickers and I see a plate of food out

25  there like what's going on out there.  He went and engaged with

1  the customer and upon engagement with the customer the customer

2  owned a bakery and was going to leave the stickers for the team

3  and customers.

4      He explained to him he couldn't do that, that we don't

5  allow solicitation in our store and he would have to make sure

6  he collected all of his items upon leaving the building.  The

7  customer left without incident.  Again, it wasn't that big of a

8  deal.  It was something that was, you know, we deal with this

9  on occasion, so the team knew how to handle it and just moved

10 on.

11 Q.   Now, we heard a lot of testimony about the break room at

12 the World Trade Center store so I'll try to move through it

13 fairly quickly, but is there times or has there been times

14 where you observed third-party material in the break room?

15 Again, focused on the external side?

16 A.   Yeah.  You know, specifically, third-party materials in

17 terms of the only like from like a vendor, anything specific?

18 Q.   Correct.

19 A.   Yeah.  I mean in general, third-party material is like,

20 you know, what would be like a coupon or like a flyer or things

21 of that nature.  Again, it's part of general cleanliness.  We

22 just kind of grab it and throw it out.  It's really not

23 something that is a regular occurrence in our store.

24 Q.   We've heard some testimony yesterday where there was an

25 allegation that coupons and newspapers would stay on the table

1  day after day after day and they would not be removed.  Have

2  you ever witnessed that or experienced that in your five or so

3  years at the World Trade Center?

4  A.   Yeah, that is incredibly inconsistent with the way in

5  which we manage our stores and the standards that we set.  Our

6  stores are cleaned every single night.  We open customer ready

7  every single day and it's not my place to say that someone is

8  lying, but that would be incredibly unlikely in our space to

9  find anything left behind, especially overnight, whether it be

10 us or cleaning crew, we have to make sure the place looks

11 immaculate.  It just wouldn't happen.

12 Q.   Now, Waleed, this cleanliness standard that you have, you

13 know, referenced, is there a certain time of day where, you

14 know, you would sweep the break room or another area or is this

15 as you see it you act, or something in between?

16 A.   It's like breathing.  We just literally do it all the

17 time.  We're always in there.  We have our coffee machines

18 there.  We have our tech stations there.  We have lockers for

19 our teams there.  The refrigerators are there.  The microwave

20 is there.  So you would just go there and you would clean up as

21 you saw things and you would then, you know, again it's not --

22 everyone is in there.  So it's just part of the way we work.

23 Q.   Now, turning to the internal side, can you think of

24 examples at the World Trade Center where you specifically had

25 to talk to employees about, you know, distribution or

1  solicitation of material?

2  A.    Yeah.   On May 10, I was doing an exit interview with a

3  team member named Andrew Goebel.   Andrew was an ops specialist

4  that had been with us for a number of years and Andrew was

5  leaving Apple.   I was told by our leaders that he was putting

6  together a going away party and he was passing out flyers, and

7  one of our leaders had already addressed him, I think it was

8  Yanell who had already addressed him, Yanell Brown, a team

9  manager, already addressed him about non solicited policy and

10 how it is in terms of leaving flyers around and our standards

11 in the space.

12      Andrew had reached out to me to have an exit interview,

13 which is common practice at Apple when we find someone leaving.

14 And during the exit interview I addressed the non-solicitation

15 policy, again, explained to him why he wouldn't be permitted to

16 do that and we went through it and it was a non-issue.   Andrew

17 said he truly understood.   It wasn't an issue and then he

18 stopped.

19 Q.    By the way, two follow up questions for you.   You said May

20 10.   Of which year?

21 A.    Oh, sorry.   2022.

22 Q.    Okay.   Now, the second question.   I had a brain freeze for

23 a moment.   You mentioned that you took the time to talk to the

24 employee about this in his exit interview.   In light of the

25 fact of his exit interview, you know, why did you have this

1  conversation with him?

2  A.   Well, first the exit interview is really a way for us to

3  connect with our team to first understand, wish them well,

4  which is the first point.  The second thing is we always want

5  to know how we could do better, right?  So when someone is

6  leaving, I think they're never more honest than when they're

7  leaving, so we want to know what could we have done to keep

8  them at Apple.

9      What could we have done to help support them.  Is there

10  anything better or more we can do for our team.  So that's a

11  really great opportunity for us to share and learn from our

12  people after leaving the company and then to obviously wish

13  them well.  We want to make sure they're okay.  It was just --

14  it was something that had just come up a few days earlier, so

15  it was my responsibility to address it.  So that's why I

16  addressed it.

17  Q.   Okay.  And as of May 10, 2022, had you ever seen union

18  flyers in the break room?

19  A.   No.

20  Q.   Okay.  Now, you know, there's an allegation in this case,

21  I think paragraph eight of the complaint, I believe that you

22  removed union flyers on the break room table on May 15.  Are

23  you aware of that allegation?

24  A.   Yes.

25  Q.   Okay.  And did you in fact remove the flyers from the

1  break room table that day?

2  A.    Yes.

3  Q.    Okay.  And just kind of explain to us how they came to

4  your attention and why you took the action you took?

5  A.    Yeah.  So on that particular day I had a number of leaders

6  had come up to me and shared that there were flyers on the

7  break room tables.  My initial reaction was pretty

8  straightforward.  All right.  If they're left behind, just

9  remove them.  Because of the type of material, our leaders were

10  very nervous.

11     They had never encountered union flyers before.  They were

12  nervous about how to approach it.  For me it was pretty

13  straightforward.  It was just like if they're left behind just

14  go throw them out.  You know, it wasn't really -- again, it was

15  a non-issue for me.  You know, the leaders, you know, really

16  struggled and for me it was, you know, after hearing it from a

17  number of leaders I just went in and took them and threw them

18  out.

19  Q.    So why don't we just back up for a moment.  You testified

20  extensively that it's just normal practice, you know, to clean

21  up a store or clean up the break room.  You know, in your view,

22  why were our leaders struggling with this decision?

23  A.    Well, I think the fact that --

24     MR. BOLLEPALLI:  Objection.  Objection.  This witness is

25  testifying about why other people might have been nervous.

1    JUDGE ESPOSITO:  But what's the basis, you know, for his

2  knowledge regarding the other -- the leaders and the attitude

3  of the leaders towards these flyers, Mr. Stanevich.  Are you

4  asking him for communication from him or are you asking him for

5  his personal interpretation of their response to the flyers and

6  having seen the flyers?  What is the basis for his knowledge

7  that you're attempting to elicit here?

8    MR. STANEVICH:  Sure.  And I was looking to clarify the

9  testimony.  The witness testified that his managers came to him

10  for guidance.  So I'm asking what was his basis for their

11  uncertainty.  So he testified that they were uncertain.  I'm

12  just simply asking him what was the basis for the uncertainty

13  that he referenced a moment ago in his testimony.  And why he

14  took certain action.  It's not a -- it's not a hearsay issue.

15  It goes to, you know, why he did what he did.

16    JUDGE ESPOSITO:  Okay.  I understand, but are you asking

17  him for the basis for his understanding that the leaders were

18  uncertain or struggling with the issue?

19    MR. STANEVICH:  That is correct.  He testified that they

20  were and I'm asking what was the basis of his understanding of

21  why they were struggling.

22    JUDGE ESPOSITO:  All right.  I'll allow that.  Go ahead.

23    THE WITNESS:  So leaders told me they were uncomfortable

24  and when I asked why they were uncomfortable they stated that

25  it was union literature.  My response was it doesn't matter if

1  it's union literature or not.  Remove it like anything else and

2  that was the end of it.

3      So as their leader, when your leaders are nervous about

4  something, you know, you try to demonstrate the right way to

5  handle it, right?  So in my case it was a non-issue, like I

6  shared.  I went and got it and threw it out and I said in the

7  future just we would clean it up like anything else and that

8  was it.

9  BY MR. STANEVICH:

10 Q.   Waleed, we heard testimony I believe yesterday that, you

11 know, employees did physically pass it out and hand it to each

12 other in the break room and there was no interference.  In your

13 mind, is there any policy issue with that in the break room?

14 A.   No.  As long as they are on non-work time.

15 Q.   So why is there an issue if they are left on the table?

16 A.   Because it was abandoned.  And if it's abandoned we would

17 clear it out like anything else.

18 Q.   Now, did you ever talk to, have a conversation with any

19 employee about the removal of these flyers.  And when I say

20 employee, I mean non-store leader?

21 A.   Yeah.  I was approached on May 15 by Jordan Vasquez.  He

22 questioned why we were removing items from the break room.  In

23 that conversation I shared that it was -- that we reiterated

24 the non solicitation policy at Apple.  Also, we enforced our

25 cleanliness standards with him.  He said that he felt if we

1  were implementing the policy selectively and he brought up

2  something related to Shake Shack and I said, well, I'm not

3  really understanding what Shake Shack has to do with this and

4  he shared that, well, we give out coupons for Shake Shack and I

5  said a few things, one, Shake Shack doesn't come into our store

6  and does not go to our back of house and pass out the Shake

7  Shack coupons.

8       We've never given coupons out to the team.  We give

9  vouchers to our team that Apple purchases that we give to

10  everyone to purchase lunch for our team members.  So they are

11  not coupons and they're not left behind.  They are tracked and

12  we have a roster and we make sure everyone gets one and it's

13  part of the perk we provide for our people.  But Shake Shack is

14  not coming into our building.  They're not hanging out

15  backstage and they're definitely not passing it out.

16  Q.   Did you discuss any other examples with Mr. Vasquez?

17  A.   Yeah.  The next thing he said, well, I know that there are

18  team members that are passing things out.  He mentioned Andrew

19  Goebel had been passing out flyers for his going away party.

20  And I said, well, actually I have addressed that with Andrew

21  and Andrew was also made aware of the policy and I can't

22  discuss any further what was said but Andrew was made aware of

23  it and explained that he can't do that.

24  Q.   And why did you say to Jordan that you can't discuss it

25  any further as it relates to Andrew's situation?

1    A.    A couple of things.  First, it's none of Jordan's business

2    because I'm speaking about another employee and I would never

3    share the details of a conversation that I had with one

4    employee with another to protect their privacy.  And other than

5    the information that was shared that was relative to the

6    conversation is what I disclosed and I would not disclose

7    anything further than to protect the privacy of another member.

8         And Jordan was still uncomfortable with that response so I

9    encouraged him -- I said I would love to have you partner with

10   our busy HR person which we call them our people business

11   partner, which is Alyssa Rodriguez.  Let me connect you with

12   Alyssa.  It seems like you're still having some challenges

13   around the policy.  So let me put you into contact with Alyssa

14   so you can talk further with her and I said if there's a

15   mistake, you know, I'm fine to correct it but I think she's the

16   best person to speak to and I also sent them a link to the non-

17   solicitation policy so that he can pull it up on the people's

18   website.  That was kind of how we wrapped up the conversation.

19   Q.    Thank you, Waleed, I have nothing further.

20        JUDGE ESPOSITO:  All right.  Ms. Weinreb, cross

21   examination?

22        MS. WEINREB:  Your Honor, I'm going to need additional

23   time because I may be putting up some videos, so I need to

24   really regroup and think about this and then there's a

25   possibility that I may be putting up the video.  So if I can

```
 1   have 20 minutes?
 2        JUDGE ESPOSITO:  Sure.  Okay.  Let's come back at 25 until
 3   three.
 4        (Off the record)
 5        THE COURT REPORTER:  We're back on the record.
 6        JUDGE ESPOSITO:  Okay.  Go ahead, Ms. Weinreb.
 7                        CROSS-EXAMINATION
 8   BY MS. WEINREB:
 9   Q.   Okay.  I'd like to share something on the screen and I
10   don't have my IT people so I'm going to attempt to do this on
11   my own.
12        MR. BOLLEPALLI:  I know a few people if you need any help.
13        MS. WEINREB:  No, I know.  I know.  This is the part I
14   don't --
15        JUDGE ESPOSITO:  The video Ms. Weinreb?
16        MS. WEINREB:  Excuse me?
17        JUDGE ESPOSITO:  Is this a video, one of the videos?
18        MS. WEINREB:  No, it's not the video.  I received
19   documents pursuant to the subpoena and they're in a big pile,
20   but I just want to put up one document and I'm not sure.  Maybe
21   Ms. Davison can help me if I can put up one document or do I
22   have to put up the entire thing.  Can I just like open up --
23        JUDGE ESPOSITO:  Okay.  Let's go off the record.
24        (Off the record)
25        JUDGE ESPOSITO:  Let's go back on the record.
```

1    THE COURT REPORTER:  We're back on the record.

2    JUDGE ESPOSITO:  Go ahead Ms. Weinreb.

3  BY MS. WEINREB:

4  Q.   So I'm sharing -- I would like to have this page -- it's a

5  document dated May 15, 2022, and it's from Mr. Abdelal.  I

6  don't know whether your name is --

7  A.   You did well.  That's fine.

8  Q.   No, it seems like it's spelled differently than what's on

9  your screen name?

10 A.   Yeah, I logged in on, unfortunately, I'm on my daughter's

11 zoom account.  So --

12 Q.   Oh, okay.  So I would like to have this marked as General

13 Counsel Exhibit 9 for identification.

14    JUDGE ESPOSITO:  Okay.  And is this a memo, an email?

15 BY MS. WEINREB:

16 Q    Well, I'm going to have Mr. Abdelal explain what it is and

17 he appears to be the author of it, correct, Mr. Abdelal?

18 A.   Yes.

19 Q.   Okay.  You can see it okay?  I don't know if it's tiny on

20 your -- I don't know how it appears on your screen.

21 A.   Yeah, I can see okay.

22            (General Counsel's GC-9 identified)

23 Q.   Okay.  So let me know if you can't see it properly but it

24 -- so this is a memo that you wrote and it's to Mona Patel?

25 A.   Yes.

1   Q.    And who is she?

2   A.    She's our flag leader.

3   Q.    Okay.  And what do you mean by flag leader?

4   A.    She's the general manager for the store.

5   Q.    And at the World Trade Center?

6   A.    Yes.

7   Q.    Okay.  So did you write this?

8   A.    Based on the email, it looks like it came from me.

9   Q.    Okay.  So this is an email -- oh, I'm sorry.

10      JUDGE ESPOSITO:  Hold on.  Give him a chance to review the

11  document.

12      MS. WEINREB:  Okay.  So please review it.

13      JUDGE ESPOSITO:  If you're asking him whether he wrote it.

14      THE WITNESS:  It looks like probably an email that I sent

15  to Mona in terms of most likely would be communication that

16  would be from a number of my leaders and put it into one place

17  and some of it may be written by me and some of it may have

18  been forwarded by other leaders that I just added to the

19  document.

20  BY MS. WEINREB:

21  Q.    So some of the things may have been you wrote personally?

22  Yes?

23  A.    Yes.

24  Q.    And some things might have been you received from someone

25  else?

1  A.   Yes.  Some of my leaders may have sent a recap to me about

2  something they had observed and I ordered -- I put it into one

3  communication to my boss.

4  Q.   Okay.  But this you sent to Mona?

5  A.   It seems as though it's an email from the boss, yeah,

6  Mona.

7  Q.   Okay.  So I'd like you to go -- I'm showing you the bottom

8  of the page which at the bottom right side say 19, correct?

9  A.   I am seeing APLWTC 0019, yes.

10  Q.   Yes.  Okay.  So in the paragraph, the preceding paragraph,

11  the last paragraph of this page starting with the bullet point

12  when these team members, do you see that?

13  A.   Uh-huh.  Yes, I do see that.

14  Q.   So it says when -- and tell me if I'm not reading it

15  correctly.  When these team members NR Jordan and Kay, they've

16  been redacted, certain employee names were redacted.  Do you

17  know?

18  A.   I don't know why they would be redacted, no.

19  Q.   Okay.  But they're employee names, nonetheless?

20  A.   Yeah.

21  Q.   That's the intent?

22  A.   Yes, they are employee names.  Yes.

23  Q.   Okay.  And then it goes on to say came into the store for

24  meeting/their shift.  They continue to chat with other

25  employees about unionizing, correct?

1    A.    That's correct.

2    Q.    They also placed below flyers in the break room and

3    continue to engage employees, correct?

4    A.    Yes.   That's what it says.

5    Q.    Okay.   And the sign was in the break room estimated 9:20

6    a.m. to 10:50 a.m., right?

7    A.    Yes.

8    Q.    So the sign is the flyers?

9    A.    Yes.

10   Q.    Okay.   And then it says we removed the sign once I

11   connected with Jason?

12   A.    Yes.

13   Q.    So is that Jason Borilia (phonetic)?

14   A.    I'm not sure if it was Jason Borilia or not.   We have a

15   manager -- we have managers named Jason was which wasn't with

16   us at the time of the employee's name.   Most likely it could

17   have been that.   I'm not 100 percent sure it was Jason Borilia,

18   but it could have been.

19   Q.    Okay.   But would you consult with an employee before

20   removing the flyer?

21   A.    It could have been someone that came to me when I

22   connected.   It could have been someone that came over to me and

23   said it, so I just need to process the message a little bit but

24   I would say if it doesn't say Jason Borilia I would assume that

25   it was Jason, but again, I'm not --

1  Q.   Jason Borilia you mean?

2  A.   I assumed it was Jason, yes.

3  Q.   Right.  Okay.  So you connected with him before removing,

4  correct?

5  A.   Again, I don't remember if it was him, but based on the

6  message it was highly likely it was Jason.

7  Q.   Well, if it was in Jason Borilia, who could it be?

8       MR. STANEVICH:  Objection.  Asked and answered repeatedly.

9       MS. WEINREB:  Well, I'm trying to narrow it down.  How

10 many other Jason's would you go to then for something like

11 this?

12      MR. STANEVICH:  I think the witness has answered that

13 question and identified several different Jason's and he says

14 he doesn't recall which Jason he was referring to.

15      JUDGE ESPOSITO:  Okay.  Mr. Abdelal, do you recall

16 consulting with Mr. Borilia regarding the flyers?

17      THE WITNESS:  On this particular day I don't, but again,

18 if it says -- I would say it's highly likely it was Jason

19 Borilia.

20      JUDGE ESPOSITO:  Okay.

21      MS. WEINREB:  I'd like to offer this into evidence.

22      JUDGE ESPOSITO:  Is it just that one page, Ms. Weinreb or

23 is there another page to it?

24      MS. WEINREB:  Oh, wait, actually there is something in

25 reference, yes.  Well, I just -- well, let me just ask the

1  question.  I think it's just this page, but in -- I just wanted

2  to say --

3      MR. STANEVICH:  Ms. Weinreb, if you could just scroll down

4  so I can see whether it's the entire document or not.

5      MS. WEINREB:  Oh, okay.  Is that part of it?  20.

6  BY MS. WEINREB:

7  Q.   Mr. Abdelal, is this part of your email?

8  A.   I don't know.  I'm looking at a PDF that could have been

9  pulled together from a number of different sources, so I don't

10 know.

11 Q.   No, but is this part of the email that you sent to Mona on

12 the 15th?  There is a second page and maybe it is.

13     MR. STANEVICH:  You've got to show him the entire email.

14     MS. WEINREB:  I am.  I don't know what -- I don't know

15 what you see, but I'm --

16     MR. STANEVICH:  You've got to scroll all the way down to

17 the bottom yet.  We cannot see the entire email.

18     JUDGE ESPOSITO:  All right.  Ms. Weinreb -- Ms. Weinreb,

19 go back to the beginning and scroll down through the entire

20 thing so that Mr. Abdelal has a chance to see everything.

21     MS. WEINREB:  Okay.  Here's the top part, all right.

22 BY MS. WEINREB:

23 Q.   Do you see your name?

24 A.   I do.

25 Q.   Okay.  So I'm going to -- this you've identified as an

1    email you sent to Mona, this page, correct?

2    A.    Yes, I did.

3    Q.    Okay.

4    A.    I applied that into what we showed, I guess.

5    Q.    And know I'm going to a second page, and let me know if

6    you have a problem with seeing the second page.  This is the

7    second page.  It doesn't say page two or anything.  It's just

8    another page that follows the attachment and let me know.  I'm

9    at the top of it.  I can't show you the bottom yet because then

10   the top would be eliminated.  So if you could take a look and

11   let me know when you want me to scroll down a little more.

12   A.    Do you mind scrolling up a little more, please?

13   Q.    Sure.

14   A.    Thank you.

15   Q.    That's the end of that second page.

16   A.    Again, I'm not trying to dismiss or knock the email.  This

17   doesn't seem like -- what this seems like it's bullets from

18   multiple communications put into one place.  It doesn't look --

19   the second page in particular doesn't look like one consistent

20   email and again, I want to reiterate, Your Honor, I'm not

21   saying that it's not.  It just doesn't look like that to me.

22   There are a number of gaps in between that's not structured in

23   a way where it would come out of one email.

24        So again, everything in there I'm reading through.  It

25   seems like pretty straightforward to me but, again, if it's an

1  email that was sent, you're saying that it came from me, but

2  that's fine, but again, it just looks like a bunch of different

3  bullets from a bunch of different spaces.

4  Q.   And it may be, Mr. Abdelal.  It may be, so let me ask you

5  this question.  So are you saying that you don't know if the

6  second page that you just reviewed was part of your first

7  email?

8  A.   That's exactly what I'm saying.  I'm not sure --

9  Q.   Okay.  So then I would like to --

10       MR. STANEVICH:  Can we see the document in its entirety.

11  That clearly looks to be a page three and it looks to be

12  attachments?

13       MS. WEINREB:  Sure.  But, he -- well, actually, the one

14  thing after it is another memo from Tyler Perroni that I have,

15  you know.

16       MR. STANEVICH:  But it does look like you're on the third

17  page right now.  This looks like a three page document in a

18  memo format.  We have no objection to the three pages coming

19  into evidence.

20       MS. WEINREB:  But Your Honor, the witness has testified

21  that he didn't know that whether even the second page was part

22  of that first email, so why would we put it into evidence if he

23  doesn't -- I don't know what it is then.

24       MR. STANEVICH:  Well, then you can't put it into evidence.

25       MS. WEINREB:  Wait.  Excuse me.  He identified the first

1   page as an email.  He recognized that and I'm willing to say

2   that was sent to Mona.  He doesn't recognize the second page

3   and we didn't even get to the third page yet for him to review,

4   but he didn't recognize the second page as being part of that

5   same email.

6       So it could be something that someone at Apple drafted,

7   I'm assuming, because it is bullet points and it was provided

8   pursuant to the subpoena, but if Mr. Abdelal can't identify it

9   as part of an email and I'm trying to put in something that he

10  has identified, then why would I put something -- why would I

11  be allowed something else and then none of us know what it is.

12  Maybe Mr. Stanevich knows what it is.

13      MR. STANEVICH:  I know what it is and if you would show

14  the witness the entire three page document he may have a chance

15  to opine on it.  You're showing him pieces of the document.

16  Let's start at the top.  Scroll through the three pages and ask

17  him if he knows what it is.

18      MS. WEINREB:  No, I'm not.  No, I'm not, Mr. Stanevich.

19  I'm going page by page.

20      JUDGE ESPOSITO:  Hold on.  Hold on.  All right.  Mr.

21  Abdulel, do you need to see these three pages again to

22  determine what is part of your email to Ms. Patel?

23      THE WITNESS:  Your Honor, if I could just explain why --

24  what my concern is with the layout of the PDF to help you

25  understand in my world why I'm concerned about it.  I would

1  like a moment to do that if that's okay?

2       JUDGE ESPOSITO:  Okay.  Go ahead.

3       THE WITNESS:  All right.  So if you look at the top on the

4  first page.

5       JUDGE ESPOSITO:  Uh-huh.

6       THE WITNESS:  And look at the format of the email it's

7  clear that it's sequential.  The space in it is consistent all

8  the way across.

9       JUDGE ESPOSITO:  Uh-huh.

10      THE WITNESS:  When you move to the second page there is a

11 significant gap between the first and second page.  If it were

12 a concurrent emails they would know the spacing, even it

13 transferred to a PDF would be consistent.  Now, this could be

14 just a -- just the way it was copied over, the way it was

15 downloaded from the back up, but that's my only concern.

16      You're asking me the question about did you send the

17 email, is this your email.  I send hundreds of emails a day.

18 It's not a question of whether or not.  My concern is she asked

19 me if it was the same email and I said, hey, I'm not sure

20 because of the way it's laid out, if it was all under the same

21 email.  If the question was whether or not I sent it, well, it

22 seems consistent in terms of the bullets so it seems like it's

23 a concurrent email.

24      But again, with the layout and gaps and the spaces, I'm

25 not sure if it was one email, multiple emails.  That's why I

 1  asked the question.

 2        JUDGE ESPOSITO:  I see.

 3        MS. WEINREB:  Your Honor, I withdraw my request to put it

 4  in.  I am not going to put it in.  So we will alleviate the

 5  whole issue.  I'm not -- I'm not seeking to have it admitted.

 6        JUDGE ESPOSITO:  Okay.

 7        MS. WEINREB:  I'm going to stop sharing for a minute.

 8  BY MS. WEINREB:

 9  Q.  Mr. Abdelal, on May 15, did you tell Matt Moya to shred

10  the flyer?

11  A.  I may have told him to do that, yes.

12  Q.  Do you know if anyone took photographs of the flyer?

13  A.  Yes.

14  Q.  Who?

15  A.  I think it was Yanell one of the leaders took photos as

16  part of just letting us know something was in the break room.

17  It was one of the managers.  I don't remember specifically

18  which one, but definitely one of the managers took photos.

19        MS. WEINREB:  Can I just have a second, Your Honor?

20        JUDGE ESPOSITO:  Sure.

21        MS. WEINREB:  Can we go off the record for a minute?

22        JUDGE ESPOSITO:  Let's go off the record.

23        MS. WEINREB:  Thank you.

24        (Off the record)

25        THE COURT REPORTER:  We're back on the record.

1      JUDGE ESPOSITO:  Ms. Weinreb, anything else?

2      MS. WEINREB:  No further questions.

3      JUDGE ESPOSITO:  Okay.  Mr. Bollepalli, do you have any

4  questions for Mr. Abdelal?

5      MR. BOLLEPALLI:  Yes, Your Honor.

6      JUDGE ESPOSITO:  Okay.  Go ahead.

7                    CROSS EXAMINATION

8  BY MR. BOLLEPALLI:

9  Q.   Good afternoon, Mr. Abdelal.  I'm Sumanth Bollepalli.  I'm

10  the union's attorney.  I'm going to ask you a few questions.

11  A.   Good afternoon.

12  Q.   Do you regularly communicate with other store managers via

13  text message?

14  A.   At times.  I mean we did more so prior to the shift of the

15  swack.  So once we shifted to swack it seemed like we declined.

16  Q.   And when did you guys shift to swack?

17  A.   I don't remember the exact time.  I would say within the

18  last year or so.

19  Q.   So would it have been like the earlier part of 2022?

20  A.   That feels about right.  Maybe a little later on.

21  Q.   Do you recall texting with Matt Moya about flyers in the

22  break room on May 15?

23  A.   I don't remember specifically texting him that, no.

24  Q.   Do you remember instructing any other managers to not only

25  remove the flyers but also to shred them?

1   A.   I don't recall, but there likely could have been that

2   direction to remove them and to shred maybe a couple, sure.

3   Q.   And I just need clarification.  Did you instruct managers

4   to shred flyers?

5        MR. STANEVICH:  Objection to relevancy.  There is no

6   allegation in this complaint about shredding the flyers.  It's

7   about removing flyers and the video demonstrates what it

8   demonstrates.

9        JUDGE ESPOSITO:  Overruled.  Go ahead.

10  BY MR. BOLLEPALLI:

11  Q.   So I repeat the question.  I just want clarification.  Did

12  you instruct any managers to shred flyers?

13  A.   As part of -- not just flyers.  It would be paperwork in

14  general.  Like it's -- like we have ae shredder in the office

15  for federal per legal anything that we need to get rid of we

16  just shred it.  It's kind of like a thing that we do but, yes,

17  on that particular day I remember I may have said to like --

18  you're saying Matt, maybe said to, Matt, hey, just go ahead and

19  just shred it so, yes.  I said that early on.

20  Q.   And so the reason why you're saying that they -- you would

21  have instructed the manager to shred the union flyers is

22  because that's what you do with all such documents?

23  A.   Well, not just -- just trash.  So we would just throw it

24  out or we would shred it.  Whatever we felt needed to be done.

25  So in that particular case I said to shred it.  So I shredded

 1   it.  I would have also told them to throw it in the trash as I

 2   would other things.

 3   Q.   Do you know if you were communicating with Mona Patel via

 4   text message?

 5   A.   I would say --

 6        MR. STANEVICH:  Objection.  Over broad.

 7        MR. BOLLEPALLI:  Rephrase.

 8   BY MR. BOLLEPALLI:

 9   Q.   On May 15, do you recall if you were communicating with

10   Mona Patel via text message?

11   A.   I would have definitely communicated with Mona.  She's my

12   boss.

13   Q.   Do you recall if at any time she said not to shred these

14   flyers?

15   A.   I don't remember specifically if she told me not to shred

16   them.

17   Q.   All right.  I just need a minute to pull up an exhibit.

18        JUDGE ESPOSITO:  All right.

19   BY MR. BOLLEPALLI:

20   Q.   Actually, before we get to that, Mr. Abdelal, you were

21   testifying earlier regarding the emails from Sunday, May 15, to

22   Mona Patel?

23   A.   Uh-huh.

24   Q.   And specifically about the sign that we removed the sign

25   that said we removed the signs once I connected with Jason.

```
 1   You wrote that, correct?
 2        MR. STANEVICH:  Objection.  This document is not in
 3   evidence.
 4        MR. BOLLEPALLI:  We've already had testimony in.
 5        JUDGE ESPOSITO:  Overruled.  Go on.
 6   BY MR. BOLLEPALLI:
 7   Q.   You wrote that statement, correct?
 8   A.   Yes.
 9   Q.   And earlier you had testified that managers seemed
10   nervous; is that correct?
11   A.   Yes.
12   Q.   Who were those managers?
13   A.   I don't remember.
14   Q.   Was it Yanell Brown?
15   A.   I don't remember.
16   Q.   Was it Jorge Romero?
17   A.   I don't recall.  I had a number of managers reporting to
18   me on that day.  There was a number of managers that spoke to
19   me who also leads and general team members.
20   Q.   Okay.  So by listing names, that wouldn't help refresh
21   your memory?
22   A.   I would have to know the schedule of who worked that day
23   and then be able to narrow it down.  Specifically, do you have
24   a specific date in mind that you're talking about?
25   Q.   I was actually just following up to your testimony where
```

1  you were saying that managers seemed nervous.  My understanding

2  of your testimony was that it was in regards to May 15.  Is

3  that what you were testifying?

4  A.   Yeah, so on May 15 I was approached by a number of

5  managers that were in the building on that day.  We had an all

6  team lead in that day, so there was a number of managers in the

7  building that day.  So the general consensus of the managers

8  that were there that day that approached me were nervous about

9  removing the literature from the break room.

10  Q.   But you don't remember specifically any manager that you

11  spoke to?

12  A.   I mean, again, we had networking that day.  Rachel was in

13  the building that day.  Yanell was in the building that day.

14  You know, so again, there was a team of 22 managers in that one

15  building.  So this is quite the extended lead team which is

16  another 12.

17  Q.   No, I understand.  If you don't remember, you don't

18  remember.  That's why I was asking you.

19  A.   Yeah, that's -- if I remember specifically, it was Rachel

20  and I, and if I remember that day and I think it was Yanell

21  were the most ones I remember clearly, but again, there was a

22  number of leaders throughout the day --

23     JUDGE ESPOSITO:  And Mr. Abdulel, when you said I remember

24  clearly, do you mean you remember them being in the store at

25  that day or you have a specific recollection of a discussion

1  regarding the flyers with them where they seemed to be nervous?

2      THE WITNESS:  Yes.  So, Your Honor, throughout the entire

3  day this was an ongoing conversation with multiple leaders

4  about their concern about removing the literature and when it

5  first appeared, again, I'm trying to remember in terms of who

6  spoke to me on that day.  I'm trying to paint the picture for

7  you where in an all store meeting.  We have tons of leaders,

8  tons of team members coming at us all at once and I'm trying to

9  narrow down who I spoke to about what on the day and it wasn't

10 just a typical day.

11     It was the day where I had, you know, hundreds of lead

12 team members in the store.  So as simple as that question may

13 sound, it was not your typical day when I'm running the store

14 with 60 team members and seven managers.  It was a day where we

15 had hundreds of team members in the store and upwards of over

16 20 leaders in the building.

17     JUDGE ESPOSITO:  Okay.  I understand.  I just wanted to --

18 I was just unclear whether you were referring to -- when you

19 were referring to the specific managers or leaders who you said

20 were there.  I was unclear as to whether you were just saying I

21 remember this person being there or you had a specific

22 recollection of discussing the flyers with them?

23     THE WITNESS:  Yeah.

24     JUDGE ESPOSITO:  And if it's the former, do you just

25 remember them being there and you don't have a specific

1  recollection of a discussion regarding the flyers with that

2  person?  I'm just trying to understand what it is that you

3  know.

4      THE WITNESS:  Yeah, Your Honor.  The conversations were

5  being had because the leaders were coming at me, and leads, as

6  well as members of the staff throughout the entire day.  So

7  where counsel is asking me specifically who, if like I share --

8  I don't have a schedule for that day, but I can tell you that

9  it was touched upon with multiple people as I was being

10  approached by pretty much a number of team members, supervisors

11  and managers.

12      So when you have a team of 20 people and you don't have a

13  schedule in front of you, it's hard when counsel points out

14  Jorge, Rachel.  I mean any one of those individuals could have

15  been working that day.  So I'm uncomfortable to say a leader

16  worked that day and if counsel points that name out, I would be

17  comfortable saying I likely had a conversation with that

18  individual.

19      But when you're listing names, I don't know if the person

20  was working.  I don't want to say yes and then be perceived as

21  I'm not saying the truth.  So if he could specify whether or

22  not they were on the schedule, I'm happy to say whether or not

23  I remember more specific if I had a conversation with that

24  individual.

25      JUDGE ESPOSITO:  Okay.  But in any event, you had multiple

1  conversations with the managers --

2       THE WITNESS:  Yes.

3       JUDGE ESPOSITO:  -- or the leaders regarding the issue of

4  the flyers that day?

5       THE WITNESS:  Yes.  I was approached by multiple leaders

6  on the day of multiple team members as well as multiple

7  supervisors or leads.

8       JUDGE ESPOSITO:  Okay.  All right.  Go ahead Mr.

9  Bollepalli.

10      MR. BOLLEPALLI:  Thank you.

11  BY MR. BOLLEPALLI:

12  Q.   So you were aware that certain employees were wearing red

13  wristbands?

14  A.   Yes.

15  Q.   And would you say they started wearing them around May 15?

16  A.   That was the first day that I was made aware of it, yeah.

17  Q.   And these are the CWA wristbands?

18  A.   I'm not sure if they were CWA.  They were red wristbands

19  and we were told by team members they were union related.

20  Q.   And they weren't prohibited under the solicitation policy?

21  A.   No.

22  Q.   Did the customers -- so some of these employees wearing

23  red wristbands, were they wearing them in customer facing

24  areas?

25  A.   Yes.

```
 1   Q.    Was that a concern to Apple's brand?

 2   A.    No.

 3   Q.    All right.  I'm going to try this one more time.  A minute

 4   to share my screen for an exhibit.  I don't know how people can

 5   see my screen.  Is the document big enough?

 6         THE WITNESS:  I can -- I can see your screen.

 7         MR. BOLLEPALLI:  Can you read the text here?

 8         THE WITNESS:  Yeah, I can read it.

 9         MR. BOLLEPALLI:  This is the top of the document and I

10   would just reference the Bates stamp for the court reporter.

11   It's APL-WTC_00000047.  Okay.  So this is the top of the

12   document.  There is a timestamp 3:14 and I'm just going to

13   scroll down so you can see and just tell me if you need me to

14   stop.

15         THE WITNESS:  I'm good.  I can see it.

16   BY MR. BOLLEPALLI:

17   Q.    Do you want to take a second and read this?

18   A.    Yes.  Okay.

19   Q.    And then the second page is a continuation.  You can see

20   it, right?  There is nothing covering it?

21   A.    Yes, I can see it.

22         MR. STANEVICH:  Can you leave it on the screen for a

23   moment.  We're trying to read it --

24         MR. BOLLEPALLI:  Yes.  Sorry.  Sorry.

25         MR. BOLLEPALLI:  I apologize.
```

1      MR. STANEVICH:  Can you go back to the first page?

2      MR. BOLLEPALLI:  Yeah.  I was actually waiting for the

3  witness to finish on the second.  Are you done?

4      MR. STANEVICH:  I understand, I understand.

5      THE WITNESS:  Yes.  What question are you going to ask?

6  BY MR. BOLLEPALLI:

7  Q.   All right.  So I just want to scroll to the top so counsel

8  can hear or read the --

9      MR. STANEVICH:  Just give me one second, please.  Okay.

10  You can go to the second page.  Okay.  Okay.

11  BY MR. BOLLEPALLI:

12  Q.   So this is a text message you exchanged between you and

13  Ms. Patel?

14  A.   Yes.

15  Q.   And it was sent on Sunday, May 15 at 3:29 p.m.?

16  A.   Correct.

17  Q.   And what's highlighted in the blue, that would be messages

18  from you?

19  A.   That's correct.

20  Q.   And the other messages, this last one, save the posting

21  they are putting up.  Don't tread.  That was from Ms. Patel?

22  A.   Yes, based upon that message, yes.

23  Q.   Did you advise your managers not to shred that at any

24  time?

25  A.   I mean if Mona said not to I would have likely told them

1  don't shred anything.

2  Q.   But you're not sure?

3  A.   I mean I can tell you that I would say if Mona said not to

4  do that, then I would have definitely told the leaders not to

5  shred it.

6  Q.   I should have first identified the Charging Party Exhibit

7  1 for identification.  I would like to move this exhibit into

8  the record, but I need to separate it from the rest of the PDF

9  so I can do that on break.

10     MR. STANEVICH:  If you could just share the Bates numbers,

11 but there's no objection.

12     MR. BOLLEPALLI:  It's --

13     MR. STANEVICH:  47 and probably 48.

14     MR. BOLLEPALLI:  48.

15     MR. STANEVICH:  Thank you, counsel.  Respondent has no

16 objection.

17     JUDGE ESPOSITO:  All right.  The Charging Party Exhibit 1

18 is admitted.

19 (Charging Party Exhibit 1 identified and received)

20     JUDGE ESPOSITO:  I'm sorry, Ms. Weinreb, you didn't have

21 any objections, did you?

22     MS. WEINREB:  No, I don't.

23     JUDGE ESPOSITO:  The admission of Charging Party one.

24     MR. BOLLEPALLI:  I'm sorry.  I'm just trying to get one

25 more exhibit.

1    BY MR. BOLLEPALLI:

2    Q.    Can you see my screen, Mr. Abdelal?

3    A.    Yes.

4    Q.    I'll try to make it a little bigger.  Can you read the

5    text here?

6    A.    I can.

7    Q.    Is it visible to you?  I can try to make it bigger.

8    A.    Yes, I can see it.

9    Q.    Do you recognize this document?

10   A.    It's a text message.

11   Q.    Between who?

12   A.    I don't -- I can't see you is on the top so do you not

13   have who it was sent from?

14   Q.    For the record I'll just state that these documents are

15   being presented in the same way that the Respondent provided

16   them.  So this is all I have.

17   A.    I remember the message.  I just don't know who it was

18   from, though.

19   Q.    Okay.  So which is your messages and which is the other

20   persons?

21   A.    The blue would have been me.

22   Q.    Okay.  And so you don't know who is referring to Ian and

23   Jordan and others as idiots?

24   A.    That message came from Paul, now that you mention that.

25   Q.    Paul Distasio?

1   A.    My partner, yes.

2   Q.    And his title is store leader as well?

3   A.    Yes.

4   Q.    Is that how Apple managers speak about their employees?

5         MR. STANEVICH:  Objection to relevancy.

6         JUDGE ESPOSITO:  Yes, Mr. Bollepalli, what's the relevance

7   of the way they characterize their employees?

8         MR. BOLLEPALLI:  I'll withdraw that.

9   BY MR. BOLLEPALLI:

10  Q.    Mr. Abdelal, do you know if Paul Distasio was one of the

11  managers who was nervous about the flyers?

12  A.    I can't speak to Paul's emotional -- Paul wasn't there

13  that day, I don't think, and Paul doesn't get nervous.  Paul is

14  a very -- Paul is not like that.  So to use that phrase around

15  Paul is not -- he is very -- I mean it's just not -- nervous

16  and Paul just doesn't happen.  He just handles it.

17  Q.    Okay.  All right.  If I could just have a few minutes,

18  Your Honor?

19        JUDGE ESPOSITO:  Are you are you offering that or not, Mr.

20  Bollepalli?

21        MR. BOLLEPALLI:  I'm not offering it.

22        JUDGE ESPOSITO:  Okay.

23        MR. BOLLEPALLI:  But I am going to offer Charging Party

24  Exhibit 1 for identification.  I just need to do it on a break.

25        JUDGE ESPOSITO:  Charging party one I have is already

1  admitted.

2      MR. BOLLEPALLI:  Oh, you have it, but I guess I need to

3  somehow get the file to you and the court reporter and everyone

4  else as well or I guess I could put it on SharePoint at the end

5  of the day.

6      JUDGE ESPOSITO:  Well, you have to -- you have to move

7  these images from the overall PDF.

8      MR. BOLLEPALLI:  Exactly.

9      JUDGE ESPOSITO:  And provide it to the court reporter.

10     MR. BOLLEPALLI:  Okay.  So, yes, then those are already

11  moved in.

12     JUDGE ESPOSITO:  All right.  So then do you have any more

13  questions for Mr. Abdelal?

14     MR. BOLLEPALLI:  I just need like two minutes.

15     JUDGE ESPOSITO:  All right.  Let's go off the record.

16     (Off the record)

17     THE COURT REPORTER:  We are back on the record.

18     JUDGE ESPOSITO:  Are there any further questions for Mr.

19  Abdelal?  Mr. Bollepalli?

20     MR. BOLLEPALLI:  Sorry.  I don't know why my volume was

21  turned down.  That's why.  I apologize.

22     JUDGE ESPOSITO:  Okay.  Do you have any further questions?

23     MR. BOLLEPALLI:  No, Your Honor, I have no questions.

24     JUDGE ESPOSITO:  Okay.  Mr. Stanevich, do you have any

25  redirect examination?

1    MR. STANEVICH:  Just a quick question, if I may?  May I

2  proceed?

3    JUDGE ESPOSITO:  Go ahead.  I'm sorry.

4                     REDIRECT EXAMINATION

5  BY MR. STANEVICH:

6  Q.   Waleed, just a quick follow-up question or two.  I think

7  you were asked some questions about a manager taking pictures

8  of the break room.  Does that give you any concern at all?

9  A.   No.

10 Q.   Why not?

11 A.   So we will take pictures of our break room which is of our

12 office space, pictures of the back of the house and it's a part

13 of one sometimes calling out where standards are not acceptable

14 and also to show where things are acceptable.  Usually we will

15 share photos to also celebrate, you know, someone did a really

16 great job.  It's like we sit in the break room.  We sit in the

17 office backstage.  So taking pictures and like kind of sharing

18 is not necessarily a big deal.

19 Q.   And when you say we, who are you referring to?

20 A.   Our leaders, our team will take photos and send them to

21 us.  You know, just part of sharing but usually there would be

22 a leader, often than not, calling out when the standards have

23 been unacceptable and we would share a photo of it.  Like a

24 right and wrong way of doing it.

25 Q.   And just going back to the flyers for a moment on May 15.

1   You explained in detail why it was a busy day, but you

2   testified that you had a number of people, you know, leaders,

3   leads and team members coming to you that day, and just so the

4   record is clear, what were they coming to you about?

5   A.   Specifically related to this topic were a number of team

6   members that had come to me sharing that they had gotten

7   wristbands for me and I think it was like Kyle and Ray, at the

8   time, and they thought because we were having -- they didn't

9   realize what the wristbands were for and they just thought it

10  was us as leaders and they were like handing them out as part

11  of the meeting, and then when they realized that they were CWA,

12  like it was all organized and union related, they just threw

13  them out in the trash.

14       MS. WEINREB:  Your Honor, I object to this testimony.  It

15  reveals names of the employees engaging in union activity.

16  It's way outside the scope of the complaint and I would like to

17  have it stricken from the record in terms of the

18  confidentiality of these employees' names.

19       MR. STANEVICH:  I strongly disagree.  The two employees

20  that Waleed just mentioned I believe testified themselves to

21  what they did.  Mr. Bollepalli asked Waleed about his knowledge

22  of the red wristbands and how he responded and my question was

23  to clarify his testimony before where he said a number of

24  people were coming to him about a certain topic.  The topic

25  wasn't discussed.  So this clarifies on the record and again,

1    it's in response to questions that Mr. Bollepalli had asked
2    Waleed.
3         MS. WEINREB:  I don't have a problem with the question.
4    I'm saying the answer now went way beyond and it revealed
5    employees' names who aren't part of this complaint.  They
6    engaged in union activity and the question was did people come
7    up to you and if he had said yes then I would have been fine
8    with that.  But now we've gone into much more detail that I
9    feel is inappropriate for this record.
10        MR. STANEVICH:  We can redact the name, but I think your
11   request was to redact his answer.  If the name is the issue, we
12   had no objections to redacting the one name that has not been -
13   -
14        MS. WEINREB:  Well, there were two names.
15        MR. STANEVICH:  -- otherwise listed.  Two names.
16        JUDGE ESPOSITO:  All right.  So the names will be redacted
17   from the transcript.  Anything else, Mr. Stanevich?
18        MR. STANEVICH:  Nothing further.  I'm sorry, Your Honor.
19        JUDGE ESPOSITO:  Okay.  Ms. Weinreb, any additional cross
20   examination?
21        MS. WEINREB:  No, Your Honor.
22        JUDGE ESPOSITO:  Mr. Bollepalli, anything else?
23        MR. BOLLEPALLI:  No, Your Honor.
24        JUDGE ESPOSITO:  Okay.  Thank you very much, Mr. Abdelal.
25   You are excused.

1    THE WITNESS:  Thank you.

2    JUDGE ESPOSITO:  Thank you.

3    MR. STANEVICH:  Your Honor, if we can just go off the

4  record for five or so minutes and I could advise whether we

5  have an additional witness or whether we would rest our case in

6  chief.

7    JUDGE ESPOSITO:  All right.  Let's go off the record.

8    (Off the record)

9    THE COURT REPORTER:  We're back on the record.

10    JUDGE ESPOSITO:  Ms. Mastrony, would Respondent like to

11  call another witness?

12    MS. MASTRONY:  Yes, we do --

13    JUDGE ESPOSITO:  Let's go off the record for a minute.

14    (Off the record)

15    THE COURT REPORTER:  We're back on the record.

16    JUDGE ESPOSITO:  During an off the record discussion the

17  parties addressed a few other videos that Respondent intends to

18  introduce as part of its case.  So Ms. Mastrony and Ms. Weinreb

19  would you like to address that issue on the record?

20    MS. MASTRONY:  Sure.  So we have three additional videos

21  that we would like to put into evidence.  The May 29, 2022,

22  video which was marked as Respondent's Exhibit 24, partially

23  full, I believe, but the May 30, 2022, video which I will mark

24  as Respondent's Exhibit 29 and then the June 2nd video which I

25  will mark as Respondent's Exhibit 30 and I have also

1 represented that as part of each of those we will submit in

2 conjunction in chart of relevant timestamps that we would like

3 to use to support our case and, you know, supplement the

4 evidence that we have put in.

5          (Respondent's R-24, R-29 and R-30 identified)

6      JUDGE ESPOSITO:  Okay.  With respect to Respondent Exhibit

7 24, what happened yesterday was that I wanted Ms. Weinreb to

8 have an opportunity to view the entire video before General

9 Counsel's position with respect to admissibility.  So I don't

10 think that -- I think that entire issue in terms of the

11 admissibility of any portion of the video has been sort of

12 postponed until Ms. Weinreb had an opportunity to review it.

13      MS. WEINREB:  Yeah.  But also after the hearing closed

14 yesterday Ms. Mastrony gave me an index of what she was relying

15 on in the May 29 video.  So it made it easier for me to

16 identify exactly what she was focusing on and I was able to

17 review them so I don't have a problem with the May 29 since I

18 reviewed -- I reviewed the stamp locations that she directed me

19 to.  With regard to the May 30 and June 2, I don't know exactly

20 the stamp time that the Respondent is going to be relying on

21 but it's my understanding from our off the record discussion

22 that in May 30th and June 2nd video that the timestamp that

23 will be put into evidence for these videos will be about

24 employees removing trash from the break room table.

25      JUDGE ESPOSITO:  Well, and I believe Ms. Mastrony  also

1  stated that Respondent would be referring to video that say the

2  table or the services of the break room clear at the end of a

3  workday and/or at the beginning of a work day.

4      MS. MASTRONY:  And at times throughout the day, too, if

5  applicable.

6      JUDGE ESPOSITO:  Okay.  So why don't we do this.  The

7  videos will be marked with the exhibit numbers as Ms. Mastrony

8  described and then we can have a second index, an index

9  prepared by Respondent with respect to the timestamp from the

10 different videos that they intend to rely upon as part of their

11 case and that index will be a separate index.

12     MS. MASTRONY:  Do you want it to be like, you know, the

13 video is 24, 24A is the index or do you want it have a

14 completely separate --

15     JUDGE ESPOSITO:  I think it's easier as a separate -- a

16 separate document.

17     MS. MASTRONY:  Sure.

18     JUDGE ESPOSITO:  If that's all right with you all.

19     MS. MASTRONY:  Fine.

20     JUDGE ESPOSITO:  I take it that that's fine.  Okay.  Okay.

21     So Mr. Bollepalli, I'm taking it that your silence is

22 consent to all of this.

23     MR. BOLLEPALLI:  Sorry.  I was distracted.  Yeah, I have

24 no objection as long as the index is coming.

25     JUDGE ESPOSITO:  Okay.  All right.  Now, I just wanted to

1  give you an opportunity to speak up if you had something on

2  this issue.  All right.  So Ms. Mastrony, would you like to

3  call another witness on behalf of Respondent?

4      MS. MASTRONY:  Yes.  Thank you.  I would call Paul

5  Distasio.  He should be in the waiting room.

6      MS. DAVIDSON:  One moment.

7      JUDGE ESPOSITO:  Okay.  Thank you Ms. Davison.  Hello, Mr.

8  Distasio.

9      THE WITNESS:  Hi.  Good afternoon.

10  Whereupon,

11                       PAUL DISTASIO,

12  was called as a witness by and having been first duly sworn,

13  was examined and testified on his oath, as follows:

14      JUDGE ESPOSITO:  Thank you.

15      MS. MASTRONY:  Just before I begin, I forgot to mention

16  this earlier.  I did send the exhibits to Sumanth, Ruth and the

17  court reporter.  There were two for some reason that got kicked

18  back to me so we've uploaded those to SharePoint.  I don't

19  know.  It said it was violating your email policy so for some

20  reason they weren't big or anything.  I don't know what

21  happened, but they are on SharePoint.  Everything else has been

22  emailed to you guys.

23      MR. BOLLEPALLI:  Okay.  And are you going to refer to them

24  with this witness?

25      MS. MASTRONY:  Yes.

1          MR. BOLLEPALLI:  Okay.

2          JUDGE ESPOSITO:  All right.  Mr. Distasio, can you please

3  state and spell your name for the record, sir?

4          THE WITNESS:  Yes.  My first name is Paul, p-a-u-l, and my

5  last name is Distasio, d-i-s-t-a-s-i-o.

6          JUDGE ESPOSITO:  Does anyone have voir dire for Mr.

7  Distasio regarding his location and surroundings?

8          MS. WEINREB:  Yes.

9                    VOIR DIRE EXAMINATION

10  BY MS. WEINREB:

11  Q.   Hi, Mr. Distasio.  I'm Ruth Weinreb with counsel for the

12  General Counsel for the NLRB and I just want to know where you

13  are seated right now?

14  A.   Sure.  I'm seated at a conference room here.  I can show

15  you.

16  Q.   Oh, thank you.  I see no one is with you, correct?

17  A.   That's correct.

18  Q.   And you don't have anything on the desk right in front of

19  you, except --

20  A.   No, I don't.  I have a bottle of water.

21  Q.   Okay.  Thank you.

22          JUDGE ESPOSITO:  All right.  Okay, Mr. Distasio, let me

23  just go over a few things with you before Ms. Mastrony begins

24  asking you questions.  First, it's very important that you

25  listen carefully to each question before answering and do not

1  start speaking or answering until you're sure the question is

2  finished.  The court reporter is recording and cannot have more

3  than one person speaking at a time.

4      Second, if someone objects to an answer to any question,

5  do not answer.  Stop and wait for me to rule on the objection.

6  Again, just try to make sure that there is not more than one

7  person speaking at a time.  Let us know right away if you are

8  having trouble with your audio or video.  Feel free to

9  interrupt whatever else is going on at the time.

10     Tell us you're having problems or wave your hand in front

11 of the camera so that we can see it.  Finally, if you lose

12 audio video completely, check the power and Internet connection

13 and reconnect or reboot the device if necessary.  Then try

14 again to join the hearing using the same link or numbers or try

15 to contact us with a backup device and we will assist you.

16     All right.  Go ahead, Ms. Ms. Mastrony.

17     MS. MASTRONY:  All right.  Thank you.

18                    DIRECT EXAMINATION

19 BY MS. MASTRONY:

20 Q.   Good afternoon, Paul.  How are you today?

21 A.   I'm doing well.  Thank you.

22 Q.   All right.  So can you tell us, are you currently

23 employed?

24 A.   Yes, I am.

25 Q.   And by whom?

1   A.    Apple, Inc.

2   Q.    And what is your position with Apple?

3   A.    Store leader.

4   Q.    All right.  How long have you been in that position?

5   A.    Since October 2018, so four and a half years.

6   Q.    And what location are you at?

7

8   A.    Apple World Trade Center.

9   Q.    All right.  And when were you initially hired by Apple?

10  A.    In September 2008, so about a little over 14 years ago.

11  Q.    And can you just give us a brief overview of the positions

12  you held between the time you were hired and when you became

13  store leader in 2018?

14  A.    Yes.  Sure.  So I worked in five different stores starting

15  in the Palisades Center mall in upstate New York where at the

16  time I was hired as a business partner.  I worked with business

17  clients.  I became the business manager at that same store

18  about two years later where I was the business manager there

19  through 2010.

20      I then moved down to Florida where I was the business

21  manager at a store called the Galleria in Fort Lauderdale and

22  then shortly thereafter a store called the Lincoln Road in

23  Miami Beach.  I was in Miami until late 2012 and I moved back

24  to New York City where I was the business manager at Upper West

25  Side and then in 2014 I became a senior manager in the Upper

1  West Side and then moved down to help open World Trade Center

2  as the senior manager, and like I said since 2018 I've been the

3  store leader there.

4  Q.   And can you just tell us generally what your duties are as

5  a store leader?

6  A.   Sure.  So, you know, it's my job to kind of set the vision

7  of the store, set goals, expectations, oversee the team

8  experience, the people experience.  In kind of a nutshell it's

9  kind of everything that happens within the building.  I will

10 say we are a flagship location.  We're a large store, over 300

11 employees, and in those environments we have two store leaders.

12     So I have a partner and his name is Waleed and we also

13 have what's called a flagship leader who works in our store as

14 well.  So we're a little bit of a larger leadership structure

15 so amongst Waleed and I we kind of share the responsibilities I

16 described and the ultimate responsibility or accountability I

17 guess falls on our market leader.

18 Q.   All right.  There's been a lot of testimony about Apple's

19 solicitation distribution policy.  Are you familiar with that

20 policy?

21 A.   Yes, I am.

22 Q.   And how are you familiar with that policy?

23 A.   Annually we train on business conduct and it's kind of the

24 training we go through that covers kind of all of our policies

25 and solicitation and distribution being one of them.  I believe

1  when I became a manager it was a training I went through when I

2  became a manager.

3      I know when I became an employee it was a training I went

4  through as kind of all new employees go through similar

5  training as well, but we do do like a refresher annually as

6  well.

7  Q.   I know you just told us that you worked at several other

8  stores prior to coming to the World Trade Center location.  Did

9  you ever have occasion to apply the solicitation policy prior

10  to working at the World Trade Center location?

11  A.   Yes, definitely.

12  Q.   All right.  Could you give us some examples of ways you

13  have applied it with respect to, you know, third-party

14  customers, so not your own internal folks?

15  A.   Yeah.  Yeah, I think there's kind of two different ways

16  that I saw it, especially earlier in my career when I worked

17  with our business team.  My role was to support customers who

18  were purchasing our products and integrating them into our

19  businesses, and a lot of times there were consultants that

20  would help with that business and would want to come in and

21  encourage us and our team members to refer them to those

22  businesses and we would very often have to have conversations

23  with those folks about the solicitation policy, that they

24  weren't to come in and solicit our customers, leave business

25  cards or anything to that effect behind.

1    We also with other third parties there is a company called
2  Drive Savers that is a data recovery company and they -- kind
3  of in the same vein, want us to refer our customers to them.
4  They're little bit different, though, because what they
5  typically do is they'll send like swag I guess is the best way
6  I would describe it, to our stores, like logoed stress balls
7  and things like that and they'll send it in box to the store
8  that says like attention to Genius Bar or something like that
9  and we've disposed of those materials as well, keychains and
10  stuff like that.
11  Q.   Okay.  And did you ever have occasion to apply the
12  solicitation distribution policy to employees prior to coming
13  to the World Trade Center?
14  A.   Yes, I have.
15  Q.   All right.  Can you just give us some general examples?
16  A.   Yeah.  I mean generally we see all sorts of things with
17  our team.  I think I can recall a couple of instances where
18  folks were trying to do like bake sales or cookies and Girl
19  Scout cookies and talking to their peers on the floor about it
20  and we've had to kind of correct that behavior.
21    I've seen fantasy football and Super Bowl boxes and all
22  things of that nature where we have a team that is kind of
23  soliciting their peers during like, you know, a slow time on
24  the floor.
25  Q.   All right.  And what about once you came to the World

1  Trade Center, did you have occasion to apply the policy to

2  third parties there as well?

3  A.    Yes.

4  Q.    And can you just explain that for us?

5  A.    Yeah.  Drive Savers, they still send us stuff so we still

6  dispose of that.  You know, we work in a mall.  We're like at

7  Upper West Side for example we were standalone store so that

8  environment is slightly different.  In a mall, specifically as

9  it relates to the solicitation policy, new stores will open,

10 new like food venues, like a Auntie Anne's, I remember when

11 they opened up they came in and they would try and give us

12 coupons.       Sometimes there are a little I guess overt about

13 it and will just like leave stacks of coupons out and around

14 the store and we've seen that.  They just kind of pick them up

15 and throw them out.  Other times they directly hand them to

16 employees.  We see it with, you know, other stores as well.

17 Not just food.      Certainly folks, when they open their

18 store, they come in and kind of give us, you know, different,

19 you know, print outs of their kind of discounts that they want

20 to offer us.  We have people who come into our store and try to

21 sell stuff.  I've seen people come into our store and try to

22 sell iPhone accessories.       I've seen people come into our

23 store and try to sell candy.  We've certainly sent those folks

24 away and reminded them of our policies.  We see people come in

25 and very often solicit our customers.  I think for us, like

1  when we opened, it was back in 2016.  We opened alongside the

2  mall so there was a lot of fanfare with that.

3      Like John legend was performing.  It was this really big

4  deal, and Apple stores, when they open, they often draw a big

5  crowd.  And we had a line of about 500, and 600 people cued up

6  to kind of enter our store and there were definitely folks that

7  saw that as a captive audience to try to solicit them and we

8  had to ask them not to do that.

9      You know, give them different kind of discounts to, you

10 know, come get a pretzel or whatever it was.  So we have

11 definitely done that.  We see it periodically, too, throughout

12 like busy times when we have iPhone launches.  Any time there

13 is a que outside of our store it feels like that comes back up.

14 So we certainly talk about that as well.

15 Q.  All right.  What about at the World Trade Center location,

16 have you had occasion to apply the solicitation distribution

17 policy to employees?

18 A.  Yeah, absolutely.

19 Q.  And how does that come up?

20 A.  You know, our team, we are fortunate.  We have a very

21 diverse and unique team and they're also very, very creative

22 and oftentimes have different events that they participate in

23 or different kind of albums that they release, shows that they

24 have, and we have often been asked to kind of celebrate those

25 or spotlight those, to post them, to share them in our

1    downloads.    I'm sorry, like our morning meetings and we've

2    had to talk to them about the fact that, you know, we don't use

3    those opportunities to solicit.  Certainly they talk about it

4    amongst themselves when they are sitting and eating lunch or

5    whatever it might be but, you know, it's not something that we

6    would ever kind of sponsor, if you will.

7    Q.    Okay.  And if they're talking about that kind of thing

8    while they're on their break or, you know, sitting in the break

9    room, do you permit that?

10   A.    Yeah, of course.

11   Q.    All right.  And have you ever had occasion to discuss the

12   solicitation distribution policy with other management and

13   other leaders?

14   A.    Yes, I have.

15   Q.    Okay.  And how does that come up?

16   A.    It comes up periodically.  You know, I think I shared

17   already that when we have cues outside of our store, that tends

18   to be a moment where folks try to solicit our customers.  So

19   that's definitely a time where we'll kind of have a reminder,

20   hey, everybody, just a reminder.  Here's a solicitation

21   distribution policy so that way everybody is abreast of what to

22   do and how to handle it.

23        We see it around like Halloween sometimes.  Folks come in

24   and there's like these kind of like trick-or-treating things

25   that happen in malls.  So we've certainly talked about it

1   around then.  You know, it pops up here and there and like any

2   policy like we're all kind of in tune with the policy and what

3   policies are, but there are times throughout the year where it

4   becomes a bit more relevant and we'll take that time just to

5   make sure everybody feels comfortable with those policies.

6   Q.   All right.  I'm going to show you some exhibits now.  I

7   want to share my screen.  I'm putting up Respondent's Exhibit

8   19.  Just let me know that -- oh, let me make that smaller.

9   Oops.  Okay.  Let me know when you can see it.

10  A.   I see it.  It's a little big but, yeah, okay, I see it

11  now.

12  Q.   Is it still too big?

13  A.   No, I can see it.

14  Q.   Okay.  All right.  So I'm just going to scroll for you.

15  This is just one page.  Let me just give you a second to look

16  at it and tell me when to scroll.

17  A.   If you could scroll down just a little bit.  Okay.

18  Q.   All right.  And that's the bottom?

19  A.   Yes.

20  Q.   All right.  Can you tell us what this document is?

21  A.   Yes.  That is an example of a time when a store in our

22  mall left behind flyers to offer a discount to our team.  It

23  looks like a 50 percent discount.

24              (Respondent's R-19 identified)

25  Q.   And the writing in blue, who is that?

1   A.   That is me.

2   Q.   All right.  And do you know with whom you were speaking?

3   A.   I do.

4   Q.   Okay.  And you don't have to say his name, but if you

5   could just identify if it's another manager, an employee?

6   A.   At the time he was a senior manager at our store.

7   Q.   Okay.  And the date on this?

8   A.   January 25 of 2019.

9   Q.   All right.  And do you remember where this was?

10  A.   Yeah, in the break room.

11  Q.   At which location?

12  A.   At Apple World Trade Center.

13  Q.   All right.  I would like to enter this as as an exhibit.

14  This is Respondent's 19.

15       JUDGE ESPOSITO:  Any objection to the admission of

16  Respondent Exhibit 19?

17       MS. WEINREB:  No, Your Honor.

18       MR. BOLLEPALLI:  No objection.

19       JUDGE ESPOSITO:  No objection.  Respondent Exhibit 19 is

20  admitted.

21       (Respondent Exhibit 19 is admitted)

22  BY MS. MASTRONY:

23  Q.   All right.  Let's go to Respondent's 18.  Let me make this

24  a little bit smaller so it -- just tell me.  Can you see it?

25  A.   I can.

1  Q.   All right.  Again, I'm just going to scroll through so you

2  can see the whole thing.  It's a three-page document so tell me

3  when you're ready for me to scroll.

4  A.   Okay.  You can go ahead.  Okay.

5  Q.   All right.  That was page one.  This is page two.  And

6  then the last page.

7  A.   Okay.  Thank you.

8  Q.   All right.  Can you tell us what this document is?

9  A.   Yes.  So back in February our vending machines were

10 serviced.  It's common.  They break and we have the drinks

11 refilled, what have you, and following that service I noticed

12 that they were running ads on the little touch screen like

13 where you would type in the number and kind of pay.  So I

14 raised it to me leaders to have somebody reach out to the

15 vending machine company to have those removed.  I felt like it

16 was a violation of our solicitation policy.

17                    (Respondent's R-18 identified)

18 Q.   Okay.  And did they remove them?

19 A.   Yes, they did.

20 Q.   All right.  And what's the date of the --

21 A.   February 14 of 2022.

22 Q.   Okay.  And then who is Manny?

23 A.   Manny is an operations lead at Apple World Trade Center.

24 Q.   All right.  And he reached out to Brett Haykin?

25 A.   I don't know who Brett is, but Canteen is the vendor that

1  we use for our vending machines.

2  Q.  All right.  I would like to enter this as a full exhibit.

3  This is Respondent's 18.

4      JUDGE ESPOSITO:  Any objection?

5      MS. WEINREB:  No.  Go ahead.  Sorry.  No objection.

6      JUDGE ESPOSITO:  Mr. Bollepalli?

7      MR. BOLLEPALLI:  No objections.

8      JUDGE ESPOSITO:  Respondent Exhibit 18 is admitted.

9      (Respondent Exhibit 18 is admitted)

10  BY MS. MASTRONY:

11  Q.  All right.  Let's now turn to Respondent's 20.  Again, I'm

12  going to scroll for you.  It's just one page, but tell me when

13  to scroll.  Can everyone see it?  Or is it too small?

14  A.  It's a little small.

15  Q.  All right.  How is that?

16  A.  That's better for me.

17  Q.  Okay.  Okay.

18  A.  If you could scroll.

19  Q.  Uh-huh.

20  A.  Okay.  Thank you.

21  Q.  All right.  So can you tell us what this document is?

22  A.  Yes.  It's an email that I sent to Josh Jennison who at

23  the time was our flagship leader referring to a new whiteboard

24  that we purchased.  We have a whiteboard at our store that we

25  use and as you can see in this example sometimes they ask silly

1    questions about licking a Tootsie Roll pop.  Other times to

2    highlight something like a new product feature or what have you

3    and the board we had was too small, so we got a second larger

4    board and was sharing that information with the leaders and

5    just kind of setting some ground rules for how to use it.

6                    (Respondent's R-20 identified)

7    Q.   All right.  And at the top there in the subject line it

8    says draft.  Do you know if you actually sent this email?

9    A.   I don't know.  I would think so, but I don't know for

10   sure.

11   Q.   Okay.  And the date on this was?

12   A.   January 30 of 2017.

13   Q.   All right.  I'd like to enter this as Respondent's 20, a

14   full exhibit.

15       JUDGE ESPOSITO:  Any objections to the admission of

16   Respondent's Exhibit 20?

17       MS. WEINREB:  No, Your Honor.

18       MR. BOLLEPALLI:  No, Your Honor.

19       JUDGE ESPOSITO:  Respondent Exhibit 20 is admitted.

20       (Respondent Exhibit 20 is admitted)

21   BY MS. MASTRONY:

22   Q.   All right.  And then down here at the bottom, Paul, you

23   know, you told them about the new whiteboard and then it says

24   please keep the board appropriate and inclusive and remember we

25   should never use for solicitation.  Why did you include that

1   piece about not using the whiteboard for solicitation?

2   A.   It's an area where I've seen in multiple stores.  It can

3   be susceptible to solicitation.  It's kind of a blank canvas

4   and I have definitely had instances in past stores where I've

5   had to remove again things like, hey, come to me comedy show.

6        It's a space where folks -- we do allow them to write

7   things off and it's like recognition for their peers, but it's

8   a canvas with a marker and somebody could certainly write

9   something like come to me comedy show.  So I just wanted to

10  share the reminder with everybody that solicitation wouldn't be

11  permitted on the whiteboard.

12  Q.   All right.  I'm going to stop sharing.  All right.

13  Switching gears for a moment, we've had a lot of testimony

14  about a program called Benevity.  Are you familiar with that

15  program?

16  A.   Yes, I am.

17  Q.   And can you just explain to us briefly what that is?

18  A.   Yes, I can.  It's a benefit we offer our employees.  It's

19  a part of like our employee gifting or matching, excuse me,

20  program.  So if you volunteer time or if you donate to a

21  charitable cause, Apple will either donate $25 per hour donated

22  towards the charitable cause or will match your donation.

23       Often times its dollar for dollar, but there are different

24  times throughout the year where sometimes it's a two for one or

25  a three for one match.  It's something our teams really

1  appreciate being able to give back to their kind of community,

2  but also have Apple match that in kind.

3  Q.   All right.  And is this a voluntary program?

4  A.   Yes, it is.

5  Q.   Okay.  And if, you know, an employee wants to take

6  advantage of this benefit, how would they access it?

7  A.   It's accessed through a website.  It's Apple.Benevity.org

8  and it's a website that they need to login using their Apple

9  connect, which is like their internal username and password and

10  then that gives them access to Benevity to either submit a

11  donation, submit a donation for match or log time that they

12  volunteered.

13  Q.   All right.  Let's go to Respondent's 27 and I'm going to

14  put this up.  Just let me know when you can see it.

15  A.   I can see it.

16  Q.   All right.  So this -- let me just scroll through it for

17  you, okay?

18  A.   Sure.

19  Q.   All right.  Can you identify what this is?

20  A.   I can.

21  Q.   All right.  What is it?

22  A.   It is -- sorry.  It is the people site.  So we have an

23  internal website for all of our benefits.  It's called

24  people.apple.com.  So it's actual people site that explains our

25  employee giving and matching program that I described earlier.

1          (Respondent's R-27 identified)

2    Q.   All right.  And why would someone be on this website?

3    A.   Well, if they're just wanting to learn about the benefits.

4    You know, obviously it's an informational tool but it also

5    spotlights some of the great stories that have happened which

6    is nice as well as it appears on the bottom there it links

7    directly to that Apple Benevity portal as well.

8    Q.   All right.  And I would like to enter this as Respondent's

9    27.

10          JUDGE ESPOSITO:  Any objection to the admission of

11   Respondent Exhibit 27?

12          MS. WEINREB:  No, Your Honor.

13          MR. BOLLEPALLI:  Just looking at it right now, I mean this

14   document refers to various policies.  I would like to see

15   copies of these policies specifically on page two.

16          MS. MASTRONY:  What are you referring to?

17          MR. BOLLEPALLI:  So I guess page two?

18          MS. MASTRONY:  I don't know.  It's really -- it's only one

19   page the way mine is showing.

20          MR. BOLLEPALLI:  Okay.  Because you had sent me the

21   exhibits in a different way.  All right.  Sorry.  I think I'm

22   looking at the wrong one then.

23          MS. MASTRONY:  Yeah, I think you might be looking --

24          MR. BOLLEPALLI:  I was on 28.  I didn't have this one.

25          JUDGE ESPOSITO:  Okay.  So do you have --

1    MR. BOLLEPALLI:  I have no objection to this.

2    JUDGE ESPOSITO:  All right.  Respondent Exhibit 27 is

3  admitted.

4    (Respondent Exhibit 27 is admitted)

5    MS. MASTRONY:  Sumanth, this is one of the ones that got

6  kicked back to me so it's in SharePoint.

7    MR. BOLLEPALLI:  Okay.

8  BY MS. MASTRONY:

9  Q.  All right.  So if you were to click on here where it says

10  go give, where would that take you?

11  A.  Apple.Benevity.org.

12  Q.  All right.  Let's go to Exhibit 25, what I've marked as

13  Respondent's Exhibit 25.  Can you tell us what that is?

14  A.  Sure.

15  Q.  Okay.  Can you tell us about it?

16  A.  That's the front page of the portal.  So

17  Apple.Benevity.org.

18  Q.  All right.  I'd like to offer this as Respondent's 25.

19    MS. WEINREB:  Can I just see the whole page.  This is the

20  first page you said?

21    MS. MASTRONY:  Yeah, it's just one page.

22    MR. BOLLEPALLI:  I'm sorry.  Can you just go the to the

23  bottom so I can read it?

24    MS. MASTRONY:  Yeah.

25    MR. BOLLEPALLI:  Thank you.  I'm done reviewing.

1    MS. WEINREB:  Yeah, I'm good.

2    JUDGE ESPOSITO:  All right.  Does anyone have an objection

3  to the admission of Respondent Exhibit 25?

4    MS. WEINREB:  No, Your Honor.

5    MR. BOLLEPALLI:  No objection.

6    JUDGE ESPOSITO:  Respondent Exhibit 25 is admitted.

7    (Respondent Exhibit 25 identified and received)

8  BY MS. MASTRONY:

9  Q.  All right.  Actually, I can stop sharing this.  Paul,

10  we've been referring to Benevity as a program, but what is

11  Benevity itself?

12  A.   I mean it's a benefit that we offer our team.  I guess at

13  Benevity we use kind of like colloquially.  I'm not great at

14  that word, but like it just kind of like a word we use like to

15  describe our volunteering program.  I suppose it's the website

16  that kind of organizes everything I described.

17  Q.  All right.  Do they administer the donation program?

18  A.   To my knowledge, yes.

19  Q.  Okay.  All right.  And then let me show you one more

20  document.  All right.  This is probably too big.  Is that too

21  big?

22  A.   It looks okay to me.

23  Q.  Okay.  So this is quite long.  It's 28 pages.  I'm only

24  going to go to one piece of it, but just from the front page,

25  can you tell us what it is?

1    A.    Yes.  So each store has somebody that we call a volunteer

2    champion and it's like a temporary assignment, I guess.  It's

3    not in lieu of their existing job.  It's in addition to their

4    existing job but often times we have folks in our store that

5    are really interested in philanthropy and volunteerism and will

6    want to help kind of be the point person for all of those

7    efforts and we'll have them do that for a period of time.

8         You know, maybe a year or two and they'll support those

9    efforts and they have to go through some specific training

10   before they can be kind of dubbed our volunteer champion and

11   help with the coordination of volunteering events and this is

12   kind of the handbook or playbook, all right, if you will, of

13   the volunteer champion or volunteer guide.

14   Q.    All right.  And how do you access this playbook?

15   A.    It's on the people site as well.  So at people.apple.com.

16   Q.    All right.  I'm just going to scroll.  Well, actually I

17   would like to enter this as a whole exhibit as Respondent's 28.

18        JUDGE ESPOSITO:  Ms. Weinreb and Mr. Bollepalli, have you

19   had an opportunity to review the entire document?

20        MR. BOLLEPALLI:  I have not.

21        MS. WEINREB:  No.

22        MR. BOLLEPALLI:  This is the exhibit where I was referring

23   to on page two there was various other policies that were

24   cited.

25        MS. WEINREB:  It was just sent to us this afternoon while

1  we were giving testimony so I haven't had an opportunity to

2  review it.

3       JUDGE ESPOSITO:  Okay.

4       MS. MASTRONY:  Yeah, I don't think -- I mean if they want

5  to read it, but I don't think that's really necessary.

6       MS. WEINREB:  If you want me too -- if you could just go

7  down slowly just to see.  I mean it's -- well, a little slower.

8       MS. MASTRONY:  I know.  I mean it's pretty long.  You

9  should have a copy.  It might be easier for you to scroll it

10 yourself.  I mean I can, but it's --

11      MS. WEINREB:  Well, it's just about the volunteer program?

12      MS. MASTRONY:  Yes.  It's their playbook I think Paul was

13 explaining.

14      MS. WEINREB:  Can you just go down a little bit because I

15 -- I don't think I'm going to have any objections.

16      JUDGE ESPOSITO:  Well, if you want to review it and if you

17 want to take some time and review it then --

18      MS. MASTRONY:  All right.  Well, we don't need this

19 exhibit.  We can move on.

20      MR. BOLLEPALLI:  I just -- yeah, all right.  If we're

21 withdrawing it.

22      MS. MASTRONY:  That's fine.

23      JUDGE ESPOSITO:  Okay.  So you're withdrawing it, Ms.

24 Mastrony?

25      MS. MASTRONY:  Yeah.

1       JUDGE ESPOSITO:  Okay.

2       MS. MASTRONY:  Okay.  I don't have any further questions.

3       MS. WEINREB:  Can I just have five minutes, please?

4       JUDGE ESPOSITO:  Sure.  Why don't we come back at 10 till

5   five.

6       MS. WEINREB:  Thank you.

7       JUDGE ESPOSITO:  Off the record.

8       (Off the record)

9       THE COURT REPORTER:  We're back on the record.

10      JUDGE ESPOSITO:  Okay.  Ms. Weinreb, cross examination?

11      MS. WEINREB:  Yes.  I just have one thing to show, if I

12  may.  Now I don't know why.  Oh, God.  It's not coming up.

13  Just a second.

14      JUDGE ESPOSITO:  Do you want to go off the record and

15  maybe Ms. Davidson can assist you?

16      MS. WEINREB:  Yeah.  I'm just -- I'm just -- I just had it

17  on my screen and I thought it would.

18      JUDGE ESPOSITO:  Okay.  Let's go off the record for a

19  minute.

20      (Off the record)

21      THE COURT REPORTER:  We're back on the record.

22      JUDGE ESPOSITO:  Okay.  Go ahead, Ms. Weinreb.

23                      CROSS-EXAMINATION

24  BY MS. WEINREB:

25  Q.  Okay.  So I would like to -- what's up on the screen, I

1  would like to have marked for identification as General Counsel

2  10 and Mr. Distasio, I would like you to take a look at what's

3  been -- what's on the screen, what we finally were able to

4  share with you and this is a document that's from you, correct?

5  A.    Yes.  It appears as though it's an email from me.

6  Q.    Okay.  And it's to Tyler Perroni?

7  A.    Yes.

8  Q.    And who is he?

9  A.    Tyler is a manager at Apple World Trade Center.

10  Q.    And how long has Tyler been at World Trade Center?

11  A.    Approximately four years.

12  Q.    And what team is -- is he on the selling side or the

13  repair side?

14  A.    He is on the Genius Bar side, so the repair side.

15  Q.    And then -- so this is from you to him and below, if you

16  go down where it says on May 30, 2022, at 5:25 p.m., Tyler

17  Perroni wrote and below that is Tyler's email to you?

18  A.    Yes, that's correct.

19  Q.    Okay.

20       MS. MASTRONY:  Ruth, if you're going to ask him about

21  this, could you just scroll so he could see the full doc before

22  he testifies about it?

23       MS. WEINREB:  Okay.  So I don't have control of it, so

24  Sumanth, could you --

25       MR. BOLLEPALLI:  Oh, I'm sorry.

1    MS. WEINREB:  -- Just allow Mr. Distasio to look at the --

2    it's a two page document I believe.  Let us know when you're

3    ready for the second page, Mr. Distasio.

4    THE WITNESS:  Okay.  You can proceed.

5    MS. WEINREB:  Okay.  So now we're showing you the second

6    page.

7    THE WITNESS:  Okay.

8    BY MS. WEINREB:

9    Q.   So in this -- I would like to go to the first page and if

10   you can go down to the second -- the third -- the third

11   paragraph going up from the bottom of the first page where it

12   says I told Ian.

13   MS. MASTRONY:  I think we need to scroll down.

14   JUDGE ESPOSITO:  Well, if you need to scroll down.

15   BY MS. WEINREB:

16   Q.   I can.  Okay.  Wait.  Right there.  So do you see where it

17   says on the first page and so Tyler wrote to you.  I told Ian

18   that he seems to be more informed on the laws than I am.  So it

19   may be best to actually question the members of leadership

20   directly who he had witnessed removing the flyers and signage.

21   Is that what he wrote to you?

22   A.   Yes.

23   Q.   And you also wrote continuing in the next paragraph, he

24   kept repeating himself, so I just smiled and told him that I'm

25   sorry.  I really don't have an answer for you on this.  That's

1  Tyler wrote that, right?

2  A.   Yes, that's correct.

3  Q.   And he's telling you what he told Ian, right?

4  A.   Yes, that's correct.

5  Q.   And Tyler goes on to say that he told -- that he told Ian,

6  I'm always transparent and honest with you and this time I

7  don't have an answer.  You really should follow up with those

8  folks directly.  So Tyler said that to Ian?

9  A.   Yes, that's how he reported it to me.

10  Q.   In this email?

11  A.   Yes.

12  Q.   Okay.  No further questions.  Wait, Your Honor.  I would

13  just like to identify.  I don't think I properly did.  This

14  email was -- also, could you go to the top.  The email that

15  Tyler sent was on May 30, 2022, as well as your response to Mr.

16  Perroni, correct?

17  A.   Yes.

18  Q.   They were both on May 30, 2022, right?

19  A.   Yes.

20  Q.   No further questions.

21       JUDGE ESPOSITO:  Okay.  Ms. Weinreb, are you moving for

22  the admission of this document or is it just going to remain

23  marked for identification?

24       MS. WEINREB:  Just going to remain marked.

25       JUDGE ESPOSITO:  Okay.  Mr. Bollepalli, do you have any

1    questions for Mr. Distasio?

2        MR. BOLLEPALLI:  No, Your Honor.

3        JUDGE ESPOSITO:  Ms. Mastrony, do you have any redirect

4    examination?

5        MS. MASTRONY:  Can you just give me three minutes?

6        JUDGE ESPOSITO:  Yeah, sure.  Let's go off the record.

7        MS. MASTRONY:  Thanks.

8        (Off the record)

9                        REDIRECT EXAMINATION

10   BY MS. MASTRONY:

11   Q.   I do have a couple of questions for Paul on that document

12   but I don't think I have a copy of it.  It doesn't appear to be

13   in SharePoint and I don't need one frankly, but if someone

14   could put it up for me.  I don't need one right this second but

15   I would like a copy but, yeah, Sumanth if you could put that

16   up, that would be great.

17       MR. BOLLEPALLI:  Yes.

18       MS. WEINREB:  This document came from you?

19       MS. MASTRONY:  I know.

20       MS. WEINREB:  Okay.

21       MR. BOLLEPALLI:  Can you see it?

22       MS. MASTRONY:  Not yet.  It's coming.  All right.  Okay.

23   BY MS. MASTRONY:

24   Q.   Paul, just quickly, you know, we were just talking about

25   this document.  This is a May 30 email from you to Tyler.  So

1   how long had Tyler been a manager at this point as of May 30?

2   A.    Six months.

3   Q.    Okay.  So he was pretty new --

4   A.    Johnson.

5   Q.    Okay.  So he was pretty new to management?

6   A.    Yes.

7   Q.    All right.  So he sent you this email about the flyers or

8   the conversation about the flyers, right?

9   A.    Yes.

10  Q.    All right.  So he had escalated this issue to his store

11  leader?

12  A.    Yes.

13  Q.    All right.  And what was your response to him in this

14  email?

15  A.    I thanked him for the recap.  Let him know the issue that

16  Ian was describing with the issue of our solicitation policy

17  and that I would like to connect with him further.

18  Q.    Okay.  I don't have any other questions.

19        JUDGE ESPOSITO:  All right.  Ms. Weinreb, any additional

20  cross examination?

21        MS. WEINREB:  No, Your Honor.

22        JUDGE ESPOSITO:  Mr. Bollepalli?

23        MR. BOLLEPALLI:  No, Your Honor.

24        JUDGE ESPOSITO:  All right.  Thank you very much, Mr.

25  Distasio.  You're excused.

1    THE WITNESS:  Thanks, Your Honor.

2    JUDGE ESPOSITO:  Let's go off the record for a minute.

3    (Off the record)

4    THE COURT REPORTER:  We're back on the record.

5    JUDGE ESPOSITO:  Okay.  So Ms. Mastrony, does the

6    Respondent have any other testimony or documentary evidence

7    that it wishes to introduce as part of its case?  Ms. Mastrony

8    and Mr. Stanevich?

9    MS. MASTRONY:  No, we do not.

10    JUDGE ESPOSITO:  Okay.  And Ms. Weinreb, does General

11    Counsel have any rebuttal evidence it wishes to present?

12    MS. WEINREB:  No, Your Honor.

13    JUDGE ESPOSITO:  Then what I'm going to do is close the

14    record with the exception of Respondent Exhibit 29, which is

15    the May 30, 2022, video, Respondent Exhibit 30 which is the

16    June 2, 2022, and an index regarding the portions of those

17    videos that Respondent intends to rely on as part of the case

18    which I understand will be provided by Respondent to General

19    Counsel and to the Charging Party within the next day and at

20    that time I will admit all of those exhibits subject to any

21    objection by the parties and close the record.  The record is

22    only being held open for that specific purpose.

23    MS. WEINREB:  Your Honor, if I may just clarify something.

24    Will the index be part of the evidence, admitted?  I mean I

25    just want to confirm that.

1      JUDGE ESPOSITO:  Yes, my understanding is that the index

2    is going to be an exhibit that is admitted.

3      MS. WEINREB:  Okay.  So I don't think counsel has

4    submitted the index to May 29.  I'm sorry, yeah, May 29 video

5    which is Respondent's 24, I believe.  I don't think we have an

6    index that's been admitted into evidence.  Just the tape.

7      MS. MASTRONY:  Right.  We haven't done it yet.  We will.

8      MS. WEINREB:  Okay.  I'm just clarifying.  I don't need it

9    because I know you sent it to me last night but I don't think

10   it's -- I got an email about it but I don't think it's admitted

11   into evidence so as long as that will be admitted into evidence

12   with the other Respondent's 29 and 30, you will also be

13   providing the index for Respondent 24.

14      (Respondent's R-29, R-30, and R-24)

15      JUDGE ESPOSITO:  Yes, but the index -- all three videos is

16   going to be one exhibit.

17      MS. WEINREB:  Okay.

18      JUDGE ESPOSITO:  That Respondent submits and is admitting

19   into evidence as just one exhibit, the index.

20      MS. MASTRONY:  Right.

21      MS. WEINREB:  So would that be Respondent's 31?

22      MS. MASTRONY:  Yes.

23      JUDGE ESPOSITO:  Is there anything else before I close the

24   record with the exception of these two videos and the index to

25   the three videos?

1        (Respondent's R-31 received)

2      MR. BOLLEPALLI:  No.

3      JUDGE ESPOSITO:  No?  Okay.  I will prepare and file with

4    the Board my decision in this proceeding.  A copy will be

5    served on each of the parties.  You are reminded to refer to

6    the Board's rules and regulations for information regarding the

7    filing of briefs and proposed findings for my consideration and

8    regarding procedures before the Board after the issuance of the

9    Judge's decision.

10      I will allow until February 14, 2023, for the filing of

11    any briefs, findings and conclusions.  These should be filed

12    directly with the judge's division office in New York, New York

13    regardless of whether they are e-filed or mailed.  See sections

14    102.3 through 102.5 of the Board's rules for filing and service

15    requirement.

16      Any request for an extension of time for the filing of

17    briefs must be made in writing to the Associate Chief Judge

18    Kenneth Chu in the New York office of the division of judges

19    and served on the other parties.  The positions of the other

20    parties regarding extension should be obtained and set forth in

21    the request.

22      Request for extension should contain specific reasons and

23    show that the requesting party cannot reasonably meet the

24    current deadline.  There being nothing further, the hearing is

25    now closed with the exception of the materials discussed

1  earlier.  Off the record.

2       (Whereupon, at 4:00 p.m., the hearing in the above-

3  entitled matter was closed.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                                    CERTIFICATION

4         This is to certify that the attached proceedings before

5    the National Labor Relations Board (NLRB), Region 2, in the

6    matter of Apple, Inc. and Communications Workers of America,

7    AFL-CIO, Case No. at the National Labor Relations Board, Jacob

8    Javits Federal Building, 26 Federal Plaza, New York, New York,

9    10278-3699, was held according to the record, and that this is

10   the original, complete, and true and accurate transcript that

11   has been compared to the recording from the hearing, that the

12   exhibits are complete and no exhibits received in evidence or

13   in the rejected file are missing.

14

15

16                     *Rae'gen Rogers-Rogue*

17                     _____

18                     Raegan Rogers-Rogue

19

20

21

22

23

24

25

**$**

**$10 (1)**
234:22
**$25 (1)**
362:21

**A**

**Aaron (4)**
241:18,21;242:9;
243:25
**abandoned (2)**
312:16,16
**a-b-d-e- (1)**
292:12
**Abdelal (25)**
196:20;282:5;
292:4,11,15,19;294:1,
20;316:5,16,17;
320:15;321:7,20;
323:4;324:8;326:9;
327:4,9;329:20;
338:2;339:10;340:13,
19;343:24
**Abdulel (2)**
324:21;331:23
**Abdullah (1)**
238:5
**able (9)**
230:20;245:13;
250:11;282:14;303:9;
330:23;345:16;363:1;
370:3
**Above (7)**
197:8,11,22;
224:13;245:4;257:11;
296:16
**above- (1)**
378:2
**above-entitled (1)**
183:13
**abreast (1)**
356:21
**absolutely (5)**
219:5;255:5;
286:12;290:6;355:18
**acceptable (2)**
341:13,14
**access (8)**
230:7;255:6,9,12,
12;363:6,10;367:14
**accessed (1)**
363:7
**accessible (1)**
225:17
**accessories (1)**
354:22
**accomplish (1)**
220:7
**accomplishments (1)**
234:6

**account (1)**
316:11
**accountability (1)**
351:16
**accurate (3)**
191:22;219:24;
244:22
**accurately (2)**
244:25;295:3
**achieve (1)**
223:10
**across (9)**
193:11;197:4;
198:6,16;216:9;
246:10;247:8;272:8;
325:8
**act (1)**
307:15
**action (3)**
231:1;310:4;311:14
**action-packed (1)**
217:7
**actions (1)**
270:17
**active (2)**
218:5;257:5
**activism (1)**
225:23
**activities (2)**
205:18;234:2
**activity (8)**
200:5;233:15;
285:4,17,19;288:13;
342:15;343:6
**actor (1)**
233:25
**actors (1)**
303:15
**actual (1)**
363:24
**actually (26)**
194:5;199:14;
204:11;209:16;
211:15;224:11;253:7;
263:17;269:1;271:21;
273:8;280:23;283:23;
287:10,21;300:14;
313:20;320:24;
323:13;329:20;
330:25;336:2;361:8;
366:9;367:16;371:19
**add (1)**
245:1
**added (1)**
317:18
**addition (6)**
200:8;211:21;
220:17;232:11;
287:14;367:3
**additional (13)**
214:18;224:13;
250:14;251:5;256:17;
259:5,8;298:18;

**account (1)**
314:22;343:19;344:5,
20;374:19
**address (6)**
235:16,16;309:15;
344:19
**addressed (8)**
257:10;308:7,8,9,
14;309:16;313:20;
344:17
**addressing (1)**
289:3
**adhere (1)**
301:17
**adhering (1)**
303:19
**adjusted (1)**
249:16
**administer (3)**
299:20,24;366:17
**administered (1)**
299:19
**Administrative (2)**
183:14;188:6
**admins (1)**
201:7
**admissibility (2)**
345:9,11
**admission (9)**
202:13;214:11;
215:2;337:23;358:15;
361:15;364:10;366:3;
372:22
**admit (2)**
215:9;375:20
**admitted (21)**
203:9;208:11,12;
214:9;326:5;337:18;
340:1;358:20,21;
360:8,9;361:19,20;
365:3,4;366:6;
375:24;376:2,6,10,11
**admitting (1)**
376:18
**ads (1)**
359:12
**advantage (1)**
363:6
**advise (3)**
253:1;336:23;
344:4
**advised (1)**
207:10
**ae (1)**
328:14
**AFL-CIO (1)**
183:9
**afoul (1)**
233:16
**afternoon (8)**
262:6;279:4;
295:20;327:9,11;
347:9;349:20;367:25
**afternoons (1)**

**account (1)**
226:1
**again (61)**
188:17,20;192:9;
193:11;197:7,16,22,
25;201:17;210:5;
218:8;224:17;235:25;
240:9;241:5;242:14;
244:21;257:12,12;
261:15,24;266:1;
270:9;271:3,23;
272:12,20;273:8,14;
274:1;278:11,20;
282:17;302:13,24;
306:7,15,21;307:21;
308:15;310:14;
319:25;320:5,17;
322:16,20,24,25;
323:2;324:21;325:24;
331:12,14,21;332:5;
342:25;349:6,14;
359:1;360:11;362:5
**against (1)**
247:11
**ago (9)**
264:22;268:19,20;
274:2;279:11;297:11;
302:17;311:13;
350:10
**agreed (1)**
222:13
**ahead (33)**
190:1,23;192:11;
193:10;202:17;
203:18;204:6;208:3;
209:25;215:16;
227:15;236:17;
245:24;252:2;260:11;
262:3;266:1;277:14;
278:24;295:17;
311:22;315:6;316:2;
325:2;327:6;328:9,
18;334:8;341:3;
349:16;359:4;360:5;
369:22
**aiming (1)**
228:13
**alarm (1)**
231:3
**albums (1)**
355:23
**alcove (1)**
247:6
**align (1)**
235:7
**aligned (1)**
297:8
**allegation (4)**
306:25;309:20,23;
328:6
**allegations (1)**
287:19
**alleged (1)**
286:1

**allegedly (1)**
288:12
**alleviate (1)**
326:4
**allow (10)**
210:22;227:15;
266:12;286:4;287:16;
306:5;311:22;362:6;
371:1;377:10
**allowed (3)**
285:10,14;324:11
**almost (1)**
222:21
**alone (1)**
292:25
**along (2)**
216:25;246:7
**alongside (2)**
298:13;355:1
**altogether (1)**
275:7
**always (11)**
207:6;218:23;
220:11;284:9;285:7,
9;301:10;303:1;
307:17;309:4;372:6
**Alyssa (3)**
314:11,12,13
**AMERICA (1)**
183:8
**among (3)**
222:19;223:2;
224:21
**amongst (2)**
351:15;356:4
**amount (2)**
209:12;218:16
**and/or (5)**
188:21;222:17,19;
251:14;346:3
**Andrew (12)**
270:15;274:16,18;
308:3,3,4,12,16;
313:18,20,21,22
**Andrew's (1)**
313:25
**Anne's (1)**
354:10
**announcements (1)**
204:14
**annual (3)**
224:12,15;243:4
**annually (5)**
243:7,8;256:15;
351:23;352:5
**answered (3)**
288:24;320:8,12
**anticipated (1)**
258:24
**apartment (1)**
206:5
**APLWTC (1)**
318:9

**APL-WTC_00000047 (1)**
335:11
**apologize (4)**
255:17;272:23;
335:25;340:21
**app (1)**
206:18
**appear (2)**
208:15;373:12
**appearance (1)**
222:18
**appearances (1)**
188:22
**appeared (4)**
236:22;287:12,25;
332:5
**appears (4)**
316:17,20;364:6;
370:5
**APPLE (99)**
183:5;188:5;
192:20,21,22;193:5,
12,19,21;194:13;
195:3;196:23;197:1;
198:4,9,12,25;204:13,
19,21,22;206:17;
209:2;219:23;221:4,
14;222:6,8,9,16,17;
224:6,7;225:3;226:6;
229:9;232:9;233:22;
234:4;237:20;238:13,
14;240:3,12,14,14;
242:21;252:23;
262:11,13,15,20,23;
264:22;265:4,18;
266:10;272:21;273:9;
279:9,10,11,16;281:4;
283:12;290:2;296:1,
2,19;297:1,1,12,13,
15,17,23;298:12,20;
301:18;303:12;308:5,
13;309:8;312:24;
313:9;324:6;339:4;
350:1,2,8,9;355:4;
358:12;359:23;
362:21;363:2,8;
364:7;370:9
**AppleBenevityorg (3)**
363:7;365:11,17
**Apple's (3)**
266:6;335:1;351:18
**applicable (1)**
346:5
**application (3)**
225:11;299:11;
302:17
**applied (6)**
225:14;236:22;
268:15;302:20;322:4;
352:13
**apply (9)**
236:4;265:17;
266:6,25;304:15;

352:9;353:11;354:1;
355:16
**appointments (2)**
209:1,5
**appreciate (1)**
363:1
**approach (4)**
253:20;284:14,21;
310:12
**approached (8)**
253:19;284:20;
287:14;312:21;331:4,
8;333:10;334:5
**approaches (1)**
230:10
**approaching (1)**
287:14
**appropriate (3)**
206:10;290:11;
361:24
**approved (1)**
204:20
**approximately (8)**
203:20;262:13,17;
263:5;271:7,15;
273:24;370:11
**apps (1)**
206:18
**April (20)**
193:16;194:11,24;
196:17;236:2,4;
238:2,18,20;239:2,17,
17;240:7;241:16;
242:3;249:20;250:20;
258:15;271:9;274:23
**area (56)**
199:15,16,22,24,25;
200:3,6,10,11,12,15;
202:8;203:24;204:1;
207:21,23,25;208:4,
16;210:17,18;212:18;
213:17;215:22;216:3,
5,7;217:5,6;218:9,11,
14,17,20;219:2,3,15;
220:25;228:2,16,25;
246:7,8,13,20,24;
247:2;248:22;254:15;
267:9;268:2;270:21;
293:20;300:23;
307:14;362:2
**areas (26)**
196:24;199:6,7,11,
24;200:17;202:10;
220:10,17,19;221:23;
225:16;226:20,23;
227:5,5,17;228:16;
233:13,15;271:6;
275:2,4;302:10,11;
334:24
**Arianna (1)**
241:18
**around (22)**
224:24;225:21;

228:9;235:4;241:2;
262:8;267:21;269:23;
270:1;271:5;273:12,
15;296:21;298:14;
300:5;308:10;314:13;
334:15;339:14;
354:13;356:23;357:1
**art (1)**
273:20
**artist (1)**
273:9
**artists (2)**
273:9;303:14
**aside (1)**
257:22;266:13
**assigned (1)**
257:8
**assignment (2)**
281:22;367:2
**assist (8)**
188:10;189:16;
192:11;278:22;
280:23;295:16;
349:15;369:15
**assisted (1)**
262:1
**Associate (1)**
377:17
**assume (2)**
216:21;319:24
**assumed (1)**
320:2
**assuming (1)**
324:7
**attached (3)**
247:19;285:17;
288:12
**attachment (1)**
322:8
**attachments (1)**
323:12
**attempt (2)**
243:14;315:10
**attempting (1)**
311:7
**attend (6)**
243:8,14,16,18;
256:11,12
**attended (2)**
243:8,11
**attention (2)**
310:4;353:8
**attitude (1)**
311:2
**attorney (3)**
257:22;261:13;
327:10
**attorney's (2)**
191:23;295:4
**attract (2)**
233:22;300:13
**audience (2)**
234:11;355:7

**audio (14)**
188:13;192:1,2,6;
245:10;261:17,21;
278:14,14,18;295:9,
12;349:8,12
**Auerbach (1)**
242:5
**August (5)**
194:7;221:18;
225:5;262:14;264:1
**Auntie (1)**
354:10
**authenticity (1)**
214:5
**author (1)**
316:17
**authorities (1)**
188:16
**availability (1)**
250:4
**available (5)**
230:13;244:9;
254:1;298:22,24
**Aventura (1)**
282:19
**Avenue (14)**
191:8;238:13;
260:19;297:13,19,21,
22,22;298:4;299:14;
300:23;302:20;304:2,
18
**aware (9)**
207:9;224:10;
230:16;285:3;309:23;
313:21,22;334:12,16
**away (22)**
191:25;194:18;
208:6;225:19;228:4;
229:16,22;235:18,20;
252:10;253:10;
267:11;269:2,4;
272:1;278:13;293:25;
295:8;308:6;313:19;
349:7;354:24
**Awesome (2)**
259:12;276:13

**B**

**back (78)**
200:6;204:3;
207:14,23;209:21;
210:14;211:9;212:17;
216:2;217:24;224:2,
24;225:18;227:14;
228:16;229:1;230:4,
4,18,20;231:7,22,23;
232:2,3;236:3,18;
237:4,9;241:24;
245:11,23;254:9;
255:23,25;259:15;
267:15;270:21;
272:24;274:8,10;

276:16;282:6,24;
283:23;291:7;292:2,
23;297:18;301:11,20;
303:2;310:19;313:6;
315:2,5,25;316:1;
321:19;325:15;
326:25;336:1;340:17;
341:12,25;344:9,15;
347:18;350:23;355:1,
13;359:9;363:1;
365:6;369:4,9,21;
375:4
**backpack (2)**
206:1,2
**backpacks (2)**
212:2;217:19
**backstage (2)**
313:15;341:17
**backup (5)**
192:10;261:25;
278:22;295:16;
349:15
**bad (7)**
286:25;287:2,11,
13,25;288:4,6
**bag (3)**
205:25;206:4,22
**bags (1)**
217:15
**bake (1)**
353:18
**bakery (1)**
306:2
**balconies (1)**
198:8
**balcony (7)**
198:21;199:7,12,
22;220:10;247:15;
289:16
**ballpark (3)**
240:9;241:6;242:14
**balls (1)**
353:6
**bank (1)**
246:17
**Bar (14)**
196:4;198:21;
199:14,18;208:24;
210:21;211:5,11;
241:11;263:13;268:7;
298:1;353:8;370:14
**Barlia (1)**
258:10
**B-a-r-l-i-a (1)**
258:12
**base (1)**
300:12
**based (6)**
250:3,3;287:11;
317:8;320:5;336:22
**basically (4)**
198:9;199:23;
208:22;211:2

**basis (9)**
221:21;232:21;
281:13;311:1,6,10,12,
17,20
**Bates (3)**
202:21;335:10;
337:10
**bathrooms (3)**
204:2;220:25;247:8
**Beach (1)**
350:23
**beautiful (6)**
198:5,16,25;
222:22,23;302:1
**became (7)**
264:17;350:12,17,
25;352:1,2,3
**become (2)**
238:7,20
**becomes (1)**
357:4
**becoming (1)**
263:4
**began (3)**
194:1;262:22;
279:16
**begin (7)**
189:22;190:18;
217:21;222:2;280:23;
291:24;347:15
**beginning (5)**
205:23;217:15;
281:24;321:19;346:3
**begins (4)**
191:16;261:4;
278:3;348:23
**behalf (1)**
347:3
**behavior (1)**
353:20
**behind (8)**
200:12;235:12;
307:9;310:8,13;
313:11;352:25;
357:22
**beige (1)**
248:7
**belief (1)**
301:22
**Below (7)**
195:23;196:7,10;
250:16;319:2;370:15,
17
**benefit (3)**
362:18;363:6;
366:12
**benefits (2)**
363:23;364:3
**Benevity (6)**
362:14;363:10;
364:7;366:10,11,13
**best (13)**
201:10;218:24;

222:25;225:6;233:21;
241:7,7;262:9;297:4;
302:5;314:16;353:5;
371:19
**better (9)**
204:25;205:19;
208:21;289:23;
294:17,19;309:5,10;
360:16
**beyond (4)**
199:9;224:14;
289:2;343:4
**big (17)**
199:3;205:19,20;
234:23;246:24;266:9;
306:7;315:19;335:5;
341:18;347:20;355:3,
4;357:10,12;366:20,
21
**bigger (2)**
338:4,7
**bins (1)**
252:14
**bit (18)**
192:24;197:12;
209:11;217:4;219:22;
225:11;233:14;
249:16;265:7;297:22;
299:10;319:23;
351:14;353:4;357:4,
17;358:24;368:14
**black (1)**
211:1
**blank (1)**
362:3
**blanking (1)**
241:19
**blocks (1)**
227:19
**blue (3)**
336:17;338:21;
357:25
**BOARD (19)**
183:2,15;188:4;
204:16;205:8,11;
206:19,24;222:3;
239:3;267:13;288:19;
292:20;303:21;361:3,
4,24;377:4,8
**boarding (2)**
298:12,20
**boards (3)**
204:11,17;207:6
**Board's (2)**
377:6,14
**body (3)**
288:9,20;300:6
**Bollepalli (102)**
189:3,3;202:16,17,
18,21;203:7;208:9,
10;214:23,25;226:19;
232:20,22,23;233:1;
237:7;251:24;252:1,

3;255:17;259:4,6;
276:5,7;286:19;
287:4;291:13,15;
310:24;315:12;327:3,
5,8,9;328:10;329:7,8,
19;330:4,6;334:9,10,
11;335:7,9,16,24,25;
336:2,6,11;337:12,14,
24;338:1;339:6,8,9,
20,21,23;340:2,8,10,
14,19,20,23;342:21;
343:1,22,23;346:21,
23;347:23;348:1;
358:18;360:6,7;
361:18;364:13,17,20,
24;365:1,7,22,25;
366:5;367:18,20,22;
368:20;370:25;
372:25;373:2,17,21;
374:22,23;377:2
**book (1)**
206:3
**booked (1)**
234:14
**Borilia (8)**
319:13,14,17,24;
320:1,7,16,19
**boss (6)**
257:11;258:7,7;
318:3,5;329:12
**both (11)**
188:17;201:10;
220:10;228:10;235:5;
249:22;272:22;
281:14;282:4;302:18;
372:18
**bottle (1)**
348:20
**bottom (11)**
202:22;248:3;
318:7,8;321:17;
322:9;357:18;361:22;
364:6;365:23;371:11
**bought (1)**
217:16
**Bowl (1)**
353:21
**box (5)**
198:24;213:10;
216:8;222:22;353:7
**boxes (1)**
353:21
**brain (1)**
308:22
**brand (10)**
220:16;228:12;
268:4;296:21,22,22,
23,25;297:9;335:1
**brands (1)**
267:7
**break (114)**
200:1;202:24;
203:2,4,12,15,19,20,

23;204:1,9;208:4,18;
211:15,19,20;212:5,7,
10,19;213:19;216:22,
25;217:5,5,7,12;
219:9;220:25;226:25;
227:4;228:18;229:1,
3,15;230:7,9,13,18,
20,24;231:4,9,16,19,
21,24;232:3,4;233:9,
13;234:17;235:4,9,9,
14;246:19,23,24;
247:5,19;250:22;
251:4,6,7,13,16;
252:11,12;253:3,5,16,
22,24;254:5,18,18;
255:18;267:18;
268:10;270:20;
271:13,19;275:6,23;
300:23;301:2;306:11,
14;307:14;309:18,22;
310:1,7,21;312:12,13,
22;319:2,5;326:16;
327:22;331:9;337:9;
339:24;341:8,11,16;
345:24;346:2;356:8,
8;358:10;359:10
**breaks (18)**
217:22,22;218:19,
19;219:7,8,10;250:11,
18,19,19,21;251:1,10,
17,18;254:15,16
**breathing (2)**
302:15;307:16
**Brett (2)**
359:24,25
**brief (2)**
202:16;350:11
**briefly (2)**
252:1;362:17
**briefs (3)**
377:7,11,17
**bring (3)**
296:19,23;297:18
**bringing (1)**
222:3
**broad (1)**
329:6
**broadly (1)**
226:17
**Broadway (2)**
303:15;304:8
**brochures (1)**
235:8
**broke (1)**
221:22
**broken (2)**
246:5;247:21
**Brooklyn (1)**
234:23
**brought (4)**
207:6;218:1;
273:19;313:1
**Brown (17)**

23;204:1,9;208:4,18;
211:15,19,20;212:5,7,
10,19;213:19;216:22,
25;217:5,5,7,12;
219:9;220:25;226:25;
227:4;228:18;229:1;
3,15;230:7,9,13,24;
247:5,19;250:22;
251:4,6,7,13,16;
252:11,12;253:3,5,16,
22,24;254:5,18,18;
255:18;267:18;
268:10;270:20;
271:13,19;275:6,23;
300:23;301:2;306:11,
14;307:14;309:18,22;
310:1,7,21;312:12,13,
22;319:2,5;326:16;
327:22;331:9;337:9;
339:24;341:8,11,16;
345:24;346:2;356:8,
8;358:10;359:10

223:14;239:19;
240:6,11;259:18,19,
21,24;260:5,7,15;
261:3;274:16;276:6,
11;308:8;330:14
**b-r-o-w-n (1)**
260:6
**build (3)**
204:24,25;222:11
**Building (18)**
183:16;195:22;
198:6,11;200:18;
225:25;301:10,16;
304:24;306:6;313:14;
331:5,7,13,13,15;
332:16;351:9
**buildings (1)**
222:23
**built (1)**
263:22
**bulk (1)**
197:7
**bullet (2)**
318:11;324:7
**bulletin (1)**
303:20
**bullets (3)**
322:17;323:3;
325:22
**bumper (1)**
305:20
**bunch (4)**
267:5;305:24;
323:2,3
**busiest (1)**
305:11
**business (32)**
196:10;199:19;
204:15;229:18;253:2;
256:5,6,24;257:4;
265:8;280:19;281:3;
290:12;298:1,17;
299:3,4;300:10,20,21;
314:1,10;350:16,16,
17,18,20,24;351:23;
352:17,20,24
**businesses (10)**
196:24;229:10;
230:2,3;266:11;
267:9;300:2;305:9;
352:19,22
**busy (15)**
199:15;201:18;
217:7;218:8;223:5;
231:9;235:10;281:8;
284:9;285:19;289:15;
305:1;314:10;342:1;
355:12

---

**C**

**café (1)**
230:10

**call (26)**
189:23;190:1,3;
196:3;197:6,9,11;
198:21;199:12;
203:14;208:16;209:2;
210:18;211:2;243:11;
259:16,18;263:21;
276:18;294:16;
303:21;314:10;
344:11;347:3,4;367:1
**called (20)**
190:10;195:23;
197:14,23;198:5;
205:24;227:20;
248:18;258:14;
259:25;277:2;292:5;
298:12;347:12;
350:21,22;351:13;
353:1;362:14;363:23
**calling (2)**
341:13,22
**camaraderie (1)**
204:25
**came (24)**
183:13;197:20;
205:24;214:20;
223:23;229:4;236:3;
238:13;250:10;266:8;
282:6;297:16;305:18;
310:3;311:9;317:8;
318:23;319:21,22;
323:1;338:24;353:25;
354:11;373:18
**camera (6)**
192:4;255:12;
261:21;278:17;
295:11;349:11
**can (185)**
189:18;190:12;
192:4,19;195:11;
196:17,22;198:12,19,
23;199:2,6;200:20;
201:2,3,3,10,23,25;
203:1;208:1,21;
209:4,14;210:5,8,14,
15;211:13,19;212:1,
7;214:18;215:12,18,
20;218:19;224:5,21;
225:13,18;226:15;
227:12;228:21;
229:12,24;233:19;
234:8,12,20;243:10;
244:8;245:11,12,19;
246:1;247:14;249:4;
260:2,3;261:21;
263:24;267:23;
268:16;271:3,5,18;
273:13;276:20;277:4,
7;278:17;280:2;
281:6,7,8;282:11;
284:11;285:12,12;
287:5;288:24;289:5;
292:8,9;293:16,21,25;

295:3,9,11;296:12;
299:1,16,25;300:13,
18;302:12,20;303:17;
304:20;305:14;
307:23;309:10;
314:14,17,25;315:21,
21,22;316:19,21;
321:4;323:10;326:19,
21;333:8;335:4,6,6,7,
8,13,15,19,21,22;
336:1,8,10;337:3,9;
338:2,4,6,7,8;343:10;
344:3;346:8;348:2,
14;349:11,22;350:11;
351:4;353:15,17;
354:4;357:9,13,20;
358:24,25;359:2,4,8;
360:13,21,25;362:2,
17,18;363:14,15,19,
20;365:13,15,19,22,
23;366:9,25;367:10;
368:10,14,19;369:3,
15;371:4,10,16;373:5,
21
**candy (1)**
354:23
**cans (1)**
252:12
**Canteen (1)**
359:25
**canvas (2)**
362:3,8
**capacity (1)**
282:1
**captive (1)**
355:7
**card (1)**
227:25
**cards (5)**
209:4;253:2,2,7;
352:25
**care (8)**
208:25;228:8;
296:17;297:5;301:5,
19,20;302:6
**career (2)**
279:16;352:16
**carefully (5)**
191:17;261:8;
278:5;294:23;348:25
**Case (21)**
183:3;188:5,8;
189:22;190:4;226:21,
24;227:6;276:19;
284:4;287:5;301:13;
309:20;312:5;328:25;
344:5,18;345:3;
346:11;375:7,17
**cases (2)**
300:7;305:17
**categories (2)**
197:3,18
**Catherine (2)**

240:20;241:3
**cause (2)**
362:21,22
**celebrate (3)**
205:1;341:15;
355:24
**celebrated (1)**
269:3
**center (82)**
193:19,25;194:1,9,
11,25;195:2,11,14,18,
24;196:15,16;198:3,4,
7;199:1,3;202:25;
203:4;205:5,9;
210:13;212:23;
213:10;222:16;
225:13;228:23;
229:15;232:18;
237:22,25;238:14;
239:5;241:13;242:10;
249:11;263:17;
264:18,21;266:23;
267:1;268:8,16;
272:16;279:17,18;
280:3;281:12,16,25;
282:17,25;283:5,18;
290:20;296:6,8,14;
297:10,19;299:12;
304:14,17,21;305:16;
306:12;307:3,24;
317:5;350:8,15;
351:1;352:8,10;
353:13;354:1;355:15;
358:12;359:23;370:9,
10
**Central (2)**
201:5;217:14
**certain (10)**
209:12,12;210:21;
230:24;305:4;307:13;
311:14;318:16;
334:12;342:24
**Certainly (6)**
354:17,23;355:14;
356:3,25;362:8
**cetera (4)**
211:25;221:2;
224:25;235:8
**chain (1)**
193:19
**chairs (5)**
200:15;216:22;
246:16,24;254:13
**challenge (1)**
218:23
**challenges (2)**
205:20;314:12
**challenging (1)**
235:14
**champion (3)**
367:2,10,13
**chance (4)**
206:8;317:10;

321:20;324:14
**change (1)**
236:7
**changed (3)**
225:6,9;264:15
**characterization (1)**
255:14
**characterize (2)**
302:22;339:7
**charge (4)**
194:2;196:5,6;
207:5
**Charging (9)**
183:10;189:2;
337:6,17,19,23;
339:23,25;375:19
**charitable (2)**
362:21,22
**chart (2)**
237:24;345:2
**chat (1)**
318:24
**check (13)**
192:7;201:3,8;
209:4;229:2;230:23;
261:22;263:14;
278:18;280:15;
290:15;295:12;
349:12
**checked (4)**
290:14,17,18,24
**checking (5)**
263:10;280:16;
289:17,24;305:19
**cheer (1)**
234:11
**Chicago (2)**
281:18,20
**Chicken (1)**
229:25
**chief (2)**
344:6;377:17
**Chinese (3)**
229:17,19;252:17
**choose (3)**
204:20;234:19;
235:16
**chose (1)**
235:16
**Chu (1)**
377:18
**cited (1)**
367:24
**City (15)**
191:8;199:1;
204:22;222:23;224:9;
225:4;227:21;233:22;
234:15,22;237:19;
250:23;279:17;
303:13;350:24
**civil (1)**
225:20
**clap (1)**

269:3
**clarification (2)**
328:3,11
**clarifies (1)**
342:25
**clarify (4)**
280:10;311:8;
342:23;375:23
**clarifying (1)**
376:8
**clarity (1)**
215:4
**class (2)**
243:11,14
**classes (6)**
224:19;243:5,6,12,
16,18
**clean (15)**
220:16,21;227:7,8;
229:6;232:3;294:17;
301:12,16;302:10,16;
307:20;310:20,21;
312:7
**cleaned (2)**
232:1;307:6
**cleaning (14)**
200:9;211:9;
219:22,25;220:3,6,13,
14,23;221:3;232:2,
10;272:11;307:10
**cleanliness (18)**
220:19;221:1;
225:12,15;227:10;
228:11,17;233:16;
236:5,20;265:18;
272:9,18;302:18;
304:16;306:21;
307:12;312:25
**clear (16)**
201:21;203:4;
211:14;212:22;
244:24;254:23;
255:15;262:19;
285:24;287:22;
290:23;304:1;312:17;
325:7;342:4;346:2
**clearing (2)**
230:23;301:10
**clearly (4)**
288:10;323:11;
331:21,24
**click (1)**
365:9
**clicking (1)**
265:20
**clients (1)**
350:17
**clock (1)**
248:19
**clocks (1)**
211:3
**close (7)**
201:19;203:22;

232:6;249:17;375:13,
21;376:23
**closed (9)**
226:2;245:16;
249:18;260:22,23;
292:23;345:13;
377:25;378:3
**closet (2)**
204:2;247:7
**closing (1)**
231:24
**cloths (1)**
211:10
**club (1)**
234:14
**clutter (3)**
227:8;235:9;253:18
**cluttered (1)**
235:14
**coach (1)**
280:14
**coat (1)**
212:1
**code (1)**
217:18
**coffee (11)**
212:4;217:16;
219:10;220:12;
229:13,13;251:2;
267:6;268:2,7;307:17
**colleague (1)**
189:7
**colleagues (5)**
234:4,24;270:4;
286:14;290:5
**collected (1)**
306:6
**collectively (1)**
286:25
**colloquially (1)**
366:13
**combination (1)**
251:14
**comedy (4)**
234:14,14;362:5,9
**comfortable (5)**
221:13;225:1,1;
333:17;357:5
**comic (2)**
233:25;234:13
**coming (21)**
199:3;200:4;201:7;
208:22;222:7;224:17;
239:3;297:10;305:11;
313:14;323:18;332:8;
333:5;342:3,4,24;
346:24;352:8;353:12;
369:12;373:22
**commitment (1)**
223:9
**common (2)**
308:13;359:10
**communal (1)**

212:6
**communicate (2)**
204:13;327:12
**communicated (1)**
329:11
**communicating (2)**
329:3,9
**communication (3)**
311:4;317:15;318:3
**COMMUNICATIONS (3)**
183:8;208:2;322:18
**community (3)**
230:1;297:7;363:1
**commuters (1)**
226:1
**company (14)**
192:19;193:3,18;
264:24;269:2;276:18;
296:5,24;297:3;
298:6;309:12;353:1,
2;359:15
**company's (1)**
193:24
**compare (2)**
236:15;290:19
**compared (1)**
236:6
**comparing (2)**
236:9,11
**compensation (3)**
290:2,4,5
**complaint (5)**
289:3;309:21;
328:6;342:16;343:5
**complete (7)**
199:11;201:3,8;
209:1;256:14;257:6,9
**completed (2)**
257:5,13
**completely (8)**
189:12;192:7;
261:22;278:18;290:8;
295:12;346:14;
349:12
**complexity (1)**
304:23
**compliance (6)**
224:12,13,15;
256:15;298:21;299:2
**component (4)**
196:5;220:8;223:7;
254:3
**comprise (1)**
195:20
**comprised (1)**
222:6
**computer (4)**
275:14;294:4,11;
302:1
**computers (7)**
196:1;199:14,17,
20;200:8;201:2;
211:10

**concern (6)**
324:24;325:15,18;
332:4;335:1;341:8
**concerned (2)**
285:16;324:25
**conclusions (1)**
377:11
**concurrent (2)**
325:12,23
**condition (2)**
229:2;231:15
**conduct (11)**
256:5,6,24;257:4;
265:4,8,8;298:17;
299:3,4;351:23
**conference (2)**
260:18;348:14
**confidence (1)**
221:11
**confident (1)**
257:14
**confidentiality (1)**
342:18
**confirm (4)**
209:1;260:9;
292:19;375:25
**Congratulations (3)**
235:3;253:14;
282:20
**Congress (2)**
285:19,21
**conjunction (1)**
345:2
**connect (6)**
231:8;301:6;309:3;
314:11;363:9;374:17
**connected (9)**
201:13,16;226:8;
253:14;285:4;319:11,
22;320:3;329:25
**connecting (1)**
273:14
**connection (8)**
189:14;192:7;
205:23;209:18;
261:22;278:19;
295:13;349:12
**connectivity (3)**
293:11,21,23
**connects (1)**
247:20
**consensus (1)**
331:7
**consent (1)**
346:22
**consider (2)**
218:12;219:16
**consideration (1)**
377:7
**considered (1)**
222:19
**considering (1)**
218:21

**consistent (9)**
197:4,4;219:20;
290:21;302:13;
322:19;325:7,13,22
**constantly (1)**
305:9
**constructed (1)**
198:6
**consult (1)**
319:19
**consultants (1)**
352:19
**consulting (1)**
320:16
**contact (6)**
192:10;261:25;
278:21;295:16;
314:13;349:15
**contain (1)**
377:22
**content (3)**
206:7;207:1,5
**continuation (2)**
188:3;335:19
**continue (4)**
226:14;266:1;
318:24;319:3
**continues (1)**
205:11
**continuing (1)**
371:23
**contracted (1)**
220:5
**contractor (4)**
219:24,24;221:3,6
**contractors (1)**
220:3
**control (2)**
213:5;370:23
**convenience (1)**
244:12
**conversation (35)**
189:8;224:24;
235:1;253:23,25;
267:14;269:7,23;
270:7,24;273:12;
283:13,16,23,24,25;
284:2;285:4,24;
286:5;288:7;289:9,
19,25;290:13;309:1;
312:18,23;314:3,6,18;
332:3;333:17,23;
374:8
**conversations (5)**
285:10;290:12;
333:4;334:1;352:22
**cookies (2)**
353:18,19
**coordination (1)**
367:11
**copied (1)**
325:14
**copies (3)**

189:15,19;364:15
**copy (4)**
368:9;373:12,15;
377:4
**core (2)**
298:12,14
**corner (3)**
215:23;220:20;
229:19
**correcting (1)**
282:10
**correctly (4)**
240:5;261:12;
273:16;318:15
**corroborate (1)**
288:1
**counsel (33)**
188:21,23,24,25;
189:1,1,3,10,13;
191:1,2;232:14,14;
237:15,15;260:15,16;
277:17,18;292:20,21;
316:13;333:7,13,16;
336:7;337:15;348:11,
12;370:1;375:11,19;
376:3
**Counsel's (1)**
316:22
**Counsel's (1)**
345:9
**counter (1)**
232:4
**counters (1)**
220:24
**country (1)**
225:21
**couple (19)**
198:8;199:10;
215:25;221:23;224:9;
225:18;229:23;234:8;
240:15;246:16;266:8;
267:11;268:19,20;
270:23;314:1;328:2;
353:17;373:11
**coupon (3)**
229:15,25;306:20
**coupons (16)**
232:15;267:6,6,17,
23;268:3,9;300:17;
301:1;306:25;313:4,
7,8,11;354:12,13
**course (8)**
200:4;212:2;
217:13;228:24;
232:16;243:9;300:24;
356:10
**court (30)**
188:10,19;191:20;
209:24;237:9;244:8;
245:23;255:25;
259:15;261:10;
274:11;276:16;278:8;
291:10;292:2;295:1;

315:5;316:1;326:25;
335:10;340:3,9,17;
344:9,15;347:17;
349:2;369:9,21;375:4
**courtroom (1)**
188:9
**coverage (1)**
250:12
**covered (1)**
272:23
**covering (1)**
335:20
**covers (2)**
304:24;351:24
**Covid (1)**
226:3
**crazy (2)**
228:7;232:8
**create (3)**
296:15;297:7;
303:17
**created (3)**
253:18;294:12;
296:20
**creates (1)**
293:20
**creative (2)**
233:23;355:21
**credibility (2)**
286:22;287:3
**credit (2)**
209:4;227:25
**crew (3)**
232:2;263:20;
307:10
**cross (16)**
189:17;236:25;
237:10;251:24;
256:17;259:5;274:6,
12,14;291:4,11;
314:20;327:7;343:19;
369:10;374:20
**cross- (1)**
215:12
**cross-examination (5)**
214:1,8;237:12;
315:7;369:23
**crowd (1)**
355:5
**crowded (1)**
201:12
**cue (1)**
304:25
**cued (1)**
355:5
**cues (1)**
356:17
**culture (4)**
266:10;281:4;
296:18;301:19
**cup (2)**
219:10;251:2
**cups (1)**

220:13
**current (7)**
193:3,4,17;194:22;
282:22;296:4;377:24
**currently (9)**
192:17;237:17,18;
239:7,8,11;249:13;
279:7;349:22
**cursor (1)**
215:20
**customer (33)**
199:10;215:23;
220:9,16,17;225:15,
16;226:20,23;227:13,
17;228:2;233:13;
248:5,22;263:12,12;
264:8;280:6,6;281:8;
282:15;283:11;
299:19;300:12;
305:18,21;306:1,1,1,
7;307:6;334:23
**customers (45)**
196:1;198:18,19;
209:1,5;211:4;
221:18;222:17;223:1;
226:6;229:11;231:18;
247:13,13;248:12,14,
15,23,25;249:2;
250:9;280:23;296:23;
298:2;299:21,21,23;
300:1;301:23,24;
302:6,22;304:25;
305:3,6,7,11;306:3;
334:22;352:14,17,24;
353:3;354:25;356:18
**cut (2)**
210:14;245:10
**CWA (3)**
334:17,18;342:11

## D

**daily (1)**
221:21
**Dan (1)**
242:5
**dashed (1)**
213:9
**dashes (1)**
215:25
**data (2)**
200:13;353:2
**date (6)**
238:10;265:13;
330:24;358:7;359:20;
361:11
**dated (1)**
316:5
**dates (1)**
241:6
**daughter's (1)**
316:10
**DAVIDSON (2)**

347:6;369:15
**Davison (6)**
188:10;259:20;
276:20,22;315:21;
347:7
**day (99)**
194:23;200:4,5;
205:13;206:22;
208:23;210:12,12,24;
211:7,12;217:11,13;
219:12;223:5;228:25;
229:5;230:25;231:13,
16;232:16,16,16;
236:1;250:3,11,13;
251:16;255:7;263:25,
25;280:17,18;281:10;
284:15,25;285:1;
286:18,18,25;287:2,
11,13,17,25;288:2,4,
6,7;289:10;290:18,18,
19,19;302:24,24;
307:1,1,1,7,13;310:1,
5;320:17;325:17;
328:17;330:18,22;
331:5,6,7,8,12,13,13,
20,22,25;332:3,6,9,
10,11,13,14;333:6,8,
15,16;334:4,6,16;
339:13;340:5;342:1,
3;346:3,4;375:19
**days (2)**
233:9;309:14
**d-d-e-n (1)**
277:10
**deadline (1)**
377:24
**deal (4)**
306:8,8;341:18;
355:4
**dealing (1)**
249:2
**dealt (1)**
305:16
**December (2)**
194:4;236:23
**decided (1)**
206:20
**decision (5)**
188:7;229:20;
310:22;377:4,9
**declined (3)**
207:11,11;327:15
**deem (1)**
305:3
**deep (2)**
301:22;302:3
**deeply (1)**
302:6
**defense (1)**
227:11
**defenses (1)**
258:24
**definitely (18)**

229:8;266:8,10;
267:5,19;270:6;
271:4;274:2;303:18;
313:15;326:18;
329:11;337:4;352:11;
355:6,11;356:19;
362:4
**degrees (1)**
208:5
**deleted (2)**
189:13,19
**deliver (1)**
205:13
**delivered (1)**
223:8
**demonstrate (1)**
312:4
**demonstrates (2)**
328:7,8
**demonstrative (1)**
203:3
**department (4)**
197:10;227:19;
298:2,4
**departments (1)**
241:23
**depended (1)**
251:7
**depending (2)**
217:11;251:5
**depends (3)**
254:1,1;255:11
**depicted (1)**
215:12
**deputy (1)**
188:9
**describe (5)**
208:21;286:16;
287:23;353:6;366:15
**described (7)**
247:3;286:5,17;
346:8;351:16;363:25;
366:16
**describing (2)**
217:4;374:16
**description (2)**
210:14;288:2
**deserve (3)**
302:9,10,11
**designated (1)**
230:24
**designed (4)**
197:8;205:2,25;
206:6
**desk (2)**
275:14;348:18
**desks (2)**
199:20;270:20
**despite (1)**
218:24
**destinations (1)**
227:21
**destroyed (1)**

189:15
**detail (4)**
245:1;286:5;342:1;
343:8
**details (1)**
314:3
**determine (1)**
324:22
**development (1)**
193:9
**device (14)**
192:8,10;209:2;
248:19,20;261:23;
262:1;278:20,22;
293:17;295:13,16;
349:13,15
**devices (2)**
189:15;295:14
**dictated (1)**
250:21
**didn't (1)**
235:12
**difference (5)**
236:19,21;270:4,
12;272:16
**differences (1)**
195:7
**different (33)**
196:13,24;197:3,4;
221:16,23;236:7;
241:22;262:25;
263:16,25;269:24;
270:20;272:15;
273:14;293:17,25;
298:10;320:13;321:9;
323:2,3;346:10;
350:14;352:15;353:4;
354:8,18;355:9,22,23;
362:23;364:21
**differently (1)**
316:8
**difficult (1)**
284:11
**difficulty (1)**
288:10
**dire (16)**
190:19,24;202:16;
213:1,4;214:1,4,24;
260:7,13;277:11,15;
292:14,17;348:6,9
**DIRECT (5)**
192:13;262:4;
279:2;295:18;349:18
**directed (1)**
345:18
**direction (2)**
300:21;328:2
**directly (9)**
221:14;266:19;
273:19;287:25;
354:15;364:7;371:20;
372:8;377:12
**director (3)**

258:14,16,18
**disagree (1)**
342:19
**discharge (1)**
287:20
**discipline (1)**
287:20
**disciplined (1)**
287:8
**disclose (1)**
314:6
**disclosed (1)**
314:6
**discount (3)**
227:19;357:22,23
**discounts (2)**
354:19;355:9
**discuss (4)**
313:16,22,24;
356:11
**discussed (6)**
189:9;222:19;
236:5;289:18;342:25;
377:25
**discussing (2)**
302:17;332:22
**discussion (4)**
331:25;333:1;
344:16;345:21
**dismiss (1)**
322:16
**dispose (1)**
354:6
**disposed (1)**
353:9
**disruption (1)**
188:14
**Distasio (22)**
196:19;223:12;
238:3,4;244:2,4;
282:4;338:25;339:10;
347:5,8,11;348:2,5,7,
11,22;370:2;371:1,3;
373:1;374:25
**d-i-s-t-a-s-i-o (1)**
348:5
**distinguish (1)**
299:18
**distortion (1)**
209:12
**distracted (1)**
346:23
**distribution (7)**
307:25;351:19,25;
353:12;355:16;
356:12,21
**disturb (2)**
293:3,6
**diverse (2)**
233:23;355:21
**division (2)**
377:12,18
**DNA (1)**

302:14
**doc (1)**
370:21
**document (46)**
201:22;206:23;
207:15;212:11;213:2;
214:4,12,14,20;215:2,
10,11,11;216:13;
217:2;246:2,22;
315:20,21;316:5;
317:11,19;321:4;
323:10,17;324:14,15;
330:2;335:5,9,12;
338:9;346:16;357:20;
359:2,8;360:21;
364:14;366:20;
367:19;370:4;371:2;
372:22;373:11,18,25
**documentary (1)**
375:6
**documents (7)**
191:11;214:5,7;
277:23;315:19;
328:22;338:14
**dollar (2)**
362:23,23
**donate (2)**
362:20,21
**donated (1)**
362:21
**donation (4)**
362:22;363:11,11;
366:17
**done (12)**
201:12;209:2;
228:22;267:5;302:14;
309:7,9;328:24;
336:3;355:11;365:25;
376:7
**donut (1)**
217:16
**door (12)**
200:23,24;201:9,
19;203:23;204:3;
207:25;212:19;216:2;
248:14,16;260:22
**doors (3)**
198:17;221:17;
250:9
**double (1)**
198:17
**down (31)**
199:23;200:5;
204:2;208:3;220:24;
229:13;254:23;260:3;
273:22;277:5;292:9;
293:6;320:9;321:3,
16,19;322:11;330:23;
332:9;335:13;340:21;
350:20;351:1;357:17;
361:22;368:7,14;
370:16;371:10,13,14
**downloaded (1)**

325:15
**downloads (1)**
356:1
**downtown (2)**
226:18;230:2
**draft (1)**
361:8
**drafted (1)**
324:6
**draw (1)**
355:4
**drawers (1)**
211:8
**dreams (1)**
233:24
**dress (1)**
217:17
**drinks (1)**
359:10
**drive (7)**
197:15;228:6,7;
263:13;300:20;353:2;
354:5
**driven (1)**
204:18
**dropped (2)**
266:14;267:7
**drops (1)**
217:15
**drum (1)**
268:21
**dubbed (1)**
367:10
**duly (5)**
190:10;259:25;
277:2;292:5;347:12
**During (23)**
189:8;191:23;
194:24;200:4;208:23;
212:2;223:5,6;
226:16;228:24;
232:16;236:2;239:1;
249:14;251:16,16,19;
278:10;289:22;295:4;
308:14;344:16;
353:23
**duties (2)**
231:24;351:4
**dynamic (1)**
218:5

**E**

**earlier (14)**
208:6;216:19;
237:14;252:4;256:25;
269:1;309:14;327:19;
329:21;330:9;347:16;
352:16;363:25;378:1
**early (11)**
193:15;194:11;
217:9;218:3;232:7;
239:17;240:9,10;

241:2;250:11;328:19
**easier (3)**
345:15;346:15;
368:9
**easily (1)**
197:17
**easy (3)**
229:20;253:22;
284:8
**eating (1)**
356:4
**edits (1)**
206:20
**effect (1)**
352:25
**efforts (4)**
218:24;226:14;
367:7,9
**e-filed (1)**
377:13
**eight (3)**
250:15,25;309:21
**either (13)**
204:20;216:22;
218:25;233:16;243:6;
254:18;267:12;272:4;
281:12;284:12;
302:21;362:21;
363:10
**elected (1)**
285:21
**electronics (1)**
200:14
**elevate (1)**
296:22
**elicit (1)**
311:7
**eliminated (1)**
322:10
**Ellis (1)**
276:8
**else (21)**
192:2;209:7;
219:13;261:19;
265:21;271:24;
278:15;289:18;295:9;
312:1,7,17;317:25;
324:11;327:1;340:4;
343:17,22;347:21;
349:9;376:23
**email (42)**
201:3,8;257:8;
316:14;317:8,9,14;
318:5;321:7,11,13,17;
322:1,16,20,23;323:1,
7,22;324:1,5,9,22;
325:6,17,17,19,21,23,
25;347:19;360:22;
361:8;370:5,17;
372:10,14,14;373:25;
374:7,14;376:10
**emailed (2)**
244:11;347:22

**Emails (5)**
189:19;325:12,17,
25;329:21
**embrace (1)**
297:7
**emotional (1)**
339:12
**employed (5)**
192:17;262:20;
279:6;295:23;349:23
**employee (51)**
205:5,15,17,25;
206:11;211:22;219:3;
220:19;223:2;227:8;
235:2;247:6;250:3,
24;253:11,13,19,20,
21,24;254:20;257:6,
9;263:14;267:11,15,
18;268:19,25;269:13;
270:14;273:6;274:21;
286:16;287:24;
288:21;298:23;
308:24;312:19,20;
314:2,4;318:16,19,22;
319:19;352:3;358:5;
362:19;363:5,25
**employees (48)**
195:15;218:22;
219:1;224:11,14;
230:10;231:18,20,21;
233:15,23;243:13;
250:14;251:5,17,18;
252:23;254:15,16;
255:4;256:11;257:25;
264:6;266:10;268:15;
272:21;287:14;
290:16,18;298:25;
302:19;307:25;
312:11;318:25;319:3;
334:12,22;339:4,7;
342:15,19;345:24;
351:11;352:4;353:12;
354:16;355:17;
362:18
**employees' (2)**
342:18;343:5
**employee's (1)**
319:16
**employer (3)**
279:8;288:21;
295:25
**employment (2)**
262:22;283:8
**empty (1)**
220:12
**emptying (1)**
220:20
**encountered (2)**
233:8;310:11
**encourage (4)**
206:16;219:15;
305:5;352:21
**encouraged (3)**

243:17,17;314:9
**end (15)**
212:8;218:4;230:9;
231:16;234:18;238:1;
241:5;267:19;281:24;
290:13;292:23;312:2;
322:15;340:4;346:2
**ended (1)**
281:22
**ends (1)**
231:11
**enforce (5)**
228:17;254:4;
266:21;273:5;299:13
**enforced (1)**
312:24
**enforcement (4)**
221:4,7,9,11
**engage (6)**
222:15;226:6;
264:9;285:13,18;
319:3
**engaged (7)**
193:10;219:16;
233:15;305:3,21,25;
343:6
**engagement (5)**
204:23;205:18;
206:12;263:10;306:1
**engaging (2)**
205:11;342:15
**enjoy (1)**
302:12
**enough (3)**
227:21;250:12;
335:5
**enriched (1)**
193:10
**ensure (2)**
285:8;294:16
**enter (6)**
355:6;358:13;
360:2;361:13;364:8;
367:17
**entire (17)**
198:10,16;221:24;
227:11;242:22;
251:19;315:22;321:4,
13,17,19;324:14;
332:2;333:6;345:8,
10;367:19
**entirely (1)**
288:3
**entirety (1)**
323:10
**entitled (5)**
227:2;251:10,12,
12;378:3
**entrance (4)**
203:21;216:5,6;
246:11
**entranceway (4)**
246:13,15,16;

247:25
**entry (1)**
198:17
**entry-level (2)**
197:6,8
**environment (3)**
296:16,20;354:8
**environmental (1)**
297:6
**environments (2)**
302:7;351:11
**equally (1)**
220:18
**equipment (2)**
211:14;218:12
**equipped (1)**
209:5
**equivalent (1)**
298:3
**erase (1)**
204:11
**escalated (2)**
257:11;374:10
**escalations (1)**
263:12
**especially (6)**
221:14;225:22;
267:8;305:7;307:9;
352:16
**Esposito (219)**
183:14;188:3,6;
189:2,5,8,21;190:1,5,
12,16,18,23;191:14;
192:6,25;197:19,24;
202:13,17;203:8;
208:9,11;209:10,20,
25;213:3;214:19,23;
215:1,8,16;226:22;
227:15;232:21,25;
233:4,7;236:17,24;
237:1,4,10;245:13,17,
21,24;249:4,8;
251:24;252:2;255:22;
256:1,17,21;258:25;
259:2,4,7,10,13,16,18,
21;260:2,7,11;261:3,
7;262:3;265:22;
274:6,8,10,12;276:5,
8,11,14,17,20,23;
277:4,7,11,14;278:2,
24;286:4,20;287:9;
288:5;289:5;291:4,7,
11,13,16,21,25;292:8,
14;293:19;294:11,19;
311:1,16,22;314:20;
315:2,6,15,17,23,25;
316:2,14;317:10,13;
320:15,20,22;321:18;
324:20;325:2,5,9;
326:2,6,20,22;327:1,
3,6;328:9;329:18;
330:5;331:23;332:17,
24;333:25;334:3,8;

337:17,20,23;339:6,
19,22,25;340:6,9,12,
15,18,22,24;341:3;
343:16,19,22,24;
344:2,7,10,13,16;
345:6,25;346:6,15,18,
20,25;347:7,14;348:2,
6,22;358:15,19;360:4,
6,8;361:15,19;364:10,
25;365:2;366:2,6;
367:18;368:3,16,23;
369:1,4,7,10,14,18,
22;371:14;372:21,25;
373:3,6;374:19,22,24;
375:2,5,10,13;376:1,
15,18,23;377:3
**espresso (1)**
268:7
**essence (2)**
197:2;251:13
**essentially (11)**
197:16;200:3;
201:9;204:6;205:2;
206:1;207:24;209:3;
219:19;269:6;275:14
**estimated (1)**
319:5
**et (4)**
211:25;221:2;
224:25;235:8
**even (6)**
265:23;271:20;
273:25;323:21;324:3;
325:12
**evenings (1)**
226:7
**event (8)**
234:9,16,19;
253:16;284:19;
293:14;295:10;
333:25
**events (7)**
269:19;299:25,25;
300:3;304:25;355:22;
367:11
**everybody (1)**
200:3;201:16,20;
204:4;205:9;208:24;
210:24;211:7;217:14,
22;231:17;256:14;
265:12;356:20,21;
357:5;362:10
**everyone (12)**
188:17;243:12;
265:25;281:9;298:21;
299:6;303:13;307:22;
313:10,12;340:3;
360:13
**everyone's (1)**
261:12
**evidence (21)**
202:12;208:7;
210:4;212:25;215:6;

227:2;320:21;323:19,
22,24;330:3;344:21;
345:4,23;375:6,11,24;
376:6,11,11,19
**Exact (7)**
195:8;238:10;
241:6;256:13;275:8;
288:2;327:17
**exactly (7)**
242:8;245:2;249:7;
323:8;340:8;345:16,
19
**examination (35)**
189:17;190:24;
192:13;215:13;
237:10;251:25;252:3;
256:2,18,22;258:22;
259:5,8;262:4;274:6,
12,14;276:9;277:15;
279:2;291:5,11;
292:17;295:18;
314:21;327:7;340:25;
341:4;343:20;348:9;
349:18;369:10;373:4,
9;374:20
**examined (5)**
190:11;260:1;
277:3;292:6;347:13
**example (15)**
210:13;226:17;
227:17;228:19;
234:20;250:23;
270:13;272:24;
301:25;302:25;303:6,
7;354:7;357:21;
360:25
**examples (17)**
225:14;228:21;
233:19;234:8;252:16;
267:3,15,16;268:9,17,
17;269:10;305:14;
307:24;313:16;
352:12;353:15
**exceed (1)**
250:15
**except (1)**
348:19
**exception (3)**
375:14;376:24;
377:25
**exchanged (1)**
336:12
**excited (2)**
206:5;234:24
**exciting (4)**
218:5;234:2;235:2;
253:15
**Excuse (4)**
265:19;315:16;
323:25;362:19
**excused (5)**
259:11;276:12;
291:17;343:25;

374:25
**exhibit (60)**
201:22,23;202:12,
14;203:3,8,10;
207:16;208:7,11,12;
210:4,8;212:12,25;
215:9;252:11;254:6;
316:13;329:17;335:4;
337:6,7,17,19,25;
339:24;344:22,24,25;
345:6;346:7;357:7;
358:13,16,19,21;
360:2,8,9;361:14,16,
19,20;364:11;365:2,4,
12,13;366:3,6,7;
367:17,22;368:19;
375:14,15;376:2,16,
19
**exhibits (4)**
347:16;357:6;
364:21;375:20
**exist (1)**
195:12
**existence (1)**
214:21
**existing (5)**
222:6;238:15;
294:18;367:3,4
**exists (2)**
203:24;227:18
**exit (6)**
308:2,12,14,24,25;
309:2
**exits (1)**
207:25
**expect (1)**
302:8
**expectation (3)**
301:15,17;302:13
**expectations (4)**
222:18;223:3;
272:19;351:7
**experience (6)**
222:9;230:8;
282:15;288:3;351:8,8
**experienced (4)**
228:22;232:17;
233:6;307:2
**expert (5)**
197:9,10;263:3;
288:18,20
**explain (19)**
210:3;214:4;
227:16;263:24;
268:23;271:18;300:8,
17;301:7;302:20;
303:21,24;304:11;
305:12;310:3;316:16;
324:23;354:4;362:17
**explained (7)**
214:12;270:25;
273:21;306:4;308:15;
313:23;342:1

**explaining (1)**
368:13

**explains (1)**
363:24

**explore (1)**
285:23

**extended (1)**
331:15

**extension (3)**
377:16,20,22

**extensively (1)**
310:20

**external (10)**
280:6;282:15;
297:16;299:20,22,23;
302:18;304:20;
305:15;306:15

**eye (1)**
289:16

**eyes (1)**
207:7

**F**

**face (3)**
269:5;270:22;293:6

**facility (2)**
298:3;300:8

**facing (14)**
199:10,22,24;
215:23;220:9,17;
225:16,16;227:17;
228:3;233:13;248:5;
290:10;334:23

**fact (8)**
256:24;257:3;
285:20;286:23;
308:25;309:25;
310:23;356:2

**fair (2)**
194:15;286:25

**fairly (1)**
306:13

**fake (1)**
227:25

**fall (5)**
197:2,17;226:3,16;
280:7

**falls (2)**
271:23;351:17

**familiar (16)**
202:2,5,9;207:22;
212:13;223:25;224:2,
5;264:24;265:2;
298:6,9,11;351:19,22;
362:14

**fancy (1)**
193:21

**fanfare (1)**
355:2

**fantasy (1)**
353:21

**far (4)**

242:11,11;243:1;
244:24

**faster (1)**
294:16

**fast-forward (1)**
304:13

**feature (1)**
361:2

**February (5)**
281:24;282:6;
359:9,21;377:10

**Federal (5)**
183:15,16;188:16;
227:2;328:15

**feedback (2)**
265:20,21

**feel (7)**
192:2;221:12;
225:1;261:18;297:7;
343:9;349:8

**feeling (5)**
231:14;280:22;
281:2;289:21,23

**feels (6)**
281:5,7,9;327:20;
355:13;357:5

**feet (1)**
203:20

**fell (1)**
280:4

**felt (7)**
207:12;225:1;
280:17,17;312:25;
328:24;359:15

**few (27)**
190:21;191:14;
199:20;203:18;208:6;
215:17;219:11;220:7;
223:24;224:18;
227:19;245:19;
256:19;258:23;261:3;
270:22;275:9;278:3;
294:20;302:17;
309:14;313:5;315:12;
327:10;339:17;
344:17;348:23

**Fi (1)**
294:16

**Fifteen (1)**
237:3

**Fifth (13)**
238:13;297:13,19,
21,22,22;298:4;
299:14;300:23;
302:20;304:2,5,17

**file (2)**
340:3;377:3

**filed (1)**
377:11

**filing (4)**
377:7,10,14,16

**filled (1)**
207:3

**final (2)**
200:10;206:21

**Finally (5)**
192:6;261:21;
278:18;349:11;370:3

**find (8)**
216:5;229:8;
267:17;284:8,11;
301:2;307:9;308:13

**findings (2)**
377:7,11

**fine (10)**
270:11;290:15;
294:2;314:15;316:7;
323:2;343:7;346:19,
20;368:22

**finish (2)**
217:16;336:3

**finished (5)**
191:19;261:10;
278:7;294:25;349:2

**firm (1)**
290:7

**firmly (1)**
198:25

**first (74)**
189:23;190:2,4,10,
14;191:13,16;194:24;
199:11,25;200:11;
201:2,4;207:24;
220:8,10;221:23,25;
222:9,22;224:10;
225:19;229:4,23;
232:6,8,9;234:14,23;
235:2,6;236:2;
237:16;239:1;247:14,
20;250:5;253:5,14;
259:25;261:7;269:10;
275:22;277:2;278:4;
281:15;286:6;288:17;
290:23;292:5,11;
296:15;297:15;
301:15;309:2,3,4;
314:1;323:6,22,25;
325:4,11;332:5;
334:16;336:1;337:6;
347:12;348:4,24;
365:20;371:9,11,17

**five (15)**
227:20;275:9;
279:11;291:6;296:9;
297:11,14,15;298:5;
304:14;307:2;344:4;
350:14;369:3,5

**flag (2)**
317:2,3

**flagship (16)**
193:19,20,24;
194:9,10;195:2;
222:10;228:22;
232:17;237:21;
238:20;243:9;249:14;
351:10,13;360:23

**flex (1)**
200:11

**flexibility (2)**
193:5,14

**floor (57)**
196:2;197:16;
198:18,20;199:10,22,
23,25;200:11;201:2,
4;202:7;204:4;
207:24,25;208:24;
210:21;211:13;
212:18,20;215:24;
216:2;217:20,24;
230:11,19;231:6;
247:14,20;248:6;
250:12;251:2;253:5;
266:19;268:24;
280:14,14,15;283:17,
19;284:3,3,5,8,12,14,
19,22;287:15;289:15;
290:10,16;301:11;
305:19,22;353:19,24

**floors (3)**
198:11,15;220:13

**Florida (3)**
282:19,25;350:20

**flyer (7)**
269:5;275:22;
303:23;306:20;
319:20;326:10,12

**flyers (48)**
235:3;252:5,5;
266:13,15;268:22;
270:21;271:13,19;
272:12;274:23;275:7,
19;300:17;308:6,10;
309:18,22,25;310:6,
11;311:3,5,6;312:19;
313:19;319:2,8;
320:16;327:21,25;
328:4,6,7,12,13,21;
329:14;332:1,22;
333:1;334:4;339:11;
341:25;357:22;
371:20;374:7,8

**focus (9)**
196:24;205:11;
218:19;228:15;229:7;
256:6;281:2;286:17;
287:24

**focused (5)**
204:18;281:3;
306:15

**focusing (2)**
280:19;345:16

**folding (1)**
200:15

**folk (2)**
269:17,17

**folks (18)**
197:12,14;226:9;
227:23;229:2;235:4;
250:10;352:14,23;

353:18;354:17,23;
355:6;356:18,23;
362:6;367:4;372:8

**follow (4)**
233:24;302:12;
308:19;372:7

**followed (1)**
272:17

**following (2)**
330:25;359:11

**follows (6)**
190:11;260:1;
277:3;292:6;322:8;
347:13

**follow-up (3)**
255:19;256:4;341:6

**food (5)**
218:1,1;305:24;
354:10,17

**foot (1)**
203:22

**footage (4)**
199:4;255:17;
304:23;305:4

**football (1)**
353:21

**force (1)**
255:18

**foremost (1)**
221:23

**forgot (1)**
347:15

**formal (1)**
188:3

**format (3)**
207:3;323:18;325:6

**former (1)**
332:24

**formulated (1)**
287:17

**Fort (1)**
350:21

**forth (2)**
224:24;377:20

**fortunate (1)**
355:20

**forward (2)**
241:8;254:9

**forwarded (1)**
317:18

**found (2)**
234:22;252:21

**four (11)**
195:19;196:13;
197:3,14;247:8;
250:16;251:11;275:9;
280:5;350:5;370:11

**framework (2)**
300:5;304:11

**frankly (1)**
229:3;373:13

**free (3)**
192:2;261:18;349:8

**freeze (1)**
308:22
**freezing (2)**
209:7,12
**front (29)**
191:11;192:4;
198:16;199:1;205:9;
207:24;208:14;210:8;
215:24;220:12;
224:14;243:13;247:9;
260:24,25;261:20;
277:23;278:16;293:2,
11;295:11;301:20;
303:2;304:24;333:13;
348:18;349:10;
365:16;366:24
**fronting (1)**
198:16
**frontline (1)**
230:14
**full (9)**
190:13;212:9;
249:24;260:3;292:9;
344:23;360:2;361:14;
370:21
**full-time (4)**
249:22;250:24;
251:9;263:2
**fully (2)**
197:4;203:1
**funny (2)**
200:25;234:22
**further (26)**
191:13;214:13;
215:4;217:2;236:24;
251:23;256:16;274:4;
276:4;289:9;291:2,
12;313:22,25;314:7,
14,19;327:2;340:18,
22;343:18;369:2;
372:12,20;374:17;
377:24
**future (1)**
312:7

**G**

**Gabrielle (1)**
188:9
**gain (1)**
234:10
**Galleria (1)**
350:21
**gap (1)**
325:11
**gaps (2)**
322:22;325:24
**garage (1)**
228:6
**garbage (1)**
252:12
**gathered (1)**
288:11

**gave (3)**
252:16;301:4;
345:14
**GC-9 (1)**
316:22
**gears (1)**
362:13
**General (38)**
188:22,24;189:1,
10,13;191:2;193:21;
194:2;195:21;203:5;
232:14;237:15;
260:16;263:14;265:5;
277:18;292:21;
298:25;299:16,23;
300:4;301:9,14,16;
306:19,21;316:12,22;
317:4;328:14;330:19;
331:7;345:8;348:12;
353:15;370:1;375:10,
18
**generally (11)**
250:4;265:3;
266:12,17;267:9,14;
270:12;272:14,21;
351:4;353:16
**Genius (15)**
196:4;197:11,22;
198:21;199:13,18;
208:24;210:21;211:5,
11;241:11;263:13;
297:25;353:8;370:14
**geniuses (1)**
199:13
**gets (2)**
257:10;313:12
**gifting (1)**
362:19
**Girl (1)**
353:18
**given (8)**
199:5;237:17;
250:19;255:7;286:4;
287:15,19;313:8
**gives (1)**
363:10
**giving (4)**
210:13;233:20;
363:25;368:1
**g-l-a- (1)**
277:9
**Gladden (15)**
276:18,21;277:1,9,
12,17;278:2;286:6,
23;287:1,10;288:5,
18;291:14,16
**Gladden's (1)**
287:16
**glass (1)**
198:16
**global (2)**
193:9,11
**goal (2)**

218:17;232:3
**goals (3)**
220:8;222:12;351:7
**God (1)**
369:12
**Goebel (6)**
270:15,17;274:16,
18;308:3;313:19
**g-o-e-b-e-l (1)**
274:19
**G-o-e-b-l (1)**
274:20
**goes (11)**
211:7;212:9;216:2,
9;232:2;258:23;
286:22,23;311:15;
318:23;372:5
**Goldman (5)**
239:19,23,24,25;
240:1
**Good (28)**
190:5,7;192:15,16;
201:8;210:7;211:10;
227:25;228:8;229:2;
231:14;262:6,8;
279:4;280:17,22;
281:2,6,10;295:20,22,
23;327:9,11;335:15;
347:9;349:20;366:1
**gorgeous (1)**
199:4
**grab (3)**
218:1;234:18;
306:22
**grabbed (4)**
270:24;274:23;
275:1,4
**grabs (1)**
211:7
**Grand (3)**
201:5;217:14;223:5
**gray (2)**
218:20;246:7
**great (9)**
201:13,15;238:8;
285:1;309:11;341:16;
364:5;366:13;373:16
**greater (1)**
282:14
**ground (5)**
198:18;199:23;
202:7;212:18;361:5
**group (1)**
233:23
**groups (1)**
226:4
**guess (16)**
195:20;196:2,13;
223:4;240:3,4;241:7;
322:4;340:2,4;
351:17;353:5;354:12;
364:17;366:12;367:2
**guessing (1)**

211:23
**guidance (1)**
311:10
**guide (1)**
367:13
**guitar (1)**
269:17
**guys (2)**
327:16;347:22

**H**

**habits (1)**
227:3
**half (5)**
195:5;196:2;240:4;
298:2;350:5
**Halloween (1)**
356:23
**hallway (5)**
204:1;208:3;
229:14;254:10,24
**halves (1)**
195:25
**hand (10)**
192:3;260:2;
261:20;277:5;278:16;
292:8;295:11;312:11;
349:10;354:15
**handbook (1)**
367:12
**handing (1)**
342:10
**handle (3)**
306:9;312:5;356:22
**handled (1)**
263:11
**handles (1)**
339:16
**handouts (3)**
267:17,24;268:9
**hang (2)**
212:1;269:6
**hanging (1)**
313:14
**happen (7)**
197:25;217:25;
232:12;268:24;
307:11;339:16;
356:25
**happened (6)**
226:8,15;230:1;
345:7;347:21;364:5
**happening (9)**
201:17;204:22;
218:3,13;225:21;
226:15,16;264:11;
289:16
**happens (3)**
218:17;275:16;
351:9
**happy (3)**
214:13;244:12;

333:22
**hard (4)**
201:12;218:24,25;
333:13
**hate (1)**
244:21
**Hats (1)**
300:18
**Haykin (1)**
359:24
**head (5)**
195:21;211:13;
217:20;230:18;247:6
**heading (3)**
203:25;231:6;248:4
**headphones (1)**
272:3
**healing (2)**
289:21,23
**hear (3)**
192:23;279:22;
336:8
**heard (8)**
200:19;219:22;
232:13;244:24;
255:14;306:11,24;
312:10
**hearing (22)**
183:13;188:4,7,12,
18,19;191:20,22;
192:9;232:24;233:2;
261:10,24;265:20,22;
278:20;295:15;
349:14;377:24;378:2
**hears (1)**
265:21
**hearsay (1)**
311:14
**heart (1)**
218:7
**hectic (5)**
199:15;201:11,18;
217:7;281:8
**height (1)**
284:8
**held (2)**
350:12;375:22
**hello (4)**
229:2;259:21;
276:24;347:7
**help (16)**
197:15;204:24,25;
205:18;230:15;250:6;
263:12;309:9;315:12,
21;324:24;330:20;
351:1;352:20;367:6,
11
**helpful (2)**
202:25;214:16
**helping (2)**
220:9,18
**helps (1)**

296:18

**here's (4)**
206:3;207:2;
321:21;356:20

**herself (2)**
206:15;207:1

**hey (13)**
206:3;207:7;
230:11,11;264:5;
270:25;272:2;284:14;
305:23;325:19;
328:18;356:20;362:5

**Hi (8)**
191:1;237:14;
259:22;260:15;
277:17;292:19;347:9;
348:11

**high (5)**
212:15;225:25;
286:17;296:12;
301:17

**higher (1)**
204:21

**highest (3)**
197:21;302:7,8

**high-level (1)**
193:6

**highlight (2)**
205:25;361:2

**highlighted (1)**
336:17

**highly (2)**
320:6,18

**himself (2)**
234:23;371:24

**hire (2)**
205:22;221:24

**hired (6)**
239:21;240:3;
297:16;350:9,12,16

**hiring (4)**
194:3;222:1,2;
264:3

**hold (4)**
262:25;317:10;
324:20,20

**holster (1)**
211:8

**home (1)**
277:20

**honest (4)**
218:21;229:18;
309:6;372:6

**honestly (4)**
201:18;271:20;
285:22;305:17

**Honor (42)**
189:18;190:21;
191:13;227:1;237:11;
259:9;265:19;276:7,
10;277:13;279:1;
287:2;288:14;291:15;
314:22;322:20;

323:20;324:23;326:3,
19;327:5;332:2;
333:4;339:18;340:23;
342:14;343:18,21,23;
344:3;358:17;361:17,
18;364:12;366:4;
372:12;373:2;374:21,
23;375:1,12,23

**hope (3)**
213:13;234:17;
244:4

**hoping (1)**
213:12

**hosted (1)**
243:6

**hosting (1)**
269:19

**hotspot (3)**
293:8,13;294:12

**hour (6)**
249:17;250:25;
251:4,11;297:23;
362:21

**hourly (4)**
195:17;219:3;
224:14;243:13

**hours (7)**
231:9;249:11,16,
24;250:1,15,16

**house (13)**
200:6;207:23;
212:17;215:24;216:3;
270:21;301:11,20,21;
303:2,2;313:6;341:12

**housekeeping (4)**
301:9,14;302:21,23

**HR (2)**
193:8;314:10

**hub (3)**
198:5,9;225:24

**huge (3)**
198:8;227:18;
300:12

**hundreds (3)**
325:17;332:11,15

**hung (1)**
207:2

---

# I

**Ian (8)**
189:11;338:22;
371:12,17;372:3,5,8;
374:16

**idea (2)**
202:20;285:22

**identification (8)**
201:24;207:16;
212:12;316:13;337:7;
339:24;370:1;372:23

**identified (20)**
203:10;208:12;
212:21;246:23;

247:22;256:25;
288:12;316:22;
320:13;321:25;
323:25;324:10;337:6,
19;345:5;357:24;
359:17;361:6;364:1;
366:7

**identify (7)**
196:17;221:24;
324:8;345:16;358:5;
363:19;372:13

**identifying (1)**
221:25

**identity (1)**
222:11

**idiots (1)**
338:23

**illuminated (1)**
293:5

**images (1)**
340:7

**imagine (2)**
232:19;299:25

**immaculate (1)**
307:11

**immediate (1)**
188:15

**immediately (4)**
202:8;210:25;
261:17;279:19

**implement (1)**
224:25

**implementing (1)**
313:1

**importance (1)**
223:3

**important (16)**
191:17;220:18;
222:10,13;223:7;
224:25;225:2;227:6;
229:7;261:7;278:4;
294:22;299:18;
301:23;303:3;348:24

**impression (1)**
229:5

**inappropriate (1)**
343:9

**INC (3)**
183:5;188:5;350:1

**incentive (1)**
300:14

**incident (1)**
306:7

**incidents (1)**
226:24

**include (10)**
212:18;219:2;
223:11,14,18,20,22;
229:1;280:5;361:25

**included (4)**
203:2;211:20;
214:14;224:15

**includes (2)**

200:8;212:3

**including (3)**
219:19;221:9,12

**inclusive (1)**
361:24

**inconsistent (1)**
307:4

**incredible (1)**
303:16

**incredibly (4)**
233:22;303:12;
307:4,8

**index (16)**
345:14;346:8,8,11,
11,13,24;375:16,24;
376:1,4,6,13,15,19,24

**individual (2)**
333:18,24

**individuals (2)**
300:5;333:14

**inequities (1)**
290:1

**information (5)**
211:6;288:10;
314:5;361:4;377:6

**informational (1)**
364:4

**informed (2)**
205:14;371:18

**initial (1)**
310:7

**initially (1)**
350:9

**initiated (3)**
283:23,25;284:2

**initiatives (3)**
204:13,22,23

**injury (1)**
289:20

**innocently (1)**
301:3

**inside (13)**
196:23;198:7,10,
11;200:22;202:6;
208:18;211:15;213:9;
245:6;246:1,7;302:1

**inspire (1)**
197:15

**instance (4)**
206:10;235:1;
253:1,19

**instances (11)**
226:4,5;229:12,17;
234:12;235:5,17;
243:10;251:11;
353:17;362:4

**instruct (2)**
328:3,12

**instructed (1)**
328:21

**instructing (1)**
327:24

**instruction (1)**

188:14

**instructions (1)**
294:21

**integrating (1)**
352:18

**intend (1)**
346:10

**intends (2)**
344:17;375:17

**intent (1)**
318:21

**intentionally (2)**
300:19;302:25

**interactions (2)**
280:24;281:8

**interested (2)**
303:11;367:5

**interesting (1)**
234:2

**interestingly (1)**
227:21

**interference (1)**
312:12

**interim (3)**
281:12,18,19

**internal (13)**
247:13;280:5;
282:15;298:19,22;
299:19,22;302:19,22;
307:23;352:14;363:9,
23

**internally (1)**
193:20

**Internet (5)**
192:7;261:22;
278:19;295:13;
349:12

**interpersonal (1)**
280:21

**interpretation (1)**
311:5

**interrupt (6)**
192:2;197:20;
261:18;278:15;295:9;
349:9

**interruption (1)**
194:12

**interview (6)**
308:2,12,14,24,25;
309:2

**into (60)**
194:13;195:25;
197:2,17,20;202:12;
204:9;206:4;208:4,7;
212:25;214:20;215:6;
216:2,6;220:20;
226:5,6,13;229:4;
230:4,4,20;231:24;
232:2,6;236:1;
238:25;239:1;247:6;
257:6;270:9;271:24;
284:19;305:11,18;
313:5,14;314:13;

317:16;318:2,23;
320:21;322:4,18;
323:19,22,24;337:7;
343:8;344:21;345:23;
352:18;354:20,21,22;
376:6,11,11,19
**introduce (2)**
344:18;375:7
**introduced (2)**
298:14,16
**inventory (3)**
199:16;200:6,7
**invite (4)**
234:6,24;269:16;
304:9
**inviting (1)**
253:16
**involved (3)**
264:1;269:10;
270:14
**involves (1)**
193:7
**involving (4)**
189:9;270:17;
287:19,20
**iPad (1)**
213:23
**iPads (1)**
200:8
**iPhone (6)**
209:3;248:18;
300:6;301:25;354:22;
355:12
**iPhones (1)**
211:2
**irrelevant (2)**
288:22;290:8
**Isaac (6)**
209:3;211:3,7;
213:22;249:5,9
**i-s-a-a-c (1)**
249:7
**Isaacs (3)**
213:23;216:15;
248:18
**issuance (1)**
377:8
**issue (21)**
188:7;209:19;
226:21,23;286:7;
293:8,16;308:17;
311:14,18;312:13,15;
326:5;334:3;343:11;
344:19;345:10;347:2;
374:10,15,16
**issues (2)**
188:10;210:3
**items (8)**
205:5;225:12;
248:7;252:7;254:5;
266:20;306:6;312:22

## J

**jackets (2)**
211:24;212:2
**Jacob (1)**
183:15
**janitorial (1)**
247:7
**janitor's (1)**
204:2
**January (10)**
183:17;194:20;
235:19,22;236:4,19;
281:17,24;358:8;
361:12
**Jason (22)**
189:6;244:8,21;
257:22,23;258:2,6,8;
319:11,13,14,15,17,
24,25;320:1,2,6,7,14,
18;329:25
**Jason's (3)**
244:23;320:10,13
**Javis (1)**
183:15
**Jenks (2)**
189:9,13
**Jennison (33)**
190:3,5,6,9,15,19;
191:1,15;192:25;
195:9;197:19;202:18;
203:3;207:15,17;
209:10,15;210:2,8;
213:6;214:18;215:13;
232:24;233:3,8;
237:14;244:18;
245:14;246:1;249:5;
252:4;259:11;360:22
**j-e-n-n-i-s-o-n (1)**
190:15
**Jennison's (1)**
227:3
**jewel (2)**
198:24;222:22
**job (15)**
193:4;196:25;
197:1,16;210:22,24;
221:24;234:23;
284:10;289:13;298:4;
341:16;351:6;367:3,4
**jobs (1)**
216:16
**Joe (1)**
229:13
**John (1)**
355:3
**Johnson (1)**
374:4
**join (10)**
192:10;234:7,19;
238:13;261:24,25;
278:20,21;295:15;

349:14
**joined (4)**
188:12;242:14,20,
21
**joining (1)**
192:8
**Jordan (32)**
189:11;283:1,3,4,6,
11,13;284:4,6,7,20,
24,25;285:13,20,25;
286:8,10,13,16,17;
287:1;288:2,3,22;
289:10;290:24;
312:21;313:24;314:8;
318:15;338:23
**Jordan's (2)**
285:15;314:1
**Jorge (8)**
223:20;240:20,25;
241:1,9;257:20;
330:16;333:14
**Josh (21)**
190:3;192:15,17;
193:3;198:3;201:21;
211:18;212:12;
215:17;217:3;221:16;
223:25;232:13;
233:12;235:18;
236:24;256:4,16;
279:20,23;360:22
**Josh's (1)**
279:25
**JOSHUA (2)**
190:9,14
**j-o-s-h-u-a (1)**
190:14
**journey (3)**
264:8;280:6,6
**Judge (223)**
183:14;188:3,6;
189:2,5,8,21;190:1,5,
12,16,18,23;191:14;
192:6,25;197:19,24;
202:13,17;203:1,8;
208:9,11;209:10,20,
25;213:3;214:19,23;
215:1,8,16;226:22;
227:15;232:21,25;
233:4,7;236:17,24;
237:1,4,10;245:13,17,
21,24;249:4,8;
251:24;252:2;255:22;
256:1,17,21;258:25;
259:2,4,7,10,13,16,18,
21;260:2,7,11;261:3,
7;262:3;265:22;
274:6,8,10,12;276:5,
8,11,14,17,20,23;
277:4,7,11,14;278:2,
24;286:4,20;287:9;
288:5,25;289:5;
291:4,7,11,13,16,21,
25;292:8,14;293:19;

294:11,14,19;311:1,
16,22;314:20;315:2,6,
15,17,23,25;316:2,14;
317:10,13;320:15,20,
22;321:18;324:20;
325:2,5,9;326:2,6,20,
22;327:1,3,6;328:9;
329:18;330:5;331:23;
332:17,24;333:25;
334:3,8;337:17,20,23;
339:6,19,22,25;340:6,
9,12,15,18,22,24;
341:3;343:16,19,22,
24;344:2,7,10,13,16;
345:6,25;346:6,15,18,
20,25;347:7,14;348:2,
6,22;358:15,19;360:4,
6,8;361:15,19;364:10,
25;365:2;366:2,6;
367:18;368:3,16,23;
369:1,4,7,10,14,18,
22;371:14;372:21,25;
373:3,6;374:19,22,24;
375:2,5,10,13;376:1,
15,18,23;377:3,17
**Judge's (1)**
377:9
**judges (1)**
377:18
**judge's (1)**
377:12
**judgment (1)**
221:10
**June (6)**
242:21;275:20;
344:24;345:19,22;
375:16
**June-ish (1)**
271:17
**justice (1)**
225:20

## K

**Kay (1)**
318:15
**keep (12)**
188:13;199:17;
200:7,13;201:9;
211:10;228:8;272:19,
20;289:16;309:7;
361:24
**keeper (1)**
296:18
**keeps (1)**
200:14
**Kenneth (1)**
377:18
**kept (5)**
200:10;227:7,8;
301:16;371:24
**Kerri (3)**
206:13;273:6,8

**key (2)**
220:8;221:23
**keychains (1)**
353:9
**keys (2)**
206:4
**KFC (3)**
267:6;268:1,2
**Khan (2)**
189:1,1
**kicked (2)**
347:17;365:6
**kind (127)**
194:12;195:14,15,
16,19,21,25;197:2,8,
13,17;199:9,21,23,24;
200:4,10,11,13,14;
201:17,20;204:14,14;
205:12;206:6,14,21;
207:5;212:6;216:6,
25;217:23;218:5,6,7,
8,13,13,19,20;220:2,
7,16;221:22,23;
225:21;226:17;228:9,
10,12,12;229:4,21;
230:12,16,17;231:10,
11,12;234:11;235:11,
12;243:6;249:19;
251:4;254:3;263:14,
24;264:4;265:5;
266:20;267:20;270:9,
24;271:5,21,22,23;
272:3;274:1;280:11;
281:8;282:4;299:23;
301:10;304:20;305:6;
306:22;310:3;314:18;
328:16;341:17;351:6,
8,9,15,23,24;352:4,
15;353:2,20,22;
354:14,18,19;355:6,9,
23,24;356:6,7,19,24;
357:2;359:13;361:5;
362:3;363:1,2;
366:13,14,16;367:6,
10,12
**kitchenette (2)**
212:3;232:5
**Kleenex's (1)**
220:22
**knee (2)**
289:20,21;290:14
**knew (3)**
269:22;301:6;306:9
**knock (1)**
322:16
**knowing (1)**
218:10
**knowledge (7)**
225:7;252:12;
299:11;311:2,6;
342:21;366:18
**known (3)**
222:14;284:10;

299:3
**knows (4)**
205:21,22;324:12,
17
**Kyle (1)**
342:7

# L

**LABOR (4)**
183:2,15;188:4;
292:20
**lacks (2)**
286:17;287:24
**laid (2)**
217:18;325:20
**l-a-l (1)**
292:13
**language (2)**
288:9,20
**large (3)**
200:6;280:13;
351:10
**larger (5)**
197:13;230:1;
234:10;351:14;361:3
**last (23)**
190:15;193:16;
194:23,23;197:21;
236:1;239:23;240:14,
15;241:19;242:6;
244:11;258:9;260:6;
269:1;292:12;305:18;
318:11;327:18;
336:20;348:5;359:6;
376:9
**Late (5)**
240:9;242:15;
250:10;266:24;
350:23
**later (5)**
223:22,23;249:17;
327:20;350:18
**laterally (1)**
238:14
**Lauderdale (1)**
350:21
**launch (1)**
299:25
**launches (2)**
305:1;355:12
**Lauren (2)**
183:14;188:5
**Law (4)**
183:14;188:6;
260:19;298:19
**laws (1)**
371:18
**laying (1)**
271:21
**layout (2)**
324:24;325:24
**lead (9)**

197:14,23;247:16;
282:15;302:25;331:6,
15;332:11;359:23
**leader (69)**
193:5,14,19,20,24;
194:9,10;195:3,23;
196:5,6,7,8,18;
208:23;210:21;
222:10;225:3;228:23;
232:17;237:21;238:7,
9,12,15,15,21;239:4,
8,10;243:9,9,14;
249:14;255:11;
256:14;257:12;258:3;
280:1,14;281:18,19;
282:3,18;284:3,14,22;
296:6,13,15;297:13,
16,17;305:22;312:3,
20;317:2,3;333:15;
339:2;341:22;350:3,
13;351:3,5,13,17;
360:23;374:11
**leaders (52)**
195:24;196:17,19;
207:7;219:2,5,15,16,
18;222:6,8;224:11,
13;238:3,18;239:9;
255:6,8;256:9;
298:13;308:5,7;
310:5,9,15,17,22;
311:2,3,17,23;312:3;
317:16,18;318:1;
326:15;331:22;332:3,
7,16,19;333:5;334:3,
5;337:4;341:20;
342:2,10;351:11;
356:13;359:14;361:4
**leader's (1)**
203:14
**leadership (34)**
195:10,15,18,19,20;
196:14,21;200:25;
204:13,19;206:8;
220:7;221:21;222:1,
5,5,12,19,20;223:8,9,
11;224:8,20;236:4;
243:4,6,11;258:6;
281:5;284:5;290:22;
351:14;371:19
**leading (8)**
221:19;233:1,5;
280:13;282:8;286:3;
297:24;303:6
**leads (8)**
193:8,11;246:15;
247:10;330:19;333:5;
334:7;342:3
**lean (1)**
270:9
**learn (2)**
309:11;364:3
**least (2)**
244:24;275:9

**leave (14)**
226:12;227:24;
228:1;235:3;253:15;
266:20;267:13;269:3;
270:1;301:4;306:2;
335:22;352:24;
354:13
**leaving (12)**
235:8;239:2;
241:24;254:5;269:2;
306:6;308:5,10,13;
309:6,7,12
**led (1)**
288:6
**left (56)**
194:21,23;196:16;
202:6;203:15;204:1,
3;208:1;210:5;
213:12,16;216:12;
228:9;229:15,21;
231:17,20,25;233:8;
234:16;235:25;236:4,
16,22;238:18,20;
239:17;240:13,14,14;
241:16;246:19;
249:19;250:19;253:2;
258:13,15;262:15;
264:22;267:21;268:3;
269:6;281:11,14,15,
17;282:16,25;283:20;
306:7;307:9;310:8,
13;312:15;313:11;
357:22
**legal (1)**
328:15
**legend (1)**
355:3
**length (5)**
250:16,22;251:5,
14;283:8
**letting (2)**
257:8;326:16
**level (23)**
196:22;197:6,7,11,
11,14,21,21,23;
198:17,21;199:7,8,12;
204:21,24;212:15;
221:10,11;286:5;
289:16;296:12;302:7
**leveling (1)**
197:9
**levels (5)**
195:19;196:13;
197:3;219:6;220:10
**licking (1)**
361:1
**lieu (2)**
293:21;367:3
**life (3)**
296:19,24;303:13
**light (1)**
308:24
**likely (8)**

304:7;317:15;
319:16;320:6,18;
328:1;333:17;336:25
**Lincoln (1)**
350:22
**line (8)**
213:10;215:25;
216:8;224:14;243:13;
288:14;355:5;361:7
**lines (1)**
213:9
**link (7)**
192:9;261:24;
273:18;278:21;
295:15;314:16;
349:14
**links (1)**
364:6
**listed (1)**
343:15
**listen (6)**
191:17;206:17;
261:8;278:5;294:22;
348:25
**listened (1)**
289:11
**listing (2)**
330:20;333:19
**literally (2)**
232:1;307:16
**literature (4)**
311:25;312:1;
331:9;332:4
**little (38)**
192:22,23;193:1;
197:12;200:24;
213:21;216:7,8;
217:4;219:22;225:11;
226:17;227:24;
233:14;246:8;247:6,
22;248:18;249:16;
265:7;297:22;299:10;
319:23;322:11,12;
327:20;338:4;350:10;
351:14;353:4;354:12;
357:10,17;358:24;
359:12;360:14;368:7,
14
**Littler (2)**
191:8;292:24
**local (2)**
230:11;300:10
**locally (1)**
300:11
**located (18)**
198:3,4,10,14,22;
199:12;200:11,17;
201:4;207:21;209:15;
214:17;216:7,17;
225:24;227:19;247:7;
254:20
**location (36)**
190:19;193:25;

249:12;260:8;262:24;
263:1,9,16,17,19,23;
264:14;267:1,8;
270:22;277:12;
279:14,17,19;281:16;
282:17;292:15;296:6,
8,14;297:13,21;
298:5;305:12;348:7;
350:6;351:10;352:8,
10;355:15;358:11
**locations (4)**
265:6;272:15,18;
345:18
**locker (2)**
231:25;232:1
**lockers (7)**
211:22,23;216:24,
24;246:17;254:20;
307:18
**log (2)**
299:1;363:11
**logged (1)**
316:10
**login (1)**
363:8
**logoed (1)**
353:6
**long (27)**
192:21;193:13;
194:8;195:4;199:19;
213:17;239:23;241:1,
6,25;242:9,12,18,23;
251:8;281:19;283:6;
296:7;303:8;312:14;
346:24;350:4;366:23;
368:8;370:10;374:1;
376:11
**longer (3)**
227:18;240:12;
262:19
**look (25)**
200:23;206:8;
209:14;211:5;226:6;
231:16,19;245:3,4,18;
246:1,22;248:13;
264:5,8;322:10,18,19,
21;323:16;325:3,6;
357:15;370:2;371:1
**looked (4)**
227:25;228:5,6;
235:14
**looking (22)**
196:25;211:10;
213:13;214:2,10;
215:5;220:12;226:9;
228:8;229:18;245:1,
2;248:7;254:9;
284:17;288:1;300:3;
311:8;321:8;364:13,
22,23
**looks (14)**
203:3;216:4;
229:21;232:7;302:15;

307:10;317:8,14;
323:2,11,11,17;
357:23;366:22
**lose (5)**
192:6;261:21;
278:18;295:12;
349:11
**lot (32)**
196:23;197:16;
199:4;200:5;202:23;
205:10,10;214:15;
225:20,22;226:1;
229:10;234:4;257:25;
264:9,10;265:20;
267:7,9;268:1,2;
272:20;273:9;280:16,
21;294:19;300:2;
306:11;351:18;
352:19;355:2;362:13
**love (1)**
314:9
**lower (4)**
198:4;227:17;
229:11;248:8
**lunch (15)**
211:25;212:7;
219:8,10;250:12;
251:4,6,10,12,15,18;
254:18;262:8;313:10;
356:4
**lunches (2)**
217:25;218:2
**luring (1)**
300:20
**lying (1)**
307:8

**M**

**ma'am (4)**
260:21;277:4;
278:24;294:9
**machine (2)**
212:4;359:15
**machines (4)**
247:8;307:17;
359:9;360:1
**mail (1)**
265:3
**mailed (1)**
377:13
**main (7)**
199:25;200:18,18;
203:19;204:9;208:4;
212:20
**maintain (5)**
220:9,18,24,25;
302:16
**maintaining (1)**
223:4
**majority (1)**
280:13
**makes (2)**

191:20;295:1
**making (9)**
201:15;205:11;
220:15;222:12;
228:11;264:3;280:21;
296:21;302:24
**mall (7)**
305:8,12;350:15;
354:6,8;355:2;357:22
**malls (1)**
356:25
**man (1)**
279:20
**manage (1)**
307:5
**management (2)**
356:12;374:5
**manager (70)**
193:22;194:2;
195:21;196:10,12;
203:6,14;223:17;
231:23;232:2;239:10,
22;240:1,6,8,11,16,
25;241:1,2,9,10,12,
15;242:12,12,16,17,
19,21,23,24;248:2;
256:5,13;258:2;
263:4,8,11;264:1,13,
14,17;279:16;280:3,
9;281:25;282:7,8,13;
288:21;298:18;308:9;
317:4;319:15;328:21;
331:10;341:7;350:17,
18,21,24,25;351:2;
352:1,2;358:5,6;
370:9;374:1
**managerial (2)**
195:12;263:6
**managers (48)**
196:8,9,11;201:6;
219:6,7;239:13,14,18;
240:18;241:16,22;
242:3;256:25;258:1,
1;263:20;265:11,13;
266:19;282:14;
297:24;299:5,6;
311:9;319:15;326:17,
18;327:12,24;328:3,
12;330:9,12,17,18;
331:1,5,6,7,14;
332:14,19;333:11;
334:1;336:23;339:4,
11
**manager's (12)**
200:25;201:20;
203:13,21;216:7;
246:20;247:10;
254:10,24;255:1,2;
276:3
**Manhattan (4)**
198:4;227:18;
229:11;237:20
**manner (1)**

284:20
**Manny (2)**
359:22,23
**many (8)**
192:25;203:20;
218:22;235:10;
250:19;263:5;275:7;
320:10
**mark (5)**
201:23;245:4,6;
344:23,25
**marked (9)**
207:16;212:11;
316:12;344:22;346:7;
365:12;370:1;372:23,
24
**marker (1)**
362:8
**market (5)**
258:14,16,18;
281:17;351:17
**marks (2)**
245:4;246:5
**Marshall (1)**
240:20
**Mastrony (54)**
189:7;344:10,12,
18,20;345:14,25;
346:4,7,12,17,19;
347:2,4,15,25;348:23;
349:16,17,19;358:22;
360:10;361:21;
364:16,18,23;365:5,8,
21,24;366:8;368:4,8,
12,18,22,24,25;369:2;
370:20;371:13;373:3,
5,7,10,19,22,23;
375:5,7,9;376:7,20,22
**match (4)**
362:22,25;363:2,11
**matching (2)**
362:19;363:25
**material (20)**
189:9;204:16;
205:15;207:11;227:7,
9,9;228:18;267:4,17;
270:3;272:8;293:2;
297:5;301:1;305:15;
306:14,19;308:1;
310:9
**materials (11)**
189:13,15;229:9;
230:4,9;252:20;
253:16;300:25;
306:16;353:9;377:25
**Matt (9)**
223:18;242:4,18,
25;243:23;326:9;
327:21;328:18,18
**Matteo (2)**
268:4,6
**Matter (6)**
183:4,13;188:4;

227:11;311:25;378:3
**Maura (1)**
189:7
**maximize (1)**
300:3
**may (70)**
188:19,21;189:16;
213:5;225:14;233:15;
240:16;242:7;251:6;
254:1,2;255:19;
258:19;264:17;267:4,
24;271:17;274:24;
275:20;282:18;
283:14;286:10,14;
287:2;308:2,19;
309:17,22;312:21;
314:23,25;316:5;
317:17,17,21;318:1;
323:4,4;324:14;
326:9,11;327:22;
328:17;329:9,21;
331:2,4;332:12;
334:15;336:15;341:1,
1,25;344:21,23;
345:15,17,19,22;
369:12;370:16;
371:19;372:15,18;
373:25;374:1;375:15,
23;376:4,4
**maybe (18)**
199:7;204:25;
211:23;214:9;217:16;
230:15;252:5;253:2;
258:5;273:25;315:20;
321:12;324:12;
327:20;328:2,18;
367:8;369:15
**May-ish (1)**
271:9
**meals (1)**
218:2
**mean (37)**
198:24;204:10;
207:8;218:10;226:20;
230:23;257:25,25;
258:1;263:19;267:5;
270:6;280:10;293:20;
296:25;298:25;301:3;
305:17;306:19;
312:20;317:3;320:1;
327:14;331:12,24;
333:14;336:25;337:3;
339:15;353:16;
364:13;366:12;368:4,
7,8,10;375:24
**Meaning (1)**
225:9
**means (2)**
224:25;230:17
**media (1)**
273:19
**meet (3)**
229:11;281:7;

377:23
**meeting (2)**
332:7;342:11
**meeting/their (1)**
318:24
**meetings (1)**
356:1
**Meli (1)**
241:18
**member (14)**
196:22;207:4;
224:8;234:9;274:21;
280:16;283:1;284:13;
285:9;299:1;303:20,
22;308:3;314:7
**members (48)**
199:13;201:7;
205:20;206:25;
210:19;212:6;217:9;
219:20;222:3;234:21;
248:19;249:23,25;
250:8;253:16;268:22;
275:18;280:12;
285:10;297:24;
298:13;299:20;
300:12,14,20;301:3;
302:22;303:8,16;
305:10,21;313:10,18;
318:12,15;330:19;
332:8,12,14,15;333:6,
10;334:6,19;342:3,6;
352:21;371:19
**memo (4)**
316:14,24;323:14,
18
**memorial (1)**
222:24
**memory (1)**
330:21
**Mendelson (2)**
191:8;292:24
**mention (3)**
255:14;338:24;
347:15
**mentioned (21)**
198:14;203:12;
204:8;205:16,16;
213:6;216:24;231:9;
237:14;238:2,3;
239:13;243:4;267:16;
272:6;274:23;282:16;
286:24;308:23;
313:18;342:20
**menus (3)**
229:14,19;252:17
**merchandise (1)**
248:12
**message (14)**
205:12;206:9;
223:7;226:10;319:23;
320:6;327:13;329:4,
10;336:12,22;338:10,
17,24

**messages (3)**
336:17,20;338:19
**messaging (1)**
204:18
**met (1)**
228:12
**method (1)**
293:25
**Miami (2)**
350:23,23
**microwave (3)**
212:4;218:2;307:19
**middle (3)**
194:7;212:5;216:21
**Midtown (1)**
237:20
**might (15)**
203:22;211:8;
250:10;251:6,11,12;
255:2;267:20;275:24;
280:7;310:25;317:24;
356:5;364:23;368:9
**million (1)**
298:2
**mind (8)**
225:19;229:24;
230:12;235:15;
240:22;312:13;
322:12;330:24
**mindset (2)**
270:4;274:3
**mine (1)**
364:19
**minimize (1)**
218:16
**minute (17)**
212:7;217:22;
219:7;223:5;231:6;
251:1,6,7;254:18;
291:24;326:7,21;
329:17;335:3;344:13;
369:19;375:2
**minutes (12)**
209:19;219:11;
237:3;245:20;274:7;
291:6;315:1;339:17;
340:14;344:4;369:3;
373:5
**mistake (1)**
314:15
**mix (1)**
205:1
**model (1)**
233:25
**moment (16)**
207:14;215:3;
242:8;254:2;267:16;
284:20;289:12;
308:23;310:19;
311:13;325:1;335:23;
341:25;347:6;356:18;
362:13
**Mona (14)**

238:24;316:24;
317:15;318:4,6;
321:11;322:1;324:2;
329:3,10,11,22;
336:25;337:3
**month (1)**
205:24
**months (7)**
214:16;221:19;
224:18;240:15;
265:15;302:17;374:2
**mopping (1)**
220:21
**more (35)**
191:21;193:10;
197:12;226:17;
227:13;230:25;
231:18,18;232:23;
241:4;244:12;245:1;
255:18;261:11,15;
270:23;275:9;278:9;
295:2,6;309:6,10;
322:11,12;327:14;
333:23;335:3;337:25;
340:12;343:8;349:2,
6;357:4;366:19;
371:18
**morning (16)**
189:22;190:5,7;
192:15;199:2;201:8;
217:8;218:3;229:2;
231:4,10;232:7,9;
250:5,10;356:1
**mornings (1)**
226:1
**most (14)**
194:13;198:25;
222:10,23;235:18,20;
268:18;299:23;300:4;
304:7;305:17;317:15;
319:16;331:21
**motivation (1)**
197:15
**mounted (2)**
204:7,12
**mouse (1)**
244:23
**move (17)**
193:10;202:12;
208:7;212:25;227:14;
228:15;233:12;
238:25;288:16,25;
289:5;299:17;306:12;
325:10;337:7;340:6;
368:19
**moved (13)**
206:4;234:21;
238:14;239:1;241:11,
22;263:3,15;306:9;
340:11;350:20,23;
351:1
**movement (2)**
225:21;299:12

**moving (3)**
216:12;266:23;
372:21
**Moya (8)**
223:18;242:4,18,
25;243:23;257:18;
326:9;327:21
**much (15)**
199:21;217:13;
218:18;219:17;
227:12;228:8;237:1;
259:10;270:9;276:11;
291:16;333:10;343:8,
24;374:24
**multiple (9)**
322:18;325:25;
332:3;333:9,25;
334:5,6,6;362:2
**mundane (1)**
206:14
**museum (1)**
222:24
**music (2)**
269:17;273:10
**musician (1)**
233:25
**musicians (1)**
303:14
**must (1)**
377:17
**mute (1)**
295:20
**muted (3)**
265:24,24,25
**myself (4)**
207:6;219:19;
290:21;296:17

# N

**name (46)**
188:5;190:13,14,
15;192:19;200:9;
206:13;234:22;
238:24;239:24;
241:19;242:6;257:23;
258:7,9;260:3,6;
269:13,22;270:14;
273:6;274:17;277:7;
279:8,22;283:1;
285:4,16;292:9,11,12,
12;295:25;316:6,9;
319:16;321:23;
333:16;343:10,11,12;
348:3,4,5;351:12;
358:4
**named (6)**
258:2;260:19;
268:19;279:20;308:3;
319:15
**names (11)**
318:16,19,22;
330:20;333:19;

342:15,18;343:5,14,
15,16
**Naomi (4)**
268:19;269:14,15;
273:1
**narrow (4)**
199:19;320:9;
330:23;332:9
**NATIONAL (5)**
183:2,15;188:4;
222:24;292:20
**nature (3)**
298:19;306:21;
353:22
**navigate (1)**
206:16
**near (1)**
272:1
**necessarily (2)**
254:3;341:18
**necessary (8)**
192:8;208:25;
210:23;261:23;
278:20;295:14;
349:13;368:5
**need (32)**
198:22;210:21;
211:13;217:20;
232:11;235:10;237:1;
303:6,24;314:22,23;
315:12;319:23;
324:21;328:3,15;
329:17;335:13;337:8;
339:24;340:2,14;
363:8;368:18;371:13,
14;373:13,14;376:8
**needed (1)**
328:24
**needs (2)**
208:24;257:9
**nervous (11)**
310:10,12,25;
312:3;330:10;331:1,
8;332:1;339:11,13,15
**network (1)**
294:16
**networking (1)**
331:12
**neutral (1)**
285:8
**New (50)**
183:16,16;191:8;
193:15;194:2;198:6;
199:1;204:22;205:22;
206:4;222:4,7,8,23;
224:8,23;225:3,21;
227:21;233:22,24;
234:14,21;236:1;
237:19;240:3;243:10;
250:22,23;258:16,18;
263:21,22;267:8;
279:17;303:13;305:9;

350:15,24;352:4;
354:9,10;360:23;
361:2,23;374:3,5;
377:12,12,18
**newly (1)**
198:6
**newspapers (2)**
232:15;306:25
**Newton (1)**
249:9
**next (10)**
200:23;232:7;
254:20;259:17;
276:17,19;281:23;
313:17;371:23;
375:19
**nice (2)**
201:13;364:6
**night (8)**
199:2;217:12;
218:4;231:10;232:10;
244:11;307:6;376:9
**NLRB (1)**
348:12
**Nobody (1)**
191:10
**noise (1)**
265:20
**non (6)**
207:12;235:7;
265:23;266:6;308:9;
312:24
**non- (1)**
314:16
**noncustomer (1)**
199:24
**non-customer (1)**
199:22
**none (2)**
314:1;324:11
**nonetheless (1)**
318:19
**non-issue (3)**
308:16;310:15;
312:5
**non-participant (1)**
265:23
**non-phone (1)**
293:17
**nonpublic (1)**
199:6
**non-solicitation (2)**
298:16;308:14
**non-store (1)**
312:20
**nonwork (4)**
204:16;228:16;
233:15;303:25
**non-work (2)**
303:8;312:14
**noon (1)**
199:2
**normal (4)**

206:14;266:13;
290:19;310:20
**normally (2)**
271:22;272:6
**Noted (1)**
188:2
**notice (2)**
183:14;236:19
**noticed (2)**
305:19;359:11
**notifications (1)**
257:8
**November (3)**
262:18;279:11,12
**NR (1)**
318:15
**NSO (1)**
263:20
**number (29)**
188:5;196:7,11;
197:10;211:1;221:19;
222:6,8;250:14;
275:8;295:15;298:10,
15;308:4;310:5,17;
317:16;321:9;322:22;
330:17,18;331:4,6,22;
333:10;342:2,5,23;
359:13
**numbers (3)**
337:10;346:7;
349:14
**nutshell (1)**
351:8

**O**

**oath (5)**
190:11;260:1;
277:3;292:6;347:13
**object (10)**
213:25;214:10;
215:7;226:19;232:20;
258:21;286:19;
288:14,18;342:14
**objecting (1)**
215:1
**objection (32)**
191:24;202:15;
203:7;208:8;215:9;
232:21;236:8;261:14;
286:3;295:6;310:24,
24;320:8;323:18;
328:5;329:6;330:2;
337:11,16;339:5;
346:24;349:5;358:15,
18,19;360:4,5;
364:10;365:1;366:2,
5;375:21
**objections (9)**
202:13;208:9,10;
214:25;337:21;
343:12;360:7;361:15;
368:15

**objects (5)**
191:23;261:13;
278:10;295:4;349:4
**observation (2)**
287:12,25
**observe (1)**
188:12
**observed (5)**
267:4;269:20;
270:17;306:14;318:2
**observer (1)**
265:24
**observers (1)**
188:18
**obsessed (1)**
222:21
**obtained (1)**
377:20
**obviously (6)**
264:7;269:21;
301:5,6;309:12;364:4
**occasion (9)**
228:17;266:6;
273:5;306:9;352:9;
353:11;354:1;355:16;
356:11
**occasionally (1)**
200:16
**occasions (2)**
266:25;299:13
**occurred (2)**
272:25;273:24
**occurrence (3)**
304:6,6;306:23
**o'clock (3)**
217:11,12;231:3
**October (1)**
350:5
**oculus (7)**
198:5,7,10,13;
225:24;226:5,14
**off (67)**
188:13;189:8;
199:16,18,25;206:20;
209:13,18,20,23;
210:2,6;216:25;
217:15;222:22;228:1;
229:15;230:23;235:2;
237:8;245:17,19,21,
22;251:2;253:14;
255:22,24;259:13,14;
266:14;267:7;274:9;
276:14,15;291:8,9,25;
292:1;296:15;301:15;
315:4,23,24;326:21,
22,24;340:15,16;
344:3,7,8,13,14,16;
345:21;362:7;369:7,
8,14,18,20;373:6,8;
375:2,3;378:1
**offer (7)**
320:21;339:23;
354:20;357:22;

362:18;365:18;
366:12
**offered (3)**
214:14;243:7;
293:24
**offering (2)**
339:19,21
**office (49)**
191:7,8;197:20;
199:19,19;200:1,19,
21,22,25,25;201:1,4,
20,20;202:7,9;203:13,
14,17,21,23,25;208:5;
209:14,17;216:7;
217:14;246:15,18,20;
247:10;248:2;254:10,
24;255:1,2,3;276:3;
277:20;285:21;
292:23,23;294:18;
328:14;341:12,17;
377:12,18
**offices (4)**
220:23;237:20;
260:19;292:24
**official (1)**
188:20
**officially (2)**
194:10;260:19
**often (20)**
200:16;217:22;
219:8,10;222:20;
228:24;229:1;234:3,
5;256:9;265:14;
268:5;299:7;341:22;
352:22;354:25;355:4,
24;362:23;367:4
**oftentimes (1)**
355:22
**O'Hara (1)**
189:11
**O'Hara's (1)**
189:14
**Old (1)**
249:5
**onboarding (1)**
222:3
**once (8)**
231:20;264:10;
299:8;319:10;327:15;
329:25;332:8;353:25
**one (107)**
190:16,17;191:21;
195:25;200:21;
201:22;205:20,22;
207:4;220:11;222:10,
22;226:7;227:13,20;
229:25;230:10;
232:13;234:20;239:8;
242:7;243:18;244:16;
248:11;251:4;252:17,
23;255:13;259:20;
261:11,15;264:5;
266:9;269:1,18,

270:19;272:9,21;
273:1,8,10;275:5,17;
277:22;278:9,11;
281:21;287:13;
291:24;295:2,6;
297:22;298:15;
302:23;305:21;308:7;
313:5,12;314:3;
315:17,20,21;317:16;
318:2;320:22;322:18,
19,23;323:13;325:25;
326:15,17,18,18;
331:14;333:14;335:3;
336:9,20;337:23,24;
339:10,25;341:13;
343:12;347:6;348:16;
349:3,6;351:25;
357:15;359:5;360:12;
362:24,25;364:18,22,
24;365:5,21;366:19,
24;369:11;373:13,14;
376:16,19
**one-on-one (1)**
270:7
**ones (3)**
229:23;232:15;
241:25;331:21;365:5
**ongoing (4)**
231:5,11;298:20;
332:3
**only (18)**
188:12,19;201:1,1;
219:12;226:24;228:4;
278:11;290:24;
297:23;302:6;304:22;
306:17;325:15;
327:24;364:18;
366:23;375:22
**on-site (1)**
298:3
**onto (3)**
207:25;217:24;
297:10
**Oops (1)**
357:9
**open (31)**
194:5;201:9;
215:22;229:11;
231:24;232:6;239:20,
21,21;242:22;249:14,
15,15,17;250:7;
251:16;260:22;
263:19;264:1;285:11;
300:11;301:25,25;
302:1;307:6;315:22;
351:1;354:9,17;
355:4;375:22
**opened (18)**
194:4,7;202:10;
219:14;221:18;
222:15;224:3;225:5;
229:13;232:1,8;
242:20;250:9;263:17;

266:24;354:11;355:1,
1
**opening (9)**
194:3;221:20;
222:4,7;223:5;
239:20;264:11;268:2;
305:9
**openings (1)**
263:21
**opens (1)**
217:8
**opera (3)**
234:21;252:24;
253:2
**operation (2)**
195:22;270:19
**operations (6)**
196:5;250:6;275:6,
18;280:5;359:23
**opine (1)**
324:15
**opportunities (1)**
356:3
**opportunity (9)**
265:17;303:17;
304:15;309:11;345:8,
12;347:1;367:19;
368:1
**opposed (1)**
233:2
**ops (2)**
275:11;308:3
**order (4)**
188:20;189:16;
220:7;229:7
**ordered (1)**
318:2
**orders (1)**
248:23
**organization (3)**
195:10;221:1;
236:20
**organizational (1)**
237:24
**organizations (1)**
267:25
**organized (2)**
229:6;342:12
**organizes (1)**
366:16
**organizing (1)**
207:5
**original (1)**
263:20
**others (2)**
242:7;338:23
**otherwise (2)**
251:3;343:15
**ourselves (2)**
208:16;302:3
**out (102)**
189:16;192:23;
201:6,10;203:13,17,

25;204:3,4;207:2,25;
210:14;211:3,13;
212:20;215:24;
217:18,20,24,25;
218:8;219:11;220:12;
221:1,22;226:2;
230:15,18;231:6,12;
232:1;237:20;245:10;
246:19,23;247:2,5;
248:2,5,19,22;250:18;
262:9;266:17;267:22;
268:4,18;269:3,6,18;
271:2,22;272:5,5,6,7,
7,14;275:17,25;
276:3;284:5,7;287:4,
4;300:16;301:5,6;
303:23;304:25;
305:21,22,24,25;
306:22;308:6,12;
310:14,18;312:6,11,
17;313:4,6,8,14,15,
18,19;322:23;325:20;
328:24;333:13,16;
341:13,22;342:10,13;
354:13,15;359:14,24

**outline (2)**
227:4;247:12

**outlined (3)**
219:1;300:25;
301:13

**outs (1)**
354:19

**outside (22)**
202:9;216:7;
219:23,23,24;220:6;
226:13;230:6;234:2;
258:21;266:15;267:3,
24;271:16;281:18;
285:22;300:19;302:2;
305:4;342:16;355:13;
356:17

**outsourcing (1)**
221:13

**over (26)**
188:7;192:22;
193:1;198:9;205:19;
206:17;216:12;
221:22;222:7;233:19;
238:13,14;243:9;
252:21;266:23;284:3,
5;299:12;305:23;
319:22;325:14;329:6;
332:15;348:23;
350:10;351:10

**overall (6)**
195:22;233:20;
264:3;287:18;296:24;
340:7

**overlapped (1)**
239:2

**overlook (1)**
198:8

**overnight (1)**

307:9

**overrule (1)**
215:8

**Overruled (2)**
328:9;330:5

**oversee (2)**
298:4;351:7

**overseeing (1)**
241:11

**overt (1)**
354:12

**overview (11)**
193:6;196:22;
199:5;200:20;211:19;
280:2;282:12;296:12;
297:19;299:16;
350:11

**own (2)**
315:11;352:14

**owned (1)**
306:2

**ownership (1)**
303:4

# P

**page (58)**
246:10,13;247:23;
248:3;273:20;316:4;
318:8,11;320:22,23;
321:1,12;322:1,5,6,7,
7,8,15,19;323:6,11,
17,17,21;324:1,2,3,4,
14,19,19;325:4,10,11;
335:19;336:1,10;
357:15;359:5,5,6;
360:12;364:15,17,19;
365:16,19,20,21;
366:24;367:23;371:2,
3,6,9,11,17

**pages (4)**
323:18;324:16,21;
366:23

**paid (1)**
251:1

**paint (1)**
332:6

**Palisades (1)**
350:15

**pan (1)**
208:4

**pandemic (2)**
226:3;273:4

**paper (1)**
252:14

**papers (1)**
260:24

**paperwork (2)**
201:8;328:13

**paragraph (6)**
309:21;318:10,10,
11;371:11,23

**part (56)**

195:25;196:9;
201:10,11;210:12;
217:8;219:17;220:18;
222:4,7,9;223:8;
230:1;231:23;233:21,
21;241:24,25;242:1;
257:4;263:20,21;
269:19;287:4;290:22;
297:24;298:11;
302:14,24;306:21;
307:22;313:13;
315:13;321:5,7,11,21;
323:6,21;324:4,9,22;
326:16;327:19;
328:13;341:12,21;
342:10;343:5;344:18;
345:1;346:10;362:19;
375:7,17,24

**partially (1)**
344:22

**participants (1)**
188:17

**participate (3)**
206:11;234:1;
355:22

**particular (12)**
212:13,16;263:9;
268:16;282:2;289:10;
290:18;310:5;320:17;
322:19;328:17,25

**parties (11)**
189:9;230:3,19;
233:13;344:17;353:1;
354:2;375:21;377:5,
19,20

**partner (5)**
314:9,11;339:1;
350:16;351:12

**partnership (1)**
196:11

**parts (2)**
197:4;222:10

**part-time (4)**
249:22,25;251:9;
263:2

**Party (13)**
183:10;189:2;
229:10;308:6;313:19;
337:6,17,19,23;
339:23,25;375:19;
377:23

**pass (4)**
267:20;303:23;
312:11;313:6

**passcode (1)**
293:17

**passing (5)**
266:9;308:6;
313:15,18,19

**passion (1)**
234:3

**passively (1)**
235:9

**password (1)**
363:9

**past (4)**
209:21;237:5;
262:18;362:4

**pastries (1)**
305:20

**Patel (8)**
238:24;316:24;
324:22;329:3,10,22;
336:13,21

**Paul (28)**
196:19;219:19;
223:12;238:3,7;
239:4;244:2;256:25;
257:16;282:4;338:24,
25;339:10,12,13,13,
14,15,16;347:4,11;
348:4;349:20;361:22;
366:9;368:12;373:11,
24

**p-a-u-l (1)**
348:4

**Paul's (1)**
339:12

**pay (2)**
290:1;359:13

**payment (1)**
248:25

**PDF (5)**
321:8;324:24;
325:13;337:8;340:7

**peers (5)**
273:15;304:9;
353:19,23;362:7

**pens (1)**
211:9

**people (42)**
201:2,6,10;206:16;
212:1;217:23,25;
231:14;233:24;
234:11;235:10;238:1;
257:13;269:16;271:2;
272:10;298:23;303:3,
5,12,17;309:12;
310:25;313:13;
314:10;315:10,12;
333:9,12;335:4;
342:2,24;343:6;
351:8;354:20,21,22,
24;355:5;363:22,24;
367:15

**peopleapplecom (2)**
363:24;367:15

**people's (1)**
314:17

**per (2)**
328:15;362:21

**perceived (1)**
333:20

**percent (2)**
228:1;229:15;
319:17;357:23

**perception (3)**
287:16,17;288:22

**Perfect (1)**
209:22;236:18

**perform (1)**
199:14

**performance (6)**
234:25;286:21;
287:3,8,18,23

**performances (2)**
234:7;287:6

**performed (1)**
218:9

**performing (2)**
234:23;355:3

**perhaps (1)**
195:12

**period (5)**
205:24;236:3,14;
251:19;367:7

**periodically (2)**
355:11;356:16

**perk (1)**
313:13

**permanent (1)**
281:12

**permission (1)**
205:1

**permit (1)**
356:9

**permitted (4)**
188:19;255:4;
308:15;362:11

**Perroni (7)**
242:4,23;243:2;
323:14;370:6,17;
372:16

**person (24)**
191:21;224:19,22;
232:6;240:23;243:7;
257:23;261:11,16;
266:18;269:10;278:9,
12;284:17;295:2,6;
314:10,16;332:21;
333:2,19;349:3,7;
367:6

**personal (6)**
205:5,23;266:11;
290:22;293:13;311:5

**personally (12)**
205:7;228:7;234:8;
252:7;253:7;268:10,
12;281:6;296:17;
298:11;305:15;
317:21

**personnel (2)**
280:8,10

**persons (1)**
338:20

**perspective (3)**
228:11;301:9,14

**phase (1)**
227:14

**philanthropy (1)**
367:5
**philosophy (1)**
233:20
**phone (11)**
293:3,3,5,10,11,13,
20,25;294:8,12,15
**phones (3)**
199:15,17;200:8
**phonetic (5)**
223:18;242:5;
279:20;305:23;
319:13
**photo (4)**
202:8,8;207:23;
341:23
**photographer (1)**
233:25
**photographs (1)**
326:12
**photography (1)**
273:10
**photos (6)**
202:9,19;326:15,
18;341:15,20
**phrase (1)**
339:14
**physical (1)**
296:24
**physically (2)**
273:16;312:11
**pick (3)**
210:5;235:4;354:14
**picked (6)**
229:16;270:22;
271:25;272:4;275:8;
294:15
**picking (2)**
220:12;303:1
**picks (1)**
294:12
**picture (9)**
202:6,6;203:1;
207:18,20,22;208:14;
213:8;332:6
**pictures (7)**
201:25;202:2,5;
341:7,11,12,17
**piece (7)**
195:16;235:6,7;
270:10;303:7;362:1;
366:24
**pieces (2)**
210:22;324:15
**pile (1)**
315:19
**place (24)**
201:1,18;211:12;
217:21;218:5,8,16;
219:5;223:1;224:22;
225:22;226:25;229:3;
232:7;233:22;268:7;
283:16,17;290:11;

302:5;307:7,10;
317:16;322:18
**placed (1)**
319:2
**placement (1)**
213:11
**places (1)**
272:22
**plate (1)**
305:24
**play (1)**
248:13
**playbook (3)**
367:12,14;368:12
**player (1)**
269:17
**plays (1)**
269:17
**Plaza (1)**
183:16
**please (15)**
188:21;189:12;
190:12;244:7,15;
260:3;265:25;277:7;
292:9;317:12;322:12;
336:9;348:2;361:24;
369:3
**pm (5)**
249:15;251:17;
336:15;370:16;378:2
**podcast (5)**
205:15;206:16,17,
17;207:11
**point (13)**
224:16;230:6;
242:24;243:15;
255:13;257:10;287:4;
288:2,11;309:4;
318:11;367:6;374:1
**pointed (1)**
287:4
**points (7)**
198:17;212:16;
226:16;230:24;324:7;
333:13,16
**policies (12)**
221:4,12;224:21;
272:18;303:19;
351:24;354:24;357:3,
5;364:14,15;367:23
**policy (82)**
207:13,14;221:8,9,
10,12,17;223:24,25;
224:2,6,10,15,21,23;
225:2,6,12,14;226:11;
228:5,17;233:17;
235:7;236:21;250:22;
253:17;254:5;264:25;
265:2,3,17,18;266:7,
21,25;268:15;269:23;
271:24;272:17,19;
273:6,12;298:7,9,11,
16;299:11,12,13,19,

24;301:7;302:18,21,
21;304:16;308:9,15;
312:13,24;313:1,21;
314:13,17;334:20;
347:19;351:19,20,22;
352:9,23;353:12;
354:1,9;355:17;
356:12,21;357:2,2;
359:16;374:16
**pop (3)**
229:1;231:7;361:1
**Popeye's (2)**
229:24;252:5
**popping (1)**
231:12
**pops (1)**
357:1
**portal (2)**
364:7;365:16
**porters (1)**
220:11
**portion (3)**
212:17,18;345:11
**portions (1)**
375:16
**position (26)**
193:3,4,13,15,17,
24;194:22,25;195:1,
23;196:18;197:6;
223:16;238:25;239:1,
21;263:6;264:12;
279:14;282:22;296:4;
297:11,15;345:9;
350:2,4
**positions (6)**
196:21;249:23;
262:25;264:16;
350:11;377:19
**positive (1)**
282:15
**possibility (2)**
255:9;314:25
**possible (4)**
188:15;218:18;
262:9;297:4
**post (15)**
204:20;205:5,8,15;
206:24;207:10;
268:22;269:15;270:1,
3;271:1,5;273:16;
303:20;355:25
**postcard (1)**
234:18
**postcards (3)**
227:24;234:15;
235:8
**posted (5)**
206:19;207:4;
266:14,15;273:18
**posting (2)**
270:8;336:20
**postponed (1)**
345:12

**potentially (3)**
218:13;269:24;
300:11
**power (5)**
192:7;261:22;
278:19;295:12;
349:12
**practice (6)**
230:22;265:5;
272:7;287:15;308:13;
310:20
**practices (4)**
227:3,4,10;264:4
**pre- (1)**
273:3
**preceding (1)**
318:10
**prefer (1)**
294:1
**pre-pandemic (2)**
274:1,3
**prepare (3)**
188:20;236:25;
377:3
**prepared (2)**
250:6;346:9
**preparing (1)**
189:16
**present (3)**
206:21;207:2;
375:11
**presented (3)**
189:10;224:23;
338:15
**preserve (1)**
218:18
**presiding (1)**
188:7
**presumably (1)**
234:17
**pretty (14)**
197:3;199:21;
218:8;226:10;268:4;
290:7;299:25;310:7,
12;322:25;333:10;
368:8;374:3,5
**pretzel (1)**
355:10
**previous (2)**
195:1;236:23
**previously (2)**
261:25;274:22
**pride (4)**
205:10;290:21;
302:3;303:5
**primary (2)**
283:11;284:10
**print (1)**
354:19
**printed (2)**
189:16;234:15
**printer (1)**
201:4

**Prior (10)**
193:17;194:25;
264:11;297:10;
299:11,12;327:14;
352:8,9;353:12
**Priscilla (2)**
242:6,7
**privacy (2)**
314:4,7
**pro (2)**
197:11,22
**proactively (1)**
272:12
**probably (22)**
196:25,25;209:9;
211:22;215:6;227:20;
230:16;231:2;240:4,
8,9;241:2,5;242:15;
268:18;271:16,17;
273:25;304:22;
317:14;337:13;
366:20
**probations (1)**
229:12
**problem (6)**
261:2,17,18;322:6;
343:3;345:17
**problems (5)**
192:3;261:20;
278:16;295:10;
349:10
**procedures (1)**
377:8
**proceed (2)**
341:2;371:4
**proceeded (2)**
206:21;290:15
**proceeding (2)**
295:1;377:4
**proceedings (1)**
278:8
**process (4)**
209:16;222:2,11;
319:23
**product (13)**
198:22;248:12;
263:11;264:7;282:8,
11;283:4,9;297:1,3,8;
302:4;361:2
**products (6)**
198:19;200:9;
211:4;300:2;301:24;
352:18
**profile (1)**
225:25
**program (11)**
205:24;206:12;
362:14,15,20;363:3,
25;366:10,15,17;
368:11
**programs (3)**
193:9,11;204:23
**prohibited (1)**

334:20
**project (1)**
194:13
**projected (1)**
296:23
**promise (1)**
227:12
**promote (14)**
263:12;266:11;
267:10,12;269:5;
273:10,13;300:6,15,
20;303:16;304:10;
305:10,10
**promoted (5)**
238:8,9;241:1,5;
282:18
**promoting (1)**
303:10
**promotion (3)**
241:4;272:13;
282:20
**prompt (1)**
299:8
**properly (2)**
316:23;372:13
**property (1)**
305:13
**prophet (1)**
249:5
**proposed (1)**
377:7
**protect (2)**
314:4,7
**protest (1)**
226:4
**protests (1)**
225:22
**protocol (1)**
272:21
**proud (1)**
201:18
**provide (4)**
210:23;227:2;
313:13;340:9
**provided (12)**
189:13;192:9;
220:6;227:9,9;229:9,
9;251:4;261:25;
324:7;338:15;375:18
**provides (1)**
219:25
**providing (3)**
283:12;293:14;
376:13
**psychiatrist (1)**
288:19
**public (5)**
194:6;199:5;
225:17;290:10;
298:25
**publicly (2)**
298:22,24
**pull (4)**

206:20,25;314:17;
329:17
**pulled (4)**
194:12;206:7;
284:19;321:9
**purchase (7)**
196:3,7;198:19;
239:14;240:18;242:2;
313:10
**purchased (1)**
360:24
**purchases (1)**
313:9
**purchasing (1)**
352:18
**purpose (3)**
201:15;283:22;
375:22
**purposes (2)**
207:16;293:9
**pursuant (3)**
183:13;315:19;
324:8
**put (32)**
207:7;208:4;
211:24;228:7;230:18;
244:8,12;260:2;
264:4;269:4;277:4;
292:8;314:13;315:20,
21,22;317:16;318:2;
322:18;323:22,24;
324:9,10;326:3,4;
340:4;344:21;345:4,
23;363:14;373:14,15
**putting (7)**
230:12;241:7;
308:5;314:23,25;
336:21;357:7

## Q

**quarter (2)**
198:10;237:4
**que (1)**
355:13
**quick (3)**
256:4;341:1,6
**quickly (7)**
245:11;262:9;
269:9;271:18;297:18;
306:13;373:24
**quite (2)**
331:15;366:23

## R

**R-18 (1)**
359:17
**R-19 (1)**
357:24
**R-20 (1)**
361:6
**R-22 (2)**

212:21;215:14
**R-24 (2)**
345:5;376:14
**R-27 (1)**
364:1
**R-29 (2)**
345:5;376:14
**R-30 (2)**
345:5;376:14
**R-31 (1)**
377:1
**Rachel (6)**
239:19,23;240:1;
331:12,19;333:14
**rack (1)**
212:1
**Radachel (1)**
241:21
**Raegan (1)**
188:11
**R-a-e-g-a-n (1)**
188:11
**raise (1)**
286:1
**raised (5)**
285:25;286:6,6,8;
359:14
**ran (2)**
224:19;297:25
**random (1)**
228:9
**Ray (1)**
342:7
**reach (3)**
284:5,7;359:14
**reached (3)**
305:22;308:12;
359:24
**reaction (2)**
284:23;310:7
**read (8)**
335:7,8,17,23;
336:8;338:4;365:23;
368:5
**readily (1)**
244:9
**reading (4)**
206:3;288:20;
318:14;322:24
**ready (13)**
212:9;217:18,20,
24;223:5;231:7;
250:9;288:25;291:22,
24;307:6;359:3;371:3
**reality (1)**
218:20
**realize (1)**
342:9
**realized (3)**
270:23;271:20;
342:11
**really (56)**
193:21;195:14,19;

197:2;198:15,15;
200:25;201:1,13,15,
19;204:17,17,18;
205:1,2;206:5,5;
209:10;211:11;218:6,
15,17;219:3,14;
220:15;229:6;234:1,
2;235:6;245:11;
253:15;263:22;266:9;
272:10,11;281:6,7;
285:18;302:12;305:1;
306:22;309:2,11;
310:14,15;313:3;
314:24;341:15;355:3;
362:25;364:18;367:5;
368:5;371:25;372:7
**reason (3)**
328:20;347:17,20
**reasonably (1)**
377:23
**reasons (3)**
235:15;287:13;
377:22
**reboot (6)**
192:8;261:23,23;
278:19;295:13;
349:13
**rebuttal (1)**
375:11
**recall (19)**
223:16;252:5,24;
254:6;269:13;271:7;
272:24;273:24;275:8;
283:6,13;320:14,15;
327:21;328:1;329:9,
13;330:17;353:17
**recap (2)**
318:1;374:15
**receive (3)**
251:1;256:14;257:8
**received (9)**
203:10;205:4;
215:14;288:11;
315:18;317:24;
337:19;366:7;377:1
**recent (2)**
241:4;305:17
**recognition (1)**
362:7
**recognize (4)**
207:17;324:2,4;
338:9
**recognized (1)**
324:1
**recollection (5)**
241:7;253:21;
331:25;332:22;333:1
**reconnect (5)**
192:8;261:23;
278:19;295:13;
349:13
**record (90)**
188:19,20,22;

189:8,12;190:13;
209:14,18,20,23,24;
210:2;214:16;227:8,
9;245:18,19,21,22,23;
249:4;255:22,24,25;
259:13,14,15;260:4;
274:9,10,11;276:14,
15,16;277:8;288:18;
291:8,9,10,25;292:1,
2,10;315:4,5,23,24,
25;316:1;326:21,22,
24,25;337:8;338:14;
340:15,16,17;342:4,
17,25;343:9;344:4,7,
8,9,13,14,15,16,19;
345:21;348:3;369:7,
8,9,14,18,20,21;
373:6,8;375:2,3,4,14,
21,21;376:24;378:1
**recording (6)**
188:18;191:20;
261:10;278:8;295:1;
349:2
**recovery (1)**
353:2
**RECROSS (1)**
256:22
**rectangle (9)**
245:6;246:5,8;
247:4,9,21,22;248:15,
15
**rectangles (3)**
213:21;216:13,14
**rectangular (1)**
213:9
**recycle (1)**
252:14
**recycling (1)**
252:14
**red (13)**
213:9;216:8;
227:24;245:4,4,6;
246:5;247:21;248:15;
334:12,18,23;342:22
**redact (2)**
343:10,11
**redacted (4)**
318:16,16,18;
343:16
**redacting (1)**
343:12
**REDIRECT (8)**
256:2;258:22;
259:8;276:9;340:25;
341:4;373:3,9
**refer (5)**
195:18;347:23;
352:21;353:3;377:5
**reference (4)**
208:20;299:2;
320:25;335:10
**referenced (5)**
202:7;216:18;

223:24;307:13;
311:13
**referral (1)**
188:15
**referred (1)**
208:5
**referring (10)**
320:14;332:18,19;
338:22;341:19;346:1;
360:23;364:16;
366:10;367:22
**refers (1)**
364:14
**refilled (1)**
359:11
**reflect (1)**
244:25
**refocused (2)**
289:13,14
**refresh (1)**
330:20
**refresher (1)**
352:5
**refrigerators (2)**
212:4;307:19
**regard (2)**
280:12;345:19
**regarding (22)**
190:19;215:10;
227:2,10;228:18;
252:16;260:8;277:12;
287:16;290:1;292:15;
311:2;320:16;329:21;
332:1;333:1;334:3;
348:7;375:16;377:6,
8,20
**regardless (2)**
210:20;377:13
**regards (1)**
331:2
**Region (1)**
183:15
**regroup (1)**
314:24
**regular (5)**
257:8;304:5,6,7;
306:23
**regularly (2)**
230:1;327:12
**regulations (1)**
377:6
**reinforce (1)**
301:7
**reiterate (1)**
322:20
**reiterated (1)**
312:23
**related (13)**
204:15;205:3,15;
221:7;225:12;265:5;
267:24;280:8;290:4;
313:2;334:19;342:5,
12

**relates (4)**
296:13;297:5;
313:25;354:9
**relation (1)**
273:6
**RELATIONS (5)**
183:2,15;188:4;
263:12;292:20
**relationship (1)**
220:2
**relationships (2)**
214:8,15
**relative (1)**
314:5
**relatively (2)**
193:15;194:2
**relax (1)**
251:3
**release (1)**
355:23
**relevance (6)**
202:22,23;226:19;
286:19,20;339:6
**relevancy (3)**
258:21;328:5;339:5
**relevant (6)**
227:11;287:19;
288:3;289:4;345:2;
357:4
**rely (2)**
346:10;375:17
**relying (2)**
345:14,20
**remain (6)**
194:8;249:15;
264:21;285:8;372:22,
24
**remarks (1)**
261:12
**remember (36)**
224:22;226:15;
238:9;240:4;241:23;
242:6,8;243:10;
244:3;273:10;289:15;
320:5;326:17;327:17,
23,24;328:17;329:15;
330:13,15;331:10,17,
18,19,20,21,23,24;
332:5,21,25;333:23;
338:17;354:10;358:9;
361:24
**remind (3)**
188:13,17;235:25
**reminded (2)**
354:24;377:5
**reminder (3)**
356:19,20;362:10
**removal (4)**
188:15,21;228:10;
312:19
**remove (12)**
228:3;267:14;
268:24;269:7,22;

309:25;310:9;312:1;
327:25;328:2;359:18;
362:5
**removed (14)**
252:7,9,21;268:12;
271:12,19,25;275:19;
307:1;309:22;319:10;
329:24,25;359:15
**removing (9)**
235:12;312:22;
319:20;320:3;328:7;
331:9;332:4;345:24;
371:20
**reopened (1)**
226:2
**repair (8)**
199:12,14,17;
211:5;298:3;300:7;
370:13,14
**repeat (1)**
328:11
**repeatedly (1)**
320:8
**repeating (1)**
371:24
**Rephrase (1)**
329:7
**report (3)**
279:19;282:2,4
**reported (3)**
258:5;279:20;372:9
**reporter (30)**
188:10,19;191:20;
209:24;237:9;244:8;
245:23;255:25;
259:15;261:10;
274:11;276:16;278:8;
291:10;292:2;295:1;
315:5;316:1;326:25;
335:10;340:3,9,17;
344:9,15;347:17;
349:2;369:9,21;375:4
**reporting (1)**
330:17
**reports (1)**
257:6
**represent (5)**
189:12;213:10;
302:3,4,4
**representation (3)**
189:19;222:25;
286:2
**represented (2)**
215:11;345:1
**representing (2)**
216:10;247:18
**represents (3)**
215:11;248:11;
297:3
**reprimand (1)**
287:20
**request (9)**
205:4,14;207:10;

255:12;326:3;343:11;
377:16,21,22
**requesting (1)**
377:23
**required (10)**
224:12;243:8,12,
13,16;254:3;256:7,9;
298:17;299:5
**requirement (6)**
219:13;256:11,12;
265:11,12;377:15
**requires (1)**
221:10
**reset (2)**
231:21;232:3
**residence (1)**
277:22
**resolve (2)**
209:19;210:3
**respect (5)**
226:23;345:6,9;
346:9;352:13
**respond (3)**
266:16;285:6;
288:24
**responded (1)**
342:22
**Respondent (43)**
183:6;189:5,6,12;
190:3;202:14;203:8,
10;208:11,12;215:9;
252:11;254:6;259:18;
337:15;338:15;
344:10,17;345:6,20;
346:1,9;347:3;
358:16,19,21;360:8,9;
361:19,20;364:11;
365:2,4;366:3,6,7;
375:6,14,15,17,18;
376:13,18
**Respondent's (9)**
212:21;215:14;
345:5;357:24;359:17;
361:6;364:1;376:14;
377:1
**Respondent's (33)**
189:22,23;190:1;
201:23;202:12;
207:16;208:7;210:4;
212:12;244:7,19;
245:2;246:4,22;
259:17;344:22,24,25;
357:7;358:14,23;
360:3,11;361:13,16;
363:13;364:8;365:13,
18;367:17;376:5,12,
21
**response (10)**
270:18;284:23;
285:2,15;311:5,25;
314:8;343:1;372:15;
374:13
**responsibilities (11)**

195:6;220:9;221:3,
22;263:8;280:8,11;
282:7;283:9;296:13;
351:15
**responsibility (11)**
220:24;221:7,15;
280:15;282:13;
283:11;285:8;297:2,
6;309:15;351:16
**responsible (7)**
195:22;220:4,15,
20;221:25;280:3,4
**rest (4)**
275:6;284:21;
337:8;344:5
**restaurant (5)**
229:17;230:10,11;
252:17;267:16
**restocking (1)**
220:21
**restrooms (2)**
200:2;247:6
**result (2)**
188:15,21
**retail (5)**
193:5,8,9,20;
224:11
**retailers (1)**
230:6
**return (1)**
194:18
**returned (6)**
194:20;235:18,19,
22;236:18;281:25
**revealed (1)**
343:4
**reveals (1)**
342:15
**reversed (1)**
213:16
**review (13)**
191:15;261:4;
278:3;294:20;317:10,
12;324:3;345:12,17;
367:19;368:2,16,17
**reviewed (6)**
206:20,23;214:16;
323:6;345:18,18
**reviewing (1)**
365:25
**revisit (1)**
298:17
**rid (2)**
267:11;328:15
**right (189)**
189:21;190:5,18;
191:3,6,25;194:5;
198:6;202:8;203:8,
15,18;204:8;205:12;
208:5;211:17;213:21;
215:8,25;216:4,21,25;
225:19;227:15;
230:14;233:18;

235:23;237:4,23;
238:4,6;240:22;
244:4,4,5,6,18;
245:21;247:3,10,17,
21,23;248:8,14;
253:21;254:7,12,20;
259:2,10;260:17;
261:3;262:19,20;
267:8;270:6,16;
274:8;276:22;277:19;
278:2,13,24;281:11,
18;284:14;291:4,25;
292:22;294:15;295:8,
17,25;296:4;300:15;
301:16;302:19;304:2,
7,13,24;305:6;309:5;
310:8;311:22;312:4,
5;314:20;318:8;
319:6;320:3;321:18,
21;323:17;324:20;
325:3;327:20;329:17,
18;334:8;335:3,20;
336:7;337:17;339:17;
340:12,15;341:24;
343:16;344:7;346:18,
25;347:2;348:2,13,18,
22;349:7,16,17,22;
350:4,9;351:18;
352:12;353:15,25;
355:15;356:11;357:6,
14,18,20;358:2,9,13,
23;359:1,5,8,20,24;
360:2,11,15,21;361:7,
13,22;362:12,12;
363:3,13,16,19,21;
364:2,8,13,21;365:2,
9,12,18;366:2,9,17,
19,20;367:12,14,16;
368:18,20;371:16;
372:1,3,18;373:14,22;
374:7,8,10,13,19,24;
376:7,20
**road (2)**
    270:11;350:22
**Rodriguez (1)**
    314:11
**Rogue (1)**
    188:11
**R-o-g-u-e (1)**
    188:11
**role (20)**
    193:10,17,19;
    194:12;195:8;197:8,
    13;219:17;220:18;
    221:19;222:10;236:2;
    239:22;263:3,25;
    296:15;297:20,21,25;
    352:17
**roles (2)**
    197:2,10
**Roll (1)**
    361:1
**Romero (3)**

223:20;240:20;
330:16
**roof (1)**
    272:21
**room (106)**
    199:13,17;200:1,6,
    13;202:24;203:2,4,12,
    15,19,20,23;204:1,9;
    208:18;211:15,19,20;
    212:5,19;213:19;
    216:22;217:5,7,12;
    219:9;226:25;227:5,
    14;228:18;229:1,3,
    15;230:4,7,9,13,18,
    20,24;231:4,9,16,19,
    21,24;232:3,4;233:9,
    13;235:4,9,10,14;
    246:19,23,24;247:5,
    19;252:11,12;253:3,5,
    17,22,25;254:5;
    258:12;259:19;
    260:18;267:18;
    268:10;271:13,19;
    275:6,15,23;293:18;
    300:23;301:2;306:11,
    14;307:14;309:18,22;
    310:1,7,21;312:12,13,
    22;319:2,5;326:16;
    327:22;331:9;341:8,
    11,16;345:24;346:2;
    347:5;348:14;356:9;
    358:10
**roster (1)**
    313:12
**roughly (1)**
    272:24
**routine (2)**
    227:3;290:19
**rule (6)**
    191:24;227:2;
    261:14;278:11;295:5;
    349:5
**rules (3)**
    361:5;377:6,14
**run (2)**
    217:25;233:16
**running (5)**
    200:14;285:19,20;
    332:13;359:12
**runs (1)**
    274:2
**Ruth (10)**
    188:24;191:1;
    236:12;237:14;
    260:15;277:17;
    292:19;347:16;
    348:11;370:20
**Ryan (2)**
    241:21;305:22

**S**

**sake (1)**

244:12
**sale (1)**
    228:6
**sales (21)**
    196:2,5;198:19;
    199:25;204:4;207:25;
    208:24;209:1;210:21;
    212:20;215:23;216:2;
    241:25;242:1;248:6;
    255:18;263:11,13;
    280:14;290:10;
    353:18
**same (33)**
    192:9;195:6,8;
    203:5;213:13,13;
    232:15;236:22;
    256:11,12,13;261:16,
    24;271:3,24;272:19,
    19,21;278:21;284:20;
    295:2,7,15;304:15,16;
    305:6;324:5;325:19,
    20;338:15;349:14;
    350:17;353:3
**sanctions (2)**
    188:16,21
**sanitizer (1)**
    220:22
**Saturday (1)**
    249:17
**save (1)**
    336:20
**Savers (2)**
    353:2;354:5
**savvy (1)**
    197:13
**saw (12)**
    244:18;252:11;
    253:9;269:21;270:21;
    271:21,23;272:4;
    275:22;307:21;
    352:16;355:7
**saying (14)**
    193:21;235:2;
    253:24;322:21;323:1,
    5,8;328:18,20;331:1;
    332:20;333:17,21;
    343:4
**scenario (1)**
    290:9
**scenarios (1)**
    227:14
**schedule (4)**
    330:22;333:8,13,22
**scheduled (1)**
    249:24
**schematic (3)**
    212:13,17;254:7
**scope (4)**
    258:22;285:22;
    289:2;342:16
**Scout (1)**
    353:19
**screen (28)**

201:24,25;207:17;
210:5;211:18;212:15;
213:5,12,22;215:18;
217:3;244:7,19;
245:3,12;315:9;
316:9,20;335:4,5,6,
22;338:2;357:7;
359:12;369:17,25;
370:3
**scroll (21)**
    321:3,16,19;
    322:11;324:16;
    335:13;336:7;357:14,
    16,17;359:13;360:12,
    13,18;363:16;367:16;
    368:9;370:21;371:13,
    14
**scrolling (1)**
    322:12
**seat (1)**
    272:1
**seated (7)**
    191:4,6;260:16;
    292:21,23;348:13,14
**Second (41)**
    191:22;196:6;
    199:8;201:22;240:4;
    244:16;247:20;
    259:20;261:13;
    283:17,19;295:4;
    308:22;309:4;321:12;
    322:5,6,7,15,19;
    323:6,21;324:2,4;
    325:10,11;326:19;
    335:17,19;336:3,9,10;
    346:8;349:4;357:15;
    361:3;369:13;371:3,
    5,10;373:14
**section (1)**
    199:10
**sections (1)**
    377:13
**seeing (3)**
    213:13;318:9;322:6
**seek (1)**
    269:15
**seeking (1)**
    326:5
**seem (3)**
    284:25;290:7;
    322:17
**seemed (5)**
    288:9;327:15;
    330:9;331:1;332:1
**seems (8)**
    314:12;316:8;
    318:5;322:17,25;
    325:22,22;371:18
**sees (3)**
    205:9;220:16;303:1
**segments (1)**
    284:12
**selected (2)**

206:11;222:1
**selectively (1)**
    313:1
**sell (4)**
    300:7;354:21,22,23
**selling (7)**
    196:1,1;211:4;
    239:14,18;241:15;
    370:12
**semi-circle (1)**
    247:22
**send (7)**
    325:16,17;341:20;
    347:16;353:5,7;354:5
**senior (31)**
    196:8,9,10,11;
    219:7;239:13,14,18,
    22;240:1,6,8,11,16,
    18,25;241:1,1,9,10,
    12;264:17;279:16;
    280:3,9;281:25;
    282:8,13;350:25;
    351:2;358:6
**seniors (1)**
    270:19
**sense (3)**
    222:11;229:7;290:9
**sent (20)**
    268:18;314:16;
    317:14;318:1,4;
    321:11;322:1;323:1;
    324:2;325:21;336:15;
    338:13;354:23;
    360:22;361:8;364:20;
    367:25;372:15;374:7;
    376:9
**Sentry (3)**
    227:20,23;252:5
**separate (5)**
    337:8;346:11,14,
    15,16
**September (1)**
    350:10
**sequential (1)**
    325:7
**served (3)**
    298:2;377:5,19
**serves (2)**
    200:15;201:15
**service (6)**
    220:6;283:12;
    298:1;300:7;359:11;
    377:14
**serviced (1)**
    359:10
**services (5)**
    219:22,25;220:3;
    300:2;346:2
**set (15)**
    198:12;202:24;
    203:5;204:7;209:14;
    223:3;231:23;237:20;
    280:18;291:23;305:2;

307:5;351:6,7;377:20

**setting (3)**
222:12,18;361:5

**seven (2)**
217:10;332:14

**several (5)**
226:3,16;264:22;
320:13;352:7

**Shack (6)**
313:2,3,4,5,7,13

**shadow (1)**
222:24

**Shake (6)**
313:2,3,4,5,6,13

**share (25)**
201:24;203:1;
206:15;207:17;210:5;
226:10;234:5,9;
284:18;289:12;303:6,
18;309:11;314:3;
315:9;333:7;335:4;
337:10;341:15,23;
351:15;355:25;357:7;
362:10;370:4

**shared (12)**
206:15;212:6;
226:11,12;285:3,17;
310:6;312:6,23;
313:4;314:5;356:16

**SharePoint (6)**
244:10;340:4;
347:18,21;365:6;
373:13

**sharing (12)**
206:14;211:18;
217:3;272:10;316:4;
326:7;341:17,21;
342:6;361:4;362:12;
366:9

**shelf (1)**
210:11

**shelves (9)**
208:15,20;210:23,
25;211:1,9,14;
213:23;263:22

**shift (21)**
212:3,8,8,10;
217:16,21;234:18;
249:19;250:10,15,22,
25;251:8,11,14;
286:24;289:22;
290:25;318:24;
327:14,16

**shifted (1)**
327:15

**shifts (4)**
249:21;250:2;
251:5,18

**shift's (1)**
250:2

**shirts (1)**
217:17

**shop (1)**

229:13

**short (1)**
208:3

**shortly (1)**
350:22

**show (26)**
201:21,22;207:15;
212:11;222:16;
234:14;268:20;281:6;
287:5,6,6;300:5;
303:10,23;304:8;
321:13;322:9;324:13;
341:14;348:14;357:6;
362:5,9;366:19;
369:11;377:23

**showcase (1)**
273:20

**showed (2)**
275:10;322:4

**showing (4)**
318:7;324:15;
364:19;371:5

**shown (1)**
211:15

**shows (2)**
212:17;355:23

**shred (16)**
252:20;326:9;
327:25;328:2,4,12,16,
19,21,24,25;329:13,
15;336:23;337:1,5

**shredded (2)**
189:20;328:25

**shredder (1)**
328:14

**shredding (1)**
328:6

**shrugged (1)**
272:3

**Side (36)**
195:3;199:18;
216:12;239:14,15,18;
240:19;241:15;247:9,
10,23;248:8;262:24;
263:1,4,6,7,16;
265:16;266:6,16;
272:16;280:20;298:1;
303:7;304:21;306:15;
307:23;318:8;350:25;
351:1;354:7;370:12,
13,14,14

**Sidrick (4)**
241:20,21;242:9;
243:25

**sign (7)**
200:24;255:1;
319:5,8,10;329:24,24

**signage (1)**
371:20

**significant (2)**
299:25;325:11

**signs (1)**
329:25

silence (1)
346:21

**silly (1)**
360:25

**similar (4)**
249:18;273:12;
304:22;352:4

**simple (2)**
226:10;332:12

**simply (2)**
255:2;311:12

**singer (4)**
234:21;252:24;
253:2;268:20

**single (5)**
232:1;251:6;
284:13;307:6,7

**sings (1)**
269:17

**sink (1)**
212:4

**sit (4)**
212:7;253:16;
341:16,16

**site (6)**
298:22,23,23;
363:22,24;367:15

**sitting (8)**
228:2,9;229:19;
235:4;272:1;277:19;
356:4,8

**situation (2)**
290:8;313:25

**situations (2)**
267:12;285:7

**six (4)**
198:17,17;205:24;
374:2

**sixth (1)**
240:21

**skills (2)**
255:10;280:21

**sled (2)**
209:3;211:2

**Slightly (2)**
204:3;354:8

**slow (2)**
223:6;353:23

**slower (1)**
368:7

**slowly (1)**
368:7

**small (9)**
191:7;212:3;
218:21;246:17;247:7;
300:2;360:13,14;
361:3

**smaller (4)**
199:16;226:18;
357:8;358:24

**smiled (1)**
371:24

**sneaker (1)**

266:10

**social (1)**
273:19

**society (1)**
226:17

**solicit (6)**
305:5;352:24;
354:25;355:7;356:3,
18

**solicitation (58)**
207:13;221:7,10,
12,17;223:24;224:6,
10,15,21,23;225:6;
226:11,23;227:10,17;
228:5,10,17;233:17;
235:7;236:5,21;
253:17;264:24;265:3,
17;266:7,25;270:10;
271:24;272:17;298:7;
299:13;302:18,21;
304:16;305:15;306:5;
308:1;312:24;314:17;
334:20;351:19,25;
352:9,23;353:12;
354:9;355:16;356:12,
20;359:16;361:25;
362:1,3,10;374:16

**solicited (1)**
308:9

**soliciting (1)**
353:23

**somebody (14)**
197:20;203:17;
205:7;211:6;229:4;
230:9;231:7;234:13,
17;250:24;261:13;
359:14;362:8;367:1

**somebody's (1)**
205:1

**somehow (6)**
213:16;230:3,21;
267:21;294:11;340:3

**someone (33)**
191:23;203:12;
209:14;238:20;258:5,
5;265:24;267:20,20;
272:1;278:9;288:19;
295:4;296:18,18;
300:10,16,19;301:4;
304:8,8;305:3;307:7;
308:13;309:5;317:24;
319:21,22;324:6;
341:15;349:4;364:2;
373:13

**sometimes (9)**
201:12;266:18;
284:8,18;341:13;
354:12;356:23;
360:25;362:24

**somewhere (3)**
250:17;267:19;
271:9

**sorry (29)**

197:19,24;200:18;
203:13;209:10;
232:25;235:19;274:1;
284:1;295:20;298:22;
308:21;317:9;335:24,
24;337:20,24;340:20;
341:3;343:18;346:23;
356:1;360:5;363:22;
364:21;365:22;
370:25;371:25;376:4

**sort (4)**
272:13;287:20;
300:13;345:11

**sorts (1)**
353:16

**soul (1)**
218:7

**sound (1)**
332:13

**sounded (1)**
265:22

**Sounds (1)**
210:7

**source (3)**
221:24;294:15,17

**sources (1)**
321:9

**sourcing (1)**
222:8

**space (21)**
199:11;218:23;
219:13;235:13;
240:21;246:25;
270:20;272:10,11,20;
275:6;294:18;297:7;
302:11,15;303:4;
307:8;308:11;325:7;
341:12;362:6

**spaces (3)**
302:4;323:3;325:24

**spacing (1)**
325:12

**spare (2)**
199:17;231:6

**spatial (1)**
214:15

**speak (9)**
219:4;237:25;
253:11;266:19;
286:23;314:16;339:4,
12;347:1

**speaking (12)**
191:21;261:9,11;
278:6,9,12;294:24;
314:2;349:1,3,7;
358:2

**special (3)**
194:13;211:2;223:1

**specialist (5)**
197:7;263:2;283:4,
10;308:3

**specific (19)**
197:17;234:20;

243:10;267:3,15,23;
287:17;297:25;
305:14;306:17;
330:24;331:25;
332:19,21,25;333:23;
367:9;375:22;377:22
**specifically (20)**
221:6;224:22;
226:7,15;265:12;
268:15;270:16;
306:16;307:24;
326:17;327:23;
329:15,24;330:23;
331:10,19;333:7;
342:5;354:8;364:15
**specify (1)**
333:21
**spell (7)**
190:13;249:4;
258:11;260:3;277:7;
292:9;348:3
**spelled (4)**
188:11;292:12,12;
316:8
**spend (8)**
212:9;217:23;
219:6,9,15;227:12;
232:10;234:4
**spends (1)**
234:3
**spent (3)**
233:12;280:13,16
**spills (1)**
220:21
**spirit (1)**
235:12
**split (1)**
195:25
**spoke (6)**
211:22;273:22;
330:18;331:11;332:6,
9
**sponsor (1)**
356:6
**spot (2)**
220:13,21
**spotlight (1)**
355:25
**spotlights (1)**
364:5
**spread (1)**
305:21
**square (3)**
199:4;304:23;305:4
**stack (3)**
229:14,18;252:17
**stacked (1)**
254:5
**stacks (2)**
235:8;354:13
**staff (3)**
220:6,7;333:6
**stage (1)**

248:12
**staged (1)**
250:6
**staggered (1)**
251:18
**staircase (3)**
247:12,13,19
**stairs (3)**
247:11,16,18;
283:20
**stamp (3)**
335:10;345:18,20
**stamps (1)**
202:21
**stand (1)**
226:13
**standalone (1)**
354:7
**standard (4)**
250:25;251:4;
254:4;307:12
**standards (18)**
220:16;223:10;
225:15;228:12,18;
233:16;236:5,20;
296:22,25;301:17;
302:8;304:17;307:5;
308:10;312:25;
341:13,22
**standing (2)**
207:24;289:22
**stand-sions (1)**
305:1
**standup (2)**
233:25;234:13
**Stanevich (122)**
189:6,6,11,18,23,
25;190:3;191:16;
192:12,14;193:2;
198:2;202:23;203:11;
208:13;209:13,16,22,
25;210:1;213:25;
214:3,7,12;215:3,16,
17,19;226:22;227:1;
228:14;232:23;233:1,
5,11;236:9,11,14;
244:11,14,16;245:17,
19;255:13,19;256:1,3,
16;257:23;258:21;
259:7,9,16;261:4;
262:3,5;266:2,3,4;
276:8,10,17,18;278:3,
25;279:1,3,24;286:9,
20,22;287:22;288:16,
24;289:6,7,8;291:19,
21,23;293:16,24,24;
294:21;295:17,19;
311:3,8,19;312:9;
320:8,12;321:3,13,16;
323:10,16,24;324:12,
13,18;328:5;329:6;
330:2;335:22;336:1,
4,9;337:10,13,15;

339:5;340:24;341:1,
5;342:19;343:10,15,
17,18;344:3;375:8
**start (22)**
191:18;193:23;
210:14;211:12;212:8;
233:20;250:14;261:9;
262:13,22;278:6;
279:10;280:19;
281:10;284:12;
286:24;290:24;
294:23;296:2;299:22;
324:16;349:1
**started (11)**
193:15;194:4;
210:11;262:14,24;
264:12;279:11,18;
282:4;296:10;334:15
**starting (8)**
195:12,20;199:7;
211:6;227:16;242:24;
318:11;350:14
**starts (2)**
200:5;294:21
**stash (1)**
217:19
**state (8)**
188:22;190:12;
250:23;260:3;277:7;
292:9;338:14;348:3
**stated (4)**
252:20;287:24;
311:24;346:1
**statement (1)**
330:7
**statements (2)**
285:6;290:1
**station (8)**
208:17,21;210:18;
211:21;214:7;216:18;
217:14;218:11
**stations (2)**
216:15;307:18
**stay (3)**
201:13;232:15;
306:25
**stays (1)**
201:16
**Stephanie (8)**
276:18;277:1,9;
279:4,6;280:25;
291:2,19
**s-t-e-p-h-a-n-i-e (1)**
277:9
**steps (4)**
203:18,22;208:6;
283:12
**sticker (1)**
305:20
**stickers (2)**
300:18;301:1;
305:24;306:2
**still (18)**

196:14;238:18;
240:11,16;241:9,10,
11,12;242:9,25;
251:9;253:21;264:18;
314:8,12;354:5,5;
357:12
**stock (1)**
275:15
**stools (1)**
228:2
**Stop (11)**
191:24;211:18;
217:3;261:14;278:10;
295:5;326:7;335:14;
349:5;362:12;366:9
**stopped (1)**
308:18
**storage (1)**
200:15
**store (240)**
193:9,20,25;194:1,
2,3,3,5,7,9,12,15,18,
20,21,23;195:9,11,19,
23,24,24,25,25;196:2,
5,6,6,7,8,15,16,17,18,
19,23;197:1,5,10;
198:3,9,13,14,15,16,
24,25;199:3,6,7;
200:7,14;201:11;
202:10,11;203:5;
204:24;205:5,13;
206:22,25;207:6;
208:23;209:2,5;
210:13,20;212:23;
217:8,8;218:7,20,21;
219:2,14,17,17,23;
220:8,20;221:20,25;
222:4,7,15,18,22;
223:4;224:3;225:5,
16,24;226:6,9,12,13;
227:5,6,11,19,19;
228:8,9,12,16,23,25;
231:18,19;232:7,9,18;
235:22,25;236:1,3,4,
19,23;237:22,22,25;
238:2,7,9,12,14,15,
18;239:4,5,8,8,10,10;
241:13;242:10,20,22;
243:9;247:14;248:12;
249:11;250:6;251:16;
254:2;255:6,8,11;
256:9,13,25;257:24;
258:3;263:9,16,21;
264:1,5,7,12,18,21;
266:16,24;271:5;
280:1,12;281:9,12,18,
19;282:3,6,7,18;
283:7,18;284:9;
285:5,17;296:6,13,15;
297:1,13,16,17,20,25,
25;299:14;300:5;
304:2,17,24;305:5,16,
19;306:5,12,23;

310:21;313:5;317:4;
318:23;327:12;
331:24;332:7,12,13,
15;339:2;350:3,13,17,
21,22;351:3,5,7,10,
11,13;353:7;354:7,14,
18,20,21,23;355:6,13;
356:17;357:21;358:6;
360:24;367:1,4;
374:10
**stored (1)**
213:23
**stores (16)**
258:16;266:14;
296:24;297:5,23;
305:11;307:5,6;
350:14;352:8;353:6;
354:9,16;355:4;
362:2,4
**stories (1)**
364:5
**Straight (5)**
204:6;208:3,14;
247:4,5
**straightforward (3)**
310:8,13;322:25
**streaming (1)**
201:6
**street (1)**
198:6
**stress (1)**
353:6
**stricken (1)**
342:17
**strike (1)**
235:19
**stronger (1)**
209:18
**strongly (1)**
342:19
**structure (1)**
351:14
**structured (1)**
322:22
**struggled (1)**
310:16
**struggling (3)**
310:22;311:18,21
**stuff (8)**
228:9;267:10,13,
22;270:1;353:10;
354:5,21
**style (2)**
281:5;290:22
**sub (1)**
196:24
**subject (4)**
262:10;287:21;
361:7;375:20
**submit (3)**
345:1;363:10,11
**submits (1)**
376:18

submitted (1)
376:4
subpoena (2)
315:19;324:8
Sumanth (6)
189:3;327:9;
347:16;365:5;370:24;
373:15
summer (3)
225:19;238:17;
239:11
Sunday (4)
249:18;305:18;
329:21;336:15
super (2)
201:18;353:21
supervisor (1)
287:1
supervisors (2)
333:10;334:7
supplement (2)
293:22;345:3
supplies (3)
200:9;210:23;
211:12
supply (1)
242:2
support (24)
193:9;196:3,7;
198:22;234:10;
250:13;263:14;264:6,
6;268:21;270:8;
271:3;282:14;283:11;
284:10,18;285:9,25;
286:1;296:16;309:9;
345:3;352:17;367:8
supported (4)
196:9;263:13;
286:11,14
supporting (1)
194:13
suppose (1)
366:15
Sure (104)
190:14;191:5,18;
194:1;195:13;196:19,
23;198:14;199:9;
200:23;201:16;
205:11,21;206:9,10;
210:16;211:21;213:3;
215:5;217:9;220:5,
15;222:12,21;223:10;
224:7,18;225:18;
227:22;228:12,24;
229:2,3;231:13,14,14,
22,22,25;233:21;
241:25;244:22;
254:19,23;256:12;
259:21;261:9,15;
264:3;265:13,25;
272:11;278:6,11;
280:17,21;281:9;
284:9;291:7,23;

293:12;294:2,24;
296:21;297:2;302:5,
15,16,24;303:1,4,19,
25;306:5;307:10;
309:13;311:8;313:12;
315:2,20;319:14,17;
322:13;323:8,13;
325:19,25;326:20;
328:2;334:18;337:2;
344:20;346:17;
348:14;349:1,6;
350:14;351:6;357:5;
361:10;363:18;
365:14;369:4;373:6
surroundings (5)
190:20;260:8;
277:12;292:15;348:7
surveillance (3)
255:6,14,15
susceptible (1)
362:3
swack (3)
327:15,15,16
swag (1)
353:5
sweep (3)
231:4;267:21;
307:14
Switching (1)
362:13
sworn (5)
190:10;259:25;
277:2;292:5;347:12
system (2)
255:9,12

**T**

table (31)
212:5,6;213:22;
216:25;229:16,19;
230:18,23,24;232:4,
15;233:8;234:16;
235:9,10;253:3,17;
254:5;267:19,24;
271:13,19,22,23;
275:23;306:25;
309:22;310:1;312:15;
345:24;346:2
tables (10)
213:17;216:22;
228:3;246:16,24;
248:11;254:12,21;
283:21;310:7
talented (2)
233:23;303:12
talents (1)
303:18
talk (28)
195:9,16;206:2;
210:11;225:11;231:7;
233:14;254:2;265:5;
266:12;269:24;270:3,

6;271:3,4;280:19;
283:22;284:13;
285:12;299:10;303:9;
307:25;308:23;
312:18;314:14;
355:14;356:2,3
talked (6)
223:2;224:20;
225:15;226:9;230:22;
356:25
talking (11)
233:12;261:16;
287:7;288:21;295:2,
6;304:1;330:24;
353:19;356:7;373:24
Tannen (1)
305:22
Tanya (1)
189:1
tape (1)
376:6
tapes (3)
255:7,15,16
tasked (1)
296:16
tasks (1)
232:11
team (166)
193:8,8,11;194:3;
195:13,17,20;196:22;
197:7,9;199:11,18,19,
20;201:7,14;204:13,
19,24,25;205:18,19,
20,21;206:8,25;
207:4;210:19;211:3,
24;212:6,9;216:16;
217:9,22;219:16,17,
20;221:21,24;222:1,1,
3,5,6,11,12,15,19,20;
223:8,9;224:8;226:7;
228:3;230:13,14,17;
231:8;232:9;234:1,3,
6,9,10,21;241:24;
242:1;247:14;248:19;
249:22,23,25;250:4,6,
8;253:16;263:10,10,
22;264:5,6,10;
268:22;269:6,18,25;
270:7;271:4;273:19;
274:21;275:17,18;
280:12,16,22;281:5,
17;282:14;283:1;
284:10,13,21;285:9,9;
297:11,23,23,24;
298:13,13;299:1,20;
300:12,14,20;301:3;
302:6,7,22;303:1,6,8,
16,20,22;305:10,20,
21;306:2,9;308:3,8;
309:3,10;313:8,9,10,
18;318:12,15;319:19;
331:6,14,15;332:8,12,
14,15;333:10,12;

334:6,19;341:20;
342:3,5;351:7;
352:17,21;353:17,22;
355:20,21;357:22;
366:12;370:12
teams (6)
193:9;224:20;
296:16,17;307:19;
362:25
tech (9)
208:17,20;210:3,
18;211:21;216:15,18;
248:18;307:18
technical (2)
188:10;303:7
technically (1)
197:12
technology (5)
210:22;216:16;
217:19;218:11;
231:22
telling (1)
372:3
template (1)
207:3
temporary (1)
367:2
tends (2)
294:17;356:17
tense (1)
288:9
tenure (3)
225:3;232:17;283:8
term (3)
193:20;223:4;238:2
terms (25)
195:10;196:17;
211:19;218:7;220:25;
221:4;222:5;227:6;
230:22;236:19,21;
250:16;255:9;272:16;
288:3;293:10,14;
301:13;306:17;
308:10;317:15;
325:22;332:5;342:17;
345:10
terrible (2)
228:5;229:21
test (1)
248:13
Testament (1)
249:5
testified (23)
190:11;221:17;
237:24;252:23;260:1;
274:16;275:19;277:3;
287:10,11;288:8;
290:17;292:6;304:14;
310:19;311:9,11,19;
323:20;330:9;342:2,
20;347:13
testifies (1)
370:22

testifying (7)
226:20;232:24;
233:2;252:4;310:25;
329:21;331:3
testimony (28)
189:14;200:19;
202:24;203:2;209:11;
214:15;227:3;237:16;
244:24;253:1;256:4;
282:11;288:1;294:21;
306:11,24;311:9,13;
312:10;330:4,25;
331:2;342:14,23;
351:18;362:13;368:1;
375:6
texting (2)
327:21,23
thanked (2)
289:23;374:15
Thanks (2)
373:7;375:1
theory (1)
227:6
thereabouts (1)
304:15
thereafter (1)
350:22
thin (3)
213:9;245:6;246:8
thinking (1)
232:5
Third (15)
191:8,25;229:10;
230:3,19;233:13;
260:19;261:16;295:8;
323:16;324:3;353:1;
354:2;371:10,10
third-party (8)
227:7,9;228:18;
301:1;306:14,16,19;
352:13
though (5)
243:14;318:5;
338:18;353:4;370:5
thought (4)
202:25;342:8,9;
369:17
thousands (1)
300:1
three (21)
196:8;199:24;
200:17;209:19;211:1;
239:13,14;240:18;
247:8;315:3;323:11,
17,18;324:14,16,21;
344:20;362:25;373:5;
376:15,25
three-page (1)
359:2
threw (8)
252:10;253:10;
272:5,6;276:3;
310:17;312:6;342:12

**Throughout (12)**
217:13;225:3;
227:10;231:13;
301:10;331:22;332:2;
333:6;346:4;355:11;
357:3;362:24
**throw (17)**
228:4;229:21;
252:18;266:17;
267:11,21;268:3;
272:7,7,13;301:5,5;
306:22;310:14;
328:23;329:1;354:15
**throwing (1)**
271:22
**thrown (2)**
229:16;272:5
**tidy (1)**
272:20
**ties (1)**
287:24
**tight (1)**
272:10
**till (2)**
291:7;369:4
**timeframe (2)**
271:9,17
**times (34)**
188:14;204:23;
205:17,19;223:5,6,25;
224:17;227:22;229:8;
230:2,17;236:11;
241:22;250:2,14,15;
251:19;254:16;266:8,
9;267:5;306:13,13;
327:14;346:4;352:19;
354:15;355:12;357:3;
361:1;362:23,24;
367:4
**timestamp (3)**
335:12;345:22;
346:9
**timestamps (1)**
345:2
**tiny (1)**
316:19
**title (6)**
193:4;237:18;
258:13;279:25;
282:10;339:2
**titles (7)**
195:10,11,12;
196:25;197:1,16;
238:1
**today (13)**
188:9,11,12,22;
192:15;225:15;236:6;
241:10;260:17;262:6;
279:4;295:21;349:20
**together (11)**
206:7;207:1,3;
223:9;239:3;250:5;
264:4;269:4;274:2;

308:6;321:9
**told (16)**
308:5;311:23;
326:11;329:1,15;
334:19;336:25;337:4;
352:7;361:23;371:12,
17,24;372:3,5,5
**ton (1)**
234:1
**tons (2)**
332:7,8
**took (16)**
224:22;226:25;
228:7;257:1,14;
270:17;273:22;
283:17;308:23;310:4,
4,17;311:14;326:12,
15,18
**tool (1)**
364:4
**tools (5)**
208:25,25;211:11;
216:16;217:20
**Tootsie (1)**
361:1
**top (20)**
195:21;197:13;
206:13;213:21,22;
227:20;246:10,13;
283:20;321:21;322:9,
10;324:16;325:3;
335:9,11;336:7;
338:12;361:7;372:14
**topic (8)**
221:16;285:11,25;
286:1;304:8;342:5,
24,24
**totally (1)**
240:21
**touch (2)**
286:17;359:12
**touched (2)**
217:3;333:9
**tourist (1)**
227:20
**towards (8)**
203:25;211:8;
246:19;248:2,3;
290:2;311:3;362:22
**tower (1)**
198:7
**tracked (1)**
313:11
**tracking (1)**
257:5
**Trade (75)**
193:24;194:1,8,10,
25;195:2,11,14,18,24;
196:15,16;198:3,4,7;
202:25;203:4;205:5;
210:13;212:22;
222:16;225:13;
228:23;232:18;

237:21,25;238:14;
239:5;241:13;242:10;
249:11;263:17;
264:18,21;266:23;
267:1;268:16;272:16;
279:17,18;280:3;
281:12,16,25;282:17,
24;283:4,17;290:20;
296:6,7,14;297:10,19;
299:12;304:14,17,21,
23;305:16;306:12;
307:3,24;317:5;
350:8;351:1;352:8,
10;353:13;354:1;
355:15;358:12;
359:23;370:9,10
**trail (1)**
305:20
**train (1)**
351:23
**training (43)**
196:4;198:20;
201:3;221:11;224:12,
13,16,17,19,22;228:2;
243:11;256:5,5,7,7,
13,15,24;257:1,4,5,7,
7,9,13;264:3;265:4,8,
8,14;298:14,18,21;
299:2,3,4,5;351:24;
352:1,3,5;367:9
**trainings (2)**
298:18,20
**transactions (1)**
256:6
**transcribed (2)**
261:12;295:3
**transcript (3)**
244:23,25;343:17
**transcription (1)**
191:22
**transferred (1)**
325:13
**transit (4)**
198:5,9;199:3;
225:24
**transiting (1)**
226:2
**transitioned (2)**
236:1;263:2
**transparent (1)**
372:6
**trash (8)**
220:12;221:1;
252:18;303:1;328:23;
329:1;342:13;345:24
**trashes (1)**
220:21
**tread (1)**
336:21
**trial (1)**
289:4
**trick-or-treating (1)**
356:24

**trouble (6)**
191:25;192:1;
278:13,14;295:8;
349:8
**true (1)**
281:7
**truly (1)**
308:17
**truth (1)**
333:21
**try (29)**
192:8,10;218:15,
16,17;261:24,25;
267:9,12;269:5;
278:5,20,21;295:15,
16;306:12;312:4;
335:3;338:4,7;349:6,
13,14;354:11,20,21,
23;355:7;356:18
**trying (24)**
240:21;241:21,23;
242:6;266:11;268:21;
269:4,16,18;273:9;
289:14,16;300:6,20;
320:9;322:16;324:9;
332:5,6,8;333:2;
335:23;337:24;
353:18
**tune (2)**
201:17;357:2
**turn (3)**
204:8;253:22;
360:11
**turned (3)**
188:13;203:18;
340:21
**turning (1)**
307:23
**two (59)**
189:9;190:16;
195:5,14,15,24,25;
196:19;198:11,15;
201:25;202:2;204:7,
11;205:2;208:1;
209:19;212:3,19;
213:11,21;216:13;
220:11;224:22;
227:13;235:5,15,16;
238:2;242:7;250:17;
251:1,13;255:19;
257:7;269:9;272:15,
18;275:5;291:8;
308:19;322:7;340:14;
341:6;342:19;343:14,
15;347:17;350:18;
351:11;352:15;359:5;
362:24;364:15,17;
367:8,23;371:2;
376:24
**Tyler (17)**
242:4,23,24;243:2,
21;323:14;370:6,9,10,
16;371:17;372:1,5,8,

15;373:25;374:1
**Tyler's (1)**
370:17
**type (7)**
195:6;280:8;
284:23;289:20;
304:16;310:9;359:13
**types (6)**
195:15;196:14;
263:25;285:7;290:11;
293:22
**typical (3)**
287:15;332:10,13
**typically (2)**
250:25;353:5

---

## U

**ultimate (2)**
285:8;351:16
**ultimately (1)**
222:15
**unacceptable (1)**
341:23
**uncertain (2)**
311:11,18
**uncertainty (2)**
311:11,12
**unclear (2)**
332:18,20
**uncomfortable (4)**
311:23,24;314:8;
333:15
**under (5)**
227:1;272:21;
281:21;325:20;
334:20
**Understood (5)**
219:1;270:11;
280:18;301:8;308:17
**unexpectedly (1)**
197:21
**unfortunately (2)**
271:1;316:10
**uniforms (1)**
217:18
**union (23)**
189:4;271:12;
275:19,22;285:4,17,
19;286:1,2,7,11,14;
289:9;309:17,22;
310:11;311:25;312:1;
328:21;334:19;
342:12,15;343:6
**unionizing (2)**
288:12;318:25
**union's (1)**
327:10
**unique (1)**
355:21
**units (1)**
211:1
**unlikely (1)**

307:8
**unpack (1)**
265:7
**unpaid (1)**
251:4
**unwind (1)**
217:23
**up (16)**
194:11;198:12,23;
199:20;200:14;
202:24;203:5;204:20;
209:14;210:5,19;
211:5;212:1;216:4;
218:1;220:12,21,23;
221:19;222:16;
224:17;229:11,13,16,
25;230:9;231:24;
232:1,10;234:15;
235:4;244:8,12;
246:5;247:14,21;
254:5;264:22;265:13;
266:1,8;267:19;
268:2,21;270:22;
271:25;272:4,11;
275:8;280:18;281:6;
283:23;291:24;
293:23;294:12,15;
300:5,11;301:12,25,
25;302:1;303:1;
305:2,9;307:20;
308:19;309:14;310:6,
19,21,21;312:7;
313:1;314:17,18,23,
25;315:20,21,22,22;
322:12;325:15;
329:17;330:25;
336:21;343:7;347:1;
354:11,14;355:5,13,
19;356:15,16;357:1,
7;363:14;369:12,25;
371:11;372:7;373:14,
16
**uploaded (1)**
347:18
**upon (7)**
217:4;287:11;
306:1,6;333:9;
336:22;346:10
**Upper (15)**
195:3;198:20;
262:24;263:1,4,6,7,
15;265:16;266:5,16;
272:15;350:24,25;
354:7
**upset (3)**
285:5,14,18
**upstate (1)**
350:15
**upwards (1)**
332:15
**use (28)**
193:20;199:18;
200:16;201:3;204:12;

208:1;211:4,5;219:1,
2,21;223:4;232:5;
235:11;248:19;
255:10;270:2;287:1;
293:25;339:14;345:3;
356:2;360:1,25;
361:5,25;366:13,14
**used (16)**
200:21;204:16;
208:20;209:4;210:12;
217:6,12;219:18;
263:21;268:1,4;
278:21;293:13,15,21;
294:14
**user (1)**
297:5
**username (1)**
363:9
**uses (7)**
199:11,20,21;
211:24;216:16;
219:23;294:12
**using (11)**
192:9;261:24;
278:20;293:7,8;
294:4;295:14,15;
349:14;362:1;363:8
**usually (5)**
267:10;269:3;
305:11;341:14,21

---

**V**

**values (8)**
296:19,20,21;
297:3,8,9;301:18;
302:14
**variety (2)**
249:21,21
**various (8)**
191:1;251:19;
265:4;271:6;275:2,4;
364:14;367:23
**vary (2)**
250:3,17
**Vasquez (10)**
189:11,14;283:1;
287:10,12,21;288:6,
23;312:21;313:16
**Vasquez's (2)**
286:21;287:18
**vein (1)**
353:3
**vending (4)**
247:8;359:9,15;
360:1
**vendor (3)**
221:13;306:17;
359:25
**vendors (1)**
230:7
**venues (1)**
354:10

**verify (1)**
272:2
**veterans (1)**
205:22
**via (4)**
183:16;327:12;
329:3,10
**video (35)**
188:13;192:1,2,6;
200:12,12;245:10,10;
255:9,17;261:18,22;
278:14,15,18;295:9,
12;314:25;315:15,17,
18;328:7;344:22,23,
24;345:8,11,15,22;
346:1,13;349:8,12;
375:15;376:4
**videos (11)**
314:23;315:17;
344:17,20;345:23;
346:7,10;375:17;
376:15,24,25
**videotaping (1)**
188:18
**view (2)**
310:21;345:8
**views (1)**
290:2
**violated (1)**
228:4
**violates (1)**
253:17
**violating (1)**
347:19
**violation (3)**
188:14;207:12;
359:16
**violations (1)**
188:20
**virtually (1)**
243:7
**visible (2)**
205:10;338:7
**vision (1)**
351:6
**visit (1)**
228:1
**voir (16)**
190:19,24;202:16;
213:1,4,25;214:4,24;
260:7,13;277:11,15;
292:14,17;348:6,9
**volume (1)**
340:20
**voluntary (1)**
363:3
**volunteer (6)**
362:20;367:1,10,
13,13;368:11
**volunteered (1)**
363:12
**volunteering (2)**
366:15;367:11

**volunteerism (1)**
367:5
**vouchers (1)**
313:9

---

**W**

**wait (9)**
191:24;265:19;
278:11;295:5;320:24;
323:25;349:5;371:16;
372:12
**waiting (4)**
259:19;300:1;
336:2;347:5
**Waleed (27)**
196:20;219:19;
223:22;238:5,11,12;
239:10;243:16;257:1,
14;282:5;292:4,11;
293:17;295:20,23;
298:6;305:14;307:12;
312:10;314:19;341:6;
342:20,21;343:2;
351:12,15
**w-a-l-e-e-d (1)**
292:12
**walk (19)**
195:11;196:21;
198:12;199:6;203:18;
210:17;212:16;220:2;
230:18;246:23;247:2,
5,16;248:14,15;
268:17;270:16;
303:13;304:20
**walked (1)**
275:25
**walking (3)**
203:13,17,25
**wall (5)**
200:12,12;204:7,
12;247:11
**walls (3)**
220:13;263:22;
280:5
**wants (3)**
230:14;303:20;
363:5
**warm (1)**
218:1
**warmer (1)**
271:16
**wasn't (1)**
319:15
**watch (1)**
301:25
**water (1)**
348:20
**wave (6)**
192:3;250:8;
261:20;278:16;
295:10;349:10
**way (50)**

193:21;201:13;
203:15;213:13,13;
217:17;218:4,25;
219:18;230:8;231:23;
246:11;248:3;267:18;
272:4;281:7;286:7;
289:2;296:22,23;
297:4,4,5,6;299:18,
20,24;300:4;301:2;
302:3;307:4,22;
308:19;309:2;312:4;
321:16;322:23;325:8,
14,14,20;338:15;
339:7;341:24;342:16;
343:4;353:5;356:21;
364:19,21
**ways (8)**
218:7;224:9;
269:24;273:14;274:2;
298:10;352:12,15
**wearing (4)**
334:12,15,22,23
**website (6)**
314:18;363:7,8,23;
364:2;366:15
**week (8)**
194:24;217:11;
232:16;236:2;239:1;
249:14,25;250:1
**weekends (1)**
249:16
**weeks (4)**
214:17;240:15;
257:7;264:22
**weigh (1)**
287:1
**Weinreb (163)**
188:24,24;190:21,
25;191:1;192:23;
202:15;208:8;209:7;
213:1;214:2,3,6,9,19,
22;215:1,3,9,15;
236:8,10,13,16,25;
237:2,3,6,10,11,13,
15;244:13,15;245:24,
25;249:10;251:23;
256:17,19,23;258:23;
259:1,3;260:9,12,14,
15;265:19;274:6,7,12,
13,15;277:13,16,17;
279:22;286:3;287:2;
288:14,16,17;289:2;
291:4,6,11,12;292:16,
18,19;293:19;294:2,
3;314:20,22;315:6,8,
13,15,16,18;316:2,3,
15;317:12,20;320:9,
21,22,24;321:3,5,6,
14,18,18,21,22;
323:13,20,25;324:18;
326:3,7,8,19,21,23;
327:1,2,3;337:20,22;
342:14;343:3,14,19,

**Burke Court Reporting & Transcription**
**(973) 692-0660**

21;344:18;345:7,12,
13;348:8,10,11;
358:17;360:5;361:17;
364:12;365:19;366:1,
4;367:18,21,25;368:6,
11,14;369:3,6,10,11,
16,22,24;370:23;
371:1,5,8,15;372:21,
24;373:18,20;374:19,
21;375:10,12,23;
376:3,8,17,21

**Weinreb's (1)**
262:10
**WEINREG (1)**
213:4
**WEINTREB (1)**
244:17
**welcome (4)**
226:12,13;278:1;
297:8
**well-being (1)**
296:17
**weren't (3)**
334:20;347:20;
352:24
**West (14)**
195:3;262:24;
263:1,4,6,7,16;
265:16;266:6,16;
272:16;350:24;351:1;
354:7
**what's (30)**
201:17;205:24;
206:1,2,21;210:11;
211:19;214:7,13;
215:11,12;231:15;
232:21;244:18;
247:11;258:9,13;
275:13;286:19;
305:23,25;311:1;
316:8;336:17;339:6;
351:13;359:20;
369:25;370:2,3
**Whenever (4)**
206:7;231:5,6;
305:1
**Whereupon (6)**
190:8;259:23;
276:25;292:3;347:10;
378:2
**whispering (1)**
265:23
**white (3)**
204:11;212:19;
213:17
**whiteboard (29)**
204:6,10;205:6,15;
206:22;213:6,8;
216:10;245:9;246:8;
247:3,17;254:7,9;
269:10,15,20,21;
270:3;272:24;273:11,
17,22;303:21;360:23,

24;361:23;362:1,11
**whiteboards (5)**
204:7;208:1;
212:19;213:11;
216:11
**whole (5)**
211:24;326:5;
359:2;365:19;367:17
**Wi- (1)**
294:15
**wide (1)**
198:15
**Wi-Fi (7)**
209:17;291:24;
293:8,9,14,23;294:18
**Willam (2)**
279:20,23
**willing (1)**
324:1
**Wilson (2)**
268:7;273:7
**window (1)**
245:15
**windows (1)**
220:14
**wiping (1)**
220:23
**wish (2)**
309:3,12
**wishes (2)**
375:7,11
**withdraw (2)**
326:3;339:8
**withdrawing (2)**
368:21,23
**within (16)**
197:1,10;200:17,
18;216:8;224:8;
225:24;240:14;257:7;
270:6;280:4;300:5;
305:4;327:17;351:9;
375:19
**without (1)**
306:7
**witness (83)**
189:24;190:2,4,7,
10,14,17;192:5;
193:1;197:23;198:1;
202:20;209:9;214:4;
226:20;227:16;233:2,
10;236:18;245:15;
249:7,9;255:20;
259:12,17,22,25;
260:5;261:6;262:2;
276:13,17,19,24;
277:2,6,9;278:23;
279:23;286:8;287:23;
288:9,24;291:18,20,
22;292:5,7,11;
294:14;310:24;311:9,
23;317:14;320:12,17;
323:20;324:14,23;
325:3,6,10;332:2,23;

333:4;334:2,5;335:6,
8,15;336:3,5;344:1,5,
11;347:3,9,12,24;
348:4;371:4,7;375:1
**witnessed (2)**
307:2;371:20
**witnesses (2)**
189:10;232:14
**witness's (1)**
288:1
**word (2)**
366:14,14
**work (37)**
193:8;194:4,13;
199:11,14;200:4;
201:12;205:2;207:8;
208:22,24;218:9,13,
16;220:17;221:14;
229:4;234:2;237:17,
18,19,19,19,22;
249:24;250:1,18;
279:9;280:22;286:21;
287:3,6,7,18;307:22;
346:3;354:6
**workday (1)**
346:3
**worked (13)**
196:11;202:10;
206:25;249:23;
262:11;272:15;283:6;
330:22;333:16;
350:14,16;352:7,16
**WORKERS (1)**
183:8
**workforce (2)**
193:4,13
**Working (15)**
188:9;198:23;
199:15;210:19,20;
225:3;233:21;238:13;
250:24;251:8,13;
284:4;333:15,20;
352:10
**workplace (2)**
267:4;272:8
**works (3)**
275:17;293:10;
351:13
**workstation (2)**
275:5,11
**World (77)**
193:24;194:1,8,10,
25;195:2,10,14,18,24;
196:15,16;198:3,4,7;
199:1;202:25;203:4;
205:5;210:12;212:22;
222:16;225:12;
228:23;232:18;
237:21,25;238:14;
239:4;241:13;242:10;
249:11;263:17;
264:18,21;266:23;
267:1;268:16;272:16;

279:17,18;280:3;
281:12,15,25;282:17,
24;283:4,17;290:20;
296:6,7,13;297:10,19;
299:12;304:13,17,21,
23;305:16;306:12;
307:3,24;317:5;
324:25;350:8;351:1;
352:8,10;353:13,25;
355:15;358:12;
359:23;370:9,10
**worn (1)**
300:5
**worries (1)**
198:1
**worst (1)**
201:11
**wrapped (1)**
314:18
**wristbands (7)**
334:13,17,18,23;
342:7,9,22
**write (3)**
317:7;362:6,8
**writing (2)**
357:25;377:17
**written (1)**
317:17
**wrong (3)**
294:13;341:24;
364:22
**wrote (10)**
316:24;317:13,21;
330:1,7;370:17;
371:17,21,23;372:1

**Y**

**Yanell (16)**
223:14,17;239:19;
240:6,8,11;259:18,24;
260:5;262:6;308:8,8;
326:15;330:14;
331:13,20
**y-a-n-e-l-l (1)**
260:5
**Yanell's (1)**
223:16
**year (17)**
193:16;194:11;
235:20;256:10;257:1;
263:7;269:1;271:10;
281:21;298:3,17;
299:8;308:20;327:18;
357:3;362:24;367:8
**years (22)**
192:22,25;193:1;
195:5;224:7;252:21;
263:5;268:19,20;
279:11;296:9;297:11,
14,15;298:5;304:14;
307:3;308:4;350:5,
10,18;370:11

**Yep (1)**
208:22
**yesterday (8)**
189:10;200:20;
202:24;232:13;
306:24;312:10;345:7,
14
**York (28)**
183:16,16;191:8;
199:1;204:22;222:23;
224:9,23;225:3,22;
227:21;233:22,24;
234:14,21;237:19;
243:10;250:23,23;
258:17,18;279:17;
303:13;350:15,24;
377:12,12,18

**Z**

**zone (5)**
263:11;282:8,11;
283:4,9
**ZOOM (6)**
183:17;188:16;
245:15;294:6,16;
316:11

**0**

**0019 (1)**
318:9

**1**

**1 (4)**
337:7,17,19;339:24
**10 (10)**
203:22;209:21;
229:14;255:23;274:7;
308:2,20;309:17;
369:4;370:2
**10:30 (3)**
217:12;218:3;
231:10
**10:50 (1)**
319:6
**100 (2)**
211:23;319:17
**102.3 (1)**
377:14
**102.5 (1)**
377:14
**10278-3699 (1)**
183:16
**10th (1)**
183:17
**11 (3)**
217:12;231:3;237:5
**11:50 (1)**
255:21
**12 (3)**
255:23;265:15;

331:16
**12:35 (1)**
274:8
**14 (7)**
192:22;193:1;
224:7,17;350:10;
359:21;377:10
**15 (21)**
203:22;212:7;
217:22;219:7;227:25;
251:1,6,7;254:18;
309:22;312:21;316:5;
326:9;327:22;329:9,
21;331:2,4;334:15;
336:15;341:25
**150 (1)**
211:23
**15th (1)**
321:12
**18 (7)**
250:1;265:15;
273:25;358:23;360:3,
8,9
**19 (6)**
318:8;357:8;
358:14,16,19,21

**2**

**2 (3)**
183:15;345:19;
375:16
**20 (13)**
197:1,2;209:21;
291:7;315:1;321:5;
332:16;333:12;
360:11;361:13,16,19,
20
**2001 (1)**
235:18
**2008 (1)**
350:10
**2010 (1)**
350:19
**2012 (1)**
350:23
**2013 (2)**
262:14;296:3
**2014 (1)**
350:25
**2015 (1)**
194:4
**2016 (12)**
194:7,16;221:18;
224:3;225:5;236:6,
15;242:21;263:18;
264:2;266:24;355:1
**2017 (8)**
194:16;238:9,10;
239:5;241:2;279:12;
296:10;361:12
**2018 (9)**
194:16;238:17;

239:11;240:4,9;
242:15;350:5,13;
351:2
**2018-ish (1)**
296:10
**2019 (8)**
194:16;240:9,10;
241:5;273:3,4,25;
358:8
**2020 (4)**
194:16;225:20;
236:6;264:17
**2021 (5)**
194:14;235:19,20;
242:24;281:17
**2022 (37)**
193:16;194:20,24;
196:17;235:22;236:2,
14,19;238:2;239:17;
240:16;241:17;242:3;
249:20;250:20;
258:19;262:18;
266:24;271:11;
274:24;275:20;
281:24;282:7,18;
283:14;308:21;
309:17;316:5;327:19;
344:21,23;359:21;
370:16;372:15,18;
375:15,16
**2023 (2)**
183:17;377:10
**21 (9)**
194:19;207:16;
208:7,11,12;210:4;
227:20,24;252:5
**22 (13)**
212:12;215:9;
244:7,14,15,19;245:2;
246:4,22;252:11;
254:6;281:17;331:14
**23 (5)**
201:23;202:12,14;
203:8,10
**24 (6)**
297:23;344:22;
345:7;346:13;376:5,
13
**24A (1)**
346:13
**25 (12)**
197:1,2,2;250:1;
315:2;358:8;365:12,
13,18;366:3,6,7
**26 (2)**
183:16;250:1
**27 (5)**
363:13;364:9,11;
365:2,4
**28 (3)**
364:24;366:23;
367:17
**29 (8)**

344:21,24;345:15,
17;375:14;376:4,4,12
**2-CA-295979 (2)**
183:4;188:5
**2nd (2)**
344:24;345:22

**3**

**3:14 (1)**
335:12
**3:29 (1)**
336:15
**30 (12)**
344:23,25;345:19;
361:12;370:16;
372:15,18;373:25;
374:1;375:15,15;
376:12
**300 (5)**
205:20;210:19;
222:3;272:10;351:10
**30th (1)**
345:22
**31 (1)**
376:21

**4**

**4:00 (1)**
378:2
**40 (1)**
249:24
**406 (1)**
227:2
**47 (1)**
337:13
**48 (2)**
337:13,14

**5**

**5:25 (1)**
370:16
**50 (1)**
357:23
**500 (1)**
355:5
**55 (1)**
297:24

**6**

**6 (1)**
240:15
**6:30 (2)**
217:10;231:9
**60 (1)**
332:14
**600 (1)**
355:5

**8**

**8 (1)**
240:15
**800 (2)**
297:23;300:12
**85 (1)**
209:9
**883 (1)**
287:5

**9**

**9 (2)**
283:14;316:13
**9:00 (5)**
249:15,15,18;
251:17,17
**9:20 (1)**
319:5
**9:30 (2)**
183:17;188:2
**90 (1)**
208:5
**900 (1)**
260:19
**911 (2)**
222:24,24

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

---

**General Counsel's Exhibits**
**GC-1 through GC-8**

---

In the Matter of:                                        Case No.: 02-CA-295979

APPLE, INC.

        Respondent,

and

COMMUNICATIONS WORKERS
OF AMERICA

        Charging Party

---

---

Place:   New York, New York (via Zoom)
Dates:   January 9 and 10, 2023

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC

**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

GC-1                           X
EXHIBIT NO._____  RECEIVED _____  REJECTED _____


02-CA-295979                        APPLE, INC.
CASE NO _____ CASE NAME _____


29                01-09-2023        Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**Apple, Inc.**

**and**

**Communications Workers of America AFL-CIO**

---

**GENERAL COUNSEL EXHIBIT NO. 1**

---

**<u>Case No</u>.**

**02-CA-295979**

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**Apple, Inc.**

**and**

**Communications Workers of America AFL-CIO**

**<u>Case No</u>.**

**02-CA-295979**

a)   **Charge in Case No. 02-CA-295979 dated May 18, 2022**

b)   **Affidavit of  Service of (a) above dated May 18, 2022**

c)   **Complaint and Notice of Hearing in Case No. 02-CA-295979 dated September 30, 2022**

d)   **Affidavit of Service of (c) above dated September 30, 2022**

e)   **Respondent's Answer to Complaint in Case No. 02-CA-295979 dated October 14, 2022**

f)   **Order Rescheduling Hearing in Case No. 02-CA-295979 dated November 4, 2022**

g)   **Affidavit of Service of (f) above dated November 4, 2022**

h)   **Amendment to Complaint in Case No. 02-CA-295979 dated December 16, 2022**

i)   **Affidavit of Service of (h) above dated December 16, 2022**

j)   **Respondent's Answer to Amendment to Complaint in Case No. 02-CA-295979 dated December 21, 2022**

k)   **Index to General Counsel's Exhibit No. 1**

k

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 02-CA-295979 | May 18, 2022 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

| 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT | | |
|---|---|---|

| a. Name of Employer Apple, Inc. | | b. Tel. No. (408) 996-1010 |
|---|---|---|
| | | c. Cell No. |
| | | f. Fax No. |
| d. Address *(Street, city, state, and ZIP code)* One Apple Park Way Cupertino, California  95014 | e. Employer Representative Deirdre O'Brien, Senior Vice President Retail + People | g. e-Mail lawenforcement@apple.com |
| | | h. Number of workers employed 100+ |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)* retail store | j. Identify principal product or service technology products and services | |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list*

*subsections)* _____ of the National Labor Relations Act, and these unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce
within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*
See attachment.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
Communications Workers of America, AFL-CIO

| 4a. Address *(Street and number, city, state, and ZIP code)* 80 Pine Street, 37thFloor New York, New York  10005 | 4b. Tel. No. (212) 344-2515 |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax No. (212) 425-2947 |
| | 4e. e-Mail |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*  Communications Workers of America, AFL-CIO

| 6. DECLARATION I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. By _____ *(signature of representative or person making charge)*  Sumanth Bollepalli, District Counsel *(Print/type name and title or office, if any)* | Tel. No. (212) 344-2515 |
|---|---|
| | Office, if any, Cell No. |
| | Fax No. (212) 425-2947 |
| Address 80 Pine Street, 37th Floor, New York, NY  10005 | May 18, 2022 *(date)* | e-Mail sbollepalli@cwa-union.org |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

a

<u>ATTACHMENT</u>

Since on or about November 19, 2021, the above-named Employer by its officers, agents and representatives has interfered with, restrained, and/or coerced employees in the exercise of their Section 7 rights in violation of the Act.  Specifically, the Employer has and continues to maintain an overly broad no-solicitation policy intended to discourage employees from engaging in union activity at work in violation of the Act.

Since on or about May 3, 2022, the above-named Employer by its officers, agents and representatives has interfered with, restrained, and/or coerced employees in the exercise of their Section 7 rights in violation of the Act.  Specifically, the Employer has allegedly engaged in the following unlawful acts:

(a) On or about May 3, 2022, the above-named Employer interrogated employee Jordan Vasquez regarding his and/or other employees protected concerted activities;

(b) On or about May 3, 2022, the above-named Employer surveilled or created the impression of surveillance of employee Jordan Vasquez and/or other employees regarding their protected concerted activities;

(c) On or about May 15, 2022 the above-named Employer unlawfully implemented a work rule prohibiting employees from posting Union flyers in break areas during non-work time; and

(d) On or about May 15, 2022, the above-named Employer began conducting captive-audience speeches in order to discourage employees from supporting the Union.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| |
|---|
| **APPLE, INC.**<br><br>     Charged Party<br><br>     and<br><br>**COMMUNICATIONS WORKERS OF AMERICA**<br><br>     Charging Party |

**Case 02-CA-295979**

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on May 18, 2022, I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Deirdre O'Brien, Senior Vice President Retail
+ People
Apple Inc
One Apple Parkway
Cupertino, CA 95014

| | |
|---|---|
| | Tira Branch, Designated Agent of NLRB |
| Date | Name |
| May 18, 2022 | |
| | Tira Branch |
| | Signature |

b

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**APPLE, INC.**

    **and**                                  **Case 02-CA-295979**

**COMMUNICATIONS WORKERS OF**
**AMERICA, AFL-CIO**

## COMPLAINT AND NOTICE OF HEARING

This Complaint and Notice of Hearing is based on a charge filed by the Communications Workers of America, AFL-CIO (Charging Party or Union). It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and Regulations of the National Labor Relations Board (the Board) and alleges that Apple Inc. (Respondent) has violated the Act as described below.

1.  The charge in this proceeding was filed by the Charging Party on May 18, 2022, and a copy was served on Respondent by U.S. mail on May 18, 2022.

2.  At all material times, Respondent, a California corporation with headquarters located in Cupertino, California, and retail facilities located throughout the United States, including a store located at 185 Greenwich Street, New York New York (the facility), the sole facility herein, is engaged in the development, manufacture and retail sale of consumer electronics and software.

3.  (a) Annually, in the course and conduct of its business operations described above in paragraph 2, Respondent derives gross revenues in excess of $500,000.

    (b) Annually, in the course and conduct of its business operations described above in paragraph 2, Respondent purchases and receives materials and products at its facility valued in excess of $5,000 from suppliers located outside the State of New York.

c

4.  At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the Act.

5.  At all material times, the Charging Party has been a labor organization within the meaning of Section 2(5) of the Act.

6.  At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act.:

    a) Stephanie Gladden          Sr. Manager
    b) Waleed Abdelal             Store Leader
    c) Matt Moya                  Store Leader
    d) Jorge Ramirez              Store Leader
    e) Yanell Brown               Store leader

7.  In or about early May 2022, Respondent, by Stephanie Gladden, at the facility, interrogated its employees about their support for the Union and their protected concerted activities regarding a discussion with Respondent involving higher wages, and employee support for receiving higher wages.

8.  (a) At all material times, Respondent has maintained the following rule:

    Solicitation and Distribution policy:

    As an Apple employee, you're not permitted to solicit other employees — including for your own hobbies or business (such as jewelry, makeup, personal training services), charitable campaigns or political causes — during work time. Additionally, you may not distribute material during work time or in a work area.

    Third parties are not permitted to distribute materials or solicit employees, vendors, or customers on Apple property at any time.

    Employees may not use Apple's bulletin boards to distribute materials or solicit employees, vendors, or customers. In addition, third parties may not use any Apple system (electronic or physical) to distribute materials or solicit employees, vendors, or customers.

(b) Respondent, by the individuals named below and about the dates opposite their names, at the facility selectively and disparately enforced the rule described above in paragraph (a) by applying it only against employees who formed, joined or assisted the Union by prohibiting the placement of Union flyers on the breakroom table while permitting nonunion solicitations and distributions:

     (i)      Waleed Abdelal     May 15, 2022

     (ii)     Matt Moya        May 15, 2022 and between May 30 and June 2, 2022

     (iii)    Jorge Ramirez     June 1, 2022

     (iv)    Yanell Brown      On or about May 30 or June 2, 2022

9. By the conduct described above in paragraphs 7 and 8, Respondent has been interfering with, restraining and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

10. The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.


## REMEDIES

**WHEREFORE**, the General Counsel further seeks an Order providing for all relief as may be just and proper to remedy the unfair labor practices alleged, including but not limited to requirements that Respondent:

(a) Physically post the Notice to Employees at Respondent's facility located at 185 Greenwich Street, New York, New York and electronically distribute the Notice to Employees to all employees employed at Respondent's facility by email, text

messaging, posting on social media websites and posting on internal apps and intranet

websites, if Respondent communicates with its employees by such means;

(b) Provide training for its managers and supervisors on their obligations under the Act to

ensure future compliance with the law.

## **ANSWER REQUIREMENT**

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules

and Regulations, it must file an answer to the complaint.  The answer must be **received by this**

**office on or before October 14, 2022 or postmarked on or before October 13, 2022**.

Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website.   To file

electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number,

and follow the detailed instructions.  Responsibility for the receipt and usability of the answer rests

exclusively upon the sender.  Unless notification on the Agency's website informs users that the

Agency's E-Filing system is officially determined to be in technical failure because it is unable to

receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time)

on the due date for filing, a failure to timely file the answer will not be excused on the basis that

the transmission could not be accomplished because the Agency's website was off-line or

unavailable for some other reason.  The Board's Rules and Regulations require that an answer be

signed by counsel or non-attorney representative for represented parties or by the party if not

represented. See Section 102.21.  If the answer being filed electronically is a pdf document

containing the required signature, no paper copies of the answer need to be transmitted to the

Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file

containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission.  If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## NOTICE OF HEARING

**PLEASE TAKE NOTICE THAT** on **December 13, 2022, at 9:30 a.m.**, and on consecutive days thereafter until concluded, a hearing will be held before an Administrative Law Judge, via videoconference technology (such as Zoom, Skype, WebEx, etc.) or in-person at a hearing room at 26 Federal Plaza, New York, New York, as ordered by the Regional Director or Administrative Law Judge. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated:  September 30, 2022

John D. Doyle, Jr.
Regional Director
National Labor Relations Board, Region 2
26 Federal Plaza, Suite 3614
New York, NY 10278-3699

Attachments

FORM NLRB 4338
(6-90)

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**NOTICE**

Case 02-CA-295979

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing. However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements *will not be granted* unless good and sufficient grounds are shown *and* the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds must be set forth in *detail*;

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5) Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Deirdre O'Brien , Senior Vice President Retail
  + People
Apple Inc
One Apple Parkway
Cupertino, CA 95014

Robert G. Hulteng, Esq..
Littler Mendolson
333 Bush Street
34th Floor
San Francisco, CA 94104

Sumanth Bollepalli , District Counsel
80 Pine Street, 37th Floor
New York, NY 10005-1728

Communications Workers of America
80 Pine St; Fl 37
New York, NY 10005-1728

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative.**  If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations.  The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently.  To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts.  You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**.  The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.     BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations.  In addition, you should be aware of the following:

- **Special Needs**:  If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance.  Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference**:  One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference.  You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.     DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations.  Please note in particular the following:

- **Witnesses and Evidence**:  At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits:  Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered**

(OVER)

Form NLRB-4668
(6-2014)

**in evidence.**  If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**:  An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation.  Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval.  Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion.  If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:**  You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing.  Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**:  Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ.  The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations.  Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:**  If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred.  You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request.  You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:**  In due course, the ALJ will prepare and file with the Board a decision in this matter.  Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision.  The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**:  The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections.  A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**APPLE, INC.**

    **and**                                                  **Case 02-CA-295979**

**COMMUNICATIONS WORKERS OF AMERICA**


**AFFIDAVIT OF SERVICE OF: Complaint and Notice of Hearing (with forms NLRB-4338 and NLRB-4668 attached)**

I, Lisa Coleman the undersigned employee of the National Labor Relations Board, being duly sworn, say that on 9/30/22, I served the above-entitled document(s) by **E-Issued,** as noted below, upon the following persons,:

Deirdre O'Brien, Senior Vice President
Retail + People
Apple Inc
One Apple Parkway
Cupertino, CA 95014

Robert G. Hulteng, Esq.
Littler Mendolson
333 Bush Street; 34th Floor
San Francisco, CA 94104

Sumanth Bollepalli , District Counsel
80 Pine Street, 37th Floor
New York, NY 10005-1728

Communications Workers of America
80 Pine St; Fl 37
New York, NY 10005-1728

| | |
|---|---|
| 9/30/2022 | Lisa Coleman, Designated Agent of NLRB |
| Date | Name |

| |
|---|
| /s/ Lisa Coleman |
| Signature |

d

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

APPLE INC.                                        Case No.  02-CA-295979

-and-


COMMUNICATIONS WORKERS OF                         OCTOBER 14, 2022
AMERICA, AFL-CIO

<u>**ANSWER TO COMPLAINT**</u>

      Apple Inc., in accordance with the National Labor Relations Act ("Act") and the applicable Rules and Regulations of the National Labor Relations Board ("NLRB"), formally submits its Answer to the Complaint and Notice of Hearing ("Complaint") issued by the Regional Director of Region 2, on September 30, 2022.  In this regard, and in Answer to the above-captioned unfair labor practice charge, Respondent reiterates its denial of any and all claimed violations of the Act.

      1.      On information and belief, Respondent admits that the charge in Case 02-CA-295979 was filed by the Union on May 18, 2022.  Respondent admits the remaining allegations in Paragraph 1.

      2.      Respondent admits the allegations in Paragraph 2.

      3(a).      Respondent admits the allegations in Paragraph 3(a).

      3(b).      Respondent admits the allegations in Paragraph 3(b).

      4.      Respondent admits the allegations in Paragraph 4.

      5.      Respondent admits the allegations in Paragraph 5.

      6.      Respondent denies the portion of the allegation that Stephanie Gladden was the Sr. Manager during all material times. Respondent avers that Stephanie Gladden transferred to another

e

location on May 25, 2022. Respondent denies the portion of the allegation that Matt Moya was a

Store Leader. Respondent avers that Matt Moya held the title of Manager. Respondent denies the

portion of the allegation that Jorge Ramirez was a Store Leader. Respondent avers that Jorge

Romero held the position of Sr. Manager. Respondent denies the portion of the allegation that

Yanell Brown was a Store Leader. Respondent avers that Yanell Brown held the position of Sr.

Manager. Respondent admits the remaining allegations in Paragraph 6.

      7.      Respondent denies the allegations in Paragraph 7.

      8(a).     Respondent admits the allegations in Paragraph 8(a).

      8(b).     Respondent denies the allegations in Paragraph 8(b).

      9.      Respondent denies the allegations in Paragraph 9.

      10.     Respondent denies the allegations in Paragraph 10.

## AFFIRMATIVE DEFENSES

      1.      Respondent alleges and takes the position that the Complaint does not state a claim

upon which relief can be granted.

      2.      Respondent alleges and takes the position that the Complaint does not state facts

sufficient to constitute any unfair labor practices or a violation of the Act.

      3.      Respondent alleges and takes the position that any actions taken by Respondent

were taken for lawful, legitimate reasons and not in violation of the Act.

      4.      Respondent alleges and takes the position that the claims alleged, in whole and/or

in part, are frivolous and without foundation in law or fact.

      5.      Respondent alleges and takes the position that, assuming arguendo, any allegation

in the Complaint is found to violate the Act (which Respondent contends would be improper and

legally baseless), such would still legally qualify as being a *de minimis* violation of the Act and does not warrant a finding of an unfair labor practice of the issuance of a remedial order.

6.     Respondent reserves the right to assert any additional affirmative defenses it discovers during the course of these proceedings.

WHEREFORE, Respondent requests the Complaint be dismissed in its entirety.

Respectfully submitted,


*/s/Jason R. Stanevich*
Jason R. Stanevich
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street; Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile:  203.974.8799
jstanevich@littler.com


## CERTIFICATE OF SERVICE

A copy of the foregoing Answer to the Complaint was served electronically upon Union Counsel and the National Labor Relations Board on October 14, 2022 as follows:

Sumanth Bollepalli, Esq.
80 Pine Street, 37th Floor
New York, NY 10005-1728
sbollepalli@cwa-union.org
*--Counsel for Communications Workers of America*

Karen Newman
Supervisory Attorney
National Labor Relations Board, Region 2
Karen.Newman@nlrb.gov


*/s/ Jason R. Stanevich*
Jason R. Stanevich

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**APPLE, INC.**

    **and**
                                      **Case No. 02-CA-295979**

**COMMUNICATIONS WORKERS OF AMERICA,**
**AFL-CIO**

### ORDER RESCHEDULING HEARING

    **IT IS HEREBY ORDERED** that the hearing before an administrative law judge in the above-captioned matter is rescheduled from Tuesday, December 13, 2022 to Monday, January 9, 2023, at 9:30 a.m. and on consecutive days thereafter until concluded. The hearing will be conducted via Zoom/videoconference or as otherwise ordered by the Administrative Law Judge.

Dated: November 4, 2022
New York, New York

_____
John D. Doyle, Jr.
Regional Director
National Labor Relations Board, Region 2
26 Federal Plaza, Room 36-130
New York, NY 10278-3699

f

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**APPLE, INC.**

  **and**                                            **Case 02-CA-295979**

**COMMUNICATIONS WORKERS OF AMERICA**

**AFFIDAVIT OF SERVICE OF ORDER RESCHEDULING HEARING**

I Rhonda Rhodes, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on November 4, 2022**,** I served the above-entitled document(s) by **E-Issued** upon the following persons, addressed to them at the following addresses:

Apple Inc
Attn: Deirdre O'Brien, Senior Vice President
Retail + People
One Apple Parkway
Cupertino, CA 95014

Robert G. Hulteng, Esq.
Littler Mendolson
333 Bush Street
34th Floor
San Francisco, CA 94104

Sumanth Bollepalli, District Counsel
80 Pine Street, 37th Floor
New York, NY 10005-1728

Communications Workers of America
80 Pine St
Fl 37
New York, NY 10005-1728

November 4, 2022

|  | Rhonda Rhodes, Designated Agent of NLRB |
|---|---|
| Date | Name |

|  | /s/ Rhonda Rhodes |
|---|---|
|  | Signature |

g

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**APPLE, INC.**

　　**and**　　　　　　　　　　　　　**Case No.: 02-CA-295979**

**COMMUNICATIONS WORKERS OF**
**AMERICA, AFL-CIO**

**AMENDMENT TO COMPLAINT**

Pursuant to Section 102.17 of the Rules and Regulations of the National Labor Relations

Board (the Board), the Complaint and Notice of Hearing issued in the above captioned matter on

September 30, 2022, is amended as follows:

1. Substitute paragraph 6 with the following revised paragraph 6:

　　6. At all material times, the following individuals held the positions set forth opposite their

　　respective names and have been supervisors of Respondent within the meaning of Section

　　2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

| | |
|---|---|
| a) Stephanie Gladden | Sr. Manager |
| b) Waled Abdelal | Store leader |
| c) Matt Moya | Manager |
| d) Jorge Ramirez | Sr. Manager |
| e) Yanell Brown | Sr. Manager |

2. Substitute paragraph 8(a) with the following revised paragraph 8(a):

　　8.(a) At all material times, Respondent has maintained the following rule:

　　Solicitation and Distribution

As an Apple employee, you're not permitted to solicit other employees- including for your
own hobbies or business (such as jewelry, makeup, personal training services), charitable
campaigns or political causes-during work time. Additionally, you may not distribute

h

material during work time or in a work area. Third parties are not permitted to distribute materials or solicit employees, vendors, or customers on Apple property at *any time.*

Employees may not use Apple's bulletin boards to distribute materials or solicit employees, vendors, or customers. In addition, third parties may not use any Apple system (electronic or physical) to distribute materials or solicit employees, vendors, or customers.

Employees and third parties may not request or accept money, good, or compensable services of any kind or for, or buy or sell outside commercial products or services, at *any time* on Apple property, including during non-work time and in non-work areas.

Apple facilities are generally for Apple business use only (including authorized Apple events, such as Apple's health and wellness fairs, product fairs, Apple's Employee Giving, or Diversity Network Association activities) and may not be used for other non-Apple business activity without prior written approval of Apple's Facilities Department.

If you're approached by a third party wishing to distribute materials or engage in any kind of solicitation on Apple property, you may ask them to leave. If you need any assistance, you may contact Global Security or Loss Prevention. If you're approached by an employee who is distributing materials or engaging in solicitation during *work time*, you may ask them to stop. Alternatively, you may contact your manager or the Business Conduct Helpline.

3. Substitute paragraph 8(b) with the following revised paragraph 8(b):

8.(b) Respondent, by the individuals named below and about the dates opposite their names, at the facility, selectively and disparately enforced the rule described above in paragraph (a) by applying it only against employees who formed, joined, or assisted the Union by prohibiting the placement of Union flyers on the breakroom table while permitting nonunion solicitation and distribution materials:

| | | |
|---|---|---|
| (i) | Waleed Abdelal | May 15, 2022 |
| (ii) | Matt Moya | May 15, 2022 and on about May 30 or June 2, 2022 |
| (iii) | Jorge Ramirez | June 1, 2022 |
| (iv) | Yanell Brown | May 27, 2022, and on about May 30 or June 2, 2022 |

4. Insert the following paragraph as paragraph 8 (c):

8.(c)  Respondent, by the individuals named in paragraph 8(b) above on the dates specified, at the facility, confiscated Union flyers from a nonworking area.

5. Add the following language to the Remedies section of the Complaint:

(c) Rescind the unlawfully applied Solicitation and Distribution policy, and if Respondent decides to reinstate this policy after the notice posting period, include therein a disclaimer that Respondent will not apply the policies to Section 7 activities.

**ANSWER REQUIREMENT**

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint.  The answer must be received by this office on or before December 30, 2022, or postmarked on or before December 29, 2022.  Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website.  To file electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions.  Responsibility for the receipt and usability of the answer rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be

signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

DATED in New York, NY, this 16th day of December, 2022

_____
John D. Doyle, Jr.
Regional Director
National Labor Relations Board, Region 2
26 Federal Plaza Ste. 36-130
New York, NY 10278

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

**APPLE, INC.**

    **and**                                        **Case 02-CA-295979**

**COMMUNICATIONS WORKERS OF AMERICA**

**AFFIDAVIT OF SERVICE OF AMENDMENT TO COMPLAINT**

I, D. Mahr the undersigned employee of the National Labor Relations Board, being duly sworn, say that on December 16, 2022**,** I served the above-entitled document(s) by **E-Issuance** upon the following persons, addressed to them at the following addresses:

Deirdre O'Brien , Senior Vice President Retail
   + People
Apple, Inc.
One Apple Parkway
Cupertino, CA 95014

Robert G. Hulteng , ESQ.
Littler Mendolson
333 Bush Street, 34th Floor
San Francisco, CA 94104

Maura A. Mastrony , Atty.
Littler Mendelson, P.C.
265 Church Street, Suite 300
New Haven, CT 06510

Sumanth Bollepalli , District Counsel
80 Pine Street, 37th Floor
New York, NY 10005-1728

Communications Workers of America
80 Pine Street, Fl 37
New York, NY 10005-1728

December 16, 2022

| | |
|---|---|
| Date | D. Mahr, Designated Agent of NLRB |
| | Name |
| | /s/ D. Mahr |
| | Signature |

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**


APPLE INC.                                                    Case No.  02-CA-295979

-and-


COMMUNICATIONS WORKERS OF                      DECEMBER 21, 2022
AMERICA, AFL-CIO

**<u>ANSWER TO AMENDMENT TO COMPLAINT</u>**

Apple Inc., in accordance with the National Labor Relations Act ("Act") and the applicable Rules and Regulations of the National Labor Relations Board ("NLRB"), formally submits its Answer to the Amendment to Complaint ("Complaint") issued by the Regional Director of Region 2, on December 16, 2022.  In this regard, and in Answer to the above-captioned unfair labor practice charge, Respondent reiterates its denial of any and all claimed violations of the Act.

1.      On information and belief, Respondent admits that the charge in Case 02-CA-295979 was filed by the Union on May 18, 2022.  Respondent admits the remaining allegations in Paragraph 1.

2.      Respondent admits the allegations in Paragraph 2.

3(a).   Respondent admits the allegations in Paragraph 3(a).

3(b).   Respondent admits the allegations in Paragraph 3(b).

4.      Respondent admits the allegations in Paragraph 4.

5.      Respondent admits the allegations in Paragraph 5.

6.      Respondent denies the portion of the allegation that Stephanie Gladden was the Sr. Manager during all material times. Respondent avers that Stephanie Gladden transferred to another

j

location on May 25, 2022. Respondent denies the portion of the allegation that Jorge Ramirez was a Sr. Manager. Respondent avers that Jorge Romero held the position of Sr. Manager.  Respondent admits the remaining allegations in Paragraph 6.

7.      Respondent denies the allegations in Paragraph 7.

8(a).   Respondent admits the allegations in Paragraph 8(a).

8(b).   Respondent denies the allegations in Paragraph 8(b).

8(c).   Respondent denies the allegations in Paragraph 8(c).

9.      Respondent denies the allegations in Paragraph 9.

10.     Respondent denies the allegations in Paragraph 10.

## **AFFIRMATIVE DEFENSES**

1.      Respondent alleges and takes the position that the Complaint does not state a claim upon which relief can be granted.

2.      Respondent alleges and takes the position that the Complaint does not state facts sufficient to constitute any unfair labor practices or a violation of the Act.

3.      Respondent alleges and takes the position that any actions taken by Respondent were taken for lawful, legitimate reasons and not in violation of the Act.

4.      Respondent alleges and takes the position that the claims alleged, in whole and/or in part, are frivolous and without foundation in law or fact.

5.      Respondent alleges and takes the position that, assuming arguendo, any allegation in the Complaint is found to violate the Act (which Respondent contends would be improper and legally baseless), such would still legally qualify as being a *de minimis* violation of the Act and does not warrant a finding of an unfair labor practice of the issuance of a remedial order.

6.     Respondent reserves the right to assert any additional affirmative defenses it discovers during the course of these proceedings.

WHEREFORE, Respondent requests the Complaint be dismissed in its entirety.

Respectfully submitted,


*/s/Jason R. Stanevich*
Jason R. Stanevich
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street; Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile:  203.974.8799
jstanevich@littler.com

**<u>CERTIFICATE OF SERVICE</u>**

A copy of the foregoing Answer to the Amendment to Complaint was served electronically upon Union Counsel and the National Labor Relations Board on December 21, 2022 as follows:

Sumanth Bollepalli, Esq.
80 Pine Street, 37th Floor
New York, NY 10005-1728
sbollepalli@cwa-union.org
*--Counsel for Communications Workers of America*

Ruth Weinreb
Field Attorney
National Labor Relations Board, Region 2
Ruth.Weinreb@NLRB.gov

*/s/ Jason R. Stanevich*
Jason R. Stanevich

```
                    GC-2                        X
EXHIBIT NO._____     RECEIVED _____ REJECTED _____


                    02-CA-295979                    APPLE, INC.
CASE NO _____ CASE NAME _____


                        1               01-09-2023        Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

G.C. Exhibit 2

 **OC Chat**   



**Clementine Vasquez** May 9, 2022
They just had a union feeler convo with me
I'll explain when I get a chance          11:48 AM

Stephanie gladden was the manager who tried to talk to you about unions, correct?
                                        12:04 PM ✓

GC-3                          X
EXHIBIT NO._____    RECEIVED _____ REJECTED _____


02-CA-295979                        APPLE, INC.
CASE NO _____ CASE NAME _____


1              01-09-2023        Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____

G.C. Exhibit 3

✓ Higher Pay

✓ Better Benefits

✓ More Representation

Read our store's
Vision Statement
here





Add your name
to join the
movement



Video filed separately

GC-4                          X
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____


02-CA-295979                          APPLE, INC.
**CASE NO** _____ **CASE NAME** _____


video          01-09-2023          Barrington Moxie
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

GC-5                              X
**EXHIBIT NO.**_____  **RECEIVED** _____  **REJECTED** _____

02-CA-295979                          APPLE, INC.
**CASE NO** _____ **CASE NAME** _____

3                01-09-2023        Barrington Moxie
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____





Gov Exhibit 5



```
         GC-6                    X
EXHIBIT NO._____ RECEIVED _____ REJECTED _____


         02-CA-295979                   APPLE, INC.
CASE NO _____ CASE NAME _____


         1                 01-09-2023      Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

GC Exhibit 6

# WHAT OUR UNION IS FIGHTING FOR:

**<u>INCLUSION & EQUITY:</u>** Establish a concrete and actionable program committed to diversifying store leadership through inclusion and promotion of BIPOC, LGBTQ, and colleagues with disabilities. Reward multilingual employees monetarily for their leveraged contributions that are taken for granted. We're all valuable and want fair representation.

**<u>CAREER DEVELOPMENT:</u>** Protected, regularly scheduled training and coaching time for current roles. Make internal promotion the primary method for filling open positions. Establish clear and achievable career advancement paths. Employee oversight when hiring for senior-level store positions.

**...And much more.**

Read the full Vision Statement here!



video filed separately

GC-7                          X
EXHIBIT NO._____   RECEIVED _____   REJECTED _____

02-CA-295979                          APPLE, INC.
CASE NO _____   CASE NAME _____

                              01-09-2023         Barrington Moxie
NO OF PAGES _video_____   DATE: _____   REPORTER: _____

video filed separately

GC-8                          X
EXHIBIT NO._____  RECEIVED _____ REJECTED _____

02-CA-295979                        APPLE, INC.
CASE NO _____ CASE NAME _____

                                01-09-2023        Barrington Moxie
NO OF PAGES _video_____ DATE: _____ REPORTER: _____

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

-------------------------------------------

**Respondent's Exhibits**
**R-19 thru R-23, R-25 and R-27**

-------------------------------------------

In the Matter of:                                    Case No.: 02-CA-295979

APPLE, INC.

        Respondent,

and

COMMUNICATIONS WORKERS
OF AMERICA

        Charging Party

-------------------------------------------

-------------------------------------------

Place:   New York, New York (via Zoom)
Dates:  January 9 and 10, 2023

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC

**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

R-18                          X
EXHIBIT NO._____    RECEIVED _____ REJECTED _____

02-CA-295979                      APPLE, INC.
CASE NO _____ CASE NAME _____

3                01-09-2023        Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____

**From:** **Haykin, Brett** Brett.Haykin@compass-usa.com 📎
**Subject:** RE: [Ext] Vending Machine Advertisements
**Date:** February 15, 2022 at 9:57 AM
**To:** Manny Bennett ebennett2@apple.com
**Cc:** Arianna L. Meli meli@apple.com, Yanell Brown ybrown@apple.com, Paul Distasio distasio@apple.com, Waleed Abdelal wabdelal@apple.com, Nicole Taffe ntaffe@apple.com

Hi Manny,

A service call was placed and we'll get a technician out there to turn off all the advertisements.

Thank you.



**Brett Haykin** | District Operations Manager
o. 732.527.1082 | m. 848.235.2456
190 Homestead Ave | Avenel, NJ 07001
brett.haykin@compass-usa.com

**www.canteen.com**

---

**From:** Manny Bennett <ebennett2@apple.com>
**Sent:** Monday, February 14, 2022 3:19 PM
**To:** Haykin, Brett <Brett.Haykin@compass-usa.com>
**Cc:** Arianna L. Meli <meli@apple.com>; Yanell Brown <ybrown@apple.com>; Paul Distasio <distasio@apple.com>; Waleed Abdelal <wabdelal@apple.com>; Nicole Taffe <ntaffe@apple.com>
**Subject:** [Ext] Vending Machine Advertisements

> CAUTION:This email contains a link or attachment. Please make sure it's from a trusted source before you open the attachment or click on the link.

Hi Brett,

It was brought to my attention that we have advertisements displaying on our vending machines (see attached images), at Apple we are not allowed to have these images displayed on our machines as they go against our company policy. If you can send a technician to the store to adjust the software of our vending machines it would be greatly appreciated.

Please reach out if you have any further questions.


Best,
Manny

Manny Bennett
Operations Lead
Apple World Trade Center
Phone: (646) 802-3800
Fax: (646) 802-3805
ebennett2@apple.com
po_r654@apple.com
www.apple.com/worldtradecenter









R-19                          X
EXHIBIT NO._____    RECEIVED _____ REJECTED _____

02-CA-295979                          APPLE, INC.
CASE NO _____ CASE NAME _____

1                01-09-2023        Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____

11:29 

  

J          G          ›

I am stuck on an A w signal problems :/

See you in a bit

Jan 25, 2019 at 10:28 AM



These were in the break room. Besides them being terribly designed, it's solicitation. Can you send a note to leaders to remind them that these things should be disposed of

iMessage

 

       

R-20                         X
EXHIBIT NO._____    RECEIVED _____ REJECTED _____


02-CA-295979                          APPLE, INC.
CASE NO _____ CASE NAME _____


1                 01-09-2023         Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____

**From:** Josh Jennison <jennison@apple.com>
**Date:** January 30, 2017 at 4:34:59 PM EST
**To:** Paul Distasio <distasio@apple.com>
**Subject: Re: DRAFT: New Whiteboard in Break Area**

connect with leaders first and get the key influencers on board, then brief email to the team is fine

we can start now with the questions — curated by you so that the team can see it come alive — a soft-launch of sorts.


Josh Jennison
Market Leader
Apple
Williamsburg & World Trade Center
jennison@apple.com

> On Jan 30, 2017, at 4:33 PM, Paul Distasio <distasio@apple.com> wrote:
>
> right -
>
> Just to be clear — you do or do not want this sent out to the full team?
>
> Paul
>
>> On Jan 30, 2017, at 4:31 PM, Josh Jennison <jennison@apple.com> wrote:
>>
>> sounds good — can you share at the senior meeting tomorrow and then seed to a couple of key influencers in the store to help lead
>>
>> we'll need to do some curation over the coming weeks to show what is, and what isn't, appropriate.  would love to see a nice mix of recognition and Tootsie Roll  questions.
>>
>> Josh Jennison
>> Market Leader
>> Apple
>> Williamsburg & World Trade Center
>> jennison@apple.com
>>
>>> On Jan 30, 2017, at 3:06 PM, Paul Distasio <distasio@apple.com> wrote:
>>>
>>> Hi team -
>>>
>>> As you may have seen, we have added a new whiteboard to the break space on the main level. In the spirit of recognition and teamwork - we'd love to see you use it to recognize and thank peers as well as have some fun.
>>>
>>> Think of it as a space to pause, ponder, and engage.
>>>
>>> We are excited to see how we can use this new space to stay connected. Please keep the board appropriate and inclusive - and remember we should never use it for solicitation.
>>>
>>> And to answer today's question - it takes 252 licks to get to the center of a Tootsie Roll pop.
>>>
>>> Thanks,
>>>
>>> Paul

R-21                          X
EXHIBIT NO._____   RECEIVED _____ REJECTED _____


02-CA-295979                          APPLE, INC.
CASE NO _____ CASE NAME _____


1                01-09-2023        Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____



Responden'ts Ex. 21 - White Board Photo

```
                 R-22                        X
EXHIBIT NO._____ RECEIVED _____ REJECTED _____


            02-CA-295979                APPLE, INC.
CASE NO _____ CASE NAME _____


              1            01-09-2023       Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____
```



```
            R-23                    X
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


      02-CA-295979                 APPLE, INC.
CASE NO _____ CASE NAME _____


            1              01-09-2023      Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____
```



R-25                              X
EXHIBIT NO._____    RECEIVED _____ REJECTED _____

          02-CA-295979                        APPLE, INC.
CASE NO _____ CASE NAME _____

              1              01-09-2023      Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____



My Dashboard    Make a Donation    Volunteer    Take Action    What's New    Quick Links ▾    Search

Hi ▅▅▅▅▅ ▾    Help



# Cause more good.

Learn More ▶

🔍 Find causes | Search

## Explore



View profile

### Featured Content



BOYS & GIRLS CLUBS OF SILICON VALLEY

NEXT WEEK
January 16, 10am-12pm; Engage in STEM activities...

⏱ VOLUNTEER

Celebrate Lunar New Year

❤ Matching Offer

♡ GIVE

NEXT WEEK
01/17/23 FCSF wants your help!!

⏱ VOLUNTEER

● ○ ○ ○ ○ ○ ○ ○ ○ ○

## My Impact

Jan 2023 - Dec 2023

♡ $0.00 donat

⏱ 0 hours volunte

ALL TIME

🚀 0 activities com

NEXT WEEK
North Fulton Community Charities Food Pantry

⏱ VOLUNTEER

### Matching and Volunteer Rewards
Use before Jan 1, 2024

$0.00 | $10,000.00
Used | Remaining

### Giving Account   ?

Funds $0.00 | Add Funds ＋
Rewards $0.00 | View Rewards ›

## My Activity

⏱ **Track your volunteer time**
Submit your hours for external volunteering

💙 **Request a match**
Receive company matching on external donations

📅 **Upcoming**
Looking for some inspiration? See what's happening in your program.
Browse giving opportunities ›
Browse volunteer opportunities ›

### My Favorite Causes

You do not have any favorite causes yet. When you favorite a cause, it will be listed here.

Explore Causes ›

---

My Profile | Help | Privacy and Cookies | Terms of Use

Download the Benevity App
Enter apple as your program domain to get started

🌐 Select a new language

简体中文    繁體中文    Nederlands    Français (Canada)    Français (France)



 

© 2023 Benevity, Inc. All Rights Reserved.

```
           R-27                    X
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


         02-CA-295979                   APPLE, INC.
CASE NO _____ CASE NAME _____


          video          01-09-2023        Barrington Moxie
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____

**Charging Party's Exhibit**
**CP-1**

_____

In the Matter of:                              Case No.: 02-CA-295979

APPLE, INC.

        Respondent,

and

COMMUNICATIONS WORKERS
OF AMERICA

        Charging Party

_____
_____

Place:   New York, New York (via Zoom)
Dates:   January 9 and 10, 2023

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC

**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

X

EXHIBIT NO. CP-1_____     RECEIVED _____ REJECTED _____

02-CA-295979                              APPLE, INC.
CASE NO _____ CASE NAME _____

01-09-2023          Barrington Moxie
NO OF PAGES 2_____ DATE: _____ REPORTER: _____





policy and was told to stop distributing his invite, also i shared I didn't understand why someone bringing in a newspaper and leaving in the break room was relevant, lastly that us giving the team a voucher for lunch, the we are paying for isnt solicitation. Shake shack didnt come in and distribute them. I continued and asked if there was any further clarity he needed, said he did not. I than went on to say so we're on the same page, I've made you aware of the policy, and you stated you understand. Moving forward I expect you to follow it. In addition, if anyone else needs clarity that you are aware of, to please direct them to me. A few minutes later he asked to see the policy, I shared its on the people site and when I had a moment id send home the link. However he welcome to search it himself. Im going to send him the link but wanted to loop you in.

**AppleConnect Sign In**
people.apple.com

I also encouraged him to continue to bring his concerns forward and know that as we've always done, we would listen and do our best to support

Save the posting they are putting up. Don't shred.

APL-WTC_00000048

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____

**Joint Exhibit**
**J-1**

_____

In the Matter of:                    Case No.: 02-CA-295979

APPLE, INC.

            Respondent,

and

COMMUNICATIONS WORKERS
OF AMERICA

            Charging Party

_____
_____

Place:   New York, New York (via Zoom)
Dates:   January 9 and 10, 2023

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC

**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

X

EXHIBIT NO. J-1_____    RECEIVED _____ REJECTED _____

02-CA-295979                          APPLE, INC.
CASE NO _____ CASE NAME _____

                              01-09-2023        Barrington Moxie
NO OF PAGES 2_____ DATE: _____ REPORTER: _____



‹ Return to Policies & Notices

## Policies & Notices

**At Work** +

Workplace Conduct +

Communications & Systems ✕

    Employee Use of Electronic Systems and Communications

    Social Media and Online Communications

    Solicitation and Distribution

    Personally Identifiable Information

Attendance & Schedule +

Legal Notices +

# Solicitation and Distribution

As an Apple employee, you're not permitted to solicit other employees — including for your own hobbies or business (such as jewelry, makeup, personal training services), charitable campaigns or political causes — during *work time*. Additionally, you may not distribute material during work time or in a work area. Third parties are not permitted to distribute materials or solicit employees, vendors, or customers on Apple property at *any time*.

Employees may not use Apple's bulletin boards to distribute materials or solicit employees, vendors, or customers. In addition, third parties may not use any Apple system (electronic or physical) to distribute materials or solicit employees, vendors, or customers.

Employees and third parties may not request or accept money, goods, or compensable services of any kind or for any cause, or buy or sell outside commercial products or services, at *any time* on Apple property, including during non-work time and in non-work areas.

Apple facilities are generally for Apple business use only (including authorized Apple events, such as Apple's health and wellness fairs, product fairs, Apple's Employee Giving, or Diversity Network Association activities) and may not be used for other non-Apple business activity without the prior written approval of Apple's Facilities Department.

If you're approached by a third party wishing to distribute materials or engage in any kind of solicitation on Apple property, you may ask them to leave. If you need any assistance, you may contact Global Security or Loss Prevention. If you're approached by an employee who is distributing materials or engaging in solicitation during *work time*, you may ask them to stop. Alternatively, you may contact your manager or the Business Conduct Helpline.

**Published date: May 24, 2022**

Was this page helpful?   **Yes**   **No**       55 people found this page helpful.



## Need support from the People team? We're ready to help.

**Start here** ⌄

 People        🌐 Retail | United States

| Your Information | Benefits Providers | Employee Resources | Sites & Tools | Discounts | Connection |
|---|---|---|---|---|---|
| myPage | Empower | Report a concern | Wellness | Product Savings | Accessibility |
| Pay Portal | Provider Directory | Employee Support | AppleWeb | Concierge | Inclusion & Diversity |
| Benefits Enrollment Tool | Cigna Global | Global Security | Careers at Apple | The Source | Employee Giving Portal |
| Employment Verification | International SOS | How-To Library | Apple Travel | QPromo | Employee Clubs |
| Time Away Request | Sedgwick | Apple Start | Commute | HotAds | |
| | E*TRADE | Apple University | IS&T | | |
| | | Immigration | | | |

Copyright © 2022 Apple Inc. All rights reserved. The information presented on the People site is subject to conditions. Learn more     Sign out | Feedback



Joint Exhibit 1

**HR**Web



HR HelpLine     Corporate

# Solicitation and Distribution

Apple employees are not permitted to solicit other employees — including for their own hobbies or business (such as jewelry, makeup, personal training services), charitable campaigns, or political causes — during *work time*. Additionally, employees may not distribute material during work time or in a work area. Third parties are not permitted to distribute materials or solicit employees, vendors, or customers on Apple property at *any time*.

Employees may not use Apple's bulletin boards to distribute materials or solicit employees, vendors, or customers. In addition, third parties may not use any Apple system (electronic or physical) to distribute materials or solicit employees, vendors, or customers.

Employees and third parties may not request or accept money, goods, or compensable services of any kind or for any cause, or buy or sell outside commercial products or services, at *any time* on Apple property, including during nonwork time and in nonwork areas.

Apple facilities are generally for Apple business use only (including authorized Apple events, such as Apple's health and wellness fairs, product fairs, Apple's Employee Giving, or Diversity Network Association activities) and may not be used for other non-Apple business activity without the prior written approval of Apple's Facilities Department.

If you are approached by a third party wishing to distribute materials or engage in any kind of solicitation on Apple property, you may ask him or her to leave. If you need any assistance, you may contact Global Security or Loss Prevention. If you are approached by an employee who is distributing materials or engaging in solicitation during *work time*, you may ask him or her to stop. Alternatively, you may contact your manager or the Business Conduct Helpline.

Copyright © 2016 Apple Inc. All rights reserved. The information presented on HRWeb is subject to conditions.    Learn more  |  Site feedback

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**DIVISION OF JUDGES**
**NEW YORK BRANCH OFFICE**

**APPLE, INC.**

                                                    **Case No.     2-CA-295979**

                **and**

**COMMUNICATIONS WORKERS OF**
**AMERICA, AFL-CIO**

<u>**ORDER FOR HEARING BY VIDEOCONFERENCE**</u>

The Complaint in the above matter issued on September 30, 2022, and was amended on December 16, 2022, based upon an unfair labor practice charge filed by Communications Workers of America, AFL-CIO (the Union).  The Complaint alleges that Respondent Apple, Inc. violated Section 8(a)(1) of the Act when it selectively and disparately enforced its rule regarding employee Solicitation and Distribution by prohibiting the placement of Union flyers on a table in its breakroom, while permitting the solicitation and distribution of materials which were not related to the Union.  The Complaint further alleges that Apple violated Section 8(a)(1) by confiscating Union flyers from a non-working area, and by unlawfully interrogating employees regarding their support for the Union and their protected concerted activities.  Apple filed an Answer on October 14, 2022, and an Amended Answer on December 21, 2022, denying the Complaint's material allegations.

The hearing in this matter is scheduled to begin on January 9, 2023.  On November 30, 2022, Apple filed a Motion for an In-Person Hearing, and on December 14, 2022, Counsel for the General Counsel (General Counsel) filed a Response in Support of Remote Hearing by Zoom.  At a conference call on December 16, 2022, the parties and I engaged in substantial discussions regarding trial scheduling, available facilities, and whether the hearing would be conducted in-person or by videoconference via the Zoom for Government platform.  I informed the parties during the conference call that I would make a determination regarding whether the hearing would be conducted in-person or by videoconference on January 3, 2023, in order to consider the Center for Disease Control (CDC) COVID-19 Community Level applicable to New York, New York, and the ramifications for the conduct of the hearing in terms of applicable protocols, at a time more proximate to the hearing.

Based upon the circumstances of the pandemic in New York City at this time, and the subsequent implications for an in-person hearing pursuant to various protocols established to address the COVID-19 pandemic, I find that an in-person hearing in the instant case is not feasible on January 9, 2023, as scheduled.  At the current time, the CDC COVID-19 Community Level for New York County is High.  See COVID-19 by County | CDC.  Thus, the CDC recommends that individuals "Wear a high-quality mask or

respirator when indoors in public."  Consequently, current agency COVID-19 protocols and protocols developed by the United States General Services Administration applicable to 26 Federal Plaza, New York, New York, where an in-person hearing would take place, require that masks be worn in all common areas, and for the implementation of social distancing.[1]  During the conference call discussed above, General Counsel confirmed that as a result witnesses would be required to wear masks while testifying in this case.  General Counsel further stated that some witnesses she intended to present had indicated that they would wear masks during their testimony due to personal and medical issues.  As is common knowledge at this point, when worn appropriately in order to prevent the spread of COVID-19, masks cover the area of the face from the nose to under the the the chin, and fit snugly to the face.  See Masks and Respirators (cdc.gov).

One of the primary functions of the Administrative Law Judge is to evaluate witness credibility and resolve disputed issues of fact involving potentially conflicting witness testimony.  See, e.g., *M.P.C. Plating, Inc.*, 301 NLRB 785, 788, fn. 13 (1991), enf. denied in part on other grounds, 912 F.2d 883 (6th Cir. 1990) ("assessment of witness credibility" a "function of the administrative law judge"); *Romo Paper Products*, 208 NLRB 644, 645 (1974) (ALJ "abdicated his responsibility to determine credibility" by failing to "resolve credibility dispute").  Credibility resolutions are critical to factual determinations premised upon an analysis of witness testimony, as opposed to documentary evidence of uncontested probative value.

One important component of any credibility assessment is the demeanor of the particular witness whose testimony is being presented.  See, e.g., *Casino Pauma*, 362 NLRB 421, 423, fn. 4 (2015); *Standard Dry Wall Products, Inc.*, 91 NLRB, 544, 545 (1950), enf'd. 188 F.2d 362 (3rd Cir. 1951) (demeanor a "factor of consequence" in credibility resolutions).  Thus, the Board stated in *Standard Dry Wall Products, Inc.* that "as the [Administrative Law Judge], but not the Board, has had the advantage of observing the witnesses while they testified, it is our policy to attach great weight to a[n ALJ's] credibility findings insofar as they are based on demeanor."[2]  91 NLRB at 545. Based upon twelve years of experience as an Administrative Law Judge with the agency, it is my conclusion that the ability to assess the credibility of the witnesses appearing before me will be detrimentally affected if those witnesses testify while wearing masks covering the nose and mouth, as the currently applicable protocols require.  Thus, in my estimation, hearing testimony from witnesses by videoconference

---

[1] In this regard, I note that the hearing rooms at the offices of Region 2, on the 36th Floor of 26 Federal Plaza, are currently closed for asbestos abatement.  While Courtroom A-238, on the 2nd Floor of 26 Federal Plaza, may be adequate to permit social distancing for hearing participants, the agency's Public Affairs office has indicated that media representatives are interested in attending the hearing, and the Union stated during the conference call that it anticipated a certain number of observers as well.

[2] It is well-settled that the "established policy" of the Board "is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect." *United States Postal Service*, 365 NLRB No. 51 at p. 1, fn. 1 (2017), citing *Standard Dry Wall Products, Inc.*, supra; see also *E.S. Sutton Realty Co.*, 336 NLRB 405, fn. 2 (2001) (noting that "the Board should reverse a judge's credibility resolutions only in rare cases"); *Adams and Associates, Inc.*, 871 F.3d 358, 371 (5th Cir. 2017) (ALJ's credibility resolutions "are binding unless unreasonable, contradictory to other findings, or unjustified," and generally "require deference except in unusual circumstances").

who are able to testify without wearing masks is preferrable to hearing in-person testimony from witnesses who must wear masks while testifying.

The Board has repeatedly stated during the past three years, informed by Section 102.35(c) of the NLRB Rules and Regulations, that the COVID-19 pandemic has created "compelling circumstances" for conducting hearings by videoconference. The Board has thus held that videoconference hearings constitute a viable alternative to in-person hearings where necessary in order to conduct a hearing safely and effectively, and to ensure that the Act is enforced in an efficient and meaningful manner in the context of the COVID-19 pandemic.[3]  See, e.g., *Amazon.com Services, LLC*, unpub. Board order issued June 15, 2022; *Michael Cetta, Inc. d/b/a Sparks Restaurant*, 2-CA-142626, unpub. Board order issued May 14, 2021; *William Beaumont Hospital*, 370 NLRB No. 9 (2020); *XPO Cartage, Inc.*, 370 NLRB No. 10 (2020).

As a result, for the reasons discussed above regarding the circumstances engendered by the current status of the COVID-19 pandemic in New York City, the hearing in this case will be conducted by videoconference using the Zoom for Government platform.  The remainder of this order will address the manner in which hearing participants and non-participant observers may access the unfair labor practice hearing on Zoom, and provide instructions for how the hearing will proceed, as described below.

Trial Dates

The hearing will begin on January 9, 2023 at 9:30 a.m., and will continue on consecutive days that week until completed.  In general, please bring any additional scheduling issues which arise to my attention as soon as possible.

On the first day of the hearing, we will begin by addressing procedural and preliminary matters, including opening the trial record, introducing the formal papers, resolving any outstanding disputes regarding subpoenas and the production of documents, addressing any other pending motions, and opening statements.  Counsel for the General Counsel (General Counsel) should then be prepared to begin presenting their first witness.

Zoom Invitations

Before the trial, I will send the parties a PDF Zoom invitation by e-mail on Microsoft Outlook. The parties may share the PDF copy of the Zoom invitation with other participants and observers.  However, please **do not forward the e-mail attaching the PDF Zoom invitation, which will contain my email address**.

If you are unable to join the meeting either online or by phone, please contact one of the other participants in the trial or call our Courtroom Deputy, whose name and

---

[3] General Counsel's contention that agency budgetary constraints constitute compelling circumstances justifying conducting the hearing by videoconference pursuant to Section 102.35(c) is rejected.

telephone number will be provided after an assignment is made, for assistance. If you cannot reach the assigned Courtroom Deputy, please call Ms. Dana Brown at the Division of Judges, New York Branch Office at (212)944-2943 for assistance.

<u>Courtroom Deputy</u>

I will request that a Courtroom Deputy be assigned to participate in the trial in this case.  The Courtroom Deputy will be available during the trial to assist with managing the trial, handling exhibits, and addressing technical issues with Zoom, should any arise.  The Courtroom Deputy will be an attorney from the "Board-side" of the National Labor Relations Board (i.e., the staff of a Board Member, the Office of the Executive Secretary, or the Solicitor's Office), and will be screened from working on this case if it comes before the Board.

<u>Identification of Participants</u>

To facilitate managing the trial and access thereto, **by Noon (Eastern time) on the business day before the first hearing date,** each party must email the Judge and Courtroom Deputy a list of all trial participants to which counsel has sent information about accessing the trial on Zoom. This list is for procedural use only and will not become part of the record. The list must include each participant's name, email address, telephone number and role in the proceeding. This list is necessary for the Judge to allow the appropriate access to the proceedings and to correctly assign individuals to breakout rooms (when needed) or the waiting room.

As the trial proceeds, each party must supplement its list as needed to identify any new trial participants. The parties shall provide any supplemental participant names **by Noon (Eastern time) on the business day before the participant will be joining the trial.** Notwithstanding these instructions, a party will not be precluded from calling a witness who is not on the party's participant list if the witness is necessary for presenting the party's case.

To limit the number of video images on the Zoom video display during trial, the following participants generally should be the only participants with their outgoing video turned on: the Judge; <u>one</u> attorney per party (typically the attorney presenting argument or handling the witness);[4] and the witness. All other trial participants may observe the trial proceedings but generally should have their outgoing video off and their audio on mute (unless directed otherwise by the Judge or Courtroom Deputy). This will enable all participants to select "Hide Nonvideo Participants" in Zoom settings and focus their attention on the video images of participants who are actively involved in the trial.

---

[4] This guideline does not preclude another attorney from turning their video and/or audio on if the need arises to speak briefly during the trial.

<u>Identification of Non-Participant Observers (Public Access)</u>

The Regional Office (Region 2) will have the responsibility of advising any members of the public (non-participant observers) about how they may access the trial. Parties may also share copies of the PDF Zoom invitation with any known non-participant observers, but also must provide the Region, **by Noon (Eastern time) on the business day before the next trial date,** the names and email addresses of any such known non-participant observers. The Region must then provide a list of all non-participant observers to the Judge and Courtroom Deputy **by 5:00 pm (Eastern time) on the business day before the next trial date.** The Judge and Courtroom Deputy will use the list to manage access to the trial.

Identified non-participant observers may observe the Zoom trial by video and/or audio but must have their outgoing audio on mute and their outgoing video turned off throughout the trial (unless directed otherwise by the Judge or Courtroom Deputy). Non-participant observers may not disrupt the trial in any way and may be subject to removal and other sanctions if they disrupt the trial or violate the Judge's instructions.

<u>Prohibition of Videotaping or Recording the Trial</u>

The official court reporter is the only individual permitted to record the trial. Accordingly, **do not video record, audio record, broadcast, televise, stream, screenshot, photograph, or otherwise copy the trial.** Violation of this rule may result in removal and other sanctions.

<u>Exhibits</u>

To facilitate the trial, it is requested that all parties email their potential exhibits to the Judge, the Courtroom Deputy, the court reporter, all other counsel, and the parties' own witnesses before the witness testifies. Jencks materials are not covered by this request, as those materials need not be provided until requested for cross examination.

As an alternative to email, the parties may request that the agency create secure NLRB SharePoint webpages for this case. Exhibits can be uploaded to Sharepoint, where they can be viewed by those with authorized access (such as an individual party, which may then provide access, as needed, to the Judge, Courtroom Deputy, court reporter, and/or other parties). Sharepoint may be required if a party intends to introduce an audio or video exhibit, or a large exhibit that cannot be transmitted by email. The agency requires at least three business days advance notice to set up a Sharepoint webpage.

All exhibits should, where possible, be pre-marked, paginated, and converted into one bookmarked PDF file per party. Please redact all personally identifiable information (PII, such as social security numbers, dates of birth, etc.) from your exhibits, and have an unredacted copy available for review if necessary.

Jencks Statements

Jencks statements, such as affidavits given to the General Counsel, will be provided (by email or another method) to opposing counsel upon request for cross examination. After cross-examination, opposing counsel **MUST** delete all Jencks statements from their computer and represent to the court and the General Counsel that it has done so.

Additional Appropriate Safeguards

Informed, but not controlled, by Section 102.35(c) of the NLRB Rules and Regulations, I will implement various appropriate safeguards to ensure that I and all parties have the ability to assess each witness' credibility and that the parties have a meaningful opportunity to examine and cross examine each witness. See *William Beaumont Hospital*, 370 NLRB No. 9 (2020) (noting that Section 102.35(c) addresses the videoconference testimony of a single witness during an in-person hearing, but is not controlling with respect to a hearing conducted entirely by videoconference). Appropriate safeguards will generally include, but are not limited to:[5]

1.  Before taking testimony, ensuring that I, all trial participants and the hearing reporter are able to hear the testimony and observe the witness, and ensuring that the witness is able to hear all other trial participants;

2.  Permitting voir dire of any witness regarding their location, equipment, and surroundings, and, upon request, having the witness adjust their camera view to show whether any other individuals are present in the room where the witness is located;

3.  Generally requiring the parties to provide copies of any exhibits to me, the witness, and all counsel of record before starting their examination (i.e., before starting direct, cross, or redirect);[6] and

4.  Having video technology assistance available to assist with technical difficulties that may arise during the hearing (e.g., assistance from the Courtroom Deputy or agency information technology staff).

---

[5] Board Rule 102.35(c)(2) lists, as one safeguard, providing the opportunity of party representatives to be present at the remote location where the witness will be located when testifying. I will not be employing that safeguard because it is inconsistent with the physical distancing safety procedures that we all must follow due to the ongoing COVID-19 pandemic.

[6] This requirement will not preclude counsel from sharing, at a later point, additional exhibits that counsel may need to use to address issues in the witness' testimony, or certain exhibits that counsel may wish to hold in reserve as part of their litigation strategy.

Ultimately, I will determine in my discretion whether it is feasible and appropriate to proceed with each witness' testimony by videoconference.[7]

Dated:  January 3, 2023
          New York, New York

_____
 Lauren Esposito
Administrative Law Judge

---

[7] If I determine that it is not feasible to receive a witness' testimony by videoconference at a particular time, the remedies may include rescheduling the witness for a later trial date and/or having the relevant party take additional steps to ensure that the witness can access and participate in the Zoom hearing.

## <u>ATTORNEY/REPRESENTATIVE INSTRUCTIONS AND GUIDELINES</u>
## <u>FOR VIDEO HEARINGS</u>

Due to the compelling circumstances created by the COVID-19 pandemic, the Administrative Law Judge will conduct the hearing in this matter on the Zoom for Government videoconferencing platform. The following guidelines and instructions are for the attorneys and/or representatives who will be participating in the video hearing. (There are separate instructions for individuals who expect to testify as witnesses in the video hearing.)

## <u>Before the Video Hearing</u>

<u>Technology Requirements</u>

To participate in the hearing, you will need access to a reliable internet connection and a device you can use to participate in the hearing by audio <u>and</u> video. It is recommended that you use a computer or laptop with a microphone, speaker and a web camera. In the alternative, you may use a smartphone or tablet, but those devices may be less effective if/when you need to receive and review documents. Regardless of the device you use, it is recommended that you use a headset or earphones with a microphone to help reduce feedback and background noise.

The hearing will be conducted on the Zoom videoconferencing platform.  Accordingly, you should load the Zoom application on the device you will be using, and verify that you can connect to Zoom by doing a test connection at https://zoom.us/test.

It is also recommended that you set up a free Zoom account using your first and last name and your email address. By setting up a Zoom account in that manner, your first and last name will appear when you join the hearing, which will make it easier to identify you as an attorney/representative.  You may set up a Zoom account at: https://zoom.us.

***In addition to setting up their own account/access, counsel are responsible for ensuring that their witnesses have the equipment and internet access necessary to fully participate in the Zoom video hearing.*** Please bring any issues to the ALJ's attention as soon as possible.

It is highly recommended that you practice using Zoom with your witnesses before the hearing, including practice with handling and reviewing exhibits.

<u>Agency Courtroom Deputy</u>

In some cases, the ALJ may have a Courtroom Deputy present to assist with certain tasks during the video hearing. Courtroom Deputies may (among other tasks): manage

who is permitted to join the video hearing; set up breakout rooms for individuals to confer privately; display exhibits if requested by one of the parties; and assist with general Zoom troubleshooting/questions. All Courtroom Deputies are attorneys from the "Board-side" of the agency (i.e., the staff of a Board Member, the Office of the Executive Secretary, or the Solicitor's Office) and will be screened from working on the case if it comes before the Board.

<u>Invitation to Video Hearing (Participants and Observers)</u>

All counsel of record and unrepresented parties will receive an email invitation to attend the video hearing. The invitation will contain a link to "Join ZoomGov Meeting" and a "Meeting ID" and "Password" for participants to join through Zoom. The General Counsel is responsible for forwarding the invitation to the court reporter and any interpreter(s). Counsel and unrepresented parties are responsible for notifying their witnesses (or the witnesses' counsel) about the hearing and applicable instructions/guidelines.

It is permissible for individuals (non-witnesses) to observe the hearing. To ensure appropriate access to the hearing, however, counsel will need to provide the ALJ/courtroom deputy with a list of all hearing participants and observers, along with each individual's name, email address, telephone number and role in the proceeding. The ALJ/courtroom deputy will use the list to allow access to the hearing and, when needed, correctly assign individuals to breakout rooms or the waiting room. <u>The list generally must be provided to the ALJ/courtroom one business day before the hearing</u>, but may be amended as appropriate to accommodate new witnesses or observers. The list will not be part of the evidentiary record.

<u>Hearing Preparation</u>

Before the hearing, all participants should take the following steps:

1. Set up computer, laptop, tablet or smartphone in a well-lit and quiet room with no distractions, and with the strongest light source in front of you;

2. Position the web camera at or slightly above eye level;

3. Test your equipment and internet connection (www.zoom.us/test);

4. Close out and avoid running unnecessary applications besides Zoom during the hearing;

5. To the extent possible, limit the number of other devices connected to the internet/wifi service at your location during the hearing;

6. Mute sounds from other applications (e.g., email notifications, chat messaging, etc.); and

7. Plug device into a good power source.

## **Joining the Hearing**

1. Participants must join the video hearing at least 5 minutes before the scheduled start time by clicking the "Join ZoomGov Meeting" link in the invitation or clicking "Join a Meeting" in Zoom and entering the Meeting ID and Password. If asked whether to open Zoom in your browser or in the Zoom app, open in the Zoom app.  Select "Join by Computer Audio," even if connecting via smartphone or tablet.

2. Upon joining the virtual hearing, each participant will initially appear in a Waiting Room. The ALJ or courtroom deputy will admit counsel and parties into the video hearing room. Unless otherwise ordered, witnesses will remain in the Waiting Room until called to testify.

3. The video hearing is an official proceeding. Please approach the hearing with the same level of respect and civility that you would approach an in-person proceeding in a courthouse, and accordingly wear appropriate clothing and use appropriate language.

4. *Microphone and Video*: When each participant is admitted to the video hearing room, the participant's video should be on and audio should be muted until the hearing or any pre-trial discussions begin. To the extent necessary, the ALJ or courtroom deputy may mute any participant's microphone and/or turn off a participant's video during the hearing.

## **During the Hearing**

1. *The court reporter is the only person authorized to record the hearing. Participants and observers may not record, duplicate, screenshot or save any audio or video of the video hearing, including conferences or sidebars.*

2. Participants must speak one at a time and pause before speaking in case there is any "lag" or delay in the audio/video feed. Before speaking, counsel should wait for the witness to finish her or his answer, and the witness should wait for counsel to finish his or her question. If there is an objection, the witness should stop speaking and wait for instruction from the ALJ.

3. While testifying, witnesses may not communicate with anyone else about their testimony (including during breaks), and may not review any documents, devices, or other items unless asked to do so by the ALJ or by an attorney as part of a question during testimony.

4. In most hearings, the Chat feature in Zoom will be turned off.  Attorneys may use their cell phones to text their co-counsel and/or an individual designated as

essential to assisting the attorney with presenting her case. Texting is not permitted with a designee while that person is on the stand testifying as a witness.

5. Counsel may ask the ALJ for the opportunity to confer with clients privately during the hearing. The ALJ/courtroom deputy will send counsel and the client(s) into a Zoom Breakout Room where the attorney and client may confer privately. The ALJ/courtroom deputy may send chats to counsel in a Breakout Room for status updates, and may set a time limit for completing discussions in the Breakout Room and returning to the video hearing. When finishing a session in a Breakout Room, do not click on "Leave Meeting" because doing so will end your connection to the Zoom hearing (though you can reconnect by repeating the login process).

6. Counsel may request a sidebar with counsel and the ALJ. The ALJ/courtroom deputy will send counsel into a Breakout Room for the sidebar.  At the end of the sidebar, counsel will all return to the video hearing room.

## Exhibits

1. Counsel have the following options for sharing exhibits:

   a. Email a pdf copy of the exhibit to the witness and hearing participants, who would then need to open the file and review it;
   b. Use Zoom's share screen feature to show the witness (and everyone else in the video hearing) a copy of the exhibit as it appears on your own device screen;
   c. Email the exhibit to the courtroom deputy who can then use Zoom's share screen feature to display the exhibit at the attorney's request;
   d. Upload the exhibit to an agency webpage that can be accessed by the ALJ and all parties [note – if this option is desired, the agency generally needs three business days' notice to set up the webpage]; or
   e. Use Zoom's chat feature to send a pdf copy of the exhibit to the witness and other selected hearing participants. The witness and hearing participants would then need to download and open the file and review it [note – this option may not work if the intended recipient is using a smartphone or tablet].
   f. Each of these options has advantages and limitations. Counsel should consider and experiment with each option to determine which will best meet their needs.

2. Exhibits should be in pdf format and pre-marked (or saved) by Exhibit Number. You may save each exhibit as a separate pdf file, or you may create a single pdf file with bookmarks that allow the reader to select each individual exhibit.  Please identify each exhibit with: initials that identify the party presenting the document and the exhibit number (e.g., "GC Exh. ___," "CP Exh. ___," or "R. Exh.___");

and a brief description of the document (e.g., (2017-2020 Collective-Bargaining Agreement), (November 21, 2019 Disciplinary Warning Issued to John Smith), or (January 2, 2020 Information Request)).

3. Any exhibit with multiple pages must be clearly paginated (e.g., "Page__ of__.") or Bates Stamped.

4. Counsel must make sure all personally identifiable information (PII) other than names (e.g., social security number, date of birth, address, telephone number, etc.) is redacted from exhibits before the exhibits are proffered to a witness. This step is particularly important if you will be using Zoom's screen share function to present an exhibit to a witness during trial, because other hearing participants (including observers) will be able to see the exhibit on their device screens.

5. Large exhibits, such as audio or video files, may require special handling since they may not be transmittable over email. Accordingly, counsel should notify the ALJ/courtroom deputy about any such exhibits at least three business days before the trial to allow time for the agency to set up a webpage where the large exhibit may be uploaded and accessed by the ALJ and other parties.

6. Counsel are responsible for making sure the court reporter receives and is able to open/access all exhibits that are admitted into the evidentiary record or are offered for inclusion in a rejected exhibit file.

## WITNESS INSTRUCTIONS AND GUIDELINES FOR VIDEO HEARINGS

You are receiving these instructions because you may be appearing as a witness in a National Labor Relations Board hearing. Due to the compelling circumstances created by the COVID-19 pandemic, the Administrative Law Judge ("ALJ") will conduct the hearing using the Zoom videoconferencing platform. The guidelines and instructions for the video hearing are as follows:

### Before the Video Hearing

#### Technology Requirements

To participate in the hearing, you will need access to a reliable internet connection and a device you can use to participate in the hearing by audio <u>and</u> video. It is recommended that you use a computer or laptop with a microphone, speaker and a web camera. In the alternative, you may use a smartphone or tablet, but those devices may be less effective if/when you need to receive and review documents. Regardless of the device you use, it is recommended that you use a headset or earphones with a microphone to help reduce feedback and background noise.

The hearing will be conducted on the Zoom videoconferencing platform.  Accordingly, you should load the Zoom application on the device you will be using, and verify that you can connect to Zoom by doing a test connection at https://zoom.us/test.

It is also recommended that you set up a free Zoom account using your first and last name and the email address that you will provide to your attorney or the attorney calling you as a witness. By setting up a Zoom account in that manner, your first and last name will appear when you join the hearing, which will make it easier to identify you as a witness. You may set up a Zoom account at: https://zoom.us.

If you have any problems setting up a Zoom account or obtaining the necessary equipment and/or internet access, please contact your attorney, or the attorney calling you as a witness, as soon as possible. It is strongly recommended that you practice using Zoom before testifying at the hearing.

#### Invitation to Video Hearing

One of the attorneys (most likely your attorney or the attorney calling you to testify as a witness) will provide you with an email copy of the invitation to attend the video hearing. The invitation will contain a link to "Join ZoomGov Meeting" and a "Meeting ID" and "Password" that you can use to participate in the video hearing through Zoom. You (or your attorney) should communicate with the attorney calling you to estimate when you will be needed to testify. Do not share the contents of the invitation with others as participation in the hearing may be limited. If you know someone who would like to listen

to the hearing, please discuss it with your attorney or the attorney who sent you the Zoom invitation and be prepared to provide the individual's name, email address and telephone number.

<u>Hearing Preparation</u>

Before the hearing, please take the following steps:

1. Set up your computer, laptop, tablet or smartphone in a well-lit and quiet room with no distractions, and with the strongest light source in front of you;

2. Position the web camera at or slightly above eye level;

3. Test your equipment and internet connection ([www.zoom.us/test](http://www.zoom.us/test));

4. Turn off any virtual background on Zoom;

5. Close out and avoid running unnecessary applications besides Zoom during the hearing;

6. To the extent possible, limit the number of other devices connected to the internet/wifi service at your location during the hearing;

7. Mute sounds from other applications (e.g., email notifications, chat messaging, etc.); and

8. Plug your device into a good power source.

If you have any issues, please contact your attorney or the attorney calling you as a witness.

## **Joining the Hearing**

1. The attorney who has called you as a witness will notify you (or your attorney) about when to log into Zoom and be available to testify. Because the exact time for your testimony may change, please provide the attorney with multiple ways to contact you (e.g., telephone, cell phone, email), and be on standby to log on to Zoom and testify on short notice.

2. Please join the video hearing at least 5 minutes before the time you are asked to testify. You can join the hearing by clicking the "Join ZoomGov Meeting" link in the invitation or clicking "Join a Meeting" in Zoom and entering the "Meeting ID" and "Password." If you receive a message asking whether to open Zoom in the browser or in the Zoom app, select the Zoom app. Select "Join by Computer Audio," even if you are connecting via smartphone or tablet.

3.  When you join the Zoom hearing, you will first see that you are in a Zoom "Waiting Room." Please do not disconnect from the Waiting Room. The ALJ will receive a message that you are in the Waiting room, and will bring you into the video hearing when it is your turn to testify.

4.  The video hearing is an official court proceeding. Please approach the hearing with the same level of respect that you would approach an in-person proceeding in a courthouse, and accordingly wear appropriate clothing and use appropriate language.

5.  Your video should be on when you join the video hearing. If your audio is on "Mute," as indicated by a microphone symbol with a slash mark at the bottom of your device screen, then no one will be able to hear you when you speak during the video conference. You may "Unmute" yourself by clicking on the microphone symbol one time, which will remove the slash mark on the microphone symbol and allow everyone to hear you when you testify.

## During the Hearing

1.  The court reporter is the only person authorized to record the hearing. Participants, witnesses and observers may not record, duplicate, save or photograph any video or audio portions of the proceeding, including conferences or sidebars.

2.  Please do not talk over another person. Due to the potential for the audio and/or video connection to "lag" or delay, pause before speaking to avoid having more than one person speaking at the same time. Consistent with that guideline, please wait for the attorney to finish her or his question before starting your answer. If one of the attorneys makes an objection, please stop speaking and wait for instruction from the ALJ.

3.  While testifying, you may not communicate with anyone else about your testimony (including during breaks), and you may not review any documents, devices, or other items unless the attorney or ALJ asks you to do so as part of a question they pose during your testimony. You may be asked to use your camera to show your surroundings before or while testifying.

4.  During the trial, the attorneys may ask you to look at an exhibit. They may show you the document on your device screen, or if allowed, they may electronically send you the document. Please make sure you have provided an email address that you can access during the hearing. You should answer any questions about the exhibit, and then put the exhibit aside once the attorney moves on to another line of questions.

5.  At the end of your testimony, the ALJ will give you some final instructions,

including the instruction to not tell any other possible witness about your testimony.  The ALJ will then advise you when to disconnect from the Zoom video hearing. One of the attorneys will contact you if you need to appear again to provide additional testimony.

6.  If you experience any connection or technology related issues during the hearing, please immediately notify the ALJ and/or the attorney who called you as a witness.

JD(NY)-12-23
New York, NY

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**DIVISION OF JUDGES**
**NEW YORK BRANCH OFFICE**

**APPLE, INC.**

                                             **Case No.     02-CA-295979**

         **and**

**COMMUNICATIONS WORKERS OF**
**AMERICA, AFL-CIO**

*Ruth Weinreb, Esq. and Tanya Khan, Esq.*, for the General Counsel
*Sumanth Bollepalli, Esq., for the Charging Party*
*Jason R. Stanevich, Esq. and Maura A. Mastrony, Esq.*
*(Littler Mendelson, P.C.)*,
 of New Haven, Connecticut for the Respondent

<u>**DECISION**</u>

Statement of the Case

      **LAUREN ESPOSITO, Administrative Law Judge.**  On September 30, 2022, the Regional Director, Region 2, issued a Complaint and Notice of Hearing against Apple, Inc. (Apple or Respondent), based upon a charge filed on May 18, 2022, by Communications Workers of America, AFL-CIO (CWA or the Union).  On October 14, 2022, Apple filed an Answer denying the Complaint's material allegations.  The Complaint alleged that Apple violated Section 8(a)(1) of the Act when it selectively and disparately enforced its Solicitation and Distribution policy at its store located at 185 Greenwich Street, New York, New York, on May 15, 2022, May 27, 2022, June 1, 2022, and on or about May 30 or June 2, 2022, by prohibiting the placement of Union flyers on the store's breakroom table, while permitting solicitation and distribution with respect to nonunion materials.  The Complaint further alleged that Apple violated Section 8(a)(1) by unlawfully interrogating employees regarding their support for the Union and protected concerted activities in or about early May 2022.  Subsequently, on December 16, 2022, the Regional Director, Region 2, issued an Amendment to Complaint to include an allegation that Apple violated Section 8(a)(1) by its confiscation of Union flyers in a non-working area of the store on the above dates.  Apple filed an Answer to the Amendment on December 21, 2022.

      This case was tried before me by videoconference on January 9 and 10, 2022. During the hearing, Counsel for the General Counsel (General Counsel) amended the Complaint on the record to withdraw the allegations regarding incidents which allegedly

occurred on May 30 or June 2, 2022.[1]  Tr. 70-71.  On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by General Counsel, Respondent, and Charging Party, I make the following

5                              Findings of Fact

                              I.  Jurisdiction

        Apple, a California corporation with headquarters located in Cupertino, California,
10   and retail facilities located throughout the United States, including a store located at 185 Greenwich Street, New York, New York, is engaged in the development, manufacture and retail sale of consumer electronics and software.  Apple admits, and I find, that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.  Apple also admits, and I find, that CWA is a labor organization within the
15   meaning of Section 2(5) of the Act.

                         II.  Alleged Unfair Labor Practices

        A.  *Apple's Retail Store and Operations at 185 Greenwich Street*
20
        Apple sells and services consumer electronics devices and software at its retail store at 185 Greenwich Street, New York, New York.  The store is located on two floors in the Oculus, a transportation hub in lower Manhattan across the street from the World Trade Center.  Tr. 198-199.  The store opened in August 2016, and has operated
25   continuously since that time.  Tr. 194, 263.  For the purposes of this decision, the 185 Greenwich Street store will be referred to as the WTC store.

        The managerial hierarchy of the WTC store consists of four levels, and is generally organized along two lines, one for sales and one for customer service or
30   "after-purchase support."  Tr. 195.  A "Flagship Leader" or general manager is responsible for overall store operations; beginning in early April 2022 Mona Patel held this position.  Tr. 195, 238-239.  Two "Store Leaders" report to the general manager of the WTC store, one responsible for sales and the other for customer service.  Tr. 195-196.  As of April 2022, the Store Leaders were Paul Distasio and Waleed Abdelal.  Tr.
35   196, 239, 296, 350.  Three senior managers reported to each of the Store Leaders, and a number of managers reported to each senior manager.  Tr. 196.  As of April 2022, the senior managers for sales at the WTC store were Rachel Goldman and Yanell Brown, and the senior managers for customer service were Jorge Romero, Catherine Marshall, and one other individual.[2]  Tr. 239-240, 264.  The managers reporting to the senior
40   managers as of April 2022 included Aaron Sidrick and Ryan Radechel with respect to sales, and Matt Moya, Tyler Perroni, Dan Auerbach, and Priscilla with respect to customer service.  Tr. 241-243.  Jason Barilia was Apple's market director for New York

---

[1] In addition, in her Post-Hearing Brief, General Counsel moves to amend the Complaint to include an allegation that Apple violated Section 8(a)(1) of the Act by maintaining its Solicitation and Distribution policy in a manner that restricted the Section 7 activities of its employees.  Post-Hearing Brief at 3, 32-37.
[2] A third senior manager position for sales was open as of April 2022.  Tr. 239.  Brown left his employment with Apple in November 2022.  Tr. 240, 264.

as of May 2022.  Tr. 258.

While there are approximately 20 to 25 job titles for non-managerial employees at an Apple store, these titles are generally grouped into four levels, contingent upon employee experience and expertise.  Tr. 196-197.  Entry-level employees, which comprise the majority of the non-managerial employees, are referred to as the "specialist level."  Tr. 197.  Directly above the "specialist" level is an "expert" level of employees.  Above the "expert" level is a level referred to as "pro" or "genius," and the highest level of non-managerial employees is referred to as the "lead" level.  Tr. 197.

Jordan Vasquez and Ian O'Hara, both of whom worked at the WTC store during the spring and summer of 2022, were called to testify by General Counsel.  Tr. 28, 115.  Vasquez testified that he sells products and services for Apple, and O'Hara stated that he worked for Apple as a technician.  Tr. 28, 115.  At the time of the hearing, Vasquez had been employed by Apple at a retail store near Houston, Texas, since September 2022, where he had begun working immediately after leaving the WTC store.  Tr. 27-28.  O'Hara began working as a technician at the WTC store on June 24, 2016, and his employment with Apple ended on November 24, 2022.  Tr. 115.

Joshua Jennison, Waleed Abdelal, Paul Distasio, Yanell Brown, and Stephanie Gladden were called to testify by Apple.  Jennison was the Flagship Leader or general manager of the WTC store from its opening in 2016 through 2020, and from January 2022 until the first week in April 2022.  Tr. 193-194.  As discussed above, Abdelal and Distasio are Store Leaders at the WTC store, and Brown was a senior manager in sales during the spring of 2022.  Stephanie Gladden was a senior manager at the WTC store in sales as of May 2022, and is currently a Store Leader in Aventura, Florida.  Tr. 279, 281-282.

Both floors of the WTC store contain areas open to and visited by customers.  Tr. 198.  On the ground floor, which is dedicated to sales, customers purchase products and training is conducted.  Tr. 198.  The upper level of the store, referred to as the balcony level, is a sales floor as well, but also contains the customer service area, called the "Genius Bar," where employees respond to customer questions and assist customers with products which are not property functioning.  Tr. 107-109, 110-111, 198.

Both of the WTC store's two levels contain areas used only by store employees and management.  The balcony level includes a repair room where employees perform repair work on devices brought in by customers.  Tr. 199.  Off of the repair room is a smaller inventory area where spare computers and phones are stored for use by the customer service employees in their work, together with a few computers and desks also used by the customer service employees.  Tr. 199.  The ground floor contains three non-customer areas.  Tr. 195.  At the back of the store on the ground floor is a large inventory room where all of the store's inventory is kept, including not only computers, phones, and iPad tablets but cleaning supplies and products.  Tr. 200.  Behind a video wall is a data room containing all of the electronics necessary for the store's day-to-day operations, as well as a storage area for items used on an occasional basis.  Tr. 200.

The third non-customer area, on the ground floor, includes the employee breakroom where the events at issue in the instant case took place.  Tr. 199-201.  The layout and uses of the employee breakroom and the rest of the non-customer area on the ground floor were established by video taken of the breakroom during the course of the store's daily operations, photographs, and schematics, explicated by the witnesses.[3] As one walks into the breakroom from the hallway, there is a silver rack immediately to the left where employees place their backpacks and belongings, and additional racks for clothing.  Tr. 44, 211-212; G.C. Ex. 4.  To the right as one enters the breakroom are shelves containing devices called "Isaacs," used by the employees to accept customer payments for products and services.[4]  Tr. 45, 85-86, 208-211, 216, 248-249; R.S. Ex. 22.[5]  Next to the racks used for clothing are lockers for the employees' personal belongings.  Tr. 44, 211, 216-217; R.S. Ex. 22.   At the back of the breakroom are refrigerators, and along the side is a sink, a microwave, and a coffee machine.  Tr. 45, 211-212.  In the middle of the room is a large table with chairs which employees use during non-work time, such as before and after their shifts and during breaks.[6]  Tr. 45, 211-212, 216; G.C. Ex. 4; R.S. Ex. 22.  Thus, employees spend time at the breakroom table eating meals, reading, playing games, and conversing with one another during their lunch and break periods.  Tr. 64, 128, 217-218.  Managers often enter the breakroom during their shifts, and may use the area for these same purposes.  Tr. 65-66, 219.

As one exits the breakroom there is a large whiteboard mounted on the wall to the right.[7]  Tr. 98, 107, 109-110, 204, 207-208, 216, 246; R.S. Ex. 21, 22.  If one turns left coming out of the breakroom, there are additional tables sometimes used by employees on their breaks, a small bank of lockers, and, down a hall about ten to fifteen steps, a manager's office, which contains desks with computers.[8]  Tr. 45-46, 200-203, 246, 254-255; R.S. Ex. 23.  If one turns right, a hallway leads out to the sales floor.  Tr. 46, 203-204, 215-216, 247-248; R.S. Ex. 22.  If one continues straight down the hall after emerging from the breakroom, there is a table with chairs for the employees' use, together with vending machines and the employee bathrooms.  Tr. 46, 203-204, 247.

---

[3] In particular, the parties stipulated that Vasquez accurately described the layout of the breakroom and other non-customer areas on the ground floor of the WTC store.  Tr. 111-112; G.C. Ex. 4.

[4] The Isaac device is also used by the employees to clock in and out for their shifts.  Tr. 210-211, 248.

[5] The staircase depicted in Respondent's Exhibit 22 does not lead to the breakroom, but connects the customer areas on the ground floor and the balcony.  Tr. 247.

[6] Employees at the WTC store receive an unpaid one hour lunch break and two paid fifteen-minute breaks per shift.  Tr. 28-29, 115-116, 217.

[7] Jennison testified that the whiteboard contains postings of material "either approved at Apple or at a higher level."  Tr. 204.  At the time that the whiteboard was installed in 2017, Distasio and Jennison had an e-mail exchange discussing the manner in which it would be used and appropriate direction to employees, which included a statement that "we should never use [the whiteboard] for solicitation."  Tr. 360-362; R.S. Ex. 20.

[8] Jennison testified that although a sign next to the door says "manager's" or "leadership" office, the office is crowded with employees coming in to "check their email" or "complete paperwork," and that the office door is left open.  Tr. 200-201.  Vasquez and O'Hara both described this office as an office for management.  Tr. 45-46, 54, 58-59, 127, 146.

4

At all times material to the Complaint's allegations, Apple maintained the
following Solicitation and Distribution Policy applicable to the WTC store:

**Solicitation and Distribution**

As an Apple employee, you're not permitted to solicit other employees —
including for your own hobbies or business (such as jewelry, makeup,
personal training services), charitable campaigns or political causes —
during work time. Additionally, you may not distribute material during work
time or in a work area. Third parties are not permitted to distribute
materials or solicit employees, vendors, or customers on Apple property at
any time.

Employees may not use Apple's bulletin boards to distribute materials or
solicit employees, vendors, or customers. In addition, third parties may not
use any Apple system (electronic or physical) to distribute materials or
solicit employees, vendors, or customers.

Employees and third parties may not request or accept money, goods, or
compensable services of any kind or for any cause, or buy or sell outside
commercial products or services, at any time on Apple property, including
during non-work time and in non-work areas.

Apple facilities are generally for Apple business use only (including
authorized Apple events, such as Apple's health and wellness fairs,
product fairs, Apple's Employee Giving, or Diversity Network Association
activities) and may not be used for other non-Apple business activity
without the prior written approval of Apple's Facilities Department.

If you're approached by a third party wishing to distribute materials or
engage in any kind of solicitation on Apple property, you may ask them to
leave. If you need any assistance, you may contact Global Security or
Loss Prevention. If you're approached by an employee who is distributing
materials or engaging in solicitation during work time, you may ask them
to stop. Alternatively, you may contact your manager or the Business
Conduct Helpline

Tr. 9-10; Jt. Ex. 1.  Managers are versed in the Solicitation and Distribution Policy
through required annual compliance or business conduct training, and employees
receive notice of the Policy during "core training" after they are hired.  Tr. 224, 256-257,
265, 298-299, 351-352.  The Policy is also available on Apple's internal employee
website, as well as its "People" or human resources website.  Tr. 298-299, 351-352.

General Counsel and Apple's witnesses both testified regarding the company's
practices with respect cleaning the breakroom.  Jennison testified that Apple engaged
an outside contractor which provided cleaning services in both the customer and

employee-only areas of the store.  Tr. 219-220.  This contractor is responsible for
emptying trash, mopping, cleaning up spills, wiping down counters, and restocking
items like Kleenex and hand sanitizer.  Tr. 220.  Jennison stated that after the store
closed for the night the manager was responsible for ensuring with the cleaning crew
that the breakroom was clean, so that no cleaning needed to be performed in the
morning before the store opened.  Tr. 231-232.  Abdelal also testified that the store was
cleaned every night.  Tr. 306-307.  Vasquez and O'Hara both testified that employees
using the breakroom were expected to throw out their own trash and generally clean up
after themselves.  Tr. 68, 150-151.

B.  *Organizing Activity at Apple's 185 Greenwich Street Store*

O'Hara and Vasquez testified regarding employee organizing activities at the
WTC store during 2021 and 2022.  O'Hara testified that he initially contacted CWA in
January 2021, and over the next two to three months created an organizing committee
comprised of himself and a few other employees.  Tr. 116.  The organizing committee
held virtual meetings via Zoom once or twice each week to coordinate their activities,
and communicated through the encrypted messenger application Signal, which the
employees installed on their personal phones.  Tr. 117.  O'Hara testified that he sent
messages to the organizing committee over Signal on a daily basis.  Tr. 118.  Vasquez
testified that he joined the organizing committee in January 2022, and participated in the
weekly Zoom meetings and Signal communications.  Tr. 29.  Vasquez testified that he
communicated with the organizing committee via Signal multiple times each day.  Tr.
29-30.  In addition, Vasquez testified that he had in-person conversations with other
WTC store employees on a daily basis regarding the need for higher wages.  Tr. 30.
These conversations took place at the WTC store on the sales floor and in the
breakroom, and also outside of work.  Tr. 30.

In late April 2022, Vasquez spoke to senior manager Rachel Goldman regarding
wage rates on the sales floor at the WTC store.  Tr. 30-31.  Vasquez testified that he
told Goldman that he believed that the employees' pay was too low, and asked whether
there were ways that the employees could obtain higher wage rates.  Tr. 31.  Goldman
referred Vasquez to Julissa Rodriguez of Apple's People Team or human resources.
Tr. 31.  On May 3, 2022, Vasquez spoke to Rodriguez over WebEx, stating that the
Apple employees needed higher wages and more vacation time.  Tr. 32.  Rodriguez
responded that she would discuss these issues with her managers.[9]  Tr. 32.

On May 15, 2022, the organizing committee "went public" with respect to their
campaign for representation by CWA.  Tr. 30, 39.  On that date, members of the
organizing committee placed flyers on the breakroom table at the WTC store for the first
time, in the manner discussed below.  Tr. 40.  In addition, beginning on May 15, 2022,
members of the organizing committee wore red wristbands that stated "CWA" on them
during their shifts, and distributed the wristbands to other employees.  Tr. 40, 82, 160,
179-180.

---

[9] Goldman and Rodriguez did not testify at the hearing.

In June or July of 2022, Vasquez spoke about his support for the Union during a "download," a brief meeting conducted each morning where employees discuss events at the company and their duties and objectives for the day and the week.  Tr. 75, 76-77, 101.

5   C.  *The Interaction Between Jordan Vasquez and Stephanie Gladden on May 9, 2022*

Jordan Vasquez and Stephanie Gladden both testified regarding a conversation between them which occurred on May 9, 2022.  At the time of this conversation,
10   Gladden was a senior manager at the WTC store.  Tr. 32-33, 281-282.  Vasquez was familiar with Gladden from his work at the WTC store, and typically spoke to her a few times each day on the sales floor or in the breakroom.  Tr. 32-33.  Vasquez testified without contradiction that while the two had discussed non-work-related issues such as bicycling and bars around the city, they did not socialize outside of work and were not
15   friends.  Tr. 33, 36.

On May 9, 2022, Gladden approached Vasquez on the balcony level of the WTC store between 11 a.m. and 12 p.m.  Tr. 33, 283.  Vasquez testified that he could recall the time of the conversation because the store was slow before the rush of customers
20   that typically arrived during the mid-day lunch period.  Tr. 34.  Gladden also testified that she approached Vasquez, as part of her general practice to initiate contact with all employees on the floor at the inception of her shift, in order to determine whether they needed anything and how their shift was progressing.  Tr. 283-284, 290-291.  Vasquez confirmed that it was not unusual for Gladden to approach him during a shift.  Tr. 72-73.
25   No one else was present at the time.  Tr. 34.

Vasquez testified that after Gladden approached him, she asked him how he was doing, and then said that she had heard about Vasquez's meeting with Rodriguez and asked about how the meeting went.  Tr. 34.  According to Vasquez, he told Gladden
30   that his meeting with Rodriguez went well, and that the two had discussed the need for higher pay for the Apple employees.  Tr. 34, 73.  Gladden then asked Vasquez if he had spoken to other employees regarding the wage increase issue, and when Vasquez stated that he had done so, Gladden asked how many people he had spoken to.  Tr. 34, 73.  Vasquez stated in response that he was not keeping track of that information.  Tr.
35   34, 73.  According to Vasquez, Gladden then asked him what he thought about the unionization efforts at Apple.  Tr. 34-35.  Vasquez responded that he did not have time to pay attention to that issue because he was running for Congress.  Tr. 35.  However, Vasquez said he was concerned that his name had been associated with the union organizing campaign at Apple, and he did not want his name associated with something
40   that he was not a part of.[10]  Tr. 35.  Gladden said that she believed that Apple would always do the right thing in the end, and Vasquez agreed.  Tr. 35.

---

[10] Vasquez testified that he did not tell Gladden about his activities with the Union organizing committee because "We were trying to keep all that information under wraps [so] as to not alert managers that we were trying to form a Union."  Tr. 35.

Gladden testified that after she asked Vasquez how his day was going, he responded that he had heard that his name had been connected "to some union activity and conversation in the store," and that he was very upset as a result. Tr. 284-285. Gladden testified that she told Vasquez that unionization was something that he could
5    talk about and engage in, and asked why he was upset given that union activity was permitted. Tr. 285. According to Gladden, Vasquez responded that he did not have time to engage in union activity because he was running for Congress. Tr. 285. Gladden testified that she then asked Vasquez how his knee was healing after a recent injury, and whether he was able to stand during his shift, and Vasquez thanked her for
10   inquiring but stated that he was feeling better. Tr. 289. Gladden stated that Vasquez raised the topic of union activity, and denied asking Vasquez questions regarding who, if any, of his co-workers may have supported the union. Tr. 285-286. Gladden also testified that Vasquez did not discuss "pay inequities" or "his views towards his compensation" as an Apple employee, and that she did not ask Vasquez any questions
15   regarding "his compensation or [the] compensation of his colleagues." Tr. 290. Gladden testified that the sales floor was busy at the time of their conversation. Tr. 289.

Vasquez testified that after his conversation with Gladden, he went to the back area off of the sales floor and spoke with O'Hara, telling O'Hara that Gladden had asked
20   about his thoughts regarding unionization. Tr. 36, 118-119. O'Hara encouraged Vasquez to specifically identify Gladden in the organizing committee's group chat to inform the committee. Tr. 119. Vasquez then sent a message to the organizing committee via Signal, stating "They just had a union feeler convo with me I'll explain when I get a chance."[11] Tr. 36-38, 80-81, 120; G.C. Ex. 2. About 15 minutes later,
25   O'Hara responded on Signal, stating, "Stephanie [G]ladden was the manager who tried to talk to you about unions, correct?" Tr. 37, 120-121, 122; G.C. Ex. 2. Vasquez did not respond to O'Hara's message. Tr. 158-159.

Vasquez testified that as he was leaving work that day he approached Goldman
30   outside the store, and told Goldman that a manager was asking him what he thought about unions. Tr. 38-39. Vasquez asked Goldman if she knew why he was being questioned. Tr. 39. Goldman said that she did not know why it was happening but could look into it, and then asked Vasquez who had questioned him. Tr. 39. Vasquez said that he did not want to disclose who had questioned him, but was only checking to
35   see whether Goldman knew anything about the issue. Tr. 29. Goldman reiterated that she would look into it. Tr. 39.

D. *The Events of May 15, 2022*

40   As discussed above, May 15, 2022 was the date that the organizing committee "went public" with respect to the union organizing campaign at the WTC store. That was the first date that Vasquez and O'Hara distributed Union flyers, both outside the store and inside the breakroom. Tr. 40-41. In addition to the testimony of Vasquez and O'Hara, General Counsel introduced into evidence as General Counsel's Exhibit 4 a

---

[11] Vasquez is identified in this series of Signal messages as "Clementine Vasquez," his legal name since late December 2021. Tr. 27, 37, 121-122; G.C. Ex. 2.

video of the breakroom at the WTC store filmed on May 15, 2022. Tr. 42, 59. The video begins at 7:00 a.m. and runs continuously through 9:00 p.m., with time stamps beginning at 0 for 7:00 a.m. Tr. 43; G.C. Ex. 4. In the discussion that follows, references to the video time stamps from General Counsel's Exhibit 4 will be denoted in
5    parentheses.

      The flyers Vasquez and O'Hara placed on the breakroom table on May 15, 2022, attached hereto as Appendix B, contained the logo of the Apple Retail Union CWA, and stated "Higher Pay, Better Benefits, More Representation." Tr. 40-42, 122-124; G.C.
10  Ex. 3. Two QR codes appeared on opposite sides of the Apple Retail Union CWA logo. Explanatory text for one of the QR codes stated, "Read our store's Vision Statement here," and explanatory text for the other QR code stated, "Add your name to join the movement." G.C. Ex. 3. WTC store employees could scan these QR codes with their phones, and be directed to a mission statement prepared by the organizing committee
15  and Union cards which appeared on the Union's website, respectively. Tr. 63, 161-163; G.C. Ex. 3.

      On May 15, 2022, Vasquez first entered the breakroom at approximately 7:37 a.m., prior to the 8:00 a.m. start of his shift.[12] Tr. 40-41, 47 (37:42). Vasquez walked
20  around the breakroom table and placed two flyers next to one another, face up, on the breakroom table. Tr. 49 (37:53). Seconds later, O'Hara entered the breakroom, wearing a pink baseball cap. Tr. 49 (38:02). O'Hara proceeded to place two Union flyers on the breakroom table, face up, on the side of the table opposite to the flyers Vasquez had placed. Tr. 50 (38:28). Store Leader Waleed Abdelal was in the
25  breakroom next to Vasquez during this time. Tr. 50. Approximately ten minutes later, Abdelal entered the breakroom again for a few seconds, then manager Matt Moya entered, took a photograph of the Union flyers on the table, and left.[13] Tr. 51, 124-125 (49:55, 50:02, 50:53-51:17). About an hour later, Abdelal entered the breakroom, removed all of the Union flyers from the table, and exited the breakroom, turning left.
30  Tr. 53-55 (1:51:08-1:51:24).

      During their lunch break from 3:00 p.m. to 4:00 p.m., Vasquez and O'Hara replaced the Union flyers that Abdelal had taken from the breakroom table earlier. Tr. 55 (5:05:39-5:06:08). A minute later, Moya entered and exited after viewing the
35  breakroom table. Tr. 55-56, 126 (5:07:45-5:07:58). A few minutes later, Vasquez and O'Hara left the breakroom to eat lunch at the tables and chairs located in the hallway. Tr. 56-58 (5:11:05-5:11:08). Seconds later, Moya returned, removed the Union flyers Vasquez and O'Hara had place on the breakroom table, and exited the breakroom. Tr.

---

[12] Vasquez identified himself as the individual who appears on General Counsel's Exhibit 4 wearing a red beanie hat. Tr. 47. The parties stipulated that Vasquez accurately identified O'Hara and the various managers depicted in the video. Tr. 111-112; G.C. Ex. 4.

[13] Vasquez testified that prior to May 15, 2022, he had never seen any manager take a photograph of anything on the breakroom table. Tr. 52. Abdelal testified that one of the managers "took photos as part of just letting us know something was in the break room." Tr. 326. Abdelal testified that it was not unusual for "our leaders, or team" to take photographs of the breakroom "to celebrate, you know, someone did a really great job" as well as "calling out when standards have been unacceptable and we would share a photo of it." Tr. 341.

58, 127 (5:11:15-5:11:33).  From their table in the hallway, Vasquez and O'Hara saw Moya turn down the hallway in the direction of the management office.[14]  Tr. 58-59, 127-128.

5       About an hour later, O'Hara entered the breakroom and placed Union flyers on the table again.  Tr. 83-84, 171 (6:01:27-6:02:05).  The video shows O'Hara briefly conversing with someone immediately after placing the Union flyers on the table (6:02:05-6:02:17, 6:02:31-6:02:54).  Vasquez then entered the room and spoke to O'Hara (6:03:02-6:03:10).  O'Hara then picked up the flyers and, after exchanging a few
10 words with the same individual,[15] placed them in his bag.  Tr. 84-85, 171 (6:03:15-6:03:48).  O'Hara testified that he could not recall why he removed the Union flyers from the table at that time.  Tr. 172, 173.

15       Abdelal addressed the removal of Union flyers from the breakroom table on May 15, 2022 during his testimony.  Abdelal testified that on May 15, 2022 "a number of" managers had told him that there were Union flyers on the breakroom table.  Tr. 309-310.  Abdelal told the managers that if the Union flyers were left behind, the managers should just remove them, but the managers "were very nervous" and "uncomfortable," "[b]ecause of the type of material," "union literature," which they had never encountered
20 before.  Tr. 310, 311, 331.  According to Abdelal, "throughout the entire day this was an ongoing conversation with multiple leaders about their concern about removing the literature."  Tr. 331-334.  Abdelal stated that the managers "really struggled," so he "just went in and took them and threw them out" himself.  Tr. 310, 311.  Abdelal testified that he told the other managers that if Union flyers were discovered in the future, "we would
25 clean it up like anything else," to the extent that they were "abandoned."  Tr. 312.

      During the afternoon of May 15, 2022, Vasquez approached Abdelal outside of the store, having heard that Abdelal had removed the Union flyers from the breakroom table earlier.  Tr. 59-60.  Vasquez asked Abdelal why he had removed the Union flyers
30 that day, and Abdelal stated that Apple has a no-solicitation policy that prohibited Vasquez from distributing the Union flyers.  Tr. 60, 312.  Abdelal testified that he also discussed Apple's cleanliness standards with Vasquez.  Tr. 312.  Vasquez stated in response that he and O'Hara were employees, and that they were placing the Union flyers on the breakroom table during non-work time, but Abdelal stated that Vasquez
35 was nevertheless prohibited from doing so.  Tr. 60.  Abdelal testified that Vasquez also contended that Abdelal was implementing the policy selectively because Apple had previously distributed Shake Shack coupons to the employees, and Abdelal stated that Apple had issued specific vouchers for the employees to use at Shake Shack.  Tr. 312-313.  According to Abdelal, Vasquez also mentioned that employee Andrew Goebel had
40 distributed flyers for his going-away party, and Abdelal told Vasquez that he had discussed the policy with Goebel in that context.  Tr. 313.  Abdelal also told Vasquez that he could send Vasquez the policy if he wanted to review it, and Vasquez asked

---

[14] Abdelal testified that he "may have" told Moya to shred the Union flyer on May 15, 2022.  Tr. 326, 327-329.  Moya did not testify at the hearing.
[15] Both Vasquez and O'Hara testified that they were unable to identify this person on the video.  Tr. 85, 173.

Abdelal to do so.  Tr. 60-61.  Abdelal sent Vasquez the policy by text later that day.  Tr. 61; Jt. Ex. 1.

5
After reviewing the no-solicitation policy, Vasquez asked to discuss it with Abdelal the next day on the sales floor.  Tr. 61.  Vasquez told Abdelal that he had reviewed the policy and did not believe that he and O'Hara had violated it, because they distributed the Union flyers during non-work time and in a non-work area.  Tr. 61-62.  Abdelal stated that Vasquez needed to respect the policy, which prohibited distribution of Union flyers as he and O'Hara had done.  Tr. 62.  Abdelal also suggested that
10
Vasquez speak to Rodriguez again regarding the issue.  Tr. 62, 312.

A few days later, Vasquez spoke with Rodriguez by phone.  Tr. 62.  Vasquez described the situation to Rodriguez, and said that after reviewing the no-solicitation policy he did not believe that he had violated it.  Tr. 62.  Rodriguez said that the
15
employees were not permitted to distribute third-party material such as Girl Scout cookies.  Tr. 62-63.  Vasquez stated that he and O'Hara were not third parties, but Apple employees.  Tr. 63.

Vasquez testified that after May 15, 2022, he did not leave any other Union flyers
20
in the breakroom, because multiple Apple managers had informed him that it constituted a violation of company policy.  Tr. 63-64.

E.  *The Events of May 27, 2022*

25
O'Hara testified that on May 27, 2022, he distributed Union flyers by placing them in the center of the breakroom table before his shift began at 11:30 a.m. and during his lunch break after 4 p.m.  Tr. 130-131, 132-133.  O'Hara stated that he placed between four and six flyers on the table before his shift, and three flyers during his lunch break.  Tr. 131, 132-133.  Other employees were present in the breakroom when O'Hara
30
placed the flyers on the table at these times.  Tr. 132-133.  In addition to the Union flyers placed on the breakroom table previously, O'Hara placed a new Union flyer on the table on May 27, 2022, which stated as follows:

# WHAT OUR UNION
35
# IS FIGHTING FOR:

**INCLUSION & EQUITY:**  Establish a concrete and actional program committed to diversifying store leadership through inclusion and promotion of BIPOC, LGBTQ, and colleagues with disabilities.  Reward multilingual
40
employees monetarily for their leveraged contributions that are taken for granted.  We're all valuable and want fair representation.

**CAREER DEVELOPMENT:**  Protected, regularly scheduled training and coaching time for current roles.  Make internal promotion the primary
45
method for filling open positions.  Establish clear and achievable career

advancement paths.  Employee oversight when hiring for senior-level store positions.

## …And much more.

5     Tr. 134-135; G.C. Ex. 6.  The flyer also contained the Apple Retail Union CWA insignia, and a QR code with explanatory text stating, "Read the full Vision Statement here!"

10     After placing the Union flyers on the breakroom table during his lunch break, O'Hara remained in the breakroom speaking with a colleague.  Tr. 132-133.  A few minutes later, while O'Hara remained in the breakroom, senior manager Yanell Brown entered the breakroom and removed the flyers, without speaking to anyone.  Tr. 133-134.  Using his phone, O'Hara took a video of Brown removing the Union flyers.  Tr. 135-136, 137-138; G.C. Ex. 7.

15     Brown testified that he did not realize what the Union flyers were at the time that he removed them.  Tr. 271.  Brown stated that, "I just kind of saw them laying on the table and was kind of throwing out things as I would normally do and saw they were on the table," in that "it falls into the same no solicitation policy as everything else."  Tr. 271.  Brown testified that before picking up the Union flyer he asked the employee 20     sitting closest to the flyer whether it belonged to them, and the employee shrugged, so Brown picked up the flyer to throw it out.  Tr. 271-272.  Brown testified that after picking up the Union flyer he threw it out in the manager's office.  Tr. 275-276.

25     F.  *The events of June 1, 2022*

     O'Hara distributed Union flyers in the breakroom again on June 1, 2022, before his shift began at 11:30 a.m. and during his lunch break.  Tr. 138.  General Counsel introduced a videotape of the breakroom on June 1, 2022 as General Counsel's Exhibit 30     8; references to the videotape time stamp will be indicated in parenthesis.  Tr. 146-147. Before beginning his shift, O'Hara and another Apple employee and organizing committee member placed four Union flyers on the breakroom table.  Tr. 139-140 (3:05:39-3:06:28).  About five minutes later, senior manager Ryan Radechal entered and left the breakroom, only to return a few minutes later.  Tr. 140-141 (3:10:12-3:10:56, 35     3:11:23-3:13:13).  Immediately thereafter, senior manager Jorge Romero entered the breakroom and removed the Union flyers O'Hara and his co-worker had placed on the table.  Tr. 141-142 (3:13:31-3:13:49).

     Later that day, at about 4:45 p.m. during his lunch break, O'Hara and a co-worker 40     placed additional Union flyers on the breakroom table.  Tr. 142-143 (7:25:05-7:25:39). O'Hara then left the breakroom and went to the tables near the vending machines to eat his lunch.  Tr. 143-144.  About 15 minutes later, Romero entered the breakroom, removed the Union flyers from the table, and exited after briefly speaking with an employee seated at the breakroom table.  Tr. 144-145 (7:40:19-7:41:05).  After leaving 45     the breakroom with the flyers, Romero walked by the tables where O'Hara was eating lunch, and O'Hara saw him walk into the manager's office.  Tr. 145-146.

About an hour later, Romero walked by the area where O'Hara was taking his lunch break.  Tr. 147.  O'Hara got Romero's attention, and asked him to stop removing the Union flyers.  Tr. 147.  Romero said that he could not stop removing the flyers,
5  because they were promotional materials.  Tr. 147.  O'Hara stated that the Union flyers were not promotional, and that employees were permitted to have them in the breakroom.  Tr. 147-148.  When Romero contended again that the flyers were promotional and not permitted, O'Hara pulled up the employee rights page of the National Labor Relations Board's public website, and showed Romero a statement that
10  employees were allowed to have union materials in non-work areas.  Tr. 148.  Romero continued to insist that the Union flyers were promotional materials, and stated that he would keep removing them.  Tr. 148.  O'Hara then asked Romero what he did with the Union flyers after removing them, and Romero responded that he shredded them.  Tr. 148-149.  O'Hara then asked whether the employees could have a bulletin board or a
15  cork board to post Union flyers and materials; Romero responded that they could look into it and see whether something could be designed.[16]  Tr. 148-149.

O'Hara testified that after June 1, 2022 he did not distribute Union flyers again, because managers kept removing them.  Tr. 149.
20

## Decision and Analysis

### A.   Credibility Resolutions

25  Evaluating certain issues of fact in this case requires an assessment of witness credibility.  Credibility determinations involve consideration of the witness' testimony in context, including factors such as witness demeanor, "the weight of the respective evidence, established or admitted facts, inherent probabilities, and reasonable inferences drawn from the record as a whole."  *Double D Construction Group*, 339
30  NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001), enf'd. 56 Fed.Appx. 516 (D.C.Cir. 2003); see also *Hill & Dales General Hospital*, 360 NLRB 611, 615 (2014).  Corroboration and the relative reliability of conflicting testimony are also significant.  See, e.g., *Precoat Metals*, 341 NLRB 1137, 1150 (2004) (lack of specific recollection, general denials, and comparative vagueness insufficient to rebut more detailed positive
35  testimony).  It is not uncommon in making credibility resolutions to find that some but not all of a particular witness' testimony is reliable.  See, e.g., *Farm Fresh Co., Target One, LLC*, 361 NLRB 848, 860 (2014).

In addition, the Board has developed general evidentiary principles for evaluating
40  witness testimony and documentary evidence.  For example, the Board has determined that the testimony of an employer Respondent's current employee which is contrary to the Respondent's contentions may be considered particularly reliable, in that it is potentially adverse to the employee's own pecuniary interests.  *Covanta Bristol, Inc.*, 356 NLRB 246, 253 (2010); *Flexsteel Industries*, 316 NLRB 745 (1995), *aff'd*, 83 F.3d
45  419 (5th Cir. 1996).  It is also well-settled that an administrative law judge may draw an

---

[16] Romero did not testify at the hearing.

adverse inference from a party's failure to call a witness who would reasonably be assumed to corroborate that party's version of events, particularly where the witness is the party's agent. *Chipotle Services, LLC*, 363 NLRB 336, 336 fn. 1, 349 (2015), enf'd. 849 F.3d 1161 (8th Cir. 2017); *Roosevelt Memorial Medical Center*, 348 NLRB 1016,
5    1022 (2006). Adverse inferences may also be drawn based upon a party's failure to introduce into evidence documents containing information directly bearing on a material issue. See *Metro-West Ambulance Service, Inc.*, 360 NLRB 1029, 1030, fn. 13 (2014).

10    In making credibility resolutions here, I have considered the demeanor of the witnesses, the context of their testimony, corroboration via other testimony or documentary evidence or lack thereof, the internal consistency of their accounts, and the witnesses' apparent interests, if any. As a general matter, any credibility resolutions I have made are discussed and incorporated into my analysis herein.

15    I generally credit the testimony of Jordan Vasquez and Ian O'Hara. Both Vasquez and O'Hara provided specific, detailed testimony, and did not speculate regarding circumstances not within their own personal knowledge. See, e.g., Tr. 101-102. I note that Vasquez in particular made a discernable effort to thoroughly explicate the topics he discussed, even during his cross-examination. See Tr. 77-79. Vasquez
20    and O'Hara's testimony regarding the physical layout and uses of the non-employee areas of the WTC store was consistent with photographs, videos, and schematics introduced into evidence by both General Counsel and Apple. Their testimony regarding the removal of Union flyers from the breakroom table on the dates in question was also confirmed by video created by Apple in the normal course of the WTC store's
25    operations and, in the case of O'Hara, by video he created himself using his iPhone.

    In addition, Vasquez's testimony directly contradicted the testimony of Apple's witnesses regarding his conversation with Stephanie Gladden – which forms the basis for the allegation that Apple unlawfully interrogated employees in violation of Section
30    8(a)(1) – and with respect to the parameters and enforcement of Apple's Solicitation and Distribution Policy and housekeeping procedures. Thus, as a current employee of Apple, Vasquez's testimony, may be considered particularly reliable in that it is potentially adverse to his own pecuniary interests. *Covanta Bristol, Inc.*, 356 NRLB at 253; *Flexsteel Industries*, 316 NLRB at 745.
35

    The testimony of Apple's witnesses regarding the store layout and operations was similarly credible. However, I find that their explications of Apple's housekeeping and cleanliness standards, and their accounts of the application of those standards and of Apple's Solicitation and Distribution Policy, to be of varying reliability. I further find
40    that their explanations for their conduct in connection with the removal of Union flyers from the breakroom table to be implausible or contradicted by other, more probative evidence, in the manner discussed below.

    B. The Alleged Interrogation
45
    The Complaint alleges that in or about early May 2021, Apple unlawfully

14

interrogated employees regarding their Union sympathies and protected concerted activities, in violation of Section 8(a)(1) of the Act.  General Counsel contends in support of this allegation that Stephanie Gladden, who was then a senior manager at the WTC store, interrogated Vasquez regarding his support for the Union and protected concerted activities on the balcony level sales floor on May 9, 2022.  Apple contends that Gladden did not interrogate Vasquez during their conversation, and that her remarks were not coercive.  For all of the following reasons, the evidence establishes that Gladden coercively interrogated Vasquez during their conversation on May 9, 2022.

For many years, the Board has determined whether an employer has coercively interrogated an employee by evaluating if "under all the circumstances, the interrogation reasonably tends to restrain, coerce, or interfere with the rights granted under the Act." *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, at p. 10 (2022), quoting *Rossmore House*, 269 NLRB 1176, 1177-1178, aff'd. 760 F. 2d 1006 (1985).  In order to determine whether a particular interrogation is coercive in nature, the Board considers the background to the specific interaction, the nature of the information sought, the identity of the questioner, the place and method of questioning, and the truthfulness of the employee's response.  *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, at p. 10; see also *Relco Locomotives*, 359 NLRB 1145, fn. 1, 1156 (2013), aff'd. 361 NLRB 911 (2014); *Westwood Health Care Center*, 330 NLRB 935, 939 (2000).  It is well-settled that such factors "are not to be mechanically applied," but serve as a framework for assessing "the totality of the circumstances" for analyzing the statements' potentially coercive impact.  *Westwood Health Care Center*, 330 NLRB at 939, quoting *Rossmore House*, 269 NLRB at 1178, fn. 20, and *Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 835 (D.C. Cir. 1998).

As an initial matter, I credit Vasquez's account of the May 9, 2022, conversation as opposed to Gladden's.  As discussed above, Vasquez provided a specific, detailed account of the events that he addressed during his testimony, and evinced a good-faith effort to create an accurate record.  Furthermore, as a current employee of Apple who testified in a manner adverse to his own pecuniary interest by contradicting Apple's own witnesses, Vasquez's testimony is considered particularly reliable pursuant to the Board caselaw discussed above.

Thus, I credit Vasquez's testimony that after Gladden greeted him she told him that she had heard about his meeting with human resources representative Julissa Rodriguez, and asked how it went.  Although Gladden denied asking Vasquez "questions related to his compensation or compensation of his colleagues," during her testimony, she was not asked and did not testify regarding whether she and/or Vasquez addressed Vasquez's meeting with Rodriguez, which had taken place on May 3, 2022, only days earlier.  Tr. 289-290.  As a result, Vasquez's testimony that Gladden questioned him regarding his meeting with Rodriguez is effectively unrebutted.  I further credit Vasquez's testimony that after he described his meeting with Rodriguez, Gladden asked him whether he had spoken to other employees regarding a wage increase, and asked how many employees he had spoken to.  According to Vasquez's uncontradicted testimony, his discussions with both senior manager Rachel Goldman and Rodriguez

were not directed toward obtaining a wage for himself alone.  Instead, Vasquez was contending that the pay for the WTC store Apple employees was too low, and requesting information regarding how the employees as a group could obtain an increase in their wage rates.  I thus credit Vasquez's testimony that after asking

5 Vasquez how the meeting with Rodriguez went, Gladden asked Vasquez for information regarding the parameters of the group of employees dissatisfied with their wage rates, whose concerns Vasquez had just presented to Rodriguez.  The Board has found that employer questioning regarding employee discussions of wages may constitute an unlawful interrogation.  See *Spectrum Juvenile Justice Services*, 368 NLRB No. 102 at

10 p. 1, fn. 1, and at p. 8-10 (2019) (questioning regarding petition submitted by employees contending that pay rates were inadequate, and addressing other terms and conditions of employment, unlawful); *Chipotle Services*, 363 NLRB 336, 338, 339-340, 346 (2015) (service manager's questions regarding which employees were discussing wages and how employees had learned of one anothers' specific wage rates constituted an

15 unlawful interrogation).

I further credit Vasquez's testimony that after Gladden questioned him regarding his meeting with Rodriguez and interactions with other employees, she asked Vasquez what he thought about the unionization efforts at Apple.  In addition to the general

20 credibility considerations addressed above, Vasquez's depiction of the manner in which the May 9, 2022, conversation unfolded was the more inherently plausible.  Specifically, Vasquez and Gladden both testified that Vasquez stated during their conversation that he was concerned that his name had been associated with the union organizing campaign, because he was not involved.  Tr. 35, 284-285.  However, I find it unlikely

25 that, as Gladden claimed, Vasquez immediately responded to her initial, innocuous question regarding how his day was going by making such an assertion.  Tr. 284-285.  At the time of their conversation, Vasquez had been a member of the Union organizing committee for approximately four months, and had spoken to Goldman and Rodriguez regarding how the employees could obtain higher wages and more vacation time.

30 However, the Union organizing committee had yet to "go public" with respect to its activities, which did not occur until May 15.  Given this context, a scenario where *Vasquez* spontaneously raised the issue with Gladden to convey his disquiet with being associated with the Union only makes sense if one presumes that Vasquez was attempting to "gaslight" Gladden in some way by preemptively denying involvement in

35 the Union campaign.  Thus, crediting Gladden's account requires accepting a contorted set of circumstances and motivation on Vasquez's part.  Vasquez's contention that Gladden's initial questioning regarding his meeting with Rodriguez and the wage issue segued into her question regarding what Vasquez thought of the Union campaign is substantially more plausible.  Vasquez's subsequent response that he was concerned

40 that he was being associated with the Union when he was not in fact a part of the organizing efforts is also more believable in that context.  Thus, Vasquez provided a more reliable account of their conversation, and I therefore conclude that Gladden asked Vasquez what he thought about the union organizing efforts at Apple.  It is well-settled that supervisory questioning regarding employees' thoughts or sentiments

45 involving a union may constitute an unlawful interrogation.  See, e.g., *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (2020) (supervisor unlawfully interrogated employee

by asking him "how he felt about the Union"); *Relco Locomotives*, 359 NLRB at 1156 (supervisor unlawfully interrogated employee by asking him what he thought about the union).

5          In addition, Vasquez's account of his conversation with Gladden is corroborated by his statement to O'Hara that Gladden had asked about his thoughts regarding the Union, as well as by Vasquez's Signal message to the organizing committee stating, "They just had a union feeler convo with me I'll explain when I get a chance." Tr. 36-38, 118-120; G.C. Ex. 2. At the hearing, Vasquez was cross-examined regarding the
10        conversation with Gladden and his subsequent message to the organizing committee, as well as the extent of his public identification as a Union supporter, one of the factors considered as part of the totality of the circumstances analysis. Tr. 72-74, 74-80, 80-81. As a result, Vasquez's statements to O'Hara and the committee constitute prior consistent statements admissible pursuant to Federal Rule of Evidence 801(d)(1)(B),[17]
15        and support Vasquez's account of his conversation with Gladden. See *Pagerly Detective Agency*, 273 NLRB 494, fn. 1 (1984) (ALJ erred by excluding employee's testimony regarding his immediate recounting of president's request that he provide a list of employees supporting the union).

20        Finally, during her direct examination, Gladden testified that she did question Vasquez about union activity, asking him, "if you're allowed to do these things, why does it upset you?" to be associated with the Union, given that "This is something that you can talk about and you can engage in." Tr. 285. Vasquez's account of his conversation did not include these statements. Nonetheless, this question is simply a
25        variation on supervisory queries regarding employee "thoughts" and "feelings" about a union or union representation which the Board has found to be impermissible. *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5; *Relco Locomotives*, 359 NLRB at 1156; see also *Dayton Hudson Corp.*, 316 NLRB 477, 483 (1995) (manager's questioning of employee as to "why he wanted the Union, and what significance it had" unlawful
30        interrogation); *Research Management Corp.*, 302 NLRB 627, 648 (1991) (manager unlawfully interrogated employee by asking him "why he supported the Union and what good did he feel the Union would do"); *Nice-Pak Products, Inc.*, 248 NLRB 1278, 1286-1287 (1980) (supervisor's questioning of employees as to "why [they] thought the employees needed a union" and "why [they] really wanted a union" unlawful
35        interrogation).

          Apple argues that Gladden's remarks are comparable to the "offhand and somewhat innocuous" comments at issue in *Bozzuto's Inc. v. NLRB*, which the Second Circuit, contrary to the Board, found did not constitute a coercive interrogation. 927
40        F.3d 672, 685, 686-687 (2019), denying enforcement of *Bozzutto's, Inc.*, 365 NLRB No. 146 (2017). However, the circumstances of that case are inapposite in this respect. In *Bozzuto's Inc.*, a fleeting, chance encounter between an employee and a Senior Vice

---

[17] Rule 801(d)(1)(B) provides that statements consistent with a witness' testimony which are offered "to rebut an express or implied charge that the declarant recently fabricated [them] or acted from a recent improper influence or motive in so testifying," or "to rehabilitate the declarant's credibility as a witness when attacked on another ground," do not constitute inadmissible hearsay.

President resulted in a two-sentence interaction, where the Senior Vice President asked, "what's going on with this Union stuff?" and the employee responded, "I'm not going to talk about it with you." 927 F.3d at 676. In the instant case, by contrast, Gladden deliberately approached Vasquez, questioned Vasquez regarding his meeting
5 with Rodriguez and the number of employees he had spoken to regarding wage rates, and then asked Vasquez what he thought about the unionization efforts at Apple. Thus, Gladden's comments involved more extensive probing, and sought more specific information regarding Vasquez's protected concerted activities and Union sentiments, than the Senior Vice President's "offhand" remark at issue in *Bozzuto's Inc.*
10

Other factors comprising the totality of the circumstances analysis further support the conclusion that Gladden's interrogation of Vasquez was coercive. As a senior manager, Gladden reported directly to Store Leaders Abdelal and Distasio, and was Vasquez's direct supervisor on the sales floor during that portion of his shift. See
15 *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (interrogation coercive where questioner was employee's "direct supervisor"); *Spectrum Juvenile Justice Systems*, 368 NLRB No. 102 at p. 11 (questioning by employee's shift supervisor coercive). I do credit Gladden's testimony, which was confirmed by Vasquez, that she approached Vasquez in connection with her general practice of briefly speaking with each employee
20 on the sales floor at the beginning of her shift.[18] Tr. 72-73, 284. However, Vasquez's testimony that despite their casual exchanges he and Gladden did not have a friendship or personal relationship was not contradicted. See, e.g., *Bozzuto's, Inc.*, 365 NLRB No. 146 at p. 2, fn. 6, quoting *Management Consulting, Inc.*, 349 NLRB 249, 250, fn. 6 (2007) (supervisory remarks potentially coercive regardless of supervisor's "friendship"
25 with employee and "regardless of whether the remark was well intended"). Furthermore, Gladden's regular interactions with sales floor employees to identify herself and initiate contact at the beginning of her shift do not obviate the coercive nature of questioning regarding Union and protected concerted activity. There was no collective bargaining relationship or certification of a union as collective bargaining
30 representative in effect for the employees at the WTC store at the time. Indeed, as of May 9, 2022, the Union organizing committee had yet to make its campaign public, and while Vasquez had spoken to Goldman and Rodriguez regarding the employees' desire for higher wages and more vacation time, at the time of his conversation with Gladden he was not an open union supporter. See *Bozzuto's, Inc.*, 365 NLRB No. 146 at p. 2-3
35 (employee's "leading role in the organizing campaign" irrelevant where evidence demonstrated that employee was endeavoring to "keep a low profile when engaged in union activity" "*at the time of the interrogation*") (emphasis in original).

Finally, the evidence establishes that Vasquez equivocated in response to
40 Gladden's questions, by stating that he had not kept track of the number of employees with whom he had discussed the wage rate issue, and by denying any association or

---

[18] I note as well that the conversation between Gladden and Vasquez took place on the sales floor, and Vasquez was not called into a management office or otherwise subjected to circumstances creating "an atmosphere of unnatural formality." *Westwood Health Care Center*, 330 NLRB at 939, quoting *Bourne v. NLRB*, 332 F.2d 47, 48 (2nd Cir. 1964). This factor therefore militates against a finding that Gladden's questioning was coercive.

involvement with the Union.  Vasquez testified that he did so in order to prevent the
WTC store managers from learning that the employees were attempting to form a
Union.  It is well-settled that an employee's evasive or untruthful response to
supervisory questioning supports a determination that the questioning was coercive in
nature.  See *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (employee's "reluctance to
answer" supervisor's questions evinces their coercive nature); *Chipotle Services*, 363
NLRB at 346; *Relco Locomotives*, 359 NLRB at 1156 (employee's untruthful answer to
supervisor's query regarding his union sentiments "because he feared for his job"
indicative of coercion).  In this respect, I note that while there is no historical backdrop of
"employer hostility or discrimination" at issue here, a factor which would militate against
a conclusion that Gladden's questioning was coercive, there was no labor union
recognized or certified as collective bargaining representative.  Furthermore, Vasquez
and the rest of the organizing committee were sufficiently concerned with the
ramifications if management became aware of the Union organizing campaign that
Vasquez responded to Gladden's questioning untruthfully.  *Westwood Health Care
Center*, 330 NLRB at 939.  Such evidence contradicts Apple's argument that Gladden's
reassurance to Vasquez that "Apple would always do the right thing at the end,"
ameliorated the coercive effect of her questioning, as does Vasquez's immediate
reporting of the incident to O'Hara and to the organizing committee as a "union feeler
convo."  Tr. 35, 36-38; G.C. Ex. 2; see Post-Hearing Brief at 26-27.

For all of the foregoing reasons, the evidence establishes that Gladden
coercively interrogated Vasquez on May 9, 2022, in violation of Section 8(a)(1) of the
Act.

C.  Alleged Violations Based Upon the Removal of Union Flyers from the
Breakroom Table

1.  The Complaint's Allegations and General Counsel's Post-Hearing Motion to
Amend

The Complaint alleges two distinct violations of Section 8(a)(1) of the Act based
upon Apple's removal of Union flyers from the table in its employee breakroom on May
15, 2022, May 27, 2022, and June 1, 2022.  First, the Complaint alleges that Apple's
removal of the Union flyers constituted a disparate enforcement of its Solicitation and
Distribution Policy, in that Apple permitted solicitation and distribution in the breakroom
with respect to non-Union materials.  The Complaint further alleges that Apple
unlawfully confiscated Union flyers in a non-working area of the WTC store.

In her Post-Hearing Brief, General Counsel moves to amend the Complaint to
include an allegation that at all material times Apple maintained its Solicitation and
Distribution Policy in a manner which restricted its employees' Section 7 activities, in
violation of Section 8(a)(1) of the Act.  G.C. Post-Hearing Brief at 3, 35-37.  Section
102.17 of the Board's Rules and Regulations provides that amendments to a complaint
may be made "upon such terms as may be deemed just" via a motion to an
Administrative Law Judge at the hearing and until the case is transferred to the Board.

In order to determine whether an ALJ has properly exercised their discretion with respect to a motion to amend the complaint, the Board considers "(1) whether there was surprise or lack of notice, (2) whether there was a valid excuse for the delay in moving to amend, and (3) whether the matter was fully litigated."  See, e.g., *Rogan Bros. Sanitation, Inc.*, 362 NLRB 547, 549, n. 8 (2015), enf'd. 651 Fed. Appx. 34 (2nd Cir. 2016), citing *Stagehands Referral Service, LLC*, 347 NLRB 1167, 1171-1172 (2006); see also *CAB Associates*, 340 NLRB 1391, 1397-1398 (2003).    Because Apple was provided with no notice regarding the amendment now advanced by General Counsel, and General Counsel has provided no explanation for the delay in moving to amend, General Counsel's motion is denied.

       Apple was not provided with any notice that General Counsel would be alleging as a discrete violation of Section 8(a)(1) that it maintained its Solicitation and Distribution Policy in a manner which restricted the Section 7 rights of its employees prior to the submission of the parties' Post-Hearing Briefs.  As discussed above, as of the issuance of the December 16, 2022 Amendment to the Complaint, Apple was apprised that General Counsel was contending that its conduct with respect to the distribution of Union flyers at the WTC store violated Section 8(a)(1) in two distinct ways:  (i) that it selectively and disparately enforced its Solicitation and Distribution Policy by prohibiting the placement of Union flyers on the store's breakroom table, while permitting solicitation and distribution with respect to nonunion materials; and (ii) that it unlawfully confiscated Union flyers in a non-work area.  These were the extant allegations with respect to Apple's conduct involving the Union flyers throughout the entirety of the hearing, during the presentation of both the General Counsel's case and Apple's.  General Counsel amended the Complaint in this matter twice – once on December 16, 2022 and again on the record at the hearing.  But although the Solicitation and Distribution Policy has been at issue since the unfair labor practice charge in this case was filed on May 18, 2022,[19] General Counsel never, prior to submitting a Post-Hearing Brief, sought to include in the Complaint an allegation that the Policy was maintained in a manner that restricted employees' Section 7 rights.  See *Oncor Electric Delivery Co.*, 364 NLRB 677, 684-685 (2016), remanded in part on other grounds 887 F.3d 488 (D.C. Cir. 2018) (motion to amend made on the final day of hearing denied where General Counsel was aware of the facts underlying the allegation "prior to the beginning of the trial").

       The timing of General Counsel's motion to amend is even more mystifying given the parties' opening statements in the case.  During her opening statement on the first day of the hearing, General Counsel explicitly argued that the Board's decision in *AT&T Mobility, LLC* – which eliminated the remedy of revision or rescission of an otherwise lawful policy that was unlawfully "applied to restrict" employee Section 7 activity – should be overruled in that respect.[20]  370 NLRB No. 121 at p. 7 (2021).  As the Board

---

[19] The unfair labor practice charge filed by the Union on May 18, 2022 alleged that Apple "has and continues to maintain an overly broad no-solicitation policy intended to discourage employees from engaging in union activity."  G.C. Ex. 1(a).
[20] "In addition, General Counsel will be requesting the administrative law judge here to overturn AT&T

discusses at length in *AT&T Mobility, LLC*, the revision or rescission remedy was premised upon the theory that the application of a lawful rule to restrict Section 7 activity engenders a conclusion that the rule itself was unlawful to maintain – a theory that the Board in *AT&T Mobility, LLC* rejected. 370 NLRB No. 121 at p. 1-2, 5-7. Yet at no time
5 during the hearing did General Counsel move to amend the Complaint to include an allegation that Apple maintained its Solicitation and Distribution Policy in a manner which restricted its employees' Section 7 activity. Apple specifically addressed the rescission and revision remedy and the import of *AT&T Mobility, LLC* in its Post-Hearing Brief, presumably based upon General Counsel's remarks in her opening statement.
10 R.S. Post-Hearing Brief at 45-47. However, Apple was never on notice that an allegation that it had maintained its Solicitation and Distribution Policy in a manner which restricted employees' Section 7 rights was at issue.


    With regard to the second component of the analysis, General Counsel has
15 provided no "valid excuse" for the delay in moving to amend the Complaint to include an allegation that Apple unlawfully maintained its Solicitation and Distribution Policy in a manner which restricted employee Section 7 activity. General Counsel provides no explanation whatsoever in her Post-Hearing Brief for why such a motion to amend the Complaint was not made before the record closed, particularly when one motion to
20 amend was made prior to the hearing's opening and another was made on the record. While General Counsel claims that the proposed amendment is based upon the testimony of Apple's witnesses regarding the enforcement of Solicitation and Distribution Policy, she points to no new information revealed by such testimony which would excuse the failure to move to amend the Complaint before the hearing concluded.
25 General Counsel's failure to provide any explanation or mitigating circumstances militates against granting a motion to amend raised in a Post-Hearing Brief. See *Graphic Communications Conference/Teamsters Local 137(C)*, 359 NLRB 265, 266 (2012) (motion to amend raised in Post-Hearing Brief denied where General Counsel "offers no explanation as to why he did not raise the motion before the record closed");
30 *Oncor Electric Delivery Co.*, 364 NLRB at 685 (motion to amend made on the final day of trial denied where "General Counsel offered no reason for why the motion to amend was not made earlier").


    General Counsel argues that the motion to amend should be granted because it
35 merely articulates a "new theory" for a violation of Section 8(a)(1) based upon the record evidence adduced at trial, citing *Hawaiian Dredging Construction Co.* and *Parexel International, LLC*. G.C. Post-Hearing Brief at 35-36; *Hawaiian Dredging Construction Co.*, 362 NLRB 81 (2015), remanded on other grounds 857 F.3d 877 (D.C. Cir. 2017), vacated 368 NLRB No. 7 (2019); *Parexel International, LLC*, 356 NLRB 516
40 (2011). However, both of those cases involved violations of Section 8(a)(3) grounded in basic allegations of retaliation for union and/or protected concerted activity. See *Hawaiian Dredging Construction Co.*, 362 NLRB at 82, fn. 6 (*Wright Line* theory encompassed by allegation that Respondent discharged employees "because [they]

---

Mobility…And order a remedy that would include Respondent rescinding its solicitation and distribution policy, and upon restoration of this policy, disclaim that Respondent will modify the policy against employees for engaging in activities protected by Section 7 of the Act." Tr. 15.

were members of the Union" in violation of Section 8(a)(3)); *Parexel International, LLC*, 356 NLRB at 517 ("preemptive strike theory" sufficiently related to complaint allegations that employee "engaged in concerted activities with other employees…by discussing wages" and was subsequently discharged by Respondent "to discourage employees

5   from engaging in these or other concerted activities").  Here, by contrast, the violation raised by the motion to amend – the maintenance of a Solicitation and Distribution Policy in a manner which restricted employee Section 7 activity – is distinct from the alleged confiscation of Union flyers and disparate enforcement of the Policy described in the Amended Complaint.  Thus, the violation raised by the proposed amendment is

10  not a theory amenable to being encompassed by or subsumed in the Amended Complaint's extant allegations.  Furthermore, the standard applied by the Board in cases such as *Parexel International, LLC* to find and remedy a violation not explicitly alleged in a complaint is different from the analysis articulated in *Stagehands Referral Service, LLC* and similar cases for determining whether an ALJ abused their discretion

15  in granting a motion to amend.  See *CAB Associates*, 340 NLRB at 1398 (Board may find and remedy a violation not specifically alleged "if the issue is closely connected to the subject matter of the complaint and has been fully litigated"); *Parexel International, LLC*, 356 NLRB at 517 (same).

20         For all of the foregoing reasons, Apple was not provided with notice of the proposed amendment prior to the submission of Post-Hearing Briefs, and General Counsel has not articulated any explanation for the failure to move to amend the Complaint at an earlier time.  As a result, General Counsel's motion to amend the Complaint to include an allegation that Apple maintained its Solicitation and Distribution

25  Policy in a manner that restricted employee Section 7 activity is denied.

        2.  The Legal Framework

30         It is well-established that employees are permitted to engage in solicitation and to distribute union literature during non-working time and in non-working areas, absent a showing of "special circumstances" necessary for the employer to "maintain production or discipline."  *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797, 801, 805 (1945); *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 2, 23 (2018).  The Board has stated that,

35  "Interference with employee circulation of protected material in nonworking areas during off-duty periods is presumptively a violation of the Act unless the employer can affirmatively demonstrate the restriction is necessary to protect its proper interest." *Waste Management of Arizona, Inc.*, 345 NLRB 1339 fn. 2, 1346 (2005), quoting *Champion International Corp.*, 303 NLRB 102, 105 (1991).  In order to overcome the presumption that a rule restricting such employee activities is unlawful, an employer

40  "must show a compelling and legitimate business reason necessitating" the restrictions it has imposed.  *Waste Management of Arizona, Inc.*, 345 NLRB at 1346, citing *Midland Transportation*, 304 NLRB 4, 5 (1991); see also *Mercedes-Benz U.S. International, Inc. (MBUSI)*, 361 NLRB 1018, 1028 (2014) (employer bears the burden of establishing "special circumstances warranting an exception to the rule that employees not on

45  working time have the right to distribute union literature to other such employees in a

mixed use area").[21]

Consonant with the foregoing, the confiscation of union literature from non-work areas generally constitutes a violation of Section 8(a)(1) of the Act absent such a showing of special circumstances.  See, *Valley Health System, LLC d/b/a Desert Springs Hospital Medical Center*, 369 NLRB No. 16 at p. 2, 16 (2020); *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 2, 23 (2018), enf'd. 775 Fed.Appx. 752 (D.C. Cir. 2019). Indeed, the Board has held that it is unlawful for an employer to confiscate union literature even if the employer could under the circumstances legally prohibit its distribution.  *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 23, citing *Manorcare Health Services-Easton*, 356 NLRB 202, 204-205 (2010).

Finally, it is well-settled that the disparate or discriminatory enforcement of a facially permissible no-solicitation or no-distribution policy, in order to prohibit the dissemination of union literature while the distribution of other materials is permitted, also violates Section 8(a)(1) of the Act.  See, e.g., *Novelis Corp.*, 364 NLRB 1452, 1453, fn. 10, 1489; *Intertape Polymer Corp.*, 360 NLRB 957, 958 (2014); *Ozburn-Hessey Logistics, LLC*, 357 NLRB 1632, fn. 5, 1638 (2011).

3.  The Removal of Union Flyers from the Breakroom Table

The evidence establishes that Apple managers repeatedly removed Union literature from the table in the employee breakroom on the ground floor of the WTC store.  Specifically, witness testimony and Apple's continuous video of the breakroom establishes that Store Leader Waleed Abdelal and manager Matt Moya removed Union flyers on May 15, 2022.  Tr. 53-55, 58, 127; G.C. Ex. 4 at 1:50:27-1:50:35, 1:51:08-1:51:24, 5:11:15-5:11:33.  Such evidence further demonstrates that Union literature was removed from the breakroom table on June 1, 2022, by senior manager Jorge Romero. Tr. 144-145; G.C. Ex. 8 at 7:40:19-7:41:05.  Finally, the evidence establishes that on May 27, 2022, senior manager Yanell Brown removed flyers from the breakroom table, as depicted in a video recording made by O'Hara.  Tr. 135-138; G.C. Ex. 7.  There is no general contention that the employee breakroom is a work area, that Vasquez and O'Hara were on work time when they placed Union flyers on the breakroom table, or that any other employees in the breakroom were on work time.

As a result, Apple is required to establish special circumstances that justify its removal or confiscation of union flyers from the breakroom table.  Apple advances two general rationales to support its removal of union literature from the breakroom table – its Solicitation and Distribution Policy and its housekeeping or cleanliness standards. For the following reasons, I find that the evidence does not substantiate either of these contentions.

---

[21] "Mixed-use areas" are areas inside a facility used for both work and non-work related purposes.  See, e.g., *Novelis Corp.*, 364 NLRB 1452, 1453, fn. 10 (2016); *DHL Express, Inc.*, 357 NLRB 1742, fn. 1 (2011).

Apple begins by arguing that its breakroom table is analogous to a bulletin board, so that its uses could lawfully be restricted to prohibit all non-business-related matters, including the posting of Union materials.  R.S. Post-Hearing Brief at 32-33.  This contention is not persuasive.  While a bulletin board is generally established and
5   maintained by an employer for the express purpose of communication with employees, a breakroom table is not.  Thus, caselaw cited by Apple which permits an employer to restrict the use of a bulletin board is irrelevant.  See, e.g., *Honeywell, Inc.*, 262 NLRB 1402 (1982), enf'd, 722 F.2d 405 (8th Cir. 1983).  In support of this argument Apple discusses *Shamrock Foods Co.*, where the ALJ, affirmed by the Board, found that the
10  respondent employer could lawfully remove union literature from an information counter the employer maintained in its employee breakroom.  366 NLRB No. 117 at p. 1, fn. 3, 23-24.  However, in analogizing the information counter in that case to a bulletin board, the ALJ found that the information counter was "used by the Company for displaying or distributing health and fitness information."  *Shamrock Foods Co.*, 366 NLRB No. 117 at
15  p. 23-24.  The breakroom table at issue here, by contrast, was not used by Apple to provide company-generated information to employees; indeed, immediately outside the breakroom was a bulletin board maintained by Apple specifically for that purpose. There is no dispute that the breakroom table was used by the employees for non-business activities, such as eating meals, playing games, and casual conversation,
20  during employees' non-work time such as lunch and breaks.  Thus, Apple's argument that the breakroom table constituted some sort of "Apple system (electronic or physical)" which could not be used "to distribute materials or solicit employees" pursuant to its Solicitation and Distribution Policy is not compelling.  Jt. Ex. 1; R.S. Post-Hearing Brief at 32-33.
25

Apple next argues that its housekeeping and cleanliness standards applicable at the WTC store permitted the removal of Union flyers from the breakroom table, pursuant to *Page Avjet* and *North American Refractories Co.*[22]  *Page Avjet*, 278 NLRB 444, 450 (1986) and *North American Refractories Co.*, 331 NLRB 1640, fn. 1, 1641,

---

[22] The Board noted in *North American Refractories Co.* that no exceptions were filed to the ALJ's recommended dismissal of the allegation in that case that the respondent employer enforced its housekeeping and distribution rules in a disparate or discriminatory manner.  331 NLRB at 1640, fn. 1. As a result, that issue was never considered by the Board, and based solely upon the Board's decision in that case the ALJ's findings on the issue would lack precedential value.  However, in *Ozburn-Hessey Logistics, LLC*, the Board in its decision specifically referred to *North American Refractories Co.* as "holding that an employer may lawfully maintain and enforce housekeeping rules that result in the confiscation from nonworking areas of pro-union literature left behind following break periods."  366 NLRB No. 177 at p. 11 (2018), enf. granted and denied in part on other grounds 803 Fed.Appx.876 (6th Cir. 2000).  As a result, *North American Refractories Co.* will be addressed herein.

In *Enloe Medical Center*, 345 NLRB 874, 881 (2005), also cited by Apple, the ALJ, citing *Page Avjet, Inc.* and *North American Refractories Co.*, stated that "Employers may prohibit the leaving of materials in nonwork areas."  However, the Board in *Enloe Medical Center* stated that it was "unnecessary to pass on the judge's finding that employers may prohibit the leaving of materials, including union literature, in nonwork areas" given its conclusion that the employer violated Section 8(a)(1) by explicitly prohibiting employees from placing union literature in the breakroom.  345 NLRB at 877-878, fn. 15.  Thus, *Enloe Medical Center* is not precedential authority for the proposition that, as the Board described the ALJ's finding, "employers may prohibit the leaving of materials in nonwork areas."  345 NLRB at 877.

1642-1643 (2000); see also *Mitchellace, Inc.*, 321 NLRB 191, 198-199 (1996).[23]
However, I find that these cases are inapposite given the record evidence here.  First of
all, the evidence does not establish that prior to May 15, 2022, Apple maintained a
coherent housekeeping or cleanliness policy with respect to the employee breakroom
5    table at the WTC store.  No such written policy was introduced into evidence by Apple.
See *North American Refractories Co.*, 331 NLRB at 1641 ("Company policy concerning
housekeeping… contained in the employee handbook" and "addressed frequently by
management officials at employee meetings").  Furthermore, the general contentions
made by Apple's managers regarding its purported housekeeping and cleanliness policy
10    were belied by video of the breakroom introduced into evidence.

General Counsel and Apple both introduced into evidence continuous video
created by Apple of the employee breakroom at the WTC store during the store's
operating hours.  General Counsel introduced video taken on May 15, 2022 (G.C. Ex.
15    4), and on June 1, 2022 (G.C. Ex. 8), while Apple introduced video taken on May 29,
2022 (R.S. Ex. 24), May 30, 2022 (R.S. Ex. 29), and June 2, 2022 (R.S. Ex. 30).  See
Tr. 344-346, 375-376.  As an evidentiary matter, the May 15, 2022 video is substantially
more probative with respect to the application of Apple's Solicitation and Distribution
Policy, and its housekeeping and cleanliness standards, at the time its managers
20    removed the Union literature from the employee breakroom table.  As discussed above,
May 15, 2022 was the day that the Union "went public" with respect to the organizing
campaign, and the first day that the employees placed flyers on the breakroom table.
Furthermore, the initial unfair labor practice charge in the instant case, alleging that
Apple maintained an overly broad no-solicitation policy, was filed on May 18, 2022.
25    G.C. Ex. 1(a-b).  Therefore, the May 29 and 30, 2022 and June 1 and 2, 2022 videos
were all recorded after at least two incidents where Vasquez and O'Hara placed Union
literature on the breakroom table which was removed by Apple managers, and after the
initial charge in this case was filed.[24]

30    Given these considerations, it is important to note that the May 15, 2022
breakroom video in evidence as General Counsel's Exhibit 4 corroborates the testimony

---

[23] The ALJ in *Mitchellace, Inc.* cited to *Steelcase, Inc.* for the proposition that "The mere fact of a
supervisor removing union literature from a break area does not constitute a violation of the Act – or
rather, does not where the supervisor routinely helps keep the break area clean."  *Mitchellace, Inc.*, 321
NLRB at 198, citing *Steelcase, Inc.*, 316 NLRB 1140, 1143-1144 (1995).  However, the Board in
*Steelcase, Inc.* stated that it had affirmed the ALJ's holding in that case that a supervisor's removal of
union newsletters from tables in the employee breakroom was not unlawful "In the absence of
exceptions."  316 NLRB at 1140, fn. 2.  As a result, *Steelcase, Inc.* lacks precedential import in this
respect.

[24] General Counsel introduced into evidence photographs taken by Vasquez of items on the breakroom
table in the Apple store in Texas where he is currently employed.  Tr. 66-68; G.C. Ex. 5.  I do not find that
these photographs are probative with respect to the application of Apple's Solicitation and Distribution
Policy and housekeeping and cleanliness standards at the WTC store.  Apple also elicited testimony
regarding the application of its Solicitation and Distribution Policy and housekeeping and cleanliness
standards at other stores, which I also find irrelevant to the events at the WTC store.  Tr. 299-304, 352-
353.  Finally, Apple adduced testimony regarding the application of its Solicitation and Distribution Policy
in areas of the WTC store open to customers, and with respect to customers waiting on the sidewalk to
be admitted to the store.  Tr. 255-228, 304-306, 352-357.  I find that such evidence is not relevant with
respect to the enforcement of the Policy in areas of the store accessible only to employees.

of Vasquez and O'Hara, and not Apple's witnesses, with respect to Apple's purported
housekeeping and cleanliness policy or standards. Specifically, the May 15, 2022 video
shows at its very inception approximately three bottles and several other items on the
breakroom table. G.C. Ex. 4 (0:00:00-0:00:10). While several managers, including
Abdelal and Radechal, enter and exit the breakroom almost immediately after the
recording begins, none of them remove these items from the breakroom table.[25] See
Tr. 51; G.C. Ex. 4 (0:0:10-0:0:15, 0:49:55-0:50:00 (Abdelal), 0:01:40-0:04:10, 0:49:33-
0:49:42 (Radechal)). Some of the items are removed by a member of the cleaning
contractor staff about 45 minutes after the video begins at 7:00 a.m., but others are not
removed by the cleaning staff until over six hours later.[26] G.C. Ex. 4 (0:47:58-0:49:05,
7:15:04-7:15-54). Furthermore, about two hours after the video begins a basket of fruit
is placed on the breakroom table, and is not removed until seven hours later, well after it
is completely empty. See G.C. Ex. 4 (1:43:54, 8:48:31-8:48:42). The May 15, 2022
video does not show *any* of the several managers who enter and exit the breakroom
cleaning, tidying, or organizing the breakroom in any way. See, e.g., G.C. Ex. 4 (38:28,
5:07:45-5:07:58).

Thus, the most probative video evidence conclusively contradicts the testimony
of Apple's witnesses regarding the purportedly critical nature of cleanliness and
organization in the employee breakroom, and regarding the managers' role in
maintaining Apple's vaunted standards of housekeeping. For example, Jennison
testified that Apple managers were "popping and out" of the breakroom "throughout the
day" "whenever you have a spare minute" to check on its "condition," and ensure that it
was "really organized and clean." Tr. 229, 231. Abdelal testified that the managers'
cleaning and organization of the breakroom was "part of our values our DNA," and "like
breathing. We just literally do it all the time…you would just go there and you would
clean up as you saw things." Tr. 302, 307. Abdelal further stated, "I intentionally make
sure that the team always sees me picking up trash" in "the back of the house." Tr. 302-
303. Brown claimed during his testimony that Apple managers "want to make sure like
we're cleaning up really proactively." Tr. 272. Jennison also testified that at the end of
the day managers "reset the break room back to clean," so that the "next morning the
place looks like it did when it opened for the very first time." Tr. 231-232. Abdelal
echoed this testimony, stating that it "would be incredibly unlikely in our space to find
anything left behind, especially overnight" given the housekeeping and cleanliness
standards in effect at the WTC store. Tr. 306-307. The video evidence from May 15,
2022 flatly belies all of this testimony. Instead, the video corroborates Vasquez and
O'Hara's testimony regarding items left on the breakroom table throughout one of their
shifts, and from one day to the next.

Even the videos taken after the Union began to openly campaign and the instant
charge was filed contradict Apple's witnesses with respect to the application of its

---

[25] Abdelal and Radechal have been identified in these portions of General Counsel's Exhibit 4 based upon
identifications made by Vasquez while viewing this Exhibit during his testimony. Tr. 51, 53-54; G.C. Ex. 4
(0:49:43-0:49:55, 1:47:16, 1:51:08-1:51:24). The parties stipulated that Vasquez accurately identified the
various managers depicted in General Counsel's Exhibit 4. Tr. 111-112.
[26] As a result, some of these items are still on the breakroom table when Abdelal first removes the Union
flyers. See G.C. Ex. 4 (1:51:07-1:51:23).

purported housekeeping and cleanliness policy.  In the four videos taken after the charge in the instant case was filed, three of which Apple introduced into evidence, over approximately 38 hours of video Apple points to only a single instance where a manager removes items from the breakroom table.[27]  R.S. Ex. 24 (5:49:25); Tr. 174-177; see

5    generally G.C. Ex. 8; R.S. Ex. 24, 29, 30.  As in the May 15, 2022 video, video from June 1, 2022 does not show any of the Apple managers who enter the breakroom cleaning or organizing.  See G.C. Ex. 8 (3:10:12-3:10:56, 3:11:23-3:13:13).  Thus, the video evidence contradicts the testimony of Apple's managers to the effect that managers cleaned and organized the breakroom and the breakroom table on any sort

10   of a consistent basis pursuant to a housekeeping or cleanliness standard then in effect.  Furthermore, the videos conclusively demonstrate that when Apple managers removed Union flyers from the breakroom table, they did not do so as part of some overall effort to clean or organize the breakroom.  Instead, they entered the breakroom, removed the Union flyers from the table, and left without performing any other cleaning, organization,

15   or overall "sweep."[28]

Other specific circumstances at issue in the cases discussed above involving the legitimate removal of union literature pursuant to an employer's housekeeping policy or standard of cleanliness also render them inapposite.  For example, in *North American*

20   *Refractories Co.* and *Page Avjet, Inc.*, the record established that leaflets were left not only on breakroom tables after break times concluded, but "remained on the counters, microwaves, refrigerator and floor" engendering "employee complaints due to the disarray."  *North American Refractories Co.*, 331 NLRB at 1641, 1643; *Page Avjet, Inc.*, 278 NLRB at 450 (union literature "scattered on the floor" of the breakroom as well as

25   "left on the tables").  Here, by contrast, the video evidence confirms Vasquez and O'Hara's testimony that they placed four Union flyers neatly on the breakroom table only.  Nor is there any evidence that other Apple employees complained about the Union flyers, or about some state of disorganization that the flyers created.  Furthermore, there is no evidence here that Apple specifically informed employees that

30   they were permitted to distribute Union flyers in nonwork areas during breaks, or that the employees did so.  See *North American Refractories Co.*, 331 NLRB at 1641, 1642-1643; see also *Page Avjet, Inc.*, 278 NLRB at 450.  In addition, in *Page Avjet, Inc.* the alleged violation was based upon a supervisor's admission that "on the one occasion he did pick up the union literature and place it on a table outside the break area."  278

35   NLRB at 450.  Here, by contrast, Apple managers repeatedly returned to the breakroom throughout the day and specifically removed Union flyers on multiple occasions, discarding and/or shredding them.  Nor did Apple managers permit the Union flyers to remain on the table for an entire shift, but removed them as soon as they were

---

[27] The other evidence referred to by Apple in its Post-Hearing Brief consists of employees cleaning up after themselves after using the breakroom table, which is consistent with Vasquez and O'Hara's testimony, or periods where the breakroom table is clean.  R.S. Post-Hearing Brief at 43-44; Tr. 68, 150-151.

[28] Such a finding is consistent with Abdelal's testimony regarding his own removal of the Union flyers on May 15, 2022.  Although Abdelal testified that he told the other managers that they should "clean [Union flyers] up like anything else" if they were "abandoned," he stated that on May 15, 2022 he specifically "went in and took them and threw them out," as opposed to removing the Union flyers as part of an overall effort to clean and organize the breakroom.  Tr. 310-312.

discovered.  See *Mitchellace, Inc.*, 321 NLRB at 199 (supervisor left union notices on break area tables "for more than 10 hours, including through two break periods and the lunch period").  As discussed herein, after removing Union flyers, Apple managers did not place them in another area where employees could possibly encounter them, but
5    threw them away or shredded them.  Thus, the evidence establishes that the managers at the WTC store "specifically targeted union literature for removal" in an unlawful manner.  *Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 177 at p. 11.

For all of the foregoing reasons, the evidence establishes that Apple's Solicitation
10   and Distribution Policy did not permit Apple to lawfully remove Union flyers from the employee breakroom table, nor did its housekeeping and cleanliness standards.  Thus, the evidence does not substantiate any "special circumstances" justifying Apple's removal of Union flyers from the employee breakroom table.  As a result, I find that the confiscation of Union flyers from the employee breakroom on May 15, 2022, May 27,
15   2022, and June 1, 2022 violated Section 8(a)(1) of the Act.

The evidence further establishes that Apple enforced its Solicitation and Distribution Policy and its housekeeping and cleanliness standards in a discriminatory manner to prohibit the distribution of the Union flyers.  I credit Vasquez and O'Hara's
20   testimony that they had seen coupons for Shake Shack and Burger King, as well as newspapers,[29] in the breakroom, and that such materials had remained on the breakroom table for an entire shift and were sometimes present at the beginning of their shift the following day.  Tr. 64-65, 92-93, 94-96, 149-150, 165-166, 166-167.  Apple argues in its Post-Hearing Brief that Vasquez and O'Hara only described approximately
25   nine incidents where coupons or newspapers were left on the breakroom table at the WTC store.  R.S. Post-Hearing Brief at 37-38.  However, when arguing that its Solicitation and Distribution Policy was consistently applied and enforced, Apple's witnesses only identified four to five specific incidents where coupons and menus from restaurants were removed from the breakroom table at the WTC store.  R.S. Post-
30   Hearing Brief at 42-43.  Jennison and Abdelal testified without contradiction regarding two specific incidents where they informed employees that they were not permitted to leave flyers in the breakroom advertising their own performance and a going-away party.[30]  Tr. 234-235, 307-308.  However, I am cognizant that these witnesses were not credible when recounting their activities in connection with Apple's purported
35   housekeeping and cleanliness policy.  Thus, on balance, the evidence establishes that the Solicitation and Distribution Policy was not consistently applied with respect to the

---

[29] Apple's contention that leaving newspapers on the breakroom table while removing Union flyers does not constitute disparate enforcement of its Solicitation and Distribution Policy pursuant to *St. Luke's Memorial Hospital*, 342 NLRB 1040 (2004), is not persuasive.  R.S. Post-Hearing Brief at 39-40.  In *St. Luke's Memorial Hospital*, the Board found that local newspapers provided by the respondent employer in a cafeteria which was "open to the general public" "for the convenience of the cafeteria patrons" did not constitute "sufficient evidence of discrimination" with respect to respondent's enforcement of its No-Solicitation/No-Distribution Policy to prohibit the distribution of union literature and deny access to union representatives.  342 NLRB at 1041-1042, 1045.  Here, the employee breakroom was not open to the public, and there is no evidence that the newspapers in question were provided by Apple for the convenience of employees.
[30] Distasio's testimony in this regard, discussed by Apple in its Post-Hearing Brief, involved discussions on the sales floor as opposed to a non-customer area, at stores other than the WTC Store.  Tr. 352-353.

employee breakroom at the WTC store.

The unprecedented manner in which Apple's managers effectuated the
Solicitation and Distribution Policy in removing the Union flyers also indicates that this
5     did not constitute an even-handed, non-discriminatory application of the Policy.  Abdelal
testified that after the other WTC store managers informed him about the Union flyers
on May 15, 2022, he removed them pursuant to the Solicitation and Distribution Policy
and housekeeping standards, instructing the managers that "abandoned" Union flyers
should be cleaned up "like anything else."  Tr. 310-312.  However, nothing in the May
10    15, 2022 breakroom video, or any of the other record evidence, indicates that Abdelal
took any measures to determine whether the Union flyers were "abandoned."  Abdelal
simply entered the breakroom, took the flyers, and left.  G.C. Ex. 4 (1:51:07-1:51:23).
Nor does any evidence indicate that Moya, Brown, or Romero made any attempt to
determine whether the Union flyers they removed from the breakroom table on May 15,
15    2022, May 27, 2022, or June 1, 2022 were "abandoned."[31]  Instead, managers entered
a breakroom containing multiple employees engaged in non-work activities and
removed Union flyers from around those employees.  In addition, the breakroom videos
establish that, as Jennison testified, the breakroom was constantly busy with employees
on non-work time eating, conversing, reading, and playing games.  As Jennison
20    testified, "the break room it's busy all hours, 6:30 in the morning, 10:30 at night and so,
you know, it's just kind of this ongoing, just kind of never ends."  Tr. 231.  Thus, while
the store was open there was no set conclusion to break periods, such that an empty
breakroom would permit managers to determine whether or not materials which
remained there were "abandoned."  As a result, the managers' removal of Union flyers
25    before the day ended inevitably prevented other employees from viewing them.
*Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 177 at p. 3, 10-11.

In addition, the breakroom videos establish that Moya photographed the Union
flyers on May 15, 2022, an action that Vasquez testified he had never witnessed
30    previously.  Abdelal's testimony that photographing the breakroom was not unusual "to
celebrate…someone did a really great job," "let us know something was in the
breakroom," or draw attention to "when standards have been unacceptable" is not
corroborated and simply incredible.  Tr. 326, 341.  Given the lack of evidence to
establish that photographing items on the breakroom table constituted a routine
35    practice, I find Moya's photographing of the Union flyers constitutes a distinct change in
the manner in which Apple's Solicitation and Distribution Policy was applied or enforced,

---

[31]  Brown claimed during his testimony that he did not realize on May 27, 2022 that the items he removed
from the breakroom table were Union flyers, testimony that I do not credit given the fact that the Union's
campaign had "gone public" twelve days earlier and Abdelal's testimony regarding the degree of
consternation that the Union flyers had caused among the WTC store's managers.  Tr. 271; see Tr. 310,
311, 331-334.  Brown further contended that he spoke to an employee seated at the breakroom table to
determine whether the Union flyer was the employee's before removing it.  Tr. 271-272.  Given Brown's
unreliable claim that he did not realize that he was removing Union flyers from the breakroom table, I
credit O'Hara's testimony that Brown did not in fact speak to the employee seated at the breakroom table
before removing the flyer, conduct also not evinced by O'Hara's video of the incident.  Tr. 133-134, 271-
272; G.C. Ex. 7.  I note that in O'Hara's video, the seated employee is wearing earbuds and is not
interacting with Brown.

29

specific to materials involving the Union.  The evidence further establishes that the
unprecedented shredding of Union flyers removed from the breakroom table constitutes
an additional departure from Apple's typical practices with respect to the Solicitation and
Distribution Policy, as per Jennison's testimony.  Tr. 148-149, 252.  In this respect, I
5    discredit as implausible Abdelal's claim, after testifying that he "may have" told Moya to
shred the Union flyers Moya removed from the breakroom table on May 15, 2022,[32] that
other materials which violated the Policy were sometimes shredded as opposed to
simply discarded.  Tr. 326-329.  In fact, Abdelal provided no coherent explanation for
how he determined which materials should be shredded as opposed to thrown out,
10   stating that materials which were "federal per legal anything that we need to get rid of"
were shredded, and that the managers did "Whatever we felt needed to be done" with
respect to shredding as opposed to discarding items.  Tr. 328.  Thus, the evidence
establishes that the shredding of the Union flyers, as directed by Store Leader Abdelal,
constituted a departure from the typical application of Apple's Solicitation and
15   Distribution Policy.

         For all of the foregoing reasons, the evidence establishes that Apple enforced its
Solicitation and Distribution Policy in a disparate or discriminatory manner by removing
Union flyers from the table in its employee breakroom at the WTC store on May 15,
20   2022, May 27, 2022, and June 1, 2022, in violation of Section 8(a)(1) of the Act.

                                  Conclusions of Law

         1.  Respondent Apple, Inc. is an employer engaged in commerce within the
25   meaning of Section 2(2), (6), and (7) of the Act.

         2.  Communications Workers of America, AFL-CIO ("the Union") is a labor
organization within the meaning of Section 2(5) of the Act.

30       3.  On May 9, 2022, Apple coercively interrogated employees regarding their
protected concerted activity and their Union sympathies, in violation of Section 8(a)(1) of
the Act.

         4.  On May 15, 2022, May 27, 2022, and June 1, 2022, Apple confiscated Union
35   flyers in its employee breakroom, a non-working area, in violation of Section 8(a)(1) of
the Act.

         5.  By prohibiting the placement of Union flyers on the employee breakroom table
on May 15, 2022, May 27, 2022, and June 1, 2022, while permitting solicitation and
40   distribution with respect to non-Union materials, Apple selectively and disparately
enforced its Solicitation and Distribution Policy, in violation of Section 8(a)(1) of the Act.

         6.  The unfair labor practices described above affect commerce within the
meaning of Section 2(6) and (7) of the Act.

---

[32] I further credit in this respect that O'Hara's unrebutted testimony that Romero stated that he had
shredded the Union flyers he removed from the breakroom table on June 1, 2022.

## The Remedy

Having found that Respondent has engaged in certain unfair labor practices, I
find that it must be ordered to cease and desist and to take certain affirmative action
designed to effectuate the Act's policies.

Respondent shall post an appropriate information notice, as described in the
attached Appendix.  This notice shall be posted in the Respondent's facility at 185
Greenwich Street, New York, New York, wherever notices to employees are regularly
posted, for 60 days, without anything covering the notice or defacing its contents.  In
addition to the physical posting of paper notices, notices shall be distributed
electronically, posted on an intranet or an internet site, and/or other electronic means, to
the extent Respondent customarily communicates with its employees in such a manner.
In the event that, during the pendency of these proceedings, Respondent has gone out
of business or closed its 185 Greenwich Street facility, Respondent shall duplicate and
mail, at its own expense, a copy of the notice to all current employees and former
employees employed by Respondent at any time since May 1, 2022.

General Counsel requests as part of the remedy that I order Respondent to
rescind or revise its Solicitation and Distribution Policy, which was applied in a manner
that restricted its employees in the exercise of their Section 7 rights.  As discussed in
detail above, such a remedy was eliminated by the Board in *AT&T Mobility, LLC*, 370
NLRB No. 121 (2021).  As an Administrative Law Judge, I am required to apply existing
Board precedent that has not been overruled by the Board itself or by the Supreme
Court.  See *Pathmark Stores, Inc.*, 342 NLRB 378, 378 fn. 1 (2004); *Waco, Inc.*, 273
NLRB 746, 749 fn. 14 (1984).  Thus, General Counsel's request for an order requiring
that Respondent revise or rescind its Solicitation and Distribution Policy is denied.

On these findings of fact and conclusions of law, and on the entire record, I issue
the following recommended:[33]

## Order

Apple, Inc., its officers, agents, successors and assigns shall

1.  Cease and desist from

(a)  Coercively interrogating employees regarding their protected concerted
activities and Union sympathies.

(b)  Confiscating Union flyers from its employee breakroom, a non-working area.

---

[33] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the
findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be
adopted by the Board and all objections to them shall be deemed waived for all purposes.

(c)  Selectively and disparately enforcing its Solicitation and Distribution Policy by prohibiting the placement of Union flyers on the employee breakroom table, while permitting solicitation and distribution with respect to non-Union materials.

5

(d)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

Take the following affirmative action necessary to effectuate the policies of the Act.

10

(a)  Within 14 days after service by the Region, post at its facility at 185 Greenwich Street, New York, New York, copies of the attached notice marked "Appendix."  Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by

15  the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted.  Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  If Respondent has gone out of business or closed the 185 Greenwich Street facility, Respondent shall duplicate and mail, at its own expense,

20  a copy of the notice to all current employees and former employees employed by Respondent at any time since May 1, 2022.

(b)  Within 21 days after service by the Region, file with the Regional Director for Region 2 a sworn certification of a responsible official on a form provided by the Region

25  attesting to the steps that Respondent has taken to comply.

Dated, Washington, D.C.  June 20, 2023

30
_____
Lauren Esposito
Administrative Law Judge

32

# APPENDIX

## NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT coercively interrogate you regarding your protected concerted activities and your sympathies or sentiments with respect to Communications Workers of America, AFL-CIO (the Union)

WE WILL NOT confiscate Union flyers in our employee breakroom, a non-working area.

WE WILL NOT selectively and disparately enforce our Solicitation and Distribution Policy by prohibiting the placement of Union flyers on the employee breakroom table, while permitting solicitation and distribution with respect to non-Union materials.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed to you by Section 7 of the Act.


|  | APPLE, INC |  |
| --- | --- | --- |
|  | (Employer) |  |

| Dated | _____ | By | _____ |
| --- | --- | --- | --- |
|  |  |  | (Representative)          (Title) |


The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below. You may also obtain information from the Board's website: www.nlrb.gov.

26 Federal Plaza, 36th Floor, New York, New York, 10278
(212)264-0300, Hours: 8:30 a.m. to 5:00 p.m.

JD(NY)-12-23

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case 02-CA-295979 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, (212)264-0300.

# UNITED STATES OF AMERICA
## BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| APPLE, INC.<br><br>and<br><br>COMMUNICATIONS WORKERS OF<br>AMERICA, AFL-CIO | Case 28-CA-278213 |

## ORDER TRANSFERRING PROCEEDING TO
## THE NATIONAL LABOR RELATIONS BOARD

A hearing in the above-entitled proceeding having been held before a duly designated Administrative Law Judge, and the decision of that judge, a copy of which is attached, having been filed with the Board in Washington, D.C.,

**IT IS ORDERED,** pursuant to Section 102.45 of the National Labor Relations Board's Rules and Regulations, that the above-entitled matter be transferred to and continued before the Board.

Dated, Washington, D.C., June 20, 2023.

By direction of the Board:

/s/ Roxanne L. Rothschild
Executive Secretary

NOTE: Communications concerning compliance with the Administrative Law Judge's decision should be with the Regional Director of the Regional Office that issued the complaint.

Exceptions to the decision of the Administrative Law Judge must be received by the Board's Office of the Executive Secretary, 1015 Half Street SE, Washington, DC 20570, on or before **July 18, 2023.**

Please refer to Section 102 of the Board's Rules and Regulations ("Rules") with regard to the procedure for filing exceptions to the Administrative Law Judge's decision, or any responsive documents. Attention is specifically directed to the Rules concerning requests for extension of time to file documents (Rule 102.2(c)); the style and format of documents (Rule 102.5(a)); limitations on the length of briefs (Rules 102.5(a), 102.46(a)(1)(i)(D), & 102.46(h)); methods of filing with the Board's Office of the Executive Secretary (Rules 102.5(c)-(e)); and service on the other parties (Rules 102.5(c), 102.5(f)-(i), & 102.46(h)).



United States Government
NATIONAL LABOR RELATIONS BOARD
Region 2
26 Federal Plaza – Room 3614
New York, New York 10278-0104

June 28, 2023

**BY ELECTRONIC FILING**
Roxanne L. Rothschild, Executive Secretary
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570-0001

Re: Apple, Inc.
Case No. 02-CA-295979

Dear Executive Secretary Rothschild,

Pursuant to Sections 102.2(c) and 102.46 of the Board's Rules and Regulations, Counsel for the General Counsel (General Counsel) respectfully requests an extension of time for the General Counsel to file its Exceptions and a Memorandum in Support to Administrative Law Judge Lauren Esposito's June 20, 2023 Decision in the above-captioned case. Pursuant to Judge Esposito's Order transferring the proceedings to the National Labor Relations Board, Exceptions are due to be filed by July 18, 2023.

General Counsel seeks a three-week extension of time to August 8, 2023, in which to file Exceptions and a Memorandum in Support in this matter. The requested extension is being requested due to previously scheduled leave from June 29, 2023 until July 17, 2023 and other case handling responsibilities.

Respondent Counsel and Union Counsel have been informed of this request and do not object.

Accordingly, Counsel for the General Counsel respectfully requests that General Counsel's three-week extension of time be granted.

Sincerely,

Ruth Weinreb, Counsel for the General Counsel
National Labor Relations Board, Region 2
26 Federal Plaza, Rm 36-130
New York, New York   10278

cc: **BY EMAIL**

Jason Stanovich, Esq.
Jstanovich@littler.com.

Sumanth Bollepalli, Esq.
sbollepalli@cwa-union.org.



UNITED STATES GOVERNMENT
**OFFICE OF THE EXECUTIVE SECRETARY**
**NATIONAL LABOR RELATIONS BOARD**
**1015 Half Street SE**
**Washington, DC 20570**

June 30, 2023

Re:   Apple, Inc.
      Case 02-CA-295979

### EXTENSION OF TIME TO FILE EXCEPTIONS AND
### BRIEF IN SUPPORT OF EXCEPTIONS

The request for an extension of time in the above-referenced case is granted. The due date for the receipt in Washington, D.C. of Exceptions to the Administrative Law Judge's Decision and Brief in Support of Exceptions is extended to **August 8, 2023**. This extension of time to file exceptions and briefs in support of exceptions applies to all parties.

/s/ Elizabeth M. Tafe
Associate Executive Secretary

cc:  Parties
     Region

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

APPLE INC.

                                           Case  02-CA-295979

and

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO                                August 4, 2023

## <u>MOTION FOR EXTENSION OF TIME ON CONSENT</u>

Pursuant to Section 102.46 of the Board's Rules and Regulations, Apple Inc. ("Apple") moves for an extension of time of twenty-one days, up to and including August 29, 2023, within which to file Exceptions and a Brief in Support of Exceptions to the Administrative Law Judge's decision in this matter.  Due to multiple work events, including an unfair labor practice trial that just concluded (Region 19) and two more scheduled for the month of August (Region 7), the undersigned requires additional time to review the decision and draft Exceptions to the decision and a brief in support thereof.

Both Counsel for the General Counsel and Counsel for Communications Workers of America, AFL-CIO, have consented to the extension of time to file its Exceptions and supporting brief.

Based on the above, Apple respectfully requests an extension of time of twenty-one days, up to and including August 29, 2023, within which to file its Exceptions and supporting brief.

APPLE INC.

/s/*Jason R. Stanevich*
Jason R. Stanevich
Maura A. Mastrony
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street; Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
jstanevich@littler.com
mmastrony@littler.com

## **CERTIFICATION**

 This is to certify that a copy of the foregoing document has been delivered, on this 4th day of August 2023, via e-mail to all counsel and *pro se* parties of record as follows:

Sumanth Bollepalli, Esq.
80 Pine Street, 37th Floor
New York, NY 10005-1728
sbollepalli@cwa-union.org
--*Counsel for Communications Workers of America*

Ruth Weinreb
Field Attorney
National Labor Relations Board, Region 2
Ruth.Weinreb@NLRB.gov


          */s/Jason R. Stanevich*
          Jason R. Stanevich



UNITED STATES GOVERNMENT
**OFFICE OF THE EXECUTIVE SECRETARY**
**NATIONAL LABOR RELATIONS BOARD**
**1015 Half Street SE**
**Washington, DC 20570**

August 9, 2023

Re:    Apple, Inc.
       Case 02-CA-295979

### EXTENSION OF TIME TO FILE EXCEPTIONS
### AND BRIEF IN SUPPORT OF EXCEPTIONS

The request for an extension of time in the above-referenced case is granted. The due date for the receipt in Washington, D.C. of Exceptions to the Administrative Law Judge's Decision and Brief in Support of Exceptions is extended to **August 29, 2023**.[1]  This extension of time to file exceptions and briefs in support of exceptions applies to all parties.

/s/ Elizabeth M. Tafe
Associate Executive Secretary

cc:  Parties
     Region

---

[1] This Extension of Time Request was misfiled with the Division of Judges and the Office of the Executive Secretary only became aware of it today, a day after the original filing deadline of August 8, 2023.  This extension of time is granted based on the original date filed with the Division of Judges, which was at least 3 days before the due date.

**UNITED STATES OF AMERICA BEFORE THE**
**NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

Apple, Inc.

        Respondent

 and                                                 Case No.: 2-CA-295979

Communications Workers of America,
AFL-CIO

        Charging Party


**GENERAL COUNSEL'S EXCEPTIONS**
**TO THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**


Pursuant to Section 102.46 of the Bord's Rules and Regulations, Series 8, as amended,

Counsel for the General Counsel of the National Labor Relations Board files the following

Exceptions to the Decision of Administrative Law Judge Lauren Esposito (ALJ), which issued

on June 20, 2023.

General Counsel excepts to the ALJ's failure to order the rescission of Respondent's

Solicitation and Distribution policy, which was applied in a manner that restricted its employees

in the exercise of Section 7 rights and a remedy consistent with then-Member McFerran's dissent

in *AT&T Mobility, LLC*, 370 NLRB No. 121(2021) (ALJD at 31:20-22).

1

The grounds for these exceptions are set forth in General Counsel's Brief in Support of

Exceptions.

Dated: 29th of August 2023.

Respectfully submitted,

Ruth Weinreb, Counsel for the General Counsel
National Labor Relations Board, Region 2
26 Federal Plaza, Rm 36-130
New York New York   10278

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

| | | |
|---|---|---|
| In the matter of: | : | |
| | : | |
| APPLE INC. | : | CASE NO.02-CA-295979 |
| | : | |
| Respondent | : | |
| | : | |
| and | : | |
| | : | |
| COMMUNICATIONS WORKERS OF | : | August 29, 2023 |
| AMERICA, AFL-CIO | : | |
| | : | |
| Charging Party | | |

## RESPONDENT'S EXCEPTIONS TO THE
## ADMINISTRATIVE LAW JUDGE'S DECISION

Pursuant to Section 102.46(a) of the National Labor Relations Board's Rules and Regulations, Respondent Apple Inc. ("Apple") respectfully files the following Exceptions to the Administrative Law Judge's ("ALJ") decision in this matter ("Decision") issued on June 20, 2023. The rationale and legal authority supporting Apple's Exceptions are set forth in Apple's supporting memorandum of law, filed simultaneously herewith.

**I.**      **Apple Excepts to the Following Findings of Fact and Conclusions of Law**

1.      Apple excepts to the ALJ's finding that she found, "[t]he testimony of Apple's witnesses regarding . . . their explanations of Apple's housekeeping and cleanliness standards, and their accounts of the application of those standards and of Apple's Solicitation and Distribution Policy, to be of varying reliability." Decision, p. 14:36-39. Apple excepts to this finding, as it submits that Apple's witnesses were reliable, offered consistent testimony, and offered numerous examples of applying the housekeeping and cleanliness standards and the Solicitation and Distribution Policy since the WTC Store opened.

2.      Apple excepts to the ALJ's finding that Apple's witnesses' "explanations for their conduct in connection with the removal of Union flyers from the breakroom table to be implausible or contradicted by other, more probative evidence[.]" Decision, p. 14:40-42.  Apple excepts to this finding, as it submits that Apple's witnesses' explanations were corroborated by ample other evidence in the record.

3.      Apple excepts to the ALJ's finding that. "Gladden coercively interrogated Vasquez during their conversation on May 9, 2022." Decision, p. 15:48.  Apple excepts to this finding, as it submits that Gladden's conversation was permissible and lawful, and the evidence shows that it was not coercive.

4.      Apple excepts to the ALJ's finding that, "after [Vasquez] described his meeting with Rodriguez, Gladden asked him whether he had spoken to other employees regarding a wage increase, and asked how many employees he had spoken to." Decision, p. 15:43-45.  Apple excepts to this finding, as it submits that Ms. Gladden testified that she did not ask "questions related to his compensation or compensation of his colleagues."

5.       Apple excepts to the ALJ's finding that, "after asking Vasquez how the meeting with Rodriguez went, Gladden asked Vasquez for information regarding the parameters of the group of employees dissatisfied with their wage rates, whose concerns Vasquez has just presented to Rodriguez." Decision, p. 16:5-7. Apple excepts to this finding, as it submits that Ms. Gladden testified that she did not ask "questions related to his compensation or compensation of his colleagues."

6.      Apple excepts to the ALJ's finding that, "[Gladden] asked Vasquez what he thought about the unionization efforts at Apple."  Decision, p. 16:18-19.  Apple excepts to this

finding, as it submits that Vasquez voluntarily provided this information to Ms. Gladden upon asking how his day was going.

7.    Apple excepts to the ALJ's finding that, "Vasquez's depiction of the manner in which the May 9, 2022, conversation unfolded was the more inherently plausible [version]." Decision, p. 16:20-21. Apple excepts to this finding, as it submits that Vasquez voluntarily provided this information to Ms. Gladden upon asking how his day was going.

8.    Apple excepts to the ALJ's finding that, "a scenario where Vasquez spontaneously raised the issue with Gladden to convey his disquiet with being associated with the Union only makes sense if one presumes that Vasquez was attempting to 'gaslight' Gladden in some way by preemptively denying involvement in the Union Campaign." Decision, p. 16:31-35. Apple excepts to this finding, as it submits that Vasquez voluntarily provided this information to Ms. Gladden upon asking how his day was going, and the ALJ specifically found that Vasquez equivocated in response to Gladden's question, thus making the scenario where he preemptively denied his involvement all the more likely.

9.    Apple excepts to the ALJ's finding that, "It is well settled that supervisory questioning regarding employees' thoughts or sentiments involving a union may constitute an unlawful interrogation." Decision, p. 16:43-45. Apple excepts to this finding, as it submits that to hold that any instance of casual discussions concerning union sympathies violates the Act ignores the realities of the workplace and is not a violation of the Act.

10.     Apple excepts to the ALJ's finding that, Gladden's statements to Vasquez, namely, "if you're allowed to do these things, why does it upset you?" and "This is something that you can talk about and you can engage in" is "simply a variation on supervisory queries regarding employee 'thoughts' and 'feelings' about a union or union representation which the Board has found to be impermissible." Decision, p. 17:21-26. Apple excepts to this finding, as these statements were lawful. Moreover, they were directed towards Vasquez's mood at the time, not his thoughts or feelings towards the Union.

11.     Apple excepts to the ALJ's finding that, "Gladden's comments involved more extensive probing, and sought more specific information regarding Vasquez's protected concerted activities and Union sentiments, than the Senior Vice President's "offhand" remark at issue in *Bozzutto's Inc*." Decision p. 18:7-9. Apple excepts to this finding, as it submits that Gladden's statements were offhand and innocuous.

12.     Apple excepts to the ALJ's finding that, Gladden's statements were coercive because she was "Vasquez's direct supervisor on the sales floor during that portion of his shift." Decision, p. 18:11-14. Apple excepts to this finding, as it submits that Ms. Gladden was a mid-level manager at the store, rendering her conversation even less likely to be perceived as coercive or restraining by Mr. Vasquez.

13.     Apple excepts to the ALJ's finding that, "Vasquez's testimony that despite their casual exchanges he and Gladden did not have a friendship or personal relationship was not contradicted." Decision, p. 18:20-22. Apple excepts to this finding, as it submits that Vasquez and Gladden spoke a few times a day when they were working together about work, as well as personal things, such as cycling and bars around the city and therefore had a friendly and open relationship.

4

14.   Apple excepts to the ALJ's finding that, "Gladden's regular interactions with sales floor employees to identify herself and initiate contact at the beginning of her shift do not obviate the coercive nature of questioning regarding Union and protected concerted activity." Decision, p. 18:26-28. Apple excepts to this finding, as it submits that Vasquez and Gladden had a friendly and open relationship and the fact that Vasquez admits that Gladden would approach him on his shift does, in fact, obviate any allegedly coercive nature of the questioning.

15.   Apple excepts to the ALJ's finding that, "Vasquez and the rest of the organizing committee were sufficiently concerned with the ramifications if management became aware of the Union organizing campaign that Vasquez responded to Gladden's questioning untruthfully." Decision, p. 19:13-15. Apple excepts to this finding, as it submits that Mr. Vasquez did not testify that he feared being terminated or was afraid that his unionization efforts would be thwarted by management. Instead, he testified that the organizing committee was simply trying to keep this a secret from management.

16.   Apple excepts to the ALJ's finding that, "the evidence does not establish that prior to May 15, 2022, Apple maintained a coherent housekeeping or cleanliness policy with respect to the employee breakroom table at the WTC store." Decision, p. 25:3-5. Apple excepts to this finding, as it submits that, Apple established through an abundance of testimony and evidence that, since the WTC store opened, it maintained (and continues to maintain) a general housekeeping and cleanliness policy or standard with which all employees are required to comply.

5

17.     Apple excepts to the ALJ's finding that, "the general contentions made by Apple's managers regarding its purported housekeeping and cleanliness policy were belied by video of the breakroom introduced into evidence." Decision, p. 25:8-10. Apple excepts to this finding, as it submits that Apple established through an abundance of testimony and evidence that, since the WTC store opened, it maintained (and continues to maintain) a general housekeeping and cleanliness policy or standard with which all employees are required to comply.

18.     Apple excepts to the ALJ's finding that, "the most probative video evidence conclusively contradicts the testimony of Apple's witnesses regarding the purportedly critical nature of cleanliness and organization in the employee breakroom, and regarding the managers' role in maintaining Apple's vaunted standards of housekeeping." Decision, p. 26:18-21. Apple excepts to this finding, as it submits that it established through an abundance of evidence that, since the WTC store opened, Apple maintained (and continues to maintain) a general housekeeping and cleanliness policy or standard with which all employees are required to comply.

19.     Apple excepts to the ALJ's finding that, "[t]he video evidence from May 15, 2022 flatly belies all of this testimony. Instead, the video corroborates Vasquez and O'Hara's testimony regarding items left on the breakroom table throughout one of their shifts, and from one day to the next." Decision, p. 26:35-38. Apple excepts to this finding, as it submits that it established through an abundance of evidence that, since the WTC store opened, Apple maintained (and continues to maintain) a general housekeeping and cleanliness policy or standard with which all employees are required to comply.

20.     Apple excepts to the ALJ's finding that, "the videos conclusively demonstrate that when Apple managers removed Union flyers from the breakroom table, they did not do so as part of some overall effort to clean or organize the breakroom. Instead, they entered the breakroom, removed the Union flyers from the table, and left without performing any other cleaning, organization, or overall 'sweep.'" Decision, p. 27:11-15. Apple excepts to this finding, as it submits that it established through an abundance of evidence that, since the WTC store opened, Apple maintained (and continues to maintain) a general housekeeping and cleanliness policy or standard with which all employees are required to comply and removed the flyers as part of maintaining the breakroom.

21.     Apple excepts to the ALJ's finding that, "the evidence establishes that the managers at the WTC store "specifically targeted union literature for removal" in an unlawful manner." Decision, p. 28:5-7. Apple excepts to this finding, as it submits that it established through an abundance of evidence that, since the WTC store opened, Apple maintained (and continues to maintain) a general housekeeping and cleanliness policy or standard with which all employees are required to comply and removed the flyers as part of maintaining the breakroom and maintained this policy in a consistent and nondiscriminatory manner.

22.     Apple excepts to the ALJ's finding that, "the evidence establishes that Apple's Solicitation and Distribution Policy did not permit Apple to lawfully remove Union flyers from the employee breakroom table, nor did its housekeeping and cleanliness standards." Decision, p. 28:9-11. Apple excepts to this finding, as it submits that it established through an abundance of evidence that, since the WTC store opened, Apple

maintained (and continues to maintain) a Solicitation and Distribution Policy and a general housekeeping and cleanliness policy or standard with which all employees are required to comply and removed the flyers as part of maintaining the breakroom.

23. Apple excepts to the ALJ's finding that, "the evidence does not substantiate any "special circumstances" justifying Apple's removal of Union flyers from the employee breakroom table." Decision, p. 28:12-13. Apple excepts to this finding, as it submits that it established through an abundance of evidence that, since the WTC store opened, Apple maintained (and continues to maintain) a Solicitation and Distribution Policy and a general housekeeping and cleanliness policy or standard with which all employees are required to comply and removed the flyers as part of maintaining the breakroom.

24. Apple excepts to the ALJ's finding that, "The evidence further establishes that Apple enforced its Solicitation and Distribution Policy and its housekeeping and cleanliness standards in a discriminatory manner to prohibit the distribution of the Union flyers." Decision, p. 28:17-19. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard in a nondiscriminatory manner.

25. Apple excepts to the ALJ's finding that, "Apple's contention that leaving newspapers on the breakroom table while removing Union flyers does not constitute disparate enforcement of its Solicitation and Distribution Policy pursuant to *St. Luke's Memorial Hospital,* 342 NLRB 1040 (2004), is not persuasive." Decision, p. 28:fn. 29. Apple excepts to this finding, as it submits that the law is clear that leaving newspapers out

8

on a breakroom table is not an indication of disparate enforcement of a Solicitation and Distribution Policy.

26.    Apple excepts to the ALJ's finding that, "[Vasquez and O'Hara] had seen coupons for Shake Shack and Burger King, as well as newspapers, in the breakroom, and that such materials had remained on the breakroom table for an entire shift and were sometimes present at the beginning of their shift the following day." Decision, p. 28:20-21. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard in a nondiscriminatory manner, whereas Vasquez and O'Hara relied only upon their own self-serving testimony without any supporting or corroborating evidence.

27.    Apple excepts to the ALJ's finding that, "the evidence establishes that the Solicitation and Distribution Policy was not consistently applied with respect to the employee breakroom at the WTC store."  Decision, pp. 28:35-29:1. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard in a nondiscriminatory manner.

28.    Apple excepts to the ALJ's finding that, '[t]he unprecedented manner in which Apple's managers effectuated the Solicitation and Distribution Policy in removing the Union flyers also indicates that this did not constitute an even-handed, non-discriminatory application of the Policy." Decision, p. 29:3-5. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and

housekeeping and cleanliness standard in a nondiscriminatory manner. Further, there is no evidence to suggest Apple's managers effectuated the Solicitation and Distribution Policy in an unprecedented manner.

29.    Apple excepts to the ALJ's finding that, "nothing in the May 15, 2022 breakroom video, or any of the other record evidence, indicates that Abdelal took any measures to determine whether the Union flyers were 'abandoned.'" Decision, p. 29:9-11. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard, and the evidence demonstrates that at no point when management removed the flyers from the breakroom table can anyone be seen reading or holding the flyers.

30.    Apple excepts to the ALJ's finding that, "[n]or does any evidence indicate that Moya, Brown, or Romero made any attempt to determine whether the Union flyers they removed from the breakroom table on May 15, 2022, May 27, 2022, or June 1, 2022 were 'abandoned.'" Decision, p. 29:13-15. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard, and the evidence demonstrates that at no point when management removed the flyers from the breakroom table can anyone be seen reading or holding the flyers.

31.    Apple excepts to the ALJ's finding that, "there was no set conclusion to break periods, such that an empty breakroom would permit managers to determine whether or not materials which remained there were 'abandoned.' As a result, the managers' removal

of Union flyers before the day ended inevitably prevented other employees from viewing them." Decision, p. 29:22-25. Apple excepts to this finding, as it submits that the evidence showed that Apple was able to determine if material was abandoned because, *inter alia*, at no point when management removed the flyers from the breakroom table can anyone be seen reading or holding the flyers.

32.    Apple excepts to the ALJ's finding that, "Moya's photographing of the Union flyers constitutes a distinct change in the manner in which Apple's Solicitation and Distribution Policy was applied or enforced, specific to materials involving the Union." Decision, pp. 29:35-30:1. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard, and that there was a reason for his taking pictures – namely, that managers were unsure how to proceed and were therefore seeking advice.

33.    Apple excepts to the ALJ's finding that, "[t]he evidence further establishes that the unprecedented shredding of Union flyers removed from the breakroom table constitutes an additional departure from Apple's typical practices with respect to the Solicitation and Distribution Policy." Decision, p. 30:1-4. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard.

34.    Apple excepts to the ALJ's finding that, "the evidence establishes that Apple enforced its Solicitation and Distribution Policy in a disparate or discriminatory manner by removing Union flyers from the table in its employee breakroom at the WTC store on

May 15, 20 2022, May 27, 2022, and June 1, 2022, in violation of Section 8(a)(1) of the Act." Decision, p. 30:17-20. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard.

35.    Apple excepts to the ALJ's conclusion that, "[o]n May 9, 2022, Apple coercively interrogated employees regarding their protected concerted activity and their Union sympathies, in violation of Section 8(a)(1) of the Act." Decision, p. 30:30-32. Apple excepts to this finding, as it submits that Gladden's questions were not in any way coercive or restraining to the exercise of the employee's Section 7 rights.

36.    Apple excepts to the ALJ's conclusion that, "[o]n May 15, 2022, May 27, 2022, and June 1, 2022, Apple confiscated Union flyers in its employee breakroom, a non-working area, in violation of Section 8(a)(1) of the Act." Decision, p. 30:34-36. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard.

37.    Apple excepts to the ALJ's conclusion that, "[b]y prohibiting the placement of Union flyers on the employee breakroom table on May 15, 2022, May 27, 2022, and June 1, 2022, while permitting solicitation and distribution with respect to non-Union materials, Apple selectively and disparately enforced its Solicitation and Distribution Policy, in violation of Section 8(a)(1) of the Act." Decision, p. 30:38-41. Apple excepts to this finding, as it submits that Apple submitted overwhelming evidence to show that, since the WTC store opened, it has consistently enforced its Solicitation and Distribution Policy and housekeeping and cleanliness standard.

38.  Apple excepts to the ALJ's recommendation that, "Apple, Inc., . . . Cease and desist from . . . Confiscating Union Flyers from its employee breakroom, a non-working area . . . [and] Selectively and disparately enforcing its Solicitation and Distribution Policy by prohibiting the placement of Union flyers on the employee breakroom table, while permitting solicitation and distribution with respect to non-Union materials." Decision, p. 31:35-32:3. Apple excepts to this finding, as it submits that, since the WTC store opened, Apple maintained (and continues to maintain) a Solicitation and Distribution Policy and a general housekeeping and cleanliness policy or standard with which all employees are required to comply and removed the flyers as part of maintaining the breakroom.  Further, Apple excepts to this overly broad remedy that is not supported by law.

39.  Apple excepts to the fact that the ALJ failed and refused to accord proper weight to numerous ALJ decisions that bear directly on this case and were cited by the Employer.

## II.    Conclusion

For the reasons set forth above and in the supporting brief, Apple respectfully requests that the Board sustain Apple's Exceptions and overturn the Decision.

APPLE INC.,

/s/ Jason R. Stanevich
Jason R. Stanevich
Maura A. Mastrony
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street; Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
jstanevich@littler.com
mmastrony@littler.com

13

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing document has been delivered, via e-mail,, on this 29th day of August 2023, via e-mail to all counsel and *pro se* parties of record as follows:

Sumanth Bollepalli, Esq.
80 Pine Street, 37th Floor
New York, NY 10005-1728
sbollepalli@cwa-union.org
--*Counsel for Communications Workers of America*

Ruth Weinreb
Field Attorney
National Labor Relations Board, Region 2
Ruth.Weinreb@NLRB.gov

*/s/Jason R. Stanevich*
Jason R. Stanevich

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**

APPLE INC.

Case  02-CA-295979

and

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO                                      September 11, 2023

**<u>MOTION FOR EXTENSION OF TIME ON CONSENT</u>**

      Pursuant to Section 102.46 of the Board's Rules and Regulations, Apple Inc. ("Apple")

moves for an extension of time of fourteen days, up to and including September 26, 2023, within

which to file its Brief in Opposition to the General Counsel's Exceptions to the Administrative

Law Judge's decision in this matter.  Due to multiple previously scheduled work obligations, the

undersigned requires additional time to review the General Counsel's Exceptions and Brief in

Support and draft opposition thereto.

      Counsel for the General Counsel has consented to the extension of time for Apple to file

its opposition.  Counsel for Communications Workers of America, AFL-CIO, consents to a three-

day extension.  However, such an extension would be an insufficient time for Apple to draft its

opposition.

      Based on the above, Apple respectfully requests an extension of time of fourteen days, up

to and including September 26, 2023, within which to file its Brief in Opposition to the General

Counsel's Exceptions to the Administrative Law Judge's decision in this matter.  Respondent

submits that any extension should apply equally to Counsel for the General Counsel and the Union.

APPLE INC.

*/s/Jason R. Stanevich*
Jason R. Stanevich
Maura A. Mastrony
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street; Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
jstanevich@littler.com
mmastrony@littler.com

## **CERTIFICATION**

      This is to certify that a copy of the foregoing document has been delivered, on this 11th day of September 2023, via e-mail to all counsel and *pro se* parties of record as follows:

Sumanth Bollepalli, Esq.
80 Pine Street, 37th Floor
New York, NY 10005-1728
sbollepalli@cwa-union.org
*--Counsel for Communications Workers of America*

Ruth Weinreb
Field Attorney
National Labor Relations Board, Region 2
Ruth.Weinreb@NLRB.gov

*/s/Jason R. Stanevich*
Jason R. Stanevich



UNITED STATES GOVERNMENT
**OFFICE OF THE EXECUTIVE SECRETARY**
**NATIONAL LABOR RELATIONS BOARD**
**1015 Half Street SE**
**Washington, DC 20570**

September 11, 2023

Re:   Apple, Inc.
      Case 02-CA-295979

### EXTENSION OF TIME TO FILE ANSWERING BRIEF TO EXCEPTIONS
### TO THE ADMINISTRATIVE LAW JUDGE'S DECISION

The request for an extension of time in the above-referenced case is granted.[1]
The due date for the receipt in Washington, D.C. of an Answering Brief to Exceptions to
the Administrative Law Judge's Decision is extended to **September 26, 2023**.[2]  This
extension for filing answering briefs to exceptions applies to all parties.

/s/ Diane L. Bridge
Counsel

cc: Parties
     Region

---

[1] Please note that NLRB Rules and Regulations Section 102.2(c) states that "[r]equests for
extensions of time filed within three days of the due date must be grounded upon circumstances
not reasonably foreseeable in advance."  The due date for answering briefs to exceptions is
September 12, 2023 and the request for an extension of time was filed on September 11, 2023,
which is within three business days of the document's due date.  Despite this, there is no
explanation in the request for extension of time as to why the need for the extension was "not
reasonably foreseeable in advance."  Nonetheless, given that Counsel for Respondent has
represented that Counsel for the General Counsel does not oppose the extension and that
Charging Party consents up to three days and not 14 days, we will allow the extension.

[2]  When a party is granted an extension of time to file an answering brief to exceptions to an
Administrative Law Judge's decision, this extension does not automatically extend the time for
filing cross-exceptions to that decision.  Please note, however, that when a party requests an
extension of time to file cross-exceptions, the extension automatically extends the time for filing
answering briefs to exceptions.  See *P&M Cedar Products*, 282 NLRB 772 (1987).  Here,
Counsel for the Respondent only requested an extension of time for filing an answering brief to
exceptions.  As no request was made for extending the time for filing cross-exceptions, the due
date for cross-exceptions remains **September 12, 2023**.

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 2**


**APPLE, INC.**


**CASE: 02-CA-295979**


**COMMUNICATIONS WORKERS OF**
**AMERICA, AFL-CIO**


**GENERAL COUNSEL'S REQUEST FOR AN**
**EXTENSION OF TIME TO FILE AN ANSWERING BRIEF TO**
**RESPONDENT'S EXCEPTIONS  TO**
**ADMINISTRATIVE LAW JUDGE**
**LAUREN ESPOSITO'S DECISION**


Pursuant to Section 102.2(c) and 102.46(a), (b) and (c) of the Board's Rules and

Regulations of the National Labor Relations Board, Counsel for the General Counsel (General

Counsel) respectfully files this Request for an extension of time for the General Counsel to file

its Answering Brief to Respondent's Exceptions to the Administrative Law Judge (ALJ) Lauren

Esposito's Decision, which were filed on August 29, 2023 in the above-captioned case. Pursuant

to Section 102.46(d)(1) of the Rules and Regulations, General Counsel's Answering Brief to

Respondent's exceptions is currently due September 26, 2023.

General Counsel seeks a three-week extension of time to October 17, 2023 in which to

file an Answering Brief to Respondent's Exceptions in this matter. The requested extension is

being requested due to the substantive issues raised in the multitude of exceptions (39) filed by

Respondent and the limited work schedule due to the Jewish Holidays and prior case handling matters of the undersigned Counsel for the General Counsel.

Respondent and Union Counsel are aware of this request and do not object.

Accordingly, Counsel for the General Counsel respectfully requests the General Counsel's three-week extension of time be granted.

Dated: at New York, New York this 13th day of September 2023.

Respectfully submitted,

*Ruth Weinreb*

Ruth Weinreb, Counsel for the General Counsel
National Labor Relations Board, Region 2
26 Federal Plaza, Rm 36-130
New York, New York   10278



UNITED STATES GOVERNMENT
**OFFICE OF THE EXECUTIVE SECRETARY**
**NATIONAL LABOR RELATIONS BOARD**
**1015 Half Street SE**
**Washington, DC 20570**

September 13, 2023

Re:    <u>Apple, Inc.</u>
        Case 02-CA-295979

**EXTENSION OF TIME TO FILE ANSWERING BRIEF TO EXCEPTIONS
TO THE ADMINISTRATIVE LAW JUDGE'S DECISION**


        The request for an extension of time in the above-referenced case is granted.
The due date for the receipt in Washington, D.C., of an Answering Brief to Exceptions to
the Administrative Law Judge's Decision is extended to **October 17, 2023**.[1]  This
extension for filing answering briefs to exceptions applies to all parties.


                                                /s/ Nelson Carrasco
                                                Associate Executive Secretary


cc:  Parties
      Region

---

[1]  When a party is granted an extension of time to file an answering brief to exceptions
to an Administrative Law Judge's decision, this extension does not automatically extend
the time for filing cross-exceptions to that decision.  Please note, however, that when a
party requests an extension of time to file cross-exceptions, the extension automatically
extends the time for filing answering briefs to exceptions.  See *P&M Cedar Products*,
282 NLRB 772 (1987).  Here, Counsel for the General Counsel only requested an
extension of time for filing an answering brief to exceptions.  As no request was made
for extending the time for filing cross-exceptions, the due date for cross-exceptions
remains September 26, 2023.

 UNITED STATES GOVERNMENT
**OFFICE OF THE EXECUTIVE SECRETARY**
**NATIONAL LABOR RELATIONS BOARD**
**1015 Half Street SE**
**Washington, DC 20570**

September 14, 2023

Re:    Apple, Inc.
        Case 02-CA-295979

### CORRECTED[1]
### EXTENSION OF TIME TO FILE ANSWERING BRIEF TO EXCEPTIONS
### TO THE ADMINISTRATIVE LAW JUDGE'S DECISION

        The request for an extension of time in the above-referenced case is granted.
The due date for the receipt in Washington, D.C., of an Answering Brief to Exceptions to
the Administrative Law Judge's Decision is extended to **October 17, 2023**.  This
extension for filing answering briefs to exceptions applies to all parties.


                                        /s/ Nelson Carrasco
                                        Associate Executive Secretary


cc:  Parties
      Region

---

[1]  Yesterday, we sent a response to this extension of time stating that cross-exceptions
were due on September 26, 2023.  That was an error.  The deadline for filing cross-
exceptions was September 12, 2023.  Therefore, parties may no longer file cross-
exceptions.

**UNITED STATES OF AMERICA BEFORE THE
NATIONAL LABOR RELATIONS BOARD
REGION 2**

Apple, Inc.
      Respondent

    and                                      Case No.: 2-CA-295979

Communications Workers of America, AFL-CIO
      Charging Party

**GENERAL COUNSEL'S ANSWERING BRIEF
TO RESPONDENT'S EXCEPTIONS
TO THE ADMININSTRATIVE LAW JUDGE'S DECISION**

Ruth Weinreb, Counsel for the General Counsel
National Labor Relations Board, Region 2
26 Federal Plaza, Room 36-130
New York, New York 10278

**TABLE OF CONTENTS**

I.Introduction…………….……………………………………………………..…….……1

II. Case Summary………………………………………………………………..…..…2

III. Answer to Respondent's Exceptions Issues…………………………………………4

A.    The Judge's Credibility Determinations Were Appropriate
(Respondent's Exceptions 1, 2, 4, 5, 6, 7, 8, 11, 16-34, 36, 37)………………4

B.    The ALJ correctly found Gladden's comments coercive in violation of Section
8(a)(1) of the Act.
(Respondent's Exceptions 3-15, 35)………………………………………………8

    1. Coercion is unlawful and falls outside the protection of the First
    Amendment…………………………………………………………………11
    2. Under *Gissel*, Coercion is Measured Objectively from the Perspective
    of the Listening Employee……………………………………………………12
    3. *Counterman* Does Not Require the Board to Now Measure Coercion
    based on the Subjective Intent of the Speaking Employer…………..14
    4. Even if *Counterman* Imposes a *Mens Rea* Requirement on the
    Speaker, an Employer Making Objectively Coercive Statements Acts
    Recklessly *per se*………………………………………………………………18

C.    The ALJ correctly found that Respondent's removal of Union flyers from the
employee breakroom table was a violation of Section 8(a)(1) of the Act.
(Respondent exceptions 1, 2, 16-34, 36, 37)………………………………………19

D.    The ALJ correctly found that Respondent enforced its Solicitation and Distribution
policy in a selective and disparate manner in violation of Section 8(a)(1) of the
Act.
(Respondent's Exceptions 24-28, 34, 37)…………………………………………22

E.    The ALJ issued the correct Order by requiring Respondent to cease and desist
from confiscating Union flyers from the employee breakroom table, a nonworking
area, and from selectively and disparately enforcing its Solicitation and
Distribution policy by prohibiting the placement of Union flyers on the employee
breakroom table, while permitting solicitation and distribution with respect to non-
Union materials.
(Respondent Exception 38)……………………………………………………26

F.    The ALJ accorded the proper weight to numerous ALJ decisions that were cited by Respondent
      (Respondent Exception 39)……………………………………………………..27

IV.   Conclusion…………………………………………………………………………..29

## TABLE OF AUTHORITY

<u>NLRB Decisions</u>

*Atelier Condo.*, 361 NLRB 966 (2014)……………………………………………..6
*AT&T Mobility, LLC*, 370 NLRB No. 121 (2021)…………………………………………27
*Chipotle Service*, 363 NLRB 338 (2015)……………………………………………10
*Covanta Bristol, Inc.*, 356 NLRB 246 (2010)……………………………..…………5
*Daikichi Sushi*, 335 NLRB 622, 623 (2001), enf'd. 56 Fed. Appx. 516 (D. C. Cir. 2003)…..…5
*D.L. Baker, Inc.*, 351 NLRB 515 (2007)………………………………………..…5
*Double D Construction Group*, 339 NLRB 303, 305 (2003)……………………………5
*Flexsteel Industries*, 316 NLRB 745 (1995), aff'd, 83 F.3d 419 (5th Cir. 1996)……………….5
*Great Lakes Chemical Corp.*, 300 NLRB 1024 (1990). ......................................................28
*Healthbridge Management, LLC*, 362 NLRB 310 (2015), enfd. per curiam 672 Fed. Appx. 1 (D.C. Cir. 2016)...........................................................................................................................28
*Hill & Dales General Hospital*, 360 NLRB 611 (2014)………………………………………5
*Intertape Polymer Corp.*, 360 NLRB 957 (2014)....................................................27
*ITT Industries, Inc.*, 331 NLRB 4 (2000)....................................................27
*Kumho Tires Georgia*, 370 NLRB No. 32 (2020)....................................................10
*Mclaren Macomb*,372 NLRB No. 58 (2023)....................................................14
*Mercedes-Benz U.S. International, Inc.*, 361 NLRB 1018 (2014)....................................20
*Midland Transportation*, 304 NLRB 4, 5 (1991)....................................................20
*NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35 (2022)..................13, 14
*Novelis Corp.*, 364 NLRB 1452 (2016)....................................................27
*Paige Avject, Inc.*, 278 NLRB 444 (1986)....................................................20
*Pathmark Stores, Inc.*, 342 NLRB 378 (2004)....................................................28
*Planned Building Services, Inc.*, 347 NLRB 670 (2006)....................................................28
*Pressroom Cleaners*, 361 NLRB 643 (2014)....................................................28
*Relco Locomotives*, 359 NLRB 1145 (2013). ....................................................10,14
*Richfield Hospitality, Inc.*, 369 NLRB No. 111 (2020)....................................................28
*Rossmore House*, 269 NLRB 1176 (1984)....................................................13
*Shamrock Foods Co.*, 336 NLRB No. 117 (2018)....................................................20, 26
*Sinclair Co.*, 164 NLRB 261 (1967)....................................................11
*Smithfield Packing Co.*, 344 NLRB 1 (2004)....................................................14
*Spectrum Juvenile Justice Services*, 368 NLRB No. 102 at p. 1, fn. 1 and at p. 8-10 (2019);
*Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951)..............5, 24
*Stark Electric, Inc.*, 327 NLRB 518 (1999)....................................................28
*St. Lukes Memorial Hospital*, 342 NLRB 1040 (2004)....................................................25
*Valley Health System, LLC d/b/a Desert Springs Hospital
    Medical Center*, 369 NLRB No. 16 (2020)....................................................26
*Western Cab Co.*, 365 NLRB No. 78 (2017)....................................................27

*Westwood Health Care Center*, 330 NLRB 935 (2000)..........................................................................14
*Wismettac Asian Foods, Inc*., 371 NLRB No. 9 (2021)....................................................................4, 24


Circuit Court Decisions

*Bozzuto's Inc. v. NLRB*, 927 F.3d 672 (2019)...............................................................................9


U.S. Supreme Court Decisions

*Agostini v. Felton, 521 U.S. 203 (1997)*..............................................................................18
*Counterman v. Colorado*, 143 S. Ct. 2106 (2003)........................................11, 14, 15, 16, 17, 18, 19
Elonis v. United States, 575 U.S. 723 (2015)..............................................................................15
*Mallory v. Norfolk S. Ry*., 143 S.Ct. 2028 (2023)................................................................................18
*NLRB v. Gissel Packing Co*., 395 U.S. 575 (1969).............................................11,12, 13, 16, 17
*Republic Aviation Cor., v. NLRB*, 324 U.S. 793 (1945)............................................................20
*Rodriguez de Quijas v. Shearson/Am. Express, Inc*., 490 U.S. 477 (1989).........................18
*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978).................................................17
*Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748 (1976).............17


Statutes

29 U.S.C. 157.................................................................................................................11
19 U.S.C. 158(a)(1)..........................................................................................................11

iv.

# I.    Introduction

Pursuant to Section 102.46(d) of the Board's Rules and Regulations, as amended, General Counsel hereby submits her Answering Brief to Apple Inc.'s (Respondent) Exceptions and Supporting Brief. As the General Counsel will demonstrate, Respondent's exceptions are without merit and should be rejected by the Board.

In her decision, which issued on June 20, 2023, Administrative Law Judge Lauren Esposito found that Respondent violated Section 8(a)(1) of the Act by: (a) interrogating employees about their protected concerted activities and sympathies for the Apple Retail Union, an affiliate of the Communications Workers of America (Union) on May 9, 2021; (b) confiscating Union flyers from the employee breakroom table, a nonworking area, on May 15, May 27 and June 1, 2021; and (c) selectively and disparately implementing its Solicitation and Distribution policy by removing Union flyers from the employee breakroom table on May 15, May 27 and June 1, 2021, while allowing other nonunion material to remain on the table  (ALJD p. 30; 22-41).[1]

The ALJ's decision should be adopted by the Board. Based on her observation of witnesses, credibility determinations, corroborating evidence and Board precedent, the Judge correctly concluded that Respondent engaged in unlawful conduct that violated Section 8(a)(1) of the Act.

---

[1] In this Answering Brief, the following citations apply: "ALJD" designates the Administrative Law Judge's Decision, "R. exceptions" designates Respondent's Exceptions; "R. Brief" designates Respondent's Brief in Support of Exceptions; "Tr." designates the transcript from the hearing; "G.C. Ex.", designates a General Counsel Exhibit that was admitted into the record at the hearing; "R. Ex.", designates Respondent's Exhibits admitted into the record at the hearing and "Jt. Ex." designates a joint Exhibit admitted into the record at the hearing.

## II.   Case Summary

In January 2021, employees of Respondent's World Trade Center store began an organizing campaign with the Union. On May 9, 2021, before the campaign went public, Respondent Senior Manager Stephanie Gladden (Gladden) approached employee Jordan Vasquez (Vasquez) to ask him how his meeting went with Julia Rodriguez (Rodriguez), Respondent's PEOPLE (Human Resources) Manager (Tr. 34).  Vasquez met with Rodriguez to discuss the possibility of employees receiving higher wages (Tr. 31). Gladden also asked Vasquez about his views on the Union's organizing efforts (Tr. 34).

It is well settled that an employer's interrogation of employees concerning their union activities and protected concerted activities is violative of the Act. Although Respondent argues that Vasquez volunteered his views about his protected activities to Gladden and that the conversation was not coercive, direct and corroborating evidence shows that Gladden approached Vasquez to question him about his protected activities. Based on this credible evidence, the ALJ correctly found that Respondent unlawfully interrogated Vasquez and that the interrogation was coercive in violation of Section 8(a)(1) of the Act.

On May 15, 2021, days after Gladden interrogated Vasquez, the Union campaign went public, and employees began to distribute Union flyers. Vasquez and Ian O'Hara (O'Hara), another employee, placed Union flyers on the employee breakroom table on May 15, May 27 and June 1, 2021. Respondent's employee breakroom is in a nonworking area where employees get ready for work and sit around the table to eat, read, and to talk to one another. Employees

do not engage in work while in the breakroom. On May 15, May 27 and June 1, 2021, Respondent Managers Matt Moya (Moya), Waleed Abdelal (Abdelal), Yanell Brown (Brown) and Jorge Romero (Romero) confiscated the Union flyers that were neatly placed on the breakroom table during nonworking time. The Union flyers were removed minutes after being placed on the table.

Although Respondent quickly removed the Union flyers to prevent employees from communicating about the organizing campaign, Respondent has allowed other nonunion material such as newspapers and restaurant coupons to remain on the table.

It is axiomatic that an employer cannot confiscate union flyers without special circumstances. Here, Respondent did not have any special circumstances that warranted the removal of Union flyers. Therefore, the ALJ correctly found that Respondent's removal of the Union flyers on May 15, May 27 and June 1, 2021 was a violation of Section 8(a)(1) of the Act.

Respondent argues that the removal of Union flyers was consistent with the way in which it implemented its Solicitation and Distribution policy and general housekeeping functions. Although Respondent's Solicitation and Distribution policy may be lawful, Respondent repeatedly implemented the policy in a selective and discriminatory manner by quickly removing the flyers while allowing water bottles, newspapers and restaurant coupons to remain on the table for a longer period of time.  In addition, credible evidence shows that although Respondent may have a housekeeping policy to keep customer areas clean, the removal of Union flyers was not part of any regular housekeeping practice. Therefore, the ALJ correctly concluded that Respondent violated Section 8(a)(1) of the Act by implementing its

Solicitation & Distribution policy in a selective and disparate manner when it removed Union

flyers from the breakroom table while permitting other nonunion material to remain on the

table (ALJD p. 30; 17-20).

Respondent excepts to many substantive portions of the ALJ's Decision. Nearly all of

Respondent's exceptions are premised upon the ALJ's credibility determinations and factual

findings. This Answering Brief will describe how well-established Board law does not support

Respondent's exceptions and why the ALJ's credibility determinations, factual findings, legal

conclusions and Order should be affirmed and partly modified by the Board, as set forth herein

and in General Counsel's exceptions.

III.     **Answer to Respondent's Exceptions**

Respondent filed 39 exceptions to the ALJ's Decision. The arguments below

address Respondent's exceptions in several groups of responses that correspond to

Respondent's arguments.

### A.  The Judge's Credibility Determinations Were Appropriate<br>(Respondent's Exceptions 1, 2, 4, 5, 6, 7, 8, 11, 16-34, 36, 37)

In determining that Respondent violated Section 8(a)(1) of the Act by interrogating

employees, by confiscating Union flyers, and by selectively and disparately implementing its

Solicitation and Distribution policy, the ALJ made credibility determinations and factual findings

based on credibility. "The Board's established policy is not to overrule an administrative law

judge's credibility resolutions unless the clear preponderance of all the relevant evidence

convinces us that they are incorrect." *Wismettac Asian Foods, Inc*., 371 NLRB No. 9, slip. Op. at

fn. 4 (2021), citing *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir.

1951).

Here, there is no evidence that indicates the ALJ's credibility determinations should be

reversed, as argued by Respondent. With each witness, the ALJ thoroughly examined the

witnesses' demeanor, "the weight of the respective evidence, established or admitted facts,

inherent probabilities and reasonable inferences drawn from the record as a whole." (ALJD p.

13; 25-31; p. 9-13; citing *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi

Sushi*, 335 NLRB 622, 623 (2001), enf'd. 56 Fed. Appx. 516 (D. C. Cir. 2003); see also *Hill & Dales

General Hospital*, 360 NLRB 611, 615 (2014)). The ALJ also relied on corroborating and

documentary evidence for evaluating witness testimony (ALJD p. 13, 39-40; p. 9-13; citing

*Covanta Bristol, Inc.*, 356 NLRB 246, 253 (2010); *Flexsteel Industries*, 316 NLRB 745 (1995), aff'd,

83 F/3d 419 (5th Cir. 1996)) and correctly found that Vasquez, a current employee of

Respondent, testified adversely to his pecuniary interests (ALJD p. 14; 27-34; citing *Covanta

Bristol, Inc., supra, Flexsteel Industries, supra.*).

Further, the record evidence supports the ALJ's credibility conclusions. In Respondent's

exceptions 4 through 8, Respondent specifically argues that the ALJ incorrectly credited

Vasquez in finding that Gladden questioned him about his meeting with Rodriguez, and about

his views on the unionization efforts at Apple, and sought information regarding employees

who were dissatisfied with their pay rate in violation of Section 8(a)(1) of the Act. Although

Respondent argues that Gladden testified that Vasquez volunteered this information, the

record evidence does not support such a claim. The ALJ correctly found that Vasquez, as

opposed to Gladden, provided a "specific, detailed account" of how Gladden questioned him

about his protected activities and that he "evinced a good-faith effort to create an accurate record" (ALJD p. 15-27-30). On the other hand, Gladden failed to adequately rebut Vasquez' detailed testimony to demonstrate that she was a convincing witness. In addition, Gladden only provided a general denial about questioning Vasquez regarding employee compensation. (ALJD p. 15; 35-41; Tr. 284-290) See *Atelier Condo*., 361 NLRB 966 (2014) (general denials will not ordinarily suffice to refute specific and detailed testimony form an opposing side's witness). The ALJ also correctly found overwhelming corroborating and contemporaneous evidence that supported Vasquez' account of his conversation with Gladden. In this regard, Vasquez testified that immediately after Gladden interrogated him, he told co-worker O'Hara and sent a Signal message about his Gladden conversation to the organizing committee. O'Hara responded to the Signal message by naming Gladden as the supervisor who questioned Vasquez. Such evidence confirmed Vasquez's testimony regarding his conversation with Gladden. Accordingly, the ALJ's reliance on this strong corroborating evidence (ALJD p. 17; 5-17) to credit Vasquez and not Gladden is consistent with well-established Board law regarding credibility determinations and should not be reversed by the Board.

With respect to Respondent's exceptions 1, 2, 16-34, 36, 37, Respondent claims that the ALJ incorrectly failed to credit the testimony of Respondent's witnesses regarding the removal of Union flyers from the employee breakroom table and their application of Respondent's Solicitation and Distribution policy. However, contrary to Respondent's arguments, the ALJ carefully analyzed the testimonies of each Respondent witness regarding the removal of Union flyers and the way in which they enforced the Solicitation and Distribution and housekeeping policies. The ALJ correctly determined that Respondent's evidence was not supported by

credited evidence, including General Counsel's witnesses and video tapes of the employee

breakroom that were introduced at trial. In this regard, the ALJ was correct in not crediting the

testimonies of Respondent witnesses Joshua Jennison (Jennison) and Waleed Abdelal (Abdelal)

regarding the way in which they implemented Respondent's Solicitation and Distribution policy

and general housekeeping practice. Jennison and Abdelal testified how the removal of Union

flyers was consistent with the way in which they maintained the store and employee

breakroom free of non-Apple materials. In fact, they testified that managers regularly pop in

and out of the breakroom to check on its condition (Tr. 229, 331) and that keeping the store

clean was in their "DNA" and like "breathing" (Tr. 302, 307). However, the ALJ properly

concluded that the videos that were introduced at trial did not support Respondent's witnesses

since the videos failed to show managers regularly cleaning the employee breakroom (ALJD p.

26, 35-36).  Indeed, after reviewing 38 hours of video tapes of the employee breakroom that

were introduced into the record, there was only one instance where a manager removed non-

Apple materials from the breakroom table.  (ALJD p. 28, 36-37; p. 27; 1-15; G.C. Ex. 4, 8, R. Ex.

24, 29, 30). The video tapes repeatedly showed numerous managers going in and out of the

breakroom on a regular basis without ever looking to see if the breakroom table needed to be

cleaned (G.C. Ex. 4, 8; R. Ex. 24, 29, 30). Therefore, based on documentary evidence, the ALJ

correctly concluded that Jennison and Abdelal's broad and exaggerated description of the way

in which Respondent enforces its Solicitation and Distribution policy and housekeeping

practices was not credible. Thus, even though Jennison and Abdelal testified about a few

instances where they removed menus and self-promoting flyers from the breakroom table,

such evidence was not reliable due to the credibility issues of these witnesses. Based on

established facts and evidence, the ALJ correctly determined that Respondent's witnesses were not credible and therefore, Respondent failed to demonstrate that the removal of Union flyers on May 15, May 27 and June 1, 2021, was consistent with its Solicitation and Distribution policy and general housekeeping practices (ALJD p. 28; 33-36).

Respondent further argues that the ALJ erred in finding O'Hara and Vasquez' testimonies about Shake Shack coupons and newspapers being left on the breakroom table credible (R. exception 26; ALJD p. 28; 20-21).  As described above, throughout the trial, O'Hara and Vasquez provided direct and reliable testimonies that were consistently and repeatedly corroborated by documentary evidence, including Respondent's breakroom video tapes. Therefore, the ALJ's reliance on their testimonies was correct especially when the testimonies from Respondent witnesses were not supported by the video tapes or any other documentary evidence (ALJD p. 27; 17-38; p. 28). Accordingly, the ALJ's finding that newspapers and Shake Shack coupons were left on the breakroom table was proper and should not be reversed by the Board.

### B.   The ALJ correctly found Gladden's comments coercive in violation of Section 8(a)(1) of the Act.
###      (Respondent's Exceptions 3-15, 35)

Respondent claims that the ALJ incorrectly found the Gladden/Vasquez conversation coercive and in violation of Section 8(a)(1) of the Act. According to Respondent, even if Gladden questioned Vasquez about his Union sympathies and his meeting with Rodriquez, such questioning was not unlawful since it was common for Gladden to approach Vasquez and to inquire about his day and the events occurring at work. Respondent also argues that the conversation was noncoercive since Gladden's questions were "off hand and innocuous." In

8

addition, Respondent claims that Vasquez did not feel restrained in discussing his compensation since he had previously reached out to another Senior Manager, Rachel Goldman (Tr. 31). Therefore, according to Respondent, Gladden's questioning about compensation and the Union organizing campaign was not wrong or coercive.

Contrary to Respondent's arguments, the ALJ did not find Gladden's remarks to be "off hand and somewhat innocuous." *Bozzuto's Inc. v. NLRB*, 927 F.3d 672, 685, 686-687 (2019). After considering the totality of the circumstances, including corroborating documentary evidence, the ALJ correctly found that Gladden, a Senior Manager, directly approached Vasquez to specifically question him about his protected activities. This was not some "fleeting, chance encounter" between a manager and employee. (ALJD p. 17; 37-42 citing *Bozzuto Inc., supra*.). And while Gladden and Vasquez may have previously discussed non-work issues such as cycling, they were not friends and they did not socialize with one another (Tr. 36). Therefore, Gladden's questioning of Vasquez about his protected activities on May 9, 2021 was highly unusual.[2]

The ALJ also relied on corroborating and undisputed evidence to show that Gladden's questioning was coercive. In this regard, the ALJ relied on Vasquez' undisputed testimony where he denied any association or involvement with the Union and where he refused to answer Gladden's question about the number of employees with whom he discussed wages. (ALJD p. 18; 39-41; p. 19; 1-20; Tr. 34, 35). Based on well-established Board law, the ALJ

---

[2] In its Brief in Support of Exceptions, Respondent claims that Gladden asked Vasquez why being associated with the Union organizing efforts upset him (R. Brief p. 34) and that such a comment is similar to the offhand comments made in *Bozzuto, supra*. Contrary to Respondent's characterization of Gladden's comments, the corroborating evidence directly shows that Gladden approached Vasquez and asked him how his meeting with Rodriguez went. She also asked him for the number of employees he spoke to about wages and what he thought about the Union's organizing efforts (Tr. 30-34). The ALJ correctly relied on this credible evidence to conclude that Gladden's questioning of Vasquez was coercive and in violation of Section 8(a)(1) of the Act.

correctly found that Vasquez' evasive and untruthful response to Gladden supported a finding

that Gladden's questioning on May 9, 2021, was coercive in nature. See *Kumho Tires Georgia*,

370 NLRB No. 32, at p. 5 (2020)[3]; *Chipotle Services*, 363 NLRB 336, 346 (2015); *Relco*

*Locomotives*, 359 NLRB 1145, 1156 (2013).

Furthermore, the ALJ correctly found that Vasquez' immediate reaction to Gladden's

questioning demonstrated a fear of retaliation within Vasquez and the organizing committee.

As mentioned above, immediately after Gladden questioned Vasquez, Vasquez went to O'Hara

to report the incident. Vasquez also sent a Signal message to the organizing committee to alert

them to the conversation. Such conduct, which occurred before the organizing committee went

public, clearly shows that Vasquez, O'Hara and the organizing committee were concerned

about retaliation by management. And even though Vasquez and O'Hara proceeded to go

public with their organizing campaign days after the Gladden interrogation, the Board's

standard for evaluating the coercive nature of these statements is an objective one, not based

on a subjective interpretation of the statement. This objective standard is based on the effect

the questioning would reasonably have on an employee. Therefore, based on undisputed

evidence and current Board law, the ALJ correctly found that Gladden's questioning of Vasquez'

protected activities on May 9, 2021 was coercive and in violation of Section 8(a)(1) of the Act.

---

[3] Respondent argues that the ALJ's reliance on *Kumbo Tires Georgia*, *supra,* is misplaced (R. Brief p. 34) since an interrogation from a shift supervisor can "reasonably be coercive," not that it is coercive. Therefore, according to Respondent, absent any other unfair labor practices, Gladden's conversation with Vasquez was based on a friendly relationship and not coercive in nature. (R. Brief. p. 34, 35). However, the record evidence clearly shows that Gladden was not a mid-level supervisor. She was a Senior Manager who was not personal friends with Vasquez (Tr. 36). Rather, they had an employee/employer relationship. Therefore, according to the Board law correctly cited by the ALJ, Gladden's questioning of Vasquez was coercive.

1.   <u>**Coercion Is Unlawful and Falls Outside the Protection of the First Amendment**</u>

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations" and "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7."  29 U.S.C. § 158(a)(1).  Under Section 8(c), which "implements the First Amendment," an employer may lawfully state "'views, argument, or opinion,' so long as such expression contains 'no threat of reprisal or force or promise of benefit' in violation of [Section] 8(a)(1)."  *NLRB v. Gissel Packing Co*., 395 U.S. 575, 617 (1969) (quoting 29 U.S.C. § 158(c)).

*Gissel* is the Supreme Court's definitive precedent on the distinction between lawful statements of opinion and unlawful threats in the labor context.  At issue in *Gissel* were an employer's written and spoken statements opposing a union campaign.  395 U.S. at 619.  The Board found that those communications violated Section 8(a)(1) because they "reasonably tended to convey to the employees the belief or impression that selection of the [u]nion in the forthcoming election could lead [the employer] to close its plant."  *Id*. at 589.  *See Sinclair Co*., 164 NLRB 261, 265-66 (1967), enforced 397 F.2d 157 (1st Cir. 1968), aff'd sub nom. *NLRB v. Gissel Packing Co*., 395 U.S. 575 (1969).

In considering a First Amendment challenge to that finding, the Supreme Court noted that an employer's "free speech right to communicate his views to his employees" is "firmly established."  *Gissel,* 395 U.S. at 617.  But the Court emphasized that any assessment of

11

employer expression "must be made in the context of its labor relations setting," where "an employer's rights cannot outweigh the equal rights of the employees to associate freely." *Id*. at 617. "[A]ny balancing of those rights," the Court explained, "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Id*. at 617. And "a reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Id.* at 620. The Court accordingly reviewed the Board's finding of coercion with deference. Because "the Board could reasonably conclude" that the employer's statements were coercive, *Id*. at 619, those statements "fell outside the protection of the First Amendment and [Section] 8(c)." Id. at 579, 618.

### 2. Under *Gissel*, Coercion Is Measured Objectively from the Perspective of the Listening Employee

The analytical framework the Supreme Court upheld in *Gissel* requires no showing of the speaker's subjective mental state. In the labor context, given the economic imbalance in the relationship between employer and employee, and consistent with the policies of the Act, the focus is on the listener's objective mental state.

In defining what the law permits, the Court recognized that an employer is entitled to "make a prediction as to the precise effects he believes unionization will have on his company." 395 U.S. at 618. Such a prediction, however, "must be carefully phrased on the basis of objective fact to convey [the] employer's belief as to demonstrably probable consequences beyond his control." *Id.* A statement that instead implies that the employer may respond

negatively to unionization "on his own initiative" is an unlawful, unprotected "threat of retaliation." *Id.*

Although the Court characterized the Board's inquiry as resolving the question of what "the speaker intend[ed]" and "the listener underst[oo]d," *Gissel*, 395 U.S. at 619, the test it affirmed for answering that question was objective. The Board explicitly assessed what the communications "reasonably tended to convey." *Id*. at 589. And it was enough to support a finding of unlawful coercion that the Board found that: (1) the employer communicated, without a sufficient factual basis, that selecting the union could lead to a strike that would cause the plant to close, and (2) employees tend to take hints about plant closure "as coercive threats rather than honest forecasts." *Id*. at 619-20. An employer, the Court explained, "can avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his employees." *Id.* at 620 (emphasis added).

In adherence to the principles established in Gissel, the Board analyzes whether an employer has coercively interrogated an employee by evaluating if "under all the circumstances, the interrogation reasonably tends to restrain, coerce, or interfere with the rights granted under the Act." *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op. at 10 (2022), quoting *Rossmore House,* 269 NLRB 1176, 1177-78 (1984), aff'd. 760 F. 2d 1006 (1985). In order to determine whether a particular interrogation is coercive in nature, the Board considers the background to the specific interaction, the nature of the information sought, the identity of the questioner, the place and method of questioning, and the truthfulness of the employee's response. *Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op at 10; see also *Relco Locomotives*, 359 NLRB 1145, fn. 1, 1156 (2013), aff'd. 361 NLRB

911 (2014); *Westwood Health Care Center*, 330 NLRB 935, 939 (2000).  Notably, the intent of

the speaker is irrelevant.  See *Smithfield Packing Co.*, 344 NLRB 1, 2 (2004) (stressing that the

analysis turns on "whether the statement has a reasonable tendency to coerce the employee or

interfere with Section 7 rights, rather than the intent of the speaker"); *McLaren Macomb*, 372

NLRB No. 58, slip op. at 5 (2023) (the objective test for analysis an alleged 8(a)(1) statement

does not turn on the employer's motive).  It is similarly irrelevant whether an employee's

subsequent actions demonstrate they were in fact coerced by the employer's conduct.  See

*McLaren Macomb*, 372 NLRB No. 58, slip op. at 5.

       **3.**   ***Counterman* Does Not Require the Board to Now Measure Coercion based on the Subjective Intent of the Speaking Employer**

       Citing *Counterman v. Colorado*, 143 S. Ct. 2106 (2023)—a decision that does not

reference *Gissel* or the Act—the Respondent proffered a disjointed argument that alleges

Gladden's First Amendment rights insulate her from violating the Act, that only a true threat to

an employee should constitute a violation of Section 8(a)(1), and that Gladden lacked the

requisite state of mind to violate the Act. The Respondent is wrong for two reasons.

       First, *Counterman* addressed a question not at issue here: whether the First

Amendment requires proof of a criminal defendant's subjective mental state to support a

conviction for making "[t]rue threats of violence."  143 S. Ct. at 2111.  In answering that

question, the Court first recognized that a statement can be a true threat "based solely on its

objective content."  *Id.* at 2113.  "The existence of a threat depends not on 'the mental state of

the author,' but on 'what the statement conveys' to the person on the other end."  *Id*. at 2114

(quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)).  The Court, however, was wary of

14

"chilling non-threatening expression, given the ordinary citizen's predictable tendency to steer wide of the unlawful zone," if punishment for true threats were imposed without regard to scienter. *Id*. at 2116 (quotation and brackets omitted). Balancing the need for "First Amendment breathing space," the "societal interests" in countering true threats of violence, and the proximity of those threats to "the First Amendment's central concerns," the Court held that the First Amendment requires a showing of recklessness to support a criminal conviction. *Id*. at 2118-19. Specifically, the defendant must have "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Id*. at 2112. In reaching that conclusion, the Court drew on the analogous balancing it performed in *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964), involving defamation of a public figure. *Counterman*, 143 S. Ct. at 2115.

Yet the Court acknowledged that it has struck different balances in other contexts and as to other categories of speech. For example, it has imposed a higher standard for incitement. To shield "dissenting political speech at the First Amendment's core," *Id*. at 2118, the Court requires that speech be "'intended' (not just likely) to produce imminent disorder," Id. at 2115, to constitute unprotected incitement. But the Court has declined to require any *mens rea* showing for certain other types of speech. The standard for false commercial speech is objective, because "commercial speech is less vulnerable to chill than most other speech." *Id.* at 2116 n.4. Cf. id. at 2134-36 (Barrett, J., dissenting) (noting that an objective standard also applies to fighting words and a private person's suit to recover actual damages for defamation).

*Gissel* reflects the same sort of balancing for speech in the labor-relations setting by taking into account the nature of the speech and the potential that protected speech will be

chilled. The Supreme Court emphasized the limited scope of the speech at stake: employer statements concerning "the establishment of a nonpermanent, limited relationship between the employer, his economically dependent employee and his union agent." 395 U.S. at 617. And it specifically distinguished Sullivan, which dealt with the separate realm of core political speech, "where the independent voter may be freer to listen more objectively and employers as a class freer to talk." Id. at 617-18.

The Court also found the danger of the Board's test chilling employer speech to be insubstantial because "the line between so-called permitted predictions and proscribed threats" is not "too vague." *Id.* at 620. In the true-threats setting, "the ordinary citizen[]" may be "unsure about the side of a line on which his speech falls." *Counterman*, 143 S. Ct. at 2116. By contrast, the Court in *Gissel* explained that "an employer, who has control over th[e] [employment] relationship and therefore knows it best, cannot be heard to complain that he is without an adequate guide for his behavior," 395 U.S. at 620. *Gissel* thus "underscores the constitutional importance of the speaker's specific and unique knowledge of the relevant facts and establishes that a regulatory scheme monitoring 'the impact of utterances' is not invariably inconsistent with the First Amendment." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,* 425 U.S. 748, 778-79 (1976) (Stewart, J., concurring) (quoting *Gissel,* 395 U.S. at 620).

In sum, *Gissel* itself explains why, consistent with *Counterman*, the First Amendment does not require any showing of *mens rea* to support a Board order remedying coercion. Any question of what the speaker intended and the listener understood is answered by objective means. Contrary to the Respondent's claim, see Resp. Br. at 38, the Supreme Court has never intimated, let alone held, that, to fall outside First Amendment protection, coercion under the

Act that includes a speech element must constitute a "true threat." That term of art refers only to "serious expressions conveying that a speaker means to commit an act of unlawful violence." *Counterman*, 143 S. Ct. at 2114 (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)). By contrast, the Court has cited *Gissel* as an illustration of the principle that the government "does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). As the Court explained, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Id. (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)). That Section 8(c) uses the term "threat" in a different context does not mean that the *mens rea* requirement for "true threats of violence" would apply, just as the commonality of the term "defamation" does not require the same showing for cases involving public and private figures.

Second, even if Counterman could be read to call into question Gissel's objective standard for employer threats in the labor context, the Board would still be bound by the Supreme Court's earlier, on-point precedent. The Supreme Court has instructed that if one of its precedents "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quotation omitted). "This is true even if the lower court thinks the precedent is in tension with 'some other line of decisions.'" Mallory v. Norfolk S. Ry., 143 S.

Ct. 2028, 2038 (2023) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U. S. 477, 484 (1989)).

*Counterman* arises outside "the special context of labor disputes," Va. State Bd., 425 U.S. at 763, and it makes no mention of *Gissel*.  And, significantly, the *Gissel* Court was aware of and distinguished Sullivan, the principal authority on which Counterman relied.  The Supreme Court has not overruled Gissel in any other case.  *Gissel* controls.

### 4.  Even if *Counterman* Imposes a *Mens Rea* Requirement on the Speaker, an Employer Making Objectively Coercive Statements Acts Recklessly *per se*

Finally, even if *Counterman* altered the Board's analysis of coercive statements and interrogations, Respondent misapplied the new *mens rea* requirement for which it advocates.

In delineating what constitutes a "true threat," the Court held that the First Amendment requires a showing of recklessness.  More specifically, the defendant must have "consciously disregarded a substantial risk that his communications would be viewed as threatening violence."  *Counterman*, 143 S. Ct. at 2112.

In applying this to the labor context, in particular the Board's jurisprudence regarding unlawful interrogations, it is apparent that Gladden's statements to Vasquez were made with the requisite reckless state of mind.  As previously summarized, in analyzing alleged interrogations, the Board considers the background to the specific interaction, the nature of the information sought, the identity of the questioner, the place and method of questioning, and the truthfulness of the employee's response. *Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op. at 10.  Gladden, a senior manager, purposefully approached Vasquez one-on-one

and inquired about Vasquez's conversation with HR about improved wages and leave, asked how many other employees knew about his advocacy for these improved terms, and sought his opinion on the unionization efforts at Apple. The totality of these circumstances—in which a manager is probing about an employee's activism and unionization efforts—are objectively coercive. Indeed, even with the added layer of the speaker's *mens rea*, the outcome is unchanged. Gladden's conduct consciously disregarded the high probability that Vasquez would feel threatened by her intrusive questions about his protected concerted activities. Thus, an employer making objectively coercive statements, like Gladden's, acts recklessly *per se*. Applying *Counterman* in this manner honors the restrictions on labor speech endorsed in *Gissel* and fosters the free exercise of Section 7 rights.

### C. The ALJ correctly found that Respondent's removal of Union flyers from the employee breakroom table was a violation of Section 8(a)(1) of the Act.
### (Respondent exceptions 1, 2, 16-34, 36, 37)

The undisputed record evidence, including the testimonies of General Counsel's witnesses and Respondent's video tapes of the employee breakroom, clearly shows that Respondent managers removed Union flyers from the breakroom table on May 15, May 27 and June 1, 2021. In her decision, the ALJ properly applied the relevant Board law and found that Respondent did not meet its burden to establish special circumstances that would justify the removal of Union flyers. (ALJD p. 22, 29-33 citing *Republic Aviation Corp. V. NLRB*, 324 U.S. 793, 797, 801, 805 (1945); *Shamrock Foods Co.*, 366 NLRB No. 117 (2018)). As the Judge correctly stated," [i]n order to overcome the presumption that a rule restricting such employee activities is unlawful, an employer 'must show a compelling and legitimate business reason for necessitating' the restrictions it has imposed." (ALJD p. 22; 38-43, citing *Midland*

*Transportation*, 304 NLRB 4, 5 (1991); *Mercedes-Benz U.S. International, Inc.*, 361 NLRB 1018, 1028 (2014)). Here, the overwhelming credible record evidence fails to show that the Union flyers were abandoned, left behind, or scattered all over the room or that the removal was part of a general housekeeping policy to establish special circumstances justifying Respondent's confiscation of Union flyers. Therefore, the ALJ properly concluded that absent special circumstances, Respondent's removal of Union flyers was unlawful and in violation of Section 8(a)(1) of the Act (ALJD p. 25; 2-10; p. 27; 1-15; p. 28; 9-15).

Although Board law permits employers to remove pro-union literature that has been left behind or abandoned after employee breaks (*Paige Avject, Inc.,* 278 NLRB 444, 450 (1986), here, the credible record evidence shows that the Union flyers were not abandoned or scattered throughout the breakroom. Vasquez and O'Hara only placed a few Union flyers at the center of the breakroom table (G.C. Ex. 4). The flyers did not create a mess on the table or in the breakroom. In addition, contrary to Respondent's contention (R. exceptions 29, 30), managers including Moya, Abdelal, Brown and Romero did not walk around the table or speak to anyone to confirm whether the flyers belonged to someone or if anyone was reading them (G.C. Ex. 4, 7, 8).  And even if there were no set break times to determine whether the flyers were abandoned after a break, as Respondent argues (R. exception 31), the ALJ correctly found, based on the video tapes, that Respondent managers failed to take any measures to determine if the flyers were left behind. Based on this credible evidence introduced at trial, the ALJ was correct to conclude that there were no special circumstances to warrant the removal of Union flyers (ALJD p. 23; 36-41; p. 28; 12-15).

Further, even though Respondent may have had a housekeeping policy to keep customer areas clean and neat by removing non-Apple materials from the customer areas of the store, the evidence fails to show that Respondent's housekeeping policy included managers cleaning the employee breakroom table.  Contrary to Respondent's arguments, the video tapes that were introduced at trial by General Counsel and Respondent do not conclusively show that Respondent's removal of Union flyers was part of a general practice of keeping the breakroom table tidy and neat. First, as the May 15th video shows and as the ALJ correctly found, Respondent managers walked in and out of the breakroom on May 15, 2021, before the Union flyers were placed on the breakroom table, without removing non-Apple items that had been left on the breakroom table (ALJD p. 26; 2-16; Tr. 51; G.C. Ex. 4 (0:00:00-0:00:10). The managers did not even check whether the table or room needed to be cleaned (ALJD p. 26; 15-16; G.C. Ex. 4 (38:28,5:07:45-5:07:58). Similarly, the videos from May 30 and June 1 fail to show managers cleaning or organizing the breakroom (G.C. Ex. 8, R. Ex. 29, 30). To support its argument, Respondent only introduced one video from May 29, 2021, that shows one manager, Katheryn Marshall (Resp. Ex. 24, 05:49:22) slowly walking around the breakroom and gently picking up wrappers from the table. Aside from that one instance on May 29, 2021, the remaining videos fail to show Respondent managers cleaning the breakroom and breakroom table.  Therefore, contrary to Respondent's contention, the undisputed evidence fails to show Respondent leadership regularly performing "sweeps" of the employee breakroom (R. Brief p. 20).

Additionally, the way in which Respondent handled the flyers also shows that the removal of the flyers was not part of any housekeeping practice. Not only did Respondent specifically target the flyers and remove them quickly, but Respondent manager Moya took

21

photographs of the flyers (Tr. 52, 125; (G.C.Ex. 4, 00:37:50-00:51:04) and Respondent managers

Moya, Abdelal and Romero shredded the flyers (Tr. 58, 59, 127, 149, 228, 326). Although

Respondent argues that the photographing and shredding of the flyers were consistent with the

way they treated other non-Apple items left out on the breakroom table, the undisputed record

evidence fails to support Respondent's contention. By treating the flyers differently than the

way Respondent would treat trash, the ALJ was correct to conclude that the removal of Union

flyers on May 15, May 27 and June 1, 2021, was not part of any housekeeping function.

Accordingly, the ALJ correctly found that Respondent's removal of Union flyers was unlawful in

violation of Section 8(a)(1) of the Act (ALJD p. 28; 9-15).

> **D.  The ALJ correctly found that Respondent enforced its Solicitation and Distribution policy in a selective and disparate manner in violation of Section 8(a)(1) of the Act.**
> **(Respondent's Exceptions 24-28, 34, 37)**

Although Respondent's Solicitation and Distribution policy is lawful, the ALJ found that

the way in which Respondent applied the policy on May 15, May 27 and June 1, 2021, was

unlawful in violation of Section 8(a)(1) of the Act (ALJD p. 30; 17-20).  Contrary to Respondent's

arguments, the ALJ properly concluded that Respondent's removal of Union flyers was not

consistent with its Solicitation and Distribution policy and general housekeeping functions (ALJD

p. 28; 17-19). To reach this sound decision, the ALJ analyzed witness testimonies and hours of

Respondent video tapes to determine that the testimonies of Respondent's witnesses regarding

the application of its Solicitation and Distribution policy and housekeeping function was not

credible (ALJD p. 28; 33-36). As mentioned above, Respondent witnesses Jennison and Abdelal

testified that managers "pop in and out of the employee breakroom" to make sure it is clean

and that cleaning the store is in their "DNA" (Tr. 229, 231; 302, 307). Therefore, according to

Respondent, it would have been natural and normal for a manager to remove Union flyers from

the breakroom table as part of its Solicitation and Distribution policy and housekeeping

practice.  However, their testimonies were not supported by the video tapes and General

Counsel's credited witnesses to demonstrate that the removal of the Union flyers on May 15,

May 27 and June 1, 2021, was consistent with Respondent's Solicitation and Distribution and

housekeeping policies. As described above, after 38 hours of Respondent breakroom video

tapes, there is only one instance where a manager removed wrappers from the breakroom

table (ALJD p. 27; 1-15). The remaining hours of video tapes clearly show Respondent managers

regularly walking in and out of the breakroom without any concern about the cleanliness of the

breakroom or breakroom table (G.C. Ex. 4, 7, 8; R. Ex. 24). In addition, as mentioned above, the

managers specifically went into the breakroom on May 15, May 27 and June 1, 2021, to only

remove the Union flyers without confirming whether the Union flyers had been abandoned or

left behind (ALJD p. 29; 3-36; p. 30; 1-20; G.C. Ex. 4 (1:51:07-1:51:23); G.C. Ex. 7).  The video

tapes clearly show that the managers did not go into the breakroom to see if the breakroom

and table needed to be cleaned. Since corroborating and documentary evidence failed to

support Jennison and Abdelal's testimonies about how they applied Respondent's Solicitation

and Distribution and housekeeping policies, the ALJ properly refused to give weight to the part

of their testimonies where they described a few instances of removing menus and self-

promotional flyers from the breakroom table. Accordingly, the overwhelming corroborating

evidence clearly shows that managers did not clean the breakroom table as part of

Respondent's Solicitation and Distribution policy and general housekeeping functions (ALJD p.

28; 17-36).

The ALJ also properly credited the testimony of Vasquez and O'Hara regarding newspapers and restaurant coupons being left on the breakroom table while Respondent quickly removed Union flyers.  Overall, as described above, Vasquez and O'Hara were credible witnesses since their testimonies were repeatedly supported by documentary evidence. On the other hand, also described above, the testimonies of Respondent's witnesses were not supported by the evidence. Therefore, the ALJ's credibility resolutions in this matter were correct and the Board should not overrule them. *Wismettac Asian Foods, Inc.*, 371 NLRB No. 9, slip. Op. at fn. 4 (2021), citing *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). Based on credible and relevant evidence, the ALJ properly concluded that Respondent's decision to quickly remove Union flyers while allowing newspapers and restaurant coupons to remain on the breakroom table showed a selective and disparate implementation of Respondent's Solicitation and Distribution policy in violation of Section 8(a)(1) of the Act.  (ALJD p. 28; 17-36; p. 29, 30; 1-15).

Respondent further argues that the ALJ erred in failing to rely on the Board's decision in *St. Lukes Memorial Hospital*, 342 NLRB 1040 (2004) to find the removal of Union flyers lawful (R. exception 25). However, the ALJ properly concluded that the facts herein, are distinguishable from *St. Lukes Memorial, supra*. In *St. Lukes Memorial, supra*, the Board did not find sufficient evidence to conclude that the employer implemented its Solicitation and Distribution policy in a selective and disparate way because it denied access to Union representatives and not to a newspaper vendor who placed newspapers in the cafeteria for the comfort and convenience of cafeteria patrons. Here, unlike the newspaper vendor in *St. Lukes Memorial, supra*, the newspapers that were left on the employee breakroom table were not

provided by Respondent for the convenience of employees. Rather, the newspapers, like the

Union flyers, were left on the breakroom table by employees. Therefore, the ALJ properly

distinguished the Board's decision in *St. Lukes Memorial* to conclude that Respondent, herein,

selectively and disparately enforced its Solicitation and Distribution policy by removing Union

flyers while allowing newspapers to remain on the breakroom table (ALJD p. 28, fn. 29).

> **E. The ALJ issued the correct Order by requiring Respondent to cease and desist from confiscating Union flyers from the employee breakroom table, a nonworking area, and from selectively and disparately enforcing its Solicitation and Distribution policy by prohibiting the placement of Union flyers on the employee breakroom table, while permitting solicitation and distribution with respect to non-Union materials.**
> **(Respondent Exception 38)**

Respondent excepts to the ALJ's Order claiming that the Order is overly broad especially

since the removal of Union flyers was pursuant to its lawful Solicitation and Distribution policy

and general housekeeping and cleanliness standards (R. exception 38). Aside from filing this

general exception, Respondent failed to provide any case law or theory that would support the

exception.

As asserted in detail above, the ALJ properly found and concluded that Respondent

violated Section 8(a)(1) of the Act by confiscating Union flyers from the employee breakroom

table, a nonworking area, on May 15, May 27 and June 1, 2022 (ALJD p. 30; 34-36). The Order

to cease and desist (ALJD p. 31; 33-42) from engaging in this unlawful conduct is a well-

established and traditional Board remedy. See *Valley Health System, LLC d/b/a Desert Springs

Hospital Medical Center*, 369 NLRB No. 16 (2020); *Shamrock Foods Co.*, 336 NLRB No. 117

(2018), enf'd. 775 Fed.Appx. 752 (D.C. Cir. 2019). Therefore, the Board should reject

Respondent's exception and uphold its long tradition of affirming such a cease and desist Order

that remedies Respondent's unlawful confiscation of Union flyers from the employee

breakroom table.

Similarly, the ALJ properly found and concluded that Respondent violated Section

8(a)(1) of the Act by selectively and disparately enforcing it Solicitation and Distribution policy

by prohibiting the distribution of Union flyers while permitting the distribution of nonunion

material (ALD p. 30; 38-41). The cease and desist Order issued by the ALJ (ALJD p. 32; 1-3) to

remedy this unlawful conduct is also consistent with the Board's traditional make whole

remedy to this violation of the Act. See *Novelis Corp.,* 364 NLRB 1452 (2016); *Intertape Polymer*

*Corp.,* 360 NLRB 957 (2014); *ITT Industries, Inc*., 331 NLRB 4 (2000). Accordingly, the Board

should affirm the ALJ's cease and desist Order.[4]

    **F.  The ALJ accorded the proper weight to numerous ALJ decisions that**
       **were cited by Respondent.**
       **(Respondent Exception 39)**

Without providing supporting case law or argument, Respondent claims that the ALJ

failed to give proper weight to decisions that were neither affirmed nor reversed by the Board

(R. exception 39). Notwithstanding Respondent's exception, the ALJ thoroughly analyzed all the

ALJ decisions that were cited by Respondent in its post-hearing brief (ALJD p. 24; 26-29, fn. 22;

p. 25; 1 fn. 23).  The ALJ, herein, also properly acknowledged that the relevant issues raised in

---

[4] Although the Board should affirm the ALJ's cease and desist Order, the Board should find that the ALJ erred in failing to overrule and expand the remedy set forth in *AT&T Mobility, LLC*, 370 NLRB No. 121 (2021). See General Counsel's Exceptions that were filed on August 8, 2023. In her exceptions, General Counsel argues that Respondent should be required to rescind its Solicitation and Distribution policy in order to properly remedy the violations.

these cases were never decided by the Board (ALJD p. 24; 26-29, fn. 22; p. 25;1 fn. 23).

Therefore, the findings in these ALJ decisions lacked precedential value (ALJD p. 24; 26-29, fn. 22; p. 25; 1 fn.23).

Administrative Law Judges, including the ALJ here, are bound to apply established Board precedent, which neither the Board nor the Supreme Court has reversed. See *Western Cab Co*., 365 NLRB No. 78, slip op. at 1 n. 4 (2017); and *Pathmark Stores, Inc*., 342 NLRB 378 n. 1 (2004). See also *D.L. Baker, Inc*., 351 NLRB 515, 529 n. 42 (2007). Judges are also bound to follow particular Board findings in a prior case, where appropriate, under the doctrine of collateral estoppel. See *Great Lakes Chemical Corp*., 300 NLRB 1024, 1024–1025, n. 3 (1990), enfd. 967 F.2d 624 (D.C. Cir. 1992).  See also *Planned Building Services, Inc.,* 347 NLRB 670 n. 2 (2006), overruled on other grounds *Pressroom Cleaners*, 361 NLRB 643 (2014); and *Stark Electric, Inc*., 327 NLRB 518 n. 1 (1999) (judge properly relied, at least in part, on findings in prior Board decisions involving the same respondent to find animus).

An ALJ decision that is pending before the Board on exceptions is not binding authority and should not be cited as such.  See *Healthbridge Management, LLC*, 362 NLRB 310 n. 3 (2015), enfd. per curiam 672 Fed. Appx. 1 (D.C. Cir. 2016).  See also *Richfield Hospitality, Inc*., 369 NLRB No. 111 n. 1 (2020) (finding that ALJ correctly refused to apply collateral estoppel to findings by another ALJ in a prior case then pending before the Board).

Here, the record is clear that the ALJ reached her decision based on established Board precedent. Although Respondent relied on case law that was not binding precedent, the ALJ

examined those cases, discussed those cases in her decision and correctly determined that they lacked precedential value. Accordingly, the Board should affirm the ALJ's decision that Respondent violated 8(a)(1) of the Act by confiscating Union flyers from the employee breakroom table, a nonworking area, on May 15, May 27 and June 1, 2021 and by selectively and disparately enforcing its Solicitation and Distribution policy by removing Union flyers while permitting nonunion material to remain on the employee breakroom table.

### IV.    Conclusion

For the reasons described above, General Counsel respectfully requests that the Board deny Respondent's exceptions in their entirety and affirm the ALJ's recommended findings and conclusions, as described above. The Board should also affirm and amend in part the ALJ's Remedy and Order as set forth above and requested in General Counsel's Exceptions.

Dated: 15th of November 2023.


Respectfully, submitted,

*Ruth Weinreb*

Ruth Weinreb, Counsel for the General Counsel
National Labor Relations Board, Region 2
26 Federal Plaza, Rm 36-130
New York New York 10278

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 2

```
-------------------------------------------------------x
APPLE, INC.,                              :
                                          :      Case No. 02-CA-295979
                  Respondent,             :
                                          :
     -and-                                :
                                          :
COMMUNICATIONS WORKERS                    :
OF AMERICA, AFL-CIO,                      :
                                          :
                  Charging Party.         :
-------------------------------------------------------x
```

---

**COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO'S ANSWERING BRIEF
TO RESPONDENT'S EXCEPTIONS
TO THE ADMINISTRATIVE LAW JUDGE'S DECISION**

---

Sumanth Bollepalli, District Counsel
Communications Workers of America, AFL-
    CIO, District 1 – Legal Department
80 Pine Street, 37th Floor
New York, New York  10005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

I. STATEMENT OF FACTS .................................................................................. 1

    A. Background ................................................................................................ 1

    B. Union Organizing and Other Protected Activities ............................................ 2

    C. Vasquez Demands Higher Pay for Employees ................................................ 3

    D. Stephanie Gladdens' Interrogation ................................................................ 3

    E. May 15 Distribution of Union Flyers ........................................................... 4

    F. No-Solicitation Policy ................................................................................ 7

    G. May 19, May 27 and June 1 Distribution of Union Flyers ............................... 8

II. ARGUMENT ................................................................................................ 10

    A.   THE ALJ PROPERLY CONCLUDED THAT APPLE'S
        WITNESSES WERE NOT CREDIBLE.
        (Response to Resp. Excep. Nos. 1, 2, 4-8, 10-14, 16-22, 24-28, 32, 34) ................... 10

        1. Apple's Witness Testimonies Regarding its Cleaning and Housekeeping
          Policy is Inconsistent with the Video Evidence.
          (Response to Resp. Excep. Nos. 1, 2, 16-22) ........................................... 11

        2. Apple's Witnesses Provided Different Explanations About what it Does
          with Non-Apple Related Materials.
          (Response to Resp. Excep. Nos. 24-28, 32-34) ........................................ 13

        3. Gladden's Testimony Regarding Her Interaction with Vasquez is
          Neither Credible nor Plausible.
          (Response to Resp. Excep. Nos. 4-8, 10-14) ........................................... 15

    B.   APPLE INCORRECTLY RELIES ON *ENLOE MEDICAL CENTER*
        TO CLAIM THAT EMPLOYERS MAY PROHIBIT UNION FLYERS IN
        NONWORK AREAS ABSENT SPECIAL CIRCUMSTANCES.
        (Response to Resp. Excep. Nos. 16-24) ................................................. 18

C.  APPLE FAILED TO PROVIDE ANY EVIDENCE OF SPECIAL
    CIRCUMSTANCES THAT WOULD PERMIT REMOVAL OF
    UNION FLYERS.
    (Response to Resp. Excep. Nos. 17-23, 29-31, 36, 38)............................................ 20

D.  APPLE HAS NO BASIS TO CLAIM THAT THE ALJ'S COERCIVE
    INTERROGATION FINDING CHILLS FREE SPEECH RIGHTS
    UNDER THE FIRST AMENDMENT.
    (Response to Resp. Excep. Nos.3-10, 35) .................................................................. 21

III. CONCLUSION ........................................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>:

*Counterman v. Colorado,* 143 S. Ct. 2106 (2023) ........................................................... 21

*Enloe Med. Ctr.,* 345 NLRB 874 (2005) ................................................................. 18, 19

*Metro-West Ambulance Service, Inc.,* 360 NLRB 1029 (2014) ...................................... 11

*NLRB v. Gissel Packing Co.,* 395 U.S. 575 (1969) ................................................. 21, 22

*Sprint/United Mgmt. Co.,* 326 N.L.R.B. 397 (1998) ...................................................... 19

*St. John's Hospital*, 222 N.L.R.B. 1150 (1976) *enfd. in part*
557 F.2d 1368 (10th Cir. 1977) ..................................................................................... 19

*Stoddard-Quirk Mfg. Co.*, 138 N.L.R.B. 615 (1962) ...................................................... 19

## I.     STATEMENT OF FACTS

### A.  Background

Ian O'Hara ("O'Hara") and Jordan Vasquez ("Vasquez") were Apple retail employees at the 185 Greenwich Street/WTC flagship store in New York City (the "Flagship Store").  O'Hara worked as an Apple technician from June 24, 2016 to November 24, 2022.  (Tr. 27-28, 115.)  Vasquez worked as a product zone specialist for about five years.  In or around September 2022, he transferred to a different store near Houston, Texas, where he is currently employed.  (Tr. 27-28.)  Vasquez performs similar duties at the Houston store that he performed at the Flagship Store, including selling Apple products and services.  (Tr. 27-28, 283.)

O'Hara, Vasquez and other Apple employees at the Flagship Store work different shifts with various start and end times, break times, and lunch breaks throughout the day.   (Tr. 115-116, 249-51.)  Since Apple employs both part-time (18-26 hours per week) and full-time employees, shift times as well as breaks and lunches vary each day depending on employee availability.

Specifically, Apple provides its full-time employees with two paid 15-minute breaks and one 60-minute unpaid lunch.  Part-time employees are limited to 15-minute breaks.   (Tr. 29, 115-116.)  At various times throughout the day, employees take their breaks and lunch in the breakroom and its adjoining area, which are all noncustomer areas.  (Tr. 251, 254.)  Former Flagship Store manager, Joshua Jennison ("Jennison") described the breakroom as "[the area] where the full team goes to spend time to get ready for their shift or [] [] to take a break."  (Tr. 212.)

The employee breakroom has a large table that is a shared communal space.  It is where "team members can sit, take their 15 minute break or their lunch, or before they're going to start

1

a shift or [at the] end [of] their shift." (Id.) Vasquez testified that the breakroom table is used to eat lunch, play games and read, and that newspapers and coupons are periodically left there. (Tr. 64.) For example, when Shake Shack first opened, their coupons were left on the table. Vasquez testified he has seen these items remain on the table from the start of his shift until he left work and in some instances until the start of his next shift. (Tr. 64-65, 92-95; GC Ex. 4[1].)

While managers also use the breakroom, Vasquez testified that he only ever saw the cleaning crew clean the breakroom as well as employees clean up after themselves. (Tr. 65-66.) He testified that the only instruction he received regarding cleaning the breakroom was to throw away trash when done eating and to otherwise clean up after yourself. (Tr. 68.)

O'Hara, similarly, testified that, in his six years of working at the Flagship Store, he has seen Shake Shack and Burger King coupons, and flyers from newspapers with coupons printed on them on the breakroom table. (Tr. 149-50; 165-67.) According to O'Hara, these coupons would remain from anywhere from a day to three days. O'Hara testified that he worked often and that he would come and see these items left on the table and then when he came in the next day, they were still there. (Tr. 150.) Like Vasquez, O'Hara testified that he only saw the cleaning crew clean the breakroom and that employees are responsible for cleaning up after themselves. (Tr. 150-51.)

**B. Union Organizing and Other Protected Activities**

In January 2021, O'Hara contacted the Communications Workers of America, AFL-CIO ("CWA" or the "Union"). (Tr. 116.) By the fall, O'Hara and other Apple employees established an organizing committee to lead the Union campaign. (Tr. 116.) They met virtually

---

[1] On May 15, at the start of the day, the breakroom had several items left on the table, including an empty water bottle lying on its side. (GC Ex. 4.)

once or twice a week.  (Tr. 29, 117.)  O'Hara and other organizing committee members also communicated daily using Signal, the encrypted messenger app.  (Tr. 30, 117-118.)

In January 2022, Vasquez also joined the organizing committee.  (Tr. 29.)  He testified that, after he joined the committee, he regularly spoke to other employees about the need for higher pay on the sales floor, in the break room and outside of work.  (Tr. 30.)

### C.  Vasquez Demands Higher Pay for Employees

In late April 2022, Vasquez brought the issue of higher pay directly to management.  (Tr. 30-31.)  Specifically, he spoke with senior manager Rachel Goldman ("Goldman") on the sales floor.  (Tr. 31.)   Vasquez told her that "[he] didn't believe the pay at Apple was high enough for employees and wanted to know if there are ways that we could go about raising [it]."  (*Id.*)  According to Vasquez, Goldman responded that he could speak to Apple's People Team/HR representative, Julissa Rodriguez ("Rodriguez").[2]  (Tr. 31.)

Later, on May 3, Vasquez virtually met with Rodriguez to discuss the need for higher wages.  (Tr. 32.)   Rodriguez told him that she would discuss these issues with management and that she would make sure his concerns were relayed to them.[3]  (Tr. 32.)  It is unclear whether Apple recorded this virtual meeting.

### D.  Stephanie Gladdens' Interrogation

A few days later, on May 9, senior manager Stephanie Gladden ("Gladden") approached Vasquez on the sales floor, around 11am or 12 pm, before the post-lunch customer rush.  (Tr. 33-34.)  She asked him how he was doing and told him that she heard about his meeting with Rodriguez.  (Tr. 34, 73.)  Vasquez told her that the meeting went well and that they discussed the need for higher pay at Apple.  (Tr. 34.)  Gladden then asked whether he spoke to other

---

[2] Apple did not call Goldman as a witness to dispute Vasquez's testimony.
[3] Apple did not call Rodriguez as a witness to dispute Vasquez's testimony.

employees about higher pay to which he responded that he had. She then asked him how many employees he had spoken to about it. He told her that he was not tracking that information. (Tr. 34.) Gladden then asked him what he thought about the Union. However, despite being on the organizing committee, Vasquez told her that he was not paying any attention to it and that he was occupied with running for Congress. Vasquez testified that he pretended to not be involved in the Union campaign, because he did not want to alert management. (Tr. 34-35.)

When the conversation ended, Vazquez went to the back area off the sales floor and spoke with O'Hara. (Tr. 118-119.) No one else was present. Vasquez told him that Gladden asked him what he thought about the Union. O'Hara told Vasquez that was not right and it was illegal and he encouraged him to let the organizing committee know. (*Id.*) After he spoke with O'Hara, Vasquez also texted the organizing committee about what had occurred. (Tr. 36-37, 80-81, 119-22; 158-59; GC Ex. 2.) Specifically, Vasquez sent the Signal message: "They just had a union feeler convo with me I'll explain when I get a chance." O'Hara responded with the message "Stephanie [G]ladden was the manager who tried to talk to you about unions, correct?" (Id.) O'Hara testified that he sent the text so that other employees were clear that the manager was Gladden. (Tr. 122.)

Later that day, as he left work, Vasquez asked Goldman why a manager asked him about his thoughts about the Union. She told him she had no idea, but would look into it, and asked him the name of the manager. (Tr. 38-39.) Vasquez told her he did not want to disclose the name and that he was only asking to see if she knew anything.[4] (Tr. 39.)

### E. May 15 Distribution of Union Flyers

A few days later, on May 15, the organizing committee went public with its unionization efforts. Specifically, Vasquez spoke to employees in the breakroom about the Union and placed

---

[4] Vasquez testified that Goldman was "the manager that I trusted the most in the store." (Tr. 39.)

two Union flyers on one side of the table before his 8 am shift.  O'Hara also placed two Union flyers on the other side of the table before the start of his shift.  (GC Ex. 3; GC Ex. 4 at 37:48, 38:26; Tr. 40-41, 48-49, 82-83, 124.)

O'Hara created these flyers.  They had QR codes printed on them that directed employees to the organizing committee's mission statement and Union authorization cards.  (GC Ex. 3; Tr. 41, 63, 122-23.)  Vasquez testified that the flyers were left on the table for employees to scan the QR codes.  (Tr. 82-83.) Vasquez and O'Hara also wore red wrist bands with CWA printed on it and passed them out to other employees to alert management about their efforts.  (Tr. 40, 82, 160, 179-80, 334.)

Once the flyers were on the table, at least five managers, including Goldman, store leader Waleed Abdelal ("Abdelal"), and store manager Matt Moya ("Moya") walked in and out of the breakroom, repeatedly, without removing them.[5]  Approximately 15 minutes after Vasquez and O'Hara left the flyers on the table, Moya enters the breakroom and takes photos of the flyers, and immediately walks out without speaking to anyone.[6]  (GC Ex. 4 at 50:53; Tr. 125, 326.)  An hour or so later, Abdelal enters the breakroom, immediately confiscates the flyers and walks right out without speaking to anyone.  (GC Ex. 4 at 1:51:10.)  According to the breakroom's video recording, there were at least seven other employees in the breakroom when Abdelal removed the flyers, including one employee sitting at the table.  (*Id.*)  Abdelal testified that once the flyers are left on the table that he assumes they are "abandoned."  (Tr. 312.)  Further, while on direct examination, he testified that he threw them out (Tr. 312), on cross-examination, he confirmed

---

[5] Vasquez testified that managers Ryan and Tyler, whose last names are unknown, also walked in and out of the breakroom while the flyers sat on the table.   (Tr. 49-54.)

[6] Apple did not call Moya to testify about what he was doing when he was in the breakroom on May 15, let alone, provide any evidence of what he was doing in the breakroom on May 15.

that he shredded the flyers and that he also instructed other managers to shred the flyers (tr. 328.).[7]

By email dated May 15, Abdelal summarized the morning events to Flagship Store Leader Mona Patel ("Patel") as follows:

> "When these team members [redacted names] came into the store
> for meeting/their shift[,] [t]hey continue to chat with other
> employees about unionizing[,] [t]hey also placed below flyers in
> the breakroom and continue to engage employees[,] and the [flyer]
> was in the break room estimated 9:20 am to 10:50 am.  We
> removed the [flyer] once I connected with Jason.[8] "

(emphasis added) (Tr. 316-19.)

Later that same day, Vasquez and O'Hara left more flyers on the breakroom table.  This time they were on their lunch break.  (Tr. 125-126; GC Ex. 4 at 5:05:34.)  Five minutes later, Moya enters the breakroom and immediately confiscates them without speaking to any of the employees present.  (Tr. 127; GC Ex. 4 at 5:11:19.)  At the time, Vasquez and O'Hara were in another break area near the vending machines and restrooms, down the hall from the breakroom. (Tr. 127-28, 248, 254.)  They saw Moya walk out of the breakroom with the flyers and head towards the manager's office.  (Tr. 126-127.)  On cross examination, Abdelal was asked

---

[7] Abdelal testified that "[s]o in that particular case I said to shred it.  So I shredded it.  I would have also told them to throw it in the trash as I would other things."  (Tr. 328-29.)

[8] Abdelal could not recall which Jason he connected with before removing the flyers.  When asked repeatedly whether it was Jason Borilia, he kept responding only that he assumed it was "Jason."  (Tr. 319-320.)  Other than Apple's counsel, Abdelal could only identify one "Jason."  Upon information and belief, "Jason" may refer to Apple counsel Jason Stanevich, Esq.

whether he instructed Moya to shred the flyers, Abdelal responded, "I may have told him to do that, yes."[9] (Tr. 326.)

**F.  No-Solicitation Policy**

On May 15, in the afternoon, Vasquez spoke to Abdelal outside the store about the Union flyers.  (Tr. 59-60; CP Ex. 1.)  He initiated the conversation and asked Abdelal why he removed them.  Abdelal responded that Apple has a no-solicitation policy, and that he was not allowed to distribute the flyers.  (Tr. 60; CP Ex. 1 – "Rachel shared that we do not allow solicitation.") Vasquez responded that he was an employee and that it was on non-work time, but Abdelal continued to insist that he could not do it.  Abdelal also offered to send him a copy of the policy. (Tr. 60-61; CP Ex. 1.)   Later in the day, Abdelal sent a text message to Vasquez with a copy of the no-solicitation policy. (JX. 1; Tr.  61.)

The next day, Vasquez asked Abdelal if he could speak to him, again. (Tr. 61.)  This time they spoke on the sales floor.  Vasquez told him that he did not believe he violated the no-solicitation policy, because the flyers were left during non-work time in a non-work area.  (Tr. 61-62.)  Abdelal simply responded that that was the policy and he needed to respect it.  (Tr. 62.) And, he advised him to speak to Rodriguez if he had further questions.

A few days later, Vasquez spoke to Rodriguez over the phone.  (Tr. 62.)  He explained how they were leaving Union flyers during nonwork time in a nonwork area, and that he reviewed the no-solicitation policy, but did not believe he violated it in anyway.  (Tr. 62.) Rodiriquez responded that employees are not allowed to distribute third party material in the store and gave examples, including Girl Scout cookies.  (Tr. 63.)  Vasquez responded that he was an Apple employee, not a third-party.  That was the end of the conversation.  Vasquez testified

---

[9] It is unclear whether Abdelal shredded flyers or advised others to shred flyers.  When cross-examined about a May 15 text message he received from Patel instructing him to not shred them and to save them, he testified that "I mean if Mona said not to I would have likely told them then don't shred anything." (CP Ex. 1; Tr. 336-37.)

that, after May 15, he did not leave any more flyers in the breakroom, because he had multiple managers tell him it was a policy violation to do so.  (Tr. 63-64.)

**G.  May 19, May 27 and June 1 Distribution of Union Flyers**

On May 19, O'Hara placed more Union flyers in the breakroom a few minutes before the start of his 3:30 pm shift.  (Tr. 129.)  Several hours later when he returned to the breakroom, they were gone.  (Tr. 130.)

Also, on May 27, O'Hara placed flyers on the breakroom table before the start of his 11:30 am shift.  At the time, other employees were in the breakroom getting ready for their shifts and taking their 15-minute breaks.  (Tr. 131-32.)   Later that day, during his lunch break around 4 pm, O'Hara placed more flyers.   (Tr. 130-132.)  Again, there were other employees, in the breakroom, on their lunch break.  This time, however, after placing the flyers on the table, O'Hara stayed there.  (Tr. 133.)  Three minutes or so after he placed the flyers down, senior manager Yanell Brown ("Brown") entered the breakroom, walked right to the table and removed the flyers, and then immediately left without speaking to anyone.  (Tr. 134, 137-38; GC Ex. 7.) While Brown removes the flyers, several employees are sitting around the table eating.[10]  O'Hara recorded the incident with his phone.  According to the video recording, Brown was there for no more than a few seconds.  (Tr. 135-36; GC Ex. 7[11].)

On June 1, O'Hara again placed flyers on the breakroom table before the start of his 11:30 am shift.  (Tr. 138-140; GC Ex. 8 at 3:06:06.)  Another employee, Meredith Callie ("Callie") also placed flyers on the breakroom table.  (Tr. 140.)  Approximately 6 minutes later, a

---

[10] One employee who has white earbuds in his ear is sitting right next to the flyers. He looks out of the corner of his eye as Brown removes the flyers, but does not say anything to Brown or acknowledge him in anyway.  (GC Ex. 7 at
[11] Apple failed to introduce into evidence its own video recording of the breakroom on May 27.  And, despite the fact that, on the first day of hearing, the GC amended the complaint to withdraw any allegations regarding May 30 and June 2 (Tr. 71), Apple introduced video recordings of the breakroom on both days at the conclusion of the final day of hearing, but not May 27. (Tr. 375).

manager walks in while O'Hara is still there.  A few seconds later, O'Hara leaves the breakroom (GC Ex. 8 at 03:12:58); a few seconds later, the same manager also leaves without taking the flyers; and then senior manager Jorge Romero ("Romero") enters the breakroom.  (Tr. 141; GC Ex. 8 at 03:13:31.)  According to the breakroom video recording, Romero removes the flyers less than a minute after O'Hara leaves the breakroom.  (GC Ex. 8 at 03:13:33.)

Later that day, while on his lunch break, O'Hara placed more flyers on the breakroom table.  This was around 4:45 pm.  (Tr. 14l-42; GC Ex. 8 at 07:25:22.)  After placing the flyers down, O'Hara went and sat at a table in the adjoining break area outside the breakroom, where employees also eat their lunches.[12]  (Tr. 143-144.)    Again, a minute or so after O'Hara leaves to eat his lunch, managers Ryan and Romero enter the breakroom.  (Tr. 144-45; GC Ex. 8 at 07:41:05.)  Romero immediately removes the flyers and walks out of the break room, passes O'Hara sitting at a break table and walks into the manager's office still holding the flyers.  (Tr. 145-46.)

An hour or so after Romero removed them, O'Hara asked him to stop it.  (Tr. 147.)  In response, Romero told him that he cannot stop, because they are "promotional" materials.  (Id.)  O'Hara replies that they are not promotional and that, as employees, they are allowed to have them in the breakroom.  (Tr. 147-48.)  Romero insisted they are still promotional.  (Tr. 148.)  O'Hara continued to dispute him and used his phone to pull up the NLRB website to show him that employees have a right to have Union materials in non-work areas.  (Id.)  Romero continued to insist that they were promotional.  O'Hara then asked him what he does with the flyers that he removes.  (Id.)  Romero told him he shreds them.  (Tr. 149.)  O'Hara asked if it was possible to have an employee bulletin board for Union materials to which he said they can look into it and

---

[12] O'Hara testified that this is also a noncustomer area.  (Tr. 156.)

see if they can design something.   (Tr. 149.)  O'Hara testified that after June 1, he stopped

placing Union flyers in the breakroom, because they kept being removed.

II.     <u>ARGUMENT</u>

A.   <u>THE ALJ PROPERLY CONCLUDED THAT APPLE'S WITNESSES
WERE NOT CREDIBLE.</u>
(Response to Resp. Exceptions Nos. 1, 2, 4-8, 10-14, 16-22, 24-28, 32-34.)

The ALJ properly credited the testimony of CGC's witness over that of Apple's

witnesses in finding that Apple violated the Act.  (ALJ Dec. at 14:15-14:42.)  CGC's witness

testimonies were not only consistent, but they are corroborated by video evidence and

contemporaneous text messages.  Unlike CGC's witnesses, Apple's witnesses were unreliable,

and could not provide any supporting evidence regarding its cleaning and housekeeping policy,

removal of union and other materials, or its account of the May 9 interrogation.

Specifically, the ALJ, in part, made the following determinations:  1) "Vasquez and

O'Hara provided specific, detailed testimony, and did not speculate regarding circumstances not

with their own personal knowledge" (ALJ Dec. at 14:15.); 2) Vasquez and O'Hara's testimonies

regarding the removal of Union flyers from the breakroom table is confirmed by Apple's

breakroom videos (ALJ Dec. at 14:22.); 3) the testimony of Apple's witnesses regarding its

removal of Union flyers is implausible or contradicted by other, more probative evidence (ALJ

Dec. at 14:39.); and 4) Vasquez's testimony directly contradicted the testimony of Gladden's

regarding the alleged interrogation, but as a current Apple employee his testimony is considered

particularly reliable in that it is adverse to his own pecuniary interests (ALJ Dec. at 14:27), as

further discussed below.

Despite its Exceptions, Apple could not identify any evidence that the ALJ failed to

consider in issuing her Decision.  Rather, the ALJ correctly noted that Apple failed to produce

any breakroom videos to corroborate its witness testimony that managers regularly cleaned the breakroom (ALJ Dec. at 25:8-27:15) and that it provided no evidence that it immediately confiscates other non-Apple related materials in the same manner it did the Union flyers (ALJ Dec. at 28:17-28:23, 29:03-30:15). Finally, while Apple excepts to the ALJ's finding that Gladden coercively interrogated Vasquez, it provides no basis to disturb the credibility determination that it was, in part, based upon. (Resp. Br. at 30-33.)

**1. Apple's Witness Testimonies Regarding its Cleaning and Housekeeping Policy is Inconsistent with the Video Evidence. (Response to Resp. Exceptions Nos. 1, 2, 16-22.)**

Despite having every opportunity to do so, Apple failed to introduce any breakroom videos that corroborate its claim that managers regularly pass through the breakroom to clean and organize. Based on several days of break room videos introduced at hearing, the ALJ correctly found that Apple could only identify one instance where a manager made any effort to clean the breakroom. (ALJ Dec. at 27:1-27:15.) But, even then, it occurred well after the Union filed a charge alleging unlawful removal of flyers.

Leaving aside that one instance of a manager cleaning the breakroom has very little, if any, probative value, Apple claims that this isolated instance disputes O'Hara's testimony that he never saw a manager cleaning the breakroom. (Resp. Br. at 21.) It ignores the obvious fact that O'Hara was not present when it occurred. O'Hara only identified the manager in the breakroom video when asked on cross-examination. Had Apple introduced any breakroom videos taken before the underlying charge was filed, it should be assumed that they would further corroborate O'Hara and Vasquez's testimony that managers do not regularly clean the breakroom, as does the May 15 video. *See*, *Metro-West Ambulance Service, Inc.*, 360 NLRB 1029, 1030, fn. 13

11

(2014) (Adverse inferences may also be drawn based upon a party's failure to introduce evidence containing information directly bearing on a material issue.)

Apple failed to provide any credible evidence that it was cleaning up the breakroom table when it removed the four Union flyers placed neatly on it. At a minimum, it could not even identify any written policy regarding its alleged housekeeping and cleanliness standards, because no such policy exists. The only written policy that Apple could identify is its solicitation and distribution policy, which does not expressly prohibit placing Union flyers on the breakroom table during nonwork time.[13]

When Vasquez asked Abdelal why the flyers were being removed, all he was advised is that "Apple has a no solicitation policy, and that [he] wasn't allowed to <u>distribute</u> that material" anywhere in the store.[14] (emphasis added.) (Tr. 60; CP Ex. 1; <u>but</u>, <u>see</u>, Tr. 303.) Even after Vasquez clarified that "it was during [] [] non-work time," Abdelal advised him that he still cannot do it. This is consistent with what Abdelal texted Patel to recount his interactions with Vasquez regarding the removal of Union flyers. (CP. Ex. 1.) He did not mention anything about housekeeping or cleanliness standards. All that Vasquez was told is that Apple has a "no solicitation policy" and he is not to "distribute" Union flyers at any time.

While the solicitation policy is, arguably, unclear, the record establishes that Apple removed the Union flyers, because it determined they were a form of solicitation unlike newspapers or Shake Shack coupons left unattended on the breakroom table. In his text message, Abdelal made it very clear that newspapers and Shake Shack coupons left on the table had nothing to do with Union flyers being distributed in the breakroom. (Id.) Similarly, O'Hara

---

[13] Apple did not except to the ALJ's finding that the breakroom table is not akin to a bulletin board. (See ALJ Dec. at 24:1-24:24.)

[14] It is unclear why Apple claims that there is not "any evidence that the store leadership would have interfered if Mr. Vasquez physically distributed flyers to his colleagues while in the breakroom." (Resp. Br. at 39.)

testified that, on June 1, he asked Romero to stop removing the Union flyers. (Tr. 147-148.)
But, in response, Romero told him that "he can't stop removing them because they are
promotional materials." (Id.) Again, nothing was said about housekeeping and cleanliness
standards.

While Abdelal passionately testified that cleaning the breakroom is "like breathing" and
that "we just literally do it all the time" and that "[w]e're always in there," none of the videos
show managers removing anything other than Union flyers.[15] (Tr. 307.) As such, the ALJ
correctly concluded that there was no credible evidence to establish that Apple was cleaning up
flyers rather than confiscating them.

### 2. Apple's Witnesses Provided Different Explanations About what it does with Non-Apple Related Materials. (Response to Resp. Exceptions Nos. 24-28, 32-34.)

The ALJ correctly found that Apple provided little, if any, credible evidence that it
removed Union flyers in the same manner as it did other non-Apple related materials left on its
breakroom table. Apple simply argues, without evidence, that these credibility determinations
are "hopelessly incredible, self-contradictory, or patently unsupported." (Resp. Br. at 24-25;
ALJ Dec. at 28:30-29:1, see, 14:36-14:42, 25:30-26:16, 26:18-26:38.) However, in addition to
the inconsistencies that the ALJ found (ALJ Dec. at 28:17-29:1, 26:18-26:38), the record is
replete with Apple managers providing inconsistent testimony regarding the unprecedented
manner in which the Union flyers were removed:

a.    While Jennison testified that he never shredded any non-Apple related materials
he removed (Tr. 252), Abdelal testified that they shred everything, not just Union flyers (Tr. 326-

---

[15] The ALJ correctly noted that, on May 15, "[w]hile several managers, including Abdelal and Radechal, enter and
exit the breakroom almost immediately after the recording begins, none of them remove [] items from the
breakroom table," including three bottles and several other items. (ALJ Dec. at 26:2-26:16.)

328), but later, equivocated, when shown a May 15 text message from Patel instructing him not to do so. (CP Ex 1; Tr. 329, 336-337.) Abdelal testified that if Patel told him not to shred them, then he would have advised managers not to do so. (Id.) But, O'Hara testified that, two weeks later, on June 1, when he asked Romero what he does with them, Romero told him he shreds them. (Tr. 148-149.)

      b.      Both Jennison and Abdelal testified that the breakroom is reset each evening and clean at the start of each day. (Tr. 231-232, 306-307.) However, the beginning of the May 15 video establishes that the breakroom was messy and untidy first thing in the morning, despite their testimony otherwise. (GC Ex. 4.)

      c.      Vasquez testified that, on May 15, Moya photographed the Union flyers on the table. (Tr. 52; GC Ex. 4 at 50:53.) Moya did not testify to offer any explanation of why he took the photo. On cross-examination, Abdelal denied any specific knowledge of it, despite the breakroom video showing that he was present when Moya took the photo. (Tr. 51-52, 124-125; GC Ex. 4 at 49:55-51:17.)

      d.      On cross-examination, Abdelal testified that, on May 15, "the general consensus of the managers that were there that day that approached me were nervous about removing the literature from the break room." However, he could not identify any specific manager that was nervous. (Tr. 331-334.) Further, on redirect, Abdelal provided a completely different account. When asked, again, what managers and others were discussing with him, on May 15, he testified it had to do with CWA wristbands, but did not mention anything about the flyers. (Tr. 341-342; but, see, Tr. 331, 334.)

      e.      On cross-examination, Abdelal testified that, on May 15, he emailed Patel informing her that "we removed the signs once I connected with Jason." (Tr. 319, 329.) This is

inconsistent with his testimony that removal of the Union flyers was straightforward and that it was an issue of cleanliness and nothing more. He testified that "[i]f they're left behind [we] just remove them" and that when he heard that other managers were nervous, he "just went in and took them and threw them out," but did not mention anything about having to connect with Jason (LNU), until he was asked about it on cross-examination.[16]  (Tr.  309-310.)  Had Apple removed the flyers as part of its general cleaning standards, Apple managers would not have had any reason to "connect with Jason" in order to do so.

These inconsistencies not only undermine the credibility of Apple's witnesses, but they also make clear that Apple managers, initially, had no idea what to do with the Union flyers. Had Apple been merely cleaning up the flyers, as if they were any other non-Apple related materials, the evidence would support such a finding, but it does not.

### 3. Gladden's Testimony Regarding Her Interaction with Vasquez is Neither Credible Nor Plausible.  (Response to Resp. Exceptions Nos. 4-8, 10, 11, 12, 13, 14.)

Not only did the ALJ determine that Vasquez's testimony, as a current employee, is inherently more reliable (ALJ Dec. at 15:27-16:19), but she also correctly found that "Vasquez's depiction of the manner in which the May 9, 2022, conversation unfolded was the more inherently plausible." (ALJ Dec. at 16:19-17:3).   In addition, the ALJ also relied on the contemporaneous text message that Vasquez sent to O'Hara describing the interaction as a "union feeler convo", and the consistency of their testimonies regarding it in crediting Vasquez's account over  Gladden's.  (ALJ Dec. at 17:5-17:18.)

---

[16] On May 15, the initial set of Union flyers remained on the table for over an hour.  (Tr. 319.) While Abdelal was present when O'Hara and Vasquez placed them on the table, he did not remove them or advise them they cannot be left on the table.  (Tr. 50.)  Then ten minutes later, Abdelal reenters the breakroom, but does not remove the flyers even though O'Hara and Vasquez left the room.  (Tr. 50-52.)  Abdelal may have testified that removal of the flyers was straightforward, but the evidence clearly shows that when they were first placed on the breakroom table none of the managers knew what to do until they "connected with Jason." Apple was unable to identify whether the Jason refers to counsel for Apple or another Jason, let alone the basis for having to discuss the issue with him before removing them.

Specifically, Vasquez testified about the May 9 interaction as follows:

"She approached me and asked how I was doing and said she heard about the meeting I had with Julissa." (Tr. 34.)  "I said that my meeting with Julissa went well.  And we discussed the need for higher pay for employees at Apple." (Id.)  "She asked if I spoke with other employees about this topic." (Id.)  "I said I have." (Id.)  Then. "[s]he wanted to know how many people that I spoke to." (Id.) I said I wasn't keeping track of that information."  "She asked []  what I thought about the unionization efforts at Apple." (Tr. 34-35.)  "I said I was running for Congress at the time. And I didn't have time to pay attention to that information.  But that my name had been associated with the unionization at Apple, and I didn't want my name associated with anything I wasn't part of." (Tr. 35.)  "She said she believes that Apple would always do the right thing at the end." (Id.)  "I said I agreed."

Gladden, on the other hand, testified as follows:

"I asked Jordan how his day was going and he didn't seem like he was having a great day." (Tr. 284-85.)  "He shared with me that he had been made aware that his name was connected to some union activity and conversation in the store and that he was very upset." (Tr. 285.)  "I asked Jordan after I said that like if you're allowed to do these things, why does it upset you?" (Id.)  "He shared with me that he is really upset and that he didn't have time to engage in union activity because he was too busy running for Congress." (Id.)  "I asked him how his knee was healing.  I asked him how he was feeling if he was okay to be standing during his shift, and he said that it was healing and he was feeling better and thanked me for checking in on it." (Tr. 289.)

While Gladden provided an entirely different account than Vasquez, the ALJ properly credited Vasquez's testimony.  Apple does not dispute that Vasquez met with Rodriguez to

16

discuss the need for higher wages and that Gladden was aware of it. Based on Gladden's knowledge of his meeting, it is much more likely that Gladden would have brought up unionization, rather than Vasquez, because Vasquez and the other members of the organizing committee had not yet made the campaign public.

Further, it is also unlikely that Vasquez would have been visibly upset about being associated with union activity, as Gladden claims, if he was outspoken about the need for higher wages. Again, Vasquez was part of the Union organizing committee that was pushing for higher wages. (GC Ex. 3.) While he denied any knowledge of or involvement in the unionization effort to avoid making it public, he had no reason to be upset. In fact, a few days later, Vasquez also wore red Union wristbands and distributed Union flyers openly in the breakroom. Had Vasquez been visibly upset about being associated with Union activity, he would not have engaged in any further Union activity.

According to Gladden's own testimony, their May 9 interaction was atypical. Gladden testified that, "as a leader of the [sales] floor", she "spent a lot of time just checking in to make sure that [employees] felt good about their day, that they felt setup for the day, that they understand what like [we] were focusing on and then I would start to talk about the business side of it." (Tr. 280.) She added that "[a] lot of what I did is interpersonal skills making sure that our team is feeling good about the work they would do before they would actually begin to assist the customers in their interactions." (Id.) She added that "I just want to make sure everyone feels good before they start their day." However, Gladden did not do that here.

While Gladden described Vasquez as visibly upset, she did not do anything to refocus his attention to ensure that he could engage customers. She did not seem concerned that, as a customer-facing employee, Vasquez might make customers feel uncomfortable if he was visibly

17

upset.  She also did not testify that she checked in with him again, before the end of his shift, to find out whether he was feeling better and able to effectively interact with customers.

Unlike Gladden's account, Vasquez's account is not only plausible, but it is corroborated by other evidence.  Apple cannot dispute that Vasquez immediately texted O'Hara to let him know that Gladden had a union feeler conversation.  Further, Apple also did not call Goldman as a witness to dispute Vasquez's testimony that he asked her if she knew why Gladden had questioned him about his Union activity.  Since Apple has no basis to question Vasquez's credibility, it simply claims that the May 9 interaction was "casual" and that Gladden's comments were "offhand and innocuous", because she and Vasquez had a "friendly and open relationship," despite no evidence to support such a finding.  (Resp. Excep. Nos. 9, 11, 13, 14.)

### B. APPLE INCORRECTLY RELIES ON *ENLOE MEDICAL CENTER* TO CLAIM THAT EMPLOYERS MAY PROHIBIT UNION FLYERS IN NONWORK AREAS ABSENT SPECIAL CIRCUMSTANCES.
(Response to Resp. Excep. Nos. 16-24.)

Apple does not deny that it prohibited its employees from placing union literature in non-work areas on non-work time.  Rather, it claims, in part, that as long as it removes newspapers, coupons and other non-statutory protected items in the same manner as union literature, which it does not, employees do not have any Section 7 right to place union literature in its breakroom.  That is not only inconsistent with the law, but it misconstrues the very purpose of Section 7 rights.

First, Apple incorrectly relies on *Enloe Med. Ctr.* 345 NLRB 874 (2005), "for the proposition that an employer can lawfully prohibit leaving union literature in the breakroom as long as such prohibition is consistently [] [enforced in a nondiscriminatory manner]."  (Resp. Br. at 19.)  As the ALJ already made clear, there, the Board only found that the employer violated Section 8(a)(1) of the Act because it unlawfully discriminated against union literature.  (ALJ

18

Dec. at 24:26 *citing Enloe*, 345 NLRB at 877-878, fn. 15).   It did not, however, address the issue of whether an employer can prohibit union literature entirely, even if it does it in a nondiscriminatory manner.  (Id.)  It is unclear why Apple continues to argue otherwise without any supporting authority.

If anything, *Enloe* reiterates the well-settled law that "employers generally may ban solicitation by employees during work time, but that rules prohibiting employee solicitation during nonwork time violate Section 8(a)(1) unless justified by a showing of special circumstances making the rules necessary to maintain production or discipline."[17]  Id. at 875. Under <u>Enloe</u> and all of the other cases cited by Apple, it is well settled that Apple must establish special circumstances to justify such a prohibition, which the record establishes it failed to do so.

Instead, Apple claims without evidence that the Union flyers were abandoned.   (Resp. Excep. Nos. 23, 29-31.)  While Apple managers testified that they maintain a breakroom table free and clear of all materials, their testimony ignores the realities of its breakroom.  All of the breakroom videos establish that it is a busy and messy area in general.  Jennison testified that at all hours of the day, there are employees on break or waiting to start a shift or coming off the end of a shift.   When Vasquez and O'Hara left Union flyers on the breakroom table, Apple would have no way of knowing whether they were abandoned or left for employees to review while on break or other non-work time.

According to the breakroom videos, employees leave unattended materials on or near the breakroom table, including bags, bottles, mugs, reading materials and electronic devices, even if for a few minutes, but managers do not take any action.  While Apple also provides employees

---

[17] "Rules prohibiting the distribution of union literature during nonworking times in nonworking areas are presumptively unlawful." *Sprint/United Mgmt. Co.*, 326 NLRB 397, 398 (1998) *citing St. Johns Hospital*, 222 NLRB 1150 (1976), enfd. in part 557 F.2d 1368 (10th Cir. 1977); *Stoddard-Quirk Mfg. Co.*, 138 NLRB 615 (1962).

with lockers, it provided no evidence that employees are required to use them.  Had Apple intended to maintain a clean breakroom table, it would have advised employees to place any such items in their lockers rather than leave them unattended, but it did not.

### C.    APPLE FAILED TO PROVIDE ANY EVIDENCE OF SPECIAL CIRCUMSTANCES THAT WOULD PERMIT REMOVAL OF THE UNION FLYERS
(Response to Resp. Excep. Nos. 17-23, 29-31, 36, 38.)

Notwithstanding any witness testimony, the ALJ found that the May 15 video was the most probative evidence of how the breakroom is maintained and what managers did when removing flyers.  (Id. at 25:17.)  Since the May 15 video was taken the same day the Union went public with its campaign; when Union flyers were first placed on the breakroom table; and before the underlying charge was filed, it provides the most reliable evidence of how Apple maintained its breakroom immediately before and after flyers were left on the table.[18]  (Id. at 25:12.)  Based on this evidence, the ALJ correctly found that managers did not regularly clean or organize the breakroom.

Specifically, the ALJ found that, in each instance that a manager confiscated the Union flyers, they did just that and nothing else.  (ALJ Decision at 27:10.)  Apple managers were not cleaning.  They were coming in and confiscating the flyers and immediately leaving the breakroom.  They did not stop and interact with any employees; they did not do a sweep of the entire breakroom; and they did not ask any employee whether the flyers belonged to them.  Absent any such evidence, it is clear that Apple managers targeted Union flyers for removal.[19]

---

[18] All of the other videos (Resp. Exs. 24, 29, 30 and GC Ex. 8.) were taken after the Union had already filed a charge (GC Ex. 1(a)-(b)).
[19] The first time that Vasquez and O'Hara left union flyers on the breakroom table, managers walked in and out of the room without doing anything with them, despite Apple's claim that cleaning and organizing the breakroom is "a part of our values our DNA."  (Tr. 231-232, 272, 302-303, 306-307.)

Further, even assuming that Apple was merely enforcing its cleanliness and housekeeping standards with respect to Union flyers, which it was not, it provided no evidence that they were left in an unsightly or hazardous manner. In each instance, there were only two to four flyers placed neatly on the table. When Apple managers removed them, they were not scattered around the table, on the floor or anywhere other than where they were initially placed.

The fact is that none of the videos show that the flyers were left in a disorganized, cluttered or otherwise unsightly manner, as the ALJ correctly found. They also do not show that they interfered in any way with any employee's use of the breakroom. The ALJ properly concluded that "the videos conclusively demonstrate that when Apple managers removed Union flyers from the breakroom table, they did not do so as part of some overall effort to clean or organize the breakroom." (ALJ Decision at 27:11.)

D.    APPLE HAS NO BASIS TO CLAIM THAT THE ALJ'S COERCIVE
      INTERROGATION FINDING CHILLS FREE SPEECH RIGHTS
      UNDER THE FIRST AMENDMENT.
      (Response to Apple Exceptions Nos. 3-10, 35.)

Here, the ALJ properly found that Gladden coercively interrogated Vasquez about his and other employees' protected activities. (ALJ Dec. at 15:10 to 19:25.) While Apple claims the ALJ's finding has a chilling effect on its free speech rights, absent evidence of an unlawful "motivation or intent," it is well-established that no such *mens rea* requirement is necessary to find that a coercive interrogation violates Section 8(a)(1) of the Act.

For over fifty years, the Court has consistently held that the NLRA's restriction on coercive interrogations does not chill First Amendment protected speech. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 616-17 (1969); *see, Counterman v. Colorado*, 143 S. Ct. 2106, 2114 (2023). Specifically, in *Gissel*, the Court expressly recognized that "so long as the differences involve conduct easily avoided such as discharge, surveillance, and <u>coercive interrogation</u>, we do

21

not think that employers can complain that the distinctions are unreasonably difficult to follow." (emphasis added) *See, Gissel Packing Co.*, 395 U.S. at 616-18.   If that is generally the case, as found in *Gissel*, it is particularly so here, where the ALJ found that the coercive interrogation involved more than casual questioning.  (ALJ Dec. at  18:11-18:20.)

Here, the ALJ correctly found that Gladden "deliberately approached Vasquez, questioned Vasquez regarding his meeting with Rodriguez and the number of employees he had spoken to regarding wage rates, and then asked Vasquez what he thought about the unionization efforts at Apple."  (ALJ Dec. at 18:3.)  Based on the totality of circumstances, the ALJ determined that this was not a casual encounter involving "offhand and innocuous" comments, as Apple claims (Resp. Excep. No. 11).  In addition to finding that "Gladden's comments involved more extensive probing and sought more specific information regarding Vasquez's protected concerted activities and Union sentiments" (ALJ Dec. at 18:6), the ALJ also found that Gladden was a senior manager that was not only "responsible for everything that fell within the four walls of the operation," but she was also Vasquez's direct supervisor (Tr. 280).  The ALJ determined that it is undisputed that they were not friends or have a personal relationship to indicate her comments were in any way offhand or innocuous.

Further, since no collective bargaining relationship or public Union campaign was in existence, and Vasquez was not an open Union supporter, at the time of their interaction, the ALJ correctly found that Gladden had no other reason to question Vasquez about his and others protected concerted activity.  While Apple claims that the questions were "offhand and innocuous," Vasquez's response was in no way casual.  The ALJ correctly found that Vasquez's denial of any knowledge about his and others' protected activities, at the very least, establishes that he and others were "sufficiently concerned with the ramifications if management became

aware of the Union organizing campaign." (ALJ Dec. at 18:11-19:20.)  Based, in part, on

Vasquez's response, the ALJ found that Gladden's questions would reasonably coerce Vasquez

and other employees from engaging in Section 7 activity.

However, in relying on <u>Counterman</u>, Apple incorrectly conflates threatening conduct

under the Act with "true threats" under the First Amendment.  Unlike a "true threat," a Section

8(a)(1) violation only requires an employer to engage in conduct that would reasonably coerce an

employee from engaging in Section 7 activity.  Here, the ALJ correctly found that, amid a

nascent Union campaign, Apple knew or should have known that Gladden's questioning of

Vasquez in this manner interferes with his and other employees' Section 7 rights.

Moreover, Apple cannot claim that such a finding would have a chilling effect on

Gladden's free speech rights, because Apple also does not permit such discussions on its sales

floor.  Gladden testified that asking employees about topics such as "pay inequities" and

"compensation" on the sales floor "which is public facing [] [is] not the time or the appropriate

place for those types of conversations."  (Tr. 290.)  Here, under Apple's own standards, asking

Vasquez about higher wages and unionization is no more appropriate than questions about "pay

inequities" and "compensation."  Apple's reliance on the First Amendment is misguided,

particularly when it also does not permit such interactions.

Even assuming the ALJ's finding touches upon First Amendment concerns, the ALJ's

remedial order regarding this violation would not have any chilling effect.  The ALJ only ordered

Apple to post a notice providing that it "will not coercively interrogate [employees] regarding

[their] protected concerted activities and [their] sympathies or sentiments with respect to

Communications Workers of America, AFL-CIO (the Union)", and nothing more.  Not only

should Apple have known that extensively questioning Vasquez, under these circumstances, is

coercive, but the ALJ's remedy only requires Apple to notify employees that it will not do so in the future.  Absent a more consequential remedy, Apple cannot reasonably claim that the ALJ's finding  has any "potential to chill, or deter, speech outside of their boundaries."

### III. CONCLUSION

Apple engaged in coercive conduct when it unlawfully interrogated Vasquez about his and others protected activities, and selectively confiscated and shredded Union flyers while allowing other unattended items to remain.   For the foregoing reasons, the Union respectfully requests that the Board deny Respondent's Exceptions in their entirety and affirm the ALJ's recommended findings and conclusions as discussed above.

Dated:  New York, New York
       November 20, 2023

                 Respectfully submitted,

            By:  s/Sumanth Bollepalli_____
                Sumanth Bollepalli
                CWA, District One – Legal Department
                80 Pine Street, 33rd Floor
                New York, New York 10005
                (212) 509-0918
                Attorney for the Charging Party

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

In the matter of:                                    :
                                                     :
APPLE INC.                                           :     CASE NO. 02-CA-295979
                                                     :
            Respondent                               :      November 20, 2023
                                                     :
and                                                  :
                                                     :
COMMUNICATIONS WORKERS OF                            :
AMERICA, AFL-CIO                                     :
                                                     :
            Charging Party


**RESPONDENT'S ANSWERING BRIEF IN RESPONSE TO EXCEPTIONS TO THE**
**ADMINISTRATIVE LAW JUDGE'S DECISION FILED BY THE GENERAL COUNSEL**

Jason R. Stanevich
Maura A. Mastrony
Mathew W. Beckwith
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT 06510

Attorneys for Respondent
Apple Inc.

## I.    INTRODUCTION

Pursuant to Section 102.46(a)(2)(d) of the National Labor Relations Board's ("Board") Rules and Regulations, Apple Inc. ("Apple") submits this Answering Brief in response to the Exceptions to the Administrative Law Judge's ("ALJ") Decision ("Decision") filed by the General Counsel ("the GC") on August 29, 2023.

The Decision addressed the claims lodged against Apple in the Amended Complaint ("Complaint") issued on December 21, 2022. The Complaint alleged, *inter alia*, that Apple violated § 8(a)(1) of the National Labor Relations Act ("the Act") when it selectively and disparately enforced its Solicitation and Distribution Policy at its World Trade Center store ("WTC Store" or "Store") located at 185 Greenwich Street, New York, New York, on May 15, 2022, May 27, 2022, June 1, 2022, and on or about May 30 or June 2, 2022, by prohibiting the placement of Union flyers on the store's breakroom table, while permitting solicitation and distribution with respect to non-union material. After a hearing, the ALJ found that Apple had selectively and disparately enforced its Solicitation and Distribution Policy. Decision, p. 30.

At the hearing, the GC requested that the ALJ ignore established Board precedent and overturn *AT&T Mobility, LLC*, 370 NLRB No. 121, slip op (May 3, 2021) and order as a remedy the recission of Apple's facially lawful Solicitation and Distribution Policy. However, the ALJ held that she was bound to follow Board precedent and declined to order the recission of the Solicitation and Distribution Policy.

The GC now takes exception to the ALJ's application of Board precedent. As set forth more fully below, the decision declining to require Apple to rescind the Solicitation and Distribution Policy should be affirmed.

## II.    ARGUMENT

### A.    The ALJ Did Not Err in Applying Existing Board Precedent.

i.    *The ALJ properly held that she must adhere to existing Board law.*

The GC argues that the ALJ erred by following the existing Board precedent and not overruling *AT&T Mobility, LLC*, when the ALJ declined to order Apple rescind its Solicitation and Distribution Policy. However, the GC's brief in support of its exceptions is devoid of any legal support that would justify or allow the ALJ to ignore Board precedent.

Contrary to the GC's position, the legal authority and Board precedent have long held that "it is not for a Trial Examiner to speculate as to what course the Board should follow . . . . [o]n the contrary, it remains the Trial Examiner's duty to apply established Board precedent which the Board or the Supreme Court has not reversed. Only by such recognition of the legal authority of Board precedent, will a uniform and orderly administration of a national act, such as the National Labor Relations Act, be achieved." *Iowa Beef Packers, Inc.*, 144 NLRB 615, 616 (1963) (*citing Novak Logging Co.*, 119 NLRB 1573, 1576 (1958)).  Thus, the ALJ correctly held that "[a]s an administrative Law Judge, [she] [is] required to apply existing Board precedent that has not been overruled by the Board itself or by the Supreme Court. *See Pathmark Stores, Inc.*, 342 NLRB 378, 378 fn. 1 (2004); *Waco, Inc.*, 273 NLRB 746, 749 fn. 14 (1984)."  Here, the GC failed to present any authority to the contrary.

ii.    *Even if the ALJ could overrule existing Board law – and she cannot – there is no reason to do so here.*

There is no reason to overrule *AT&T Mobility*, which properly held that, *inter alia*, there is no reason to rescind a facially lawful policy, despite improper application of the policy, and the GC fails to provide any reason to do so. The GC simply repeats the argument set forth in the dissent of *AT&T Mobility* but does nothing to address the majority's opinion rejecting this argument.  For

instance, the GC takes the position that an otherwise facially lawful policy is unlawful because it was applied unlawfully once and therefore it must be rescinded.   However, the GC fails to address in any way the majority opinion, which holds:

> [A] rule that prohibits employees from engaging in solicitation on working time is lawful, and it remains lawful after it has been applied to discipline an employee for engaging in union solicitation on working time, which indisputably restricts that employee in exercising his or her rights under Section 7. A lawful no-distribution rule remains lawful after it has been applied to discipline an employee for distributing union literature in a working area.

*AT&T Mobility, LLC,* 370 NLRB No. 121, slip op. at 6 (May 3, 2021).

Moreover, the majority in *AT&T Mobility* rightfully acknowledges that rescinding and revising a facially lawful policy does "not support Board policy of creating stability in the workplace; to the contrary, it is likely to create confusion." *Id.* Rescinding a facially lawful policy serves no meaningful purpose because "[t]he rule is *already* lawful on its face, so it cannot very well be revised to *make* it lawful." *Id*.  Thus, an order requiring the rescission of the policy only to have it reinstated 60 days later would "likely leave employees befuddled, at best, and cynical about the ability of the NLRB to vindicate their rights, at worst." *Id*.  Further, the Board held that "[t]hese insidious effects are avoided by limiting the remedy for an 'applied to restrict' violation to one that will stick: an order commanding the employer to cease and desist from *applying* its rules to restrict employees from exercising their Section 7 rights." *Id.*

The GC fails to address any of the arguments in the majority opinion regarding the futility of an order to rescind a lawful policy. Instead, the GC makes the conclusory argument—without any support—that if an otherwise facially lawful policy is unlawfully applied, employees will continue to be chilled so long as the rule is maintained. *See* GC's Brief at p.2.  This argument, if accepted, would have extreme consequences. It would mean that an employer would have to

rescind or revise any lawful rule simply because it was at one point *applied* unlawfully. Such a result not only defies logic, but undermines the Board's stated goal of "provid[ing] . . . greater clarity and certainty to employees, employers and unions" as to what lawful workplace rules govern workers' employment. *AT&T Mobility*, 370 NLRB No. 121, slip op. at 2. Thus, there is no reason to overturn *AT&T Mobility.*

Notably, this is not the first time that the GC has unsuccessfully sought to overturn *AT&T Mobility*. The GC argued for the same relief in *Phillips 66 Co. & Wayne Michael Terrio*, No. 15-CA-263723, 2022 WL 4299536, at *2 (Sept. 16, 2022). However, ALJ Gollin declined to order that a facially lawful policy prohibiting photography and recording that was unlawfully applied be rescinded, holding that he cannot overturn *AT&T Mobility* because he was "bound to apply, not change, extant Board law."

## III.    CONCLUSION

The law is clear that the ALJ is bound to apply existing Board precedent. Moreover, the GC's brief completely fails to set forth any legal authority allowing the ALJ to overturn the Board's precedent. Nor does the GC provide any support as to why the ALJ should overturn *AT&T Mobility* – because she cannot. As such, the decision to not order the rescission of the Solicitation and Distribution policy should be upheld.

For the reasons set forth fully above, Apple requests that the Board affirm the ALJ's decision regarding the denial of the request to rescind the Solicitation and Distribution Policy and overrule the GC's exceptions related to the same.

APPLE INC.,

*/s/ Jason R. Stanevich*

Jason R. Stanevich
Maura A. Mastrony
Mathew W. Beckwith
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
jstanevich@littler.com
mmastrony@littler.com

*Attorneys for Respondent*

## <u>CERTIFICATION</u>

      This is to certify that a copy of the foregoing document has been delivered, via e-mail, on this 20th day of November, 2023, via e-mail to all counsel and *pro se* parties of record as follows:

Sumanth Bollepalli, Esq.
80 Pine Street, 37th Floor
New York, NY 10005-1728
sbollepalli@cwa-union.org
*--Counsel for Communications Workers of America*

Ruth Weinreb
Field Attorney
National Labor Relations Board, Region 2
Ruth.Weinreb@NLRB.gov

                    /s/*Jason R. Stanevich*
                    Jason R. Stanevich

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Apple, Inc.** *and* **Communications Workers of America, AFL–CIO.** Case 02–CA–295979

May 6, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS PROUTY AND WILCOX

On June 20, 2023, Administrative Law Judge Lauren Esposito issued the attached decision. The Respondent filed exceptions and a supporting brief, and the General Counsel and the Charging Party filed answering briefs. The General Counsel filed limited exceptions and a supporting brief, and the Respondent filed an answering brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions,[2] and to adopt the recommended Order as modified.[3]

ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge as modified below and orders that the Respondent, Apple, Inc., New York, New York, its officers, agents, successors, and assigns, shall take the action set forth in the Order as modified.

1. Substitute the following for paragraph 2(a).

"(a) Post at its facility at 185 Greenwich Street, New York, New York, copies of the attached notice marked "Appendix."[4] Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where

---

[1] The Respondent has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[2] The judge concluded, among other things, that the Respondent violated Sec. 8(a)(1) by interrogating an employee regarding his protected concerted activity and union sympathies. On exception, the Respondent argues that the Board should modify its longstanding objective standard for analyzing alleged unlawful interrogations to add a subjective mental-state requirement, consistent with the Supreme Court's recent decision in *Counterman v. Colorado*, 600 U.S. 66 (2023) (holding that, in criminal cases involving "true threats," to avoid chilling speech protected by the First Amendment, the government must prove that the defendant at least acted recklessly, i.e., that the defendant had a subjective understanding of the threatening character of their communications and delivered them anyway). The Respondent's argument is without merit. *Counterman* is inapplicable here, as it involved a criminal prosecution, and the Supreme Court's decision gave no indication that its principles or reasoning extends to cases arising under the National Labor Relations Act. Accordingly, we find it appropriate to apply the Board's longstanding objective standard, endorsed by the Supreme Court in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 616-620 (1969).

We also find the Respondent's reliance on *Bozzuto's Inc. v. NLRB*, 927 F.3d 672 (2d Cir. 2019), denying enf. in relevant part 365 NLRB No. 146 (2017), to be misplaced. *Bozzuto's* involved a brief "chance encounter," during which the respondent's Senior Vice President asked an open union supporter a single question: "what's going on with this Union stuff?" Id. at 687. In this case, by contrast, Senior Manager Stephanie Gladden deliberately approached employee Jordan Vasquez, questioned him regarding a meeting at which he communicated a group concern about wage rates, asked how many employees he had spoken to about wage rates, and then asked what he thought about the unionization efforts. Thus, Gladden's comments involved more extensive probing, and sought more specific information regarding Vasquez' protected concerted activities and union sentiments, than the Senior Vice President's "offhand" remark at issue in *Bozzuto's*. Moreover, unlike the employee

[3] We shall amend the judge's remedy and modify the judge's recommended Order in accordance with our decisions in *Paragon Systems*, 371 NLRB No. 104 (2022), and *Excel Container, Inc.*, 325 NLRB 17 (1997).

[4] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notices must also be posted by such electronic means within 14 days after service by the Region. If the notices to be physically posted were posted electronically more than 60 days after physical posting of the notices, the notices shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

in *Bozzuto's*, Vasquez was not an open union supporter at the time of the questioning.

With respect to the judge's finding that the Respondent violated Sec. 8(a)(1) by disparately enforcing its solicitation and distribution policy, the General Counsel filed limited exceptions urging the Board to overrule *AT&T Mobility, LLC*, 370 NLRB No. 121 (2021), find that unlawfully applied rules are unlawful to maintain, and expand the Board's remedy for the unlawful application of facially lawful rules. We decline the General Counsel's request at this time. Chairman McFerran dissented in relevant part in *AT&T Mobility* and adheres to the views she stated there. She nevertheless applies *AT&T Mobility* for institutional reasons for the purpose of determining the remedy in this case. Members Prouty and Wilcox were not members of the Board when *AT&T Mobility* issued. While they acknowledge that *AT&T Mobility* is currently governing law for the purpose of determining the remedy in this case and apply it here for institutional reasons, they would be open to reconsidering it in a future appropriate case.

2                               DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

notices to employees are customarily posted.  In addition
to physical posting of paper notices, notices shall be dis-
tributed electronically, such as by email, posting on an in-
tranet or an internet site, and/or other electronic means, if
the Respondent customarily communicates with its em-
ployees by such means.  The Respondent shall take rea-
sonable steps to ensure that the notices are not altered, de-
faced, or covered by any other material.  If the Respondent
has gone out of business or closed the facility involved in
these proceedings, the Respondent shall duplicate and
mail, at its own expense, a copy of the notice to all current
employees and former employees employed by the Re-
spondent at any time since May 9, 2022."

   Dated, Washington, D.C.  May 6, 2024

_____
Lauren McFerran,                        Chairman

_____
David M. Prouty,                        Member

_____
Gwynne A. Wilcox,                       Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

*Ruth Weinreb, Esq.* and *Tanya Khan, Esq.,* for the General Coun-
   sel.
*Sumanth Bollepalli, Esq.,* for the Charging Party.
*Jason R. Stanevich, Esq.* and *Maura A. Mastrony, Esq. (Littler
   Mendelson, P.C.),* of New Haven, Connecticut for the Re-
   spondent

DECISION

STATEMENT OF THE CASE

   LAUREN ESPOSITO, Administrative Law Judge.  On September
30, 2022, the Regional Director, Region 2, issued a complaint
and notice of hearing against Apple, Inc. (Apple or Respondent),
based upon a charge filed on May 18, 2022, by Communications
Workers of America, AFL–CIO (CWA or the Union).  On Octo-
ber 14, 2022, Apple filed an Answer denying the complaint's
material allegations.  The complaint alleged that Apple violated
Section 8(a)(1) of the Act when it selectively and disparately en-
forced its Solicitation and Distribution policy at its store located
at 185 Greenwich Street, New York, New York, on May 15,
2022, May 27, 2022, June 1, 2022, and on or about May 30 or

June 2, 2022, by prohibiting the placement of union flyers on the
store's breakroom table, while permitting solicitation and distri-
bution with respect to nonunion materials.  The complaint further
alleged that Apple violated Section 8(a)(1) by unlawfully inter-
rogating employees regarding their support for the Union and
protected concerted activities in or about early May 2022.  Sub-
sequently, on December 16, 2022, the Regional Director, Region
2, issued an Amendment to complaint to include an allegation
that Apple violated Section 8(a)(1) by its confiscation of union
flyers in a non-working area of the store on the above dates.  Ap-
ple filed an Answer to the Amendment on December 21, 2022.

   This case was tried before me by videoconference on January
9 and 10, 2024.  During the hearing, counsel for the General
Counsel (General Counsel) amended the complaint on the record
to withdraw the allegations regarding incidents which allegedly
occurred on May 30 or June 2, 2022.[1]  (Tr. 70–71.)  On the entire
record, including my observation of the demeanor of the wit-
nesses, and after considering the briefs filed by General Counsel,
Respondent, and Charging Party, I make the following

FINDINGS OF FACT

I.  JURISDICTION

   Apple, a California corporation with headquarters located in
Cupertino, California, and retail facilities located throughout the
United States, including a store located at 185 Greenwich Street,
New York, New York, is engaged in the development, manufac-
ture and retail sale of consumer electronics and software.  Apple
admits, and I find, that it is an employer engaged in commerce
within the meaning of Section 2(2), (6), and (7) of the Act.  Ap-
ple also admits, and I find, that CWA is a labor organization
within the meaning of Section 2(5) of the Act.

II.  ALLEGED UNFAIR LABOR PRACTICES

*A.  Apple's Retail Store and Operations at 185
Greenwich Street*

   Apple sells and services consumer electronics devices and
software at its retail store at 185 Greenwich Street, New York,
New York.  The store is located on two floors in the Oculus, a
transportation hub in lower Manhattan across the street from the
World Trade Center.  (Tr. 198–199.)  The store opened in August
2016, and has operated continuously since that time.  (Tr. 194,
263.)  For the purposes of this decision, the 185 Greenwich Street
store will be referred to as the WTC store.

   The managerial hierarchy of the WTC store consists of four
levels, and is generally organized along two lines, one for sales
and one for customer service or "after-purchase support."  Tr.
195.  A "Flagship Leader" or general manager is responsible for
overall store operations; beginning in early April 2022 Mona Pa-
tel held this position.  (Tr. 195, 238–239.)  Two "Store Leaders"
report to the general manager of the WTC store, one responsible
for sales and the other for customer service.  (Tr. 195–196.)  As
of April 2022, the Store Leaders were Paul Distasio and Waleed
Abdelal.  (Tr. 196, 239, 296, 350.)  Three senior managers

_____
   [1]  In addition, in her Posthearing Brief, General Counsel moves to
amend the complaint to include an allegation that Apple violated Sec.
8(a)(1) of the Act by maintaining its Solicitation and Distribution policy

in a manner that restricted the Sec. 7 activities of its employees.
Posthearing Br. at 3, 32–37.

reported to each of the Store Leaders, and a number of managers reported to each senior manager. (Tr. 196.) As of April 2022, the senior managers for sales at the WTC store were Rachel Goldman and Yanell Brown, and the senior managers for customer service were Jorge Romero, Catherine Marshall, and one other individual.[2] (Tr. 239–240, 264.) The managers reporting to the senior managers as of April 2022 included Aaron Sidrick and Ryan Radechel with respect to sales, and Matt Moya, Tyler Perroni, Dan Auerbach, and Priscilla with respect to customer service. (Tr. 241–243.) Jason Barilia was Apple's market director for New York as of May 2022. (Tr. 258.)

While there are approximately 20 to 25 job titles for non-managerial employees at an Apple store, these titles are generally grouped into four levels, contingent upon employee experience and expertise. (Tr. 196–197.) Entry-level employees, which comprise the majority of the non-managerial employees, are referred to as the "specialist level." (Tr. 197.) Directly above the "specialist" level is an "expert" level of employees. Above the "expert" level is a level referred to as "pro" or "genius," and the highest level of non-managerial employees is referred to as the "lead" level. (Tr. 197.)

Jordan Vasquez and Ian O'Hara, both of whom worked at the WTC store during the spring and summer of 2022, were called to testify by General Counsel. (Tr. 28, 115.) Vasquez testified that he sells products and services for Apple, and O'Hara stated that he worked for Apple as a technician. (Tr. 28, 115.) At the time of the hearing, Vasquez had been employed by Apple at a retail store near Houston, Texas, since September 2022, where he had begun working immediately after leaving the WTC store. (Tr. 27–28.) O'Hara began working as a technician at the WTC store on June 24, 2016, and his employment with Apple ended on November 24, 2022. (Tr. 115.)

Joshua Jennison, Waleed Abdelal, Paul Distasio, Yanell Brown, and Stephanie Gladden were called to testify by Apple. Jennison was the Flagship Leader or general manager of the WTC store from its opening in 2016 through 2020, and from January 2022 until the first week in April 2022. (Tr. 193–194.) As discussed above, Abdelal and Distasio are Store Leaders at the WTC store, and Brown was a senior manager in sales during the spring of 2022. Stephanie Gladden was a senior manager at the WTC store in sales as of May 2022, and is currently a Store Leader in Aventura, Florida. (Tr. 279, 281–282.)

Both floors of the WTC store contain areas open to and visited by customers. (Tr. 198.) On the ground floor, which is dedicated to sales, customers purchase products and training is conducted. (Tr. 198.) The upper level of the store, referred to as the balcony level, is a sales floor as well, but also contains the customer

service area, called the "Genius Bar," where employees respond to customer questions and assist customers with products which are not property functioning. (Tr. 107–109, 110–111, 198.)

Both of the WTC store's two levels contain areas used only by store employees and management. The balcony level includes a repair room where employees perform repair work on devices brought in by customers. (Tr. 199.) Off of the repair room is a smaller inventory area where spare computers and phones are stored for use by the customer service employees in their work, together with a few computers and desks also used by the customer service employees. (Tr. 199.) The ground floor contains three non-customer areas. (Tr. 195.) At the back of the store on the ground floor is a large inventory room where all of the store's inventory is kept, including not only computers, phones, and iPad tablets but cleaning supplies and products. (Tr. 200.) Behind a video wall is a data room containing all of the electronics necessary for the store's day-to-day operations, as well as a storage area for items used on an occasional basis. (Tr. 200.)

The third noncustomer area, on the ground floor, includes the employee breakroom where the events at issue in the instant case took place. (Tr. 199–201.) The layout and uses of the employee breakroom and the rest of the non-customer area on the ground floor were established by video taken of the breakroom during the course of the store's daily operations, photographs, and schematics, explicated by the witnesses.[3] As one walks into the breakroom from the hallway, there is a silver rack immediately to the left where employees place their backpacks and belongings, and additional racks for clothing. (Tr. 44, 211-212; GC Exh. 4.) To the right as one enters the breakroom are shelves containing devices called "Isaacs," used by the employees to accept customer payments for products and services.[4] (Tr. 45, 85-86, 208–211, 216, 248–249; R. Exh. 22.)[5] Next to the racks used for clothing are lockers for the employees' personal belongings. (Tr. 44, 211, 216–217; R. Exh. 22.) At the back of the breakroom are refrigerators, and along the side is a sink, a microwave, and a coffee machine. (Tr. 45, 211–212.) In the middle of the room is a large table with chairs which employees use during non-work time, such as before and after their shifts and during breaks.[6] (Tr. 45, 211–212, 216; GC Exh. 4; R. Exh. 22.) Thus, employees spend time at the breakroom table eating meals, reading, playing games, and conversing with one another during their lunch and break periods. Tr. 64, 128, 217-218. Managers often enter the breakroom during their shifts, and may use the area for these same purposes. Tr. 65-66, 219.

As one exits the breakroom there is a large whiteboard mounted on the wall to the right.[7] (Tr. 98, 107, 109–110, 204,

---

[2] A third senior manager position for sales was open as of April 2022. Tr. 239. Brown left his employment with Apple in November 2022. Tr. 240, 264.

[3] In particular, the parties stipulated that Vasquez accurately described the layout of the breakroom and other non-customer areas on the ground floor of the WTC store. Tr. 111-112; GC Exh. 4.

[4] The Isaac device is also used by the employees to clock in and out for their shifts. Tr. 210–211, 248.

[5] The staircase depicted in R. Exh. 22 does not lead to the breakroom, but connects the customer areas on the ground floor and the balcony. Tr. 247.

[6] Employees at the WTC store receive an unpaid one hour lunch break and two paid 15-minute breaks per shift. Tr. 28-29, 115–116, 217.

[7] Jennison testified that the whiteboard contains postings of material "either approved at Apple or at a higher level." Tr. 204. At the time that the whiteboard was installed in 2017, Distasio and Jennison had an e-mail exchange discussing the manner in which it would be used and appropriate direction to employees, which included a statement that "we should never use [the whiteboard] for solicitation." Tr. 360–362; R. Exh. 20.

4                                  DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

207–208, 216, 246; R. Exh. 21, 22.) If one turns left coming out of the breakroom, there are additional tables sometimes used by employees on their breaks, a small bank of lockers, and, down a hall about ten to fifteen steps, a manager's office, which contains desks with computers.[8] (Tr. 45–46, 200–203, 246, 254–255; R. Exh. 23.) If one turns right, a hallway leads out to the sales floor. (Tr. 46, 203–204, 215–216, 247–248; R. Exh. 22.) If one continues straight down the hall after emerging from the breakroom, there is a table with chairs for the employees' use, together with vending machines and the employee bathrooms. (Tr. 46, 203–204, 247.)

At all times material to the complaint's allegations, Apple maintained the following Solicitation and Distribution Policy applicable to the WTC store:

> Solicitation and Distribution
>
> As an Apple employee, you're not permitted to solicit other employees—including for your own hobbies or business (such as jewelry, makeup, personal training services), charitable campaigns or political causes—during work time. Additionally, you may not distribute material during work time or in a work area. Third parties are not permitted to distribute materials or solicit employees, vendors, or customers on Apple property at any time.
>
> Employees may not use Apple's bulletin boards to distribute materials or solicit employees, vendors, or customers. In addition, third parties may not use any Apple system (electronic or physical) to distribute materials or solicit employees, vendors, or customers.
>
> Employees and third parties may not request or accept money, goods, or compensable services of any kind or for any cause, or buy or sell outside commercial products or services, at any time on Apple property, including during non-work time and in non-work areas.
>
> Apple facilities are generally for Apple business use only (including authorized Apple events, such as Apple's health and wellness fairs, product fairs, Apple's Employee Giving, or Diversity Network Association activities) and may not be used for other non-Apple business activity without the prior written approval of Apple's Facilities Department.
>
> If you're approached by a third party wishing to distribute materials or engage in any kind of solicitation on Apple property, you may ask them to leave. If you need any assistance, you may contact Global Security or Loss Prevention. If you're approached by an employee who is distributing materials or engaging in solicitation during work time, you may ask them to stop. Alternatively, you may contact your manager or the Business Conduct Helpline

(Tr. 9–10; Jt. Exh. 1.) Managers are versed in the Solicitation

and Distribution Policy through required annual compliance or business conduct training, and employees receive notice of the Policy during "core training" after they are hired. (Tr. 224, 256–257, 265, 298–299, 351–352.) The Policy is also available on Apple's internal employee website, as well as its "People" or human resources website. (Tr. 298–299, 351–352.)

General Counsel and Apple's witnesses both testified regarding the company's practices with respect cleaning the breakroom. Jennison testified that Apple engaged an outside contractor which provided cleaning services in both the customer and employee-only areas of the store. (Tr. 219–220.) This contractor is responsible for emptying trash, mopping, cleaning up spills, wiping down counters, and restocking items like Kleenex and hand sanitizer. (Tr. 220.) Jennison stated that after the store closed for the night the manager was responsible for ensuring with the cleaning crew that the breakroom was clean, so that no cleaning needed to be performed in the morning before the store opened. (Tr. 231–232.) Abdelal also testified that the store was cleaned every night. (Tr. 306–307.) Vasquez and O'Hara both testified that employees using the breakroom were expected to throw out their own trash and generally clean up after themselves. (Tr. 68, 150–151.)

### B.  Organizing Activity at Apple's 185 Greenwich Street Store

O'Hara and Vasquez testified regarding employee organizing activities at the WTC store during 2021 and 2022. O'Hara testified that he initially contacted CWA in January 2021, and over the next 2 to 3 months created an organizing committee comprised of himself and a few other employees. (Tr. 116.) The organizing committee held virtual meetings via Zoom once or twice each week to coordinate their activities, and communicated through the encrypted messenger application Signal, which the employees installed on their personal phones. (Tr. 117.) O'Hara testified that he sent messages to the organizing committee over Signal on a daily basis. (Tr. 118.) Vasquez testified that he joined the organizing committee in January 2022, and participated in the weekly Zoom meetings and Signal communications. (Tr. 29.) Vasquez testified that he communicated with the organizing committee via Signal multiple times each day. (Tr. 29–30.) In addition, Vasquez testified that he had in-person conversations with other WTC store employees on a daily basis regarding the need for higher wages. (Tr. 30.) These conversations took place at the WTC store on the sales floor and in the breakroom, and also outside of work. (Tr. 30.)

In late April 2022, Vasquez spoke to senior manager Rachel Goldman regarding wage rates on the sales floor at the WTC store. (Tr. 30–31.) Vasquez testified that he told Goldman that he believed that the employees' pay was too low, and asked whether there were ways that the employees could obtain higher wage rates. (Tr. 31.) Goldman referred Vasquez to Julissa Rodriguez of Apple's People Team or human resources. (Tr. 31.) On May 3, 2022, Vasquez spoke to Rodriguez over WebEx, stating that the Apple employees needed higher wages and more vacation time. (Tr. 32.) Rodriguez responded that she would

---

[8]  Jennison testified that although a sign next to the door says "manager's" or "leadership" office, the office is crowded with employees coming in to "check their email" or "complete paperwork," and that the

office door is left open. Tr. 200-201. Vasquez and O'Hara both described this office as an office for management. Tr. 45–46, 54, 58–59, 127, 146.

APPLE, INC.

discuss these issues with her managers.[9]  (Tr. 32.)

On May 15, 2022, the organizing committee "went public" with respect to their campaign for representation by CWA. (Tr. 30, 39.)  On that date, members of the organizing committee placed flyers on the breakroom table at the WTC store for the first time, in the manner discussed below.  (Tr. 40.)  In addition, beginning on May 15, 2022, members of the organizing committee wore red wristbands that stated "CWA" on them during their shifts, and distributed the wristbands to other employees.  (Tr. 40, 82, 160, 179–180.)

In June or July of 2022, Vasquez spoke about his support for the Union during a "download," a brief meeting conducted each morning where employees discuss events at the company and their duties and objectives for the day and the week.  Tr. 75, 76–77, 101.

### C. The Interaction Between Jordan Vasquez and Stephanie Gladden on May 9, 2022

Jordan Vasquez and Stephanie Gladden both testified regarding a conversation between them which occurred on May 9, 2022.  At the time of this conversation, Gladden was a senior manager at the WTC store.  (Tr. 32–33, 281–282.)  Vasquez was familiar with Gladden from his work at the WTC store, and typically spoke to her a few times each day on the sales floor or in the breakroom.  (Tr. 32–33.)  Vasquez testified without contradiction that while the two had discussed non-work-related issues such as bicycling and bars around the city, they did not socialize outside of work and were not friends.  (Tr. 33, 36.)

On May 9, 2022, Gladden approached Vasquez on the balcony level of the WTC store between 11 a.m. and 12 p.m.  Tr. 33, 283.  Vasquez testified that he could recall the time of the conversation because the store was slow before the rush of customers that typically arrived during the mid-day lunch period.  (Tr. 34.)  Gladden also testified that she approached Vasquez, as part of her general practice to initiate contact with all employees on the floor at the inception of her shift, in order to determine whether they needed anything and how their shift was progressing.  (Tr. 283–284, 290–291.)  Vasquez confirmed that it was not unusual for Gladden to approach him during a shift.  (Tr. 72–73.)  No one else was present at the time.  (Tr. 34.)

Vasquez testified that after Gladden approached him, she asked him how he was doing, and then said that she had heard about Vasquez' meeting with Rodriguez and asked about how the meeting went.  (Tr. 34.)  According to Vasquez, he told Gladden that his meeting with Rodriguez went well, and that the two had discussed the need for higher pay for the Apple employees.  (Tr. 34, 73.)  Gladden then asked Vasquez if he had spoken to other employees regarding the wage increase issue, and when Vasquez stated that he had done so, Gladden asked how many people he had spoken to.  (Tr. 34, 73.)  Vasquez stated in response that he was not keeping track of that information.  (Tr. 34, 73.)  According to Vasquez, Gladden then asked him what he thought about the unionization efforts at Apple.  (Tr. 34–35.)

Vasquez responded that he did not have time to pay attention to that issue because he was running for Congress.  (Tr. 35.)  However, Vasquez said he was concerned that his name had been associated with the union organizing campaign at Apple, and he did not want his name associated with something that he was not a part of.[10]  (Tr. 35.)  Gladden said that she believed that Apple would always do the right thing in the end, and Vasquez agreed.  (Tr. 3.)(Tr. 284–285).  Gladden testified that she told Vasquez that unionization was something that he could talk about and engage in, and asked why he was upset given that union activity was permitted.  (Tr. 285.)  According to Gladden, Vasquez responded that he did not have time to engage in union activity because he was running for Congress.  (Tr. 285.)  Gladden testified that she then asked Vasquez how his knee was healing after a recent injury, and whether he was able to stand during his shift, and Vasquez thanked her for inquiring but stated that he was feeling better.  (Tr. 289.)  Gladden stated that Vasquez raised the topic of union activity, and denied asking Vasquez questions regarding who, if any, of his co-workers may have supported the union.  (Tr. 285–286.)  Gladden also testified that Vasquez did not discuss "pay inequities" or "his views towards his compensation" as an Apple employee, and that she did not ask Vasquez any questions regarding "his compensation or [the] compensation of his colleagues."  (Tr. 290.)  Gladden testified that the sales floor was busy at the time of their conversation.  Tr. 289.

Vasquez testified that after his conversation with Gladden, he went to the back area off of the sales floor and spoke with O'Hara, telling O'Hara that Gladden had asked about his thoughts regarding unionization.  (Tr. 36, 118–119.)  O'Hara encouraged Vasquez to specifically identify Gladden in the organizing committee's group chat to inform the committee.  (Tr. 119.)  Vasquez then sent a message to the organizing committee via Signal, stating "They just had a union feeler convo with me I'll explain when I get a chance."[11]  (Tr. 36–38, 80–81, 120; GC Exh. 2.)  About 15 minutes later, O'Hara responded on Signal, stating, "Stephanie [G]ladden was the manager who tried to talk to you about unions, correct?"  (Tr. 37, 120–121, 122; GC Exh. 2.)  Vasquez did not respond to O'Hara's message.  (Tr. 158–159.)

Vasquez testified that as he was leaving work that day he approached Goldman outside the store, and told Goldman that a manager was asking him what he thought about unions.  (Tr. 38–39.)  Vasquez asked Goldman if she knew why he was being questioned.  (Tr. 39.)  Goldman said that she did not know why it was happening but could look into it, and then asked Vasquez who had questioned him.  (Tr. 39.)  Vasquez said that he did not want to disclose who had questioned him, but was only checking to see whether Goldman knew anything about the issue.  (Tr. 29.)  Goldman reiterated that she would look into it.  (Tr. 39.)

### D. The Events of May 15, 2022

As discussed above, May 15, 2022 was the date that the organizing committee "went public" with respect to the union organizing campaign at the WTC store.  That was the first date that

---

[9]  Goldman and Rodriguez did not testify at the hearing.

[10]  Vasquez testified that he did not tell Gladden about his activities with the union organizing committee because "We were trying to keep all that information under wraps [so] as to not alert managers that we were trying to form a Union."  Tr. 35.

[11]  Vasquez is identified in this series of Signal messages as "Clementine Vasquez," his legal name since late December 2021.  Tr. 27, 37, 121–122; GC Exh. 2.

6                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Vasquez and O'Hara distributed union flyers, both outside the store and inside the breakroom. (Tr. 40–41.) In addition to the testimony of Vasquez and O'Hara, General Counsel introduced into evidence as General Counsel's Exhibit 4 a video of the breakroom at the WTC store filmed on May 15, 2022. (Tr. 42, 59.) The video begins at 7 a.m. and runs continuously through 9 p.m., with time stamps beginning at 0 for 7 a.m. (Tr. 43; GC Exh. 4.) In the discussion that follows, references to the video time stamps from General Counsel's Exhibit 4 will be denoted in parentheses.

The flyers Vasquez and O'Hara placed on the breakroom table on May 15, 2022, attached hereto as Appendix B, contained the logo of the Apple Retail Union CWA, and stated "Higher Pay, Better Benefits, More Representation." (Tr. 40–42, 122–124; GC Exh. 3.) Two QR codes appeared on opposite sides of the Apple Retail Union CWA logo. Explanatory text for one of the QR codes stated, "Read our store's Vision Statement here," and explanatory text for the other QR code stated, "Add your name to join the movement." (GC Exh. 3.) WTC store employees could scan these QR codes with their phones, and be directed to a mission statement prepared by the organizing committee and union cards which appeared on the Union's website, respectively. (Tr. 63, 161–163; GC Exh. 3.)

On May 15, 2022, Vasquez first entered the breakroom at approximately 7:37 a.m., prior to the 8 a.m. start of his shift.[12] (Tr. 40-41, 47 (37:42).) Vasquez walked around the breakroom table and placed two flyers next to one another, face up, on the breakroom table. (Tr. 49 (37:53).) Seconds later, O'Hara entered the breakroom, wearing a pink baseball cap. (Tr. 49 (38:02).) O'Hara proceeded to place two union flyers on the breakroom table, face up, on the side of the table opposite to the flyers Vasquez had placed. (Tr. 50 (38:28).) Store Leader Waleed Abdelal was in the breakroom next to Vasquez during this time. (Tr. 50.) Approximately 10 minutes later, Abdelal entered the breakroom again for a few seconds, then manager Matt Moya entered, took a photograph of the union flyers on the table, and left.[13] (Tr. 51, 124-125 (49:55, 50:02, 50:53-51:17).) About an hour later, Abdelal entered the breakroom, removed all of the union flyers from the table, and exited the breakroom, turning left. (Tr. 53-55 (1:51:08-1:51:24).)

During their lunch break from 3 p.m. to 4 p.m., Vasquez and O'Hara replaced the union flyers that Abdelal had taken from the breakroom table earlier. (Tr. 55 (5:05:39-5:06:08).) A minute later, Moya entered and exited after viewing the breakroom table. (Tr. 55–56, 126 (5:07:45-5:07:58).) A few minutes later, Vasquez and O'Hara left the breakroom to eat lunch at the tables and chairs located in the hallway. (Tr. 56-58 (5:11:05-5:11:08).) Seconds later, Moya returned, removed the union flyers Vasquez and O'Hara had place on the breakroom table, and exited the

breakroom. (Tr. 58, 127 (5:11:15-5:11:33).) From their table in the hallway, Vasquez and O'Hara saw Moya turn down the hallway in the direction of the management office.[14] (Tr. 58–59, 127–128.)

About an hour later, O'Hara entered the breakroom and placed union flyers on the table again. (Tr. 83–84, 171 (6:01:27-6:02:05). ) The video shows O'Hara briefly conversing with someone immediately after placing the union flyers on the table (6:02:05-6:02:17, 6:02:31-6:02:54). Vasquez then entered the room and spoke to O'Hara (6:03:02-6:03:10). O'Hara then picked up the flyers and, after exchanging a few words with the same individual,[15] placed them in his bag. (Tr. 84-85, 171 (6:03:15-6:03:48).) O'Hara testified that he could not recall why he removed the union flyers from the table at that time. (Tr. 172, 173.)

Abdelal addressed the removal of union flyers from the breakroom table on May 15, 2022, during his testimony. Abdelal testified that on May 15, 2022, "a number of" managers had told him that there were union flyers on the breakroom table. (Tr. 309–310.) Abdelal told the managers that if the union flyers were left behind, the managers should just remove them, but the managers "were very nervous" and "uncomfortable," "[b]ecause of the type of material," "union literature," which they had never encountered before. (Tr. 310, 311, 331.) According to Abdelal, "throughout the entire day this was an ongoing conversation with multiple leaders about their concern about removing the literature." (Tr. 331–334.) Abdelal stated that the managers "really struggled," so he "just went in and took them and threw them out" himself. (Tr. 310, 311.) Abdelal testified that he told the other managers that if union flyers were discovered in the future, "we would clean it up like anything else," to the extent that they were "abandoned." (Tr. 312.)

During the afternoon of May 15, 2022, Vasquez approached Abdelal outside of the store, having heard that Abdelal had removed the union flyers from the breakroom table earlier. (Tr. 59–60.) Vasquez asked Abdelal why he had removed the union flyers that day, and Abdelal stated that Apple has a no-solicitation policy that prohibited Vasquez from distributing the union flyers. (Tr. 60, 312.) Abdelal testified that he also discussed Apple's cleanliness standards with Vasquez. (Tr. 312.) Vasquez stated in response that he and O'Hara were employees, and that they were placing the union flyers on the breakroom table during non-work time, but Abdelal stated that Vasquez was nevertheless prohibited from doing so. (Tr. 60.) Abdelal testified that Vasquez also contended that Abdelal was implementing the policy selectively because Apple had previously distributed Shake Shack coupons to the employees, and Abdelal stated that Apple had issued specific vouchers for the employees to use at Shake Shack. (Tr. 312–313.) According to Abdelal, Vasquez also

---

[12] Vasquez identified himself as the individual who appears on General Counsel's Exhibit 4 wearing a red beanie hat. Tr. 47. The parties stipulated that Vasquez accurately identified O'Hara and the various managers depicted in the video. Tr. 111–112; GC Exh. 4.

[13] Vasquez testified that prior to May 15, 2022, he had never seen any manager take a photograph of anything on the breakroom table. Tr. 52. Abdelal testified that one of the managers "took photos as part of just letting us know something was in the break room." Tr. 326. Abdelal testified that it was not unusual for "our leaders, or team" to take

photographs of the breakroom "to celebrate, you know, someone did a really great job" as well as "calling out when standards have been unacceptable and we would share a photo of it." Tr. 341.

[14] Abdelal testified that he "may have" told Moya to shred the union flyer on May 15, 2022. Tr. 326, 327–329. Moya did not testify at the hearing.

[15] Both Vasquez and O'Hara testified that they were unable to identify this person on the video. Tr. 85, 173.

mentioned that employee Andrew Goebel had distributed flyers for his going-away party, and Abdelal told Vasquez that he had discussed the policy with Goebel in that context. (Tr. 313.) Abdelal also told Vasquez that he could send Vasquez the policy if he wanted to review it, and Vasquez asked Abdelal to do so. (Tr. 60–61.) Abdelal sent Vasquez the policy by text later that day. (Tr. 61; Jt. Exh. 1.)

After reviewing the no-solicitation policy, Vasquez asked to discuss it with Abdelal the next day on the sales floor. (Tr. 61.) Vasquez told Abdelal that he had reviewed the policy and did not believe that he and O'Hara had violated it, because they distributed the union flyers during non-work time and in a non-work area. (Tr. 61–62.) Abdelal stated that Vasquez needed to respect the policy, which prohibited distribution of union flyers as he and O'Hara had done. (Tr. 62.) Abdelal also suggested that Vasquez speak to Rodriguez again regarding the issue. (Tr. 62, 312.)

A few days later, Vasquez spoke with Rodriguez by phone. (Tr. 62.) Vasquez described the situation to Rodriguez, and said that after reviewing the no-solicitation policy he did not believe that he had violated it. (Tr. 62.) Rodriguez said that the employees were not permitted to distribute third-party material such as Girl Scout cookies. (Tr. 62–63.) Vasquez stated that he and O'Hara were not third parties, but Apple employees. (Tr. 63.)

Vasquez testified that after May 15, 2022, he did not leave any other union flyers in the breakroom, because multiple Apple managers had informed him that it constituted a violation of company policy. (Tr. 63–64.)

### E. The Events of May 27, 2022

O'Hara testified that on May 27, 2022, he distributed union flyers by placing them in the center of the breakroom table before his shift began at 11:30 a.m. and during his lunch break after 4 p.m. (Tr. 130–131, 132–133.) O'Hara stated that he placed between four and six flyers on the table before his shift, and three flyers during his lunch break. (Tr. 131, 132–133.) Other employees were present in the breakroom when O'Hara placed the flyers on the table at these times. (Tr. 132–133.) In addition to the union flyers placed on the breakroom table previously, O'Hara placed a new union flyer on the table on May 27, 2022, which stated as follows:

**WHAT OUR UNION
IS FIGHTING FOR:**

<u>**INCLUSION & EQUITY:**</u> Establish a concrete and actional program committed to diversifying store leadership through inclusion and promotion of BIPOC, LGBTQ, and colleagues with disabilities. Reward multilingual employees monetarily for their leveraged contributions that are taken for granted. We're all valuable and want fair representation.

<u>**CAREER DEVELOPMENT:**</u> Protected, regularly scheduled training and coaching time for current roles. Make internal promotion the primary method for filling open positions. Establish clear and achievable career advancement paths. Employee oversight when hiring for senior-level store positions.

*…And much more.*

(Tr. 134–135; GC Exh. 6.) The flyer also contained the Apple Retail Union CWA insignia, and a QR code with explanatory text stating, "Read the full Vision Statement here!"

After placing the union flyers on the breakroom table during his lunch break, O'Hara remained in the breakroom speaking with a colleague. (Tr. 132–133.) A few minutes later, while O'Hara remained in the breakroom, senior manager Yanell Brown entered the breakroom and removed the flyers, without speaking to anyone. (Tr. 133–134.) Using his phone, O'Hara took a video of Brown removing the union flyers. (Tr. 135–136, 137–138; GC Exh. 7.)

Brown testified that he did not realize what the union flyers were at the time that he removed them. (Tr. 271.) Brown stated that, "I just kind of saw them laying on the table and was kind of throwing out things as I would normally do and saw they were on the table," in that "it falls into the same no solicitation policy as everything else." (Tr. 271.) Brown testified that before picking up the union flyer he asked the employee sitting closest to the flyer whether it belonged to them, and the employee shrugged, so Brown picked up the flyer to throw it out. (Tr. 271–272.) Brown testified that after picking up the union flyer he threw it out in the manager's office. (Tr. 275–276.)

### F. The events of June 1, 2022

O'Hara distributed union flyers in the breakroom again on June 1, 2022, before his shift began at 11:30 a.m. and during his lunch break. (Tr. 138.) General Counsel introduced a videotape of the breakroom on June 1, 2022, as General Counsel's Exhibit 8; references to the videotape time stamp will be indicated in parenthesis. (Tr. 146–147.) Before beginning his shift, O'Hara and another Apple employee and organizing committee member placed four union flyers on the breakroom table. (Tr. 139–140 (3:05:39–3:06:28).) About 5 minutes later, senior manager Ryan Radechal entered and left the breakroom, only to return a few minutes later. (Tr. 140–141 (3:10:12–3:10:56, 3:11:23–3:13:13).) Immediately thereafter, senior manager Jorge Romero entered the breakroom and removed the union flyers O'Hara and his co-worker had placed on the table. (Tr. 141–142 (3:13:31-3:13:49).)

Later that day, at about 4:45 p.m. during his lunch break, O'Hara and a coworker placed additional union flyers on the breakroom table. (Tr. 142–143 (7:25:05-7:25:39).) O'Hara then left the breakroom and went to the tables near the vending machines to eat his lunch. (Tr. 143–144.) About 15 minutes later, Romero entered the breakroom, removed the union flyers from the table, and exited after briefly speaking with an employee seated at the breakroom table. (Tr. 144–145 (7:40:19-7:41:05).) After leaving the breakroom with the flyers, Romero walked by the tables where O'Hara was eating lunch, and O'Hara saw him walk into the manager's office. (Tr. 145–146.)

About an hour later, Romero walked by the area where O'Hara was taking his lunch break. (Tr. 147.) O'Hara got Romero's attention, and asked him to stop removing the union flyers. (Tr. 147.) Romero said that he could not stop removing the flyers, because they were promotional materials. (Tr. 147.) O'Hara stated that the union flyers were not promotional, and

8

that employees were permitted to have them in the breakroom. (Tr. 147–148.) When Romero contended again that the flyers were promotional and not permitted, O'Hara pulled up the employee rights page of the National Labor Relations Board's public website, and showed Romero a statement that employees were allowed to have union materials in nonwork areas. (Tr. 148.) Romero continued to insist that the union flyers were promotional materials, and stated that he would keep removing them. (Tr. 148.) O'Hara then asked Romero what he did with the union flyers after removing them, and Romero responded that he shredded them. (Tr. 148–149.) O'Hara then asked whether the employees could have a bulletin board or a cork board to post union flyers and materials; Romero responded that they could look into it and see whether something could be designed.[16] (Tr. 148–149.)

O'Hara testified that after June 1, 2022 he did not distribute union flyers again, because managers kept removing them. (Tr. 149.)

### Decision and Analysis

#### A. Credibility Resolutions

Evaluating certain issues of fact in this case requires an assessment of witness credibility. Credibility determinations involve consideration of the witness' testimony in context, including factors such as witness demeanor, "the weight of the respective evidence, established or admitted facts, inherent probabilities, and reasonable inferences drawn from the record as a whole." *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001), enf'd. 56 Fed.Appx. 516 (D.C. Cir. 2003); see also *Hill & Dales General Hospital*, 360 NLRB 611, 615 (2014). Corroboration and the relative reliability of conflicting testimony are also significant. See, e.g., *Precoat Metals*, 341 NLRB 1137, 1150 (2004) (lack of specific recollection, general denials, and comparative vagueness insufficient to rebut more detailed positive testimony). It is not uncommon in making credibility resolutions to find that some but not all of a particular witness' testimony is reliable. See, e.g., *Farm Fresh Co., Target One, LLC*, 361 NLRB 848, 860 (2014).

In addition, the Board has developed general evidentiary principles for evaluating witness testimony and documentary evidence. For example, the Board has determined that the testimony of an employer Respondent's current employee which is contrary to the Respondent's contentions may be considered particularly reliable, in that it is potentially adverse to the employee's own pecuniary interests. *Covanta Bristol, Inc.*, 356 NRLB 246, 253 (2010); *Flexsteel Industries*, 316 NLRB 745 (1995), aff'd, 83 F.3d 419 (5th Cir. 1996). It is also well-settled that an administrative law judge may draw an adverse inference from a party's failure to call a witness who would reasonably be assumed to corroborate that party's version of events, particularly where the witness is the party's agent. *Chipotle Services, LLC*, 363 NLRB 336, 336 fn. 1, 349 (2015), enf'd. 849 F.3d 1161 (8th Cir. 2017); *Roosevelt Memorial Medical Center*, 348 NLRB 1016, 1022 (2006). Adverse inferences may also be drawn based upon a party's failure to introduce into evidence documents

containing information directly bearing on a material issue. See *Metro-West Ambulance Service, Inc.*, 360 NLRB 1029, 1030 fn. 13 (2014).

In making credibility resolutions here, I have considered the demeanor of the witnesses, the context of their testimony, corroboration via other testimony or documentary evidence or lack thereof, the internal consistency of their accounts, and the witnesses' apparent interests, if any. As a general matter, any credibility resolutions I have made are discussed and incorporated into my analysis herein.

I generally credit the testimony of Jordan Vasquez and Ian O'Hara. Both Vasquez and O'Hara provided specific, detailed testimony, and did not speculate regarding circumstances not within their own personal knowledge. See, e.g., (Tr. 101–102). I note that Vasquez in particular made a discernable effort to thoroughly explicate the topics he discussed, even during his cross-examination. See (Tr. 77–79). Vasquez and O'Hara's testimony regarding the physical layout and uses of the non-employee areas of the WTC store was consistent with photographs, videos, and schematics introduced into evidence by both General Counsel and Apple. Their testimony regarding the removal of union flyers from the breakroom table on the dates in question was also confirmed by video created by Apple in the normal course of the WTC store's operations and, in the case of O'Hara, by video he created himself using his iPhone.

In addition, Vasquez' testimony directly contradicted the testimony of Apple's witnesses regarding his conversation with Stephanie Gladden—which forms the basis for the allegation that Apple unlawfully interrogated employees in violation of Section 8(a)(1)—and with respect to the parameters and enforcement of Apple's Solicitation and Distribution Policy and housekeeping procedures. Thus, as a current employee of Apple, Vasquez' testimony, may be considered particularly reliable in that it is potentially adverse to his own pecuniary interests. *Covanta Bristol, Inc.*, 356 NRLB at 253; *Flexsteel Industries*, 316 NLRB at 745.

The testimony of Apple's witnesses regarding the store layout and operations was similarly credible. However, I find that their explications of Apple's housekeeping and cleanliness standards, and their accounts of the application of those standards and of Apple's Solicitation and Distribution Policy, to be of varying reliability. I further find that their explanations for their conduct in connection with the removal of union flyers from the breakroom table to be implausible or contradicted by other, more probative evidence, in the manner discussed below.

#### B. The Alleged Interrogation

The complaint alleges that in or about May 2021, Apple unlawfully interrogated employees regarding their Union sympathies and protected concerted activities, in violation of Section 8(a)(1) of the Act. General Counsel contends in support of this allegation that Stephanie Gladden, who was then a senior manager at the WTC store, interrogated Vasquez regarding his support for the Union and protected concerted activities on the balcony level sales floor on May 9, 2022. Apple contends that Gladden did not interrogate Vasquez during their conversation, and

---

[16] Romero did not testify at the hearing.

that her remarks were not coercive. For all of the following reasons, the evidence establishes that Gladden coercively interrogated Vasquez during their conversation on May 9, 2022.

For many years, the Board has determined whether an employer has coercively interrogated an employee by evaluating if "under all the circumstances, the interrogation reasonably tends to restrain, coerce, or interfere with the rights granted under the Act." *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, at p. 10 (2022), quoting *Rossmore House*, 269 NLRB 1176, 1177–1178, aff'd. 760 F. 2d 1006 (1985). In order to determine whether a particular interrogation is coercive in nature, the Board considers the background to the specific interaction, the nature of the information sought, the identity of the questioner, the place and method of questioning, and the truthfulness of the employee's response. *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, at p. 10; see also *Relco Locomotives*, 359 NLRB 1145, fn. 1, 1156 (2013), aff'd. 361 NLRB 911 (2014); *Westwood Health Care Center*, 330 NLRB 935, 939 (2000). It is well-settled that such factors "are not to be mechanically applied," but serve as a framework for assessing "the totality of the circumstances" for analyzing the statements' potentially coercive impact. *Westwood Health Care Center*, 330 NLRB at 939, quoting *Rossmore House*, 269 NLRB at 1178, fn. 20, and *Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 835 (D.C. Cir. 1998).

As an initial matter, I credit Vasquez' account of the May 9, 2022, conversation as opposed to Gladden's. As discussed above, Vasquez provided a specific, detailed account of the events that he addressed during his testimony, and evinced a good-faith effort to create an accurate record. Furthermore, as a current employee of Apple who testified in a manner adverse to his own pecuniary interest by contradicting Apple's own witnesses, Vasquez' testimony is considered particularly reliable pursuant to the Board caselaw discussed above.

Thus, I credit Vasquez' testimony that after Gladden greeted him she told him that she had heard about his meeting with human resources representative Julissa Rodriguez, and asked how it went. Although Gladden denied asking Vasquez "questions related to his compensation or compensation of his colleagues," during her testimony, she was not asked and did not testify regarding whether she and/or Vasquez addressed Vasquez' meeting with Rodriguez, which had taken place on May 3, 2022, only days earlier. (Tr. 289–290.) As a result, Vasquez' testimony that Gladden questioned him regarding his meeting with Rodriguez is effectively unrebutted. I further credit Vasquez' testimony that after he described his meeting with Rodriguez, Gladden asked him whether he had spoken to other employees regarding a wage increase, and asked how many employees he had spoken to. According to Vasquez' uncontradicted testimony, his discussions with both senior manager Rachel Goldman and Rodriguez were not directed toward obtaining a wage for himself alone. Instead, Vasquez was contending that the pay for the WTC store Apple employees was too low, and requesting information regarding how the employees as a group could obtain an increase in their wage rates. I thus credit Vasquez' testimony that after asking Vasquez how the meeting with Rodriguez went, Gladden asked Vasquez for information regarding the parameters of the group of employees dissatisfied with their wage rates, whose

concerns Vasquez had just presented to Rodriguez. The Board has found that employer questioning regarding employee discussions of wages may constitute an unlawful interrogation. See *Spectrum Juvenile Justice Services*, 368 NLRB No. 102 at p. 1, fn. 1, and at p. 8–10 (2019) (questioning regarding petition submitted by employees contending that pay rates were inadequate, and addressing other terms and conditions of employment, unlawful); *Chipotle Services*, 363 NLRB 336, 338, 339–340, 346 (2015) (service manager's questions regarding which employees were discussing wages and how employees had learned of one anothers' specific wage rates constituted an unlawful interrogation).

I further credit Vasquez' testimony that after Gladden questioned him regarding his meeting with Rodriguez and interactions with other employees, she asked Vasquez what he thought about the unionization efforts at Apple. In addition to the general credibility considerations addressed above, Vasquez' depiction of the manner in which the May 9, 2022, conversation unfolded was the more inherently plausible. Specifically, Vasquez and Gladden both testified that Vasquez stated during their conversation that he was concerned that his name had been associated with the union organizing campaign, because he was not involved. (Tr. 35, 284–285.) However, I find it unlikely that, as Gladden claimed, Vasquez immediately responded to her initial, innocuous question regarding how his day was going by making such an assertion. (Tr. 284–285.) At the time of their conversation, Vasquez had been a member of the union organizing committee for approximately 4 months, and had spoken to Goldman and Rodriguez regarding how the employees could obtain higher wages and more vacation time. However, the union organizing committee had yet to "go public" with respect to its activities, which did not occur until May 15. Given this context, a scenario where *Vasquez* spontaneously raised the issue with Gladden to convey his disquiet with being associated with the Union only makes sense if one presumes that Vasquez was attempting to "gaslight" Gladden in some way by preemptively denying involvement in the Union campaign. Thus, crediting Gladden's account requires accepting a contorted set of circumstances and motivation on Vasquez' part. Vasquez' contention that Gladden's initial questioning regarding his meeting with Rodriguez and the wage issue segued into her question regarding what Vasquez thought of the union campaign is substantially more plausible. Vasquez' subsequent response that he was concerned that he was being associated with the Union when he was not in fact a part of the organizing efforts is also more believable in that context. Thus, Vasquez provided a more reliable account of their conversation, and I therefore conclude that Gladden asked Vasquez what he thought about the union organizing efforts at Apple. It is well-settled that supervisory questioning regarding employees' thoughts or sentiments involving a union may constitute an unlawful interrogation. See, e.g., *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (2020) (supervisor unlawfully interrogated employee by asking him "how he felt about the Union"); *Relco Locomotives*, 359 NLRB at 1156 (supervisor unlawfully interrogated employee by asking him what he thought about the union).

In addition, Vasquez' account of his conversation with Gladden is corroborated by his statement to O'Hara that Gladden had

asked about his thoughts regarding the Union, as well as by Vasquez' Signal message to the organizing committee stating, "They just had a union feeler convo with me I'll explain when I get a chance." (Tr. 36–38, 118–120; GC Exh. 2.) At the hearing, Vasquez was cross-examined regarding the conversation with Gladden and his subsequent message to the organizing committee, as well as the extent of his public identification as a Union supporter, one of the factors considered as part of the totality of the circumstances analysis. (Tr. 72–74, 74–80, 80–81.) As a result, Vasquez' statements to O'Hara and the committee constitute prior consistent statements admissible pursuant to Federal Rule of Evidence 801(d)(1)(B),[17] and support Vasquez' account of his conversation with Gladden. See *Pagerly Detective Agency*, 273 NLRB 494, fn. 1 (1984) (ALJ erred by excluding employee's testimony regarding his immediate recounting of president's request that he provide a list of employees supporting the union).

Finally, during her direct examination, Gladden testified that she did question Vasquez about union activity, asking him, "if you're allowed to do these things, why does it upset you?" to be associated with the Union, given that "This is something that you can talk about and you can engage in." (Tr. 285.) Vasquez' account of their conversation did not include these statements. Nonetheless, this question is simply a variation on supervisory queries regarding employee "thoughts" and "feelings" about a union or union representation which the Board has found to be impermissible. *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5; *Relco Locomotives*, 359 NLRB at 1156; see also *Dayton Hudson Corp.*, 316 NLRB 477, 483 (1995) (manager's questioning of employee as to "why he wanted the Union, and what significance it had" unlawful interrogation); *Research Management Corp.*, 302 NLRB 627, 648 (1991) (manager unlawfully interrogated employee by asking him "why he supported the Union and what good did he feel the Union would do"); *Nice-Pak Products, Inc.*, 248 NLRB 1278, 1286–1287 (1980) (supervisor's questioning of employees as to "why [they] thought the employees needed a union" and "why [they] really wanted a union" unlawful interrogation).

Apple argues that Gladden's remarks are comparable to the "offhand and somewhat innocuous" comments at issue in *Bozzuto's Inc. v. NLRB*, which the Second Circuit, contrary to the Board, found did not constitute a coercive interrogation. 927 F.3d 672, 685, 686–687 (2019), denying enforcement of *Bozzuto's, Inc.*, 365 NLRB No. 146 (2017). However, the circumstances of that case are inapposite in this respect. In *Bozzuto's Inc.*, a fleeting, chance encounter between an employee and a Senior Vice President resulted in a two-sentence interaction, where the Senior Vice President asked, "what's going on with this Union stuff?" and the employee responded, "I'm not going to talk about it with you." 927 F.3d at 676. In the instant case, by contrast, Gladden deliberately approached Vasquez,

questioned Vasquez regarding his meeting with Rodriguez and the number of employees he had spoken to regarding wage rates, and then asked Vasquez what he thought about the unionization efforts at Apple. Thus, Gladden's comments involved more extensive probing, and sought more specific information regarding Vasquez' protected concerted activities and Union sentiments, than the Senior Vice President's "offhand" remark at issue in *Bozzuto's Inc.*

Other factors comprising the totality of the circumstances analysis further support the conclusion that Gladden's interrogation of Vasquez was coercive. As a senior manager, Gladden reported directly to Store Leaders Abdelal and Distasio, and was Vasquez' direct supervisor on the sales floor during that portion of his shift. See *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (interrogation coercive where questioner was employee's "direct supervisor"); *Spectrum Juvenile Justice Systems*, 368 NLRB No. 102 at p. 11 (questioning by employee's shift supervisor coercive). I do credit Gladden's testimony, which was confirmed by Vasquez, that she approached Vasquez in connection with her general practice of briefly speaking with each employee on the sales floor at the beginning of her shift.[18] (Tr. 72–73, 284.) However, Vasquez' testimony that despite their casual exchanges he and Gladden did not have a friendship or personal relationship was not contradicted. See, e.g., *Bozzuto's, Inc.*, 365 NLRB No. 146 at p. 2, fn. 6, quoting *Management Consulting, Inc.*, 349 NLRB 249, 250 fn. 6 (2007) (supervisory remarks potentially coercive regardless of supervisor's "friendship" with employee and "regardless of whether the remark was well intended"). Furthermore, Gladden's regular interactions with sales floor employees to identify herself and initiate contact at the beginning of her shift do not obviate the coercive nature of questioning regarding Union and protected concerted activity. There was no collective bargaining relationship or certification of a union as collective bargaining representative in effect for the employees at the WTC store at the time. Indeed, as of May 9, 2022, the Union organizing committee had yet to make its campaign public, and while Vasquez had spoken to Goldman and Rodriguez regarding the employees' desire for higher wages and more vacation time, at the time of his conversation with Gladden he was not an open union supporter. See *Bozzuto's, Inc.*, 365 NLRB No. 146 at p. 2–3 (employee's "leading role in the organizing campaign" irrelevant where evidence demonstrated that employee was endeavoring to "keep a low profile when engaged in union activity" "*at the time of the interrogation*") (emphasis in original).

Finally, the evidence establishes that Vasquez equivocated in response to Gladden's questions, by stating that he had not kept track of the number of employees with whom he had discussed the wage rate issue, and by denying any association or involvement with the Union. Vasquez testified that he did so in order to prevent the WTC store managers from learning that the

[18] I note as well that the conversation between Gladden and Vasquez took place on the sales floor, and Vasquez was not called into a management office or otherwise subjected to circumstances creating "an atmosphere of unnatural formality." *Westwood Health Care Center*, 330 NLRB at 939, quoting *Bourne v. NLRB*, 332 F.2d 47, 48 (2nd Cir. 1964). This factor therefore militates against a finding that Gladden's questioning was coercive.

employees were attempting to form a Union. It is well-settled that an employee's evasive or untruthful response to supervisory questioning supports a determination that the questioning was coercive in nature. See *Kumho Tires Georgia*, 370 NLRB No. 32 at p. 5 (employee's "reluctance to answer" supervisor's questions evinces their coercive nature); *Chipotle Services*, 363 NLRB at 346; *Relco Locomotives*, 359 NLRB at 1156 (employee's untruthful answer to supervisor's query regarding his union sentiments "because he feared for his job" indicative of coercion). In this respect, I note that while there is no historical backdrop of "employer hostility or discrimination" at issue here, a factor which would militate against a conclusion that Gladden's questioning was coercive, there was no labor union recognized or certified as collective bargaining representative. Furthermore, Vasquez and the rest of the organizing committee were sufficiently concerned with the ramifications if management became aware of the Union organizing campaign that Vasquez responded to Gladden's questioning untruthfully. *Westwood Health Care Center*, 330 NLRB at 939. Such evidence contradicts Apple's argument that Gladden's reassurance to Vasquez that "Apple would always do the right thing at the end," ameliorated the coercive effect of her questioning, as does Vasquez' immediate reporting of the incident to O'Hara and to the organizing committee as a "union feeler convo." (Tr. 35, 36–38; GC Exh. 2; see Posthearing Br. at 26–27.)

For all of the foregoing reasons, the evidence establishes that Gladden coercively interrogated Vasquez on May 9, 2022, in violation of Section 8(a)(1) of the Act.

### C. Alleged Violations Based Upon the Removal of Union flyers from the Breakroom Table

#### 1. The complaint's allegations and General Counsel's Posthearing Motion to Amend

The complaint alleges two distinct violations of Section 8(a)(1) of the Act based upon Apple's removal of union flyers from the table in its employee breakroom on May 15, 2022, May 27, 2022, and June 1, 2022. First, the complaint alleges that Apple's removal of the union flyers constituted a disparate enforcement of its Solicitation and Distribution Policy, in that Apple permitted solicitation and distribution in the breakroom with respect to non-Union materials. The Complaint further alleges that Apple unlawfully confiscated union flyers in a nonworking area of the WTC store.

In her posthearing brief, General Counsel moves to amend the complaint to include an allegation that at all material times Apple maintained its Solicitation and Distribution Policy in a manner which restricted its employees' Section 7 activities, in violation of Section 8(a)(1) of the Act. (GC Posthearing Br. at 3, 35–37.) Section 102.17 of the Board's Rules and Regulations provides that amendments to a complaint may be made "upon such terms as may be deemed just" via a motion to an Administrative Law

Judge at the hearing and until the case is transferred to the Board. In order to determine whether an ALJ has properly exercised their discretion with respect to a motion to amend the complaint, the Board considers "(1) whether there was surprise or lack of notice, (2) whether there was a valid excuse for the delay in moving to amend, and (3) whether the matter was fully litigated." See, e.g., *Rogan Bros. Sanitation, Inc.*, 362 NLRB 547, 549 fn. 8 (2015), enf'd. 651 Fed. Appx. 34 (2nd Cir. 2016), citing *Stagehands Referral Service, LLC*, 347 NLRB 1167, 1171-1172 (2006); see also *CAB Associates*, 340 NLRB 1391, 1397-1398 (2003). Because Apple was provided with no notice regarding the amendment now advanced by General Counsel, and General Counsel has provided no explanation for the delay in moving to amend, General Counsel's motion is denied.

Apple was not provided with any notice that General Counsel would be alleging as a discrete violation of Section 8(a)(1) that it maintained its Solicitation and Distribution Policy in a manner which restricted the Section 7 rights of its employees prior to the submission of the parties' posthearing briefs. As discussed above, at the issuance of the December 16, 2022 Amendment to the complaint, Apple was apprised that General Counsel was contending that its conduct with respect to the distribution of union flyers at the WTC store violated Section 8(a)(1) in two distinct ways: (i) that it selectively and disparately enforced its Solicitation and Distribution Policy by prohibiting the placement of union flyers on the store's breakroom table, while permitting solicitation and distribution with respect to nonunion materials; and (ii) that it unlawfully confiscated union flyers in a non-work area. These were the extant allegations with respect to Apple's conduct involving the union flyers throughout the entirety of the hearing, during the presentation of both the General Counsel's case and Apple's. General Counsel amended the complaint in this matter twice—once on December 16, 2022 and again on the record at the hearing. But although the Solicitation and Distribution Policy has been at issue since the unfair labor practice charge in this case was filed on May 18, 2022,[19] General Counsel never, prior to submitting a posthearing brief, sought to include in the complaint an allegation that the Policy was maintained in a manner that restricted employees' Section 7 rights. See *Oncor Electric Delivery Co.*, 364 NLRB 677, 684-685 (2016), remanded in part on other grounds 887 F.3d 488 (D.C. Cir. 2018) (motion to amend made on the final day of hearing denied where General Counsel was aware of the facts underlying the allegation "prior to the beginning of the trial").

The timing of General Counsel's motion to amend is even more mystifying given the parties' opening statements in the case. During her opening statement on the 1st day of the hearing, General Counsel explicitly argued that the Board's decision in *AT&T Mobility, LLC*—which eliminated the remedy of revision or rescission of an otherwise lawful policy that was unlawfully "applied to restrict" employee Section 7 activity—should be overruled in that respect.[20] 370 NLRB No. 121 at p. 7 (2021).

---

[19] The unfair labor practice charge filed by the Union on May 18, 2022, alleged that Apple "has and continues to maintain an overly broad no-solicitation policy intended to discourage employees from engaging in union activity." GC Exh. 1(a).

[20] "In addition, General Counsel will be requesting the administrative law judge here to overturn AT&T Mobility. . . And order a remedy that would include Respondent rescinding its solicitation and distribution policy, and upon restoration of this policy, disclaim that Respondent will

As the Board discusses at length in *AT&T Mobility, LLC*, the revision or rescission remedy was premised upon the theory that the application of a lawful rule to restrict Section 7 activity engenders a conclusion that the rule itself was unlawful to maintain – a theory that the Board in *AT&T Mobility, LLC* rejected. 370 NLRB No. 121 at p. 1–2, 5–7. Yet at no time during the hearing did General Counsel move to amend the complaint to include an allegation that Apple maintained its Solicitation and Distribution Policy in a manner which restricted its employees' Section 7 activity. Apple specifically addressed the rescission and revision remedy and the import of *AT&T Mobility, LLC* in its posthearing brief, presumably based upon General Counsel's remarks in her opening statement. (R. Posthearing Br. at 45–47.) However, Apple was never on notice that an allegation that it had maintained its Solicitation and Distribution Policy in a manner which restricted employees' Section 7 rights was at issue.

With regard to the second component of the analysis, General Counsel has provided no "valid excuse" for the delay in moving to amend the complaint to include an allegation that Apple unlawfully maintained its Solicitation and Distribution Policy in a manner which restricted employee Section 7 activity. General Counsel provides no explanation whatsoever in her posthearing brief for why such a motion to amend the complaint was not made before the record closed, particularly when one motion to amend was made prior to the hearing's opening and another was made on the record. While General Counsel claims that the proposed amendment is based upon the testimony of Apple's witnesses regarding the enforcement of Solicitation and Distribution Policy, she points to no new information revealed by such testimony which would excuse the failure to move to amend the complaint before the hearing concluded. General Counsel's failure to provide any explanation or mitigating circumstances militates against granting a motion to amend raised in a posthearing brief. See *Graphic Communications Conference/Teamsters Local 137(C)*, 359 NLRB 265, 266 (2012) (motion to amend raised in posthearing brief denied where General Counsel "offers no explanation as to why he did not raise the motion before the record closed"); *Oncor Electric Delivery Co.*, 364 NLRB at 685 (motion to amend made on the final day of trial denied where "General Counsel offered no reason for why the motion to amend was not made earlier").

General Counsel argues that the motion to amend should be granted because it merely articulates a "new theory" for a violation of Section 8(a)(1) based upon the record evidence adduced at trial, citing *Hawaiian Dredging Construction Co.* and *Parexel International, LLC*. (GC Posthearing Br. at 35–36); *Hawaiian Dredging Construction Co.*, 362 NLRB 81 (2015), remanded on other grounds 857 F.3d 877 (D.C. Cir. 2017), vacated 368 NLRB No. 7 (2019); *Parexel International, LLC*, 356 NLRB 516 (2011). However, both of those cases involved violations of Section 8(a)(3) grounded in basic allegations of retaliation for union and/or protected concerted activity. See *Hawaiian Dredging Construction Co.*, 362 NLRB at 82, fn. 6 (*Wright Line* theory encompassed by allegation that Respondent discharged employees "because [they] were members of the Union" in violation of

Section 8(a)(3)); *Parexel International, LLC*, 356 NLRB at 517 ("preemptive strike theory" sufficiently related to complaint allegations that employee "engaged in concerted activities with other employees. . .by discussing wages" and was subsequently discharged by Respondent "to discourage employees from engaging in these or other concerted activities"). Here, by contrast, the violation raised by the motion to amend—the b of a Solicitation and Distribution Policy in a manner which restricted employee Section 7 activity—is distinct from the alleged confiscation of union flyers and disparate enforcement of the Policy described in the amended complaint. Thus, the violation raised by the proposed amendment is not a theory amenable to being encompassed by or subsumed in the Amended–'s extant allegations. Furthermore, the standard applied by the Board in cases such as *Parexel International, LLC* to find and remedy a violation not explicitly alleged in a complaint is different from the analysis articulated in *Stagehands Referral Service, LLC* and similar cases for determining whether an ALJ abused their discretion in granting a motion to amend. See *CAB Associates*, 340 NLRB at 1398 (Board may find and remedy a violation not specifically alleged "if the issue is closely connected to the subject matter of the complaint and has been fully litigated"); *Parexel International, LLC*, 356 NLRB at 517 (same).

For all of the foregoing reasons, Apple was not provided with notice of the proposed amendment prior to the submission of posthearing briefs, and General Counsel has not articulated any explanation for the failure to move to amend the complaint at an earlier time. As a result, General Counsel's motion to amend the complaint to include an allegation that Apple maintained its Solicitation and Distribution Policy in a manner that restricted employee Section 7 activity is denied.

### 2. The Legal Framework

It is well-established that employees are permitted to engage in solicitation and to distribute union literature during non-working time and in nonworking areas, absent a showing of "special circumstances" necessary for the employer to "maintain production or discipline." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797, 801, 805 (1945); *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 2, 23 (2018). The Board has stated that, "Interference with employee circulation of protected material in nonworking areas during off-duty periods is presumptively a violation of the Act unless the employer can affirmatively demonstrate the restriction is necessary to protect its proper interest." *Waste Management of Arizona, Inc.*, 345 NLRB 1339 fn. 2, 1346 (2005), quoting *Champion International Corp.*, 303 NLRB 102, 105 (1991). In order to overcome the presumption that a rule restricting such employee activities is unlawful, an employer "must show a compelling and legitimate business reason necessitating" the restrictions it has imposed. *Waste Management of Arizona, Inc.*, 345 NLRB at 1346, citing *Midland Transportation*, 304 NLRB 4, 5 (1991); see also *Mercedes-Benz U.S. International, Inc. (MBUSI)*, 361 NLRB 1018, 1028 (2014) (employer bears the burden of establishing "special circumstances warranting an exception to the rule that employees not on working time have

---

modify the policy against employees for engaging in activities protected by Section 7 of the Act." Tr. 15.

the right to distribute union literature to other such employees in a mixed use area").[21]

Consonant with the foregoing, the confiscation of union literature from non-work areas generally constitutes a violation of Section 8(a)(1) of the Act absent such a showing of special circumstances. See, *Valley Health System, LLC d/b/a Desert Springs Hospital Medical Center*, 369 NLRB No. 16 at p. 2, 16 (2020); *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 2, 23 (2018), enf'd. 775 Fed.Appx. 752 (D.C. Cir. 2019). Indeed, the Board has held that it is unlawful for an employer to confiscate union literature even if the employer could under the circumstances legally prohibit its distribution. *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 23, citing *Manorcare Health Services-Easton*, 356 NLRB 202, 204–205 (2010).

Finally, it is well-settled that the disparate or discriminatory enforcement of a facially permissible no-solicitation or no-distribution policy, in order to prohibit the dissemination of union literature while the distribution of other materials is permitted, also violates Section 8(a)(1) of the Act. See, e.g., *Novelis Corp.*, 364 NLRB 1452, 1453, fn. 10, 1489; *Intertape Polymer Corp.*, 360 NLRB 957, 958 (2014); *Ozburn-Hessey Logistics, LLC*, 357 NLRB 1632, fn. 5, 1638 (2011).

3. The Removal of union flyers from the Breakroom Table

The evidence establishes that Apple managers repeatedly removed Union literature from the table in the employee breakroom on the ground floor of the WTC store. Specifically, witness testimony and Apple's continuous video of the breakroom establishes that Store Leader Waleed Abdelal and manager Matt Moya removed union flyers on May 15, 2022. (Tr. 53–55, 58, 127; GC Exh. 4 at 1:50:27-1:50:35, 1:51:08-1:51:24, 5:11:15-5:11:33.) Such evidence further demonstrates that Union literature was removed from the breakroom table on June 1, 2022, by senior manager Jorge Romero. (Tr. 144–145; GC Exh. 8 at 7:40:19-7:41:05.) Finally, the evidence establishes that on May 27, 2022, Senior Manager Yanell Brown removed flyers from the breakroom table, as depicted in a video recording made by O'Hara. (Tr. 135–138; GC Exh. 7.) There is no general contention that the employee breakroom is a work area, that Vasquez and O'Hara were on work time when they placed union flyers on the breakroom table, or that any other employees in the breakroom were on work time.

As a result, Apple is required to establish special circumstances that justify its removal or confiscation of union flyers

from the breakroom table. Apple advances two general rationales to support its removal of union literature from the breakroom table—its Solicitation and Distribution Policy and its housekeeping or cleanliness standards. For the following reasons, I find that the evidence does not substantiate either of these contentions.

Apple begins by arguing that its breakroom table is analogous to a bulletin board, so that its uses could lawfully be restricted to prohibit all nonbusiness-related matters, including the posting of union materials. (R. Posthearing Brief at 32–33.) This contention is not persuasive. While a bulletin board is generally established and maintained by an employer for the express purpose of communication with employees, a breakroom table is not. Thus, caselaw cited by Apple which permits an employer to restrict the use of a bulletin board is irrelevant. See, e.g., *Honeywell, Inc.*, 262 NLRB 1402 (1982), enf'd, 722 F.2d 405 (8th Cir. 1983). In support of this argument Apple discusses *Shamrock Foods Co.*, where the ALJ, affirmed by the Board, found that the respondent employer could lawfully remove union literature from an information counter the employer maintained in its employee breakroom. 366 NLRB No. 117 at p. 1, fn. 3, 23–24. However, in analogizing the information counter in that case to a bulletin board, the ALJ found that the information counter was "used by the Company for displaying or distributing health and fitness information." *Shamrock Foods Co.*, 366 NLRB No. 117 at p. 23–24. The breakroom table at issue here, by contrast, was not used by Apple to provide company-generated information to employees; indeed, immediately outside the breakroom was a bulletin board maintained by Apple specifically for that purpose. There is no dispute that the breakroom table was used by the employees for non-business activities, such as eating meals, playing games, and casual conversation, during employees' non-work time such as lunch and breaks. Thus, Apple's argument that the breakroom table constituted some sort of "Apple system (electronic or physical)" which could not be used "to distribute materials or solicit employees" pursuant to its Solicitation and Distribution Policy is not compelling. (Jt. Exh. 1; R. Posthearing Brief at 32–33.)

Apple next argues that its housekeeping and cleanliness standards applicable at the WTC store permitted the removal of union flyers from the breakroom table, pursuant to *Page Avjet* and *North American Refractories Co.*[22] *Page Avjet*, 278 NLRB 444, 450 (1986) and *North American Refractories Co.*, 331 NLRB 1640, fn. 1, 1641, 1642–1643 (2000); see also *Mitchellace, Inc.*,

---

[21] "Mixed-use areas" are areas inside a facility used for both work and non-work related purposes. See, e.g., *Novelis Corp.*, 364 NLRB 1452, 1453, fn. 10 (2016); *DHL Express, Inc.*, 357 NLRB 1742 fn. 1 (2011).

[22] The Board noted in *North American Refractories Co.* that no exceptions were filed to the ALJ's recommended dismissal of the allegation in that case that the respondent employer enforced its housekeeping and distribution rules in a disparate or discriminatory manner. 331 NLRB at 1640, fn. 1. As a result, that issue was never considered by the Board, and based solely upon the Board's decision in that case the ALJ's findings on the issue would lack precedential value. However, in *Ozburn-Hessey Logistics, LLC*, the Board in its decision specifically referred to *North American Refractories Co.* as "holding that an employer may lawfully maintain and enforce housekeeping rules that result in the confiscation from nonworking areas of prounion literature left behind following break periods." 366 NLRB No. 177 at p. 11 (2018), enf. granted and

denied in part on other grounds 803 Fed.Appx.876 (6th Cir. 2000). As a result, *North American Refractories Co.* will be addressed herein.

In *Enloe Medical Center*, 345 NLRB 874, 881 (2005), also cited by Apple, the ALJ, citing *Page Avjet, Inc.* and *North American Refractories Co.*, stated that "Employers may prohibit the leaving of materials in nonwork areas." However, the Board in *Enloe Medical Center* stated that it was "unnecessary to pass on the judge's finding that employers may prohibit the leaving of materials, including union literature, in nonwork areas" given its conclusion that the employer violated Sec. 8(a)(1) by explicitly prohibiting employees from placing union literature in the breakroom. 345 NLRB at 877-878, fn. 15. Thus, *Enloe Medical Center* is not precedential authority for the proposition that, as the Board described the ALJ's finding, "employers may prohibit the leaving of materials in nonwork areas." 345 NLRB at 877.

321 NLRB 191, 198–199 (1996).[23] However, I find that these cases are inapposite given the record evidence here. First of all, the evidence does not establish that prior to May 15, 2022, Apple maintained a coherent housekeeping or cleanliness policy with respect to the employee breakroom table at the WTC store. No such written policy was introduced into evidence by Apple. See *North American Refractories Co.*, 331 NLRB at 1641 ("Company policy concerning housekeeping. . . contained in the employee handbook" and "addressed frequently by management officials at employee meetings"). Furthermore, the general contentions made by Apple's managers regarding its purported housekeeping and cleanliness policy were belied by video of the breakroom introduced into evidence.

General Counsel and Apple both introduced into evidence continuous video created by Apple of the employee breakroom at the WTC store during the store's operating hours. General Counsel introduced video taken on May 15, 2022 (GC Exh. 4), and on June 1, 2022 (GC Exh. 8), while Apple introduced video taken on May 29, 2022 (R. Exh. 24), May 30, 2022 (R. Exh. 29), and June 2, 2022 (R. Exh. 30). (See Tr. 344–346, 375–376.) As an evidentiary matter, the May 15, 2022 video is substantially more probative with respect to the application of Apple's Solicitation and Distribution Policy, and its housekeeping and cleanliness standards, at the time its managers removed the Union literature from the employee breakroom table. As discussed above, May 15, 2022 was the day that the Union "went public" with respect to the organizing campaign, and the 1st day that the employees placed flyers on the breakroom table. Furthermore, the initial unfair labor practice charge in the instant case, alleging that Apple maintained an overly broad no-solicitation policy, was filed on May 18, 2022. (GC Exh. 1(a-b).) Therefore, the May 29 and 30, 2022, and June 1 and 2, 2022 videos were all recorded after at least two incidents where Vasquez and O'Hara placed union literature on the breakroom table which was removed by Apple managers, and after the initial charge in this case was filed.[24]

Given these considerations, it is important to note that the May 15, 2022 breakroom video in evidence as General Counsel's Exhibit 4 corroborates the testimony of Vasquez and O'Hara, and not Apple's witnesses, with respect to Apple's purported housekeeping and cleanliness policy or standards. Specifically, the May 15, 2022 video shows at its very inception approximately

three bottles and several other items on the breakroom table. GC Exh. 4 (0:00:00-0:00:10). While several managers, including Abdelal and Radechal, enter and exit the breakroom almost immediately after the recording begins, none of them remove these items from the breakroom table.[25] See Tr. 51; GC Exh. 4 (0:0:10-0:0:15, 0:49:55-0:50:00 (Abdelal), 0:01:40-0:04:10, 0:49:33-0:49:42 (Radechal)). Some of the items are removed by a member of the cleaning contractor staff about 45 minutes after the video begins at 7 a.m., but others are not removed by the cleaning staff until over six hours later.[26] (GC Exh. 4 (0:47:58-0:49:05, 7:15:04-7:15-54).) Furthermore, about two hours after the video begins a basket of fruit is placed on the breakroom table, and is not removed until seven hours later, well after it is completely empty. (See GC Exh. 4 (1:43:54, 8:48:31-8:48:42).) The May 15, 2022 video does not show *any* of the several managers who enter and exit the breakroom cleaning, tidying, or organizing the breakroom in any way. (See, e.g., GC Exh. 4 (38:28, 5:07:45-5:07:58).)

Thus, the most probative video evidence conclusively contradicts the testimony of Apple's witnesses regarding the purportedly critical nature of cleanliness and organization in the employee breakroom, and regarding the managers' role in maintaining Apple's vaunted standards of housekeeping. For example, Jennison testified that Apple managers were "popping and out" of the breakroom "throughout the day" "whenever you have a spare minute" to check on its "condition," and ensure that it was "really organized and clean." (Tr. 229, 231.) Abdelal testified that the managers' cleaning and organization of the breakroom was "part of our values our DNA," and "like breathing. We just literally do it all the time…you would just go there and you would clean up as you saw things." (Tr. 302, 307.) Abdelal further stated, "I intentionally make sure that the team always sees me picking up trash" in "the back of the house." (Tr. 302–303.) Brown claimed during his testimony that Apple managers "want to make sure like we're cleaning up really proactively." (Tr. 272.) Jennison also testified that at the end of the day managers "reset the break room back to clean," so that the "next morning the place looks like it did when it opened for the very first time." (Tr. 231–232.) Abdelal echoed this testimony, stating that it "would be incredibly unlikely in our space to find anything left behind, especially overnight" given the housekeeping and cleanliness standards in effect at the WTC store. (Tr. 306–307.) The

---

[23] The ALJ in *Mitchellace, Inc.* cited to *Steelcase, Inc.* for the proposition that "The mere fact of a supervisor removing union literature from a break area does not constitute a violation of the Act – or rather, does not where the supervisor routinely helps keep the break area clean." *Mitchellace, Inc.*, 321 NLRB at 198, citing *Steelcase, Inc.*, 316 NLRB 1140, 1143–1144 (1995). However, the Board in *Steelcase, Inc.* stated that it had affirmed the ALJ's holding in that case that a supervisor's removal of union newsletters from tables in the employee breakroom was not unlawful "In the absence of exceptions." 316 NLRB at 1140, fn. 2. As a result, *Steelcase, Inc.* lacks precedential import in this respect.

[24] General Counsel introduced into evidence photographs taken by Vasquez of items on the breakroom table in the Apple store in Texas where he is currently employed. Tr. 66–68; GC Exh. 5. I do not find that these photographs are probative with respect to the application of Apple's Solicitation and Distribution Policy and housekeeping and cleanliness standards at the WTC store. Apple also elicited testimony regarding the application of its Solicitation and Distribution Policy and

housekeeping and cleanliness standards at other stores, which I also find irrelevant to the events at the WTC store. Tr. 299–304, 352–353. Finally, Apple adduced testimony regarding the application of its Solicitation and Distribution Policy in areas of the WTC store open to customers, and with respect to customers waiting on the sidewalk to be admitted to the store. Tr. 255–228, 304–306, 352–357. I find that such evidence is not relevant with respect to the enforcement of the Policy in areas of the store accessible only to employees.

[25] Abdelal and Radechal have been identified in these portions of GC Exh. 4 based upon identifications made by Vasquez while viewing this Exhibit during his testimony. Tr. 51, 53–54; GC Exh. 4 (0:49:43-0:49:55, 1:47:16, 1:51:08-1:51:24). The parties stipulated that Vasquez accurately identified the various managers depicted in GC Exh. 4. Tr. 111–112.

[26] As a result, some of these items are still on the breakroom table when Abdelal first removes the union flyers. See GC Exh. 4 (1:51:07-1:51:23).

video evidence from May 15, 2022 flatly belies all of this testimony. Instead, the video corroborates Vasquez and O'Hara's testimony regarding items left on the breakroom table throughout one of their shifts, and from 1 day to the next.

Even the videos taken after the Union began to openly campaign and the instant charge was filed contradict Apple's witnesses with respect to the application of its purported housekeeping and cleanliness policy. In the four videos taken after the charge in the instant case was filed, three of which Apple introduced into evidence, over approximately 38 hours of video Apple points to only a single instance where a manager removes items from the breakroom table.[27] (R. Exh. 24 (5:49:25); Tr. 174-177); see generally (GC Exh. 8; R. Exh. 24, 29, 30). As in the May 15, 2022 video, video from June 1, 2022, does not show any of the Apple managers who enter the breakroom cleaning or organizing. ()See GC Exh. 8 (3:10:12-3:10:56, 3:11:23-3:13:13). Thus, the video evidence contradicts the testimony of Apple's managers to the effect that managers cleaned and organized the breakroom and the breakroom table on any sort of a consistent basis pursuant to a housekeeping or cleanliness standard then in effect. Furthermore, the videos conclusively demonstrate that when Apple managers removed union flyers from the breakroom table, they did not do so as part of some overall effort to clean or organize the breakroom. Instead, they entered the breakroom, removed the union flyers from the table, and left without performing any other cleaning, organization, or overall "sweep."[28]

Other specific circumstances at issue in the cases discussed above involving the legitimate removal of union literature pursuant to an employer's housekeeping policy or standard of cleanliness also render them inapposite. For example, in *North American Refractories Co.* and *Page Avjet, Inc.*, the record established that leaflets were left not only on breakroom tables after break times concluded, but "remained on the counters, microwaves, refrigerator and floor" engendering "employee Complaints due to the disarray." *North American Refractories Co.*, 331 NLRB at 1641, 1643; *Page Avjet, Inc.*, 278 NLRB at 450 (union literature "scattered on the floor" of the breakroom as well as "left on the tables"). Here, by contrast, the video evidence confirms Vasquez and O'Hara's testimony that they placed four Union flyers neatly on the breakroom table only. Nor is there any evidence that other Apple employees complained about the Union flyers, or about some state of disorganization that the flyers created. Furthermore, there is no evidence here that Apple

specifically informed employees that they were permitted to distribute union flyers in nonwork areas during breaks, or that the employees did so. See *North American Refractories Co.*, 331 NLRB at 1641, 1642–1643; see also *Page Avjet, Inc.*, 278 NLRB at 450. In addition, in *Page Avjet, Inc.* the alleged violation was based upon a supervisor's admission that "on the one occasion he did pick up the union literature and place it on a table outside the break area." 278 NLRB at 450. Here, by contrast, Apple managers repeatedly returned to the breakroom throughout the day and specifically removed union flyers on multiple occasions, discarding and/or shredding them. Nor did Apple managers permit the union flyers to remain on the table for an entire shift, but removed them as soon as they were discovered. See *Mitchellace, Inc.*, 321 NLRB at 199 (supervisor left union notices on break area tables "for more than 10 hours, including through two break periods and the lunch period"). As discussed herein, after removing Union flyers, Apple managers did not place them in another area where employees could possibly encounter them, but threw them away or shredded them. Thus, the evidence establishes that the managers at the WTC store "specifically targeted union literature for removal" in an unlawful manner. *Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 177 at p. 11.

For all of the foregoing reasons, the evidence establishes that Apple's Solicitation and Distribution Policy did not permit Apple to lawfully remove union flyers from the employee breakroom table, nor did its housekeeping and cleanliness standards. Thus, the evidence does not substantiate any "special circumstances" justifying Apple's removal of union flyers from the employee breakroom table. As a result, I find that the confiscation of union flyers from the employee breakroom on May 15, 2022, May 27, 2022, and June 1, 2022, violated Section 8(a)(1) of the Act.

The evidence further establishes that Apple enforced its Solicitation and Distribution Policy and its housekeeping and cleanliness standards in a discriminatory manner to prohibit the distribution of the union flyers. I credit Vasquez and O'Hara's testimony that they had seen coupons for Shake Shack and Burger King, as well as newspapers,[29] in the breakroom, and that such materials had remained on the breakroom table for an entire shift and were sometimes present at the beginning of their shift the following day. (Tr. 64–65, 92–93, 94–96, 149–150, 165–166, 166–167.) Apple argues in its posthearing brief that Vasquez and O'Hara only described approximately nine incidents where coupons or newspapers were left on the breakroom

---

[27] The other evidence referred to by Apple in its Posthearing Brief consists of employees cleaning up after themselves after using the breakroom table, which is consistent with Vasquez and O'Hara's testimony, or periods where the breakroom table is clean. R. Posthearing Brief at 43–44; Tr. 68, 150–151.

[28] Such a finding is consistent with Abdelal's testimony regarding his own removal of the Union flyers on May 15, 2022. Although Abdelal testified that he told the other managers that they should "clean [Union flyers] up like anything else" if they were "abandoned," he stated that on May 15, 2022, he specifically "went in and took them and threw them out," as opposed to removing the union flyers as part of an overall effort to clean and organize the breakroom. Tr. 310–312.

[29] Apple's contention that leaving newspapers on the breakroom table while removing union flyers does not constitute disparate enforcement

of its Solicitation and Distribution Policy pursuant to *St. Luke's Memorial Hospital*, 342 NLRB 1040 (2004), is not persuasive. R. Posthearing Brief at 39–40. In *St. Luke's Memorial Hospital*, the Board found that local newspapers provided by the respondent employer in a cafeteria which was "open to the general public" "for the convenience of the cafeteria patrons" did not constitute "sufficient evidence of discrimination" with respect to respondent's enforcement of its No-Solicitation/No-Distribution Policy to prohibit the distribution of union literature and deny access to union representatives. 342 NLRB at 1041–1042, 1045. Here, the employee breakroom was not open to the public, and there is no evidence that the newspapers in question were provided by Apple for the convenience of employees.

table at the WTC store. (R. Posthearing Brief at 37–38.) However, when arguing that its Solicitation and Distribution Policy was consistently applied and enforced, Apple's witnesses only identified four to five specific incidents where coupons and menus from restaurants were removed from the breakroom table at the WTC store. (R. Posthearing Brief at 42–43.) Jennison and Abdelal testified without contradiction regarding two specific incidents where they informed employees that they were not permitted to leave flyers in the breakroom advertising their own performance and a going-away party.[30] (Tr. 234–235, 307–308.) However, I am cognizant that these witnesses were not credible when recounting their activities in connection with Apple's purported housekeeping and cleanliness policy. Thus, on balance, the evidence establishes that the Solicitation and Distribution Policy was not consistently applied with respect to the employee breakroom at the WTC store.

The unprecedented manner in which Apple's managers effectuated the Solicitation and Distribution Policy in removing the Union flyers also indicates that this did not constitute an even-handed, non-discriminatory application of the Policy. Abdelal testified that after the other WTC store managers informed him about the Union flyers on May 15, 2022, he removed them pursuant to the Solicitation and Distribution Policy and housekeeping standards, instructing the managers that "abandoned" Union flyers should be cleaned up "like anything else." (Tr. 310–312.) However, nothing in the May 15, 2022 breakroom video, or any of the other record evidence, indicates that Abdelal took any measures to determine whether the union flyers were "abandoned." Abdelal simply entered the breakroom, took the flyers, and left. (GC Exh. 4 (1:51:07-1:51:23).) Nor does any evidence indicate that Moya, Brown, or Romero made any attempt to determine whether the Union flyers they removed from the breakroom table on May 15, 2022, May 27, 2022, or June 1, 2022, were "abandoned."[31] Instead, managers entered a breakroom containing multiple employees engaged in non-work activities and removed union flyers from around those employees. In addition, the breakroom videos establish that, as Jennison testified, the breakroom was constantly busy with employees on non-work time eating, conversing, reading, and playing games. As Jennison testified, "the break room it's busy all hours, 6:30 in the morning, 10:30 at night and so, you know, it's just kind of this ongoing, just kind of never ends." (Tr. 231.) Thus, while the store was open there was no set conclusion to break periods, such that an empty breakroom would permit managers to determine whether or not materials which remained there were "abandoned." As a result, the managers' removal of union flyers before the day ended inevitably prevented other employees from

viewing them. *Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 177 at p. 3, 10–11.

In addition, the breakroom videos establish that Moya photographed the union flyers on May 15, 2022, an action that Vasquez testified he had never witnessed previously. Abdelal's testimony that photographing the breakroom was not unusual "to celebrate. . .someone did a really great job," "let us know something was in the breakroom," or draw attention to "when standards have been unacceptable" is not corroborated and simply incredible. (Tr. 326, 341.) Given the lack of evidence to establish that photographing items on the breakroom table constituted a routine practice, I find Moya's photographing of the union flyers constitutes a distinct change in the manner in which Apple's Solicitation and Distribution Policy was applied or enforced, specific to materials involving the Union. The evidence further establishes that the unprecedented shredding of union flyers removed from the breakroom table constitutes an additional departure from Apple's typical practices with respect to the Solicitation and Distribution Policy, as per Jennison's testimony. (Tr. 148–149, 252.) In this respect, I discredit as implausible Abdelal's claim, after testifying that he "may have" told Moya to shred the union flyers Moya removed from the breakroom table on May 15, 2022,[32] that other materials which violated the Policy were sometimes shredded as opposed to simply discarded. (Tr. 326–329.) In fact, Abdelal provided no coherent explanation for how he determined which materials should be shredded as opposed to thrown out, stating that materials which were "federal per legal anything that we need to get rid of" were shredded, and that the managers did "Whatever we felt needed to be done" with respect to shredding as opposed to discarding items. (Tr. 328.) Thus, the evidence establishes that the shredding of the union flyers, as directed by Store Leader Abdelal, constituted a departure from the typical application of Apple's Solicitation and Distribution Policy.

For all of the foregoing reasons, the evidence establishes that Apple enforced its Solicitation and Distribution Policy in a disparate or discriminatory manner by removing union flyers from the table in its employee breakroom at the WTC store on May 15, 2022, May 27, 2022, and June 1, 2022, in violation of Section 8(a)(1) of the Act.

CONCLUSIONS OF LAW

1. Respondent Apple, Inc. is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Communications Workers of America, AFL–CIO ("the Union") is a labor organization within the meaning of Section 2(5) of the Act.

---

[30] Distasio's testimony in this regard, discussed by Apple in its Posthearing Brief, involved discussions on the sales floor as opposed to a non-customer area, at stores other than the WTC Store. Tr. 352–353.

[31] Brown claimed during his testimony that he did not realize on May 27, 2022, that the items he removed from the breakroom table were union flyers, testimony that I do not credit given the fact that the Union's campaign had "gone public" 12 days earlier and Abdelal's testimony regarding the degree of consternation that the union flyers had caused among the WTC store's managers. Tr. 271; see Tr. 310, 311, 331–334. Brown further contended that he spoke to an employee seated at the breakroom table to determine whether the union flyer was the employee's before

removing it. Tr. 271–272. Given Brown's unreliable claim that he did not realize that he was removing Union flyers from the breakroom table, I credit O'Hara's testimony that Brown did not in fact speak to the employee seated at the breakroom table before removing the flyer, conduct also not evinced by O'Hara's video of the incident. Tr. 133–134, 271–272; GC Exh. 7. I note that in O'Hara's video, the seated employee is wearing earbuds and is not interacting with Brown.

[32] I further credit in this respect that O'Hara's unrebutted testimony that Romero stated that he had shredded the union flyers he removed from the breakroom table on June 1, 2022.

3. On May 9, 2022, Apple coercively interrogated employees regarding their protected concerted activity and their union sympathies, in violation of Section 8(a)(1) of the Act.

4. On May 15, 2022, May 27, 2022, and June 1, 2022, Apple confiscated union flyers in its employee breakroom, a non-working area, in violation of Section 8(a)(1) of the Act.

5. By prohibiting the placement of union flyers on the employee breakroom table on May 15, 2022, May 27, 2022, and June 1, 2022, while permitting solicitation and distribution with respect to nonunion materials, Apple selectively and disparately enforced its Solicitation and Distribution Policy, in violation of Section 8(a)(1) of the Act.

6. The unfair labor practices described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

### The Remedy

Having found that Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the Act's policies.

Respondent shall post an appropriate information notice, as described in the attached Appendix. This notice shall be posted in the Respondent's facility at 185 Greenwich Street, New York, New York, wherever notices to employees are regularly posted, for 60 days, without anything covering the notice or defacing its contents. In addition to the physical posting of paper notices, notices shall be distributed electronically, posted on an intranet or an internet site, and/or other electronic means, to the extent Respondent customarily communicates with its employees in such a manner. In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed its 185 Greenwich Street facility, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since May 1, 2022.

General Counsel requests as part of the remedy that I order Respondent to rescind or revise its Solicitation and Distribution Policy, which was applied in a manner that restricted its employees in the exercise of their Section 7 rights. As discussed in detail above, such a remedy was eliminated by the Board in *AT&T Mobility, LLC*, 370 NLRB No. 121 (2021). As an Administrative Law Judge, I am required to apply existing Board precedent that has not been overruled by the Board itself or by the Supreme Court. See *Pathmark Stores, Inc.*, 342 NLRB 378, 378 fn. 1 (2004); *Waco, Inc.*, 273 NLRB 746, 749 fn. 14 (1984). Thus, General Counsel's request for an order requiring that Respondent revise or rescind its Solicitation and Distribution Policy is denied.

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended[33]

### ORDER

Apple, Inc., its officers, agents, successors and assigns shall

1. Cease and desist from

(a) Coercively interrogating employees regarding their

protected concerted activities and union sympathies.

(b) Confiscating union flyers from its employee breakroom, a non-working area.

(c) Selectively and disparately enforcing its Solicitation and Distribution Policy by prohibiting the placement of union flyers on the employee breakroom table, while permitting solicitation and distribution with respect to nonunion materials.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days after service by the Region, post at its facility at 185 Greenwich Street, New York, New York, copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If Respondent has gone out of business or closed the 185 Greenwich Street facility, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since May 1, 2022.

(b) Within 21 days after service by the Region, file with the Regional Director for Region 2 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that Respondent has taken to comply.

Dated, Washington, D.C. June 20, 2023

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT coercively interrogate you regarding your protected concerted activities and your sympathies or sentiments with respect to Communications Workers of America, AFL–CIO (the Union)

WE WILL NOT confiscate union flyers in our employee

---

[33] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

18            DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

breakroom, a nonworking area.

WE WILL NOT selectively and disparately enforce our Solicitation and Distribution Policy by prohibiting the placement of union flyers on the employee breakroom table, while permitting solicitation and distribution with respect to nonunion materials.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed to you by Section 7 of the Act.

APPLE, INC.

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case_02-CA-295979 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

